UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AKIACHAK NATIVE COMMUNITY<br>  et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>DEPARTMENT OF THE INTERIOR,<br>  et al.<br><br>   Defendants.[1] | No. 1:06-cv-00969 (RWR) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE AND TO SUSPEND OBLIGATION TO ANSWER IN THE DISTRICT OF COLUMBIA**

In their Complaint filed on May 24, 2006, the Akiachak Native Community, et al., ("Plaintiffs") seek declaratory and injunctive relief concerning the Department of the Interior's ("Interior"or "Defendants") policy not to acquire land in trust status in the State of Alaska for Indians.  More precisely, Plaintiffs are challenging the rule promulgated by Interior regarding acquisitions by the United States of land in trust status for Indians, published in 1980 and currently codified at 25 C.F.R. Part 151.  Section 151.1 states in relevant part, "[t]hese regulations do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its members."     Underlying this regulatory challenge is the Plaintiffs' position that the Secretary of the Interior lacks discretion to categorically exclude trust land acquisitions in Alaska, notwithstanding enactment in 1971 of the Alaska Native Claims Settlement Act, 43 U.S.C. §

---

[1]     Pursuant to Fed.R.Civ.P 25(d), Dirk Kempthorne, Secretary of the Interior, should be substituted for P. Lynn Scarlett.

1601 et seq. ("ANCSA"). ANCSA extinguished aboriginal rights to land and water, revoked then-existing reservations, and disclaimed any intent to create a trusteeship.

The bottom-line relief sought by Plaintiffs in this lawsuit – that the United States consider applications to hold land in trust status in Alaska – is ultimately based on Plaintiffs' local interest objectives of securing immunity from state and local taxation (Compl. ¶ 45); protecting land from alienation (Compl. ¶ 43); and exercising tribal sovereignty (Compl. ¶¶ 34, 39).

As demonstrated below, there is no particular connection between this case (and the ultimate relief sought by Plaintiffs), and the District of Columbia. For that reason and pursuant to 28 U.S.C. §1404 (a), the Defendants move to transfer venue of this case to the United States District Court for the District of Alaska, the only place where the policy at issue applies and its impacts are felt.

## STATUTORY AND REGULATORY BACKGROUND

Plaintiffs' underlying claims implicate ANCSA and Interior's regulations which describe Interior's policy and process for acquiring lands in trust for Indians, promulgated at 25 C.F.R. Part 151. The policy challenged by Plaintiffs is not a national policy. It applies only to land located in the State of Alaska. The uniquely Alaskan interests and Alaskan legal issues that necessarily arise from Plaintiffs' claims, as a threshold matter, require the Court's consideration of whether or not the claims should be brought in the District of Columbia. Thus, pursuant to 28 U.S.C. §1404 (a), the Court should determine whether venue in the District of Columbia is appropriate. The following paragraphs briefly explain the laws and regulations that are implicated by the requested relief and the basis for the transfer of this case to Alaska.

**A.  The Alaska Native Claims Settlement Act ("ANCSA")**

"ANCSA embodied a novel and experimental approach in the settlement of Native claims."  D. Case and D. Voluck, Alaska Natives and American Laws 168 (2d ed. 2002). Section 2(b) of ANCSA declares as the congressional policy that:

> the settlement should be accomplished . . . with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property or institutions enjoying special tax privileges or to legislation establishing special relationships between the United States Government and the State of Alaska.

43 U.S.C. § 1601(b).

In exchange for relinquishing all aboriginal title and claims to land in Alaska, Alaska Natives received 44 million acres of land and $962.5 million in monetary compensation.  See 43 U.S.C. §§ 1603, 1611, 1613, 1615.  Congress eliminated the prior forms of Native land tenure in the State, revoking all existing reservations in Alaska except one (the Annette Island Reserve for the Metlakatla Indian Community, whose members are not eligible for benefits under the Act), and substituted in their place a novel form of land ownership.  See 43 U.S.C. §§ 1617, 1618. Unlike prior land claims settlements, Congress directed settlement lands and monies to be conveyed in fee (not in trust) and without permanent restrictions on voluntary or involuntary alienation.  See 43 U.S.C. § 1611.  Under ANCSA, the settlement lands and/or monies provided by the Act were distributed to thirteen regional corporations and to more than two-hundred village corporations.  See 43 U.S.C. §§ 1606, 1607, 1610(b)(1), 1611, 1615.

