**Comments of NCAI Land Recovery Task Force**                                          Page 7

consideration of all designated factors, land would be taken into trust "unless the adverse impact of doing so would outweigh the benefits to the tribe."

As noted above, section 5 of the IRA was intended by Congress to provide a mechanism for restoring land to tribes – in partial restitution for the terrible losses caused by the allotment policy. Congress correctly recognized that the impact of allotment meant that, as a practical matter, the restoration of a viable tribal land base and the effective rehabilitation of the tribes would often require land acquisitions off-reservation. This is clear on the fact of Section 5 itself, which provides the Secretary with broad authority to take land into trust *"within or without existing reservations."* This language underscores that Congress intended lands to be taken into trust to advance the broad policies of promoting tribal self-determination and self-sufficiency, and that to accomplish those goals Section 5 established a policy favoring taking land into trust, both on and off reservation. The legislative history also shows that the acquisition of land outside reservation boundaries was deemed necessary to meet the goals of providing adequate land for tribes:

> *Furthermore, that part of the allotted lands which has been lost is the most valuable part. Of the residual lands, taking all Indian-owned lands into account, nearly one half, or nearly 20,000,000 acres, are desert or semidesert lands.... Through the allotment system, more than 80 percent of the land value belonging to all of the Indians in 1887 has been taken away from them; more than 85 percent of the land value of all the allotted Indians has been taken away.*

Readjustment of Indian Affairs, Hearings before the House Committee on Indian Affairs on H.R. 7902, 73rd Cong. 2nd Session at 17, 1934.

Recognizing that much of the land remaining to tribes within reservation boundaries was economically useless, the drafters explicitly intended to promote land acquisition off-reservation to meet the economic development goals of the legislation. Efforts to create new barriers to off-reservation land acquisitions are directly contrary to the statute's purpose.

Our suggested standard would expressly incorporate factors arising from the purposes of the IRA itself. For example, our standard would require consideration of "the history and circumstances of land loss by the tribe," and "the economic, social and cultural consequences of that land loss." These are the basic considerations that led Congress to enact Section 5 – the fact that so much land was lost, and that the land loss had devastating consequences to every aspect of tribal life. Our standard would also require consideration of the "intent of Congress to foster tribal economic development, self-determination, Indian housing, land consolidation and natural resources protection." This is essentially a shorthand statement of the purposes of Section 5. And, our standard would require the consideration of the expected benefits of taking the particular parcel into trust. We think it is crucial to have these factors expressly stated in the regulations, in an effort to assure that at every stage in the decisionmaking process, these baseline Congressional purposes are kept clearly in mind.

We have also included in our standard for off-reservation acquisitions other factors that the

**Comments of NCAI Land Recovery Task Force**                                              Page 8

Department views as relevant. For example, our standard would require consideration of all of the tax, zoning, law enforcement, traffic, utility or similar issues raised by a state or local government (or other party) in connection with a trust land application. Our proposed standard would provide that any adverse impact identified and properly documented by a state or county government would be required to be considered with respect to an off-reservation trust land application.

Our standard would thus include consideration of positive factors (based on the purposes of the IRA and the benefits documented by the tribe) and potential negative factors (based on adverse impacts documented by state and local governments or others). In addition, our standard would include consideration of one factor – the location of the land – that will in some instances be a positive factor, while in others may be a negative factor. In this regard, our standard provides that where a tribe has a particular nexus with a parcel of land that it seeks to have placed into trust, the location of that parcel is a factor supporting taking the land into trust. So, if a parcel is contiguous to a reservation (but does not meet the definition for on-reservation treatment), that parcel would receive favored treatment under the off-reservation standards. Similar treatment would be afforded to other lands as to which the tribe has a special connection – such as a former reservation, lands as to which a tribe has treaty rights, or some other place where an Indian community exists. In such cases, under our proposed standard the location of the land would be a factor supporting taking the land into trust – in recognition of the fact that the tribe has a heightened interest in the ownership and use of such lands.

