7. **Burden of Providing Information for Off-Reservation Acquisitions** - Section 5 of the IRA explicitly grants Interior equal authority to acquire land for the benefit of tribes *"within or without existing reservations."* The legislative history clearly shows that the acquisition of land outside reservation boundaries was considered necessary to meet the goal of providing adequate land for tribes. In addition, Interior is well aware of the many tribes who have lost their land base through acts of aggression and termination and are forced to rely on off-reservation land acquisitions to attempt to rebuild their homelands.

The requirements for off-reservation acquisition requests, as set forth in Section 151.12, are extremely burdensome. Applicants would be required to submit information that is under the control of other entities who may be opposed to the application. In addition, the cost of providing much of the requested information is prohibitive given the resources of most tribal applicants. While we understand Interior's goal of creating a process that will appropriately include the concerns of states and local governments, we feel strongly that erecting such extreme barriers to off-reservation land acquisitions is directly contrary to the statute's purpose.

With regard to 151.12 (e), since state and local governments are in a better position to know the specific effects the trust acquisition will have on them, and are granted the right to comment extensively on these effects, it is redundant and unfairly burdensome to require the applicant to provide this information. The proposed regulations would substantially increase the ability of local non-Indian communities to frustrate or stifle tribal development. Similarly, with regard to 151.12 (f), state and local governments who have concerns about jurisdictional and land use issues should raise these concerns.

Finally, the proposed regulations seem to be drafted with a great awareness of controversial trust land applications, but without a context for the vast majority of trust land applications which have no controversy at all. As a result, the proposed regulations assume that conflict is the norm and require information that would be relevant only to large economic development projects, creating extensive mandatory procedures when a more flexible system might better serve the needs of all parties. A great majority of trust land acquisitions are not for development, but for cultural protection, sacred site protection, land consolidation or environmental and natural resource protection. A better method is to allow, but not require, all parties to submit information on the relevant issues, and then weigh the merits. This method will protect the procedural interests of states and local governments without placing an undue burden on tribal governments.

Suggestion - We would revise section 151.12 so that it is limited to the information that a tribe must submit in connection with an off-reservation land application. We have listed, in a separate section immediately following section 151.12, the additional information regarding the potential impact of the acquisition on state and local governments which the Secretary will consider, and which a tribe may choose to address in the application. We have further revised these provisions so they do not assume jurisdictional conflicts or adverse impacts on the state and local governments, but instead solicit information on these matters using a neutral tone. The language we suggest to precede subsections 151.12 (e) and (f) is as follows:

> *Sec. 151.    What additional information will be considered with*
> *respect to a request involving land outside a reservation or outside a*
> *Tribal Land Acquisition Area?*
>
> *In addition to the information required under Section 151.12,*
> *in determining whether to take land into trust that is outside a*
> *reservation we will consider the information submitted by any*
> *interested party on the matters contained in this section.  While tribes*
> *and individual Indians are not required to submit this information, it*
> *may in some cases be in their interest to do so.  We will consider:*

8. **Need for Timely Action in Interior Decision-Making** - The draft regulations fail to address what has been the chief concern of many tribes with the existing land-into-trust process. The BIA, who processes the applications, is not held to any time line. Applications have been known to sit for years and even decades at Agency and Area offices. By not mandating a time line for application review and processing, tribes risk losing project funding and more. Interior has an obligation to ensure that the agency takes a reasonable amount of time to process applications for land-into-trust. We have attached a letter dated November 7, 1999, where we more specifically discussed this important issue

Suggestion - We would add a series of time deadlines by which the steps are to be completed to the rule's description of the procedures for processing trust land requests. We are greatly interested in discussing the timing issues to determine an appropriate amount of time for each step of the process. We would also include a procedure by which Interior can waive the time lines in an unusual case:

> **Section 151.7a  Under what circumstances may we waive the**
> **normal time requirements for processing requests?**
> Notwithstanding any other provision of these regulations, with
> respect to a particular request, if we determine that there are
> special circumstances which make the time requirements of this
> part impracticable, we will
> > (a) provide the applicant with a written notice, stating that
> > we have so determined, and the reasons for that
> > determination,
> > (b) offer to meet with the applicant within 30 days of the
> > applicant's receipt of that written notice,
> > (c) if the applicant wishes, meet with the applicant to
> > discuss our views, and to solicit the applicant's views,
> > regarding the timing for the processing of the application,
> > and
> > (d) within 14 days of the meeting (or within 14 days of the
> > applicant declining our offer to meet), consistent with our
> > obligation to process applications in a timely manner, we

will provide the applicant with a written schedule under
which we will process the application.

