**Comments of NCAI Land Recovery Task Force**                                              **Page 20**

Moreover, the Native American Graves Protection and Repatriation Act of 1990 (NAGPRA) addresses the need to have Native American human remains returned home to tribes for proper reburial and provides criminal penalties for trafficking in Native American human remains and funerary items. It would be a sacrilege and a violation of federal law to not provide for the confidentiality of land acquired for NAGPRA reburials or for Native American burial grounds. <u>Suggestion</u> - We have included a special rule on confidentiality for information submitted by tribes in connection with land acquisitions involving sacred and ceremonial sites, or containing archeological resources. Section 151.5(d).

14. **Clarify Land-into-Trust for Gaming Purposes** - In our view, the issue of gaming has been a great source of confusion in trust land transactions. Many routine trust land transactions that have nothing to do with Indian gaming, but are for routine purposes such as cultural protection, sacred site protection, land consolidation or environmental and natural resource protection, have been adamantly opposed because of an unfounded fear that the land will be used for Indian gaming.

    The Indian Gaming Regulatory Act of 1988 is very clear that land acquired into trust after 1988 may not be used for gaming purposes unless very specific exceptions are met, including the state governor's concurrence. We would propose language revising section 151.5 to clarify that there are additional procedures specified by the Indian Gaming Regulatory Act when acquiring certain land for gaming purposes:

    <u>(f) If the request is for an acquisition under the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §2719, which governs the use of land acquired in trust when the intended use of the land is for gaming, there are additional procedures and requirements specified in the Act.</u>

15. **Federal to Federal Transfers** - Currently, transfers of excess government lands to tribes are generally not subject to Part 151. Thus, the Department has accepted trust title to lands transferred from various federal agencies, including the Army Corps of Engineers, the Bureau of Land Management, the Bureau of Reclamation, and the Parks Service without requiring applications under 25 C.F.R. Part 151.

    In some instances, however, the Department has required that a tribe submit a Part 151 application to acquire excess federal lands. For example, the Bureau has required that the Susanville Indian Rancheria submit Part 151 applications to lands on the Sierra Army Depot that were excessed through the Base Realignment and Closure (BRAC) process.

    There seems to be no justifiable policy or legal reason to require Part 151 applications on top of having to meet all the requirements imposed by the excessing authority. Several reasons, in fact, support continuing the general practice under the current regulations of not applying them to most acquisitions of federal land.

    First, all of the legal authorities for such transfers refer to and require actions by a federal official outside of the Department -- most often, either the General Services Administrator

**Comments of NCAI Land Recovery Task Force**                                                        Page 21

("Administrator"), 40 U.S.C. §483(a)(2), or the Secretary of the Army (in the BRAC process). Neither official can or should be bound by or limited by Interior regulations. In fact, only the Administrator is authorized to promulgate regulations to implement 40 U.S.C. §483(a)(2), which is the most commonly used statutory authority for the transfer of excess lands to tribes. Any regulations promulgated by the Secretary to implement section 483 would probably be subject to a court challenge.[1]

Second, the Department should do all in its power to assist tribes in acquiring excess federal lands. Most often these lands are on-reservation or former tribal lands, taken from the tribe by the United States in violation of treaties and under duress (as, for example, the lands taken from tribes along the Missouri River for the Pick-Sloan Project). Tribes have often sought to reacquire such lands for generations. Imposing Part 151 requirements on these transfers would undoubtedly make such acquisitions more time-consuming, difficult, and expensive.

Third, the reasons motivating the Department to limit the Secretary's authority under Section 5 of the Indian Reorganization Act do not apply to any statutes authorizing transfers of federal lands to tribes. Congress has not proposed any amendment or repeal of these authorities. No lawsuit has challenged these statutes under the non-delegation doctrine, and they would certainly survive any such suit since they provide terms and conditions limiting the authority of federal officials to transfer such lands to tribes. (For example, under 40 U.S.C. §483(a), the land must be within a reservation, and must no longer be needed by the agency holding title.)

