# NATIONAL CONGRESS OF AMERICAN INDIANS



July 16, 1999

**EXECUTIVE COMMITTEE**

PRESIDENT
W. Ron Allen
*Jamestown S'Klallam Tribe*

FIRST VICE PRESIDENT
Ernie Stevens, Jr.
*Oneida Nation of Wisconsin*

RECORDING SECRETARY
Lela Kaskalla
*Nambe Pueblo*

TREASURER
Russell (Bud) Mason
*Three Affiliated Tribes*

**AREA VICE PRESIDENTS**

ABERDEEN AREA
Gerald M. Clifford
*Oglala Sioux*

ALBUQUERQUE AREA
Joe A. Garcia
Ohkay Owingeh
*San Juan Pueblo*

ANADARKO AREA
Gary McAdams
*Wichita & Affiliated Tribes*

BILLINGS AREA
Earl Old Person
*Blackfeet Tribe*

JUNEAU AREA
Steve Ginnis
*Native Village of Fort Yukon*

MINNEAPOLIS AREA
Bernida Churchill
*Mille Lacs Band of Ojibwe*

MUSKOGEE AREA
S. Diane Kelley
*Cherokee Nation*

NORTHEAST AREA
Michael W. Schindler
*Seneca Nation of Indians*

PHOENIX AREA
Ivan Makil
*Salt River Pima-Maricopa*

PORTLAND AREA
Henry Cagey
*Lummi Nation*

SACRAMENTO AREA
Cheryl A. Seidner
*Table Bluff Reservation/Wiyot*

SOUTHEAST AREA
A. Bruce Jones
*Lumbee Tribe*

**EXECUTIVE DIRECTOR**

JoAnn K. Chase
*Mandan, Hidatsa & Arikara*

The Honorable Bruce Babbitt
Secretary of the Interior
1849 C Street N.W.
Room 6156
Washington D.C. 20240

Re: Interior Department's Proposed Regulations on Taking Land Into Trust

Dear Secretary Babbitt:

On behalf of the National Congress of American Indians (NCAI), we write to raise our serious objections over the substance as well as the process utilized by the Interior Department in its proposal to amend the regulations (25 C.F.R. Part 151) governing accepting land in the name of the United States to be held in trust for Indian tribes and Indians. 64 Fed. Reg. 17,574-588 (April 12, 1999). The Department will accept comments on the proposed amended regulations through September 12, 1999. The NCAI, our member Tribes, and others, have a deep-seated concern about the substance of these proposed regulations for a variety of reasons which are outlined below. If necessary, we will submit extensive comments, setting forth a litany of serious objections to these regulations.

NCAI is writing to suggest an alternative mechanism for resolving this matter. Interior should withdraw its proposed amended regulations. As shown below, Interior's issuance of the proposal was flawed. Interior failed to comply with numerous Executive Orders and federal statutes that govern issuance of proposed regulations. If Interior withdraws the proposed amendments, NCAI stands ready to work with Interior to discuss a meaningful process for the issuance of any needed amendments to Interior's existing regulations.

NCAI is deeply concerned with the procedures by which the Department of Interior issues regulations that affect the vital interests of Indian tribes. The Department of Interior has a long history of paternalistic, insensitive and high-handed dealings with Indian tribes that have resulted in many destructive policy decisions. The Clinton Administration and Congress have recognized these failings and taken steps to require direct good faith consultation with Indian tribes as well as other procedures before federal actions are taken and before regulations are drafted and published.

Akiachak v. Dept. of Interior                                   Exhibit 5
06-cv-969 (RWR)                                                 Page 1 of 8
1301 Connecticut Avenue NW, Suite 200, Washington, DC 20036  202.466.7767  fax 202.466.7797

Letter to The Honorable Bruce Babbitt
July 16, 1999
Page 2

These procedures were not followed in this instance; and once again, the result is profoundly flawed draft regulations that simply cannot be fixed through a cursory notice and comment rulemaking procedure. NCAI believes that the only remedy is to require that the Executive Orders and federal statutes intended to protect tribes from unilateral, paternalistic action be followed.

