

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### OFFICE OF THE SOLICITOR
#### WASHINGTON. D.C.  20240

SEP 1 5 1978

**MEMORANDUM**

To:       Assistant Secretary—Indian Affairs

From:     Associate Solicitor, Indian Affairs

Subject:  Trust land for the Natives of Venetie and Arctic
          Village


This is in response to the memorandum of the Deputy Assist-
ant Secretary for Administration, dated December 13, 1977,
requesting reconsideration of the position taken by former
Under Secretary Kent Frizzell that the Alaska Native Claims
Settlement Act (ANCSA) precludes the Secretary from restor-
ing land held in fee by Alaska Natives to trust status pur-
suant to Section 5 of the Indian Reorganization Act (IRA).
Our research reaffirms the conclusion of the former Under
Secretary. We further believe that there is no basis for
distinguishing, for purposes of Section 5, former reservation
land patented pursuant to Section 19(b) of ANCSA from any
other land conveyed to Natives pursuant to ANCSA.

The intent of Congress to permanently remove all Native lands
in Alaska from trust status is unmistakable. The declaration
of policy states that "the settlement should be accomplished
. . . without creating a reservation system or lengthy ward-
ship or trusteeship, and without adding to the categories of
property and institutions enjoying special tax privileges
. . . ." 43 U.S.C. § 1601(b).

In analyzing the declaration of policy, the Senate Report
stated: "A major purpose of this Committee and the Congress
is to avoid perpetuating in Alaska the reservation and the
trustee system." S. Rep. No. 405, 92th Cong., 1st Sess.
(1971) at 108. This theme was oft repeated in the floor de-
bates. See examples cited in Appendix.

The Natives of Venetie and Arctic Village elected, pursuant
to Section 19(b), to take their former reservation in fee.
They argue that they thereby disassociated themselves from
the settlement legislation and that interpretations based
upon the act as a whole should not apply to them. This
argument misconstrues the nature of Section 19(b). While a
vote to take a former reservation in fee renders the Natives

AR00001

-2-

ineligible for the land and monetary benefits generally provided for elsewhere in ANCSA, it is incorrect to say that the vote disassociates them from the settlement. ANCSA was a settlement of all Native claims. It includes Natives on and off reservations. This point may be demonstrated by comparing the treatment of the Metlakatlans of the Annette Island Reserve with Natives of all other reservations. The Metlakatlans are the sole group of Natives not included within the settlement since they are of Canadian origin and thus have no aboriginal claims to settle. In contrast to other reservation Natives, the Metlakatlans have no village corporation under ANCSA, and their reservation was not revoked.

The option contained in Section 19(b) was not designed to allow "reservation Natives" to disassociate themselves from the settlement. Rather, it was designed to avoid the hardship which would result if these Natives were forced to select land elsewhere, or a lesser total acreage. S. Rep. No. 405, 92d Cong., 1st Sess. (1971) at 159.

The structure and legislative history of Section 19 itself precludes the restoration of former reservations to trust status. Section 19 revokes all reservations (except for Metlakatla) and directs that the land be conveyed to the ANCSA village corporation, not to the IRA entities. It does not allow Natives to vote for continued trust status. It merely allows them to choose between two forms of compensation in settlement of their claims. It is clear from alternatives to Section 19 in earlier proposed settlement legislation that Congress did not exclude the alternative of continued trust status by oversight. Section 22, the counterpart in S. 35 to Section 19, would have allowed the Metlakatlans the choice between continued trust status and fee ownership. Even more telling is the fact that the Councils of Venetie and Arctic Village proposed an amendment to Section 15 of H.R. 10193 (an earlier version of Section 19) which would have permitted the retention of trust status. The proposal was never incorporated into ANCSA. Resolution No. 69-3, Combined Councils of the Native Village of Venetie and Arctic Village Native Council, June 11, 1969.

Also significant is the repeal, in Section 704(a) of the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, of Section 2 of the Act of May 1, 1936, 49 Stat. 1250, 25 U.S.C. § 496, which extended the provisions of the Indian Reorganization Act to Alaska and gave the Secretary the authority to designate certain lands in Alaska as Indian

AR00002

-3-

reservations. In view of the clear legislative intent and policy expressed in ANCSA's extensive legislative history, it would, in my opinion, be an abuse of the Secretary's discretion to attempt to use Section 5 of the IRA (which, along with SS 1, 7, 8, 15, and 17 of the IRA still apply to Alaska pursuant to the unrepealed portion of the Act of May 1, 1936) to restore the former Venetie Reserve to trust status.

We have reviewed the materials received by the Chief of the Branch of Tribal Government Relations in support of the petition for the restoration of trust status. These materials concern the advisability of a restoration of trust status and set out the provsions of the IRA. There is nothing in these materials which counters our analysis of ANCSA. There is only a vague suggestion in the letter from Donald Wright to former Commissioner of Indian Affairs Thompson, dated August 13, 1976, that the Natives believed that they could retain the reservation in trust when they voted pursuant to Section 19 to take the reservation in fee. Nothing else in the materials supports or belies this suggestion. At any rate, a finding that the Natives were uniformed in no way affects the inability of the Secretary as a matter of law to restore the reservation to trust status. Even assuming the Natives could establish that they were uniformed, or worse, actively misled, it does not follow that the remedy would be to return the land to reservation, trust status. At most, the Natives would be entitled to another vote, such as the opt-in, opt-out election ordered by the court following the establishment of the 13th Region, between fee status and normal ANCSA benefits. The Natives do not seem to be requesting a such second vote, and we are not sure that a second vote would be possible at this time absent a court order.

In conclusion, Congress intended permanently to remove from trust status all Native land in Alaska except allotments and the Annette Island Reserve. Section 19(b) allows the Natives of former reservations to choose between two forms of compensation, but does not allow them to disassociate themselves from the settlement. Finally, even if the Natives could disassociate themselves from the settlement, Section 19 itself and its legislative history preclude the restoration of trust status.

(sgd)

Thomas W. Fredericks

AR00003

-4-

## APPENDIX

### Statements regarding reservations made during ANCSA Debates

Rep. Kyl:  I do not know of any member of the com-
mittee who wanted anything to do with setting
up a reservation system in the State of Alaska
similar to that which we have in the lower 48
states.  Our experience with reservations has
just been so tragic and has resulted in such a
futile paternalistic system that we wanted to
avoid that completely.  117 Cong. Rec. 36856
(1971).


Rep. Meeds:  Every one of the bills in our committee
and the bills in the other body, all of them,
eschew the reservation or trust concept.  For
far too long we in America have been making the
Natives' mistakes for them.  117 Cong. Rec.
36865 (1971).


Sec. McGovern:  Those who are concerned about creat-
ing new Indian reservations in Alaska can find
a solution to this problem by assuring an oppor-
tunity for the Natives to secure productive and
promising lands.  117 Cong. Rec. 38444 (1971).


Sen. Gravel:  Under the committee bill all reserva-
tions in Alaska are revoked, unless the village
corporations located within the reservation
elect to take fee title to the reservation.  If
Natives do elect to take title to the reserva-
tion, they will not participate in the land
selection procedures of the bill nor share in
the monetary settlement.  117 Cong. Rec. 46967
(1971).

AR00004

DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C.  20240

SEP 2 0 1978

Mr. Donald R. Wright, Agent
Native Village of Venetie
   Tribal Government
Star Route Box 10402
Fairbanks, Alaska  99701

Dear Mr. Wright:

Secretary Andrus has asked me to respond to your letter to
him of August 8, 1978.

I have enclosed a memorandum from the Associate Solicitor,
Division of Indian Affairs, to the Assistant Secretary for
Indian Affairs which is relevant to some of the questions
you raise in your letter.  As you will note, the memorandum
concludes that the Secretary has no authority to restore the
former Venetie Reserve to trust status.

I am aware of the delays that have occured in the actual
conveyance of the lands, and I assure you that we are making
every effort to complete the conveyance as soon as possible.
Until the actual conveyance, however, it is clear that the
regulations found at 43 C.F.R. § 2650.1(a)(1), setting forth
provisions for interim administration, apply to the former
Venetie Reserve.  See 43 C.F.R. § 2654.3(a).  Section 2650.1
(a)(1) provides:

> Prior to any conveyance under the act, all
> public lands withdrawn pursuant to sections
> 11, 14, and 16, or covered by 19 of the act,
> shall be administered under applicable laws
> and regulations by the Secretary of the
> Interior, or by the Secretary of Agriculture
> in the case of national forest lands, as
> provided by section 22(i) of the act.  The
> authority of the Secretary of the Interior
> and of the Secretary of Agriculture to make
> contracts and to issue leases, permits,
> rights-of-way, or easements is not impaired
> by the withdrawals.  (Emphasis supplied.)

-2-

The Secretarial authority set forth above is exercised by
the Bureau of Land Management.  Of course, in the exercise
of such authority, it is necessary that:

> Prior to making contracts, or issuing
> leases, permits, rights-of-way, or ease-
> ments on lands subject to election pur-
> suant to section 19(b) of the act, the
> Secretary shall obtain the consent of the
> representatives of the Natives living on
> those lands.  43 C.F.R. § 2650.1(a)(2)(ii)

In view of the above, I do not see that a meeting with the
Secretary would serve any useful purpose.  Under the present
circumstances, the  Secretary simply does not have the au-
thority to ignore the policy and statutory provisions of the
Alaska Native Claims Settlement Act and restore the former
Venetie Reserve to trust status, or to waive valid Depart-
mental regulations and exempt Venetie from regulations which
clearly apply to Venetie lands.  It would appear that Depart-
mental responsibilities with respect to former trust land can
only be restored through legislation.  This is an avenue you
may wish to pursue.  Should you generate a legislative pro-
posal on this matter, the Secretary, I, or one of our repre-
sentatives will be happy to discuss the proposal with you at
some future date.

                              Sincerely,

                              (sgd)

                              SOLICITOR

                              Thomas W. Fredericks
                              Thomas W. Fredericks

# NATIVE VILLAGE OF VENETIE

Federally Chartered Tribal Government and Corporation

for the

## VENETIE INDIAN RESERVATION

August 8, 1978

**FIRST CHIEF**
Gideon James
Arctic Village

**SECOND CHIEF**
Edward John
Venetie

**SECRETARY**
Charlotte John
Venetie

**TREASURER**
Paul Williams
Arctic Village

**SERGEANT-AT-ARMS**
Timothy Sam
Arctic Village

**PARLIAMENTARIAN**
Lawrence Roberts
Venetie

**COUNCIL MEMBERS**
Christian Tritt, Sr.
Venetie

John Titus
Arctic Village

Trimble Gilbert
Arctic Village

The Honorable Cecil D. Andrus
Secretary of the Interior
Eighteenth and C Streets
Washington, D. C. 20240

Dear Secretary Andrus:

The Alaska Native Claims Settlement Act required the villages within the boundary of the Venetie Indian Reservation to vote on whether they wanted to participate in the overall land and money settlement or to retain their land and waters. The people voted overwhelmingly to retain the lands. They have waited seven years for conveyance of the lands.

The Tribal governing body, the NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, organized under the Wheeler-Howard Act of 1934, as amended for Alaska in 1936, was ratified by the people in January, 1940.

Article IV of the Constitution and By-Laws of the NATIVE VILLAGE OF VENETIE, Section 1. Powers Held.-, states ". . . To deal with the Federal and Territorial Governments on matters which interest the Village, to stop any giving or taking away of Village lands or other property without its consent. . ."

The Secretarial Approval of the Constitution and By-Laws states, "All officers and employees of the Interior Department are ordered to abide by the provisions of the said constitution and by-laws".

The inhabitants of the Venetie Indian Reservation have directed the NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT Council to request that the lands they voted to retain be retained in trust status for their use, occupancy and benefit. Formal requests were submitted to Commissioner Thompson and to Assistant Secretary Gerard.

The regulations promulgated for the conveyance of lands pursuant to ANCSA are not applicable to the Venetie Indian Reservation.

Arctic Village, Alaska 99722  •  Telephone (907) 587-8001  •  Venetie, Alaska 99781  •  Telephone (907)

August 8, 1978
Page 2

    The history of the designation of the Reservation is
clear in the intent to be for the exclusive use and occupancy
of the inhabitants and specific in the intent to exclude non-
Natives and prevent their encroachment upon the traditional
and subsistence life style of the inhabitants.

    To submit to the easement process as outlined in the
regulations for conveyances pursuant to ANCSA would be in
violation of our Constitution and By-Laws and an abrogation
of our rights to control the lands for the benefit of the
inhabitants.

    Through meetings with Bureau of Land Management Field
Office personnel, it is clear that they do not have the
authority to render the judgment that the regulations do not
apply to us and convey the lands without easements.
The authority rests with you.

    We, therefore, request a meeting with you wherein through
the exercise of your authority you would waive the regulations
and convey our lands intact, with no easements, and accept the
lands in trust. Without the continued protection of the special
trust relationship between the United States government and the
NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT for the Neets'aii
Gwich'in Athapaskan Nation, we will be submitting to racial and
cultural genocide.

    Sincerely,

    GIDEON JAMES, First Chief

    EDWARD JOHN, Second Chief

    By: _Donald R. Wright_
        DONALD R. WRIGHT, Agent for the
        NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT
        Star Route Box 10402 Fairbanks, Alaska 99701

DRW/jcw

cc: President Carter
    Senator Ted Stevens
    Senator Mike Gravel
    Congressman Don Young
    Council Members
    Assistant Secretary Gerard
    Martin Seneca
    Curtis McVee

AR00008

# *Memorandum*
Tribal Government Services

TO     : Commissioner of Indian Affairs
        Through: Director, Office of Indian Services

**DATE:** MAR 3 0 1977

FROM  : Chief, Division of Tribal Government Services

SUBJECT: The Application of Section 5 of the IRA to Alaska Native Villages

A serious question confronts those of the Bureau who work with Alaska Native Villages which in the interest of the Bureau's rapport should be resolved without much further delay. What is the policy with regards to the application of Section 5 of the IRA to Alaska Native Villages? Depending on the answer, we could get a much greater upswing in village requests for IRA organization. The question is before us as a result of queries from IRA villages, most significantly from the Village of Venetie.

