

## United States Department of the Interior



OFFICE OF THE SOLICITOR
Washington, D.C. 20240

JAN 19 1993

M-36975 (Supp. I)

Memorandum

To:       Secretary

From:     Solicitor

Subject:  Governmental Jurisdiction of Alaska Native Villages
          Over Land and Nonmembers

On January 11, 1993 you concurred in the Opinion issued by our
Office on the same date concerning the extent of governmental
jurisdiction of Alaska Native Villages over land and nonmembers.
Upon review of our Opinion, the Office of Legal Counsel,
Department of Justice has informed us that the wording of
footnote 152 which appears on pages 59-60 does not comport with
the official legal policy established by that Office.  We
acknowledge the role of the Department of Justice in establishing
the Federal Government's legal policies and hereby state below
verbatim the Office of Legal Counsel's position regarding
footnote 152:

Legislation providing benefits to Indians on the basis of their
race, rather than on the basis of tribal membership, raises
questions under the equal protection component of the Fifth
Amendment.

In general, explicit governmental classifications based on race
or ethnicity are constitutionally highly suspect.  See Richmond
v. J.A. Croson Co., 488 U.S. 469 (1988) (majority of court
imposes "strict scrutiny" on racial classification); see also
Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979) ("A
racial classification, regardless of purported motivation, is
presumptively invalid and can be upheld only upon an
extraordinary justification."); Bolling v. Sharpe, 347 U.S. 497,
499 (1954) (invalidating racial classification in District of
Columbia under strict scrutiny).  In certain circumstances,
racial classifications ordained by Congress are sustainable, but
only if, at a minimum, "they serve important governmental
objectives within the power of Congress and are substantially
related to the achievement of those objectives."  Metro
Broadcasting, Inc. v. FCC, 110 S. Ct. 2997, 3000 (1991).  Even
under that standard of review, such "characteristics provide a
relevant basis for disparate treatment only in extremely rare
situations," and the justification for "'any such classification

AR00130

[must] be clearly identified and unquestionably legitimate.'" Id. at 3028 (Stevens, J., concurring) (quoting Fullilove v. Klutznick, 448 U.S. 448, 534-35 (1980) (Stevens, J., dissenting)).

Although Indians enjoy a special position under the law, the Supreme Court has consistently emphasized that racially-based legislation is not exempt from constitutional prohibitions on racial discrimination simply because the legislation involves or benefits Indians. See, e.g., Washington v. Yakima Indian Nation, 439 U.S. 463, 500-01 (1979); Craig v. Boren, 429 U.S. 190, 209 n.22 (1976) (laws which discriminate with respect to Indians on racial grounds are of "questionable constitutionality").

Acts of Congress conferring benefits on Indian tribes -- as distinct from Indians defined as a racial class -- stand on a different constitutional footing. Accord Memorandum for Diane Weinstein, Acting General Counsel, Dep't of Education, from Douglas W. Kmiec, Ass't Att'y Gen., Office of Legal Counsel, Dep't of Justice, re: Constitutionality of Preferences Contained in Public Law No. 100-297 (Nov. 9, 1988). In Morton v. Mancari, 417 U.S. 535 (1974), the Supreme Court upheld the Indian preference contained in the Indian Reorganization Act of 1934 against a limited constitutional challenge. The regulations in Mancari defined eligibility for the preference as follows:

> To be eligible for preference in appointment, promotion, and training, an individual must be one-fourth or more degree Indian blood and be a member of a federally-recognized tribe.

417 U.S. at 553 n.24, quoting 44 BIAM 335, 3.1 (emphasis supplied). The Court explicitly relied on this definition to uphold the preference against the claim that it was racially discriminatory:

> The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities . . . .

> The preference is not directed towards a "racial" group consisting of "Indians"; instead, it applies only to members of "federally recognized" tribes. This operates to exclude many individuals who are racially to be classified as Indians. In this sense, the preference is political rather then racial in nature.

417 U.S. at 554 and 553 n.24 (emphasis supplied). Moreover, it is significant that throughout its constitutional discussion the Court refers to those Indians receiving benefits as "tribal Indians." See, e.g., id. at 552-55.

Although the classification at issue in Mancari contained a racial element (an "Indian blood" requirement), the Court held

AR00131

that the classification's further requirement of tribal membership sufficed to save the preference. The Court also noted that the preference only applied to employment in the Indian service and therefore was reasonably and directly related to a legitimate, nonracially based goal -- that of furthering the cause of Indian self-government. 417 U.S. at 554. We do not believe that by adducing this additional distinction the Court implied that Indian preferences based on racial rather than tribal classifications would be constitutional if confined to positions relating to Indian self-government.

The Supreme Court has repeatedly relied upon this distinction between tribal and racial classifications in upholding Indian preferences against attack on racial discrimination grounds. See, e.g., Washington v. Yakima Indian Nation, supra, 439 U.S. at 500-01 ("It is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive," quoting Mancari); United States v. Antelope, 430 U.S. 641, 647 (1977) ("Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a '"racial" group consisting of "Indians" . . .,'" quoting Mancari); Moe v. Salish and Kootenai Tribes, 425 U.S. 463, 480 (1976) ("statutes . . . according special treatment to Indian tribes and reservations" are "neither 'invidious' nor 'racial,'" citing Mancari); Fisher v. District Court, 424 U.S. 382, 390 (1976) (statute granting exclusive jurisdiction over certain claims to the Cheyenne Tribal Court, challenged as "impermissible racial discrimination," upheld on grounds that jurisdiction "does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law.")

Nothing in United States v. John, 437 U.S. 634 (1978), contradicts our conclusion. The Court's opinion in John involved questions of state and federal criminal jurisdiction over "Indian country," as that phrase was used in several statutes. The Opinion did not address any equal protection challenge to a racial classification.

*Tom Sansonetti*

Thomas L. Sansonetti
Solicitor

AR00132

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . .   1

II.  OUTLINE . . . . . . . . . . . . . . . . . . . . . . . . .   5

III. VILLAGE TRIBAL STATUS . . . . . . . . . . . . . . . . . .   8
     A.  History . . . . . . . . . . . . . . . . . . . . . . .   8
         1.  Early History . . . . . . . . . . . . . . . . . .   8
             a.  Social Organization . . . . . . . . . . . .  10
             b.  Leadership . . . . . . . . . . . . . . . . .  11
             c.  Land ownership . . . . . . . . . . . . . . .  11
             d.  Law Ways . . . . . . . . . . . . . . . . . .  12
         2.  Russian Rule and the Treaty of Cession . . . .  13
         3.  Early United States Administration 1867-1900 .  15
         4.  Evolution of Federal Law and Policy 1901-1932 .  22
         5.  Alaska Natives on the Eve of the New Deal . . .  27
         6.  Indian Reorganization Act . . . . . . . . . . .  28
             a.  Background . . . . . . . . . . . . . . . . .  28
             b.  Alaska Amendment . . . . . . . . . . . . . .  29
             c.  Instructions for Implementation of the
                 Alaska Amendment . . . . . . . . . . . . . .  31
             d.  IRA Organizations . . . . . . . . . . . . .  33
         7.  Extension of Public Law 280 to Alaska . . . .  34
         8.  ANCSA and Post-ANCSA Legislation . . . . . . .  38
     B.  Analysis . . . . . . . . . . . . . . . . . . . . . .  46
         1.  Treatment of Native Villages by Congress . . .  46
         2.  Arguments Against Finding Tribes . . . . . . .  48
         3.  Which Villages are Tribes . . . . . . . . . . .  58

IV.  VILLAGE GOVERNMENTAL JURISDICTION OVER LAND AND
     NONMEMBERS . . . . . . . . . . . . . . . . . . . . . . .  60
     A.  Native Land Claims . . . . . . . . . . . . . . . . .  60
         1.  Early Land Claims . . . . . . . . . . . . . . .  60
         2.  Proposed Repeal of the Alaska Amendment to the
             IRA . . . . . . . . . . . . . . . . . . . . . .  64
         3.  Land Claims in Court . . . . . . . . . . . . .  67
         4.  The Statehood Act . . . . . . . . . . . . . . .  69
         5.  Move Toward Settlement . . . . . . . . . . . .  72
     B.  Alaska Native Claims Settlement Act . . . . . . . .  76
         1.  Overview . . . . . . . . . . . . . . . . . . . .  76
         2.  Key Provisions . . . . . . . . . . . . . . . . .  81
             a.  Use of Newly-Created Corporate Entities
                 as the Vehicles for Implementing the
                 Settlement . . . . . . . . . . . . . . . . .  81
             b.  Revocation of Reservations . . . . . . . .  87
             c.  Encouragement of Local Government Through
                 State-chartered Municipalities . . . . . .  90

AR00133

      d.    Amendments . . . . . . . . . . . . . .    92
            i.    Numerous Technical Adjustments to a
                  Novel and Complex Statute . . . . .    92
            ii.   Stock   Alienability   Provisions
                  Modified to Allow Preservation of
                  Native Control . . . . . . . . . . .   95
            iii.  Provisions for Protection of the
                  Native Land              Base .  98
   C. Analysis . . . . . . . . . . . . . . . . . . .   101
      1.    ANCSA as Termination Legislation . . . . . 101
            a.    Termination Legislation . . . . . . . 102
            b.    ANCSA . . . . . . . . . . . . . . . . 103
            c.    ANCSA Legislative History . . . . . . 104
            d.    Effect of ANCSA . . . . . . . . . . . 106
      2.    Jurisdiction over Lands and Nonmembers after
            ANCSA . . . . . . . . . . . . . . . . . . . 107
            a.    The  Territorial  Component  of  Tribal
                  Powers Generally . . . . . . . . . . . 108
            b.    Indian Country and Alaska . . . . . . 110
            c.    Reservations . . . . . . . . . . . . . 111
            d.    Dependent Indian Communities . . . . . 113
                  i.    Alaska Native Corporation Lands . 118
                  ii.   Village Fee Lands . . . . . . . . 122
                  iii.  Village-Owned Townsite Lands . . . 123
            e.    Native Allotments . . . . . . . . . . 124
                  i.    Indian   Allotments   as   Indian
                        Country . . . . . . . . . . . . . 124
                  ii.   Alaska Native Allotments . . . . . 128
                  iii.  Individual Native Townsite Lots . . 129
            f.    Authority over Nonmembers After ANCSA . . 130

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . 131

AR00134



United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

JAN 1 1 1993

M-36975

Memorandum

To:         Secretary

From:       Solicitor

Subject:    Governmental Jurisdiction of Alaska Native Villages
            Over Land and Nonmembers

In the fall of 1990 at your request, we conducted an Office-wide
review of all pending legal issues in Alaska.  On June 19, 1991,
following that review and briefings with your policy and program
staff, you issued a memorandum establishing as a priority the
resolution of three of those issues.  Among your priorities was a
request that we work with the Department of Justice to develop
the legal position of the United States on "the nature and scope
of so-called governmental powers over lands and nonmembers that a
Native village can exercise after the Alaska Native Claims
Settlement Act."  You indicated that the opinion would be useful
in resolving questions that arise in the context of approving the
constitutions put forward by villages and would aid you in
deciding whether the jurisdictional claims made by the villages
were consistent with law.  You limited your request noting that
you were not seeking "to question the existence of a
long-recognized special relationship between the United States
and Alaska natives" or "to revisit the eligibility of villages to
participate in programs administered by the Department and
available to Indians."

I.   INTRODUCTION

Prior to the enactment of the Alaska Native Claims Settlement
Act, Act of December 18, 1971, Pub. L. No. 92-203, 85 Stat. 688
(codified as amended at 43 U.S.C. §§ 1601-1628) (ANCSA), sixty-
nine Alaska Native villages and regional groups adopted
constitutions pursuant to section 16 of the Indian Reorganization
Act, Act of June 18, 1934, § 16, 48 Stat. 987 (codified as
amended at 25 U.S.C. § 476) (IRA).  All but two of these
constitutions were adopted during the 1930's, 1940's and
1950's.[1]

--------

[1]    Bureau of Indian Affairs, <u>American Indians and Their Federal
Relationship</u> 2-5 (1972).  Two constitutions were adopted in 1971:
Inupiat Community of the Arctic Slope, approved on June 28, 1971,
and adopted August 26, 1971; and Kenaitze Indian Tribe, approved
June 21, 1971, and adopted August 1, 1971.

AR00135

Although there was some interest in IRA constitutions during the 1970's,[2] it was not until the 1980's that there was evidence of widespread renewal of Native interest in IRA constitutions. As a result of this renewed interest, three villages have adopted amended constitutions[3] and three have adopted constitutions for the first time.[4]  During this time, several Native groups have considered proposed constitutions or constitutional amendments and rejected them.[5]  Approximately a dozen villages are currently considering proposed constitutions.  The Bureau of Indian Affairs (BIA) is corresponding with these villages to provide technical comments.

