Briefing Paper

Prepared for:    Secretary Babbitt

Submitted:       April __, 1994

Title:           Acceptance of land title in trust for Alaska Natives

Event:           May 5-6, 1994 Albuquerque Listening Conference

Issue:           Should the Department reconsider or change its
                 present and long-held position that it will not
                 accept title to land in trust for Alaska Native
                 tribal governments?

Background/      The 1971 Alaska Native Claims Settlement Act
Status:          (ANCSA) revoked all but one of the Indian
                 reservations that had previously been established
                 in Alaska, and the statutory declaration of policy
                 stated that the settlement should be accomplished
                 without creating a reservation system or lengthy
                 period of wardship or trusteeship, or adding to the
                 categories of property enjoying special tax
                 privileges.   Based on an analysis of Congressional
                 intent set forth in Associate Solicitor for Indian
                 Affairs Thomas Fredericks' September 15, 1978
                 opinion, the Department has since declined all
                 requests by Native individuals or villages to take
                 any lands in trust for them under the authority of
                 Section 5 of the Indian Reorganization Act, which
                 would otherwise appear to apply, and to give the
                 Secretary discretion to take title in trust.

Position of      Groups such as the Native American Rights Fund and
Interested       the Alaska Inter-Tribal Council have requested
Parties:         reconsideration and reversal of the Department's
                 existing position, and individual villages or village
                 coporations such as Venetie and Point Hope have from
                 time to time made specific requests that their lands
                 be taken in trust.   The Fredericks memo has been
                 criticized on the grounds that implied repeals are
                 disfavored, the statutes at issue should be liberally
                 construed for the benefit of Indians, and the
                 pertinent provisions of both ANCSA and the IRA can be
                 given effect.   The State of Alaska has not had
                 occasion to take a position on the question, but it
                 is presumed that the State would agree with the
                 Fredericks analysis because taking land in trust
                 would bolster tribal arguments that they possess
                 governmental jurisdiction over lands, a proposition
                 that the State disputes.

4/26/94

AR00268

Department/
Bureau
Perspective:

The appropriateness or advisability of revising the Department's position is under review, but no definite decision has been made, and no deadline has been set for making such a determination. Even if the policy were modified, decisions as to whether or not to accept title to any particular land in trust would be made on a case-by-case basis. Current BIA land acquisition regulations are expressly made inapplicable in the State of Alaska. 25 C.F.R. § 151.1. In addition to implications with respect to tribal sovereignty, acceptance of title to Native lands in trust could significantly expand Departmental involvement in and financial responsibility for environmental matters, resource management, trespass abatement, approval of alienations, and other activities and issues relating to such property.

Contact:     Scott Keep, SOL-DIA, (202) 208-5134

AR00269

IN REPLY REFER TO:



# UNITED STATES
# DEPARTMENT OF THE INTERIOR
### BUREAU OF INDIAN AFFAIRS
Juneau Area Office
P.O. Box 25520
Juneau, Alaska 99802-5520

## TELEFAX   TRANSMITTAL FORM

**DATE:** 4/15/94

**TOTAL NUMBER OF PAGES, INCLUDING THIS SHEET:** 5

**TO BE TELEFAXED TO:**

   **NAME/OFFICE:** _Roger Hudson / Sol. Office_

   **CITY/STATE:** _Anchorag_

   **FAX NO.:** 271-4143          **TELEPHONE NO.:**

**MESSAGE:** _____

_____

_____

_____

_____


            ORIGINAL WILL ( ) WILL NOT ( ) BE MAILED.


**UPON COMPLETION, RETURN ATTACHED MATERIAL TO:**

   **NAME/OFFICE:** _R. Parot_          **TELEPHONE NO.:** _586-7453_
            Tribal Government Services

   **FROM:** _OFFICE SERVICES, JUNEAU AREA OFFICE_     **DATE:**_____

   **SENT BY:**_____     **TIME:**_____

   **FAX NO.:** _(907) 586-7169_          **TELEPHONE NO.:** _(907) 586-7190_


*FOR ANY DIFFICULTIES IN RECEPTION OF TELEFAX:*

   **CONTACT NO.:** _(907) 586-7191_

AR00270

Edited by Ben Hatt

## STATEWIDE

# ALASKA NATIVES AMONG TRIBES MEETING CLINTON



Anchorage Daily News map

The last time Christine Collison visited Washington, D.C., she had her picture taken with a likeness of President Clinton, like any other tourist.

This week, it will be the real thing as Collison, head of the Ketchikan IRA council, and other tribal leaders from Alaska trek to the nation's capital for a historic April 29 meeting.

For the first time, representatives of all 545 federally recognized tribes have been invited to the White House by a U.S. president. Other Alaskans making the trip include Willie Kasayulie, chairman of the Alaska Inter-Tribal Council, the statewide consortium representing recognized Alaska tribes.

As a member of the executive committee of the National Congress of American Indians, Kasayulie has played a role in structuring the agenda for the meeting. He cites several issues of particular concern to the 226 Alaska tribes, including equity funding for social programs, the Bush administration solicitor's opinion on Alaska Native tribal status and Indian country, a 1978 opinion on putting Alaska Native lands into trust status, Indian Health Service budget cuts and assertion of a Native preference for subsistence hunting and fishing resources.

Collison said the day will begin with a breakfast hosted by Vice President Al Gore. An afternoon tour of the White House will precede a 2½-hour meeting with Clinton.

According to a statement from the U.S. Justice Department, the meeting will allow tribal leaders "an opportunity to hear directly from the president about his administration's overall commitment to ensuring American Indian sovereignty and about how his domestic agenda impacts American Indians."

Collison said Clinton is also expected to listen. She said the NCAI has coordinated selection of regional representatives to address remarks to the president. Funding of Native programs is likely to head the list of concerns, she said.

"They want it to be substantial, not just a photo shoot," Collison said. "I think one thing tribes concur on, both in Alaska and Outside, is full funding for our compacts."

The White House meeting will be followed by an equally unprecedented consultation with tribal leaders in Albuquerque. The National American Indian Listening Conference on May 5-6 will be hosted by Attorney General Janet Reno and Interior Secretary Bruce Babbitt.

"Our goal is to listen so that we hear the independent thinking of tribal leaders on crucial issues," Reno said in a prepared statement. "We also hope to affirm our commitment to strengthening the nation-to-nation relationship we have with tribal governments."

According to Assistant Interior Secretary for Indian Affairs Ada Deer, the Albuquerque meeting is likely to result in a formal, written Indian policy from the Clinton administration.

*— Jeff Richardson
Tundra Times*

Anchorage Daily News          Sunday, April 24, 1994

AR00271

IV 9(2)(1)

# PETITION FOR RULE-MAKING TO THE
# SECRETARY OF INTERIOR TO REVISE
# 25 C.F.R § 151.1 TO BRING FEDERALLY
# RECOGNIZED ALASKA NATIVE TRIBES WITHIN
# THE SCOPE OF FEDERAL REGULATIONS AUTHORIZING
# THE ACQUISITION OF LAND IN TRUST STATUS

SUBMITTED BY:

CHILKOOT INDIAN ASSOCIATION
NATIVE VILLAGE OF LARSEN BAY
KENAITZE INDIAN TRIBE

AR00272

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

I.    THE INTERESTS OF PETITIONERS . . . . . . . . . . . . . . . . . . . . . . . . .   2

      A.    Chilkoot Indian Association (Haines) . . . . . . . . . . . . . . . . . . . . .   2

      B.    Native Village of Larsen Bay . . . . . . . . . . . . . . . . . . . . . . . . . .   3

      C.    Kenaitze Indian Tribe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

II.   REVISION OF THE FEDERAL REGULATIONS GOVERNING ACQUISITION
      OF LANDS IN TRUST IS NECESSARY TO ENSURE PROTECTION OF
      TRIBAL LANDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

      A.    The Solicitor's Opinion of January 11, 1993 Erroneously Rejected
            the Existence of Indian Country in Alaska . . . . . . . . . . . . . . . . . . .   6

      B.    The Ninth Circuit Court of Appeals Has Held That Tribal Fee Lands
            Are Taxable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

III.  THE EXCLUSION OF ALASKA NATIVE TRIBES FROM REGULATIONS
      GOVERNING FEDERAL ACQUISITION OF TRIBAL LANDS IN TRUST OR
      RESTRICTED STATUS CONFLICTS WITH THE CONGRESSIONAL POLICY
      SUPPORTING TRIBAL SELF-GOVERNMENT AND ECONOMIC SELF-
      SUFFICIENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

IV.   THE EXCLUSION OF ALASKA NATIVE TRIBES FROM THE SCOPE OF
      FEDERAL REGULATIONS AUTHORIZING THE ACQUISITION OF TRIBAL
      LAND IN TRUST STATUS VIOLATES THE INDIAN REORGANIZATION
      ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

      A.    By Virtue of Their Status as Federally Recognized Tribes, Alaska
            Native Tribes Are Entitled to the Same Protection, Immunities,
            Privileges and Benefits as Other Federally Recognized Tribes
            Including the Right to Have Their Land Taken Into Trust Status . . . . .   13

      B.    The Secretary of Interior Has the Statutory Authority to Take Lands
            Owned by Alaska Native Tribes Into Trust Pursuant to 25 U.S.C. §
            465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

      C.    The Secretary Cannot Administratively Repeal What Has Been
            Legislatively Mandated by Congress . . . . . . . . . . . . . . . . . . . . . .   16

            1.    ANCSA Has No Effect On Section 5 Of The IRA . . . . . . . . . . .   17

            2.    Regulation § 151.1 Promulgated By The Secretary Of Interior
                  Exceeds The Scope Of His Authority . . . . . . . . . . . . . . . . . .   22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

AR00273

AR00274

Page 1
October 11, 1994
Trust Lands Petition

## INTRODUCTION

The Chilkoot Indian Association (Haines), the Native Village of Larsen Bay, and the Kenaitze Indian Tribe hereby request the Secretary of Interior to promulgate a new rule implementing the authorities, policy, and procedures governing the acquisition of land by the United States in trust status for individuals and tribes. Petitioners request that the federal regulations governing acquisitions in trust of lands owned in fee by tribes, 25 C.F.R. § 151 et seq., be revised to include within its scope all federally recognized Alaska Native tribes listed on the Department of Interior's list of Indian Tribal Entities possessing a government-to-government relationship with the United States. 58 Fed. Reg. 54364, 54369 (Oct. 21, 1993).