**B.  Interior Regulations Codified at 25 C.F.R. Part 151**

Interior's general discretionary authority for acquiring land in trust for Indians is Section

5 of the Indian Reorganization Act of 1934, 25 U.S.C. § 465, and Interior's regulations implementing this authority are codified at 25 C.F.R. Part 151. Since their promulgation in 1980, the regulations have expressly provided that they do not cover trust land acquisitions within the State of Alaska for any Indian tribe or individual (except for the Metlakatla Indian Community and its members). 25 C.F.R. § 151.1.

Under Part 151, the criteria that Interior applies in its consideration of trust land applications include (but are not limited to): (1) the impact on the State and its political subdivisions from removing the land from the tax rolls if the land is owned in unrestricted fee; (2) potential jurisdictional problems and conflicts of land use; and (3) whether the Bureau of Indian Affairs ("BIA") within the Interior Department is equipped to discharge additional trust responsibilities relating to the land (including geographical and physical considerations of the land and available administrative resources.) 25 C.F.R. § 151.10. These criteria concern significant policy considerations when placing unrestricted fee land in trust status such as: exemption of the land from state and local taxation; restriction of the land against voluntary or involuntary alienation; and establishment of tribal sovereignty over the land. Thus, in this case the acquisition of land in trust status is significant for both tribes and the State of Alaska, its political subdivisions, and its citizens. It is also significant to the BIA in Alaska, which would assume certain responsibilities with respect to the land.

**C. Change of Venue, 28 U.S.C. Section 1404(a)**

28 U.S.C. § 1404(a) affords the Court wide discretion to determine the appropriate venue of a case based on plaintiff's claims and the issues to be litigated. The Statute states as follows:

> (a) For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it

might have been heard.

## ARGUMENT

I. **TRANSFER OF THIS CASE TO ALASKA IS APPROPRIATE UNDER THE CHANGE OF VENUE STANDARD OF 28 U.S.C. § 1404**

28 U.S.C. § 1404(a) is intended to facilitate transfer of actions to a more appropriate federal forum. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981); Van Dusen v. Barrack, 376 U.S. 612, 616 (1964). In general, a district court acting pursuant to 28 U.S.C. § 1404(a) may transfer an action to another federal forum if two requirements are met. First, as a threshold matter, the proposed transferee district must be one in which the action might have been brought originally. See DeLoach v. Philip Morris Companies, Inc., 132 F. Supp. 2d 22, 24 (D.D.C. 2000). Second, the court must then decide, in the exercise of its discretion, whether the transfer is warranted. In making the latter determination – whether transfer is warranted – the statute requires the Court to examine three factors: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interest of justice. The Court has broad discretion to order transfer under this standard. In re Scott, 709 F.2d 717, 720 (D.C. Cir. 1983). See also Norwood v. Kirkpatrick, 349 U.S. 29 (1955). An analysis of the Section 1404(a) factors demonstrate that transfer to the District of Alaska is appropriate.

    A. **The Transferee Forum In Alaska Is One Where the Case Could Have Been Brought**

A "threshold consideration" in determining the appropriateness of transfer under § 1404(a) is whether the action "might have been brought" in the transferee district. Nichols v. U.S. Bureau of Prisons, 895 F. Supp. 6, 8 (D.D.C. 1995); see also Van Dusen, 376 U.S. at 616 (transfer power is expressly limited by the clause restricting transfer to those districts in which

the action "might have been brought"). This element is certainly satisfied in this case because the lands that are identified in Plaintiffs' Complaint and all other lands that are directly affected by this case are situated only in Alaska. 28 U.S.C. § 1391(b) and (e).

### B. Transfer To Alaska Is In the Interests of Justice

This case should be transferred to Alaska in the interests of justice. "[J]ustice requires that such localized controversies be decided at home." Citizen Advocates for Responsible Expansion, Inc. (I-Care) v. Dole, 561 F. Supp. 1238, 1240 (D.D.C. 1983); Armco Steel Co. v. CXS Corp., 790 F. Supp. 311, 324 (D.D.C. 1991) (the interest in having local controversies decided locally is compelling); Harris v. Republic Airlines, 699 F. Supp. 961, 963 (D.D.C. 1988). Acquisition of land in trust status immunizes the land from state and local taxation, protects the land against alienation, and establishes tribal sovereignty over the land, and thereby implicates considerable economic and political interests.