The Department's proposed regulations include language indicating that the greater the distance from the reservation, the greater the scrutiny the Department would afford to the benefits articulated by the tribe, and the greater weight that the Department would give to concerns of state and local governments. We have retained language to the same effect in our proposal. In this regard, consistent with the Department's proposed regulations, location would in certain instances be a negative factor under our proposed standard, such as where a parcel is a great distance from the reservation and the tribe has no nexus, historical or current, with the parcel.

Overall, our standard provides a fair and balanced approach to off-reservation acquisitions. It articulates the appropriate factors for consideration, requires a careful weighing of those factors, and provides for land to be taken into trust unless the adverse impact outweighs the benefits. This is consistent with the IRA, which supports both on and off reservation acquisitions. It is good policy – since it supports tribal efforts at self-determination, while at the same time requiring due consideration of other interests. And, it provides clear standards for the Secretary, which will strengthen the Secretary's position with respect to any challenge to his authority to take land into trust.

We are aware that certain commenters and others have suggested that the regulations should establish a presumption <u>against</u> taking land into trust off-reservation. NCAI opposes any such formulation, in the strongest possible terms.

First, there is no legal basis for creating a presumption against taking land into trust. To the contrary, Section 5 clearly favors taking land into trust – as the Department itself elsewhere

**Comments of NCAI Land Recovery Task Force**                                          Page 9

recognizes, including in the preamble to its proposed regulations. To suggest that Section 5 creates a presumption against taking land into trust is to simply turn that provision on its head. Such a presumption would be legally indefensible, and would undoubtedly be the subject of extensive litigation.

Second, a presumption against taking land into trust off-reservation would do serious harm to many tribes. Many tribes are faced with two choices – continue to live with all the adverse effects of the allotment policy that took their lands, or seek to rebuild their tribal economies and institutions through off-reservation trust land acquisitions. For many tribes off-reservation acquisitions are vital, since on-reservation is not an option. Creating a heavy presumption against taking land into trust off-reservation would have a devastating impact on such tribes, relegating them to more generations of poverty. This is clearly not what Congress intended in the IRA.

Third, there is no valid policy reason to create a presumption against off-reservation acquisitions. As noted above, the standard we propose requires balancing of all the interests and considerations of all interested parties. The state and local governments are certainly well situated to advance and document their own interests with regard to trust land requests. There is simply no need to create, without any statutory basis, a presumption that would tip the balance in favor of state and local governments and against the tribes. Indeed, to do so would be contrary to both the IRA and the Department's trust responsibility to the tribes.

Fourth, a presumption against taking land into trust would be inconsistent with the Department's own position in other regards. For example, as noted above the proposed regulations contain a provision indicating that the greater the distance from a reservation, the stronger the showing that a tribe must make for a trust land request to be granted. The corollary to this is that for land near a reservation, the required showing would be correspondingly less. But an overall presumption against taking land into trust off-reservation would effectively eliminate the ability of the Department to make such gradations based on distance. Under such an approach, there would apparently be a presumption against taking land into trust, even for a parcel located very near the center of tribal life. In this and other ways, a presumption against taking land into trust would unduly limit the Secretary's ability to weigh appropriate factors and determine whether the balance favors taking land into trust off-reservation.

In sum, in the view of the Task Force, no issue is more important in these regulations than the promulgation of appropriate standards, properly grounded in the IRA. We urge the Department to adopt our proposed standards, which provide a fundamentally fair, clearly defined and legally strong balancing test for off-reservation acquisitions.

Suggestion - We would separate out the threshold filing requirements, i.e. complete application, environmental review, etc., into a subsection (a) and would propose clear substantive standards as follows:

**Comments of NCAI Land Recovery Task Force**                                                          Page 10

For on-reservation requests under the proposed Section 151.10, create a new standard for review:

> *(b) Based upon consideration of:*
> *(1) the history and circumstances of land loss by the relevant tribe,*
> *(2) the economic, governmental, social and cultural consequences of that land loss,*
> *(3) the intent of Congress to foster tribal economic development, self-determination, self-government, Indian housing, land consolidation, and natural resources protection and*
> *(4) the expected benefits of taking the specific land in question into trust,*
> *a request to have land taken into trust that meets the requirements of section 151.10(a) shall be granted and the subject land shall be taken into trust, unless there is clear and compelling evidence that the adverse impacts of taking the land into trust would significantly outweigh the benefits.*