9. **Tribal Land Acquisition Areas** - The proposed regulations acknowledge the "overwhelming importance of the tribal land base" and the unfair footing that currently landless tribes face under the proposed rule. Accordingly, they establish an alternative process for reservation-less tribes. Once an area is designated as a tribal land acquisition area, a tribe's request to have land within the area placed into trust would be evaluated as if it were an on-reservation acquisition. While this is a positive development, the proposed regulations would not afford this opportunity to the tribes with extremely small or diminished reservations, or tribes with widely scattered trust parcels that are clearly insufficient as a viable land base for its people. The Tribal Land Acquisition Area (TLAA) concept should be expanded to include any tribe that has an inadequate land base for their needs. The TLAA serves the federal interest in promoting continuous blocks of tribal lands and decreasing conflicts caused by checkerboard jurisdiction patterns. The TLAA process would also allow state, local and tribal governments to engage in long-term land use planning.

In addition, the Department's proposed procedures for Tribal Land Acquisition Areas mirror the information requirements and criteria found in Subpart C that were noted above to be unduly burdensome and inflexible and do not accomplish their stated objective of facilitating land acquisitions.

Suggestion - For these reasons, we would propose that these provisions be available to any tribe with a small, inadequate land base. We would also revised the criteria that the Secretary is to consider, in concert with our suggestions for the clear standards throughout the regulations. We would expand the application of Subpart E - Tribal Land Acquisition Areas - to include more than just "reservation-less" tribes:

### Sec. 151.17 What is a Tribal Land Acquisition Area?

*A Tribal Land Acquisition Area is a geographic boundary designated by a ~~reservation-less~~ tribe within which the tribe plans to acquire land ~~within a 10-year period.~~ If the Secretary approves the Tribal Land Acquisition Area under this part, the ~~reservation-less~~ tribe can acquire parcels of land within the Tribal Land Acquisition Area ~~during that 10-year period~~ under the on-reservation provisions of this part.*

In addition, we would change the criteria for review of a TLAA in a manner similar to the on- and off-reservation criteria, and limit the eligibility for a TLAA to those who can show a need to establish or expand tribal homelands:

*(c) A tribe is eligible to request that a Tribal Land Acquisition Area be established for it, if the tribe has no reservation or has a reservation (or other tribal land base) that is disproportionately small*

> *compared with its tribal population or does not meet the need of the tribe for land to provide a homeland for its people. In determining whether to grant such an application, we will consider, 1) whether the proposed Area is part of a former reservation, aboriginal homeland or was otherwise formerly held or used by the tribe or its members, 2) whether the proposed Area has special historical, cultural, religious or other value to the tribe, 3) whether the tribe's planned use of land in the proposed Area would further tribal economic development, self-determination, Indian housing or land consolidation, and 4) whether there are adequate arrangements for police and fire protection and other municipal-type services such as garbage removal, water and sewage (for persons living in the proposed Area (on trust lands or non-trust lands). The Secretary shall approve a proposed Tribal Land Acquisition Area, unless, upon consideration of these factors, as well as the tribe's proposal and any comments, the benefits to the tribe of approving the proposed Tribal Land Acquisition area are clearly outweighed by the reasonably anticipated harm to the state and political subdivisions and local communities.*

10. **Retroactive Effect of Regulations** - We strongly believe that the regulation should not be applied to pending requests to take land into trust. Indian Tribes and others are entitled to know the rules that govern when they engage in activity that is covered by a set of rules. Thus, for example, when a Tribe seeks to have land taken into trust, the Tribe understands the requirements it must meet to have the transaction approved pursuant to the Part 151 regulations. Interior's proposed regulations would unlawfully alter this system where they state that they "would apply to pending applications." 64 Fed. Reg. at 17,581.

Of course, at this time no one knows if Interior will amend its regulations, when the amendments will occur, or what the amended regulations will state. How then can a Tribe that has already submitted an application, or does so after today, know what the amended regulations will require when, and if, Interior gets around to amending them? In other words, a Tribe could submit an application under the current Part 151 regulations (as it is required to do), with the information required in those regulations. But, if, through no fault of the Tribe, that application is still pending when Interior amends its regulations, the application would be deficient if the Tribe has not submitted information that will be required under the new regulations, but is not required under the current regulations. This situation is especially unjust given that many tribes currently have applications that have been pending for years.

In any case, the Department has cited no authority empowering it to issue retroactive rules, and has ignored the Supreme Court's prohibition on the promulgation of retroactive rules by agencies that have not been given the express authority to do so by Congress. Bowen v. Georgetown University Hosp., 488 U.S. 204, 208 (1988). Because Interior has no such authority, the application of new regulations, once finalized, to pending applications would be illegal.

The application of a new regulation to pending matters is retroactive rulemaking. Yakima

Valley Cablevision, Inc. v. FCC, 794 F.2d 737 (D.C. Cir. 1986). Many Tribes have premised land purchasing decisions and planning for economic, social, and cultural development, on the trust rules in existence at the time of the decision to have land taken into trust. "When parties rely on an admittedly lawful regulation and plan their activities accordingly, retroactive modification or rescission of the regulation can cause great mischief." Yakima Valley Cablevision, 794 F.2d at 746. The application process can be a long one. If every pending application had to be revised each time Interior changed its regulations, "the process would become much more lengthy . . . if the rules of the game changed each time the application neared the finish line." Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1323 (D.C. Cir. 1998).