Fourth, the transfer of federal land to an Indian tribe is unlikely to have a large, detrimental impact on the state and local governments. In many instances, prior to transfer, the transferring agency is required to analyze the subject property for potential environmental or land use problems stemming from the transfer. In short, the policy considerations contained within 25 C.F.R. Part 151 requiring a tribe to extensively document potential impacts of a land transfer simply do not apply to federal-to-federal transfers. So long as the United States retains title to the land, the concerns that the regulations were intended to address simply are not present.

By way of example, several tribes in the United States are currently seeking or have successfully completed transfers of real property at downsized military bases through the BRAC process. In that process, the military must complete an exhaustive environmental analysis of the property prior to transfer. See Base Reuse Implementation Manual (BRIM) at Chapter 2. When the requesting federal agency (such as the BIA on behalf of a tribe) seeks property at the excess level, that agency must fully document, *inter alia*, (1) the need for the property, (2) the use of the property, (3) the impacts on state and local government, (4) how the use of the property will be

---

[1] Section 483 provides that excess real property located within an Indian reservation "shall be held in trust by the Secretary" for the Tribe. 40 U.S.C §483(a)(2)(emphasis added). The statute "makes it mandatory that GSA convey excess land located within a reservation to the Secretary of the Interior to be held in trust for such use as the Indian tribe located on the reservation believes best." Sen. Rep No 93-1324, 1974 U.S.C.C.A.N 7131(emphasis added). If, contrary to our position, the Department makes the final rule applicable to acquisitions of federal lands, then the Department should acknowledge, in the preamble to the final rule, that this section mandates acquisitions by the Secretary.

**Comments of NCAI Land Recovery Task Force**                                    Page 22

consistent with the zoning, physical properties, and environmental/cultural characteristics of the property, (5) whether any significant changes will be made to the use of the property, and (6) if so, whether funding exists to make those changes. See BIA, "Procedures for Obtaining Department of Defense Properties Including Base Closure and Realignment Properties" ("BIA Procedures") (1998); BIA, "Justification Required for Requesting a Transfer Without Reimbursement" ("BIA Justification") (1998). By the time the BIA has completed this documentation, all or substantially all of the criteria in 25 C.F.R. Part 151 have been met.

Fifth, although Departmental officials have stated in public meetings that the rule is intended to apply to trust acquisitions of federal lands, the proposed rule indicates otherwise. Nowhere does it mention acquisitions of federal lands. Nor does it cite as authority 40 U.S.C. §483 or any other statute authorizing the transfer of federal lands to tribes. The Administrative Procedures Act ("APA") requires that a proposed rule include "a reference to the legal authority under which the rule is proposed." 5 U.S.C §553(b). A fair reading of the rule indicates, therefore, that the Department has not proposed that the revised Part 151 would apply to such transfers. Because the proposed rule did not cite the authorities for transfers of excess federal lands to the Tribes, the final rule cannot require that such transfers comply with the rule. Natural Resources Defense Council v. Hodel, 618 F.Supp. 848, 900 (E.D. Cal. 1985).

It is clear that the proposed rule did not contemplate acquisitions of federal land into trust. Thus, adopting a final rule that applies to such acquisitions could not be done without running afoul of the APA unless the Department first published the rule for another round of comments. For these and the other reasons discussed above, the Department should expressly exempt all acquisitions of federal land from Part 151.

Suggestion: We propose language in 151.3(b)(5) that expressly exempts acquisitions of federal land from the purview of the regulations. If the Department believes that regulations are needed for federal-to-federal trust acquisitions, then we suggest that those regulations be promulgated separately. Any rule meant to apply to the acquisition of excess federal land should acknowledge (1) that acquisitions under 40 U.S.C. §483 are mandatory, and (2) that much of the documentation necessary to complete the excessing process may meet, duplicate, or exceed the detailed requirements of Part 151, which should therefore be waived. We have attached language that we believe meets our main concerns. We urge the Department, however, to consider this language only as a possible rule to be promulgated separately.