Interior's procedures for taking land into trust are crucial to the improvement and restoration of our homelands, and indeed, the ultimate survival of Indian Tribes. The Department has acknowledged that the General Allotment Act of 1887 resulted in a loss of 90 million acres of land originally reserved to Tribes. Interior described this loss of land as "catastrophic" and explained that this Act "generally is regarded by historians and others as being responsible for a precipitous decline in the economic, cultural, social and physical health of tribes and their members". 64 Fed. Reg. 17576. As a result, in 1934 Congress passed the Indian Reorganization Act (IRA) which sought to restore the land lost by the Tribes. The Interior Department is supposed to employ the IRA authority to help restore Tribes to the land base necessary for economic self-sufficiency and preservation of their culture, but to date only 8% of the land lost in through allotment has been recovered.

Regrettably, the Department of Interior sought to minimize the importance of the proposed regulations in order to avoid compliance with applicable procedures, and the proposed amended regulations were promulgated without input from the Tribes. As a result, Interior committed numerous procedural errors that are chronicled below.

## EXECUTIVE ORDERS AND STATUTES VIOLATED BY INTERIOR

A. **Executive Order 12866.** In 1993, President Clinton issued Executive Order 12866, entitled "Regulatory Planning and Review," to make the regulatory process more efficient. 58 Fed. Reg. 51,735 (Oct. 4, 1993). It established a centralized process for review of all agency regulations by the Office of Management and Budget (OMB). Before issuing any proposed regulation, an agency should "seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation." 58 Fed. Reg. at 51,740. Here, the Department developed the proposed amended regulations without the active participation of the Indian tribes, the very people who will most directly be burdened by the changes.

Each agency is to assess the effects of a regulations on Tribal governments seeking to minimize burdens placed on them. Section 1(b)(9), 58 Fed. Reg. at 51736. In the case of regulations that qualify as "significant regulatory actions," as defined in Section 3(f), agencies are required to submit to OMB extensive data on the costs and benefits of the regulation, an assessment of the costs and benefits of "reasonably feasible" alternative approaches, and an explanation as to why the planned action is preferable to the identified potential alternatives.

Letter to The Honorable Bruce Babbitt                                       Page 3
July 16, 1999

The Department openly conceded that it did not submit this matter for review by OMB. 64 Fed. Reg. at 17,580. Indeed, Interior made no assessment of the costs and benefits of the proposed action in comparison to potential alternatives, because the agency concluded that the proposed changes are not "a significant regulatory action." 64 Fed. Reg. at 17,580. This conclusion is incorrect. A "significant regulatory action" includes any regulation likely, among other things, to have an annual effect on the economy of $100 million or more or adversely affect in a material way, among other things, any sector of the economy, productivity, jobs, the environment, State, local, or tribal governments or communities, or raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

In fact, the proposed regulations clearly meet the definition of a significant regulatory action. For instance, the proposed amended regulations will have an adverse effect on Tribal governments because, as Interior concedes, the proposal would change the substantive standards the agency will apply to determine whether to take land into trust. In the agency's own words, "the proposed regulations ... set forth an application process and review criteria which is *more demanding* [than current regulations] when the land at issue is located outside the boundaries of an existing reservation ..." 64 Fed. Reg. at 17576.

Also, the proposed amended regulations will clearly have an annual effect on the economy of more than $100 million. The preamble to the proposed regulations attempts to discount the effect on the economy by stating a dollar value of the land acquired in trust in 1996 of slightly less than $20 million. This overly simplistic calculation fails to account for the value of any economic activity or infrastructure that is planned for the acquired land. One Indian Health Clinic alone can account for more than $20 million in annual economic impact, and there are several applications recently approved and pending to acquire land for health clinics. A small housing project will cost from $1 to $10 million in construction costs, and there are currently dozens of applications recently approved and pending to acquire land for small and large housing projects. Tribal schools also have significant construction and operations costs and a large impact on the economy. Most of the 150 tribal governments in California and Oklahoma have little or no land base and must acquire land in trust for all of their needs for health, housing and educational infrastructure.