The Alaska Native Claims Settlement Act (ANCSA) makes no mention of amending any IRA provisions. Section 5 of the IRA is applicable then to those Native Villages that have organized pursuant to Section 16 of the IRA?

Some 70 villages have organized pursuant to the IRA. In the absence of some announcement to the contrary, it would appear that those and any other villages which might in the future organize pursuant to the IRA could petition the Secretary to take lands in trust for them.

The village corporations will be obtaining fee title, we understand, to certain lands pursuant to the ANCSA. Such corporations are not tribes. Therefore, they can offer their lands to the Secretary pursuant to Section 5 to hold in trust for IRA villages. The Area Director must answer then "Yes or "No." To date the answer has been to stall.

Most recently the Sterling Institute, under contract with the Juneau Area Office to develop an explanation package regarding P. L. 93-638 to be presented the villages has raised the same question. (I presume the institute's contracts with villages have been so queried.)

The explanation is most likely in the villages seeking a haven for lands that will eventually be taxed by the state and then subject to loss because of non-payment. In the absence of an extension to the current period of tax exempt status offered by the ANCSA the fear is both very real and justified if the history of similar Indian legislation teaches us anything.

*Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan*

AR00009

- 2 -

Informal discussions have heard "the ANCSA's legislative history precludes taking land in trust." Others claim, "Nothing in the Act's language precludes it so the authority remains with the Secretary to favorably respond to request that he take in trust offered lands for Native Villages." No responsible answer exist, however. It is time we have one.

We have taken in this Division the position that the right of villages to organize under the IRA has not been precluded by the ANCSA. It follows that we would recommend the Secretary's authority to take lands in trust under Section 5 of the IRA has not been considered extinguished by the Act. Rather, the Secretary should exercise that right on a case by case basis to protect the village's possession of their lands when it is clearly shown that through no fault of there own the inability to meet the tax levy will result in loss of village lands. This is not to say we would endorse a policy to take in trust all lands offered, thereby become part of a subterfuge to "beat state taxes." That would be a violation of the intent of Congress in passing the ANCSA. On the other hand, it was not the intent of Congress to enact legislation that would lead to a land grab that could make that following the Allotment Act look like a Sunday School picnic.

Our recommendations having been made, we now need a policy statement to enable us to reply to those seeking the Department's position on this question.

Whether a decision may have been made is unclear. Hopefully, without our input, this is not the case. We call your attention to a sentence submerged in a paragraph in a letter of December 30, 1976, to Senator Stevens from Under Secretary Kent Frizzel (see enclosure). Mr. Frizzel expressed the view that "Our responsibilities with respect to former trust land could only be restored through legislation." It is not clear whether this means administrative action to take land in trust no longer is possible. The lands of the Chandlar (Venetie) reserve were formerly trust lands, but what of those of other villages? On the other hand, if such a decision has been reached, we should be so advised and will respond that only Congress now can transfer Alaska Native Village lands from fee to trust status. While other incentives might still remain for IRA organization, a major one would then be removed. The villages should be so notified.

reserves are no longer held by the United States in trust for the benefit of the Natives, **Dennis L. Petersen** the effect on

**Enclosure**
cc: Code 200 (John Gordon)



United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

DEC 3 0 1976

Dear Senator Stevens:

This is in further reply to your letters of August 23 and December 6 concerning the Venetie Reserve.

You have asked the status of the inhabitants of Christian Village and Robert's Fish Camp. Neither village was certified as a Native village pursuant to section 11(b)(3) of the Alaska Native Claims Settlement Act (ANCSA) [43 U.S.C. sec. 1610(b)(3)]. But while the residents of those villages originally voted to retain the Venetie Reserve, they are now given an option by section 1(b) of the Omnibus Act of January 2, 1976 (89 Stat. 1145) either to enroll into Venetie or Arctic Village or to remain enrolled in the Doyon Region on an at-large basis. There are no Alaska Native enrollees to Christian Village and only six enrolled to Robert's Fish Camp.

You have also inquired with regard to the delivery of services to the residents of Venetie under the Bureau of Indian Affairs contract with the Tanana Chiefs Conference. The formula for the provision of those services is not population-based, and services are being provided on essentially the same basis as if they were being provided directly by BIA. Of course, the remoteness of a village may necessarily impair the provision of services during certain times of the year. But local BIA officials feel that Venetie is receiving an equitable share of the contracted services.

Finally, you have asked that this Department look into the effect of the selection of a Native reserve on the trust responsibilities to the Native residents of such a reserve. This is, of course, a complex question rendered no less problematic by the fact that the scope of the Government's trust responsibility to Indian people remains a subject of much debate. See, for example, R. Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stanford Law Review 1213 (1975). The effect of the Settlement Act is, therefore, far from clear. In the case of Venetie and similar reserves, one can point to the fact that as a result of the Act, such reserves are no longer owned by the United States in trust for the benefit of the Natives. This necessarily has had some effect on

BIA 107A BCCO 5356 FRA 62/71
BIA AD, Juneau
BIA 939B mailroom
BIA 202/JFGordon:jwg 12/13/76

BIA 202 surname
BIA 202 chron
BIA 202 hold
BIA 200

cc:
Secty's surname
Secty's RF (2)
Other distribution p. 2

AR00011

trust responsibilities to provide realty-related services. To the
extent that the BIA's responsibilities to provide such services are
limited to trust land such obligations have been lifted. BIA services
for individual Indian allotments, however, would not appear to be
affected by the passage of ANCSA. Our responsibilities with respect
to former trust land could only be restored through legislation. Absent
more specific guidance from Congress, we will continue to evaluate our
remaining trust responsibilities in Alaska on a case-by-case basis.
If you have any questions regarding the nature or existence of the trust
relationship in a specific context, we will attempt to respond to it in
more detail.

If we can be of further assistance in this matter, please do not hesitate
to call on us.

                              Sincerely yours,


                              /S/ KENT FRIZZELL

                    Under
                              Secretary of the Interior

Honorable Ted Stevens
United States Senate
Washington, D. C.  20510

bcc:   Solicitor's Docket
       Solicitor's RF (2)
       Secretary's RF (2)
       U/S RF
       TFredericks RF
       RSchwartz RF (2)
       Mualter RF
       DIA RF (2)

       SOL:RSchwartz:MW:9/12/78:x39331

AR00013

MEMORANDUM

TO:      William C. "Spud" Williams
         President

FROM:    Mike Walleri
         Village Government Specialist

SUBJ:    Recovery of Tetlin's Reservation Status

DATE:    April 1, 1980

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

The Chief of Tetlin has approached me to discuss the possibility of
recovering the trust status of the former Tetlin Reserve. As you know,
the reserve was revoked by operation of §19 of the Alaska Native Claims
Settlement Act (ANCSA) and the former reservation land will be patented
in fee to the village corporation.

The Chief's proposal is very similar to that proposed by Arctic Village
and Venetie. In reference to that proposal, the Chief of the Branch of
Tribal Government Relations, B.I.A., referred the question to the
Associate Solicitor for Indian Affairs. Mr. Thomas W. Fredericks then
produced a memorandum on the subject which concluded that it would be an
abuse of discretion for the Secretary of the Interior to accept land in
trust under §5 of the Indian Reorganization Act (I.R.A.). Upon review
of the memorandum and applicable law, I must conclude that the memorandum
reflects a minority opinion and is in opposition to all the case law
which addresses the question. The following comments review the law on
the subject.

Secretary's Authority to Accept Land in Trust

The question involves the interaction between the Alaska Composite
Indian Reorganization Act (I.R.A.) and the Alaska Native Claims Settle-
ment Act. The pertinent sections of the I.R.A. are now found in 25
U.S.C. §§ 456, 466, and 473(a). These sections specifically make appli-
cable to Alaska those provisions of the I.R.A. which allow the Secretary
to receive lands in trust for Alaskan Natives and declare such lands as
reservations. In contrast, §19 of ANCSA terminated all reservations in
Alaska, except for Metlakatla. (See Appendix I for text of statutes.)
It should be noted that ANCSA failed to expressly repeal the I.R.A.

As a general rule, "when there are two acts upon the same subject, the
rule is to give effect to both if possible. . .the intention of the
legislature to repeal must be clear and manifest" Morton v Mancari, 417
U.S. 535, 551 (1974) quoting United States v Borden Co. 308 U.S. 188,
198 (1939); United States v Greathouse, 166 U.S. 601 (1897); see also
SANDS, SUTHERLAND STATUTORY CONSTRUCTION §§ 23.9-23.10 (4th ed. 1972).

A literal reading of §19 of ANCSA provides only that reservations existing at that time be revoked. It does not address future reservations in Alaska. By comparison, the I.R.A. authorizes the Secretary to accept trust status land in the future and create future reservations. This is further supported by the general rule that legislation affecting Indians is to be construed in their interest and doubtful expressions are to be resolved in favor of the Indians. Alaska Pacific Fisheries v United States, 248 U.S. 78 (1918); Choate v Trapp, 224 U.S. 665 (1912); United States v Celestine, 215 U.S. 278 (1909); United States v Nice; 241 U.S. 591 (1915); Bryan v Itasca County; 426 U.S. 373 (1976). It is therefore clearly doubtful that §19 of ANCSA prohibits the creation of reservations or trust status land in Alaska.

The case law clearly supports this contention. Extensive research has failed to uncover a single case supporting the Solicitor's memorandum. Cases on point, however, support the view that the Secretary may accept fee interest land from Indians into trust status. In City of Tacoma v Andrus, 475 F. Supp. 342 (D.D.C. 1978) the court upheld the Secretary's power to accept into trust lands within the historic boundaries of the Puyallup reservation. In so doing, the court cited past instances where the Secretary exercised this power. See Mescalero Apache Tribe v Jones, 411 U.S. 145 (1973); Stevens v Commissioner, 452 F. 2d, 741 (9th Cir. 1971). Similarly, in Chase v McMasters, 573 F. 2d 1011 (8th Cir. 1977), the court upheld the Secretary's receipt of land in trust for the benefit of an individual Indian pursuant to the Indian Reorganization Act. In light of these considerations it is quite clear that the Secretary has the authority to accept land in trust for Alaskan Natives.

Discretion of Secretary

The Eighth Circuit has clearly held that Congress did not limit the Secretary's discretion to select land for acquisition as trust land. Chase v McMasters, 573 F. 2d, at 1016. The court held that "the mere fact that Chase was motivated by a desire to avoid paying taxes does not indicate that the Secretary abused his discretion by acceptance of the conveyance." id, citing Board of Commissioners of Pawnee County, Oklahoma v United States, 139 F 2d 248, 252 (10th Cir. 1943). Similarly, it has been held that the Secretary did not abuse his discretion where the beneficiary Indians supplied the subject land. In the City of Tacoma case, the court held that the I.R.A. specifically authorizes the Secretary to acquire land through "relinquishment", which was held to include "a surrender of title by a grantor in favor of a beneficial interest." City of Tacoma v Andrus, 457 F. Supp. at 345-6. The court noted that in Stevens v Commissioner 452 F. 2d 741 (9th Cir. 1971), that court approved of the Secretary acquiring land with funds provided by Indians. The Tacoma court went on to note that "To hold that Indians may provide money but not land to come within the protection of section 5 would be the rudest exaltation of form over substance." id at 346.

It is clear that the fee status of the land received under ANCSA is not itself an impediment to Secretarial acceptance of the land in trust. Similarly, the fact that the community is not landless is irrelevant. Finally, the possible benefits trust status will convey to the bene-ficiaries is likewise not an impediment to the proposed trust-taking.

Effect of Legislative History

The Assistant Solicitor's opinion that the proposed trust taking is an abuse of Secretarial discretion is premised upon the legislative history of ANCSA. It should be pointed out that the authorization for the trust taking comes from §5 of the I.R.A., not ANCSA. The case City of Sault Ste. Marie v Andrus, 458 F. Supp. 465, 473 (D.D.C. 1978) reviewed the question of whether §5 of the I.R.A. was an unconstitutional delegation of legislative power without appropriate standards. The court upheld §5, stating that the legislative history of the I.R.A. provides adequate standards for the exercise of this discretion. The view that the Secretary should look to the legislative history of the I.R.A. rather than ANCSA is consistent with the general rule of law enunciated by Justice Brandeis when he wrote:

> The legislative history of an act may, where the meaning of the words used is doubtful, be resorted to as an aid to construction. But no aid could possibly be derived from the legislative history of another act passed nearly six years after the one in question. Penn Mutual Life Insurance Co. v Lederer, 252 U.S. 523, 537-8 (1920).

See also United States v Southwestern Cable Co., 392 U.S. 157, 170 (1968); Rainwater v United States, 356 U.S. 590, 593 (1958); United States v Price, 361 U.S. 304, 313 (1960); Haynes v United States, 390 U.S. 85, 87, n. 4 (1968). Cf. Seymour v Superintendent, 368 U.S. 351, 356-7 (1962); Mattz v Arnett, 412 U.S. 481, 505 (1972). (Court upheld existence of reservations based on subsequent congressional dealings which recognized existence of reservations.)

The review of the legislative history of Sec. 5 of the Wheeler-Howard Act to Alaska is a two step process. Originally, only Sections 9, 10, 11, 12 and 16 applied to Alaska. This meant that only Indians already residents on a reservation could take advantage of the Wheeler-Howard Act, and that the Secretary could not take additional lands in trust. The Act of May 1, 1936 (25 U.S.C. 473(a) ) was designed to change this. Basically, it allowed organization of non-reservation Natives and applied the remaining sections of the I.R.A., including Section 5, to Alaska.

The purpose of the 1936 amendment was to

> ". . .make effective the so-called Wheeler-Howard Act now largely inoperative in Alaska because, seemingly by inadvertence, the Secretary of the Interior was not authorized to complete the incorporation of Indian tribes in Alaska. . ." H.R. Rep. No. 2244, 74th Cong. 2d sess., 2 (1936).