The 1988 amendments to the IRA, Act of November 1, 1988, § 101, Pub. L. No. 100-581, 102 Stat. 2938 (codified 25 U.S.C. § 476), require that, 30 days prior to calling an election on the adoption or amendment of a tribal constitution, you advise a tribe in writing of any provision of the constitution that you believe is contrary to applicable law.  Your request to this Office arises in the context of this provision.  Legal guidance on the scope of village jurisdiction over land and nonmembers is necessary to determine whether the jurisdictional claims made by the villages are contrary to law.

As the length and detail of the opinion that follows indicates, the question you have asked is an exceedingly difficult and complex one.  As you are aware, both the federal and state courts in Alaska have been grappling with issues concerning the sovereignty and powers of Alaska Native groups for several years. The results have been, to say the least, less than consistent.[6]

---

[2]    Several elections on the adoption of village constitutions were authorized in the 1970's but, for some reason, were never held.

[3]    Tanana, adopted June 13, 1989, and approved July 26, 1989; Stevens Village, adopted June 25, 1990, and approved August 8, 1990; and Sitka, adopted November 26, 1991, and approved January 8, 1992.

[4]    Eagle, adopted April 29, 1989, and approved June 13, 1989; Circle, adopted August 20, 1991, and approved October 4, 1991; and Seldovia, adopted April 3, 1992, and approved May 18, 1992.

[5]    For example, the Metlakatla Indian Community of the Annette Islands Reserve rejected a proposed revised constitution on March 1, 1983, and the Native Village of Port Graham rejected a proposed constitution on January 30, 1992.

[6]    Federal cases include: Native Village of Tyonek v. Puckett, 957 F.2d 631 (9th Cir.), superseding 953 F.2d 1179 (9th Cir. 1992); Alyeska Pipeline Service Company v. Alaska, No. A87-201

2

AR00136

In formulating our opinion, we have attempted to step back from the details of these specific cases and examine the question of the impact of ANCSA on Native village jurisdiction over land and nonmembers from the perspective of the 125 year history of federal dealings with Alaska Natives and of general principles of Federal Indian law.

In our effort, we have consulted with the Governor and Attorney General of Alaska; numerous Native leaders in Alaska and the contiguous 48 states, as well as their counsel; the Alaska congressional delegation and other congressional leaders; and the members of the Joint Federal-State Commission on Policies and Programs Affecting Alaska Natives established by section 12 of the Act of August 18, 1990, Pub. L. No. 191-379, 104 Stat. 473, 478. We have received numerous comments, including several detailed legal briefs. These comments have been very helpful in developing our opinion.

As we discuss further below, the complexity of questions concerning the sovereign powers of Alaska Native groups arises in considerable measure from Alaska's unique circumstances and history.[7] Alaska was the last territorial acquisition of the United States on the North American continent. The remote location, large size and harsh climate of Alaska further delayed the need to confront questions concerning the relationship between the Native peoples of Alaska and the United States. As a result, all three branches of the Federal Government have dealt with the relationship in a tentative and reactive way. Often, decisions on issues concerning the relationship with Natives have been postponed, rather than addressed. Where aspects of the relationship have been addressed, they have often been resolved without a clear or consistent understanding or application of the fundamental legal principles governing the relationship.

---

Civil (D. Alaska)(Tentative Decision, filed January 17, 1992); Blatchford v. Native Village of Noatak, 111 S.Ct. 2578 (1991), rev'g Noatak v. Hoffman, 896 F.2d 1157 (9th Cir. 1990); Native Village of Venetie I.R.A. Council v. Alaska, 944 F.2d 548 (9th Cir. 1991)(Venetie II), superseding 918 F.2d 797 (9th Cir. 1990); Chilkat Indian Village v. Johnson, 870 F.2d 1469 (9th Cir. 1989); Alaska v. Native Village of Venetie, 856 F.2d 1384 (9th Cir. 1988)(Venetie I).

State cases include: Nenana Fuel Co., Inc. v. Native Village of Venetie, 834 P.2d 1229 (Alaska 1992); Hydaburg Cooperative Association v. Hydaburg Fisheries, Inc., 826 P.2d 751 (Alaska 1992); Matter of City of Nome, 780 P.2d 363 (Alaska 1989); Native Village of Stevens v. Alaska Management & Planning, 757 P.2d 32 (Alaska 1988).

[7]    See Part III, infra.

3

AR00137

This is not to say that there has been a wholly consistent pattern of dealing with Native Americans in the contiguous 48 states. There obviously has not. But there is a fundamental difference between the approach to issues of Indian law and policy in the contiguous 48 and the situation in Alaska. The shifts in dealing with Native Americans in the contiguous 48 have been characterized by fundamental changes in national policy. An initial policy of separation of Native Americans from the rest of society through removal and reservations gave way in the 1880's to a policy of assimilation as reflected in the General Allotment Act of 1887. 24 Stat. 388. Assimilation gave way in turn to a policy of reinvigorated Native self-government as reflected in the IRA and other policies of the New Deal. There followed a brief period of termination and then, in the early 1970's, the current policy of tribal self-determination.[8] Dealings with Native groups in Alaska have, to be sure, reflected elements of then-current national policies. There has been, however, no consensus on the appropriate comprehensive framework for the relationship with Alaska Natives taking into account the unique circumstances of Alaska.

ANCSA is the most comprehensive statute to address Alaska Native issues. However, even with ANCSA, the primary impetus for, and focus of, the statute was resolution of a specific issue: Native claims to the land of Alaska.[9] A comprehensive statutory scheme to address this issue was enacted. In our opinion, as we detail below, this scheme has decisive implications for the current status of Native village jurisdiction over land and nonmembers.

In several statutes subsequent to ANSCA, Congress has disclaimed an intention to address the issue of Alaska Native village sovereign powers. Most recently, in the so-called "1991 Amendments" to ANSCA, Congress said that no provision shall "confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands . . . or persons in Alaska . . . ." Act of February 3, 1988, Pub.L. No. 100-241, § 2(8)(B), 101 Stat. 1788, 1789 (1988) (43 U.S.C. § 1601 note). The Senate Energy and Natural Resources Committee explained, in its report on the legislation, that, "[t]his is an issue which should be left to the courts in interpreting applicable law and that these amendments should play no substantive or procedural

---

[8]    A concise history of Federal Indian policy through 1940 can be found in F. Cohen, Handbook of Federal Indian Law 1-88 (1942) (1942 Cohen). An update through 1981 is contained in F. Cohen, Handbook of Federal Indian Law 47-206 (1982) (1982 Cohen). A recent comprehensive history is F. Prucha, The Great Father (1984).

[9]    See Part IV.B, infra.

4

AR00138

role in such court decisions."[10]   There is an element of self-fulfilling prophecy in the Senate Committee's statement.  In the absence of further guidance from Congress, the courts will of necessity have to struggle with this issue.  However, the courts must do so within the framework of laws enacted by the Congress and within the context of the specific cases and controversies that are brought before them.  There is no assurance that the courts can comprehensively address the sovereign powers of Native villages.  Further, the cases decided to date indicate that a judicial consensus on even specific issues will be elusive.

In the opinion that follows, we attempt to provide a broader perspective on the issue of Native village jurisdiction over land and nonmembers than can be provided in a specific case or controversy.  However, the conclusions we reach can be no more than our best legal judgment.  Further, like the courts, we are constrained by the framework of laws enacted by the Congress.

The ultimate and most satisfactory answer to the question you have posed should be provided by the Congress.  Unlike the courts or the Department of the Interior, the Congress has the constitutional authority to craft general principles of Federal Indian law to address the unique circumstances of Alaska.  Only with careful and deliberate action by the legislative branch, taken in consultation with the Native and non-Native citizens of Alaska, will there be an answer that will provide certainty and fairness in the future governance and development of Alaska.

II.  OUTLINE

In 1975 Congress established the American Indian Policy Review Commission to conduct the most comprehensive review of American Indian policy since the 1930's.[11]  The Commission's review included examination of the status of Alaska Natives and is particularly relevant to our inquiry because its views on Alaska Natives and ANCSA were framed in the context of national Indian policy and were issued in 1977, six years after the Settlement Act.  While we do not find persuasive everything said by the

---

[10]    S. Rep. No. 201, 100th Cong., 1st Sess. 35 (1987).  See discussion Part IV.B.2, infra.

[11]    Pub. L. No. 93-580, 88 Stat. 1910, as amended by Act of August 9, 1975, Pub. L. No. 94-80, §§ 1-4, 89 Stat. 415 and Pub. L. No. 95-5, 91 Stat. 13.  The Commission was charged with conduct of "a comprehensive review of the historical and legal developments underlying the Indians' unique relationship with the Federal Government in order to determine the nature and scope of the necessary revisions in the formulation of policies and programs for the benefit of Indians."  The work of the Commission is discussed in 1982 Cohen, supra n. 8, at 205-06.

5

AR00139

Commission concerning Alaska Natives, the broad outlines of the Commission's findings provide a useful starting point for this opinion.

In Chapter 12 of its Final Report, the Commission described the status of Alaska Natives, in part, as follows:

> In aboriginal social and political organization, the Alaska Natives did not differ markedly from other American native peoples. They organized themselves into social and political units (groups or tribes) as various and multiform, but of the same general nature, as those evolved by the Indians of the lower 48.

> \* \* \*

> When, after the beginning of the 20th century, the United States began to take notice of the Alaska Natives, it dealt with them in much the same way as it was then dealing with the Indians of the lower 48.

American Indian Policy Review Commission, <u>Final Report</u> 95th Cong., 1st Sess. 489 (Comm. Print 1977) (footnotes omitted).

The Commission went on to conclude:

> By and large, the United States recognized that the Native tribes of Alaska were of the same genus as the other Indian tribes within its jurisdiction, and formed its relationships with them and their members accordingly. In short, it regarded the Alaska Native tribes as dependent domestic sovereigns, possessed of the same attributes and powers as the Native tribes of the lower 48. And, just as in the case of other Native tribes, it acknowledged that a special relationship existed between it and the Alaska Native tribes and their members, as an incident of which it undertook to provide them with special services.

> \* \* \*

> The Alaska Native tribes (referring, of course, to the historic and traditional tribal entities, not to the Native corporations organized under the Settlement Act), just as the tribes of the lower 48, are domestic sovereigns. They possess all of the attributes and powers normally appertaining to such status, except those that have been specifically denied or taken from them by Congress.

<u>Id.</u> at 490-91 (footnote omitted).

6

AR00140

The Commission found that ANCSA did not "effect a termination of
the traditional Alaska Native tribes." Rather, the Commission
found that, "as its very title implies," ANCSA was a settlement
of aboriginal land claims. Id. at 491. It observed that:

> No such [land claim] settlement has ever been held to
> have abolished the tribes concerned as political
> entities, to have affected their legal status, to have
> diminished their sovereign powers, or to have
> terminated the special relationship previously existing
> among them and their members and the United States.

> The Settlement Act did not alter in any way the legal
> nature or status of any of the Alaska Native tribes.
> Nor did it alter the preexisting relationship between
> the United States and the Alaska Natives as members of
> such tribes. Particularly the Settlement Act neither
> terminated the tribes nor the status as "Natives" of
> the members thereof.

Id. at 491-92 (footnote omitted).

The Commission relegated to a deceptively simple footnote the
essential conclusion for our present inquiry. After concluding
that Alaska Natives "possess all of the attributes and powers
normally appertaining to such [domestic sovereign] status, except
those that have been specifically denied or taken from them by
Congress," the Commission noted:

> Although, technically, the Alaska Native Tribes still
> possess a number of sovereign powers relating to the
> governance of territory (e.g., to regulate hunting and
> fishing on tribal domain), these powers are largely in
> abeyance at the present time because the tribes
> currently do not possess tribal domains. However, were
> the United States in the future to set aside or acquire
> land in trust for an Alaska Native tribe, all of the
> slumbering powers of that tribe pertaining to the
> governance of territory would immediately rejuvenate.
> In short, lacking the subjects to which certain of the
> sovereign powers they still possess relate, the Alaska
> Native tribes at present have no occasion to exercise
> them.

Id. at 491 n. 2.

Our review of the history of Alaska Natives and their
relationship with the United States that follows is consistent
with the factual conclusions of the Commission. Similarly, our
analysis of the law confirms the Commission's basic analysis and
conclusions. Events and judicial decisions since the
Commission's Final Report refine or expand upon the principles

AR00141

the Commission discussed.  They do not repudiate them.

Our analysis must start, as did that of the American Indian Policy Review Commission, with the question of whether there are tribes in Alaska.  Whatever governmental powers Alaska Native villages have, they have by virtue of being "tribes," as that term is used in Indian law.  Powers of inherent sovereignty are dependent on the villages being tribes.[12]

In Part III we review the ethnological history and the history of dealings between the United States and Alaska Natives for the light it sheds on villages as tribes.  We then consider the legal issue of whether there are tribes in Alaska and the arguments that have been advanced against the conclusion that villages may be tribes.  In Part IV, we turn to ANCSA and consider its effect on village exercise of governmental powers over land and nonmembers.

III. VILLAGE TRIBAL STATUS

    A.    History

In examining questions relating to the status and powers of Indians, it is useful, if not essential, to review the historical backdrop for the issues.[13]  In the current case, such a review is particularly important.  As indicated above, an understanding of the current status and powers of Alaska Native groups depends on an understanding of the unique history and circumstances of Alaska and its Native peoples.