25 C.F.R. § 151.1 sets forth the purpose and scope of the regulations governing land acquisitions in trust. Contrary to statutory authority, §151.1 expressly excludes "the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its members." By this exclusion the Secretary's present regulation has eliminated the protections and opportunities that Alaska tribes are entitled to under 25 U.S.C. § 465. The Secretary's present regulation is also contrary to the Congressional goal of promoting tribal government and economic self-sufficiency. Indeed, as Cohen notes, "[f]ederal policy makers increasingly view preservation of a substantial tribal land base as essential to the existence of tribal society and culture."[1] Petitioners request the Secretary to provide the rights and protection that Congress guaranteed by revising the current regulation to bring Alaska tribes within its scope.

---

[1]    F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 509 (1982 ed.).

Page 2
October 11, 1994
Trust Lands Petition

## I.    THE INTERESTS OF PETITIONERS

The petitioners include: the Chilkoot Indian Association (Haines), the Native

Village of Larsen Bay, and the Kenaitze Indian Tribe.

### A.    Chilkoot Indian Association (Haines)

The Chilkoot Indian Association (Haines) is a federally recognized tribe organized

under the Indian Reorganization Act (IRA), 25 U.S.C. § 476. It is listed on the

Department of Interior's list of federally recognized tribes. 58 Fed. Reg. 54364, 54369

(Oct. 21, 1993). The Chilkoot Indians have lived in the area now known as Haines from

time immemorial. When the first Russians came to the Chilkoot valley in the 1800's, it

was populated by the Chilkoot who owned and controlled the trails between the coast

and the Interior. Originally, Haines was called "Dtehshuh" which meant "end of the

trail" in the Native language.[2]

Haines is located on the shore of Lynn Canal on the narrow Chilkat Peninsula

between Chilkoot and Chilkat Bays. The Chilkat, Chilkoot, and White Passes, the

historic routes to the Klondike gold fields, are north of the community. In 1879, S. Hall

Young, a Presbyterian missionary, and John Muir, the naturalist, visited the area. They

made plans for a Christian town with a mission and school to be operated for the benefit

of the local Chilkoot Indians. In 1881, a site was selected, and Young received

permission from the Chilkoot Indians to build a mission at the crossroads area known as

Da-Shu. In 1884, the Willard Mission was renamed Haines when the post office was

established. The name Haines was selected to honor the Secretary of the Presbyterian

National Committee for Home Missions, who had raised funds for the mission.

In 1994, the Presbyterian Church conveyed seventy-three acres of land that had

formerly been part of the Mission back to the Chilkoot Indians. The land, although

---

[2]    Alaska Department of Community and Regional Affairs, Community Profile on Haines (1983).

AR00276

Page 3
October 11, 1994
Trust Lands Petition

undeveloped, is within close proximity to the City of Haines. The Chilkoot Indian

Association wishes to have this land placed in trust in order to ensure its protection for

future generations of tribal members. If the federal regulations governing the United

States acquisition of land in trust are not revised, the Chilkoot Indian Association will

have no viable means of protecting their traditional lands that have been recently

reacquired.

B.    **Native Village of Larsen Bay**

The Native Village of Larsen Bay is a rural village located near the junction of

Larsen Bay and Uyak Bay fjords on the northwest coast of Kodiak Island. The Village is

governed by a traditional council and is listed on the Department of Interior's list of

federally recognized tribes in Alaska. 58 Fed. Reg. 54364, 54369 (Oct. 21, 1993).

Petitioner's members are Aleuts[3] who have resided at the site of Larsen Bay for

centuries.[4]

Larsen Bay petitioners rely on a seasonal cash economy heavily dependent on the

summer fisheries. Due to the village's remoteness, the cost of living, including

transportation, energy and food is extremely high. Winter offers little opportunity for

tribal members to engage in cash employment. The members of Larsen Bay continue to

live a subsistence way of life and rely on subsistence resources throughout the year.

In 1971, with the passage of the Alaska Native Claims Settlement Act[5] (ANCSA),

the Native inhabitants of Larsen Bay became eligible to select land and receive a cash

---

[3]    The word "Aleut" is an anglicized version of "Alutiiq," the word by which Pacific Yup'ik speakers most often choose to designate themselves. Donald W. Clark, *Prehistory of the Pacific Eskimo Region, in* HANDBOOK OF NORTH AMERICAN INDIANS 5 (Arctic). David Damas, ed. Washington, D.C., Smithsonian Institution.

[4]    Sustained Native occupation of Larsen Bay is well documented historically and through the twentieth century. *See*, Gordon L. Pullar and Philomena Knecht, "Continuous Occupation of Larsen Bay/Uyak Bay by Quikertarmiut" (1990), and sources cited therein.

[5]    16 U.S.C. § 1601, *et. seq.*

AR00277

Page 4
October 11, 1994
Trust Lands Petition

settlement in payment for the extinguishment of their aboriginal title to lands lost.
Accordingly, the people of Larsen Bay incorporated as Nu-Nachk Pit, Inc., enrolling a
total of 201 Native shareholders.[6] Enrollees in the village corporation were also entitled
to enroll in the regional corporation, Koniag, Inc.

Pursuant to ANCSA, Nu-Nachk Pit selected more than 65,000 acres of land for
the Native people of Larsen Bay. Such selections included areas of aboriginal use and
occupancy, including Amook Island, much of the shore of Uyak Bay, Larsen Bay and
land along the Karluk river. In 1980, Nu-Nachk Pit, along with five other village
corporations merged with Koniag, Inc. The plan of merger provided that, in exchange
for new Koniag, Inc. stock issued to the shareholders of the merging village corporations,
those corporations would transfer all their assets and liabilities to Koniag, Inc. The plan
of merger also reserved ten acres of land per enrollee by the merging village corporation
to be transferred to a village IRA council or other village organization. The Nu-Nachk
Pit shareholders chose the Larsen Bay Tribal Council (LBTC) as the successor
organization to receive fee title to 2,030 acres pursuant to the merger agreement.
Subsequent to the land transfer, LBTC transferred the vast majority of this land to
individual tribal members, formerly Nu-Nachk Pit, Inc. shareholders. LBTC currently
retains 200 acres of this land in fee which were assessed for 1992 and 1993 real
property taxes by the Kodiak Island Borough. LBTC has paid the 1992 and 1993
property taxes but cannot afford to continue to pay them and thus is threatened with the
loss of its tribal lands. Maintaining its tribal land base is essential to the protection of
Larsen Bay's political integrity, economic security, health and welfare. Thus, protection
of its remaining land base by placing such land in trust is vital to the future of the tribe.

C.    Kenaitze Indian Tribe

---

[6]    ROBERT D. ARNOLD, ALASKA NATIVE LAND CLAIMS 332 (1976).

Page 5
October 11, 1994
Trust Lands Petition

    The Kenaitze Indian Tribe, with approximately eight hundred members, lives on the Kenai Peninsula, in South Central Alaska. The Kenaitze Indian Tribe is a federally recognized tribe organized pursuant to the Indian Reorganization Act (IRA), 28 U.S.C. § 461. It is listed on the Department of Interior's list of federally recognized tribes possessing a government-to-government relationship with the United States. 58 Fed. Reg. 54364, 54369 (Oct. 21, 1993).

    For centuries, the Kenaitze have pursued a way of life dominated by subsistence hunting and fishing. In recent years, however, their close proximity to an urban area has made the Kenai Peninsula a center of commercial and sport fishing which has altered the Peninsula's economy significantly. In the face of cultural pressures, the Kenaitze have fought to maintain their traditional and customary subsistence way of life.[7] Passing on their rich cultural heritage to their children is of extreme importance to the tribe. Pursuant to this goal, the Kenaitze Tribe desires to develop a youth culture camp on ten acres of land that a tribal member wishes to gift deed to the tribe. The land, however, is a restricted Native allotment whose restrictions will be discontinued upon conveyance to the tribe. The tribe lacks significant financial resources and is reluctant to develop and make improvements on this land without assurance that this land will be protected from state or local taxation. The only viable option to preserve these tribal lands is to place them in trust. Petitioners therefore request the Secretary of Interior to promulgate new rules authorizing the acquisition of land by the United States in trust status for Alaska Native tribes.

---

[7]    See e.g., Kenaitze Indian Tribe v. State of Alaska, 860 F.2d 312 (9th Cir. 1988), cert. denied, 491 U.S. 905 (1989).

Page 6
October 11, 1994
Trust Lands Petition

II. **REVISION OF THE FEDERAL REGULATIONS GOVERNING ACQUISITION OF LANDS IN TRUST IS NECESSARY TO ENSURE PROTECTION OF TRIBAL LANDS**

The federal regulation governing acquisition of lands in trust excluding Alaska Native tribes has denied Alaska tribes a valuable avenue for protection of their land base. The consequence of the present regulation may result in the diminishment of tribal land in Alaska.

A. **The Solicitor's Opinion of January 11, 1993 Erroneously Rejected the Existence of Indian Country in Alaska**

Indian tribal territory has always held a separate status under federal law. "Indian country"[8] is the jurisdictional term used to designate the area where tribes exercise substantial governing powers while enjoying substantial protections from state jurisdiction. While Indian country is often associated with reservation status, statutory Indian country exists where a tribal entity constitutes a "dependent Indian community" under 18 U.S.C. § 1151(b). The Indian country statute is thus of critical importance in determining the special territory where Indians are governed primarily by tribal and federal law rather than state law.