Although the Plaintiffs' Complaint describes only a few acquisitions that may appear relatively uncontroversial on their face, the declaratory and injunctive relief that Plaintiffs seek implicates broad potential changes to the pattern of Native land tenure, and considerable economic and political interests, across the State of Alaska. Where a case implicates such interests in a large area of the State and the current venue is one with which the affected citizens have little to no connection, the Court has found the local interest compelling and ordered transfer. See Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 26 (D.D.C. 2002). At issue in Shawnee Tribe was whether or not portions of a 9,065 military reservation, designated as surplus property by the General Services Administration, were reservation lands and subject to transfer to Interior to be held in trust for the Tribe. The Court decided that the lawsuit's transfer

from the District of Columbia to the United States District Court in Kansas was appropriate, stating that "the most persuasive factor favoring transfer . . . is the local interest in deciding a sizable local controversy at home." Id. at 26. Central to the Court's opinion was that judicial allocation of the subject property would directly impact counties and neighborhoods in that vicinity of Kansas and implicate considerable local economic, political, and environmental interests. Id. The Shawnee Tribe Court expressed particular concern "about exercising jurisdiction over a case that will affect the development of a massive area in Kansas in a venue with which Kansas citizens have little to no connection." Id.

In another case originally filed in the District of Columbia, Southern Utah Wilderness Alliance v. Norton, 315 F.Supp. 2d 82 (D.D.C. 2004), the plainitff sought venue in the District of Columbia of a dispute involving 21 parcels of land in Utah. There, the Court concluded that National Environmental Policy Act considerations were localized interests which "directly touch[ed] local citizens." Id. at 88. The Court granted the Government's transfer motion stating that "[i]t makes sense that these alleged consequences would be most particularly felt in Utah, and thus that the courts of Utah would have a clear interest in resolving the dispute." Id. citing Trout Unlimited, 944 F.Supp. at 20. In this case, geographic, economic and political ramifications and considerations resulting from review in the District of Columbia will impact Alaska lands, governments, and citizens on a far greater scale than was the case in Shawnee Tribe and Southern Utah Wilderness Alliance, where much smaller land areas were affected.

The declaratory and injunctive relief that Plaintiffs seek in the District of Columbia implicates broad fundamental changes to the pattern of Native land tenure and the distribution of governmental power throughout Alaska. The process itself of receiving and considering land-

into-trust applications on a case-by-case basis would place new burdens on the BIA in Alaska, State and local governments, and affect Alaskan private interests. In addition to these four Plaintiffs and their individual claims and prayers for relief, there are 225 other federally recognized tribes in Alaska that could also seek to have lands placed in trust by filing lawsuits in the District of Columbia.

Plaintiffs' ultimate objective, of course, is to actually have the lands placed in trust status in Alaska which may well have other substantial localized consequences. Trust land is exempt from state and local taxation. Acquisition of land in trust in Alaska may affect the ability of Alaskan State and local governments to finance governmental services, including emergency services and education. Moreover, trust land is restricted against voluntary or involuntary alienation. As a result, the land cannot be foreclosed upon or condemned under eminent domain authority by the State or any local government. Further, Indian tribes exercise tribal sovereignty over trust lands. State, local, and municipal zoning and land use laws, for example, would not apply. Differences between the tribe's and the state/local government's use and regulation of the land may well lead to local intra-Alaskan conflicts.

Even in the absence of anticipated conflicts, a tribe's ability to exercise sovereignty may generally be perceived as encroaching on state and local authority. Applications to acquire land in trust do occasionally generate controversy when the land is located outside of the boundaries of the tribe's reservation over which it is recognized to have governmental jurisdiction. As noted above, Congress' enactment of ANCSA intentionally eliminated all Indian reservations in Alaska except one. Issues such as tribal tax jurisdiction in Alaska have already generated significant local interest and controversy in Alaska. See, e.g., Alaska v. Alaska Native Village

of Venetie Tribal Government, 522 U.S. 520 (1998).