For off-reservation, modify the standard to:

*unless the adverse impact of doing so would outweigh the benefits to the tribe.*

and append the following:

> *For purposes of this subsection, in evaluating the potential benefits and harms that would flow from the granting of a request to take land into trust, we will consider, in addition to the factors described above:*
>
> *(1) Whether the acquisition will create extraordinary additional responsibilities for the Bureau of Indian Affairs, and*
> > *(i) neither the Bureau nor the tribe can reasonably meet those responsibilities, and*
> > *(ii) the burden of such responsibilities clearly outweighs the benefits of taking the lands into trust.*
> *(2) Whether the location of the land supports taking the land into trust. For purposes of this section:*
> > *i) If the land is contiguous to the Tribe's reservation or is contiguous to a parcel of land held in trust or restricted fee for the tribe or a member of the tribe and is not within the definition of "reservation" under this part, the location of the land shall be deemed to be a factor strongly supporting taking the land into trust;*
> > *ii) If the land is within the tribe's former reservation, aboriginal homeland, treaty ceded area, land where the*

> *tribe retains treaty rights, or was otherwise formerly held or used by the tribe or its members, the location of the land shall be deemed to be a factor supporting taking the land into trust.*
> *iii) If the land is not covered by subsections (b)(2)(i) or (b)(2)(ii) of this section, the greater the distance between the land and the tribe's reservation, the greater the scrutiny that will be afforded to the justification of anticipated benefits to the tribe, and the greater the weight that will be given to the legitimate concerns of state and local governments.*

5. **Contiguous Lands** - A fundamental purpose of the IRA in promoting land acquisition was to diminish the harmful economic effects of former federal policies – including allotment – which left tribes with scattered and fractionated parcels and often rendered the tribal land base essentially unusable from a practical standpoint. In this sense, it was not just the loss of land, but also the manner in which the remaining land was separated and divided, which created such ongoing hardship for the tribes:

> *The opening of the reservation in this fashion [under the allotment policy] had many ramifications other than the sheer loss of land. Much of the remaining Indian land estate was crippled. As any large rancher, miner, or timber executive can attest, effective resource management can best be achieved on a large, contiguous block of land in single ownership. The allotment program deprived most tribes of that opportunity. The tribal land ownership pattern became checkerboarded, with individual Indian, non-Indian, and corporate ownership interspersed.*

C. Wilkinson, American Indians, Time and the Law, at 20.

We feel very strongly that applications to take lands contiguous to a reservation into trust should be evaluated under the on-reservation standards. The proposed regulations make a drastic change from existing regulations by treating applications for trust acquisitions of land contiguous to a reservation as off-reservation applications. Contiguous land acquisition should be given a strong preference because it is an antidote to the primary problem cause by allotment of tribal lands - the fragmentation of land into small parcels that are exceedingly difficult to manage for purposes of jurisdiction, land use, environmental protection and economic development. Trust acquisitions of contiguous lands remedy the problem of small reservations and off-reservation checkerboarding while reducing the impact on the surrounding non-Indian community.

Contiguous acquisitions should be favored under the regulations. The legislative history for Section 5 of the Indian Reorganization Act emphasizes that it was intended to remedy the problems of discontinuous lands caused by allotment checkerboarding. See, e.g., Readjustment of Indian Affairs, supra, at 16-18, 61; 78 Cong. Rec. 11728, 11732 (Comments of Rep. Howard). The existing regulations are consistent with the Indian self-determination and Education

Assistance Act "two-sides adjoining" language, which provides statutory justification for treating acquisitions of contiguous lands as on-reservation acquisitions. See 25 U.S.C. §450h(3). The language of the Indian Gaming Regulatory Act of 1988, which gives a "contiguity exception" to the Section 20 requirements, gives additional Congressional support to preferential treatment of contiguous lands. See 25 U.S.C. §2719(a)(1).