> Suggestion - We have developed language at 151.2 that would clarify that the regulation would apply to pending applications only when tribes have specifically requested so in writing.

11. **Timing and Exhaustion of Agency and Federal Court Appeals** - Under Interior's current regulations and policies, State and local governments and others can challenge a final decision to take land into trust. Once the agency makes a final decision to take the land into trust, it provides notice to interested parties. The land will not be taken into trust for the next thirty days. 25 C.F.R. § 151.12. During that period, an interested party can file suit in federal court, seeking to block the transaction. However, once that thirty-day period has expired, Interior is legally free to take the land into trust, even if a lawsuit has been filed challenging the transaction, unless a court has prohibited the acquisition.

The current regulations do not require, or even suggest, that Interior will postpone taking land into trust simply because a lawsuit is filed. This practice of taking land into trust, even after a lawsuit is filed challenging the agency's action, continued after the agency issued amended regulations in 1996, and allows persons to challenge proposed land acquisitions in federal court. The system is fair and equitable to all interested persons, including tribes whose land is implicated in a transaction. The burden is squarely placed on the challenger to file a lawsuit and convince the court to enjoin the transaction. Unless the party suing has a strong case, it is unlikely to get relief from the court.

The proposed amended regulations would turn this system on its head. No land will attain trust status until the agency has published a notice of intent to take land into trust, *the time period for appeal within the agency has run, and all litigation, including appeals rights, have been exhausted.* Section 151.6, 151.7. As drafted, these provisions provide a strong incentive for opponents of a given application to bring suit against the agency, prolong the litigation as long as possible, and appeal all the way to the Supreme Court, simply to delay the effective date of a decision to take land into trust. This incentive to sue exists even for opponents with weak arguments. In 1996, President Clinton issued Executive Order 12988 entitled "Civil Justice Reform." The Order requires agencies to write a proposed regulation to "minimize litigation." The proposed regulations will not only not minimize litigation, but would invite unnecessary litigation. Much of the costs of defending these cases will be borne by tribes which intervene in the case and by the Justice Department, which represents Interior in court.

Suggestion - We have modified the requirements for exhaustion of agency and judicial appeals. Sections 151.5, 151.6, 151.7.

12. **Mandatory Acceptance of Title** - This part should not apply to mandatory acceptance of title where the Congress has directed the Secretary to take land into trust, leaving the Secretary no discretion. When the Secretary has no discretion to apply, there is no need for trust acquisition procedures. Upon notification that the tribe has acquired land pursuant to Congressional authorization, and that authorization provides that the Secretary "shall" take the acquired land into trust, the Secretary should simply complete the documents necessary to effect the transfer.

Our confusion is compounded by the preamble to the proposed rule which characterizes acquisitions authorized by Congress "within some broader geographic boundary, e.g. within certain named counties" as "allow[ing] for some discretion." 64 Fed. Reg. at 17578. The only discretion granted by such legislation is to the tribe--the tribe is permitted to choose what lands it will acquire. We do not understand the logic in the assertion that mandatory becomes discretionary, and that Congress "**merely** directs that the Secretary 'shall' accept title" (*id.*, emphasis added), when the tribe is permitted some discretion.

Suggestion - We have proposed to modify the language of Subpart D to require the Secretary to determine within 30 days whether a land transfer is mandatory and allow for a direct appeal to federal court. We have also modified the definition of mandatory acceptance of title. Section 151.2. In order to address concerns about tribal and Congressional reliance on vaguely worded statutes, we have attached suggested language for the preamble to the regulations.

13. **Protection of Confidentiality of Religious and Cultural Sites** - Pursuant to Section 151.5 of the proposed land acquisition regulations once an application has been received state, county and municipal authorities will be provided site locale information. Further, this section allows for general public review of information pertaining to the site at the BIA area or agency offices. After a decision is made on the request for land acquisitions, Section 151.6 provides for Federal Register publication or publication in a newspaper of general circulation serving the affected area regarding the land acquisition.

Several federal statutes provide that Native American sacred sites, ceremonial sites and archaeological sites should be afforded confidentiality. The American Indian Religious Freedom Act of 1978 Public Law 95-341 sets forth a federal policy mandate to protect and preserve for American Indians their right to the expression and exercise of their traditional religions. Confidentiality of sacred site locations is afforded under the Executive Order 13007 of May 24, 1996. The National Historic Preservation Act of 1966, as amended. 1992 (P.L. 95-515) (P.L. 102-575, (16 U.S.C. 470 et seq.) (NHPA) specifically provides that the head of a Federal Agency shall withhold the disclosure of the location of sensitive historic resources such as Native American sacred or ceremonial sites if the agency determines that the disclosure may: 1) cause a significant invasion of privacy 2) risk harm to the historic resource or 3) impede the use of a traditional religious site by practitioners. (16 U.S.C. 470w-3)