16. **Alaska Trust Lands** - The proposed rule continues the regulatory bar to acquisition of title in trust in Alaska and seeks comment on the continued validity of the Associate Solicitor's opinion ("Trust Land for the Natives of Venetie and Arctic Village," September 15, 1978) ("Fredericks opinion"), in light of the Supreme Court's ruling in *Alaska v. Venetie*, 522 U.S. 520 (1998). The Fredericks opinion incorrectly concluded that it would be an abuse of Secretarial discretion to take tribal land into trust following the passage of the Alaska Native Land Claims Settlement Act of 1971, 43 U.S.C. § 1601 *et seq.* (ANCSA). That opinion is not well founded since ANCSA did not repeal the Secretary's authority to take land into trust under the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465. In 1995, the Chilkoot Indian Association, Native Village of Larsen Bay and Kenaitze Indian Tribe filed a petition setting forth the legal arguments supporting the

**Comments of NCAI Land Recovery Task Force**                                    Page 23

Secretary's statutory authority to take lands into trust post-ANCSA and requesting that the Secretary revise 25 C.F.R. § 151.1 to comply with the IRA. (60 FR 1956 (1995). The legal basis for Secretarial authority to take lands into trust in Alaska as set forth in the Chilkoot et. al petition remains valid today.

The IRA amendments of May 1, 1936 c. 254, 49 Stat. 1250 facilitated the application of the IRA's various provisions to the Territory of Alaska notwithstanding the absence of existing reservations. Section 2 of the IRA gave the Secretary authority to designate certain lands in Alaska as Indian reservations and was repealed by Congress in 1976. But section 465 of the IRA, which gave the Secretary authority to take tribal lands into trust pursuant to section 473a, was not repealed. Congress has passed no legislation that has repealed or in any way affected the right conferred upon Alaska Native tribes by Section 473a, nor has the United States Supreme Court found to the contrary. In *Venetie*, the Court addressed the question of whether Venetie's former ANCSA lands met the test for Indian country under 15 U.S.C. 1151(b). The Court held that ANCSA lands do not satisfy requirements for "Indian country" status because such lands were not set aside for Indians as such (since they were conveyed to corporations), and the requisite federal superintendence over the land was missing since ANCSA lands lack any restriction on alienability. The Court rejected the proposition advanced by the State that no Indian country at all existed in Alaska, and instead held that "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of 1151(b) or if it constitutes 'allotments' under §1151(c)." 522 U.S. at n.2. The Court did not address the question of whether the Secretary retains authority under the IRA to place lands into trust in Alaska. Since the legal underpinning for the Secretary's authority remains intact, neither the Fredericks opinion nor the *Venetie* opinion can validly be relied upon as bases for precluding Alaska tribes from enjoying the "same protection, immunities, [and] privileges [shared by] other acknowledged tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

The proposed regulation also solicits the views of the State of Alaska's Rural Governance Commission on this topic. In its June 1999 report, the Commission makes a recommendation in favor of Indian country and tribal territorial jurisdiction in Alaska. The Rural Governance Commission's recommendation echos previous recommendations made by blue-ribbon commissions and working groups. *See, e.g.* Vol. 1, Alaska Native Commission Report at 75-76. This guidance, solicited by the Secretary, further supports lifting the regulatory bar against taking lands into trust in Alaska.

The proposed regulation is illegally restrictive both with respect to its arbitrary bar against trust lands in Alaska, and with respect to the burden that it imposes upon tribes that lack reservation status. There are no reservations in Alaska (with the exception of Metlakatla). Thus, the "off-reservation lands" category would apply to Alaska resulting in a *de facto* regulatory bar to the acquisition of title in trust in Alaska. Alaska tribes therefore join NCAI's member tribes in opposition to the proposed regulation for all the other reasons as stated herein.