Moreover, off-reservation acquisitions for gaming purposes must comply with the 151 regulations in addition to the stringent requirements of the Indian Gaming Regulatory Act. NCAI is currently aware of at least two proposed off-reservation gaming projects that are currently pending fee-to-trust approval where the proposed financing for land and improvements exceeds $250 million, respectively. In addition, many types of other types of business activity involving trust land acquisition are regularly proposed by tribes including shopping malls, industrial centers and golf courses. The annual economic impact of these recently approved transactions and currently pending applications for trust land acquisition may easily exceed $1 billion. If necessary, NCAI can create and provide a detailed listing of such projects.

Letter to The Honorable Bruce Babbitt
July 16, 1999
Page 4

NCAI would also question the method of calculation used by Interior in determining the economic impact of land into trust. The 1996 BIA Annual Report of Lands indicated that there were applications for 212,000 acres of land, and the total amount paid by Indians for lands accepted into trust was slightly less than $20 million. This calculation ignores the economic value of the lands on which no action was taken. The 1995 farm real estate average with no buildings was $644 per acre. *USDA Economics and Statistics System; Farm Real Estate Values (86010)*. Using this conservative average, the value of the 212,000 acres applied for in 1996 was $136,528,000, well over the triggering amount. Once again, this calculation does not consider the economic value of any improvements and development planned for the land.

Two other factors significantly increase the economic impact of these proposed regulations. The regulations place an increased burden on the applicant to collect information and analyze impacts as a part of the application process. The new requirements, such as environmental analysis, will require professional assistance and add significantly to the cost of the application process. Given 6,941 applications per year, the proposed regulations could easily burden tribes and Indians with an additional $15 to $30 million annually. In addition, the proposed regulations express a preference for in-lieu of tax payments to state and local governments when tribes acquire land off-reservation. This change would also significantly affect the economy of Indian reservations, as well as significantly change the fundamental tax relationship between these governments and Tribes.

The proposed regulations also raise novel policy issues. The agency acknowledges that to date "the implementation of specific statutes containing congressional mandates to acquire title to land in trust through our administrative process has not always been well-understood." 64 Fed. Reg. at 17578. The proposed regulations will establish the types of acquisitions that the agency considers mandatory and sets out a new process by which the agency will take title. It is therefore disingenuous for the agency to declare that the rule does not raise novel policy issues.

The Agency should have performed the analysis mandated by this Presidential Executive Order and submitted that assessment to OMB for review before issuing the proposed amended regulations. Its failure to designate this proposed rule as a "significant regulatory action" has denied OMB the opportunity to subject the proposed regulations to this Administration's centralized review process, and has denied the public a proper cost/benefit analysis and a list of potential alternatives. By insisting that the proposed amendments, despite their heavy impact on the economic situation of Indians and Tribes, are not a "significant regulatory action" within the definition of the Executive Order, Interior has made a mockery of the Executive Order.

B. **Executive Order 12988.** President Clinton has also issued Executive Order 12988 entitled "Civil Justice Reform". 61 Fed. Reg. 4729-4734 (Feb. 7, 1996). In Section 3, the Executive Order requires agencies to write a proposed regulation to "minimize litigation".

Interior summarily dismissed this requirement by concluding the amended regulations will not unduly burden the judicial system and, indeed, are written to minimize litigation. 64 Fed. Reg. at 17581. These conclusions are flatly incorrect. The proposed regulations will not only not minimize litigation, but, if promulgated, they will invite unnecessary litigation. Under the proposed amendments, no land will attain trust status until the agency has published a notice of intent to take land into trust, *the time period for appeal has run, all appeals rights have been exhausted, and all title objections have been cleared.* Proposed 25 C.F.R. § 151.7, 64 Fed. Reg. at 17,583. As drafted, this provision provides a strong incentive for opponents of a given application to bring suit against the agency, prolong the litigation as long as possible, and appeal all the way to the Supreme Court, simply to delay the effective date of a decision to take land into trust. This incentive to sue exists even for opponents with weak arguments. Further, under the current regulations, opponents of a proposed acquisition are provided ample opportunity to be heard during the agency's decision-making process. Of course, the costs of defending these cases will be borne directly by the Department of Justice and the relevant Tribes. Yet nowhere in Interior's Federal Register notice is there any acknowledgment that this proposed change will surely result in federal courts being flooded with frivolous litigation challenging proposed acquisitions.