Furthermore, the Committee stated that,

> Application of the other sections of the Wheeler-Howard Act is advisable and hence recommended because their inclusion will make for a smoother and more efficient administration. id.

AR00016

In this way, the terms and policies of the Wheeler-Howard Act were applied to Alaska.  Section 5 reflected two Congressional concerns.  First, the Act attempts "to build up Indian landholdings until there is sufficient land for all Indians who will beneficially use it."  City of Tacoma v Andrus, 437 F. Supp., at 345.  Citing 78 Cong Rec. 11732 (1934) (Rep. Howard; S Rep. No. 1080, 73d Cong., 2d Sess. (1934) ).  Secondly, the Act attempts to protect Indian land by allowing the Secretary to hold the lands in trust.  id; See also Mescalero Apache Tribe v Jones, 411 U.S. 145, 151 (1973).

These policies are not inconsistent with the ANCSA.  Whereas the ANCSA substantially built up Alaskan Native lands, the Wheeler-Howard Act represents an option available to protect those lands.  The statements by Congressional leaders regarding reservations cited by the Solicitor merely reflect a desire to end federal paternalism over Indians and their lands.  Like ANCSA, the I.R.A. was designed "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism."  Mescalero Apache Tribe v Jones, 411 U.S. 145, 152 (1973) quoting H.R. Rep. No. 1804, 73rd Cong. 2d Sess., 1 (1934).

Therefore, to the extent that the proposed trust-taking fulfills the intent of the Wheeler-Howard Act (i.e. builds up Indian land holding and provides for protection of the Indian land base), a Secretarial trust taking will not constitute a Secretarial abuse of discretion.

I have been unable to uncover authority for the proposition that ANCSA in any way limits the discretion of the Secretary to accept land in trust for the benefit of Alaskan Natives.  On the contrary, there exists substantial precedence to view such trust taking as wholly within the Secretary's statutory grant of authority.

62F

AR00017

1979 to allow respondent's subsidiary, Scholl Inc., to continue to market Solvex athlete's foot products, under license, from the acquirer of the divested assets, until December 31, 1980, and having placed such request on the public record for a period of thirty (30) days, and no comments thereon having been received, and having considered such request and determined that reopening and modification of the order is warranted:

It is ordered, That the proceeding be, and it hereby is, reopened.

It is further ordered, That Paragraph I of the order be, and it hereby is, modified to read as follows:

I

It is ordered, That, subject to the prior approval of the Federal Trade Commission, respondent Schering-Plough, through its officers, directors, agents, representatives, employees, subsidiaries, affiliates, divisions, successors and assigns, shall, within one (1) year from either the date Schering-Plough acquires Scholl or service of this Order, whichever comes later, divest the assets, tangible and intangible, acquired, improved or added by respondent as a result of its acquisition of Scholl and utilized by Scholl primarily for the manufacture, distribution or sale in the United States of Solvex athlete's foot products. Such assets shall include all raw material reserves, inventory, machinery, equipment, trade names, trademarks, patents, licenses, research and development projects, good will and other property of whatever description; provided, however, that nothing in this provision shall prohibit or prevent Schering-Plough, its subsidiaries, affiliates, divisions, successors or assigns, from continuing to market Solvex athelete's foot products, under license from the acquirer of the assets to be divested, until no later than December 31, 1980.

By the Commission. Commissioner Bailey did not participate.

Carol M. Thomas,
Secretary.

[FR Doc. 80-29013 Filed 9-17-80; 8.45 am]
BILLING CODE 6750-01-M

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

### 25 CFR Part 120a

### Land Acquisitions

September 5, 1980.
**AGENCY:** Bureau of Indian Affairs, Department of the Interior.

**ACTION:** Final rule.

**SUMMARY:** These are new regulations governing the acquisition of land by the United States in trust status for individual Indians and Indian tribes. They cite the statutory authorities and set forth the policies and procedures which are to be followed in such acquisitions.

**EFFECTIVE DATE:** October 20, 1980.
**FOR FURTHER INFORMATION CONTACT:** Raymond W. Jackson, Area Realty Officer, Phoenix Area Office, Bureau of Indian Affairs, P.O. Box 7007, Phoenix, Arizona 85011, telephone (602) 241-2275.

**SUPPLEMENTARY INFORMATION:** Proposed regulations were published in the Federal Register, Volume 43, No. 144 at 32311 on July 26, 1978. Many comments and suggestions were received during the 3-month comment period, including several requests for public hearings. In response to those requests, public hearing were held in Seattle, WA on March 28; in Minneapolis, MN and Oklahoma City, OK on April 3; in Spokane, WA, on April 4; in Pierre, SD, Albuquerque, MN on April 5; and in Billings, MT on April 11, 1979.

The written comments and the testimony received at the seven hearings dealt with virtually every section of the proposed regulations, as well as the general policies involved, in considerable detail and included many suggestions for revision of the proposal. The general areas of comment, some of the major suggestions, and the changes which have been made in the proposed regulations are discussed below.

The proposed § 120a.1 stated that the regulations were to govern acquisition of land in trust status and in restricted status. Some persons questioned whether any acquisitions contemplated by these regulations should be in other than trust status. Also, the inclusion of a reference to acquisition in restricted status raised questions about whether an attempt was being made to regulate fee simple acquisitions by Indians where title might become restricted by operation of law. In response to these questions, § 120a.1 has been revised to delete any reference to acquisition of land in restricted status and a sentence has been added stating that the regulations do not apply to acquisitions of land by Indians in fee simple status. Another sentence has been added to this section to make it clear that the regulations do not pertain to acquisition of interests in trust status by inheritance or escheat because some individuals believed that the proposed language was subject to a contrary interpretation. It was also pointed out that the Alaska

Native Claims Settlement Act does not contemplate the further acquisition of land in trust status, or the holding of land in such status, in the State of Alaska, with the exception of acquisitions for the Metlakatla Indian Community; consequently a sentence has been added to § 120a.1 to specify that the regulations do not apply, except for Metlakatla, in the State of Alaska.

The language of the proposed § 120a.2(b), which defined a tribe, was criticized because it required that a group be currently recognized by the U.S. Government "Currently" was interpreted to mean "at the time of the regulations". Also, many Federal agencies recognize Indian groups for different purposes and for their particular programs; therefore, the language used may have been interpreted to be much broader than intended. To resolve these problems, the definition was changed to delete the word "currently" and to specify recognition by the Secretary of the Interior as eligible for special programs and services from the Bureau of Indian Affairs. The word "sovereign" was deleted because the Indian Reorganization Act definition of "tribe" includes groups other than sovereign entities. Also, reference to Alaska native groups and villages, except Metlakatla, has been eliminated for the reason mentioned above. Another criticism of this definition was its failure to include tribal corporations. Tribal corporations were not included because the acquisition authority in the Indian Reorganization Act is limited to an "Indian tribe or individual Indian"; however, it has been pointed out that other statutory authority does provide for the acquisition of land in trust for tribal corporations; namely, section 2 of Public Law 91-229 (84 Stat. 120; 25 U.S.C. 489). In view of this, the definition has been changed to include corporations for limited purposes.

Some individuals objected to the definition of an "individual Indian" found in § 120a.2(c) because, in their opinions, it was either too broad or too narrow. As explained in the original publication, this definition is one based on administrative precedent and applicable statutes. No changes have been made except for minor editorial corrections and except for further refinement of the definition as it applies to Alaska natives.

Several comments criticized the definition of "Indian" in proposed § 120a.2(d) on the basis that the use of this term to refer to both individuals and groups was confusing. For this reason the definition has been eliminated and

the text of the other sections has been revised to accommodate this change.

Problems with the definition of an "Indian reservation" contained in proposed § 120a.2(g), now (f), were perceived by many because of the possible implication that the disestablishment or total allotment of a reservation necessarily extinguished the reservation, or because the question of the boundaries of some reservations is pending determination. Revised language has been inserted to resolve these problems.

A minor editorial change has been made in proposed § 120a.2(h), now (g). The definition of a "tribal consolidation area" set out in proposed § 120a.2(i), now (h), was criticized because some tribes do not now have an Indian reservation and because the expression "in close proximity to" was not precise. To partially resolve these difficulties the offending language has been deleted. Also, a phrase has been added indicating that a land acquisition plan is to cover acquisition of land for a tribe in trust status. Other objections to this definition reflected a wide range of sentiment ranging from too liberal to unreasonably restrictive. The provision for Secretarial approval should keep the approval of plans within reasonable limits.

The land acquisition policy specified in § 120a.3 was the subject of much objection; some from those who believe it is too restrictive and some from those who maintain it is too broad. Changes have been made to reflect the intent that land acquired under these regulations be taken in trust status, as opposed to restricted status. Also, since some question about whether tribal self-determination and economic development would include providing housing for Indians, § 120a.3(a)(3) has been modified to specifically cover acquisition of land for Indian housing. Additional editorial changes have been made which are not intended to change the meaning of the section. The policy itself is within the scope of existing statutory authority and, it is believed, reflects Congressional intent.

The proposed § 120a.4 concerning statutory restrictions on tribal property has been deleted because it was not directly pertinent to acquisition of land in trust status and because it was the source of substantial confusion about the intent of these regulations.

Proposed § 120a.5, now § 120a.4, dealing with transfer of land from fee to trust status, has been revised to eliminate redundancies and to bring it into harmony with changes made in other sections already discussed. These changes should eliminate most of the

objections to this section. The title of the section has been revised to remove any implication that the acquisitions described in the body of the section are the only kind contemplated. Also, the provision dealing with acquisitions in Oklahoma under section 5 of the Indian Reorganization Act has been made into a separate section. § 120a.5.

Proposed § 120a.6 has been deleted because its substance is covered in other sections.

Proposed § 120a.7 is renumbered § 120a.6 and has only editorial revisions.

Proposed § 120a.8 has been deleted because it has been determined that the Act of February 14, 1931, as amended, does not authorize land acquisition in trust status.

Proposed § 120a.9 is now § 120a.7. A new paragraph (b) has been added to provide that a tribe may acquire a fractional land interest in trust status if the interest to be acquired is in fee status prior to such acquisition. This section was one of the most severely criticized by spokesmen for Indian tribes. In an effort to respond to these objections, a new paragraph (e) has been added to make it possible for a tribe to also acquire an undivided interest in trust or restricted land, if the owners of a majority of remaining trust or restricted interests agree. This section has also been changed to make it apply to individuals as well as tribes. This change is in response to problems which have developed when an individual acquires a fractional interest in property and uses it to the exclusion of, and with no accountability to, the other owners.

A new § 120a.8 has been added to require tribal consent to a nonmember's acquisition of land in trust status on the tribe's reservation, unless the nonmember already owns an undivided interest, in trust or restricted status, in the parcel of land to be acquired. This addition is intended to support tribal self-determination.

Proposed § 120a.10 is now § 120a.9 and has only editorial changes. Many commentators objected to the requirement for information which would support and justify the approval of the acquisition of land in trust status. Because of the discretionary nature of trust land acquisitions, it is considered not only appropriate but also requisite to have support for the Secretary's decision in the record. The need for this requirement is increased by the addition of a new section 120a.10, which prescribes factors to be considered in evaluating requests.

Many objections were received about the acquisition of fee lands in trust status. These comments primarily concerned the erosion of tax base and

the serious jurisdictional problems that can arise when land outside of reservation is acquired in trust status. Many of the suggestions go beyond the scope of existing statutory authority and the proper purview of these regulations; e.g., the proposal that in-lieu taxes be paid for land transferred from fee to trust status.

A number of persons recommended that an economic impact analysis be made before any land acquisition regulations are adopted. However, trust land acquisitions occur whether or not such regulations are promulgated. The main purposes of these regulations are to enunciate land acquisition policy and to bring uniformity into the application of that policy.

In order to insure that conflicting interests are evaluated before land is acquired in trust status, a new § 120a.10 has been added setting forth the factors that will be considered by the Secretary when evaluating a land acquisition request. Among other things, this will require the consideration of economic impact for each acquisition before it is approved. Other factors, such as potential jurisdictional problems, the need for the land and its intended use, and the ability of the Bureau of Indian Affairs to administer the trust on the land, also must be considered.

Tribal representatives expressed the opinion that a specific time limit for acting on requests should be included in § 120a.11. While a specific time has not been included, the section has been changed to require that the applicant be promptly notified of decisions. Also, in response to several suggestions, the section now requires that the applicant be given the reasons for denial of a request.

Section 120a.12 has been subject to certain revisions. Some individuals suggested that the Secretary in requiring that liens, encumbrances, or infirmities of title be eliminated before bringing land into trust limit that requirement to those which make the title unmarketable. Others suggested that the regulations require the elimination of all liens, particularly those arising from taxes and assessments. There are some liens, encumbrances, or infirmities which, although not making the title unmarketable, could impose burdens on the United States were the title to be taken in trust without eliminating them. The section has been modified to require the elimination of those which render the title unmarketable and to provide discretion in requiring the elimination of those which do not cause unmarketability.

Section 120a.13 remains the same with only minor editorial changes.

AR00019

The primary author of this document is Raymond W. Jackson, Area Realty Officer, Phoenix Area Office, Bureau of Indian Affairs, P.O. Box 7007, Phoenix, Arizona 85011, telephone (602) 241–2275.

It has been determined that this rule is not of sufficient significance to require the preparation of a regulatory analysis under Executive Order 12044 of March 23, 1978, and 43 CFR 14.

The authority for adoption of these regulations is contained in 5 U.S.C. 301; 25 U.S.C. 1 and 2; 25 U.S.C. 450h, 450k, 464, 465, 501, 1466, 1469, 1495 and 1498; and 209 DM 8.