        1.    Early History

The consensus of anthropological opinion is that man first entered Alaska from Asia across a then-existing land bridge. The land bridge is estimated to have emerged more than 40,000 years ago and to have existed on-and-off until 10,000 years ago. The first migrations may have occurred 25,000 to 40,000 years ago.  At Old Crow Flats in the Yukon, east of Alaska in an area never glaciated, evidence has been found that man was present between 25,000 and 30,000 years ago or more.  More than 2,700 archaeological sites have been identified in Alaska proper, some

---

[12]    See Powers of Indian Tribes, 55 I.D. 14, 1 Op. Sol. on Indian Affairs 445 (1934).

[13]    C. Wilkinson, American Indians, Time, and the Law 32-52 (1987).

8

AR00142

dating back 9,000 to 10,000 years.[14]

A first migration across the land bridge is believed to have moved through Alaska and spread east and south, reaching the east coast of North America and into South America as the Clovis and other fluted point cultures. A second migration is believed to have moved through the interior of Alaska, east into Canada, and south along the west coast of North America. Descendants of this migration include the Navajo and Apache tribes, the Indians of the Pacific Northwest and the Athabascan Indians of Alaska. The final prehistoric migrants were the ancestors of the Eskimos and Aleuts.[15]

At the time of Russian arrival in the 1700's several distinct cultural groups of Alaska Natives existed: (1) the Inupiat (Northern Eskimo) and the Yupik (Southern Eskimo); (2) the Aleuts; (3) the Athabascans; and (4) the related, but distinct, tribes of southeastern Alaska, the Tlingit and the Haida. These groups were, in turn, further stratified into several dozen linguistic and cultural groups.[16]

Significant information is available concerning the various Native groups, dating from the period of early contact. Most groups had social/political ranking or hierarchy. Groups were organized to perform, regulate or accommodate subsistence and economic activity (including trading with other groups), accomplish distribution of wealth, recognize land boundaries, conduct war, maintain a slavery system, and regulate domestic matters, such as marriage, descent and distribution, and intergroup alliances and partnerships.[17]

---

[14]    R.D. Arnold, <u>Alaska Native Land Claims</u> 2-7 (2d ed. 1978) (Arnold). <u>See also</u>, J.D. Jennings, <u>Prehistory of North America</u> 323-52 (1968).

[15]    C. Turner, <u>Ancient Peoples of the North Pacific Rim</u>, <u>in</u> <u>Crossroads of Continents</u> 111, 115 (Fitzhugh & Crowell eds. 1988) (<u>Crossroads</u>). <u>See also</u>, Jennings, <u>Origins</u>, <u>in</u> <u>Ancient Native Americans</u> 141 (Jennings ed. 1978); <u>United States v. Berrigan</u>, 2 Alaska Repts. 442, 447 (D. Alaska 1905).

[16]    Arnold, <u>supra</u> n. 14, at 8-17.

[17]    The summary that follows discusses key aspects of the organization and operation of Alaska Native groups. It necessarily does not probe in detail the complexities of the history and culture of the various groups. For in-depth information on the rich history and distinct culture of each Native group see Smithsonian Institution, <u>Handbook of North American Indians</u>, Vol. 5 (Arctic) and Vol. 6 (Subarctic) (1984) (<u>Handbook</u>). For information on the recent culture and

AR00143

a.     Social Organization

Some form of village, clan or band grouping was a common
denominator of pre-contact Native Alaskan life.  The sense of
affiliation with a group, even for the relatively loosely
organized Eskimos, was described as follows by anthropologist
Jean Ray:

> The Eskimos were extremely conscious of their tribal
> affiliations, extent of their territory, and relations
> with foreign groups.  Inhabitants of the smaller
> villages felt a strong tie with members of the larger
> capital.  Wherever they went they identified themselves
> as belonging to the specific larger group and were
> acutely aware of their crossing over into other tribal
> territory.[18]

The Tlingits were divided into two large moieties, the Raven and
the Wolf.  These were in turn divided into a number of
matrilineal clans.  In addition, each Tlingit also belonged to
one of about 18 or 20 kwaan, large territorial groupings.  Each
kwaan had one or more permanent winter villages.  In the complex
Tlingit social structure, each of these levels played a role.
The clan, for example, regulated marriage and ceremonial
activities and owned specific hunting, fishing and gathering
sites.[19]

The Athabascans were loosely organized in bands made up primarily
of persons related by blood or marriage.  During much of the
year, these bands subsisted as small local groups, but during
summer fishing and fall caribou migrations, they came together as
larger regional bands.[20]  For the Eskimo, permanent clan or

---

organization of the Native groups, see Federal Field Committee
for Development Planning in Alaska, Alaska Natives and the Land
(1968) (Alaska Natives and the Land).

[18]    Arnold, supra n. 14, at 15.

[19]    A. Shinkwin, Traditional Natives Societies in D. Case,
Alaska Natives and American Laws 333, 335-336 (1984) (Shinkwin).
Haida social structure was similar to that of the Tlingits.  See
also, Tlingit and Haida Indians of Alaska v. United States, 177
F. Supp. 452, 147 Ct. Cl. 315, 361-380 (1959).  The Federal
Supplement publication of the Tlingit and Haida opinion includes
only the court's legal opinion.  The Court of Claims Reports also
includes extensive findings of fact.  Accordingly, subsequent
citations are to the Court of Claims Reports.

[20]    J. Van Stone, Northern Athapaskans: People of the Deer, in
Crossroads, supra n. 15, at 64-68.

10

AR00144

family based villages were usually the basic social unit, but villagers also identified themselves with other villagers as part of a larger group.[21] Aleut society was also village based.[22]

b.    Leadership

All Alaska Native groups had leadership or political structures, although the nature of political leadership varied considerably. The complex social organization of the Tlingit and Haida was reflected in a complex structure of nobles, chiefs, commoners and slaves.[23] Each Athabascan band had a chief, with authority derived from economic success or demonstrated ability in hunting or warfare. Persons with shamanistic power exercised the greatest authority.[24] Among the Aleut, each village had a dominant family and a chief, with chieftainship usually inherited. In some instances, several villages were affiliated under a higher chief, who had authority to protect hunting grounds, control behavior and lead in war.[25] Eskimo government was such that many observers have "assumed a lack of government."[26] However, a complex web of family and economic leaders and religious and cultural beliefs provided "naturally developed means of social control which serve the purposes of government and in fact are government."[27]

c.    Land Ownership

The social/political subgroups of the major Alaska Native groups all, to varying degrees, controlled regions, consisting of well-defined territories used for a variety of purposes. Among the Tlingit and Haida, clans exercised control of land and there were "very definite concepts of proprietary rights in their territories extending to well known landmarks, such as rivers, rocks, reefs, mountain peaks, valleys, or natural characteristics

---

[21]    Arnold, supra n. 14, at 15.

[22]    L. Black and R.G. Liapunova, Aleut: Islanders of the North Pacific, in Crossroads, supra n. 15, at 52-57.

[23]    F. de Laguna, Tlingit: People of the Wolf and Raven, in Crossroads, supra n. 15, at 58-63.

[24]    C-M. Naske & H. Slotnick, Alaska: A History of the 49th State 19-20 (1979) (Naske & Slotnick).

[25]    Handbook, supra n. 17, Vol. 5 at 176.

[26]    H.D. Anderson & W.C. Eells, Alaska Natives 48 (1935).

[27]    Id.

11

AR00145

or points on the shores, bays, inlets or watersheds."[28] Athabascan bands had subsistence use areas with well known boundaries. Band territory was ordinarily closed to other groups, unless permission for its use was granted.[29] Each Aleut village similarly had a specified territory. Boundaries of these territories were often marked by permanent look-out stations.[30] Eskimo groups exercised common possession of territory. Indeed, the name for an Eskimo social unit was "nunnatgatigiit," meaning "people who are related to one another through their common ownership of land."[31]

### d.    Law Ways

Alaska Native groups did not have legal systems in the modern European sense, but all had systems of social and political control, some quite elaborate. The Tlingits had relatively sophisticated legal arrangements. Disputes within clans and between clans were resolved by clan leaders, although each village also had a "peacemaker" whose position was marked by a special paddle. The Tlingit legal system included well-understood principles of liability and compensation for death and injury.[32] Among the Athabascans, justice for serious offenses was administered by a village chief, but was subject to question by a village council. A system of punishment for various offenses was understood.[33] Dispute resolution among the Aleuts and Eskimos was aimed primarily at restoring group social harmony, although punishment for serious crimes, such as murder

---

[28]    _Tlingit and Haida Indians of Alaska v. United States_, 147 Ct. Cl. 315, 384 (1959). _See also_, F. de Laguna, _Tlingit: People of the Wolf and Raven_, in Crossroads, _supra_ n. 15, at 60.

[29]    Shinkwin, _supra_ n. 19, at 341.

[30]    _Id._ at 345.

[31]    Arnold, _supra_ n. 14, at 12.

[32]    Alaska Judicial Council, _Resolving Disputes Locally: Alternatives for Rural Alaska_ 26-27 (1992). During the Navy's administration of Alaska between 1879-1884, which was centered at Sitka, Tlingit customary law was employed by the Navy to insure order. The Navy also employed Tlingits as policemen under the supervision of a Tlingit chief. Harring, _The Incorporation of Alaska Natives Under American Law: United States and Tlingit Sovereignty, 1867-1900_, 31 Ariz. L. Rev. 280, 301-02 (1989) (Harring).

[33]    _Resolving Disputes Locally_, _supra_ n. 32, at 22-23.

12

AR00146

and theft, was imposed.[34]

> ### 2.    Russian Rule and the Treaty of Cession

Russian traders and hunters ventured into Alaska in the mid-18th Century.  In 1766, Russia declared sovereignty over Alaska.  In 1799, the Russian American Company was granted a trading monopoly in Alaska.  The Company, which was modeled on the British East India Company, served as the government of Alaska until the territory's sale to the United States in 1867.[35]

The Russian presence was initially centered in the Aleutians, but later expanded eastward into southeastern Alaska, with headquarters at what is now Sitka.  The Russians had a major impact on Aleut society.  To harvest furs for trade, the Russians impressed Aleuts, and some Eskimos, into forced labor.  Aleut villages were disrupted and some destroyed.  The Aleut population was devastated by infectious diseases brought by the Russians. In southeastern Alaska, the Tlingit opposed the Russian presence, destroying posts at Sitka in 1802 and Yakutat in 1805. Eventually, however, the Tlingit accommodated to the Russians, becoming active suppliers and trading partners.  Contact with interior groups was limited, and often occurred through Tlingit intermediaries.[36]

The first charter of the Russian American Company did not significantly address the status of Natives.  In contrast, the second charter, issued in 1821, and the third and final charter, issued in 1844, distinguished between classes of Natives.[37] Under the 1844 Charter, "settled tribes" under Russian administration were recognized as Russian subjects.  These tribes were not subject to taxation and were allowed to remain under the governance of Native chiefs.  However, the chiefs were subject to

---

[34]    Shinkwin, _supra_ n. 19, at 346; A. Hippler and S. Conn, _The Village Council and Its Offspring: A Reform for Bush Justice_, 5 UCLA-Alaska L. Rev. 22 (1975).

[35]    Useful brief summaries of Russian rule in Alaska are found in Naske & Slotnick, _supra_ n. 24, at 27-56, and L.T. Black, _The Story of Russian America_, _in Crossroads_, _supra_ n. 15, at 70-82. For more detail, see H.H. Bancroft, _History of Alaska 1730-1885_ (1886).

[36]    _Id._

[37]    Relevant provisions of the charters are set out in _Russian Administration of Alaska and the Status of Alaska Natives_, a report prepared by the Library of Congress for the Senate Interior and Insular Affairs Committee in 1950, S. Doc. No. 152, 81st Cong., 2d Sess. 43-52 (1950).

13

AR00147

appointment by the Administrator General of the Company and supervision by Company superintendents.[38] "Not wholly dependent tribes" living within the boundaries of Russian colonies were to "enjoy the protection of the colonial administration only on making a request therefor, and when such request is deemed worthy of consideration." Those "independent tribes" not dependent on the Company, were beyond its authority. Relations with these tribes were limited to "the exchange, by mutual consent, of European wares for furs and native products." The Company could establish posts within the territory of these groups only with their consent.[39]

A memorandum prepared by the Russian Ministry of Foreign Affairs in 1867 stated that, although an informal system of allotting homesites to settlers existed, Russia had not established a formal system of land titles. In the Aleutians, the memorandum said, "[t]he division of land between the Aleutian settlements was established at a time anterior to the Russian occupation and . . . [n]either the imperial government . . . nor agents of the company . . . ever interfered with the internal division of lands." In the interior, "no attempts were ever made, and no necessity ever occurred, to introduce any system of land ownership."[40]

In the 1850's the Russian American Company's fur markets declined. The Company's efforts to diversify into other areas, such as fishing were not economically successful. At the same time, the Russian Government became interested in the sale of Alaska, partly to raise funds for Czar Alexander II's program of social reform and partly because of concern about Russia's ability to defend the colony against the United States. Initial discussions with the United States Government were suspended because of the American Civil War. In 1867 the Russian ambassador to Washington reached agreement with Secretary of State Seward for sale of Alaska to the United States for $7.2 million.[41]

Article VI of the Treaty of Cession by which the United States

---

[38]    Id. at 49-51 (Charter §§ 247-279).