On January 11, 1993, former Solicitor Thomas Sansonetti issued an Opinion on the tribal status and governmental powers of Alaska Native villages. The Opinion concludes that Alaska Native villages are tribes, but declines to identify which villages

---

[8]    Indian country is defined in 18 U.S.C. § 1151 as follows:

Except as otherwise provided in sections 1154 and 1156 of this title, the terms "Indian country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the boarders [sic] of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

AR00280

Page 7
October 11, 1994
Trust Lands Petition

have received Federal recognition.[9]  The Opinion also concludes that Alaska Native

villages generally do not constitute "Indian country" as defined in 18 U.S.C. 1151, and

therefore possess no governmental authority over land or non-members, and state

jurisdiction is not preempted.  The Solicitor's conclusion that there is no Indian country

in Alaska is based primarily on the Alaska Native Claims Settlement Act, 43 U.S.C. 1601,

et seq. (ANCSA). Op. at 108, 117-18, 130.  As will be discussed below, ANCSA neither

affected "Indian country" in Alaska, nor did it alter the Secretary's duty to include Alaska

Native tribes within the scope of regulations governing the acquisition of trust land.  The

Solicitor's Opinion is fraught with inconsistencies and is contrary to federal court

decisions, past opinions of the Solicitor and fundamental principals of federal Indian

law.[10]  Nevertheless, the Opinion stands as the official position by the Department of

Interior on Indian country in Alaska,[11] and constitutes a major hurdle which tribes must

overcome in establishing their Indian country status through litigation.  Although federal

court litigation remains a theoretical option to the establishment of Indian country status,

the enormous cost and time required to bring such protracted litigation negates the

---

[9]    On October 21, 1993, the U.S. Department of the Interior published a document in the *Federal Register* entitled *Indian Entities Recognized and Eligible to Receive Services from the United State Bureau of Indian Affairs*. 58 Fed. Reg. 54364-54369 (Oct. 21, 1993), which identified 224 Alaska Native villages as federally recognized tribes. Through this publication, the Department put an end to years of debate over the it's position regarding the tribal status of Alaska Native villages.  By its own terms the list constitutes an:

> express[] and unequivocal[] . . . determin[ation] that the villages and regional tribes listed [therein] are distinctly Native communities and have the same status as tribes in the contiguous 48 states . . . [including] the same governmental status as other federally acknowledged Indian tribes by virtue of their relationship with the United States.

58 Fed. Reg. at 54365-66.

[10]    The fallacies in the Solicitor's conclusion were detailed in a *Memorandum in Support of Request to Expressly Recognize Tribal Status of Alaska Native Villages and Withdraw Solicitor's Opinion of January 11, 1993 Insofar as it Denies the Existence of Indian Country and Tribal Territorial Powers in Alaska*, submitted to the Secretary by the Native American Rights Fund attached as appendix A.

[11]    Although this opinion is still in effect, it is under review.  Some clue as to the direction such review is taking is revealed by a recent opinion of the Associate Solicitor for Indian Affairs of November 15, 1993, holding that the Native Village of Klawock is a dependent Indian Community under the *Venetie* Criteria.

AR00281

Page 8
October 11, 1994
Trust Lands Petition

likelihood that more than a handful of Alaska Native tribes could realistically seek a

judicial determination.  Thus, Alaska tribes seeking to protect their diminishing land base

in the face of state or local incursion are left in a very real dilemma.  Absent Indian

country status or federal trust restraints, there is little to prevent the State of Alaska or its

political subdivisions from unilaterally asserting regulatory authority, including taxing

powers over tribally owned land.  In order to avoid litigation, many tribes wish to avail

themselves of the opportunity to have their land taken in trust as provided by 25 U.S.C.

§ 465.

B.    The Ninth Circuit Court of Appeals Has Held That Tribal Fee Lands Are
       Taxable

Compounding the lack of meaningful protection of tribally owned lands in Alaska

is the recent trend in federal Indian law with respect to state taxation of tribally owned

fee lands.  For many years the *per se* rule enunciated by the United Supreme Court in

the area of state taxation of tribal land was that absent an express Congressional

authorization, states lack authority to tax.  *California v. Cabazon Band of Indians*, 480

U.S. 202, 215 n.17 (1987).[12]  The scope of the *per se* rule was substantially restricted

---

[12]    The Court in *Cabazon* traced the evolution of its rule as follows:

In the special area of state taxation of Indian tribes and tribal members, we have adopted a per
se rule.  * * *  We have repeatedly addressed the issue of state taxation of tribes and tribal
members and the state, federal, and tribal interests which it implicates.  We have recognized
that the federal tradition of Indian immunity from state taxation is very strong and that the state
interest in taxation is correspondingly weak.  Accordingly, it is unnecessary to rebalance these
interests i every case.  In *Mescalero Apache Tribe v. Jones* (citations omitted), we distinguished
state taxation from other assertions of state jurisdiction.  We acknowledged that we had made
repeated statements to the effect that, even on reservations, state laws may be applied unless
such application would interfere with reservation self-government or would impair a right
granted or reserved by federal law . . . .  Even so, *in the special area of state taxation*, absent
cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory
authority for taxing Indian reservation lands or Indian income from activities carried on with n
the boundaries of the reservation, and *McClanahan v. Arizona State Tax Comm'n* (citations
omitted), lays to rest any doubt in this respect by holding that such taxation is not permissible
absent congressional consent.

480 U.S. at 215 n.17 (emphasis in original).

Page 10
October 11, 1994
Trust Lands Petition

III.    **THE EXCLUSION OF ALASKA NATIVE TRIBES FROM REGULATIONS GOVERNING FEDERAL ACQUISITION OF TRIBAL LANDS IN TRUST OR RESTRICTED STATUS CONFLICTS WITH THE CONGRESSIONAL POLICY SUPPORTING TRIBAL SELF-GOVERNMENT AND ECONOMIC SELF-SUFFICIENCY**

Strengthening tribal governments and the concomitant goal of protecting tribal assets and resources has been the focal point of federal Indian policy for decades. Beginning with the *Meriam Report*[13] in the 1920's, and continuing to the present, congressional policy has emphasized strengthening tribal governments and protection of tribal lands as a means to tribal self-determination and economic self-sufficiency. This policy was formally implemented in the Indian Reorganization Act, 25 U.S.C. §§ 461-479 (IRA).

In enacting the IRA, Congress clearly associated Indian ownership of land with Indian economic survival. Congress's foremost concerns were to improve the economic situation of Indians by stopping further land loss through allotments, to provide for additional acquisitions of tribal lands, and to revitalize tribal governments.[14] "The over-

---

[13]    Institute for Government Research, THE PROBLEM OF INDIAN ADMINISTRATION (L. Meriam ed. 1928).

[14]    Hearings on S. 2755 and S. 3645 before the Senate Comm. on Indian Affairs, 73d Cong., 2d Sess. (1934). The devastating impact that the allotment policy had on reservation Indians was summarized by the Alaska Supreme Court in *Matter of City of Nome, Alaska*, 780 P.2d 363, 366-67 (Alaska 1989) (citations omitted):

   During the late 19th and early 20th centuries, the rapid settlement and development of the West demanded that Indian land be made available for acquisition by whites. Legislation answering this demand found its justification in the policy of allotment and assimilation. Reservations were to be broken down into parcels, which were to be allotted to individual tribal members. The individuals would be transformed into farmers or livestock owners. In this manner would the Indian "be absorbed into the mainstream of American life and the 'savagery' represented by tribal autonomy be destroyed."
   The allotment policy proved successful in separating Indians from their lands. Between 1887 and 1934 tribal land holdings were reduced from about 138 million acres to only 48 million acres. Destruction of the tribal land base in turn proved successful in reducing tribal control over internal affairs to almost a nullity.
   The 1920's and 1930's saw a gradual change of attitude in those controlling federal policy toward Indians. Respect for many traditional aspects of Indian culture became evident. Among others, John Collier, then Commissioner of Indian Affairs, called for the preservation of Indian heritage and the revival of tribalism, in large part through tribal ownership of land.
   In 1934, this change of attitude found expression in the IRA, an act intended to promote

Page 11
October 11, 1994
Trust Lands Petition

riding purpose of the [IRA] was to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1974).

The prime sponsor of the IRA, Representative Howard, recognized that loss of land through the Indian General Allotment Act produced widespread poverty among reservation Indians.[15] Thus, in enacting the IRA, Congress preserved the remaining lands and provided a framework whereby tribes could acquire additional lands and thereby exercise a stronger role in governing their members and resources.

Strengthening tribal governance has been the emphasis of virtually every major piece of federal legislation since the IRA addressing the status of tribes and programs for their benefit.[16] Significantly, Alaska Native tribes have been recognized in each of these acts as being entitled to the same services and benefits as tribes in the lower-48. *See e.g.*, the Indian Financing Act of 1974, 25 U.S.C. § 1452(b); the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450(b); and the Indian Child Welfare Act of 1978, 25 U.S.C. § 1903(8). "These Acts reflect Congress's desire to promote the 'goal of Indian self-government, including its "overriding" goal of

---

tribal self-government and conserve Indian lands and resources. "The Act was intended to stop the alienation of tribal land needed to support Indians, and to provide for acquisition of additional acreage for tribes."

It was in this context that Congress empowered Section 16 entities "to prevent the sale, disposition, lease or encumbrance of tribal lands, interests in lands, of other tribal assets without the consent of the tribe." While Congress may have had before it the specific problem of appropriation of Indian assets by the Secretary of Interior, the broad terms in which it legislated indicate that it intended to protect Indian assets from other, similar threats as well. It intended to stop erosion of the tribal land base in whatever form that erosion took place.

15    78 Cong. Rec. (Part II) 11727, S3645 (daily ed. July 15, 1934).

16    The single exception to this was the federal government's disastrous experiment during the 1950's with the now thoroughly repudiated policy of Termination. President Richard Nixon renounced the Termination policy because it ignored the moral and legal obligations involved in the special relationship between tribes and the federal government. Special Message to Congress on Indian Affairs, [1970], Pub. Papers 564, 565-66 (Richard M. Nixon).

Page 12
October 11, 1994
Trust Lands Petition

encouraging tribal self-sufficiency and economic development.'" *Oklahoma Tax Comm'n*

v. *Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 510 (1991),

quoting, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987).