In addition to local interest concerns, it is appropriate for this Court to consider on motion for transfer that the reviewing court may be required to consider laws and regulations that are unique in relation to others concerning Indian tribes and specific in their application to Alaska.  See Shawnee Tribe 298 F. Supp. 2d at 27, Southern Utah Wilderness Alliance, 315 F.Supp. 2d  at 82.   The Court may also take note of the fact that the courts of the Ninth Circuit have considerable experience with the laws concerning Alaska Natives.  See, e.g., Shawnee Tribe,  298 F. Supp. 2d at 21 (expertise of 10th Circuit courts in Indian matters favors transfer).

Thus, compelling Alaskan local, governmental, and economic interests inherent in this lawsuit and the expertise of the 9th Circuit courts concerning such issues strongly favor transfer to Alaska.

        C.      **Transfer To Alaska Will Serve the Convenience of the Parties and Witnesses**

The United States is fully prepared to litigate this matter in Alaska.  Interior employees who are presently assigned to this litigation are headquartered in Washington, D.C., because the case was filed there.  However, upon transfer of the case to Alaska, Interior personnel and attorneys in Alaska stand ready to work on the case.  Interior's Alaska Regional Solicitor's Office has considerable experience with regard to Alaska Native issues.

Plaintiffs have retained counsel both in Alaska and Washington, D.C.  For Plaintiffs and their members who reside in Alaska, presumably litigation in Alaska is decidedly more convenient.  Furthermore, the state and its political subdivisions may wish to participate in this litigation.

Thus, here also, the convenience of the parties and the interests of justice are advanced

by transfer of this case to the District of Alaska.

## II. PLAINTIFFS' CHOICE OF FORUM IS ENTITLED TO LITTLE, IF ANY, DEFERENCE

While the movant bears the burden of demonstrating that transfer is warranted, when a plaintiff chooses a forum that is not its home – as is the case here – the plaintiff's choice of forum is entitled to far less deference than the choice of a home forum.  See Piper Aircraft Co., 454 U.S. 235, 55-56; Shawnee Tribe, 298 F. Supp. 2d at 24-25 (the deference that may ordinarily be due a plaintiff's choice of forum is substantially lessened where suit was brought in the plaintiff's non-home forum and transfer is sought to the forum where the plaintiff resides).

Considered in light of the foregoing factors, Plaintiffs' decision to file the action in the District of Columbia is entitled to little, if any, deference.  Plaintiffs are located in Alaska.  Furthermore, as discussed above, the subject matter of this litigation is significantly connected to Alaska.  The District of Columbia has no meaningful ties to, or interest in, the factual and policy issues underlying this litigation.  Federal agencies, like Interior, make policy decisions in the District of Columbia every workday.  Here, however, the policy at issue in this case relates only to Alaska, its citizens, and the State and local governments.

In concert with Defendants' motion to transfer venue of the case, Defendants also move the Court to suspend its obligation to answer the Complaint until thirty days following judicial resolution of the venue issue or at a time to be determined by the transferee court.

## CONCLUSION

For these reasons, defendants' motion for transfer and to suspend answering Plaintiffs' Complaint in the District of Columbia should be granted.

Dated this 20th day of September 2006.

                                          Respectfully submitted,

                                              /s/
                                        DANIEL G. STEELE
                                        D.C. Bar No. 962894
                                        U.S. Department of Justice
                                        Environment and Natural Resources
                                         Division
                                        General Litigation Section
                                        P.O. Box 663
                                        Washington, D.C.   20044-0482
                                        (202) 305-0484

<u>Of Counsel</u>:

Thomas A. Blaser
Attorney-Advisor
Division of Indian Affairs
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W.   MS 6513
Telephone: (202)208-5811
Fax:          (202)219-1791

## CERTIFICATE OF SERVICE

I, Daniel G. Steele, hereby certify on this 20th day of September 2006, I have caused the foregoing **Motion to Transfer Venue and to Suspend Obligation to Answer in the District of Columbia** and **Legal Memorandum** to be served by United States mail, first-class postage prepaid, on the following counsel at their addresses:

>Mr. Richard A. Guest
>1712 N Street, N.W.
>Washington, D.C.  20036-2976
>
>Heather Kendall Miller
>Native American Rights Fund
>420 L Street, Suite 505
>Anchorage, Alaska  99501

This is in addition to the electronic service upon Plaintiffs' attorney of record.

_____
Daniel G. Steele