Preferred Option - include all contiguous lands in on-reservation section:

> *Sec. 151.9 What information must be provided in a request involving land inside or contiguous to a reservation or inside an approved Tribal Land Acquisition Area?*

Second Option - Although it is our strong belief that all contiguous lands should be eligible for on-reservation consideration, Interior has stated resistance to this because of difficulties in certain contexts. Rather than have these exceptions drive the rule, we have suggested a second option that would include most contiguous lands in the on-reservation section except those in urbanized areas and across state boundaries. We come to this second option only as a last resort, for the fundamental goal of rebuilding contiguous land blocks for the benefit of Indian people is equally strong for all tribes regardless of their location. If this option is implemented, it is absolutely vital that contiguousness also be considered a priority under the off-reservation section:

In 151.2 definition of "reservation":
> *(3) for the purposes of this section, the consideration of requests under the on-reservation criteria includes land contiguous to a reservation unless the land is:*
>> *i) within an urbanized area as determined by the U.S. Census Bureau, or*
>> *ii) in a State in which there is no reservation or trust lands of the relevant tribe.*

In 151.14 criteria for review of off-reservation requests, create a preference as noted above, for review of off-reservation requests:
>> *i) If the land is contiguous to the Tribe's reservation or is contiguous to a parcel of land held in trust or restricted fee for the tribe or a member of the tribe and is not within the definition of "reservation" under this part, the location of the land shall be deemed to be a factor strongly supporting taking the land into trust;*

6. **Former Reservation Lands and Treaty Right Lands** - The on-reservation provisions of the regulation are intended to accord additional weight to a tribe's need for land "in recognition of the tribe's reasonable expectation that it will benefit from the lands originally promised to it by treaty or Executive Order." 64 FR 15577. Yet many tribes are struggling to repurchase lands that were once within their reservation boundaries or held in trust for their benefit, but were removed through acts of aggression and termination. This removal often occurred with the

**Comments of NCAI Land Recovery Task Force**                                                                 Page 13

participation of the federal government and through the failure of the federal government to fulfill its obligation to protect tribal lands. Recovery of these lands into trust status should be a priority under the regulations.

Suggestion - Create a preference in the 151.14 criteria, as noted above, for review of off-reservation requests:

> *ii) If the land is within the tribe's former reservation, aboriginal homeland, treaty ceded area, land where the tribe retains treaty rights, or was otherwise formerly held or used by the tribe or its members, the location of the land shall be deemed to be a factor supporting taking the land into trust;*

In addition, some tribes hold treaty rights for hunting, fishing and gathering in traditional places off-reservation and are seeking to purchase and protect these places from the development and encroachment that threaten to deny tribes the benefit of their treaty rights. These lands should also have a high-priority for trust acquisition under the regulations as this acquisition will prevent the inevitable conflicts that occur when treaty rights are threatened by environmental degradation.

Suggestion: Within the definition of reservation in 151.2, treat hunting and fishing treaty right areas within on-reservation criteria:

> *(4) for the purposes of this section, the consideration of requests under the on-reservation criteria includes land outside of a reservation that is acquired for purposes of exercising and protecting hunting, fishing and gathering rights pursuant to a treaty, Executive Order, or statute.*

In addition, as noted above allotment era policies such as diminishment and disestablishment of Indian reservations were clearly intended to be offset by the IRA and the land reform purposes of Section 5. In addition, tribes with diminished or disestablished reservation boundaries will be unable to take advantage of the benefits of "on-reservation" treatment of their land acquisitions unless some provision is made to include them. For this reason, we strongly suggest that diminished and disestablished reservations be included within the scope of on-reservation acquisitions.

Suggestion: Within the definition of reservation in 151.2, treat diminished and disestablished reservations as on-reservation:

> *Reservation means that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in the final treaty, agreement, Executive or Secretarial Order, Presidential or Secretarial Proclamation, United States patent, federal statute or judicial or administrative determination, without regard to any taking, allotment, or cession of lands therein or diminishment or disestablishment by any means.*