Suggestion - The Secretary should withdraw the Fredericks Associate Solicitor's opinion (Trust Lands for the Natives of Venetie and Arctic Village, Sept. 15, 1978.) and lift the regulatory bar to

**Comments of NCAI Land Recovery Task Force**                                                    Page 24

acquisition of trust lands in Alaska. Alaska tribes should be allowed to petition under the on-reservation standard or for tribal land acquisition area. In the alternative, if the Secretary chooses to maintain the regulatory bar against acquisition of trust lands in Alaska, the Secretary should make his decision final and set forth his reasons for doing so.

17. **Payments in Lieu of Taxes** - Section 151.12(f)(8) of the proposed regulations requires a tribal government, when applying to acquire land into trust off-reservation, to include "Whether the tribe has made any provisions to compensate the State or local governments for revenue lost because of the removal of the land from the tax rolls." This subsection's suggestion that tribes compensate state and local governments for lost tax revenues is very disconcerting given the negative impact such a requirement would have on tribal sovereignty.

    Section 5 of the IRA directs the Secretary of Interior to acquire land for tribes and explicitly states that "such land or rights shall be exempt from State and local taxation." It would be a direct violation of the statute to deny a tribe's application based on a failure to pay state taxes or, euphemistically, failure to "compensate...for revenue lost."

    State taxes on tribal government lands are fundamentally unfair. Most often state governments provide few services on Indian reservations. By and large, tribal government funding comes from federal and tribal government sources. When tribal governments are forced to collect and pay state taxes within their territory, tribal governments are left without a tax base for funding tribal infrastructure such as roads, schools and hospitals. As the editor-in-chief of State Tax Notes observed, "Indian tribes are entitled to the protections they were once afforded before the tide shifted so unfairly in favor of the states." Oswald Graham, "Do the States Have Too Much Taxing Power Over American Indians?" State Tax Notes, September 28, 1998.

    The goal of the IRA and the official policy of the United States government since at least 1969 has been to support Indian sovereignty and self-determination. Numerous federal statutes, regulations, Executive Orders, and policy statements spanning six presidencies embody this policy and recognize the unique political and cultural aspects of Indian self-government. Self-determination, as explicitly stated in Section 5 of the IRA, means allowing the tribes to set their own tax policies free from state interference.

    Suggestion - NCAI believes that section 151.12(f)(8) is an improper criteria for Interior to consider in reviewing land-to-trust applications and should be deleted. In the alternative, we have suggested more neutral language for this subsection where Interior would also consider the amount of any funds or other financial benefits (direct or indirect) that the State or local governments may realize as a result of the applicant's proposed use of the land.

18. **Notice to Tribe When Land Goes Out of Trust** - Although the IRA has been in effect for more than 60 years, to this date only a small fraction of the lands lost due to allotment have been returned to tribal ownership. 64 Fed Reg. at 17577 (citing Felix S. Cohen's, Handbook of

**Comments of NCAI Land Recovery Task Force**  Page 25

Federal Indian Law at 138 (1982 ed.), BIA's Annual Report for Indian Land, 1996). Indian land losses have continued since passage of the IRA. For example, a very substantial amount of Indian trust lands passed out of Indian ownership in the early 1950s, during the Termination Era, when Commissioner of Indian Affairs Dillon Meyer advocated for, and administratively implemented of policy tantamount to illegal "forced fee patents." See Felix Cohen, "Erosion of Indian Rights 1950-1953: A Case Study in Bureaucracy," 62 Yale L.J. 348 (1953). And the legacy of the allotment policy, which has deeply fractionated heirship of trust lands, means that for most tribes, far more Indian land passes out of trust than into trust each year (BIA's Annual Report for Indian Land, 1996.) In most instances, the BIA readily transfers the land of individual Indians out of trust status so that it can be sold or that a mortgage can be obtained. These transfers contribute to the continuing downward spiral of Indian land holdings.

Suggestion: The regulation should be modified to require notice to the interested tribal government when the BIA has received a request to transfer land out of trust.