Moreover, this procedure is a fundamental modification of the agency's existing regulations and procedures. Currently, Interior can take land into trust 30 days after it publishes a notice of its intent to take the land into trust. 25 C.F.R. § 151.12 (1998). This 30-day notice provision was intended to allow interested persons the right to seek judicial review of a proposed acquisition. However, the current regulations do not require, or even suggest, that Interior will postpone taking land into trust simply because a lawsuit is filed. Presumably, the acquisition will be postponed after the 30-day period only if a court so orders. Indeed, in a noted case involving a challenge to Interior's decision to take land into trust, the State of South Dakota filed a lawsuit against the Department challenging what was then a potential land acquisition by the United States. After the case was filed, Interior took the land into trust. South Dakota v. United States Dep't of Interior, 69 F.3d 878, 880 (8th Cir. 1995), vacated, 519 U.S. 919 (1996). We understand that this practice, taking land into trust even after a lawsuit is filed challenging the agency's action, continued after the agency issued amended regulations in 1996, allowing persons to challenge proposed land acquisitions in federal court. The Federal Register notice provides no explanation for this change of policy.

C. **Executive Order 13084.** In 1998, President Clinton issued Executive Order 13084 (Consultation and Coordination with Indian Tribal Governments). 63 Fed. Reg. 27,655-657 (May 19, 1998). It was promulgated to establish regular and meaningful consultation and collaboration with Indian governments in the development of regulatory practices that significantly affect their communities, reduce the imposition of unfunded mandates upon them, and streamline the application process applicable to them. The Executive Order requires agencies engaged in formulating policies that significantly affect Indian tribal governments to be guided by respect for their self-government and sovereignty and for responsibilities that arise from the unique legal relationship between the Federal

Government and Indian tribal governments.

Under Section 3(b), no agency shall promulgate any regulation that significantly affects Tribal communities and that imposes substantial direct compliance costs on them unless funds necessary to pay the direct costs are provided by the Federal Government. Here, there can be no serious dispute that the proposed amended regulations will significantly affect Tribal governments and impose new and substantial compliance costs on them. Nevertheless, Interior has failed to indicate whether the Federal Government will make funds available to reimburse the Tribes.

Also, pursuant to Section 5, the Order directs that on issues relating to Tribal self-government and trust resources, each agency "should explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking". Under this process an agency forms a committee and seeks to reach a consensus among all the parties as to the content of a proposed rule. 5 U.S.C. § 581 et seq.

Interior has not explored consensual mechanisms for revising its existing regulations on taking land into trust. Indeed, Interior summarily dismisses its obligations under this Executive Order by making the ludicrous assertion that the proposed amended regulations will not generate any "potential adverse effects" on Indian Tribes. 64 Fed. Reg. at 17,581. The Department has thus demonstrated a complete disregard for the Presidential directive to ensure that all agency action be informed by respect for tribal sovereignty and for the unique legal relationship between the Federal Government and Indian tribal governments. We are also concerned that Interior, as the primary representative of the federal fiduciary obligation to Indian tribes, has also set an extremely damaging precedent that may be followed by other federal agencies in carrying out their responsibilities under the Order.

D. **The Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 et seq.** The RFA compels Federal agencies to consider the impact of their regulations on small entities. Interior does not claim that Indian tribes are not small entities under the RFA. A "small entity" is defined to include a "small governmental jurisdiction," which includes "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." 5 U.S.C. § 601(5). The vast majority of Indian Tribes have less than 50,000 people.