The title of Subchapter K, Chapter I, of Title 25 of the Code of Federal Regulations is revised and a new Part 120a is added as follows:

## SUBCHAPTER K—LANDS: SURFACE AND SUBSURFACE ESTATES AND RESOURCES (RECORDS AND TITLE DOCUMENTS: ACQUISITIONS: PATENTS, ALLOTMENTS AND SALES)

## PART 120a—LAND ACQUISITIONS

Sec.
120a.1 Purpose and scope.
120a.2 Definitions.
120a.3 Land acquisition policy.
120a.4 Acquisitions in trust of lands owned in fee by an Indian.
120a.5 Trust acquisitions in Oklahoma under Sec. 5 of the I.R.A.
120a.6 Exchanges.
120a.7 Acquisition of fractional interests.
120a.8 Tribal consent for nonmember acquisitions.
120a.9 Requests for approval of acquisitions.
120a.10 Factors to be considered in evaluating requests.
120a.11 Action on requests.
120a.12 Title examination.
120a.13 Formalization of acceptance.

Authority: R.S. 161; 5 U.S.C. 301. Interpret or apply 48 Stat. 1108, as amended; 46 stat. 1471, as amended; 48 stat. 985, as amended; 49 Stat. 1967, as amended; 53 Stat. 1129: 63 Stat. 605; 60 Stat. 392, as amended; 70 Stat. 290, as amended; 70 stat. 626; 75 Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat. 747; 82 Stat. 174, as amended; 82 Stat. 884; 84 Stat. 120; 84 Stat. 1874; 86 Stat. 216; 86 Stat. 530; 86 Stat. 744; 86 Stat. 78; 86 Stat. 81; 86 Stat. 1710; 88 Stat. 2203; 88 Stat. 2207; 25 U.S.C. 409a, 450h, 451, 464, 465, 467, 488, 489, 501, 502, 573, 574, 576, 608, 608a, 610, 610a, 622, 624, 640d–10, 1466, and 1495, and other authorizing acts.

Cross-Reference: For regulations pertaining to: The inheritance of interests in trust or restricted land, see parts 15, 16, and 17 of this title and 43 CFR Part 4; the purchase of lands under the BIA Loan Guaranty, Insurance and Interest Subsidy program, see part 93 of this title; the exchange and partition of trust or restricted lands, see part 121 of this title; land acquisitions authorized by the Indian Self-Determination and Education Assistance Act, see parts 272 and 276 of this title; the acquisition of allotments on the public domain or in national forests, see 43 CFR Part

2530; the acquisition of Native allotments and Native townsite lots in Alaska, see 43 CFR 2501 and 2564; the acquisition of lands by Indians with funds borrowed from the Farmers Home Administration, see 7 CFR 1821.401, et seq., and 1890f; the acquisition of land by purchase or exchange for members of the Osage Tribe not having certificates of competency, see §§ 108.8 and 127.54 of this title.

### § 120a.1 Purpose and scope.

These regulations set forth the authorities, policy, and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes. Acquisition of land by individual Indians and tribes in fee simple status is not covered by these regulations even though such land may, by operation of law, be held in restricted status following acquisition. Acquisition of land in trust status by inheritance or escheat is not covered by these regulations.

These regulations do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its members.

### § 120a.2 Definitions.

(a) "Secretary" means the Secretary of the Interior or his authorized representative acting under delegated authority.

(b) "Tribe" means any Indian tribe, band, nation, pueblo, rancheria, colony, or other group of Indians, including the Metlakatla Indian Community of the Annette Island Reserve, which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs. For purposes of acquisitions made under the authority of 25 U.S.C. 488 and 489, or other statutory authority which specifically authorizes trust acquisitions for such corporations. "Tribe" also means a corporation chartered under section 17 of the Act of June 18, 1934 (48 Stat. 988; 25 U.S.C. 477) or section 3 of the Act of June 26, 1936 (49 Stat. 1967; 25 U.S.C. 503).

(c) "Individual Indian" means:

(1) Any person who is an enrolled member of a tribe;

(2) Any person who is a descendent of such a member and said descendent was, on June 1, 1934, physically residing on a federally recognized Indian reservation;

(3) Any other person possessing a total of one-half or more degree Indian blood of a tribe;

(4) For purposes of acquisitions outside of the State of Alaska, "Individual Indian" also means a person who meets the qualifications of

paragraphs (c)(1), (2), or (3) of this section where "Tribe" includes any Alaska Native Village or Alaska Native Group which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs.

(d) "Trust land" or "land in trust status" means land the title to which is held in trust by the United States for an individual Indian or a tribe.

(e) "Restricted land" or "land in restricted status" means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary because of limitations contained in the conveyance instrument pursuant to Federal law or because of a Federal law directly imposing such limitations.

(f) Unless another definition is required by the act of Congress authorizing a particular trust acquisition, "Indian reservation" means that area of land over which the tribe is recognized by the United States as having governmental jurisdiction, except that, in the State of Oklahoma or where there has been a final judicial determination that a reservation has been disestablished or diminished, "Indian reservation" means that area of land constituting the former reservation of the tribe as defined by the Secretary.

(g) "Land" means real property or any interest therein.

(h) "Tribal consolidation area" means a specific area of land with respect to which the tribe has prepared, and the Secretary has approved, a plan for the acquisition of land in trust status for the tribe.

### § 120a.3 Land acquisition policy.

Land not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress. No acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be valid unless the acquisition is approved by the Secretary.

(a) Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status (1) when the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or (2) when the tribe already owns an interest in the land or, (3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination. economic development, or Indian housing.

(b) Subject to the provisions contained in the acts of Congress which authorize land acquisitions or holding land in trust or restricted status, land may be acquired for an individual Indian in trust status [1] when the land is located within the exterior boundaries of an Indian reservation, or adjacent thereto; or, (2) when the land is already in trust or restricted status.

§ 120a.4  Acquisitions in trust of lands owned in fee by an Indian.

Unrestricted land owned by an individual Indian or a tribe may be conveyed into trust status, including a conveyance in trust for the owner, subject to the provisions of this part.

§ 120a.5  Trust acquisitions in Oklahoma under Section 5 of the I.R.A.

In addition to acquisitions for tribes which did not reject the provisions of the Indian Reorganization Act and their members, land may be acquired in trust status for an individual Indian or a tribe in the State of Oklahoma under Section 5 of the Act of June 18, 1934 (48 Stat. 985; 25 U.S.C. 465), if such acquisition comes within the terms of this part. This authority is in addition to all other statutory authority for such an acquisition.

§ 120a.6  Exchanges.

An individual Indian or tribe may acquire land in trust status by exchange if the acquisition comes within the terms of this part. The disposal aspects of an exchange are governed by Part 121 of this title.

§ 120a.7  Acquisition of fractional interests.

Acquisition of a fractional land interest by an individual Indian or a tribe in trust status can be approved by the Secretary only if:

(a) The buyer already owns a fractional interest in the same parcel of land; or

(b) The interest being acquired by the buyer is in fee status; or

(c) The buyer offers to purchase the remaining undivided trust or restricted interests in the parcel at not less than their fair market value; or

(d) There is a specific law which grants to the particular buyer the right to purchase an undivided interest or interests in trust or restricted land without offering to purchase all of such interests; or

(e) The owner of a majority of the remaining trust or restricted interests in the parcel consent in writing to the acquisition by the buyer.

§ 120a.8  Tribal consent for nonmember acquisitions.

An individual Indian or tribe may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition; provided, that such consent shall not be required if the individual Indian or the tribe already owns an undivided trust or restricted interest in the parcel of land to be acquired.

§ 120a.9  Requests for approval of acquisitions.

An individual Indian or tribe desiring to acquire land in trust status shall file a written request for approval of such acquisition with the Secretary. The request need not be in any special form but shall set out the identity of the parties, a description of the land to be acquired, and other information which would show that the acquisition comes within the terms of this part.

§ 120a.10  Factors to be considered in evaluating requests.

In evaluating requests for the acquisition of land in trust status, the Secretary shall consider the following factors:

(a) The existence of statutory authority for the acquisition and any limitations contained in such authority;

(b) The need of the individual Indian or the tribe for additional land;

(c) The purposes for which the land will be used;

(d) If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs;

(e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f) Jurisdictional problems and potential conflicts of land use which may arise; and

(g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

§ 120a.11  Action on requests.

The Secretary shall review all requests and shall promptly notify the applicant in writing of his decision. The Secretary may request any additional information or justification he considers necessary to enable him to reach a decision. If the Secretary determines

that the request should be denied, he shall advise the applicant of that fact and the reasons therefor in writing and notify him of the right to appeal pursuant to Part 2 of this title.

§ 120a.12  Title examination.

If the Secretary determines that he will approve a request for the acquisition of land from unrestricted fee status to trust status, he shall acquire, or require the applicant to furnish, title evidence meeting the Standards For The Preparation of Title Evidence In Land Acquisitions by the United States, issued by the U.S. Department of Justice. After having the title evidence examined, the Secretary shall notify the applicant of any liens, encumbrances, or infirmities which may exist. The Secretary may require the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition and he shall require elimination prior to such approval if the liens, encumbrances, or infirmities make title to the land unmarketable.

§ 120.13  Formalization of acceptance.

Formal acceptance of land in trust status shall be accomplished by the issuance or approval of an instrument of conveyance by the Secretary as is appropriate in the circumstances.

Thomas W. Fredericks,
Deputy Assistant Secretary—Indian Affairs.

[FR Doc. 80-18040 Filed 9-17-60, 8:45 am]
BILLING CODE 4310-02-M

DEPARTMENT OF JUSTICE

Office of Justice Assistance, Research, and Statistics

28 CFR Part 22

Confidentiality of Identifiable Research and Statistical Information

**AGENCY:** Office of Justice Assistance, Research, and Statistics (OJARS), Law Enforcement Assistance Administration (LEAA), National Institute of Justice (NIJ), and Bureau of Justice Statistics (BJS)/Department of Justice (DOJ).

**ACTION:** Final rule.

**SUMMARY:** The Office of Justice Assistance, Research, and Statistics (OJARS), is amending its regulations governing research and statistical information to conform them to the statutory amendments made by the Justice Systems Improvement Act of 1979 (JSIA). The JSIA which amended the Crime Control Act of 1976 contains different provisions regarding the

Attachment No. 2
United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

NOV 3 1980

Memorandum

To:         All Area Directors, Bureau of Indian Affairs

From:       The Secretary

Subject:    Implementation of Land Acquisition Regulations, 25 CFR §120a.

Pending the drafting and approval of a BIAM Manual release for land acquisitions, the following general guidelines should be followed. If any questions arise regarding these guidelines or regulations, contact Wayne Nordwall in the Division of Real Estate Services at (202) 343-7738, Anita Vogt, Office of the Solicitor at (202) 343-8526, or Ray Jackson, Phoenix Area Office, at (602) 261-2310.

§120a.1        Self-explanatory

§120a.2        Self-explanatory

§120a.3(a)(1)  Self-explanatory

(2)  This clause covers instances such as those where the tribe owns a fractionated interest in an off-reservation allotment, owns the minerals located off-reservation and is attempting to purchase the surface interest, and other circumstances where the tribe owns an interest in an off-reservation trust asset and is attempting to consolidate that interest.

(3)  This clause allows off-reservation fee lands to be considered for acquisition if the land is essential for tribal programs. In considering applications for off-reservation acquisitions, the factors listed in §120a.10 will be carefully balanced; in particular, the importance to the tribe of the parcel in question (including the possibility or impossibility of substitution of a closer parcel and whether or not declining to take the land in trust will materially affect the intended use of the land) will be weighed against the administrative burden on the Bureau that would result from the acquisition. §120a.10(g)  In most cases, the balance can be expected to tip toward rejecting the application as distance from the reservation increases.

-2-

All applications for acquisitions that are not within or adjacent to a reservation must be forwarded, together with the complete record on the acquisition, to the Central Office for a decision by the Office of the Secretary. In addition to the information required by the other provisions of these regulations, the applicant must include in the record a justification explaining why the proposed acquisition is necessary to effectuate the purposes listed in this section. In essence, it must be shown that the proposed acquisition is essential to a tribal program and that the program will fail in the absence of the acquisition.

§120a.4    Self-explanatory

§120a.5    Self-explanatory

§120a.6    Self-explanatory

§120a.7    Self-explanatory

§120a.8    It is up to the individual or tribe seeking a consent under this section to solicit and obtain the consent. The consent should then be included in the acquisition record.

§120a.9    No specific format is required in making an acquisition request. However, in putting together the record that will be used to support an acquisition (and to defend it in case of litigation) the Agencies and Area Offices are entitled under §120a.11 to request any material necessary for inclusion in the record. Much of this additional information will be required because of §120a.10.

§120a.10(a)  Under this part the specific acquisition authority(ies) being used should be identified. For IRA tribes (and individuals) the general authority is Section 5 of the IRA, 25 USC §465. Other authority(ies) can be cited if appropriate. For a non-IRA tribe, specific acquisition legislation relating to that tribe, if any, the Indian Financing Act, PL 93-638, or any other authority that is being used as a basis for the acquisition, should be noted.

The acquisition must meet the specifications of the particular statute which authorizes it in addition to the criteria of these regulations. For example, land acquired under the authority of PL 93-638 must be within reservation boundaries or adjoin trust land on at least two sides (See 25 U.S.C. §450h(3)) despite the broader provisions of 25 CFR §120a.3.

-3-

(b), (c) and (d) are all interrelated and cover information that must be supplied by the party requesting the acquisition. At this point it is difficult to specify all those things that should be considered under these sections, just as it is difficult to define precisely what should be considered when determining whether or not an applicant for a fee patent is competent. In general, information on personal income, social condition, education, and mental and physical condition can be considered. In other words, the record should answer the question -- Why should we take this particular land in trust for this person (or tribe)?

A statement of purpose (c) is necessary in order to make a determination under (f).

(e) and (f) If the land is presently in fee status, a letter (form letter attached) should be sent to the political subdivision in which the land is located asking for:

(1)  the amount of taxes currently levied on the property

(2)  whether there are any other special assessments (garbage, sewer etc.)

(3)  what services the local community provides to the land

(4)  what the current zoning of the property is, and

(5)  any other comments the political subdivision may want to make.

If no response is received within 30 days, this should be noted in the record and an assumption made that there are no adverse impacts on the local government.

A copy of the local government's response, if any, should be furnished to the applicant. Should the local government raise objections which appear to the agency to present good cause for denying the application, the applicant should be given an opportunity to respond to the local government's objections. (For follow up action, see §120a.11.)