[39]    Id. at 52 (Charter §§ 280, 281-285).

[40]    "Explanatory memorandum in answer to the communication of the ministry of foreign affairs, department of interior relations, dated August 31, 1867, pursuant to the communication addressed by Hon. W.H. Seward, Secretary of State, August 6, 1867, to St. Petersburg, to the American envoy near the imperial court." Id. at 53-56.

[41]    Naske & Slotnick, supra n. 24, at 53-55.

AR00148

acquired Alaska provided, in part, as follows:

> The cession of territory and dominion herein made is
> hereby declared to be free and unencumbered by any
> reservations, privileges, franchises, grants or
> possessions, by any associated companies, whether
> corporate or incorporate, Russian, or any other, or by
> any parties, except merely private individual property
> holders; and the cession hereby conveys all the rights
> and franchises, and privileges now belonging to Russia
> in said territory or dominion, and appurtenances
> thereto.

15 Stat. 539, 543 (1867).

In Article III, the Treaty addressed the status of the
inhabitants of Alaska:

> The inhabitants of the ceded territory, according to
> their choice, reserving their natural allegiance, may
> return to Russia within three years; but if they should
> prefer to remain in the ceded territory, they, with the
> exception of uncivilized native tribes, shall be
> admitted to the enjoyment of all the rights, advantages
> and immunities of citizens of the United States, and
> shall be maintained and protected in the free enjoyment
> of their liberty, property and religion.  The
> uncivilized tribes will be subject to such laws and
> regulations as the United States may, from time to
> time, adopt in regard to aboriginal tribes of that
> country.

Id. at 542.

>     3.    Early United States Administration 1867-1900

In the early years of United States ownership, little attention
was paid to the administration of Alaska.[42]  The country was
preoccupied with recovery from the Civil War and controversies of
the Reconstruction Era.  Alaska was geographically remote and did
not offer the prospect of early, profitable economic development.
No formal government was established until the first Organic Act
for the territory was adopted in 1884.[43]  Before this
legislation, such administration as existed in the territory was

---

[42]    C-M. Naske, An Interpretative History of Alaska Statehood
2-3 (1973) (Naske).

[43]    Act of May 17, 1884, 23 Stat. 24.  Owing to this delay in
forming a territorial government, the Department of the Interior
did not assume responsibility for Alaska until 1884.

15

AR00149

provided by the military and, for a brief period, the Treasury Department.[44]

The lack of attention paid to Alaska extended to the question of relations with the Native population. Treaty-making with Indians was ended by Congress in 1871, only four years after the Alaska Purchase, but the conflicts leading to the negotiation of treaties in the continental United States were not present in Alaska.[45] The American immigrant population was initially small.[46] Although tensions existed between the Natives and immigrants, including increasing immigrant encroachment on Native resources, the vast size of Alaska resulted in a relative lack of intense or continuous competition and conflict over land or resources.[47] Military skirmishes with Natives occurred, but not on the scale seen in what became the contiguous 48 states.[48] Natives were not confined to reservations.[49] No Indian agents were dispatched and the Indian Office was not given

---

[44]    Nichols, Alaska: A History of Its Administration 34-82 (1927); Naske, supra n. 42, at 1-2.

[45]    1942 Cohen, supra n. 8, at 405.

[46]    Of a total population of 33,426 reported in the 1880 Census, only 430 were whites. Arnold, supra n. 14, at 71. The details of the 1880 Census are reported in Petrov, Preliminary Report on the Population, Industry and Resources of Alaska, H.R. Exec. Doc. No. 40, 46th Cong., 3rd Sess. (1881).

[47]    An important factor in this acceleration was the discovery of gold in 1880. This began a series of gold rushes that increasingly penetrated and exploited the Alaskan interior. Along with the influx of an alien population came new and disruptive economic developments such as commercial fishing, cannery operations, and aggressive hunting of local game populations. See generally, Naske & Slotnick, supra n. 24, at 195-97.

[48]    Harring, supra n. 32, at 295-98 (1989). In 1870, the Army burned the Village of Kake after villagers killed two white traders in retaliation for the killing of two Kake warriors by the Army. In 1884, the Navy shelled and burned Angoon after villagers seized hostages in an effort to obtain compensation for the death of a Tlingit shaman in a whaling accident. Id. Wrangell was shelled by the Army in 1870 in retaliation for the killing of a white trader. Report of the Governor's Task Force on Federal-State-Tribal Relations 75 (1986) (Governor's Task Force).

[49]    See supra n. 74.

16

AR00150

responsibility for Alaska Natives until 1931.[50]  No provision was
initially made for separate Indian schools.[51]

Under these circumstances, official decisions on the legal status
and rights of Natives were fitful at best and less than
consistent.  In 1869, Secretary Seward declared to the Secretary
of War that laws regulating intercourse with Indian tribes
applied to the new territory.  Quoting the definition of "Indian
country" from the Indian Trade and Intercourse Act of June 30,
1834, Seward said, "This [definition] by a happy elasticity of
expression, widening as our dominion widens, includes the
territory ceded by Russia."[52]  Based on this guidance, and
perhaps their experience in the contiguous states, the military
in Alaska proceeded to treat Alaska as Indian country.[53]

However, in 1872, the U.S. District Court for Oregon (which then
had judicial jurisdiction for Alaska) dismissed a prosecution for
sale of liquor to Indians, finding that Alaska was not Indian
country.  United States v. Seveloff, 27 F. Cas. 1021, 1 Alaska
Fed. 64 (D. Ore. 1872) (No. 16,252).[54]  The court held that the
1834 Trade and Intercourse Act's definition of Indian country was
territorially limited to areas east of the Rocky Mountains,
except as specifically extended by Congress.  The court rejected
an argument that an 1868 statute extending the laws of the United

---

[50]    Secretarial Order No. 494 (March 14, 1931).  Secretary
Delano  appointed an Indian agent for Alaska in 1873, but the
Comptroller of the Treasury held that no authority existed to pay
him and he was recalled.  D. Case, Alaska Natives and American
Laws, 223 n. 2 (1984) (Case).

[51]    The 1884 Organic Act authorized the Secretary of the
Interior to provide for "the education of the children of school
age in the Territory of Alaska, without regard to race . . . ."
Act of May 17, 1884, § 13, 23 Stat. 24, 27.

[52]    Letter of January 30, 1869, quoted in, Brief on the Subject
of the Jurisdiction of the War Department over the Territory of
Alaska, H.R. Exec. Doc. No. 135, 44th Cong., 2d Sess. 5 (1876).
Seward's letter was supported by a legal opinion issued by E.
Peshine Smith, Examiner of Claims of the State Department.  The
opinion is set out in full in the findings of fact in Tlingit and
Haida Indians of Alaska v. United States, 147 Ct. Cl. 315, 388-90
(1959).

[53]    Id. at 4-6.

[54]    The decision relied heavily on a decision of the Supreme
Court of the Oregon Territory holding that Oregon was not Indian
country for purposes of the 1834 Act, United States v. Tom, 1
Ore. 27 (1853).

AR00151

States "relating to commerce" to Alaska was sufficient to extend the 1834 Act to the territory, id. at 1024,[55] and impliedly rejected the view that Article III of the Treaty of Cession made the 1834 Act applicable.  Id. at 1023.

This decision alarmed the War Department.[56]  Congress promptly reacted by extending the liquor control provisions of sections 20 and 21 of the 1834 Act to Alaska.[57]  This action led, in turn, to a series of decisions concluding that, because the only liquor control provisions of the 1834 Act, and not other provisions, had been extended to Alaska, the territory Alaska was not Indian country for any other purposes.  In Waters v. Campbell, 29 F. Cas. 411, 1 Alaska Fed. 91 (D. Ore. 1876) (No. 17,246), the Oregon District Court held the trader licensing provision of the 1834 Act inapplicable.  In United States v. Williams, 2 F. 61, 1 Alaska Fed. 101 (D. Alaska 1880), the court held the general, non-liquor related criminal provisions of the Act inapplicable. And, in an 1878 opinion, the Attorney General held that section 3 of the 1834 Act could not be invoked to restrict the importation of molasses into Alaska.  16 Op. Att'y Gen. 141.[58]

The early Alaska Indian country decisions have been criticized by

---

[55]    The 1868 Act also made customs and navigation laws applicable to Alaska and was the source of the Oregon District Court's jurisdiction over the territory.  Act of July 27, 1868, 15 Stat. 240.

[56]    Brief on the Subject of the Jurisdiction of the War Department over the Territory of Alaska, H.R. Exec. Doc. No. 135, 44th Cong., 2d Sess. 49, 54 (1876), quoting Letter, Brig. Gen. Edward Canby to Assistant Adj. Gen., Military Division of the Pacific, December 13, 1872.

[57]    17 Stat. 485, 530 (1873).  14 Op. Att'y Gen. 327 (1873) confirms that this statute had its intended effect of designating Alaska as Indian country for purposes of restriction of liquor. The opinion agrees with Seveloff that importation of liquor had not previously been prohibited, but does so on the basis that a provision of the 1868 Act superseded operation of the 1834 Trade and Intercourse Act in Alaska, not on the basis of the 1834 Act's Indian country definition. This opinion was signed by Attorney General George Williams.  As Justice of the Supreme Court of the Oregon Territory, Williams authored United States v. Tom, which was relied on in Seveloff.

[58]    See also, 19 L.D. 323 (1894) (Opinion of Assistant Attorney General Hall) (Approval under R.S. 2103 of contract between Native and non-Native not required).

18

AR00152

modern commentators[59] and were controversial even when issued.
An Army Assistant Adjutant General wrote in 1875:

> I do not comprehend that fine, metaphysical, vague
> reasoning which regards Alaska as Indian country in one
> case, but perhaps not in another case. If one desires
> to introduce liquor, it is Indian country . . . if he
> does not it is not Indian country, or doubtful. This
> method of reasoning calls to mind the interview between
> Hamlet and Polonius. Yonder cloud has the shape of a
> camel, weasel, or whale, depending upon the medium
> through which it is seen. Alaska is Indian country or
> not, according to the stand-point from which it is
> viewed. My opinion is that Alaska is Indian country,
> or it is not Indian country. If it is Indian country
> for any purpose it is Indian country for all.[60]

Whether correct or not, the early Alaska Indian country cases
were based on technical issues of statutory construction. They
did not turn on whether general Indian law principles were
applicable in Alaska. The status of Natives was more
substantively addressed in an 1886 habeas corpus case, In re Sah
Quah, 31 F. 327 (D. Alaska 1886). The newly created District
Court for Alaska held that ownership of a Tlingit slave by
another Tlingit, as permitted by tribal law, violated the
Thirteenth Amendment and the 1866 Civil Rights Act. The court
contrasted the status of Alaska Natives to other Indians:

> The United States has at no time recognized any tribal
> independence or relations among these Indians, has
> never treated with them in any capacity, but from every
> act of congress in relation to the people of this
> territory it is clearly inferable that they have been
> and are now regarded as dependent subjects, amenable to
> the penal laws of the United States, and subject to the
> jurisdiction of its courts. Upon a careful examination
> of the habits of these natives, of their modes of
> living, and their traditions, I am inclined to the

---

[59]    Harring, supra n. 32, at 284-93; Niedermeyer, Note, "The
True Interests of a White Population": The Alaska Indian Country
Decisions of Matthew P. Deady, 21 N.Y.U. J. Int'l. L. & Pol. 195
(1988). See also, Native Village of Venetie I.R.A. Council v.
Alaska, 944 F.2d 548, 558 (9th Cir. 1991).

[60]    Brief on the Subject of the Jurisdiction of the War
Department over the Territory of Alaska, H.R. Exec. Doc. No. 135,
44th Cong., 2d Sess. 49, 54 (1876), quoting, Letter, H. Clay Wood
to Brig. Gen. O.O. Howard, December 16, 1875 (emphasis in
original). A contrary view was stated by Judge Advocate H.P.
Curtis, id. at 44-48.

AR00153

opinion that their system is essentially patriarchal, and not tribal, as we understand that term in its application to other Indians.

Id. at 329.

In an 1886 report under the heading "Not Indians," Sheldon Jackson, the Interior Department's general agent for education in Alaska, asserted that popular opinion classing Natives as Indians "is a mistake." Adding gloss to the Sah Quah opinion Jackson asserted that the District Court's decision on the legal status of the Natives supports this view.[61]

Congress was not so sure that there were not Indians in Alaska. At an early date, it recognized that questions on the status of Alaska Natives and their relation to the land of Alaska had not been resolved. The 1884 Organic Act provided that persons should not be disturbed in the possession of any lands actually in their use or occupation, or claimed by them, until terms for acquisition of title were established in future legislation. Although this provision was applicable to all Alaskans, Congress took care to distinguish between claims of "Indians" and "other persons." Act of May 14, 1884, § 8, 23 Stat. 24, 26.