Countless other statutes throughout this century have provided special and general means

of advancing Alaska Native interests as part of Congress's fiduciary relationship to Indian

tribes and in the furtherance of its desire to promote tribal government.[17]

Beginning with the passage of the IRA through the present day, Congress has

repeatedly declared that, "a principal goal of Federal Indian policy is to promote tribal

economic development, tribal self-sufficiency, and strong tribal government." Indian

Gaming Act of 1988, 25 U.S.C. § 2701(4). These goals are shared by the Executive

Branch. On April 29th of this year, President Clinton met with over 300 tribal leaders

in Washington D.C. and reiterated his administration's commitment to the promotion of

tribal self-sufficiency and economic development. President Clinton also signed a

directive establishing guidelines for the relationship between tribes and the federal

government reaffirming the government-to-government relationship between the federal

---

[17]    *See, e.g.*, the Alaska Native Allotment Act of 1906, C. 2469, 34 Stat. 197 (granting Alaska Native rights to allotments); the Snyder Act of November 2, 1921, c. 115, 42 Stat. 208, 25 U.S.C. § 13 (authorizing appropriations for the general support of Indian tribes); the Native Townsite Act of 1926, c. 379, 44 Stat. 629 (providing for conveyance of public lands by restricted title to Natives in townsite); the Reindeer Industry Act of 1937, c. 897, 50 Stat. 900, 25 U.S.C. §§ 500-500n (providing for exclusive Native ownership of reindeer); Section 4 of the Alaska Statehood Act of July 7, 1958, 72 Stat. 339, *as amended*, 73 Stat. 141, 48 U.S.C. prec. 21 note (reprinted in Vol. I Alaska Statutes) (requiring the State to disclaim any right or title to Native occupied lands and leaving their disposition to the Federal Government, and exempting Native lands from state taxation); Public Law 83-280, as applied to Alaska in 1958, codified in Alaska criminal jurisdiction over causes of action but withholding any authority for state taxation of restricted Native tribal property); the 1968 Indian Civil Rights Act, 25 U.S.C. § 1301 *et. seq.* (applicable to Alaska villages by virtue of section 1301's reference to "any tribe, band, or other group of Indians subject to the jurisdiction of the United States and recognized as possessing powers of self-government"); the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. § 1601, *et. seq.* (settling Native tribal land claims); the Indian Financing Act of 1974, 25 U.S.C. §§ 1451 and 1452(c); the Indian Health Care Improvement Act of 1976, 25 U.S.C. § 1603(d); the Indian Child Welfare Act of 1978, 25 U.S.C. § 1903(8); the Indian Tribal Tax Status Act of 1986, 26 U.S.C. § 7701(40) (all of which expressly provide discrete treatment for Alaska tribes); and Titles VIII, IX and XIV of the 1980 Alaska National Interest Lands Conservation Act 94 Stat. 2371, 2422, 2430, 2491 (former amending the ANCSA settlement and providing for the protection of Native subsistence rights).

AR00285

Page 13
October 11, 1994
Trust Lands Petition

government and Indian tribes.

In summary, the policy behind the IRA, to strengthen tribal governments and promote economic self-sufficiency, remains the government's policy today. And, the *sine qua non* of this policy is the protection of the tribal land base. The regulations excluding Alaska tribal lands from the protection of trust status are in direct conflict with this government policy. Therefore, the regulations must be revised to include Alaska Native tribes.

IV.    THE EXCLUSION OF ALASKA NATIVE TRIBES FROM THE SCOPE OF FEDERAL REGULATIONS AUTHORIZING THE ACQUISITION OF TRIBAL LAND IN TRUST STATUS VIOLATES THE INDIAN REORGANIZATION ACT

There are no valid legal limitations on the authority of the Interior Department to take lands in trust on behalf of Alaska Native tribes. The exclusion of Alaska's federally recognized tribes from the scope of regulations governing the acquisition of tribal lands in trust or restricted status is wrong as a matter of law because there is no statutory authority for such exclusion. Moreover, it violates the trust obligations of the United States to Native tribes in Alaska.

A.    By Virtue of Their Status as Federally Recognized Tribes, Alaska Native Tribes Are Entitled to the Same Protection, Immunities, Privileges and Benefits as Other Federally Recognized Tribes Including the Right to Have Their Land Taken Into Trust Status

On October 21, 1993 the Department of the Interior, Bureau of Indian Affairs, published a new list of federally recognized tribes in Alaska, 58 Fed. Reg. 54364. Through this publication, the Department expressly recognized the sovereign tribal status of Alaska Native villages.

The operative language of the preamble makes clear that Alaska Native villages have the same tribal status as tribes in the lower-48 states:

The purpose of the current publication is to publish an Alaska list of entities conforming to the intent of 25 C.F.R. § 83.6(b) and to eliminate any doubt as to the Department's intention by expressly and unequivocally

AR00286

Page 14
October 11, 1994
Trust Lands Petition

> acknowledging that the Department has determined that the villages and regional tribes listed below are distinctly Native communities and have the same status as tribes in the contiguous 48 states. Such acknowledgement of tribal existence by the Department is a prerequisite to the protection services, and benefits from the Federal Government available to Indian tribes. This list is published to clarify that the villages and regional tribes listed below are not simply eligible for services, or recognized as tribes for certain narrow purposes. Rather, they have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; are entitled to the same protection, immunities, privileges as other acknowledged tribes; have the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes.[18]

The Department of Interior's express recognition that Alaska Native tribes share the same tribal status as other federally recognized tribes makes the present regulation with respect to acquisition of restricted or trust lands internally inconsistent. There is no basis in law for the exclusion of Alaska Native tribes from the regulations governing acquisition of trust lands. Therefore, 25 C.F.R. § 151, et seq., should be revised to include within its scope all federally recognized Alaska Native tribes listed on the Department of Interior's list of Indian Tribal Entities possessing a government-to-government relationship with the United States.

**B.    The Secretary of Interior Has the Statutory Authority to Take Lands Owned by Alaska Native Tribes Into Trust Pursuant to 25 U.S.C. § 465**

Section 465 of the IRA expressly authorizes the Secretary to acquire lands for Indian tribes and to take such lands into trust status for such tribes. 25 U.S.C. § 465. The only tribe excluded from section 465 is the Navajo tribe. Thus, Alaska tribes would appear to be covered by section 465.[19] Section 473a, however, removes any doubt. It

---

[18]    58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

[19]    In pertinent part section 465 provides:

  The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or

Page 15
October 11, 1994
Trust Lands Petition

provides that "Section . . . 465 . . . of this title shall after May 1, 1936, apply to the

Territory of Alaska . . . ."

The application of the trust land provision is consistent with the general treatment

of Alaska Natives in the IRA.  From its inception the 1934 Act was intended to apply to

Alaska Native groups.[20]  Thus, in the definitional section of the Act Congress provided

that "Eskimos and other aboriginal peoples of Alaska shall be considered Indians." 25

U.S.C. § 479.  Similarly, the IRA expressly provides that the provision for adopting tribal

constitutions "shall apply to the territory of Alaska * * *." 25 U.S.C. § 473.  When it

came time to implement the Act, however, the Department of Interior realized this

promise could not be fulfilled in Alaska due to inadvertent drafting limitations.  The

principle impediment was that, other than the congressionally established Annette Island

Reserve, few Alaska Natives actually lived on reservations.  The Interior Department

believed that only a reservation-based tribe could take advantage of Section 16 and

adopt a constitution under the Act.  Thus, while the Metlakatla Indians could (and did)

adopt a constitution under this Section, virtually none of the other Alaska tribes could do

likewise.[21]

---

    surface rights to lands, within or without existing reservations, including trust or otherwise
restricted allotments, whether the allottee be living or deceased, for the purpose of providing
land for the Indians . . . .

    Title to any lands or tights acquired pursuant to sections 461, 462, 463, 464, 465, 466 to
470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be taken in the name of the
United States in trust for the Indian tribe or individual Indian for which the land is acquired,
and such lands or rights shall be exempt from State an local taxation.

June 18, 1934, c. 567, § 5, 48 Stat. 985.

[20]    Indeed, Congress resoundingly rejected a bill proposed in 1948 which would have repealed the IRA in
Alaska.

[21]    This concern could not be overcome by use of the Secretary's Section 7 authority to proclaim new
reservations (25 U.S.C. § 467) because that section only authorized him to proclaim new reservations on lands
acquired pursuant to the IRA.  Section 2 of the 1936 Alaska amendment to the Act addressed this problem by
authorizing the Secretary to designate out of the public domain reservation lands used and occupied by Alaska
Natives.  25 U.S.C. § 496, repealed by Sec. 704(a) of the Act of October 21, 1976, 90 Stat. 2792.

AR00288

Page 16
October 11, 1994
Trust Lands Petition

To remedy these problems, Congress amended the IRA by the Act of May 1, 1936 c. 254, 49 Stat. 1250. Section 1 of the 1936 Act expanded the application of the IRA's various provisions to the Territory of Alaska.[22] The 1936 Act also dispensed with the requirement that Alaska Natives inhabit a reservation in order to reorganize under Section 16. Congress intended this amendment to allow Alaska Natives to secure the full promise of the original statute by allowing them to participate in the benefits of existing law "*to the same extent and manner as the Indians of the United States proper.*" H.R. Rep. No. 2244, 74th Cong., 2nd Sess. 3 (1936); S. Rep. No. 1748, 74th Cong., 2nd Sess. 3 (1936) (emphasis added).

### C.    The Secretary Cannot Administratively Repeal What Has Been Legislatively Mandated by Congress

A federal right granted by congress cannot be administratively revoked by agency action. Only congress can repeal such right and then only by an express and unequivocal statement of its intent. *United States ex re. Hualpai Indians v. Santa Fe Pacific R.R.*, 314 U.S. 339, 353 (1941). Although Section 2 of the IRA, which gave the Secretary authority to designate certain lands in Alaska as Indian reservations, was repealed by Congress in 1976, section 465, which gave the Secretary authority to take tribal lands into trust pursuant to section 473a of the IRA, was not repealed. Congress has passed no legislation that has repealed or in any way affected the right conferred to Alaska Native tribes by Section 473a of the IRA.

---

[22]    *This step was taken to remedy Congress's inadvertent omission in Section 13 and its failure to include* Section 17 and other provisions among the sections applicable to Alaska. The omission meant the education and financial benefits of the Act could not be carried out in the Territory. Congress recognized that such services were a fundamental component of the federal-tribal relationship and of tribal development, and the amendment was adopted.

AR00289

Page 17
October 11, 1994
Trust Lands Petition

### 1.    ANCSA Has No Effect On Section 5 Of The IRA.

The Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq.* was

intended by Congress to be a land claims settlement of aboriginal claims of Alaska

Natives. It was not intended to be a termination Act. As one of the prime architects,

Senator Stevens stated:

> [W]e have a basic agreement on the fact that Alaska Native people
> themselves have the right to self-determination. This is consistent with the
> President's policy of self-determination without termination.[23]

More recently, Senator Ted Stevens reiterated that:

> ANCSA was, and is, a land settlement. There is no reference to the
> sovereignty issue either in the 1971 conference report on the Act or in the
> Act itself. ANCSA's Declaration of Settlement extinguishes only aboriginal
> claims of land title and hunting and fishing rights — nothing more and
> *nothing less.*

*See* Tundra Drums, August 28, 1986 at 3, THE IMPORTANCE OF THE 1991 AMENDMENTS TO

ALASKA, quoting Ted Stevens.