19. **Consultation** - We have put this issue last not in measure of its importance, but in order to allow for a discussion of the substance of the regulations. As you know, for many months tribal governments' primary issue with the proposed regulations was the failure of appropriate government-to-government consultation on this most critical issue. The tribes were adamant that the regulations must be withdrawn. Only after many heated discussions and Interior's continued insistence in going forward with a flawed process did the Task Force agree to put aside the consultation issue in order to focus on the content of the regulations. Nevertheless, in these final comments we must raise the issue once more.

As result of the federal government's long history of paternalistic and insensitive dealings with Indian tribes, the Clinton Administration and Congress have taken steps to require direct good faith consultation with Indian tribes as well as other procedures before federal actions are taken and before regulations are drafted and published. These procedures were not followed in this instance. The redraft of the land-to-trust regulations was a work in progress within Interior for several years. Only a few months prior to publication, Interior did inform tribal governments of its plans to publish new regulations. However, Interior did not allow tribes to have any input into the process, and the draft regulations were created without any consultation with tribes.

At publication, Interior sought to minimize the importance of the proposed regulations in order to avoid compliance with applicable procedures. Interior committed numerous procedural errors:

Executive Order 13084. In 1998, President Clinton issued Executive Order 13084 (Consultation and Coordination with Indian Tribal Governments) and directed each agency to provide an effective process to permit elected officials and other representatives of Indian Tribal governments to have meaningful and timely input in the development of regulatory policies on matters which significantly or uniquely affect their communities. The Order directs that on issues relating to Tribal self-government and trust resources, each agency "should explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking." Interior has not explored consensual mechanisms for revising its existing regulations on taking land into trust. Indeed, Interior summarily dismisses its obligations under

**Comments of NCAI Land Recovery Task Force**                                              Page 26

this Executive Order by making the ludicrous assertion that the proposed amended regulations will not generate any "potential adverse effects" on Indian tribes. The Department has thus demonstrated a complete disregard for the Presidential directive to ensure that all agency action be informed by respect for tribal sovereignty and for the unique legal relationship between the Federal Government and Indian tribal governments.

Executive Order 12866. In 1993, President Clinton issued Executive Order 12866, entitled "Regulatory Planning and Review." Before issuing any proposed regulation, an agency is to "seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation," and perform a cost-benefit analysis. Here, the Department developed the proposed amended regulations without the participation of the very people who will most directly be burdened by the changes. Interior's failure to designate this proposed rule as a "significant regulatory action" has denied tribes a proper cost/benefit analysis and a list of potential alternatives.

The Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 et seq. The RFA compels Federal agencies to consider the impact of their regulations on small entities, which in this instance would include tribal government jurisdictions. The proposed amendments will pose major stumbling blocks for individual Indians and Tribes trying to improve their economic conditions through land acquisitions and should be subject to the analysis required by the RFA.

We would like to emphasize that appropriate government-to-government consultation in the development of regulations is not merely a pro forma exercise. We strongly believe that the regulatory process would have been vastly improved in this instance if Interior had consulted with tribal government leaders about their issues and concerns with land-to-trust in advance of drafting the regulations.

Suggestion - NCAI believes that the appropriate remedy is to require that the Executive Orders and federal statutes intended to protect tribes from unilateral federal action be followed. NCAI has sent a detailed letter to the Secretary of Interior, dated July 16, on these procedural issues, which is attached. We have strongly urged the Department to withdraw the proposed amended regulations for taking land into trust, and we continue to believe that was the appropriate remedy. Because Interior steadfastly refused to withdraw the proposed amendments, NCAI and the Land Recovery Task Force have engaged in the commenting process. In the future, it is our strong belief that Interior should engage in appropriate consultation under relevant Executive Orders and federal statutes prior to engaging in any rulemaking that significantly affects tribal government interests.

### Conclusion

On behalf of the National Congress of American Indians and the Tribal Leaders Task Force on Land Recovery, we urge the Department of Interior to consider all comments and adopt final regulations that are consistent with the suggestions and principles discussed herein.

**Comments of NCAI Land Recovery Task Force**                                                                 **Page 27**

*****