The RFA requires agencies issuing proposed regulations to "prepare and make available for public comment an initial regulatory flexibility analysis." This analysis, which must be published in the Federal Register, "shall describe the impact of the proposed rule on small entities". 5 U.S.C. § 603(a). An agency must describe the "reporting, record keeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary" to prepare these reports. 5 U.S.C. § 603(b)(4). It must outline alternatives to the proposed rule that would "minimize any significant economic impact" on small entities. 5

Letter to The Honorable Bruce Babbitt
July 16, 1999

Page 7

U.S.C. § 603(c)

Here, Interior sought to side-step these requirements by baldly asserting that the "effect on small entities will be minimal." 64 Fed. Reg. at 17,580-81. Interior thus seeks to rely on the statutory exemption for issuing an initial regulatory flexibility analysis by asserting "that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). The Department apparently seeks to come under this exemption by maintaining that the proposed rule "does not have an annual effect on the economy of $100 million." 64 Fed. Reg. 17,580-81. The Department also states the proposed regulations will not result in significant adverse effects on employment or investment. 64 Fed. Reg. 17,581.

These purported bases for exempting Interior from doing an initial regulatory flexibility analysis are nowhere to be found in the statute or any applicable regulation. Moreover, these bald conclusions should be made, if at all, only <u>after</u> the Department conducts the very analysis required by the RFA.

Finally, the Department's conclusions are simply incorrect. The proposed amended regulations will have an annual effect on the economy of more than $100,000,000. Also, the proposed amendments will pose major stumbling blocks for individual Indians and Tribes trying to improve their economic conditions through land acquisitions that are often the lifeblood of a Tribe's economic survival.

**E.  The Small Business Regulatory Enforcement Fairness Act (SBREFA).**
Interior is also seeking to avoid the mandatory Congressional review process of certain rules. In 1996, Congress enacted SBREFA, Pub. L. 104-121, Title II, 110 Stat. 857 (1996). This law requires that before an agency promulgates a "major rule", Congress is given a 60 day period to review the rule before it can take effect. 5 U.S.C. § 801. Here, Interior has already concluded that the amended regulations are not a "major rule" as defined in 5 U.S.C. § 804(2). 64 Fed. Reg. at 17,581. Interior is incorrect.

The proposed amended regulations meet the definition of a major rule on at least two of the grounds set forth in the statute. First, as shown above, the regulations will have an annual effect on the economy of at least $100 million. Second, the regulations will have a significant adverse effect on employment, investment and productivity of numerous Tribes. Accordingly, Congress must be given the mandated review (with a delayed effective date) of any regulation Interior issues that imposes the types of burdens on Tribes that would arise from the proposed amended regulations.

Letter to The Honorable Bruce Babbitt
July 16, 1999

Page 8

## CONCLUSION

On behalf of NCAI and its members, we stand ready to meet with you, representatives of the Department and any other relevant party to discuss this matter further. The Tribes understand the intent to address the "fee to trust" status regulation issues, but the process and integrity of the Presidential instructions regarding the "government-to-government" consultation policy have not been honored. We urge the Department to expeditiously withdraw the proposed amended regulations for taking land into trust. Obligating the Tribes and other Indians to draft and submit comments on the proposed amended regulations will be unnecessarily time-consuming and expensive for all concerned parties. We look forward to a constructive and positive reply.

If you have any questions or would like clarifications, please do not hesitate to call me or JoAnn K. Chase at (202)466-7767

Sincerely,

W. Ron Allen
President

cc:   The Honorable Kevin Gover
      Assistant Secretary For Indian Affairs

      Mr. Terrance Virden
      Director, Office of Trust Responsibilities
      Bureau of Indian Affairs

      The Honorable Lois J. Schiffer
      Assistant Attorney General
      Environmental and Natural Resources Division
      U.S. Department of Justice

      The Honorable Jacob J. Lew
      Director
      Office of Management and Budget

      Ms. Lynn Cutler
      Senior Advisor for Native American Affairs
      to the White House Chief of Staff