(g)  Self-explanatory.

AR00024

-4-

§120a.11    Except to the extent that Central Office action is required under §120a.3(a)(3) (above), the delegated authority to decide whether to accept land in trust is vested in the Area Directors.  As soon as possible after the agency has transmitted the complete record to the Area Office, it should be reviewed, a decision made, and the applicant advised of the decision. A favorable decision should be based upon the record and should clearly show that the acquisition falls within the regulations and that the factors in §120a.10 have been considered. An adverse decision should show the reason for denial.  If an application is denied, the applicant must be advised of the reasons for denial and of his or her right to appeal.  If the local political subdivision has submitted timely comments, it should, as a courtesy, also be notified of the decision.

§120a.12    This section does not require an applicant to provide an abstract and other title evidence until after a decision on the request is made; this was done to prevent unnecessary expenses being incurred by an applicant.  Implicit in this section is the assumption that no such title evidence is needed until the completion of all appeals.  After the time limit for all appeals has expired, the title package (not including the acquisition record) should be transmitted to the Regional or Field Solicitor for a preliminary title opinion. After defects which render the title unmarketable are eliminated, the land may be placed in trust.  Discretion to require elimination of defects which do not cause unmarketability is also provided by this section.

§120a.13    In the past there have been instances where a party has caused deeds to be written stating that the land was transferred to "the United States in Trust for . . . ".  This section makes it clear that land is not in trust until there has been a formal acceptance.  The form of the acceptance is dictated by the circumstances of the transaction.

As a summary, the general procedures are as follows:

1)    An application is filed with the agency.  (§120a.9)

2)    The agency acknowledges receipt and requests (§120a.11) any additional information needed, particularly for §120a.10(b), (c) and (d).  If the land is presently in fee status, the agency informs the applicant that the local political subdivision will be notified of the proposed acquisition and given an opportunity to comment.

3)    If the land is presently in fee status, the agency notifies the local government(s) of the proposed acquisition and

AR00025

-5-

requests appropriate input. (§120a.10(e)(f)) If necessary, the agency obtains response of applicant to local government's objections.

4) The acquisition record is transferred to the Area Office for a decision and the applicant notified of the decision. (§120a.11)

5) Local government(s) notified of decision, if it has submitted timely comments.

6) Time limit for all appeals allowed to expire.

7) Abstracts and other title evidence secured. (§120a.12)

8) Title documents sent to Solicitor for title opinion. (§120a.12)

9) Land taken in trust. (§120a.13)

10) Final title opinion if appropriate.

Cecil D. Andrus

Case 1:06-cv-00689-RWR-JMF    Document 53-3    Filed 02/06/2008    Page 27 of 65

# INDIAN NEWS NOTES

**Deadline for 1986 Applications for Indian Child Welfare Grant Funds Is February**

The Bureau of Indian Affairs has published information in the December 30 *Federal Register* about the 1986 Indian Child Welfare Act grant program. The announcement includes information about the purposes of the program, eligibility requirements, the size of the grants, selection criteria and the procedures for applying. This year applications may be submitted for projects of one year or three years duration. The closing date for the receipt of all applications is February 14. For additional information contact a Bureau of Indian Affairs area office or the BIA Division of Social Services, 1951 Constitution Avenue, N.W., Washington, D.C. 20245 (202/343-6434).

**One-Volume Version of Acclaimed History of U.S. Indian Policy Is Published:**

The University of Nebraska Press has issued a one-volume abridged edition of "The Great Father", a history of the United States Government and American Indians by Francis Paul Prucha. The original two-volume set, published in 1984, was acclaimed by reviewers as "the definitive work in the subject" and "the point of departure for all those embarking on research projects in the history of government Indian policy." It received the Ray Allen Billington Prize awarded by the Organization of American Historians. The 432-page abridged version includes all the topics discussed in the original, covering the two centuries from the Revolutionary War to 1980. Francis Paul Prucha is a professor of history at Marquette University and is considered a leading authority on American Indian history. The paper-bound abridged version is tentatively priced at $9.95; the cloth edition is $25.00. Orders should be sent to the University of Nebraska Press, 901 North 17th Street, Lincoln, Nebraska 68588-0520. Add $1 for shipping costs.

**Program Offers Teachers Opportunity to Enter Special Education:**

offered to cover tuition and living expenses for the academic year. Another $1,200 to $1,600 will be available for each summer session. Interested teachers may contact Marilyn Johnson at NAU, Box 5630, Flagstaff, Arizona 86011 (602/523-4791).

**Procedure for Taking Off-Reservation Land into Trust Is Tightened**

Interior assistant secretary Ross Swimmer issued a directive December 18 to Bureau of Indian Affairs area directors that all applicants to take into trust land that is not within the exterior boundaries of a reservation must be submitted to the Bureau's Central Office for review and approval. The directive also required that all applications for trust land acquisitions from Oklahoma Tribes or individual Indians should be submitted to the Central Office for review. The area offices were directed to include with the applications information on why trust status is necessary for the intended use of the land and a detailed analysis of potential conflicts with state and local law that could result if the land is taken in trust. Previously, the area directors were required to submit to the Central Office only those applications for land that was not "within or adjacent" to a reservation.

**1986 BIA Appropriation Total, before Gramm-Rudman, Is Close to 1985 Total:**

President Reagan signed December 19 House Joint Resolution 465, making it Public Law 99-190 and thereby making appropriations for several federal agencies, including the Department of Interior and related agencies. The appropriation for the Bureau of Indian Affairs (BIA) is $1.002 billion, about $16 million less than the total appropriated, including the supplemental, in 1985. (See attached chart for line item comparisons.) The Gramm-Rudman legislation, however, is expected to require a reduction ranging from one to five percent of the 1986 total. According to a current reading of the legislation, designed to



*Many people competed in the tra... New Years' celebration.*

# AVCP pre
# educatior

Remarks by Gene Peltola, Presid Association of Village Coun Presidents (AVCP) Kuskokwim Community College Bethel, Alaska January 9, 1986

On behalf of Kuskokwim Co munity College Council and T Association of Village Coun Presidents, I welcome the leaders of the University of Alaska and Co munity Colleges to Bethel and wish of you a healthy and prosperous N Year. As AVCP and KuCC are ble ed with a Russian Orthodox con tuency, I am also privileged to w you a Merry Christmas. 1986 is a n jor and critical time for the Univer ty, for community colleges and for State of Alaska.

The University and non-pro organizations such as AVCP similarly facing challenges of decl ing state and federal revenues. must consider the effects of this sit tion on our institutions and pay care attention to our goals and objectiv in view of the competition for limi financial resources. Rural-based stitutions also must be attentive divisiveness presently among Alask and the reduced ability of rural Alas and Alaska Natives to influence st

AR00027

UNITED STATES GOVERNMENT

# memorandum

**DATE:** May 1, 1991

**REPLY TO ATTN OF:** Area Director

**SUBJECT:** Native Village of Point Hope Petition to Take Lands in Trust

**TO:** Office of the Regional Solicitor, Alaska Region

**BUREAU OF INDIAN AFFAIRS**

**JUNEAU AREA OFFICE**
REGIONAL SOLICITOR, USDI

MAY 09 1991

ANCHORAGE, ALASKA

The subject petition has been held in Area Realty pending receipt of technical assistance from Portland Area Realty. Apparently this assistance in not forthcoming. I have therefore requested the Fairbanks Agency to begin processing the request. Attached is a copy of my memorandum to that effect.

I am attaching the following documents listed on the attached table which currently make up our case file.

I would appreciate it if you would assign an attorney to work with the Bureau staff on this case. The lead Fairbanks Agency person is James Brafford and the lead Area Realty Specialist is Glenda Miller.

Thank you very much for your help on this acquisition.

Niles C. Cesar

Attachments

cc:     Tribal Operations

        Fairbanks Agency

| DATE | ITEM |
|------|------|
| 01-17-77 | Interim Conveyance No. 050 to Tigara Corporation for approximately 134,143 acres. |
| 08-30-84 | Patent Number 50-84-0680 to Tigara Corporation for Lot 2, U.S. Survey 3515, containing 21.47 acres. |
| 10-23-89 | Order Confirming Debtor's (Tigara Corporation) First Amended Plan of Reorganization.  U.S. Bankruptcy Court Case No. 3-86-00707. |
| 10-23-89 | Order Approving Agreements by and between the Debtor (Tigara Corporation) and Drexel Burnham Lambert MBI Corp. and Authorizing Agreement for Sale of Certain Undeveloped Lands of Debtor.  U.S. Bankruptcy Court Case No. 3-86-00707. |
| 11-05-89 | Quitclaim Deed from the Tigara Corporation to the Native Village of Point Hope. |
| 01-18-90 | Memorandum in Support of Petition to Take Lands in Trust. |
| 02-21-90 | The Native Village of Point Hope - Resolution No. 90-01:  Petition to Hold Lands in Trust by Secretary of Interior. |
| 02-21-90 | The Native Village of Point Hope - Resolution No. 90-02:  Delegation of Full Authority of the Native Village of Point Hope Council to its President, Secretary, and Treasurer to do business in Washington, D.C. |
| 02-21-90 | The Native Village of Point Hope - Resolution No. 90-03:  Retention of Ella Anagick-Stebing as attorney for Point Hope. |
| 02-21-90 | Petition for Acquisition of Lands in Trust. |
| 05-24-90 | Letter from Ella Anagick-Stebing to Secretary of the Interior. |
| 06-11-90 | Letter from Fairbanks Superintendent to President of the Native Village of Point Hope. |
| 08-09-90 | Memorandum from the Deputy to the Assistant Secretary - Indian Affairs (Trust and Economic Development) to the Juneau Area Director transmitting the transaction. |
| 08-17-90 | Letter from the Acting Deputy to the Assistant Secretary - Indian Affairs (Trust and Economic Development) to the President of the Native Village of Point Hope stating that the transaction was forwarded to the Juneau Area Director. |
| 09-11-90 | Letter from the Assistant Secretary - Indian Affairs to Ella Anagick-Stebing stating that the Juneau Area was reviewing the transaction. |
| 09-18-90 | Memorandum from the Acting Juneau Area Director requesting technical assistance from the Portland Area Office. |
| 09-19-90 | Letter from the Acting Juneau Area Director to Ella Anagick-Stebing acknowledging the transaction. |

| 10-18-90 | Memorandum from the Fairbanks Superintendent to Area Director. |
|----------|---------------------------------------------------------------|
| 10-23-90 | Memorandum from the Area Director to Fairbanks Superintendent. |
| 11-06-90 | Memorandum from the Area Realty Officer to Fairbanks Realty Officer. |
| 04-22-91 | Letter from the Native American Rights Fund to Glenda Miller. |
| 04-30-91 | Letter to the Native American Rights Fund from the Area Director. |
| 04-30-91 | Memorandum to the Fairbanks Agency Superintendent from the Area Director. |

RECEIVED
BUREAU OF LAND MANAGEMENT

1977 JAN 24 AM 10: 00

DISTRICT OFFICE
FAIRBANKS, ALASKA

INTERIM CONVEYANCE

WHEREAS

Tigara Corporation

is entitled to a conveyance pursuant to sections 14(a) and 22(j) of the
Alaska Native Claims Settlement Act of December 18, 1971, 85 Stat. 688,
703, 715; 43 U.S.C. 1613(a) and 1621(j), of the surface estate in the
following described lands:

Kateel River Meridian, Alaska (Unsurveyed)

T. 32 N., R. 32 W.
secs. 2 and 3;
secs. 4, 5, 8, and 9 (fractional);
secs. 10 and 11.

T. 33 N., R. 30 W.
secs. 1 to 5, inclusive;
secs. 9 to 12, inclusive;
secs. 14, 15, 21, 22, 28, 29, 31, and 32.

T. 33 N., R. 32 W.
sec. 4;
secs. 5 and 6 (fractional);
sec. 7 (fractional), excluding Native allotment
    application F-16710;
sec. 8 (fractional);
secs. 9, 10, 15, and 16;
secs. 17, 18, 20, 21, and 22 (fractional);
sec. 25;
secs. 26, 27, 28, 34, and 35 (fractional);
sec. 36.

T. 33 N., R. 33 W.
secs. 1 and 2 (fractional), excluding Native allotment
    application F-16709;
secs. 3 and 11 (fractional);
sec. 12 (fractional), excluding Native allotment
    application F-16709.

T. 34 N., R. 30 W.
secs. 7, 8, and 9;
secs. 16 to 21, inclusive;
secs. 28, 29, 30, 32, and 33.

T. 34 N., R. 31 W.
secs. 9 and 10;
sec. 11, excluding Native allotment application
    F-16702;
secs. 12 to 20, inclusive;
sec. 24.

Interim Conveyance No. _____ 050 _____

Date ___ JAN 1 7 1977 ___

F-14921-A

**T. 34 N., R. 32 W.**
secs. 7 and 8;
secs. 17 to 20, inclusive;
secs. 29 and 30;
sec. 31 (fractional);
sec. 32.

**T. 34 N., R. 33 W. (fractional)**
All.

**T. 34 N., R. 34 W. (fractional)**
All.

**T. 34 N., R. 35 W. (fractional)**
All.

Umiat Meridian, Alaska (Unsurveyed)

**T. 9 S., R. 61 W.**
sec. 3;
secs. 4 and 9 (fractional);
sec. 10;
secs. 16, 20, 21, 28, 32, and 33 (fractional).

**T. 10 S., R. 61 W.**
sec. 4;
secs. 5, 8, 9, 16, 17, and 20 (fractional);
secs. 21 and 28;
secs. 29, 31, and 32 (fractional).

**T. 11 S., R. 61 W.**
sec. 5;
sec. 6 (fractional), excluding Native allotment
    application F-17014; *Title off... title*
sec. 7 (fractional);
secs. 8 and 17;
secs. 18 and 19 (fractional);
secs. 20 and 29;
sec. 30 (fractional);
secs. 31 and 32.