The Senate Report on the legislation explained:

> [T]he rights of the Indians to the land, or some necessary part of it, have not yet been the subject of negotiation or treaty. It would be obviously unjust to throw the whole district open to settlement under our land law until we are advised what just claim the Indians may have upon the land, or, if such a claim is not allowed, upon the beneficence of the Government.

S. Rep. No. 3, 48th Cong., 1st Sess. 2 (1883). On the floor, the bill's sponsor, Senator Benjamin Harrison, said, "It was the object of the committee absolutely to save the rights of all occupying Indians until . . . the Secretary of the Interior could ascertain what their claims were and could definitely define any reservations that were to be set apart for their use." 15 Cong. Rec. 531 (1884). To aid the Secretary's determination, the Act, in a provision presaging future legislation, provided for a commission to examine, inter alia, "the condition of the Indians residing in [Alaska], what lands, if any, should be reserved for

---

[61]    According to Jackson, in Sah Quah, "[t]he United States district court . . . affirmed that [Natives] are not Indians-- that they can sue and be sued, make contracts, go and come at pleasure, and do whatever any other person can do lawfully." Jackson, Report on Education in Alaska, S. Exec. Doc. No. 85, 49th Cong., 1st Sess. 10 (1886).

20

their use, [and] what provision shall be made for their education . . . ." Act of May 14, 1884, § 12, 23 Stat. 24, 27.[62] The Act also made special provision for continued use of land "occupied as missionary stations among the Indian tribes." Id. at § 8, 23 Stat. 24, 26.

The second Organic Act for Alaska, adopted in 1900, reaffirmed that Indians were not to be disturbed in their actual use and occupancy of land pending application of general land laws to Alaska. Act of June 6, 1900, § 27, 31 Stat. 321, 330. In 1891 and 1898, the right of Alaska Natives to continued use and occupation of land, at least pending further congressional action, was addressed in two additional statutes.[63]

The state of affairs at the end of the 19th Century is reflected in the 1891 report of Territorial Governor Lyman E. Knapp, H.R. Exec. Doc. No. 1, 52d Cong., 1st Sess. 496-501 (1892), and in an article published by Governor Knapp in the American Law Register, the leading law journal of the day.[64] The article summarizes the history between the United States and the Natives in terms paralleling the language of Sah Quah, concluding that the United States dealt with the Natives only as individuals, not as tribes. However, at the end of the article, Governor Knapp ventures a cautious opinion that, as a matter of law, the "uncivilized tribes" of Alaska may in fact be "subject to the 'laws and regulations' adopted by the United States in regard to its aboriginal tribes, and those laws and regulations already in force in other sections of the country are equally applicable here because the conditions are the same."[65]

In his 1891 report, Governor Knapp urges that "[t]he legal and political status of the native population ought to be defined by legislative enactment." He urges that Congress, in so doing, avoid what he characterizes as the "errors of policy" in dealing with Indians in the contiguous 48 states: "The Government is not

---

[62]    The work of this Commission is discussed at n. 159, infra.

[63]    Act of March 3, 1891, § 14, 26 Stat. 1095, 1100 (Right of citizens to purchase public land for trade or manufacture inapplicable to lands "to which the natives of Alaska have prior rights by virtue of actual occupation."); Act of May 14, 1898, § 10, 30 Stat. 409, 413 (Secretary to reserve from homestead entry "suitable tracts of land along the water front of any stream, inlet, bay or sea shore for landing places for canoes and other craft used by [the Natives of Alaska]").

[64]    L.E. Knapp, A Study Upon the Legal and Political Status of the Natives of Alaska, 39 Am. L. Reg. 325 (1891).

[65]    Id. at 331-32, 338.

AR00155

embarrassed by treaties with [Alaska Natives] or other precedents of recognition of tribal relations, and it has a fair and open field for inaugurating a system which shall yield better results than the old one." H.R. Exec. Doc. No. 1, 52d Cong., 1st Sess. 496-501 (1892).

4.    Evolution of Federal Law and Policy 1901-1932

After the turn of the century, a degree of consensus on the legal status of Alaska Natives began to emerge. In 1904, U.S. District Court Judge James Wickersham found that an Alaska Native could obtain citizenship under a provision of section 6 of the General Allotment Act of 1887 applicable to Indians of the United States. In re Naturalization of Minook, 2 Alaska 200 (D. Alaska 1904). This conclusion, Judge Wickersham held, was compelled by the final sentence of Article III of the Treaty of Cession:

> The meaning of this sentence . . . is clear; it is intended to and does extend all general laws and regulations which the United States may from time to time adopt in regard to the Indian tribes of the United States to and over the [uncivilized] Indian tribes of Alaska. Upon its ratification and its further approval by Congress, this treaty and this clause became the supreme law of the land. It gave the Indian tribes of Alaska the same status before the law as those of the United States and, unless a different intention appears upon the face of the law, extends all Acts of Congress, applicable and of a general nature, relating to the Indians of the United States, to Alaska.

Id. at 220-21. The same conclusion concerning the availability of the General Allotment Act citizenship provision to Natives was reached by the Ninth Circuit in Nagle v. United States, 191 F. 141 (1911).

In 1905, Judge Wickersham returned to the status of Natives in United States v. Berrigan, 2 Alaska 442 (D. Alaska 1905). He declined to give effect to the purported sale of land by Athabascans to non-Natives, holding that the 1900 Organic Act[66] forbade disturbing Indians in their use and occupancy of land "and renders void all attempts to dispossess them by deed or contract." Id. at 449-50.[67] In reaching this conclusion, Judge Wickersham analogized the situation of Alaska Natives to the

---

[66]    See p. 22, supra.

[67]    An earlier territorial decision reached a contrary conclusion. Sutter v. Heckman, 1 Alaska Repts. 188 (D. Alaska 1901), aff'd on other grounds, Heckman v. Sutter, 119 F. 83 (9th Cir. 1902).

22

AR00156

situation of Indians generally:

> The United States has the right, and it is its duty, to
> protect the property rights of its Indian wards. . . .
> [A rule allowing a Native to convey property] would
> completely nullify the act of Congress, or at least
> permit the Indian to do it, and thus leave him a prey
> to the very evil from which Congress intended to shield
> him. Congress alone has the right to dispose of the
> lands thus specially reserved for his occupancy, and
> any attempt to procure him to abandon them is void. He
> is a dependent ward of the government, and his reserved
> lands are not subject to disposal or sale or
> abandonment by him.

Id. at 450-51.[68] This shift in the judiciary was matched by a
trend in congressional action to provide services and protection
to Alaska Natives on the same or similar terms as provided to
Indians in the contiguous 48 states.

Both section 13 of the 1884 Organic Act, 23 Stat. 24, 27-28, and
section 28 of the 1900 Organic Act, 31 Stat. 321, 330, provided
for all Alaskan children to be educated in territorial schools
without regard to race. In 1905, the Nelson Act, 33 Stat. 616
(1905), conformed the practice in Alaska to that in the
contiguous 48 states, establishing a dual system of education,
with the Department of the Interior remaining responsible for the
education of Indian children and local authorities becoming
responsible for the schooling of non-Natives.

In 1906, Congress passed the Alaska Native Allotment Act, 34
Stat. 616 (1906), which permitted any Indian or Eskimo to acquire
up to 160 acres of non-mineral land as an "inalienable and
nontaxable" homestead.[69] However, unlike most allottees in other
states for whom the United States holds title in trust, Alaska
Native allottees under the 1906 Act held the title in fee,
subject to restraints on alienation.[70] In 1926, Congress passed
the Alaska Native Townsite Act, 44 Stat. 629, which provided for
individual Alaska Natives to obtain title to lots they occupied
subject to restrictions on taxation, and prohibited alienation

---

[68]   Accord, United States v. Cadzow, 5 Alaska Repts. 125 (D.
Alaska 1914).

[69]   In 1956, the Act was extended to Aleuts. Act of August 2,
1956, Pub. L. No. 84-931, 70 Stat. 954.

[70]   See State of Alaska, 45 IBLA 318, 322 (Feb. 6, 1980).

23

AR00157

without Secretarial approval.[71]

A limited exception for Natives to restrictions on taking of fur seals appeared as early as 1894. Act of April 6, 1894, § 6, 28 Stat. 52, 53. Beginning in 1902, a series of wildlife conservation statutes made various special exceptions for Alaska Natives.[72] The 1916 Migratory Bird Treaty with Great Britain excepted Eskimos and Indians from seasonal restrictions on taking of migratory nongame birds. 39 Stat. 1702, Article II, Clause 3. Statutes were also passed encouraging raising of reindeer by Natives for their own subsistence and for sale on the market. Eventually, Congress provided in the Alaska Reindeer Act for purchase of all non-Native reindeer enterprises and prohibited future non-Native reindeer ownership to assure a Native monopoly in the reindeer business.[73] In 1925, Solicitor E.C. Finney held that the Territory of Alaska could not impose a tax on reindeer controlled or killed by Alaska Natives, stating "[i]f the Territory has the power to levy and collect that tax, it might . . . very materially interfere with this instrumentality which the Government has adopted for the advancement of these natives. That act, in so far as it relates to reindeer killed by natives is, consequently, repugnant to the Constitution and hence without effect." 51 L.D. 155, 157 (1925).

---

[71] Over the years Interior Department interpretation of this statute varied with regard to whether Alaska Native townsites were to be administered identically to predominantly non-Native townsites established pursuant to the 1891 authority, 26 Stat. 1095, but the courts ultimately concluded that they were, and that the 1926 Act was intended to do no more than establish a different protected form of individual ownership for Alaska Natives, rather than to create two distinct types of townsites. Klawock v. Gustafson, No. K74-2 (D. Alaska, Nov. 11, 1976), discussed in Klawock v. Gustafson, 585 F.2d 428 (9th Cir. 1978).

[72] These statutes are summarized in 1942 Cohen, supra n. 8, at 409.

[73] The reindeer laws are summarized in 1942 Cohen, supra n. 8, at 409-10 and Case, supra n. 50, at 208-09. The House Report on the Alaska Reindeer Act explained the need for the legislation as follows: "The Natives of Alaska, including Eskimos, are held to have essentially the same status as the Indians of the United States. The Federal Government has recognized and acknowledged this responsibility through appropriations for their support, education and medical treatment as well as by the introduction and distribution of reindeer. It is likewise the responsibility of the Federal Government to look after the social and economic welfare of the Natives." H.R. Rep. No. 1188, 75th Cong., 1st Sess. 3 (1937). See generally, R.O. Stern, E.L. Arobio, L.L. Naylor and W.C. Thomas, Eskimos, Reindeer and Land (1980).

24

AR00158

The trend in judicial and legislative action was reflected as well in executive action. Between 1914 and 1933, at least 13 Executive Order Indian reserves were established.[74] The President's authority for establishment of such reserves was upheld in a May 18, 1923 Solicitor's opinion dealing with the Tyonek Reserve. 49 I.D. 592. In this opinion, Solicitor Edwards held that Alaska Natives had been treated by Congress and the courts as "within the spirit, if not within the exact letter, of the laws relative to American Indians." Id. at 595.

In a later opinion, Solicitor Finney upheld the validity of marriage by custom among Alaska Natives. 54 I.D. 39, 1 Op. Sol. on Indian Affairs 329 (1932). "It must now be regarded as established," Finney said, "that the laws of the United States with respect to the American Indians are applicable generally to the natives of Alaska." Id. at 42. Under general Indian law principles, "the relations of the Indians among themselves in matters of this kind are to be controlled by the customs of the tribe [not state or territorial law] save where Congress expressly or clearly directs otherwise."[75]

While this preponderance of opinion on the fundamental legal status of Alaska Natives was developing, there was also a consensus that Alaska Natives should be subject to many of the

---

[74]    Alaska Natives and the Land, supra n. 17, at 445 (1968). Two other reserves, Hydaburg and Klawock, were established and subsequently revoked by Executive Order. Case, supra n. 50, at 117 n. 31. A motivation for establishing the Executive Order reserves was to protect continued traditional Native use of land. Governor's Task Force, supra n. 48, at 111 n. 179, quoting U.S. Dept. of the Interior, Bureau of Education, Report on the Work of the Bureau of Education for the Natives of Alaska 1913-1914 7 (1915). Prior to the Executive Order reserves, three significant reserves specifically for reindeer culture were established. Repeal Act Authorizing Secretary of Interior to Create Indian Reservations in Alaska: Hearings on S. 2037 and S.J. Res. 162 Before the Senate Subcomm. of the Committee on Interior and Insular Affairs, 80th Cong., 2d Sess. 53 (1948) Small reserves for school purposes had also been established. Id. The only statutory reservation at that time in Alaska was the Annette Islands Reserve for immigrant Canadian Metlakatla Indians, established by Congress in the Act of March 30, 1891, 26 Stat. 1101 (codified as 48 U.S.C. § 358).