The language in ANCSA regarding corporate status may be contrasted with the

language in 25 U.S.C. § 473a. In the latter statute, Congress expressly recognized

"inherent governing rights" and "granted certain rights of home rule to Indians" with

regard to Alaska Native villages. The Report of the House Committee on Interior and

Insular Affairs chaired by Congressman Udall makes clear that the status of Alaska Native

villages did not change under ANCSA. As explained:

> ANCSA was an Indian land claims settlement act. It was not, at the time,
> the intent of Congress to deal in any way with the issue of governmental
> authority of villages in Alaska. If village entities had tribal governing
> powers under existing law prior to the passage of ANCSA, ANCSA did not
> effect them. If they did not have such powers, ANCSA did not bestow
> them. It is the intent of the Committee that this is an issue which should
> be left to the courts in interpreting applicable law.

---

[23]    117 CONG. REC. 38440 (daily ed. Nov. 1, 1971). *See also* 116 CONG. REC. 24216, 24220-27, 24234-
35, 24378-82 (daily ed. July 14, 1970) (remarks of Senator Fred Harris strongly opposing any proposals to
terminate Native American programs for Alaska Natives).

AR00290

Page 18
October 11, 1994
Trust Lands Petition

H.R. Rep. No. 99-712, 99th Cong., 2d Sess. 27 (1986).

Congress's manner of treating with Alaska Native villages was identical to the

method it traditionally employed when dealing with tribal land claims elsewhere:

> The consistent policy of the United States in its dealings with the Indian
> Tribes has been to grant them title to a portion of the lands which they
> occupied, to extinguish the aboriginal title to the remainder of the land by
> placing such land in the public domain, and to pay the fair value of the
> title extinguished.[24]

The federal courts have never interpreted ANCSA to be anything more then what

it is, a land claims settlement. In *Alyeska Pipeline Co., et. al. v. Kluti Kaah Native*

*Village of Copper Center, et al.* No. A87-201 CI (HRH), Order on Motion to Dismiss and

Motion for Summary Judgment (July 27, 1993) (Clerk's Docket #179), the court

addressed the question whether the ANCSA provision terminating all but one reservation

indicated congressional intent to extinguish Indian country and hence tribal powers. The

Court correctly rejected the notion that ANCSA terminated or altered in any way Indian

country in Alaska. *Id.* at 40-44.   Thus, it is clear that ANCSA did not change the status

of Native villages or tribes in Alaska.   Likewise, ANCSA had no effect on the Secretary's

authority to take lands into trust under section 5 of the IRA.

An earlier opinion of Associate Solicitor of Indian Affairs, Thomas Fredericks,

erroneously concluded that ANCSA precluded the Secretary from restoring Alaskan tribal

lands to trust status. *See Trust Land for the Natives of Venetie and Arctic Village*,

Memorandum to Assistant Secretary, Indian Affairs from Associate Solicitor, Indian

Affairs, Thomas W. Fredericks (September 15, 1978) (hereinafter Fredericks

Memorandum).   He states:

> The structure and legislative history of Section 19 itself precludes the
> restoration of former reservations to trust status.  Section 19 revokes all
> reservations (except for Metlakatla) and directs that the land be conveyed

---

[24]     H.R. Rep. No. 523, 92d Cong., 1st Sess. 4 (1971).

Page 19
October 11, 1994
Trust Lands Petition

to the ANCSA village corporation, not to the IRA entities. It does not allow Natives to vote for continued trust status.

* * *

Also significant is the repeal, in Section 704(a) of the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, of Section 2 of the ACT of May 1, 1936, 49 Stat. 1250, 25 U.S.C. § 496, which extended the provisions of the Indian Reorganization Act to Alaska and gave the Secretary the authority to designate certain lands in Alaska as Indian reservations. In view of the clear legislative intent and policy expressed in ANCSA's extensive legislative history, it would, in my opinion, be an abuse of the Secretary's discretion to attempt to use Section 5 of the IRA (which, along with 1, 7, 8, 15, and 17 of the IRA still apply to Alaska pursuant to the unrepealed portion of the Act of May 1, 1936) to restore the former Venetie Reserve to trust status.

Mr. Fredericks' conclusion that section 19's, 43 U.S.C. § 1918, revocation of Native reservations also implicitly revoked the Secretary's authority to take tribal land into trust is in error. It is contrary to the fundamental rule that the extinguishment of tribal rights must be express and cannot be implicit. *United States ex re. Hualpai Indians v. Santa Fe Pacific R.R.*, 314 U.S. 339, 353 (1941); *Decoteau v. District County Court*, 420 U.S. 425 (1975); *Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968); *Kimball v. Callahan*, 590 F.2d 768, 776-77 (9th Cir.), *cert. denied*, 444 U.S. 826 (1979). This principle applies to ANCSA. *See, Alyeska Pipeline Co., et. al. v. Kluti Kaah Native Village of Copper Center, et al.* No. A87-201 Ci (HRH), Order on Motion to Dismiss and Motion for Summary Judgment (July 27, 1993) (Clerk's Docket #179) (ANCSA does not preclude Indian country status in Alaska); *see also, Chilkat Indian Village v. Johnson*, No. J84-024 Civ. (D. Alaska, Oct. 9, 1990) (if Chilkat had governmental power under its status as a reservation ANCSA did nothing to extinguish those powers); *Native Village of Tyonek v. Puckett*, 890 F.2d 1157 (9th Cir. 1990), *rev'd on other grounds, Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775 (1991) (ANCSA constitutes Congressional recognition of Native Villages as Indian tribes).

Moreover, there is nothing inconsistent between the termination of existing

Page 21
October 11, 1994
Trust Lands Petition

conferred on Alaska tribes prior to or after ANCSA's passage.[26]

Of greatest relevance here, Congress has dealt with the Alaska Native tribes in two very significant and separate ways in the twentieth century. In 1936, Congress extended the IRA to Alaska and thereby allowed "villages" to be included within the definition of "tribe" for purposes of reorganizing under the IRA. In 1971, it passed ANCSA. As demonstrated above, Congress did not intend ANCSA to terminate tribal status. Otherwise, Congress would have expressly repealed the IRA and made such intention explicit. Consequently, the Secretary has a duty to give effect to both ANCSA and the IRA. More specifically, he has a duty to give effect to Section 5 of IRA as that provision pertains to Alaska. Contrary to the conclusion found in the 1978 Fredericks Memorandum, the refusal to even consider taking Alaska tribal lands into trust is not only an abuse of discretion, it is in direct violation of Section 5 of the IRA. Absent

---

[26]    *See e.g.*, the National Indian Forest Resources Management Act, 25 U.S.C. §§ 3101 & 3112 (providing technical assistance to Alaska tribes to promote sustained yield of forest resources on ANCSA lands, including fish and wildlife); 23 U.S.C. § 101 (placing Alaska Native villages on the same footing as Indian reservations for purposes of Federal-Aid Highway Act); 25 U.S.C. § 3112 (extending benefits of National Indian Forests Resources Act to ANCSA lands); 29 U.S.C. § 750(d) (placing handicapped Native Americans residing on ANCSA corporate lands to be eligible beneficiaries of special vocational rehabilitation grant programs administered by tribes); 42 U.S.C. § 2992c(2) (Native American Program Act) (equating lands under jurisdiction of Alaska Native village tribes, including ANCSA corporate lands, with Indian reservations); 42 U.S.C. § 5318(n)(2)(A) (equating Alaska Native village tribes with reservation-based tribes in the Urban Development Action Grant Program); 25 U.S.C. §§ 3202(9), 3208(a) (Indian Child Protection and Family Violence Prevention Act) (treating ANCSA corporate lands identically to Indian reservation lands for purposes of funding village tribal child abuse treatment grant programs); 25 U.S.C. § 1622(a) (eligibility of tribal organizations for health care grants and contracts); 25 U.S.C. § 2401 (Indian Alcohol and Substance Abuse Prevention and Treatment); 26 U.S.C. § 4225 (Exemption of articles manufactured or produced by Indians); 42 U.S.C. § 1471 (USDA financial assistance for farm housing); 42 U.S.C. § 5061 (HHS programs for administration and coordination of domestic volunteer services); 42 U.S.C. § 8802 (assistance in the development of biomass energy and alcohol fuels); 42 U.S.C. § 10101 (assistance in handling nuclear waste).

The government's continued supervision of Native villages and their ANCSA lands is also demonstrated by numerous federal laws and regulations which define the term "reservation" to include Alaska Native village communities, for purposes of providing federal programs and services to units of local self-government. *See e.g.*, 25 U.S.C. § 1452(d) (Indian Financing Act); 25 C.F.R. §§ 101.1(h) and 2866.1(j) (Indian Financing Act); 25 C.F.R. § 20.1(b); 25 C.F.R. § 170.2(d) (BIA roads program); 45 C.F.R. § Part 1328 (Older Americans Act, 42 U.S.C. § 3057); 29 U.S.C. § 750(c) (Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978); 34 C.F.R. § 371.4 (same); 7 C.F.R. § 1823 (Consolidated Farm and Rural Development Act, 7 U.S.C. § 1989); 43 C.F.R. § 36.21(i) (Snyder Act, 25 U.S.C. § 13, Indian Health Service programs); 42 U.S.C. § 2992(c)(2) (Native American Programs Act of 1974).

AR00293

Page 22
October 11, 1994
Trust Lands Petition

express congressional authority, the Department cannot unilaterally decide that one

congressional act overrides another.

In summary, ANCSA does not constitute a legislative repeal of Section 5 of the

IRA.  Rather, ANCSA left intact the unique federal-trust relationship between the U.S.

government and Alaska Native villages.  The current regulations excluding Alaska Native

tribes from placing lands in trust breach the Secretary's fiduciary responsibility to Alaskan

tribes and seriously undermine tribal rights to self-determination in the post ANCSA era.