**T. 11 S., R. 62 W. (fractional)**
All.

**T. 12 S., R. 58 W.**
secs. 7, 8, and 9;
secs. 16 to 19, inclusive.

**T. 12 S., R. 59 W.**
secs. 7, 12, 13, 14, 18, and 19;
secs. 22 to 30, inclusive.

**T. 12 S., R. 60 W.**
secs. 4 to 14, inclusive;
sec. 15, excluding Native allotment application
    F-19023;
secs. 16 to 30, inclusive.

Interim Conveyance No. _____ 050 _____

Date __ JAN 1 7 1977 __

AR00032

F-14921-A

T. 12 S., R. 61 W.
secs. 1 and 2;
secs. 5 to 9, inclusive;
sec. 10, excluding Native allotment application
F-13865;
secs. 11 to 22, inclusive;
secs. 27 to 30, inclusive.

T. 12 S., R. 62 W. (fractional)
All.

T. 12 S., R. 63 W. (fractional)
All.

Aggregating approximately 134,143 acres:

NOW KNOW YE, that there is, therefore, granted by the UNITED STATES OF AMERICA, unto the above-named corporation the surface estate to the land above-described; TO HAVE AND TO HOLD the said lands and fixtures with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto said corporation, its successors and assigns, forever;

EXCEPTING AND RESERVING TO THE UNITED STATES from the lands so granted:

1.  A right-of-way thereon for ditches and canals constructed by the authority of the United States. Act of August 30, 1890, 26 Stat. 391, 43 U.S.C. 945;

2.  A right-of-way thereon for the construction of railroads, telegraph and telephone lines, as prescribed and directed by the act of March 12, 1914, 38 Stat. 305, 43 U.S.C. 975(d);

3.  The subsurface estate therein, and all rights, privileges, immunities and appurtenances, of whatsoever nature, accruing unto said estate pursuant to the Alaska Native Claims Settlement Act of December 18, 1971, 85 Stat. 688, 43 U.S.C. 1601-1624; and

4.  Pursuant to section 17(b) of the Alaska Native Claims Settlement Act of December 18, 1971 (85 Stat. 688); the following easements referenced by easement identification number (EIN) on the easement map in case file F-14921-EE are reserved to the United States and subject to further regulations thereby:

    a.  (EIN 1 C4) A road easement one hundred (100) feet in width for access to and from public lands. Said easement extends from Point Hope easterly along the coast south of Marryat Inlet, then northeasterly to the Kukpuk River area where one branch crosses the Kukpuk River and goes north across regional selection as EIN 25 C4 to public lands. The other branch continues along the left bank of the Kukpuk River easterly through the village selection, and connects with EIN 11 C5 L which crosses regional selection to public ___ . The use of these easements is to be controlled by ___ le State or Federal law or regulation.

Interim Conveyance No. _____ 050 _____

Date ___ JAN 1 7 1977 _____

F-14921-A

b.  (EIN 2 C4, C5) A one (1) acre site easement for boat landing, camping, and related uses, located on the right bank of the Kukpuk River at the junction of the Kukpuk and Ipewik Rivers. The site easement extends twenty-five (25) feet into the water. That portion extending into the water is in addition to the one (1) acre on the land.

c.  (EIN 3 C4, C5) An easement twenty-five (25) feet in width for access to and from public lands via an existing trail which proceeds north and south from Point Hope. In the area north of Cape Thompson, a proposed branch of this trail proceeds easterly through the village selection and connects with EIN 12 C5, which crosses regional selection into the upper Ogotoruk Valley. The use of these easements is to be controlled by applicable State or Federal law or regulation.

d.  (EIN 4 C4, C5) A continuous linear easement twenty-five (25) feet in width upland of and parallel to the mean high tide line in order to provide access to and along the marine coastline and use of such shore for purposes such as the beaching of watercraft or aircraft, travel along the shore, recreation, and other similar uses. Deviations from the waterline are permitted when specific conditions so require, e.g., impassable topography or waterfront obstruction. This easement is subject to the right of the owner of the servient estate to build upon such easement a facility for public or private purposes, such right to be exercised reasonably and without undue or unnecessary interference with or obstruction of the easement. When access along the marine coastline easement is to be obstructed, the owner of the servient estate will be obligated to convey to the United States an acceptable alternate access route, at no cost to the United States, prior to the creation of such obstruction.

e.  (EIN 5 C4) An easement fifty (50) feet in width for a proposed trail for access to and from public lands along the left bank of the Maripak Creek, connecting with EIN 26 C4, which crosses regional selection into public lands. Also included is a two (2) acre site easement on the coast for a staging area for access to public lands. The use of the trail easement is to be controlled by applicable State or Federal law or regulation.

f.  (EIN 7 C4) An easement fifty (50) feet in width for a proposed trail for access to and from public lands along the left bank of Akalolik Creek, and connecting with EIN 27 C4, which crosses regional selection into public lands. Also included is a two (2) acre site easement on the coast for a staging area for access to public lands. The use of the trail easement is to be controlled by applicable State or Federal law or regulation.

g.  (EIN 22 C) The right of the United States to enter upon the lands herein granted for cadastral, geodetic, or other survey purposes is reserved together with the right to do all things necessary in connection therewith.

Interim Conveyance No. _____ **050** _____

Date ___JAN 1 7 1977_____

AR00034

F-14921-A

h.    (EIN 23 C) An easement for the transportation of energy,
fuel and natural resources which are the property of the
United States or which are intended for delivery to the
United States or which are produced by the United States.
*This easement also includes* the right to build any related
facilities necessary for the exercise of th. right to
transport energy, fuel and natural resources including those
related facilities necessary during periods of planning,
locating, constructing, operating, maintaining or terminating
transportation systems. The specific location of this
easement shall be determined only after consultation with
the owner of the servient estate. Whenever the use of such
easement will require removal or relocation of any structure
owned or authorized by the owner of the servient estate,
such use shall not be initiated without the consent of the
owner of such improvement; provided, however, that the
United States may exercise the right of eminent domain if
such consent is not given. Only those portions of this
easement that are actually in use or that are expressly
authorized . 1 March 3, 1996, shall continue to be in force.

THE GRANT OF THE ABOVE-DESCRIBED LAND IS SUBJECT TO:

1.    Issuance of a patent confirming the boundary description
of the lands granted after approval and filing by the
Bureau of Land Management the official plat of survey
covering such lands;

2.    Valid existing rights therein, including but not limited
to those created by any lease (including a lease issued
under section 6(g) of the Alaska Statehood Act (72 Stat.
339, 341)) contract, permit, right-of-way, or easement,
and the right of the lessee, contractee, permittee, or
grantee to the complete enjoyment of all rights,
privileges, and benefits thereby granted to him;

3.    Requirements of section 14(c) of the Alaska Native Claims
Settlement Act, 85 Stat. 688, 703, 43 U.S.C. 1613(c),
that the grantee hereunder convey those portions of land
hereinafter granted, as are prescribed in said section;
and

4.    The terms and conditions of the agreement of August 6, 1976
between Arctic Slope Regional Corporation, Tigara Corporation,
the seven other Arctic Slope village corporations, and the
Secretary of the Interior. A copy of the agreement is located in
Bureau of Land Management file F-14921-EE.

IN WITNESS WHEREOF, the undersigned authorized officer of the Bureau
of Land Management has, in the name of the United States, set his hand and
caused the seal of the Bureau to be hereunto affixed on this 17th day of
January 1977, in Anchorage, Alaska.

UNITED STATES OF AMERICA

Chief, Branch of Lands
and Minerals Operations

Interim Conveyance No.    050

Date    JAN 1 7 1977

Form 1860—9
(March 1965)
(formerly 4—1043)

F-14921-A

# The United States of America

### To all to whom these presents shall come, Greeting:

WHEREAS

Tigara Corporation

is entitled to a Land Patent pursuant to Sec. 14(a) of the Alaska Native Claims Settlement Act of December 18, 1971 (43 U.S.C. 1601, 1613(a)), of the surface estate in the following described lands:

Lot 2, U.S. Survey No. 3515, Alaska, located at Point Hope, Alaska.

Containing 21.47 acres, as shown on the plat of survey accepted December 5, 1966.

NOW KNOW YE, that there is, therefore, granted by the UNITED STATES OF AMERICA, unto the above-named corporation the surface estate in the lands above described; TO HAVE AND TO HOLD the said estate with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto the said corporation, its successors and assigns, forever.

EXCEPTING AND RESERVING TO THE UNITED STATES from the lands so granted:

The subsurface estate therein, and all rights, privileges, immunities, and appurtenances, of whatsoever nature, accruing unto said estate pursuant to the Alaska Native Claims Settlement Act of December 18, 1971 (43 U.S.C. 1601, 1613(f)).

THE GRANT OF THE ABOVE-DESCRIBED LANDS IS SUBJECT TO:

1. Valid existing rights therein, if any, including but not limited to those created by any lease (including a lease issued under Sec. 6(g) of the Alaska Statehood Act of July 7, 1958 (48 U.S.C. Ch. 2, Sec. 6(g))), contract, permit, right-of-way, or easement, and the right of the lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him. Further, pursuant

RECEIVED

OCT 3 1 1990

Bureau of Indian Affairs
Area Realty

Patent Number   50—84—0680

AR00036

Form 1860-10
(July 1975)

F-14921-A

to Sec. 17(b)(2) of the Alaska Native Claims Settlement Act of December 18, 1971 (43 U.S.C. 1601, 1616(b)(2)) (ANCSA), any valid existing right recognized by ANCSA shall continue to have whatever right of access as is now provided for under existing law; and

2.  Requirements of Sec. 14(c) of the Alaska Native Claims Settlement Act of December 18, 1971 (43 U.S.C. 1601, 1613(c)), as amended, that the grantee hereunder convey those portions, if any, of the lands hereinabove granted, as are prescribed in said section.

IN TESTIMONY WHEREOF, the undersigned authorized officer of the Bureau of Land Management, in accordance with the provisions of the Act of June 17, 1948 (62 Stat. 476), has, in the name of the United States, caused these letters to be made Patent, and the Seal of the Bureau to be hereunto affixed.

GIVEN under my hand, in    ANCHORAGE, ALASKA
the    THIRTIETH         day of    AUGUST        in the year
of our Lord one thousand nine hundred and    EIGHTY-FOUR
and of the Independence of the United States the two hundred and    NINTH.

[SEAL]

By _Ann Johnson_

Ann Johnson
Chief, Branch of ANCSA

Patent Number 50-84-0680

AR00037

Walter T. Featherly III
KOVAL & FEATHERLY, P.C.
301 W. Northern Lights Blvd., Suite 503
Anchorage, Alaska 99503
(907) 258-6600

Attorneys for the Debtor

FILED

OCT 23 1989

CLERK
U.S. BANKRUPTCY COURT
By _____
       De    Clerk

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ALASKA

In re

TIGARA CORPORATION,

        Debtor.

        CASE NO. 3-86-00707

## ORDER CONFIRMING DEBTOR'S
## FIRST AMENDED PLAN OF REORGANIZATION

The First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code (hereinafter "the Plan") filed by Tigara Corporation, Debtor and Debtor-in-Possession herein (hereinafter "Tigara" or "Debtor"), on October 10, 1989, having been transmitted to creditors and equity security holders along with the Disclosure Statement to the Debtor's First Amended Plan of Reorganization (hereinafter "Disclosure Statement"); and

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION

Page 1

The Debtor having filed on September 29, 1989, an Application to Enter Into NOL Sale Agreements (hereinafter the "Application"), and Notice of the Application having been transmitted to the creditors and other parties in interest on October 3, 1989; and

A hearing on confirmation of the Plan and on the Application having been conducted in Anchorage, Alaska on October 23, 1989; and

The Application having been granted by separate order which expressly states that the effectiveness of such order is subject to confirmation of the Plan; and

Testimony having been taken and evidence having been presented at the confirmation hearing; and

Such testimony and evidence having been presented in support of the Plan; and

After due consideration of the terms of the Plan, the evidence presented and testimony taken, and other materials in the record of this case, the Court enters the following Findings of Fact and Conclusions of Law.

A.  Adequate notice of the terms of the Plan, of the confirmation hearing thereon, and of the time for filing objections and votes thereon, has been given to creditors and parties in interest. The Disclosure Statement complies with the requirements of §§ 1125 and 1127 of the Bankruptcy Code

LAW OFFICES OF
KOVAL & HEATHERLY
A PROFESSIONAL CORPORATION
801 WEST NORTHERN LIGHTS BLVD.
SUITE 201
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 258-6680   TELEFAX (907) 279-5921

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION                    Page 2

and no additional time or further disclosure is necessary to enable parties in interest to accept or reject the Plan.

B.  The Plan has been accepted in writing by the requisite majority of the creditors and equity security holders whose acceptance is required by law.

C.  The Plan complies with the applicable provisions of Title 11 of the United States Code.

D.  The Debtor has complied with the applicable provisions of Title 11 of the United States Code.

E.  The Plan has been proposed in good faith and not by any means forbidden by law.

F.  All payments made or promised by the Debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the case, or in connection with the Plan and incident to the case, have been approved by, or are subject to the approval of, the Court and are reasonable or, if to be fixed after confirmation of the Plan, will be subject to the approval of the Court as reasonable.

G.  The identity, qualifications and affiliations of the persons who are to be directors or officers of the Debtor, after confirmation of the Plan, have been fully disclosed, and the appointment of such persons to such offices, or their continuance therein, is equitable and consistent with the

LAW OFFICES OF
KOVAL & FEAHIRLY
A PROFESSIONAL CORPORATION
801 WEST NORTHERN LIGHTS BLVD.
SUITE 501
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 258-6800   FAX (907) 258-7925

ORDER CONFIRMING DEBTOR'S FIRST                          Page 3
AMENDED PLAN OF REORGANIZATION

AR00040

interests of the creditors and equity security holders and with public policy.

H.  The identity of any insider that will be employed or retained by the Debtor and his compensation have been fully disclosed.

I.  The rates and charges of the Debtor are not subject to the jurisdiction of any regulatory commission.

J.  Each holder of a claim or interest has either accepted the Plan or will receive or retain under the Plan property of a value, as of the effective date of the Plan, not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

K.  With respect to each class of claims, such class has accepted the Plan, or such class is not impaired under the Plan.