[75]    Id. at 46. See also 54 I.D. 15, 1 Op. Sol. on Indian Affairs 320 (1932) (General laws enacted by Congress conferring jurisdiction on the Secretary, in matters on probating estates of deceased American Indians, might be applied with respect to the restricted allotments and other restricted property of deceased Alaskan Natives.)

AR00159

same laws as the non-Native residents of the Territory.

This was particularly true in the area of criminal law.    The 1884 Organic Act made the Oregon criminal code applicable to Alaska.  Act of May 14, 1884, § 7, 23 Stat. 24, 25-26.[76]  Based on the decisions that Alaska was not Indian country for purposes other than liquor control, application of territorial law to Natives was upheld.  Kie v. United States, 27 F. 351, 1 Alaska Fed. 125 (C.C.D. Oregon 1886).[77]  The Supreme Court's decision in Ex parte Crow Dog, 109 U.S. 556 (1883), which had held that a murder committed by a Sioux in Indian country could not be prosecuted under either Federal or Dakota territorial law, was said to be inapplicable in "the anomalous condition of Alaska." Kie at 353.

In 1899, Congress enacted a comprehensive criminal code for the Territory.  Act of March 3, 1899, 30 Stat. 1253-1343.  The Code provided no exception for Natives and it applied to them.  United States v. Doo-Noch-Keen, 2 Alaska 624 (D. Alaska 1905).  In 1909, Congress confirmed this result by authorizing the Attorney General to appoint Alaska school service employees as special police officers with authority "to arrest . . . any native of the district of Alaska charged with the violation of any provisions of the [1899] Criminal Code of Alaska."[78]  Section 142 of the 1899 Code prohibited the unauthorized sale of liquor to Indians, 30 Stat. at 1274.[79]   This section was subsequently found to supersede applicability of the general Federal liquor prohibition.  55 I.D. 137, 147-48 (1937).

In 1912, Congress enacted a new Territorial Organic Act delegating much of its civil and criminal jurisdiction to a territorial legislature.  37 Stat. 312.  Nothing on the face of that Act indicated that the Territory's authority over Native individuals and communities was not coextensive with its authority over other inhabitants. The new legislature proceeded to act on the basis of that presumed jurisdiction.  In 1913, it enacted a criminal statute punishing Native parents for failing to send their children to federally-funded schools for Natives operated by the Interior Department's Bureau of Education.  § 3, Ch. 44 SLA 1913.  And in 1915, the legislature passed a so-called

---

[76]    The statute also made the civil law of Oregon applicable. Id.

[77]    This holding was dicta, as the prosecution under review was brought under a general Federal criminal statute.

[78]    Act of March 3, 1909, 35 Stat. 837.

[79]    This section defined "Indian" to include "the aboriginal races inhabiting Alaska when annexed to the United States. . . ."

26

AR00160

Indian Village Act, which authorized Alaska Natives living in
communities of 40 or more residents to organize self-governing
village councils of limited authority, which authority could be
exercised so long as the ordinances enacted did not conflict with
federal or territorial law.[80]  Ch. 11 SLA 1913.  Taxes levied by
the legislature were applicable to, and collected from, Natives
to the same extent as other residents, at least in villages were
tax collection was logistically feasible.[81]

5.    Alaska Natives on the Eve of the New Deal

In January 1932, Representative Edgar Howard, Chairman of the
House Indian Affairs Committee, wrote to Secretary Wilbur seeking
an opinion on the legal status of Alaska Natives.  In response,
Solicitor Finney issued a comprehensive opinion, which was
forwarded to Chairman Howard by Secretary Wilbur in March 1932.[82]
Finney concluded his opinion by stating:

> From the foregoing it is clear that no distinction has
> been or can be made between the Indians and other
> natives of Alaska so far as the laws and relations of
> the United States are concerned whether the Eskimos and
> other natives are of Indian origin or not as they are
> all wards of the Nation, and their status is in
> material respects similar to that of the Indians of the
> United States.

53 I.D. 593, 605, 1 Op. Sol. on Indian Affairs 303, 310 (1932).
In reaching his conclusions, Solicitor Finney quoted extensively
from Solicitor Edward's 1923 opinion on the Tyonek Reserve.  That
opinion succinctly summarizes the ground covered above and is
worth restating:

> In the beginning, and for a long time after the cession
> of this Territory, Congress took no particular notice
> of these natives; has never undertaken to hamper their
> individual movements; confine them to a locality or
> reservation, or to place them under the immediate
> control of its officers, as has been the case with

---

[80]    The powers of Native villages under the statute were similar
to those of second class municipal governments in white
communities, Governor's Task Force, supra n. 48, at 92, but
Native villages were forbidden to tax property of white
residents, Ch. 25 SLA 1917.

[81]    Governor's Task Force, supra n. 48, at 97.

[82]    Letter, Edgar Howard, Chairman, House Committee on Indian
Affairs to Secretary Roy Lyman Wilbur (January 28, 1932); Letter,
Secretary Wilbur to Edgar Howard (March 14, 1932).

27

AR00161

American Indians; and no special provision was made for
their support and education until comparatively
recently. And in the earlier days it was repeatedly
held by the courts and the Attorney General that these
natives did not bear the same relation to our
Government, in many respects, that was borne by the
American Indians.

                    *     *     *

Later, however, Congress began to directly recognize
these natives as being, to a very considerable extent
at least, under our Government's guardianship and
enacted laws to protect them in the possession of the
lands they occupied; made provision for the allotment
of lands to them in severalty, similar to those made to
the American Indians; gave them special hunting,
fishing and other particular privileges to enable them
to support themselves, and supplied them with reindeer
and instructions as to their propagation. Congress has
also supplied funds to give these natives medical and
hospital treatment and finally made and is still making
extensive appropriations to defray the expenses of both
their education and their support.

Not only has Congress in this manner treated these
natives as being wards of the Government but they have
been repeatedly so recognized by the courts.

From this it will be seen that these natives are now
unquestionably considered and treated as being under
the guardianship and protection of the Federal
Government, at least to such an extent as to bring them
within the spirit, if not within the exact letter, of
the laws relative to American Indians.

49 I.D. 592, 594-95 (1923) (citations omitted; emphasis in
original).


          6.    Indian Reorganization Act

             a.    Background

In 1934, Congress enacted the Indian Reorganization Act (IRA).
Act of June 18, 1934, 48 Stat. 984 (codified as 25 U.S.C. §§ 461-
479). The "overriding purpose" of the Act was to establish
"machinery whereby Indian tribes would be able to assume greater
self-government, both politically and economically." Morton v.
Mancari, 417 U.S. 535, 542 (1974). The allotment statutes of the
late 19th Century and early 20th Century focused on assimilation

                          28

of individual Indians into the larger society. The IRA took a community-based approach through the preservation of a tribal land base and reorganization of tribal governments. Section 16 of the Act provided that tribes could organize for their common welfare and adopt appropriate constitutions and bylaws. Section 17 authorized formation of tribal corporations, with the power to own, hold, manage, operate and dispose of property. 25 U.S.C. §§ 476, 477.

Section 19 of the IRA provided that "Eskimos and other aboriginal peoples of Alaska shall be considered Indians" for purposes of the Act. 25 U.S.C. § 479. Section 13 applied portions of the statute, including section 16, to Alaska. 25 U.S.C. § 473.

Despite these provisions, initial administrative examination found that the IRA had limited practical applicability to Alaska.[83] The section 16 authorization for constitutional governments applied, by its own terms, only to tribes residing on reservations. Since most Alaska Natives did not reside on reservations,[84] this limitation effectively precluded many Native groups from organizing under the Act. Further, the list of sections applicable to Alaska omitted section 17. This prevented the formation of corporations and, as a result, made loans for economic development unavailable.

> b.    Alaska Amendment

T.H. Watkins, in his recent biography of Harold Ickes, characterizes the failure to fully extend the IRA to Alaska as a "mistake."[85] This is certainly true to a degree. The legislative history shows that both the House and Senate clearly intended the corporate organization provisions in section 17 to apply to Alaska. When the legislation's sections were renumbered in conference, the cross references in the Alaska section of the bill were not properly conformed.[86] However, the failure to

---

[83]    1942 Cohen, supra n. 8, at 413-14; M-28978, 56 I.D. 110, 1 Op. Sol. on Indian Affairs 744 (1937).

[84]    There were approximately 19 large reserves of different origins in Alaska at the time of the IRA. See Alaska Natives and the Land, supra n. 17, at 443-46.

[85]    T.H. Watkins, Righteous Pilgrim: The Life and Times of Harold Ickes 1874-1952 542 (1990). See also, 1942 Cohen, supra n. 8, at 413-14.

[86]    Compare S. Rep. No. 1080, 73rd Cong., 2d Sess. 1-3 (1934) with H.R. Rep. No. 1084, 73rd Cong., 2d Sess. 1-5 (1934) and H.R. Rep. No. 2049, 73rd Cong., 2d Sess. 1-6 (1934).

29

AR00163

consider the problem of the absence of reservations in Alaska appears to have been less a drafting error than a failure to focus on the unique circumstances of Alaska.[87]

In 1936, Anthony J. Dimond, the territorial delegate for Alaska, introduced legislation to amend the IRA at the request of Secretary Ickes.[88] Hearings on the bill were held on March 20, 1936, and the legislation passed the House on April 1, 1936. Prompt Senate action followed and the legislation became law on May 1, 1936. 49 Stat. 1250.

The full extension of the IRA to Alaska, Felix Cohen wrote, "removed almost the last significant difference between the position of the American Indian and that of the Alaska native."[89] In the Alaska Amendment, Congress extended to Alaska section 17 and several other sections not originally applicable under the IRA. It also authorized the Secretary to establish reservations on any area of land which had been reserved for the use and occupancy of the Natives and any other public lands actually occupied by them. Finally, it allowed Native groups not recognized as bands or tribes before May 1, 1936, to organize under Federal constitutions and business charters pursuant to sections 16 and 17 of the IRA if they had "a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district." 25 U.S.C. § 473a.

In providing for establishment of reservations, Congress relied on a letter from Secretary Ickes, who listed three reasons for establishing Alaska reservations. First, he said, reservations would define Alaskan tribes by identifying particular groups with the land they occupied. H.R. Rep. No. 2244, 74th Cong., 2nd Sess. 4 (1936). In this connection, Secretary Ickes pointed to the historical differences between Alaska and the continental United States:

> Indian tribes do not exist in Alaska in the same sense as in [the] continental United States. Section 19 of the Indian Reorganization Act defines the word "tribe" as referring to "Any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." With a few exceptions the lands occupied by natives of Alaska have not been designated as reservations. In

---

[87]    The IRA legislation originally proposed by the Interior Department did not address Alaska at all. H.R. 7902, 73rd Cong., 2d Sess. (1934).

[88]    The legislation was drafted by Felix Cohen. Watkins, supra n. 85, at 542.

[89]    1942 Cohen, supra n. 8, at 406.

AR00164

> order, therefore, to define an Alaskan tribe it is
> necessary to identify it with the land it occupies and
> in terms of the language of the act, "reservation."

Id.

Second, reservations would define geographic limits of
jurisdiction so that Alaska Native communities could exercise
powers of local government:

> [I]f native communities of Alaska are to set up systems
> of local government, it will be necessary to stipulate
> the geographic limits of this jurisdiction.
> Reservations set up by the Secretary of the Interior
> will accomplish this.

Id.

Third, reservations would enable the United States to segregate
Native lands and resources, thereby preserving the "economic
rights" of the Natives.  This was particularly important,
Secretary Ickes wrote.  By designating reservations, the United
States would fulfill in part "its moral and legal obligations"
undertaken in section 8 of the 1884 Organic Act, the section
providing that Natives were not to be disturbed in their use and
occupation of land pending further congressional action.  Id.
The House Report on the Alaska Amendment echoed this view,
stating "[t]his provision in reality carries out the promise of
this Government contained in its act approved on May 17, 1884 . .
. ."  Id. at 3.

In explaining the need for the provision allowing groups not
recognized as bands or tribes before 1936 to organize based on
occupational or residential bonds, the House Report stated:

> The proposed amendment . . . is necessary because of
> the peculiar nontribal organizations under which the
> Alaska Indians operate.  They have no tribal
> organizations as the term is understood generally.
> Many groups that would otherwise be termed "tribes"
> live in villages which are the bases of their
> organization.

Id. at 1-2, 3-5.

              c.    Instructions for Implementation of the Alaska
                    Amendment

On December 22, 1937, the Department of the Interior issued
detailed Instructions providing for the organization of Alaska

31

Native groups under the IRA.[90]  The Instructions provided for three different kinds of organizations, with varying powers and authorities.  In differentiating among the three types, the Instructions followed the lead of Secretary Ickes' comments on the Alaska Amendment and stressed the importance of reservations to the exercise of governmental powers.