   2.    **Regulation § 151.1 Promulgated By The Secretary Of Interior
          Exceeds The Scope Of His Authority.**

The authority of Congress to legislate in the area of Indian affairs derives from its

authority to deal with "Indian Tribes" under Article I, sec. 8, cl. 3 of the United States

Constitution; whereas, the Secretary of Interior is authorized by the Congress to

promulgate rules and regulations as they pertain to Indian affairs.  In *Morton v. Ruiz*, 415

U.S. 199 (1974), the Court held that:

> The power of an administrative agency to administrator a congressionally
> created and funded program necessarily requires the formulation of policy
> and the making of rules to fill any gap left, implicitly or explicitly, by
> Congress.  In the area of Indian affairs, the Executive has long been
> empowered to promulgate rules and policies, and the power has been
> given explicitly to the Secretary and his delegates at the BIA.  This agency
> power to make rules that affect substantial individual rights and obligations
> carries with it the responsibility not only to remain consistent with the
> governing legislation, (citation omitted) but also to employ procedures that
> conform to the law.

*Id.* at 231-32.

The following limitation in 25 C.F.R. § 151.1 is inconsistent with section 5 of IRA

and does not conform to the law:

> These regulations do not cover the acquisition of land in trust status in the
> State of Alaska, except acquisitions for the Metlakatla Indian Community of
> the Annette Island Reserve or its members.

This provision not only lacks congressional authorization or approval, it directly conflicts

AR00294

Page 23
October 11, 1994
Trust Lands Petition

with sections 465 and 473a of the IRA. As previously discussed, the Secretary has the duty to give effect to both the IRA and ANCSA. If the Secretary of Interior were to deny this petition based on the limitation found in regulation § 151.1, section 465's application to Alaska would be rendered meaningless. Such action would be contrary to the congressional policy of self-determination embodied not only in the IRA and ANCSA, but also in numerous other statutes enacted for the benefit of tribes in and outside Alaska.

The federal trust responsibility imposes strict fiduciary standards on the conduct of federal agencies unless Congress expressly authorizes a deviation from such standards. These fiduciary standards govern all executive departments that deal with Indians. The Secretary in particular has special statutory responsibilities for Indian affairs and thus has rigorous fiduciary obligations to Indians. *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252, 256 (D.D.C. 1973). These fiduciary obligations impose upon the Secretary a burden to justify the limitation within 25 C.F.R. § 151.1. In its application of the IRA, Congress made no distinction between the Native tribes of the contiguous United States and Alaska. To the extent the limitation in the regulation is applied to exclude lands currently held by Alaska Native villages such as Petitioners, the Secretary of Interior has provided unequal treatment between the "lower 48" Indian tribes and the Alaska Native villages. Such treatment violates both express congressional legislation and the fiduciary relationship between the United States government and the Alaska Native villages. As currently applied, the regulation is unlawful and should be revised so that it is consistent with the statute.

## CONCLUSION

Petitioners respectfully request the Secretary of Interior to promulgate a new rule governing the acquisition of land by the United States in trust status for individuals and

Page 24
October 11, 1994
Trust Lands Petition

tribes that expressly includes Alaska Native villages.  The Secretary should remove the

following limitation in 25 C.F.R. § 151.1:

> These regulations do not cover the acquisition of land in trust status in the
> State of Alaska, except acquisitions for the Metlakatla Indian Community of
> the Annette Island Reserve or its members.

Under C.F.R. § 151.2 Definitions, the Secretary should revise the definition of "Tribe" to

include the following:

> "Tribe" means any Indian tribe, band, nation, pueblo, community,
> rancheria, colony, including any Alaska Native village listed on the
> Department of Interior's list of federally recognized tribes, which is
> recognized by the Secretary and eligible for the special programs and
> services from the Bureau of Indian Affairs.  For purposes of acquisitions
> made under the authority of 25 U.S.C. §§ 488 and 489, or other statutory
> authority which specifically authorizes trust acquisitions for such
> corporations, "Tribe" also means a corporation chartered under section 17
> of the Act of June 18, 1934 (48 Stat. 988; 25 U.S.C. § 477) or section 17
> of the Act of June 26, 1936 (49 Stat. 1967; 25 U.S.C. § 503).

**DATED** at Anchorage, Alaska this _11_ day of October, 1994.

Heather R. Kendall
Lawrence A. Aschenbrenner
Robert T. Anderson
Native American Rights Fund
310 "K" Street, Suite 708
Anchorage, Alaska 99501

Attorneys for:
Chilkoot Indian Association
Native Village of Larsen Bay
Kenaitze Indian Tribe

[Federal Register: January 5, 1995 (Volume 60, Number 3)]
[Proposed Rules ]
[Page 1955-1956]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr05ja95-26]


[[Page 1955]]

---

Part VIII



Department of the Interior



---



Bureau of **Indian** Affairs



---



25 CFR Part 151


Land Acquisitions; Proposed Rule

[[Page 1956]]

DEPARTMENT OF THE INTERIOR

Bureau of **Indian** Affairs

25 CFR Part 151

RIN 1076-AD11


Land Acquisitions

Agency: Bureau of **Indian** Affairs, Interior.

Action: Notice of **Petition**.

------------------------------------------------------------------------

SUMMARY: The Department of the Interior requests comments on a **petition**
for rulemaking concerning Alaska Native land acquisitions. This
**petition** recommends amending regulations to bring federally recognized
Alaska Native Tribes within the scope of federal regulations
authorizing the acquisition of land in trust status.

AR00297

DATES: Comments must be received on or before March 6, 1995.

ADDRESSES: Written comments should be mailed or hand carried to the
Chief, Branch of Technical Services, Division of Real Estate Services,
Bureau of **Indian** Affairs, 1849 C Street, N.W., MS-4522-MIB, Washington,
D.C. 20240.

FOR FURTHER INFORMATION CONTACT: Copies of the **petition** may be obtained
by contacting Alice A. Harwood, Chief, Branch of Technical Services,
Bureau of **Indian** Affairs, Room 4522, Main Interior Building, 1849 C
Street, N.W., Washington, D.C. 20240; Telephone number (202) 208-3604;
or by mail at the address listed above.

SUPPLEMENTRY INFORMATION: Petitioners include three federally
recognized tribes in Alaska: **Chilkoot Indian Association** (Haines), the
Native Village of Larsen Bay, and the Kenaitze **Indian** Tribe. They
request the Secretary to amend the existing regulation which excludes
the acquisition of land in trust status in the State of Alaska for
Alaska Natives and tribes, except for the Metlakatla **Indian** Community
of the Annette Island Reserve and its members. Specifically, the
petitioners request the Secretary to: (1) remove the portion of the
existing regulation that prohibits the acquisition of land in trust
status in the State of Alaska for Alaska Native villages other than
Metlakatla and (2) include in the definition of ``tribe'' those Alaska
Native villages listed on the Department of the Interior's list of
federally recognized tribes.

    Dated: November 29, 1994.
Ada E. Deer,
Assistant Secretary--**Indian** Affairs.
[FR Doc. 95-71 Filed 1-4-95; 8:45 am]
BILLING CODE 4310-02-P

AR00298

# DEPARTMENT OF THE INTERIOR

## Bureau of Indian Affairs

### 25 CFR Part 151

RIN 1076–AD11

## Land Acquisitions

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of Petition.

**SUMMARY:** The Department of the Interior requests comments on a petition for rulemaking concerning Alaska Native land acquisitions. This petition recommends amending regulations to bring federally recognized Alaska Native Tribes within the scope of federal regulations authorizing the acquisition of land in trust status.

**DATES:** Comments must be received on or before March 6, 1995.

**ADDRESSES:** Written comments should be mailed or hand carried to the Chief, Branch of Technical Services, Division of Real Estate Services, Bureau of Indian Affairs, 1849 C Street, N.W., MS–4522–MIB, Washington, D.C. 20240.

**FOR FURTHER INFORMATION CONTACT:** Copies of the petition may be obtained by contacting Alice A. Harwood, Chief, Branch of Technical Services, Bureau of Indian Affairs, Room 4522, Main Interior Building, 1849 C Street, N.W., Washington, D.C. 20240; Telephone number (202) 208–3604; or by mail at the address listed above.

**SUPPLEMENTARY INFORMATION:** Petitioners include three federally recognized tribes in Alaska: Chilkoot Indian Association (Haines), the Native Village of Larsen Bay, and the Kenaitze Indian Tribe.

They request the Secretary to amend the existing regulation which excludes the acquisition of land in trust status in the State of Alaska for Alaska Native tribes, except for the Metlakatla Indian Community of the Annette Island Reserve and its members. Specifically, the petitioners request the Secretary to: (1) remove the portion of the existing regulation that prohibits the acquisition of land in trust status in the State of Alaska for Alaska Native villages other than Metlakatla and (2) include in the definition of "tribe" those Alaska Native villages listed on the Department of the Interior's list of federally recognized tribes.

Dated: November 29, 1994.

**Ada E. Deer,**

*Assistant Secretary—Indian Affairs.*

[FR Doc. 95–71 Filed 1–4–95; 8:45 am]

BILLING CODE 4310–02–P

AR00299



# United States Department of the Interior

### OFFICE OF THE SOLICITOR

In reply, please address to:
Main Interior, Room 6456



Michael D. Cox, General Counsel
National Indian Gaming Commission
1850 M Street, N.W., Suite 250
Washington, D.C.  20036

Dear Mr. Cox:

On January 12, 1995, your office requested an opinion as to whether
lands held by the Akiachak Native Community (ANC) fall within the
definition of "Indian lands" in the Indian Gaming Regulatory Act
(IGRA).  For the reasons set forth below, we cannot conclude that
the lands at issue are "Indian lands" for purposes of IGRA.

The IGRA defines Indian lands as including "any lands title to
which is either held in trust by the United States for the benefit
of any Indian tribe or individual or held by any Indian tribe or
individual subject to restriction by the United States against
alienation and over which an Indian tribe exercises governmental
power." 25 U.S.C. § 2703(4)(b).  The NIGC regulations have further
clarified the definition by providing that:

> Indian lands means
>
> (a)  Land within the limits of an Indian reservation; or
>
> (b)  Land over which an Indian tribe exercises governmental
>      power and that is either--
>
>      (1). Held in trust by the United States for the benefit
>           of any Indian tribe or individual; or
>
>      (2)  Held by an Indian tribe or individual subject to
>           restriction by the United States against
>           alienation.

25 C.F.R. § 502.12 (Emphasis added).

It is clear that Akiachak is an Indian tribe, as evidenced by its
inclusion on the list of tribal entities recognized and eligible
for funding and services from the Bureau of Indian Affairs by
virtue of their status as Indian tribes.  60 Fed. Reg. 9250 (1995).
The Tribe is organized pursuant to section 16 of the Indian

Reorganization Act, 25 U.S.C. § 476.