L.  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that:

(a) With respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of Title 11, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

LAW OFFICES OF
KOYAL & HALBERLY
A PROFESSIONAL CORPORATION

(b) With respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), or 507(a)(5) of Title 11, each holder of a claim of such class will receive:

(i) If such class has accepted the Plan, deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; or

(ii) If such class has not accepted the Plan, cash on the Effective Date of the Plan equal to the allowed amount of such claim; and

(c) With respect to a claim of a kind specified in section 507(a)(7) of Title 11, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

M. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan.

ACCORDINGLY, IT IS HEREBY ORDERED:

1. That the First Amended Plan of Reorganization of the Debtor, proposed by the Debtor, a copy of which is attached hereto, as filed with the Court on October 10, 1989, is hereby confirmed.

AR00042

2.   In the event that each of the following occurs on or before November 9, 1989:   (1) a sale by the Debtor of some portion of its lands; and (2) a purchase by Drexel Burnham Lambert MBI Corp. ("Drexel") of the losses recognized by the Debtor as a result of the sale of some portion of its lands; then, the following shall occur:

(a)   On the Effective Date, whatever interest the Debtor may have in the fuel oil segregated pursuant to this Court's order of April 29, 1987 shall be conveyed to the FDIC;

(b) On the Effective Date, all cash then available shall be distributed in the following order: first, to the payment of administrative expenses, to the extent such claims are fixed on the Effective Date; second, the sum of $100,000 to the FDIC in partial payment of its secured claim;  third, the sum of $350,000 to the Debtor for working capital; and fourth, the balance to the law firm of Guess & Rudd as distribution agent for the remaining administrative claimants, the priority claimants, and the unsecured creditors;

(c)   Guess & Rudd shall deposit the cash distributed to it into an interest bearing trust account. From the account, Guess & Rudd shall distribute funds to the administrative and priority claimants as allowed by order of

KOVAL & HEATHERLY
A PROFESSIONAL CORPORATION
301 WEST NORTHERN LIGHTS BLVD.
SUITE 601
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 274-6400  TELEFAX (907) 276-7521

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION                    Page 6

AR00043

the court. Following such distribution, or after reservation of funds sufficient to pay administrative and priority claims, Guess & Rudd shall distribute funds pro rata to unsecured claimants on the basis of their allowed claims, and all distributions on account of disputed claims which have not been disallowed, or the disputed portion of any claims, shall not be distributed, but shall be held by Guess & Rudd pending resolution of the dispute. All funds retained on account of claims that are subsequently disallowed shall be redistributed by Guess & Rudd to unsecured claimants as described in the previous sentence, so that when the distribution of funds is completed, all creditors shall have received the same percentage of their allowed claims.

(d) Following the Effective Date, all future payments to Tigara of NOL proceeds, if any, shall be paid to Guess & Rudd as distribution agent for the Debtor. Guess & Rudd shall distribute such funds as follows: (a) any funds received on account of the escrow of the funds resulting from the previous sale of net operating losses to Caesar's World shall be distributed in accordance with subparagraph 2(c) above; (b) any funds received which are proceeds from the sale of the Existing NOLs shall be distributed in accordance with the provisions of subparagraph 2(c) above; and (c) of any funds received which are proceeds from the sale of the

KOVAL & FEATHERLY
A PROFESSIONAL CORPORATION
601 WEST FIFTH AVENUE, SUITE 201
ANCHORAGE, ALASKA 99501

AR00044

land sale losses, twenty-five percent (25%) shall be distributed in accordance with the provisions of subparagraph 2(c) above, and seventy-five percent (75%), less the first $200,000.00 thereof, which shall be distributed to the FDIC in full satisfaction of its secured claim, shall be distributed to the Debtor, free and clear of all liens;

(e) The distributions to Guess & Rudd described in subparagraph 2(b) shall constitute commencement of distribution under the Plan within the meaning of 11 U.S.C. § 1101(2)(C).

3. In the event that either of the following does not occur on or before November 9, 1989: (1) a sale by the Debtor of some portion of its lands; and (2) a purchase by Drexel Burnham Lambert MBI Corp. ("Drexel") of the losses recognized by the Debtor as a result of the sale of some portion of its lands; then, the following shall occur:

(a) On the Effective Date, whatever interest the Debtor may have in the fuel oil segregated pursuant to this Court's order of April 29, 1987 shall be conveyed to the FDIC;

(b) On the Effective Date, all cash then available shall be distributed in the following order: first, to the payment of administrative expenses, to the extent such claims are fixed on the Effective Date; second, the sum of $100,000

AR00045

to the FDIC in partial payment of its secured claim; third, the sum of $100,000 to the Debtor for working capital; and fourth, the balance to the law firm of Guess & Rudd as distribution agent for the remaining administrative claimants, the priority claimants, and the unsecured creditors;

(c)  Guess & Rudd shall deposit the cash distributed to it into an interest bearing trust account.  From the account, Guess & Rudd shall distribute funds to the administrative and priority claimants as allowed by order of the court.  Following such distribution, or after reservation of funds sufficient to pay administrative and priority claims, Guess & Rudd shall distribute funds pro rata to unsecured claimants on the basis of their allowed claims, and all distributions on account of disputed claims which have not been disallowed, or the disputed portion of any claims, shall not be distributed, but shall be held by Guess & Rudd pending resolution of the dispute.  All funds retained on account of claims that are subsequently disallowed shall be redistributed by Guess & Rudd to unsecured claimants as described in the previous sentence, so that when the distribution of funds is completed, all creditors shall have received the same percentage of their allowed claims;

KOVAL & HATHERLY
A PROFESSIONAL CORPORATION
100 WEST PORTRONE SULTE 500
SUIT 601
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 279-0000  FACSIMILE (907) 279-7021

AR00046

(d) Following the Effective Date, all future payments to Tigara of NOL proceeds, if any, shall be paid to Guess & Rudd as distribution agent for the Debtor. Guess & Rudd shall distribute such funds as follows: (a) any funds received on account of the escrow of the funds resulting from the previous sale of net operating losses to Caesar's World shall be distributed in accordance with subparagraph 2(c) above; and (b) any funds received which are proceeds from the sale of the Existing NOLs shall be distributed in accordance with the provisions of subparagraph 2(c) above, except that the first $100,000 thereof shall be distributed to the FDIC in full satisfaction of its secured claim;

(e) The distributions to Guess & Rudd described in subparagraph 2(b) shall constitute commencement of distribution under the Plan within the meaning of 11 U.S.C. § 1101(2)(C).

4. On or before November 9, 1989, the Debtor shall file with the Court a certificate executed by an officer of the Debtor to the effect that: (a) the transfer of property described in subparagraph 2(a) or 3(a) has occurred; (b) the distributions described in subparagraphs 2(b) or 3(b) have occurred; (c) the Debtor has assumed the business of and management of substantially all of the property dealt with by the Plan; and (d) if the lands have been contributed to

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION

Page 10

the estate by the Debtor, a transfer by the Debtor of such lands as contemplated by § 1101(2)(A) has been consummated. Upon the filing of such a certificate, the Plan shall be considered to have been "substantially consummated" within the meaning of Section 1101(2) of the Bankruptcy Code.

5. Except as otherwise provided in the Plan or herein:

(a) Confirmation of the Plan vests all of the property of the estate in the Debtor, free and clear of all liens, except that all of the Debtor's lands shall be subject to the reservations, exceptions, exclusions, and limitations described in the interim conveyance of lands from the United States of America dated June 30, 1977, including but not limited to any valid rights arising under section 14(c) of the Alaska Native Claims Settlement Act ("ANCSA"), and except for the security interests granted pursuant to the agreement between the Debtor and Drexel for sale and use of certain net operating losses, as well as the related agreements (hereinafter "the Agreement");

(b) The lands conveyed to the Native Village of Point Hope, if any, are to be conveyed subject to valid existing rights, including but not limited valid existing rights arising under § 14(c) of ANCSA and the express reservations as set forth in the Order Approving Agreements Between the Debtor and Drexel and Authorizing Land Sale

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION                          Page 11

KOVAL & FEATHERLY
A PROFESSIONAL CORPORATION
801 WEST 5TH AVENUE, SUITE 900
SUITE 900
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 258-6600  TELEFAX (907) 279-7671

Agreements relating to the conveyance of such lands are incorporated herein by this reference;

(c) Confirmation of the Plan discharges the Debtor from any debt, as defined in § 101(11) of the Bankruptcy Code, that arose before the date of this Order, and any debt of the kind specified in §§ 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not a proof of the claim based on such debt is filed or deemed filed under § 501 of the Bankruptcy Code or such claim is allowed under § 502 of the Bankruptcy Code or the holder of such claim has accepted the Plan, except that nothing herein shall be deemed to discharge the Debtor from any of its obligations under the Agreement.

6. All holders of claims or interests whose claims or interests are discharged by this Order are enjoined from instituting or continuing any action or employing any process to collect the amount of such claims or interests as personal liabilities of the Debtor.

7. Confirmation of the Plan voids any prior judgment obtained against the Debtor including any judgment to the extent it constitutes a personal liability of the Debtor.

8. All persons having any claims resulting from, arising out of or in connection with, the rejection by the Debtor, prior to this Order, of executory contracts, be and hereby are allowed to file their proofs of claim herein within

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION                    Page 12

AR00049

thirty (30) days of the date of this Order or be forever barred from claiming or asserting any such claim against the Debtor, its successor or assigns in any proceeding or forum whatsoever.

9.  The Plan shall hereby be deemed to contain provisions which direct and require that the terms and conditions of, or any security interest, lien or right of offset granted under the Agreement are valid and binding obligations, security interests, liens and rights of offset for the reorganized Debtor, and that Debtor comply with each of the covenants, obligations, agreements or other provisions contained in the Agreement, unless the Debtor obtains the express written consent of Drexel, and that the breach of any of the conditions or obligations set forth in the Agreement shall be an event of default under the Agreement which shall entitle Drexel to take all actions authorized upon an event of default under the Agreement without any further Order of this Court.  All rights, obligations and remedies of the Debtor and Drexel shall survive this Order confirming the Plan.

10.  In the event of any inconsistency or ambiguity between the Plan and the Agreement, the terms and conditions of the Agreement shall control and shall be binding upon the Debtor and the estate of the Debtor as if the same were fully

KOVAL & HEATHERLY
A PROFESSIONAL CORPORATION
401 WEST NORTHERN LIGHTS BLVD.
SUITE 400
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 276-6400 FACSIMILE (907) 276-7971

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION

Page 13

incorporated into the Plan, provided, however, that the closing of the transactions contemplated by the Agreement shall not occur unless the Plan shall have been, or shall simultaneously be, substantially consummated, and provided further that nothing in the Agreement or in this order shall be construed to require the Debtor to substantially consummate the Plan.

11. All other executory contracts proposed in the Plan to be assumed by the Debtor are hereby ordered and allowed to be assumed by the Debtor on the terms set forth in the Plan or as ordered at the confirmation hearing on October 23, 1989, and no further cure of default, compensation for default, or assurance of future performance is found by the Court to be necessary for such assumption of such agreements.

12. The Court shall retain jurisdiction of this Chapter 11 case pursuant to and for the purposes set forth in Section 1127(b) of the Bankruptcy Code and: (a) to determine the allowance or disallowance of claims and interest; (b) to fix allowances, compensation, and other administrative expenses; (c) to enforce the obligations of the parties to the Agreement; and (d) to enforce the provisions of this Order and of the Order Approving Agreement By and Between the Debtor and Drexel, of eve.. date hereof.

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION                    Page 14

14. The Creditors' Committee shall remain in existence, and all professionals retained by the Committee shall continue to be paid as expenses of administration, until substantial consummation of the Plan, and the completion of all tasks assigned to the Committee.

15. Applications for approval of professional fees and expenses incurred through the Effective Date shall be filed and noticed to creditors and other parties in interest no later than November 13, 1989.

16. Objections to claims against the estate of the Debtor shall be filed and noticed to creditors and other parties in interest on or before November 13, 1989. A hearing on such objections shall be held on December 21, 1989 at 9:00 a.m.

DATED this 23rd day of October, 1989.



Herbert A. Ross
Bankruptcy Judge

Serve:
W Feathers
D Bant
UST
WTF/28
Kote Carm 10/23/89

LAW OFFICES OF
KOVAL & FEATHERLY
A PROFESSIONAL CORPORATION
301 WEST NORTHERN LIGHTS BLVD.
SUITE 501
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 276-4480  TELEFAX (907) 279-7911

ORDER CONFIRMING DEBTOR'S FIRST
AMENDED PLAN OF REORGANIZATION                    Page 15.

AR00052

FILED

OCT 23 1989

CLERK
U.S. BANKRUPTCY COURT

Walter T. Featherly III
KOVAL & FEATHERLY, P.C.
301 W. Northern Lights Blvd., Suite 503
Anchorage, Alaska 99503
(907) ~~350-6600~~

Attorneys for the Debtor

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re | ) |
| TIGARA CORPORATION, | )    CASE NO. 3-86-00707 |
| Debtor. | ) |
| | ) |

ORDER APPROVING AGREEMENTS BY AND BETWEEN
THE DEBTOR AND DREXEL BURNHAM LAMBERT MBI CORP.
AND AUTHORIZING AGREEMENT FOR SALE OF CERTAIN
UNDEVELOPED LANDS OF THE DEBTOR

On October 23, 1989, after notice as required by law, the
Court heard the Application To Enter Into NOL Sale
Agreements, made by the Debtor, Tigara Corporation, on
September 29, 1989, by which the Debtor seeks approval for
an agreement ("the Application") for sale and use of certain
net operating losses which are assets of the Debtor pursuant

LAW OFFICES OF
KOVAL & FEATHERLY
A PROFESSIONAL CORPORATION
301 WEST NORTHERN LIGHTS BLVD
SUITE 503
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 256-6600  TELEFAX (907) 278-7115

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS        Page 1

AR00053

to 11 U.S.C. § 363(b) and seeking authority to enter into a related Tax Sharing Agreement, Security and Pledge Agreement, Option Agreement, Loan Agreement and other agreements between the Debtor and Drexel Burnham Lambert MBI Corp. ("Drexel") and, in certain cases, other parties, including the Drexel Burnham Labert Group Inc. ("Group") and Drexel TC Inc. ("Newco"), (all such agreements being hereinafter collectively referred to as the "Agreement") more fully described in the Application to Enter Into NOL Sale Agreements, all of which were and are subject to confirmation of Debtor's First Amended Plan of Reorganization ("the Plan").