The first kind of organization provided for was a group consisting of all of the Native residents of a community organized to carry on municipal and public activities, as well as economic enterprises.  The Instructions indicated that this kind of organization was most suitable for Indian or Eskimo villages.  The Instructions assumed that it would be accompanied by a petition to create a reservation and stressed that "[t]he power to prescribe ordinances for civil government, relating particularly to law and order, may extend only to such lands as may be held as an Indian reservation for the use of the community."[91]

The other two kinds of organizations, in contrast, were not to be reservation based and were not to be authorized to exercise governmental powers.  The second kind of organization would consist of a group of all Native persons in a community and was said to be especially suitable for a group of Natives living among non-Natives in a town or city already organized to exercise governmental powers, as well as for Native groups already incorporated as a municipality under territorial law.  Groups of this kind would be authorized to engage in business and to provide for the common welfare, but not to exercise municipal and public powers.[92]

The third kind of organization contemplated by the Instructions was for a group, not a community, comprised of persons having common bond of occupation or association, or of residence within

---

[90]    *Instructions for Organization in Alaska Under the Reorganization Act of June 18, 1934 (48 Stat. 984), and the Alaska Act of May 1, 1936 (49 Stat. 1250), and the Amendments Thereto* (1937) (Instructions).  The Instructions were issued over the signatures of Assistant Commissioner of Indian Affairs Zimmerman and Secretary Ickes.  The Instructions were supplemented by *Supplementary Instructions Applicable to Alaska West of the 141st Meridian* (May 10, 1939) that addressed the particular problems of communicating with remote areas of Alaska.  The Instructions are discussed in 1942 Coh. *supra* n. 8, at 414 and *Governor's Task Force*, *supra* n. 48, at 112.

[91]    Instructions, *supra* n. 90, at 1.

[92]    *Id.*

32

AR00166

a definite neighborhood.  This kind of organization was to be given authority to "engage in business and to provide for the welfare of its members (excluding municipal and public powers)."[93]

### d.    IRA Organizations

Pursuant to the IRA, sixty-nine Alaska Native villages and regional groups adopted constitutions prior to enactment of ANCSA in 1971; more than sixty of those also adopted corporate charters.  However, only six villages obtained reservations under section 2 of the 1936 Act.[94]

The Department's Instructions called for information to be submitted with proposed constitutions showing the basis of organization in terms of the three categories of organization.[95] Surveys conducted by the Indian Office to comply with the Instructions consistently failed to discuss the basis of organization.[96]  Similarly, most constitutions followed standard forms.[97]  Fifty-two constitutions contain only a general statement of powers.  Seventeen contain enumerated powers.  It is difficult to determine from the constitutions the basis of organization.  For example, the constitution of the Village of Wales, for which a reservation was eventually established, contains only a general statement of powers, while a more expansive statement of powers is found in the constitution of the Douglas Indian Association, one of three Native associations

---

[93]    Id.

[94]    See 1982 Cohen, supra n. 8, at 744; Alaska Natives and The Land, supra n. 17, at 442-48.  The six reserves were Akutan (72,000 acres); Venetie (1.4 million acres); Unalakleet (870 acres) Karluk (32,200 acres); Wales (7,200 acres of land and 14,000 acres of water); and Diomede (3,000 acres).  The six reserves totaled 1.54 million acres.  Withdrawals for two additional reserves (White Mountain and Shismaref) were revoked after the villages disapproved them in elections conducted under section 2 of the Alaska Amendment, which required that withdrawals be approved by a majority of voters in an election in which at least 30 percent of eligible residents participated. Id. at 443.

[95]    Instructions, supra n. 90, at 4, ¶9.

[96]    The surveys are reprinted in H.R. Rep. No. 2503, 82d Cong. 2d Sess. 1406-1537 (1952).

[97]    Copies of the constitutions are contained in the files of the BIA's Branch of Tribal Relations.

33

AR00167

clearly organized on the basis of common bond of occupation.[98]

### 7.    Extension of Public Law 280 to Alaska

When Congress compiled the Revised Statutes in 1874, it included a chapter entitled "Government of Indian Country." R.S. title 28, ch. 4, §§ 2127-2157. However, it omitted from the chapter any definition of "Indian country." This fact, together with the development of new approaches to Indian administration, such as the allotment policy, left it to the courts to determine the scope of Indian country.[99]    In a series of decisions early in the 20th Century, the Supreme Court took up this challenge.    In Donnelly v. United States, 228 U.S. 243 (1913), the Court held that a reservation created by Executive Order from public domain land to which original Indian title had been extinguished was Indian country.    In United States v. Sandoval, 231 U.S. 28 (1913), it held that Pueblo lands owned in fee and not denominated a reservation were Indian country.    In United States v. Pelican, 232 U.S. 442 (1914), it held a single trust allotment was Indian country for purposes of the Indian Major Crimes Act. And in United States v. McGowan, 302 U.S. 535 (1938), it found that a tract of land purchased by the Federal Government and held in trust for Indians was Indian country.

In codifying Title 18 of the United States Code in 1948, Congress relied on these decisions to fashion a new statutory definition of "Indian country."[100]    As is discussed in greater detail below, this definition, found in 18 U.S.C. § 1151, defines "Indian country" to include reservations, dependent Indian communities, and Indian allotments.

This new statutory definition led to the reopening of the

---

[98]    The Douglas Indian Association was organized for the Juneau Douglas area pursuant to its members' common bond of occupation in the arts, crafts and fishing industries.    Constitution and By-Laws of the Douglas Indian Association.    At the time of organization, the Association was located in a racially mixed community governed by the municipalities of Juneau and Douglas, both of which were organized under the laws of the Territory of Alaska.    The Natives at the time of organization were from various surrounding Native villages and elsewhere.    H.R. Rep. No. 2503, 82d Cong., 2d Sess. 1442 (1952).    With respect to Wales, as well as all other villages for which reservations were established, the adoption of an IRA constitution predated establishment of a reservation.

[99]    1982 Cohen, supra n. 8, at 31-33.

[100]    1982 Cohen, supra n. 8, at 34.    See 18 U.S.C. § 1151, reviser's note.

34

AR00168

question of whether, for purposes of criminal jurisdiction,
Indian country existed in Alaska.  In <u>United States v. McCord</u>,
151 F. Supp. 132, 17 Alaska 162 (1957), the District Court for
Alaska held that the Moquawkie Indian Reserve at Tyonek was
Indian country and that an Indian resident of the Reserve could
not be prosecuted under territorial law for the statutory rape of
another Indian resident.  The Reserve, the court found, had been
set aside and treated as Indian land, bringing it within the
ambit of section 1151.  The court rejected as "novel" and
"inaccurate" a prosecution contention that "Alaska natives have a
different status than Indians of the States."  <u>Id.</u> at 135.  The
court, however, carefully limited the scope of its decision:

> This decision should not be interpreted by members of
> the native groups, be they Indian or Eskimo, as a
> general removal of the territorial penal authority over
> them, for the reason that this court will take judicial
> notice that there are few tribal organizations in
> Alaska that are functioning strictly within Indian
> country. . . .  Testimony indicates that the Tyonek
> area, unlike most other areas inhabited by Alaska
> natives, has been set aside for the use of and is
> governed by an operational tribal unit.

<u>Id.</u> at 136.


Less than a year later, a different judge of the District Court
of Alaska, in <u>United States v. Booth</u>, 161 F. Supp. 269, 17 Alaska
561 (1958), faced the question of whether the Metlakatla Reserve
was Indian country.  He held that it was not.  He found that
Metlakatla had no tribal organization and was not a "traditional
Indian Reservation" because "it is not made up of aboriginal
Indians but largely of the descendants of immigrants who came
from Canada during the 19th Century" and "Alaska natives who
choose to join them," including "Aleut and Eskimo members of the
community who are not of the Indian race."  <u>Id.</u> at 271.  He
distinguished <u>McCord</u> on the ground that the Indians of
southeastern Alaska "live under entirely different conditions"
from the Indians on the Tyonek Reservation.  In this connection,
he quoted with approval a passage from <u>United States v. Libby,
McNeil & Libby</u> stating:

> the Indians of Southeastern Alaska *** have not only
> abandoned their primitive ways and adopted the ways of
> civilized life but are now fully capable of competing
> with the whites in every field of endeavor *** It is a
> matter of common knowledge that today the Indians of
> Southeastern Alaska prefer the white man's life despite
> all its evils and shortcomings.

<u>Id.</u> at 272, quoting <u>United States v. Libby, McNeil & Libby</u>, 107

AR00169

F. Supp. 697, 699 (D. Alaska 1952).[101]

Congress reacted promptly to the McCord decision. In 1958, it enacted legislation amending Pub. L. No. 83-280, Act of August 15, 1953, 67 Stat. 164 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321-1326, 28 U.S.C. §§ 1360, 1360 note), which conferred criminal and civil cause of action jurisdiction to Indian country on several named states, to extend the law's coverage "to all Indian country" in the Territory of Alaska. Act of August 8, 1958, 72 Stat. 545 (codified as amended at 18 U.S.C. § 1162, 28 U.S.C. § 1360). On statehood, Pub. L. No. 83-280 was amended to extend the same jurisdiction to the State of Alaska.[102]

Extension of Pub. L. No. 83-280 was recommended by the Department of the Interior, a recommendation consistent with the Department's then current policy of extending criminal and civil jurisdiction to the states whenever opportune. In accepting the Department's recommendation, the House Judiciary Committee explained the need for the legislation as follows:

> In construing [18 U.S.C. § 1151] the court also decided that the native village of Tyonek, Alaska . . . came within the definition of Indian country. Such a construction, of course, affects a large number of other native villages in Alaska similarly situated. The committee has been advised that these native villages do not have adequate machinery for enforcing law and order. They have no tribal court, no police, no criminal code, and in many instances no formal organization. This is for the reason that the Territorial government in Alaska has maintained law and order in the native villages as well as in the rest of Alaska and the native tribal councils have had no reason to nor have they ever exercised these functions. Since the natives are not prepared to take over these activities, the recent court decision has left the villages and the people without protection. The instant legislation seeks to remedy this situation by restoring what, until the court decision, was the actual practice in the enforcement of the law in the Indian country in Alaska.

---

[101]    Libby, McNeil & Libby is discussed, n. 185, infra.

[102]    18 U.S.C. § 1162, note.

36

AR00170

H.R. Rep. No. 2043, 85th Cong., 2d Sess. 2 (1958).[103]  Congress also modified Booth, although less rapidly and in the context of modifying the applicability of Pub. L. No. 83-280 to the Metlakatla Indian Community.  In 1970, legislation was enacted to allow the Community to exercise concurrent criminal jurisdiction with the State over offenses committed by Indians on its reserve in the Annette Islands.  Act of November 25, 1970, Pub. L. No. 91-523, § 1, 84 Stat. 1358 (1970), amending 18 U.S.C. § 1162.[104] This legislation was sought not only by the Community, but also by the State of Alaska and the Department of the Interior.  In supporting the legislation, Under Secretary Fred Russell explained:

> The Metlakatla community is not a part of the Alaska mainland, but is located offshore on one of the Annette Islands.  This island's location creates a serious isolation problem, resulting in the lack of adequate law and order services for members of the Metlakatla Indian community . . . . [T]he limited manpower of the State police makes it impossible for them to deal effectively with minor crimes in the isolated community of Metlakatla.[105]

In urging adoption of the legislation, the House floor manager explained that, contrary to the finding in Booth, the Metlakatla Community had a long history of policing misdemeanor offenses extending back to the founding of the Community.  Extension of Pub. L. No. 83-280 disrupted this arrangement:

> [T]he discussion centered on the fact that native villages in Alaska could be regarded as Indian country and most such villages did not have machinery for enforcing law and order.  As is obvious from the history I have outlined, this was not the case as to Metlakatla.  It is apparent that this community which has been operating perfectly satisfactory law enforcement system for over half a century was simply forgotten. . . .  Strangely enough, neither the territory nor the Federal Government notified Metlakatla after enactment of the new statute to inform the community that its court and police had lost their

---

[103]    The Senate Interior Committee report contained an identical statement of the need for the legislation.  S. Rep. No. 1872, 85th Cong., 2d Sess. 2 (1958).

[104]    See 1982 Cohen, supra n. 8, at 765.

[105]    Letter of June 2, 1970 to James O. Eastland, Chairman, Senate Judiciary Committee, reprinted in, S. Rep. No. 1180, 91st Cong., 2d Sess. 4 (1970).

37

AR00171

authority to function.  In the mid-sixties, when this
fact became known, the community discontinued its
practice of employing a magistrate and police.  It
tried [unsuccessfully] to make arrangements with the
State of Alaska for the enforcement of law and order on
the Annette Islands . . . .

116 Cong. Rec. 37,353 (1970) (statement of Rep. Donohue).

8.    ANCSA and Post-ANCSA Legislation

During the 1950's and 1960's, the focus of Federal-Alaska Native
relations was on the long unresolved Native land claims.  These
claims, the role they played in consideration of Alaska
Statehood, and the impact of the claims on implementation of the
Statehood Act are discussed in Part IV, infra.  We also postpone
until Part IV consideration of the details of the approach to
claims settlement adopted in ANCSA.  For purposes of this Part,
it is necessary only to consider those provisions of ANCSA
bearing on the question of the tribal status of Native villages.