The land which Akiachak intends to use for gaming purposes is described as Lot ten (10), of Block Eight (8), Tract "A" as shown on the official plat of U.S. Survey 4479, Alaska, Townsite of Akiachak, as accepted by the Chief, Division of Cadastral Survey, for the Director on February 16, 1971, and located within the Bethel Recording District." See Trustee Deed between Gail Ozmina, trustee and the Townsite of Akiachak (March 20, 1990)(on file with your office). The land is owned in fee simple by the tribe which was conveyed to the tribe by the townsite trustee. See Letter from Bertram Hirsch, Esq., to Harold Monteau, Chairman, National Indian Gaming Commission (December 28, 1994)(on file with your office).[1] Because Akiachak is organized under the IRA, the land is likely subject to a restriction on alienation pursuant to section 16. In re 1981, 1982, 1983, 1984 & 1985 Delinquent Property Taxes Owed, 780 P.2d 363, (Alaska 1989)(holding that § 16 of the Indian Reorganization Act, 25 U.S.C. §§ 461 et seq., barred foreclosure proceedings against land held by an IRA tribe).

We are not convinced, however, that Akiachak exercises governmental power over the land. Solicitor's Opinion, M-36975 (January 11, 1993) noted that:

> With respect to these non-ANCSA lands, we believe the extent of village governmental powers will depend upon the particular status of the village itself and upon a fact-specific inquiry into whether the area at issue qualifies as a dependent Indian community and thus Indian country. Congress simply did not address this specific situation in ANCSA. The outcome would depend upon the particular history of the village, specific applicable statutes, and general principles of Indian law.

As this Opinion notes, that inquiry is extremely fact-specific. We note that the issue of the existence of dependent Indian communities in Alaska is presently in litigation in Alaska v. Native Village of Venetie Tribal Government, No. F87-0051 (HRH)(D. Alaska); Alyeska v. Kluti Kaah Native Village of Copper Center, No. A87-201 (HRH)(D. Alaska). Those cases, which have been briefed and argued, involved five and three day bench trials in late 1993 and January of 1994 respectively. They were also preceded by extensive summary judgment proceedings that took place over a period of years and developed comprehensive factual records. That the district

---

[1]    The Tribe's ordinance does not identify the particular tract of land upon which gaming would take place, but counsel for the Tribe has represented that the gaming would take place on lot 10. In any event, our decision respecting the Tribe's governmental power does not hinge on the nature of the title to any particular tract of land in the Village.

2

AR00301

court has not yet rendered its decision indicates the complex nature of the law in the area and the need for careful examination of a fully developed factual record. See Alaska v. Native Village of Venetie Tribal Government, 856 F.2d 1384, 1391 (9th Cir. 1988). The Department does not have such a record before it and we expect further guidance from the court in the foregoing cases, which are ripe for decision.

Based on the current state of the law and the information before us, we cannot conclude that the land in question is "Indian land" as defined by IGRA. If you have further questions, please contact Troy Woodward of my staff.

Sincerely,

Scott Keep
Assistant Solicitor
Branch of Tribal Government and Alaska
Division of Indian Affairs

3

AR00302





# United States Department of the Interior

OFFICE OF THE SOLICITOR
Alaska Region
4230 University Drive
Suite 300
Anchorage, Alaska 99508-4626

July 10, 1997

**MEMORANDUM**

**TO:**      Deborah Williams, Special Assistant
            to the Secretary for Alaska

**FROM:**    Roger L. Hudson, Attorney
            Office of the Regional Solicitor

**SUBJECT:** Taking Land in Alaska in Trust for Tribes or Native
            individuals


This is in response to your recent request for information about the process for taking land in trust which might apply in the event the Department of the Interior were to reverse its long-standing policy against making such property acquisitions in Alaska.

Acquisition Process.

Although a unique process could certainly be developed for Alaska[1], it is presumed for present purposes that the existing one would be applied more or less in its current form. That process, developed under authority of 25 U.S.C. § 465[2], is governed

---

[1] The main argument for a development of a modified process to be used in Alaska is that the motivation for requesting that land be taken in trust up here may differ from that typical of lower 48 situations, where many of the requesting tribes already have beneficial ownership of significant trust acreage, mostly on reservations. The existing Part 151 criteria could be applied to a request from a village or village corporation to take large areas conveyed pursuant to ANCSA into trust, but such a request might plausibly be thought of as more akin to a request for the establishment of a reservation. The Part 151 regulations were evidently drafted with an eye towards the fairly modest incremental acquisitions such as would commonly be proposed in the lower 48 states.

[2] The Secretary's exercise of discretionary authority to take land in trust under that statute was upheld on the basis that it was essentially unreviewable in State of Florida Dept. of Business Regulation v. U.S.D.O.I., 768 F.2d 1248 (11th Cir. 1985).

AR00303

Deborah Williams, Special Assistant to the Secretary
Taking Land in Alaska in Trust
July 10, 1997 - Page 2

primarily by the provisions of 25 C.F.R. Part 151[3]. A copy of
those regulations, which were recently amended[4] to deal more
extensively with off-reservation acquisitions, is attached. Along
with the regulations themselves, I am including copies of a 1990
Secretarial policy memorandum, and the two portions of the
Departmental Manual referenced in 25 C.F.R. § 151.10(h). Those DM
provisions set forth the manner in which National Environmental
Policy Act (NEPA) compliance and hazardous waste inspection issues
are to be dealt with.

     The heart of the process is the evaluation of the request
pursuant to the criteria identified in 25 C.F.R. §§ 151.10 and
151.11. The latter section deals with off-reservation
acquisitions, but incorporates almost all of the evaluation factors
listed in the former, as well as providing inter alia for notice to
state and local governments and a period for submission of written
comment as to the acquisition's potential impacts on regulatory
jurisdiction, real property taxes and special assessments. §
151.11(d). The criteria to be evaluated in exercising the
discretion to accept or reject a request to take land in trust
include the following:

- The tribe's or individual's need for the land.
- The purposes for which the land will be used.
- For an individual, how much trust land he already has, and his
  need for assistance in handling his own affairs.

---

     [3] The exercise of such discretion will likely be upheld so
long as the record reflects that the criteria set out in the
regulations were in fact considered. Jack & Shirley Baker v.
Muskogee Area Director, BIA, 19 IBIA, 98 I.D. 5 (1991).

     [4] In South Dakota v. Department of the Interior, 69 F.3d 878,
(8th Cir. 1995), 25 U.S.C. § 465 was held to be constitute an
unconstitutional delegation of legislative power to the Secretary
of the Interior. However, that problem has apparently been
overcome by virtue of a June 1995 amendment to the regulations to
provide in § 151.12 for a 30 day window following public notice of
the decision to take land in trust, during which period an A.P.A.
judicial review proceeding could be filed without running afoul of
the Quiet Title Act immunity problems which defeat most efforts to
challenge Indian titles. Following enactment of the new
regulations, the Supreme Court granted the United States petition
for certiorari, vacated the 8th Circuit's decision, and remanded
the case with instructions to vacate the District Court decision as
well, and remand to the Secretary of the Interior for
reconsideration of his decision to take the land in question in
trust. South Dakota v. Department of the Interior, No. 95-1956, 65
U.S.L.W. 3291-92 (October 15, 1996).

AR00304

Deborah Williams, Special Assistant to the Secretary
Taking Land in Alaska in Trust
July 10, 1997 - Page 3

- The impact on the State and its political subdivisions of removal
  of the land from tax rolls.
- Possible jurisdictional problems and land use conflicts.
- Whether the BIA is equipped to discharge the additional
  responsibilities resulting from acquisition in trust status.
- Tribal plans specifying anticipated economic benefits.

Assuming that acquisition of land in trust is deemed
appropriate in light of the relevant factors, NEPA and hazardous
waste concerns must also be addressed.  If only the land title
status is to be changed, and no physical alteration or change in
use is contemplated, 516 DM 6, Appendix 4, § 4.4I would appear to
provide for categorical exclusion of such an acquisition from the
requirement for preparation of an EIS.  But in all instances, a
pre-acquisition environmental inspection to guard against
acquisition of contaminated sites would be required under 602 DM
Chapter 2.

Post-Acquisition Considerations.

One criterion which should be highlighted because of its
particular long-range impact on the Department is the question as
to whether the Bureau of Indian Affairs is equipped to discharge
the additional responsibilities resulting from the acquisition of
the land in trust status.  § 151.10(g).  Realty, trespass,
environmental, forestry, fire, and other programmatic
responsibilities relating to trust property would obviously be
expanded in proportion to the increase in trust acreage.  In my
judgment the BIA is not presently staffed or funded adequately to
handle its already existing responsibilities with regard to
allotments, and it is entirely conceivable that the amount of
tribal trust land, of which there is practically none now, could
rapidly grow to exceed the allotment land base.  Whether staff and
funding resources would increase commensurately seems doubtful.

Besides creating a request processing workload, and placing
the Department in the position of making frequently controversial
decisions, reversal of the policy of not taking land in trust in
Alaska will result in assumption of certain fiduciary duties with
respect to lands so acquired, to be carried out by the BIA directly
or through the agency of Indian Self-Determination Act (ISDA)
tribal contractors or Self-Governance Tribes.  In addition, it will
lead to an increased workload for both the Regional Solicitor's
Office and the Offices of the U.S Attorney and DOJ's Division of
Energy and Resources.  The Regional Solicitor's Office already
devotes considerable time to providing legal assistance to BIA and
ISDA and Self-Governance service providers in connection with
restricted Indian lands, and an increased need for representation
in litigation is also foreseeable.  In addition, if creation of
tribal trust lands promotes assertions of governmental authority by

AR00305

Deborah Williams, Special Assistant to the Secretary
Taking Land in Alaska in Trust
July 10, 1997 - Page 4

tribal governments, additional legal work relating to tribal
jurisdictional issues is likely. Such disputes are always complex,
and often consume large amounts of manpower and resources.

Without a crystal ball, I can't give you a comprehensive
assessment of the effects of reversing the present policy of
declining across-the-board to take land in trust for Alaska tribes
or Native individuals, but I think can safely predict that the
impact would be noticeable, both in terms of greater BIA and other
budgetary requirements, and in terms of potential federal liability
and involvement in a wide range of legal disputes. It might well
be argued that a legislative intent to avoid such responsibilities
and involvements was reflected in the design and structure of the
Alaska Native Claims Settlement Act.