The Debtor and other parties-in-interest appeared before the Court and presented evidence, and having considered the evidence and arguments of the parties and their counsel, THE COURT CONCLUDES AS FOLLOWS:

A.  The Debtor is authorized, pursuant to 11 U.S.C. § 363(b)(2), to enter into an Agreement for Sale of Certain Undeveloped Lands to the Native Village of Point Hope substantially in the form of either of the two agreements attached hereto as Exhibit A or Exhibit B ("the Land Sale Agreement"), provided that, in the event that more than 53,000 acres are to be sold pursuant to the Land Sale

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS          Page 2

LAW OFFICES
KOVAL & HATHERLY
A PROFESSIONAL CORPORATION
401 WEST NORTHERN LIGHTS BLVD.
SUITE 500
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 276-6440   TELEFAX (907) 276-7311

Agreement, at least two-thirds of the shareholders of the Debtor shall cast their votes in favor of the Land Sale Agreement at a duly constituted meeting of the shareholders of the Debtor, with no shareholder casting his or her vote against the Land Sale Agreement; and provided further than any conveyances pursuant to the Land Sale Agreement shall be explicitly subject to valid existing rights at the time of the interim conveyance of the lands to the Debtor by the United States of America on June 30, 1977, including but not limited to any valid rights arising under section 14(c) of the Alaska Native Claims Settlement Act ("ANCSA"), and the deeds of conveyance shall so provide; and provided further that in any conveyances pursuant to the Land Sale Agreement or any further conveyances of the property received from the Debtor, the Native Village of Point Hope explicitly recognizes any such valid existing rights and agrees to make such reconveyances as may be required under section 14(c) of ANCSA.

B.    Drexel has offered to purchase, subject to the approval of the Bankruptcy Court and the confirmation of the Plan, and subject to the terms and conditions set forth in the Agreement, the Debtor's existing net operating losses of approximately $3,500,000 or more ("the Existing NOLs") at

KOVAL & JAFFERLY
A PROFESSIONAL CORPORATION
xxx WEST xx STREET, SUITE xxxx
SUITE xxx
ANCHORAGE, ALASKA 99501
TELEPHONE (907) xxx-xxxx  FACSIMILE (907) xxx-xxxx

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS          Page 3

AR00055

a price of approximately $.20 per dollar of loss and any of the Debtor's capital losses that may result from a sale by the Debtor of some portion of its undeveloped lands ("the land sale losses") at a price of approximately $.22 per dollar of land sale loss. The Court finds that the sale of all of the Existing NOLs and the land sale losses is a "sale of property" of the estate of the Debtor pursuant to § 363 of the Bankruptcy Code and that the prices agreed upon are fair and reasonable.

C. Neither the Debtor nor Drexel are acting in collusion with respect to the proposed sale of the Existing NOLs and of the land sale losses; both Drexel and the Debtor have entered into arms length negotiations concerning such sale, with appropriate notice to all parties-in-interest and neither the Debtor nor Drexel have acted in such manner as to defraud or attempt to take unfair advantage of other potential bidders or other parties-in-interest in this case.

D. Drexel is a good faith purchaser as that term is defined in 11 U.S.C. § 363(m).

E. The Debtor's execution of each of the documents which comprise the Agreement, as well as the Debtor's covenants and agreements described in the documents, have been or will be

ROYAL & HARTLEY
A PROFESSIONAL CORPORATION
1031 WEST NORTHERN LIGHTS BLVD.
SUITE 501
ANCHORAGE, ALASKA 99503
(907) 276-5500  FAX (907) 276-2701

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS        Page 4



AR00056

authorized by appropriate corporate representatives of the Debtor.

F.  In the event of any inconsistency in the terms of the Plan and the Agreement, the terms and conditions of the Agreement shall control, provided, however, that the closing of the transactions contemplated by the Agreement shall not occur unless the Plan shall have been, or shall simultaneously be, substantially consummated, and provided further that nothing in the Agreement or in this order shall be construed to require the Debtor to substantially consummate the Plan.

G.  The Agreement when executed will be a binding and enforceable obligation of the Debtor, the estate of the Debtor, any trustee appointed in this case, and any successor in interest of each such party.  The liens and security interests granted to Drexel, Group or Newco pursuant to the Agreement constitute valid, perfected and enforceable first-priority liens and security interests against the Debtor and the in assets of the estate of the Debtor to which the liens and security interests attach as set forth in the Agreement, and any proceeds thereof, which liens and security interests are perfected by virtue of the entry of this Order (although

KOVAL & HEABERLY
A PROFESSIONAL CORPORATION
911 WEST NORTHERN LIGHTS BLVD.
SUITE 301
ANCHORAGE, ALASKA 99503
TELEPHONE (907) 276-600    TELEFAX (907) 276-701

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS          Page 5



Drexel may, at its option, further perfect such interest by filing in any public record).

H.  Each of the Chairman of the Board and the President of the Debtor, is designated as an authorized individual to sign on behalf of the Debtor any documents or instruments contemplated by this Order, including without limitation the Agreement.

I.  The Debtor's execution of the Agreement, as well as the Debtor's covenants and agreements described in the Agreement, have been authorized by appropriate corporate representatives of the Debtor, subject to approval by this Court pursuant to 11 U.S.C. § 363.

On the basis of the above findings of fact, THE COURT CONCLUDES AS FOLLOWS::

J.  Drexel is a good faith purchaser as that term is defined in 11 U.S.C. § 363(m);

K.  The Debtor is authorized and directed to enter into and consummate the Agreement after the date this Order is no longer subject to an appeal (hereinafter "the Final Order"). Time is of the essence in connection with the performance by the Debtor of each obligation set forth in this Order and in the Agreement; provided, however, that the closing of the transactions contemplated by the Agreement shall not occur

KOVAL & HAVERLY
A PROFESSIONAL CORPORATION
801 WEST FIREWEED LANE
SUITE 301
ANCHORAGE, ALASKA 99503
(907) 278-8800 / FAX (907) 278-7671

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS          Page 6

unless the Plan shall have been, or shall simultaneously be, substantially consummated, and provided further that nothing in the Agreement or in this Order shall be construed to require the Debtor to substantially consummate the Plan.

L.   The Agreement, and each portion thereof, shall constitute a valid and binding obligation of the Debtor, the Estate of the Debtor, and Trustee appointed in this case and any successor and/or assign of such party.

M.   The liens and security interests granted to Drexel, Group, or Newco pursuant to the Agreement constitute valid, perfected and enforceable first-priority liens and security liens in the property pledged thereunder and any proceeds thereof, securing the Debtor's obligations to Drexel, Group, or Newco, all of which are perfected by virtue of entry of this Order.

Accordingly, IT IS HEREBY ORDERED:

1.   The Debtor and its respective officers, directors, agents and employees, and all other necessary parties or signatories be, and hereby are authorized, empowered and directed to:   (a) issue, execute and deliver the Agreement and the Land Sale Agreement (subject to the provisions stated above), which agreements shall, in the case of the Land Sale Agreement, be in a form substantially as set out in Exhibit

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS        Page 7

AR00059

A or B to this Order, and, in the case of the Agreement, be in a form substantially as set out in Exhibit C, and any other agreement or instrument necessary to consummate or carry out the Land Sale Agreement or the Agreement; (b) to cause the execution and carrying out of the Agreement and the Land Sale Agreement (subject to the provisions stated above); and (c) to take such actions as may be necessary to carry out the actions authorized by this Order and the Order Confirming Debtor's First Amended Plan of Reorganization.

2.   The Debtor and its respective officers, directors, agents and employees, and all other necessary Parties or signatories be, and hereby are authorized, empowered and directed to agree to such amendments to the documents described in paragraph 1, above, as shall appear necessary or appropriate, provided that no amendment shall materially alter the provisions of the Agreement to the disadvantage of the Debtor or any creditor of the Debtor.

3.   Each of the Chairman and the President is designated as the individual to sign on behalf of the Debtor any documents or instruments contemplated by this Order, including without limitation the Agreement and the Land Sale Agreement.

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS          Page 8

4.  Except as noted above, all approvals and consents of the equity security holders, officers and directors of the Debtor, as may be necessary to carry out the Agreement and the actions authorized by this Order, be, and they hereby are, deemed made or done.

5.  Debtor shall take all actions necessary to consummate the Agreement after the Final Order; provided, however, that the closing of the transactions contemplated by the Agreement shall not occur unless the Plan shall have been, or shall simultaneously be, substantially consummated, and provided further that nothing in the Agreement or in this order shall be construed to require the Debtor to substantially consummate the Plan.

6.  The Agreement is a binding and enforceable obligation of the Debtor, the Estate of the Debtor, any Trustee appointed in this case, and any successor in interest of each such party, and any security interests granted to Drexel, Group or Newco pursuant to the Agreement creates valid and perfected first priority security interests in the property pledged thereunder and any proceeds thereof, securing the Debtor's obligations to Drexel, Group or Newco, which liens and security interests shall be perfected by virtue of the entry of this Court's Order allowing same.

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS        Page 9

AR00061

7.  Guess & Rudd, as distribution agent for the Debtor, shall have the right to receive, and shall receive such monies as are authorized to be distributed to the Debtor directly from Drexel or Newco in accordance with the Agreement.

8.  Upon distribution of monies by Drexel or Newco to Guess & Rudd as distribution agent for the Debtor, such monies shall constitute property of the estate of the Debtor.

9.  In the even this case is converted to a case under Chapter 7 of the Bankruptcy Code on or before June 30, 1990, or a case by or against the Debtor is subsequently filed as a case under Chapter 7 or Chapter 11 of the Bankruptcy Code (unless the Debtor in Chapter 11 assumes the obligations of this Agreement), Newco shall be entitled to repayment of all amounts paid by Newco to the Debtor under the Agreement, and that all other obligations under the Agreement shall be terminated and of no further force and effect and that all remaining property shall be immediately distributed to Drexel.

10.  The Plan to be confirmed in this case shall provide that all terms and conditions of all liens or rights of offset granted under the Agreement or in this Order are valid and binding obligations, security interests, liens and rights

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS        Page 10

AR00062

of offset for the reorganized Debtor, and that the Debtor shall comply with each of the covenants, obligations, agreements and other provisions contained in the Agreement and in this Order unless the Debtor obtains the express written consent of Drexel.

11.  Any breach of any of the conditions or obligations set forth in this Order shall be an event of default under the Agreement which shall entitle Drexel or Newco to take all actions authorized upon an event of default under the Agreement without further order of this Court.

12.  Approval of the Application to Enter Into NOL Sale Agreements and consummation of the transactions contemplated by the Application are subject to and contingent upon the entry of the Final Order.

13.  No plan of reorganization confirmed in this case shall contain any provision which modifies or limits any of terms and conditions of, or any security interests, lien or right of offset granted under, the Agreement or this Order, any of the covenants, obligations, agreements or other provisions contained in the Agreement or this Order without the express written consent of Drexel and Newco filed with the Court.

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS          Page 11

AR00063

14.   In the event of any inconsistency or ambiguity between the Plan and the Agreement, the terms and conditions of the Agreement shall control and shall be binding upon the Debtor and the estate of the Debtor as if the same were fully incorporated into the Plan, provided, however, that the closing of the transactions contemplated by the Agreement shall not occur unless the Plan shall have been, or shall simultaneously be, substantially consummated, and provided further that nothing in the Agreement or in this order shall be construed to require the Debtor to substantially consummate the Plan.

15.   Nothing in this Order nor in the Agreement shall be interpreted to permit or require the Debtor to take any action which violates any provision of the Order entered by this Court on December 5, 1986, approving the sale of approximately $5,200,000.00 of net operating losses to the Del E. Webb Corporation. Neither shall this Order or the Agreement be interpreted to permit or require the Debtor to take any action in violation of any agreement into which the Debtor has entered in consummation of the transactions contemplated by the December 5, 1986 order.

16.   Nothing in this Order or in the Agreement shall be interpreted to permit or require the Debtor to take any

KOVAL & FEATHERLY
A PROFESSIONAL CORPORATION
901 WEST NORTHERN LIGHTS BLVD
SUITE 201
ANCHORAGE, ALASKA 99503
(907) 258-6400  (FAX)(907) 279-7013

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS        Page 12

AR00064

action which violates any provision of the Order entered by this Court on July 17, 1987, approving the sale of between $2,200,000.00 and $3,100,000.00 of net operating losses to Caesar's World, Inc.   Neither shall this Order or the Agreement be interpreted to permit or require the Debtor to take any action in violation of any agreement into which the Debtor has entered in consummation of the transactions contemplated by the July 17, 1987 order.

17.   The Debtor and its respective officers, directors, gents and employees, and all other necessary parties or signatories be, and hereby are authorized, empowered and directed to agree to such amendments to the Agreement as shall appear necessary or appropriate, provided that no amendment shall materially alter the provisions of the Agreement to the disadvantage of the Debtor or the creditors of the Debtor.

18.   Except as noted herein, all approvals and consents of the equity security holders, officers and directors of the Debtor, as may be necessary to carry out the Agreement and the actions authorized by this Order, be, and they hereby are, deemed made or done.

19.   Debtor shall take all actions necessary to consummate the Agreement after the Final Order; provided,

KOVAL & FEATHERLY
A PROFESSIONAL CORPORATION

ORDER APPROVING AGREEMENTS BETWEEN
THE DEBTOR AND DREXEL AND AUTHORIZING
LAND SALE AGREEMENTS          Page 13