ANCSA settled aboriginal title claims, including any claims to
aboriginal hunting and fishing rights, and all claims based on
aboriginal title.  43 U.S.C. § 1603.[106]  For purposes of the
settlement, most Natives were enrolled to the villages where they
resided.[107]  In the absence of proof that an individual possessed
the required quarter-degree Native blood quantum, the individual
could be placed on the roll if he was regarded as an Alaska
Native by the village of which he claimed to be a member.  43
U.S.C. § 1602(b).  Section 3(c) of ANCSA, 43 U.S.C. § 1602(c),
defines "Native village" to mean "any tribe, band, clan, group,
village, community or association in Alaska" listed in sections
11 and 16 of the Act.  43 U.S.C. §§ 1610, 1615.  Section 11
listed the names of 205 villages.  Section 11(a) withdrew the
township in which each village was located and the surrounding
townships for Native selection.  43 U.S.C. § 1610(a).  Section
11(b)(2) provided for the Secretary to review the list of named
villages and remove those that were of an urban and modern
character and in which a majority of the residents were non-
Native.  Section 11(b)(3) provided for the addition to the list
of any village which was not of an urban and modern character and

---

[106]    See United States v. Atlantic Richfield Co., 435 F. Supp.
1009, 1029-30 (D. Alaska 1977), aff'd, 612 F.2d 1132 (9th Cir.),
cert. denied, 449 U.S. 888 (1980).

[107]    Those who were not residents of villages were enrolled to
regions at large.  See 25 C.F.R. §§ 43h.4 and 43h.6(c) (1977); 37
Fed. Reg. 5615.  Columns 16-21 of enrollment application were to
establish ties to village and region.

AR00172

in which a majority of the residents were Native.[108]   Section 16 listed 10 villages in Southeast Alaska, which were treated somewhat differently because the Natives of Southeast Alaska had already participated to some extent in the Tlingit and Haida settlement.  <u>Tlingit and Haida Indians of Alaska v. United States</u>, 389 F.2d 778 (Ct. Cl. 1968).

Although Congress utilized Native villages as a basis for organizing the settlement, it determined not to convey settlement lands to the villages.  Rather, as is discussed in Part IV, <u>infra</u>, land and associated property rights were conveyed to newly established Village and Regional Corporations established under state law.  43 U.S.C. §§ 1606, 1607.  Village Corporations were defined in the Act as a "business for profit or nonprofit corporation to hold, invest, manage and/or distribute lands, property, funds and other rights and assets for and on behalf of a Native village."  43 U.S.C. § 1602(j).  However, ANCSA did not revoke the village IRA constitutions or the IRA corporate charters for those villages that also had charters.[109]  Nor did it repeal the authority in section 1 of the Alaska Amendment of the IRA for the Natives to reorganize and adopt constitutions.[110]

Contemporaneously with the consideration and passage of ANCSA, the Federal Government was reassessing its relationship with Native Americans.  In 1968, Congress enacted the Indian Civil Rights Act.  25 U.S.C. §§ 1301-1326.  The Act extended to Indians protections similar to those in the Bill of Rights against

---

[108]   To be eligible for land and money benefits under ANCSA, the listed and the unlisted villages also had to establish that they had at least 25 residents.  Those which had less than 25 Native residents which were otherwise eligible could qualify for benefits as a Native group.  43 U.S.C. §§ 1602(d), 1613(h)(2).  Natives in four urban areas (Juneau, Sitka, Kodiak and Kenai) were also eligible for benefits if they incorporated.  43 U.S.C. §§ 1602(o), 1613(h)(3).

[109]   As discussed in Part III.A.6.d., more than 60 charters were issued to villages pursuant to § 17 of the IRA, which expressly provides that no charter shall be revoked or surrendered except by act of Congress.  25 U.S.C. § 477.

[110]   Indeed, while § 19 of ANCSA, 43 U.S.C. § 1618, did revoke all reservations, except the Annette Islands Reserve for the Metlakatla Indian Community, it was not until the passage of the Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2743, 43 U.S.C. § 1701, that Congress expressly revoked the Secretary's authority to establish reservations under § 2 of the Alaska Amendment.  FLPMA § 704(a).

AR00173

actions by their tribal governments.[111]  While the Act imposed
some constraints on tribal governments by guaranteeing certain
individual rights, 25 U.S.C. § 1302, President Johnson urged its
enactment as part of a legislative and administrative program
with the overall goal of furthering "self-determination,"
"self-help," and "self-development" of Indian tribes.  114 Cong.
Rec. 5518, 5520 (1968).  Moreover, the Act contained restrictions
on states obtaining civil, 25 U.S.C. § 1322, and criminal, 25
U.S.C. § 1321, jurisdiction over Indian country and provided for
a model code aimed at strengthening tribal government.  The Act
thus marked the beginning of a broad congressional policy shift
toward strengthening tribal governments and a marked departure
from the termination policies of the 1950's and early 1960's.  On
July 8, 1970, President Nixon sent a major Message to Congress
transmitting his recommendations on an Indian policy, rejecting
termination and encouraging self-determination for Indians.[112]

As part of the new approach to relations with Native Americans,
Congress began to shift from a pattern of services provided
directly to individual Indians through the BIA and the Indian
Health Service to direct grants to tribes and administration of
programs by tribes.[113]  The pivotal point in this shift was the
enactment of the Indian Self-Determination and Education
Assistance Act of 1975.  25 U.S.C. §§ 450-458e. That Act directed
the Secretaries of the Interior and Health and Human Services to

---

[111]    The central purpose of the Act was to "secur[e] for the
American Indian the broad constitutional rights afforded to other
Americans," and thereby to "protect individual Indians from
arbitrary and unjust actions of tribal governments."  S. Rep. No.
841, 90th Cong., 1st Sess. 5-6 (1967); see also Santa Clara
Pueblo v. Martinez, 436 U.S. 49, 56-60 (1978).

[112]    President's Message to Congress Transmitting Recommendations
for Indian Policy, 6 Weekly Comp. Pres. Doc. 894-905, H.R. Doc.
No. 363, 91st Cong., 2d Sess. (1970).

[113]    1982 Cohen, supra n. 8, at 180-206.  Prior to 1921 most
services to Native Americans were provided for in appropriations
acts or tribal specific statutes.  From 1921 to the early 1970's
the principal source of authority for programs operated by the
BIA was the Snyder Act, 25 U.S.C. § 13, which authorized
appropriations to the BIA for "the benefit, care, and assistance
of Indians throughout the United States . . . ." Because Alaska
Natives were under the jurisdiction of the Bureau of Education,
rather than the BIA, the Snyder Act did not initially authorize
appropriations for Alaska. Case, supra n. 50, at 243.  However,
in 1931 Alaska Natives were placed under the jurisdiction of BIA,
supra n. 50, and the Bureau began to provide services to Alaska,
e.g., Interior Appropriations Act, FY 1933, Act of April 22,
1932, 47 Stat. 91, 108, 110.

AR00174

contract with any Indian tribe which requested to contract for
the services and benefits provided by the Departments.  25 U.S.C.
§§ 450f, 450g.  The Act defined "Indian" to mean "a person who is
a member of an Indian tribe."  25 U.S.C. § 450b(a).  It defined
"Indian tribe" to mean:

> [A]ny Indian tribe, band, nation, or other organized
> group or community, including any Alaska Native village
> or regional or village corporation as defined in or
> established pursuant to the Alaska Native Claims
> Settlement Act (85 Stat. 688), which is recognized as
> eligible for the special programs and services provided
> by the United States to Indians because of their status
> as Indians.

25 U.S.C. § 450b(b).[114]

In addition to authorizing tribes to contract with the Secretary
to perform services the Federal Government had been performing,
the Act also authorized making grants to tribes, as defined in
the Act to include Native villages, for the "strengthening or
improvement of tribal government."  25 U.S.C. § 450h.  Under the
authority of this provision, the BIA has made numerous grants to
Native villages.[115]

In 1972, the 92nd Congress, which enacted ANCSA, also enacted
federal revenue sharing.[116]  Alaska Native villages were included
with Indian tribal governments as eligible to participate along
with state and local governments nationally.  General revenue
sharing was enacted for the purpose of sharing federal revenues
with other levels of government to provide fiscal assistance to

---

[114]   In 1988, Congress enacted major amendments to the Act adding
to its statement of policy that the "United States is committed
to supporting and assisting Indian tribes in the development of
strong and stable tribal governments, capable of administering
quality programs and developing the economies of their respective
communities," thus further demonstrating the congressional trend
toward strengthening tribal governments.  25 U.S.C. § 450a(b),
Pub. L. No. 100-472, § 102, 102 Stat. 2285.

[115]   See, e.g., "FY 1991 Report to Congress" filed by the BIA as
required by 25 U.S.C. § 450j-1(c).

[116]   Pub. L. No. 92-512, §§ 102-109, 86 Stat. 919 (codified as
amended at 31 U.S.C. §§ 1221-1228).

41

AR00175

them in exercising their powers and performing their
responsibilities.[117]

The Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901-1963,
gives force and effect to tribal court proceedings concerning
child custody, stating, "[t]he United States, every State, every
territory or possession of the United States, and every Indian
tribe shall give full faith and credit to the public acts,
records, and judicial proceedings of any Indian tribe applicable
to Indian child custody proceedings." 25 U.S.C. § 1911(d).
Under the Act, a tribe may assume child custody jurisdiction, 25
U.S.C. § 1918, and may enter into intergovernmental agreements
with states. 25 U.S.C. § 1919. The Act defines "Indian tribe"
to mean "any Indian tribe, band, nation, or other organized group
or community of Indians recognized as eligible for the services
provided to Indians by the Secretary because of their status as
Indians, including any Alaska Native village as defined in
section 1602(c) of Title 43 [the definitional section of ANCSA]."
25 U.S.C. § 1903(8).

The Tribally Controlled Community College Act of 1978 requires
that a college under the Act must by one sanctioned or chartered
by a tribal governing body. 25 U.S.C. § 1801(a)(4). The
legislation assumes, without specifying, that a tribal government
will create a legal entity, able to enter into contracts, 25
U.S.C. §§ 1805, 1806, and able to receive and administer federal
grants. 25 U.S.C. § 1807. "Tribe" is defined to include Alaska
Native village. 25 U.S.C. § 1801(a)(2).

In 1982 Congress passed the Indian Tribal Government Tax Status
Act providing that Indian tribes would be treated as states for
certain enumerated purposes.[118] As originally passed, the Act
defined Indian tribal government to mean: "the governing body of
any tribe, band, community, village, or group of Indians which is
determined by the Secretary [of the Treasury], after consultation
with the Secretary of the Interior, to exercise substantial
governmental functions and in Alaska shall include only the
Metlakatla Indian Community." 128 Cong. Rec. 33238 (1982).
However, after passage but before the President signed the bill,
Congress adopted House Concurrent Resolution 439, substituting
new language for the definition in the enrolled bill. 128 Cong.
Rec. 33310 (1982). The substituted language defined Indian
tribal government to include "the governing body of any . . .
group of . . . (if applicable) Alaska Natives, which is

---

[117]    The statute defined "units of local government" to include
"the recognized governing body of an Indian tribe or Alaska
native village which performs substantial governmental
functions." 86 Stat. 919, 927.

[118]    96 Stat. 2605, as amended by 97 Stat. 65.

42

AR00176

determined by the Secretary [of the Treasury], after consultation with the Secretary of the Interior, to exercise governmental functions."[119]

Generally, Congress has seen fit to include Alaska Native villages, along with Indian tribes, in other legislation dealing with federal relations with other governments, such as the Intergovernmental Personnel Act, 42 U.S.C. § 4762 (intergovernmental personnel programs in cooperation with other levels of government); public works legislation, 13 U.S.C. § 301.2 (assistance provided under the Public Works Economic Development Act); the Public Library Services and Construction Act, 20 U.S.C. § 351a (assistance in public library services and construction); and census legislation, 13 U.S.C. § 184 (inclusion as "local unit of general purpose government" for collecting interim current census data).

In addition, the following statutes are examples of instances where Alaska Native villages have been included in the statutory definition of Indian tribes or where Native villages have been included along with tribes in definitions of units of government affected by statutes (citations are mostly to the definition sections involved):[120]

5 U.S.C. § 3371. Provisions for personnel assignments to and from states.

15 U.S.C. § 637.* Aid to small businesses.

16 U.S.C. § 470w.* Assistance in the conservation of historic sites, buildings, objects, and antiquities.

16 U.S.C. § 470bb.* Programs for archaeological resources protection.

20 U.S.C. § 3232. Assistance in bilingual education programs.

---

[119]   This legislation included a disclaimer similar to that in the 1991 Amendments to ANCSA, Part IV.A.2.d.iii, *infra*, concerning the effect of the definition on Native claims of jurisdiction over land and nonmembers. These disclaimers address jurisdiction over land and persons, not tribal status.

[120]   The statutes marked with asterisks include the Village or Regional Corporations in the definition of "tribe" as well as the Native village. Several of the statutes also include Group (43 U.S.C. § 1602(n)) or Urban Corporations (43 U.S.C. § 1602(o)) in the definition of tribe as well and they are also marked with asterisks.

43

AR00177