Please call if you need additional information about any of
the issues touched upon above.

Roger L. Hudson

Attachments:
        25 C.F.R. Part 151, as amended
        516 DM 6, including Appendix 4
        602 DM 2
        7/19/90 Secretarial Policy Memorandum

cc (w/ attachments):
        Niles Cesar, Area Director, JAO, BIA
        Glenda Miller, Area Realty Officer, JAO, BIA

DRAFT April 3, 1996

RULES and REGULATIONS

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs

25 C.F.R. Part 151.12

RIN ?

Land Acquisitions

AGENCY: Bureau of Indian Affairs, Interior.

ACTION: Procedural Rule.

SUMMARY:  This procedural rule provides a 30-day waiting period after final administrative decisions to take land into trust under the Indian Reorganization Act.  The Department provides this procedure so that parties wishing review after appeals to the Interior Board of Indian Appeals under 25 C.F.R. Part 2, or review of decisions by the Assistant Secretary-Indian Affairs, will be provided notice of administrative decisions to take land into trust before title is actually transferred to the United States.  With such notice, parties who so desire may seek judicial or other review pursuant to the Administrative Procedure Act and applicable regulations.

EFFECTIVE DATE: [Publication Date].

FOR FURTHER INFORMATION CONTACT:  Mary Jane Sheppard, Staff Attorney, Office of the Solicitor, Division of Indian Affairs, Room 6456, Main Interior Building, 1849 C Street, NW, Washington, DC 20240, Telephone No. (202) 208-6260.

SUPPLEMENTARY INFORMATION:  On July 15, 1991, the proposed rule for off-reservation land acquisitions for Indian tribes was published in the Federal Register (56 FR 32278-32280).  On June 23, 1995, the final rule was published at 60 FR 32878.  That rulemaking supplemented the already existing regulations in Part 151 of the C.F.R..  This procedural rule adds a subsection to existing 25 C.F.R. § 151.12, Action on requests.

The Department certifies to the Office of Management and Budget that this procedural rule meets the standards provided in Sections 2(a) and 2(b)(2) of Executive Order 12778.

The Department has determined that this rule:

2

- does not have significant federalism effects.
- is not a major rule under Executive Order 12866 and will not require a review by the Office of Management and Budget.

- will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 et. seq.).
- does not have significant takings implications under E.O. 12630.
- does not have significant effects on the economy, nor will it result in increases in costs or prices for consumers, individual industries, Federal, State, or local governments, agencies, or geographical regions.
- does not have any adverse effects on competition, employment, investment, productivity, innovation, or the export/import market.
- is categorically excluded from the National Environmental Policy Act of 1969 because it is of an administrative, technical, and procedural nature.
  Therefore, neither an environmental assessment nor an environmental impact statement is warranted.
  The annual number of tribal requests to place lands in trust is small.  There will be costs incurred by a party seeking judicial review.
  Because this is a procedural rule under Section 553(b)(3)(A) of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, it is exempt from requirements for notice and comment rulemaking.

BACKGROUND

In response to a recent court decision, State of South Dakota v. U.S. Department of the Interior, 69 F.3d 878 (8th Cir. 1995), the Department of the Interior announces a procedure to ensure the opportunity for judicial review of administrative decisions to acquire title to lands in trust for Indian tribes and individual Indians under § 5 of the Indian Reorganization Act (IRA) (Pub. L. 73-383, 48 Stat. 984-988, 25 U.S.C. § 465). Following consideration of the factors set out in the current regulations, the Department, through Federal Register notice, or other notice calculated to reach interested members of the public, will announce any final administrative determination to take land in trust pursuant to 25 C.F.R. § 151.14.  The Secretary will not accept title to the land in trust until at least thirty (30) days following the announcement.  This procedure permits judicial review prior to transfer of title to the United States.  The Quiet Title Act (QTA), 28 U.S.C. § 2409a, precludes judicial review after the United States acquires title.  See, e.g., United States v. Mottaz, 476 U.S. 834 (1986); Florida v. Department of Interior, 768 F.2d 1248 (11th Cir. 1985).

AR00308

3

State of South Dakota held Section 5 of the IRA, which authorizes the Secretary to acquire land in trust for Indians, unconstitutional on the ground that it violated the nondelegation doctrine.  The court's decision was based in substantial part on the understanding that judicial review is not available to challenge the agency's action.  The court noted that "judicial review is a factor weighing in favor of upholding a statute against a nondelegation challenge."  Today's rule assures that such review is available prior to formal conveyance of title to land to the United States, when the QTA's bar to judicial review becomes operative.  Judicial review is available because the action is not committed to agency discretion by law within the meaning of the APA.  The IRA authorizes the Secretary to acquire land in trust for Indians and Indian tribes: 1) within or adjacent to an Indian reservation; or 2) for purposes of facilitating tribal self-determination, economic development, or Indian housing.

While the Eighth Circuit decision precludes the Secretary from taking into trust the land at issue in that particular case, new trust acquisitions will not cease in the Eighth Circuit or in any other jurisdiction.  The procedure announced in today's rule, however, will apply to all pending and future trust acquisitions.

  List of Subjects in 25 C.F.R. Part 151

    Indians--lands.

    For reasons set out in the preamble, Part 151 of Title 25, Chapter I of the Code of Federal Regulations is amended as set forth below.

  PART 151--LAND ACQUISITIONS (NONGAMING)

Section 151.12, Action on requests, is revised to read as follows:

1. Insert "(a)" before existing paragraph.
* * * * *
2. A new paragraph (b) is added to read as follows:

    (b) Following completion of the Title Examination provided in § 151.13 of this Part, the Secretary shall publish in the Federal Register, or by such other means calculated to provide actual notice to the affected public, a notice of his decision to take land into trust under this Part.  That notice shall provide that a final agency determination to take land in trust has been made and that the Secretary shall acquire title in the name of the United

AR00309

4

States no sooner than thirty (30) days following publication
of such notice.

DATE SIGNED BY THE ASSISTANT SECRETARY.

Ada E. Deer,
Assistant Secretary--Indian Affairs.
[FR Doc. 96-_____15215 Filed _-__-96; __am ]
BILLING CODE

AR00310

Titles and Records Offices are designated as Certifying Officers for this purpose. When a copy or reproduction of a title document is authenticated by the official seal and certified by a Manager, Land Titles and Records Office, the copy or reproduction shall be admitted into evidence the same as the original from which it was made. The fees for furnishing such certified copies are established by a uniform fee schedule applicable to all constituent units of the Department of the Interior and published in 43 CFR part 2, appendix A.

## § 150.11  Disclosure of land records, title documents, and title reports.

(a) The usefulness of a Land Titles and Records Office depends in large measure on the ability of the public to consult the records contained therein. It is therefore, the policy of the Bureau of Indian Affairs to allow access to land records and title documents unless such access would violate the Privacy Act, 5 U.S.C. 552a or other law restricting access to such records, or there are strong policy grounds for denying access where such access is not required by the Freedom of Information Act, 5 U.S.C. 552. It shall be the policy of the Bureau of Indian Affairs that, unless specifically authorized, monetary considerations will not be disclosed insofar as leases of tribal land are concerned.

(b) Before disclosing information concerning any living individual, the Manager, Land Titles and Records Office, shall consult 5 U.S.C. 552a(b) and the notice of routine users then in effect to determine whether the information may be released without the written consent of the person to whom it pertains.

## PART 151—LAND ACQUISITIONS

Sec.
151.1  Purpose and scope.
151.2  Definitions.
151.3  Land acquisition policy.
151.4  Acquisitions in trust of lands owned in fee by an Indian.
151.5  Trust acquisitions in Oklahoma under section 5 of the I.R.A.
151.6  Exchanges.
151.7  Acquisition of fractional interests.
151.8  Tribal consent for nonmember acquisitions.
151.9  Requests for approval of acquisitions.
151.10  On-reservation acquisitions.
151.11  Off-reservation acquisitions.
151.12  Action on requests.
151.13  Title examination.
151.14  Formalization of acceptance.
151.15  Information collection.

AUTHORITY: R.S. 161: 5 U.S.C. 301. Interpret or apply 46 Stat. 1106, as amended; 46 Stat. 1471, as amended; 48 Stat. 985, as amended; 49 Stat. 1967, as amended, 53 Stat. 1129; 63 Stat. 605; 69 Stat. 392, as amended; 70 Stat. 290, as amended; 70 Stat. 626; 75 Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat. 747; 82 Stat. 174, as amended, 82 Stat. 884; 84 Stat. 120; 84 Stat. 1874; 84 Stat. 216; 86 Stat. 530; 86 Stat. 744; 88 Stat. 78; 88 Stat. 81; 88 Stat. 1716; 88 Stat. 2203; 88 Stat. 2207; 25 U.S.C. 2, 9, 409a, 450h, 451, 464, 465, 487, 488, 489, 501, 502, 573, 574, 576, 608, 608a, 610, 610a, 622, 624, 640d-10, 1466, 1495, and other authorizing acts.

SOURCE: 45 FR 62036, Sept. 18, 1980, unless otherwise noted. Redesignated at 47 FR 13327, Mar. 30, 1982.

CROSS-REFERENCE: For regulations pertaining to: The inheritance of interests in trust or restricted land, see parts 15, 16, and 17 of this title and 43 CFR part 4; the purchase of lands under the BIA Loan Guaranty, Insurance and Interest Subsidy program, see part 103 of this title; the exchange and partition of trust or restricted lands, see part 152 of this title; land acquisitions authorized by the Indian Self-Determination and Education Assistance Act, see parts 272 and 276 of this title; the acquisition of allotments on the public domain or in national forests, see 43 CFR part 2530; the acquisition of Native allotments and Native townsite lots in Alaska, see 43 CFR parts 2561 and 2564; the acquisition of lands by Indians with funds borrowed from the Farmers Home Administration, see 7 CFR part 1823, subpart N; the acquisition of land by purchase or exchange for members of the Osage Tribe not having certificates of competency, see §§ 117.8 and 158.54 of this title.

## § 151.1  Purpose and scope.

These regulations set forth the authorities, policy, and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes. Acquisition of land by individual Indians and tribes in fee simple status is not covered by these regulations even though such land may, by operation of law, be held in restricted status following acquisition. Acquisition of land in trust status by inheritance or escheat is not covered by these regulations. These regulations do not cover the acquisition of

AR00311