land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or it members.

### §151.2 Definitions.

(a) *Secretary* means the Secretary of the Interior or authorized representative.

(b) *Tribe* means any Indian tribe, band, nation, pueblo, community, rancheria, colony, or other group of Indians, including the Metlakatla Indian Community of the Annette Island Reserve, which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs. For purposes of acquisitions made under the authority of 25 U.S.C. 488 and 489, or other statutory authority which specifically authorizes trust acquisitions for such corporations, "Tribe" also means a corporation chartered under section 17 of the Act of June 18, 1934 (48 Stat. 988; 25 U.S.C. 477) or section 3 of the Act of June 26, 1936 (49 Stat. 1967; 25 U.S.C. 503).

(c) *Individual Indian* means:

(1) Any person who is an enrolled member of a tribe;

(2) Any person who is a descendent of such a member and said descendant was, on June 1, 1934, physically residing on a federally recognized Indian reservation;

(3) Any other person possessing a total of one-half or more degree Indian blood of a tribe;

(4) For purposes of acquisitions outside of the State of Alaska, *Individual Indian* also means a person who meets the qualifications of paragraph (c)(1), (2), or (3) of this section where "Tribe" includes any Alaska Native Village or Alaska Native Group which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs.

(d) *Trust land* or *land in trust status* means land the title to which is held in trust by the United States for an individual Indian or a tribe.

(e) *Restricted land* or *land in restricted status* means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary because of limitations contained in the conveyance instrument pursuant to Federal law or because of a Federal law directly imposing such limitations.

(f) Unless another definition is required by the act of Congress authorizing a particular trust acquisition, *Indian reservation* means that area of land over which the tribe is recognized by the United States as having governmental jurisdiction, except that, in the State of Oklahoma or where there has been a final judicial determination that a reservation has been disestablished or diminished, *Indian reservation* means that area of land constituting the former reservation of the tribe as defined by the Secretary.

(g) *Land* means real property or any interest therein.

(h) *Tribal consolidation area* means a specific area of land with respect to which the tribe has prepared, and the Secretary has approved, a plan for the acquisition of land in trust status for the tribe.

[45 FR 62036, Sept. 18, 1980, as amended at 60 FR 32879, June 23, 1995]

### §151.3 Land acquisition policy.

Land not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress. No acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be valid unless the acquisition is approved by the Secretary.

(a) Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status:

(1) When the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or

(2) When the tribe already owns an interest in the land; or

(3) When the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

(b) Subject to the provisions contained in the acts of Congress which authorize land acquisitions or holding

AR00312

land in trust or restricted status, land may be acquired for an individual Indian in trust status:

(1) When the land is located within the exterior boundaries of an Indian reservation, or adjacent thereto; or

(2) When the land is already in trust or restricted status.

## § 151.4  Acquisitions in trust of lands owned in fee by an Indian.

Unrestricted land owned by an individual Indian or a tribe may be conveyed into trust status, including a conveyance to trust for the owner, subject to the provisions of this part.

## § 151.5  Trust acquisitions in Oklahoma under section 5 of the I.R.A.

In addition to acquisitions for tribes which did not reject the provisions of the Indian Reorganization Act and their members, land may be acquired in trust status for an individual Indian or a tribe in the State of Oklahoma under section 5 of the Act of June 18, 1934 (48 Stat. 985; 25 U.S.C. 465), if such acquisition comes within the terms of this part. This authority is in addition to all other statutory authority for such an acquisition.

## § 151.6  Exchanges.

An individual Indian or tribe may acquire land in trust status by exchange if the acquisition comes within the terms of this part. The disposal aspects of an exchange are governed by part 152 of this title.

## § 151.7  Acquisition of fractional interests.

Acquisition of a fractional land interest by an individual Indian or a tribe in trust status can be approved by the Secretary only if:

(a) The buyer already owns a fractional interest in the same parcel of land; or

(b) The interest being acquired by the buyer is in fee status; or

(c) The buyer offers to purchase the remaining undivided trust or restricted interests in the parcel at not less than their fair market value; or

(d) There is a specific law which grants to the particular buyer the right to purchase an undivided interest or interests in trust or restricted land

without offering to purchase all of such interests; or

(e) The owner of a majority of the remaining trust or restricted interests in the parcel consent in writing to the acquisition by the buyer.

## § 151.8  Tribal consent for nonmember acquisitions.

An individual Indian or tribe may acquire land in trust status on a reservation other than its own only when the governing body of the tribe having jurisdiction over such reservation consents in writing to the acquisition; provided, that such consent shall not be required if the individual Indian or the tribe already owns an undivided trust or restricted interest in the parcel of land to be acquired.

## § 151.9  Requests for approval of acquisitions.

An individual Indian or tribe desiring to acquire land in trust status shall file a written request for approval of such acquisition with the Secretary. The request need not be in any special form but shall set out the identity of the parties, a description of the land to be acquired, and other information which would show that the acquisition comes within the terms of this part.

## § 151.10  On-reservation acquisitions.

Upon receipt of a written request to have lands taken in trust, the Secretary will notify the state and local governments having regulatory jurisdiction over the land to be acquired, unless the acquisition is mandated by legislation. The notice will inform the state or local government that each will be given 30 days in which to provide written comments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments. If the state or local government responds within a 30-day period, a copy of the comments will be provided to the applicant, who will be given a reasonable time in which to reply and/or request that the Secretary issue a decision. The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when

AR00313

the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:

(a) The existence of statutory authority for the acquisition and any limitations contained in such authority;

(b) The need of the individual Indian or the tribe for additional land;

(c) The purposes for which the land will be used;

(d) If the land is to be acquired for an individual Indian, the amount of trust or restricted land already owned by or for that individual and the degree to which he needs assistance in handling his affairs;

(e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f) Jurisdictional problems and potential conflicts of land use which may arise; and

(g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

(h) The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies, write to the Department of the Interior, Bureau of Indian Affairs, Branch of Environmental Services, 1849 C Street NW., Room 4525 MIB, Washington, DC 20240.)

[45 FR 62036, Sept. 18, 1980, as amended at 60 FR 32879, June 23, 1995]

### §151.11  Off-reservation acquisitions.

The Secretary shall consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation, and the acquisition is not mandated:

(a) The criteria listed in §151.10 (a) through (c) and (e) through (h);

(b) The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. The Secretary shall give greater weight to the concerns raised pursuant to paragraph (d) of this section.

(c) Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use.

(d) Contact with state and local governments pursuant to §151.10 (e) and (f) shall be completed as follows: Upon receipt of a tribe's written request to have lands taken in trust, the Secretary shall notify the state and local governments having regulatory jurisdiction over the land to be acquired. The notice shall inform the state and local government that each will be given 30 days in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

[60 FR 32879, June 23, 1995, as amended at 60 FR 48894, Sept. 21, 1995]

### §151.12  Action on requests.

(a) The Secretary shall review all requests and shall promptly notify the applicant in writing of his decision. The Secretary may request any additional information or justification he considers necessary to enable him to reach a decision. If the Secretary determines that the request should be denied, he shall advise the applicant of that fact and the reasons therefor in writing and notify him of the right to appeal pursuant to part 2 of this title.

(b) Following completion of the Title Examination provided in §151.13 of this part and the exhaustion of any administrative remedies, the Secretary shall publish in the FEDERAL REGISTER, or in a newspaper of general circulation serving the affected area a notice of his/her decision to take land into trust under this part. The notice will state that a final agency determination to take land in trust has been made and that the Secretary shall acquire title in the name of the United States no

AR00314

sooner than 30 days after the notice is published.

[45 FR 62036, Sept. 18, 1980. Redesignated at 60 FR 32879, June 23, 1995, as amended at 61 FR 18083, Apr. 24, 1996]

### § 151.13  Title examination.

If the Secretary determines that he will approve a request for the acquisition of land from unrestricted fee status to trust status, he shall acquire, or require the applicant to furnish, title evidence meeting the *Standards For The Preparation of Title Evidence In Land Acquisitions by the United States*, issued by the U.S. Department of Justice. After having the title evidence examined, the Secretary shall notify the applicant of any liens, encumbrances, or infirmities which may exist. The Secretary may require the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition and he shall require elimination prior to such approval if the liens, encumbrances, or infirmities make title to the land unmarketable.

[45 FR 62036, Sept. 18, 1980. Redesignated at 60 FR 32879, June 23, 1995]

### § 151.14  Formalization of acceptance.

Formal acceptance of land in trust status shall be accomplished by the issuance or approval of an instrument of conveyance by the Secretary as is appropriate in the circumstances.

[45 FR 62036, Sept. 18, 1980. Redesignated at 60 FR 32879, June 23, 1995]

### § 151.15  Information collection.

(a) The information collection requirements contained in §§ 151.9; 151.10; 151.11(2)(c), and 151.13 have been approved by the Office of Management and Budget under 44 U.S.C. 3501 *et seq.* and assigned clearance number 1076–0100. This information is being collected to acquire land into trust on behalf of the Indian tribes and individuals, and will be used to assist the Secretary in making a determination. Response to this request is required to obtain a benefit.

(b) Public reporting for this information collection is estimated to average 4 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the information collection. Direct comments regarding the burden estimate or any other aspect of this information collection to the Bureau of Indian Affairs, Information Collection Clearance Officer, Room 337–SIB, 18th and C Streets, NW., Washington, DC 20240; and the Office of Information and Regulatory Affairs [Project 1076–0100], Office of Management and Budget, Washington, DC 20502.

[60 FR 32879, June 23, 1995]

## PART 152—ISSUANCE OF PATENTS IN FEE, CERTIFICATES OF COMPETENCY, REMOVAL OF RESTRICTIONS, AND SALE OF CERTAIN INDIAN LANDS

Sec.
152.1   Definitions.
152.2   Withholding action on application.

ISSUING PATENTS IN FEE, CERTIFICATES OF COMPETENCY OR ORDERS REMOVING RESTRICTIONS

152.3   Information regarding status of applications for removal of Federal supervision over Indian lands.
152.4   Application for patent in fee.
152.5   Issuance of patent in fee.
152.6   Issuance of patents in fee to non-Indians and Indians with whom a special relationship does not exist.
152.7   Application for certificate of competency.
152.8   Issuance of certificate of competency.
152.9   Certificates of competency to certain Osage adults.
152.10  Application for orders removing restrictions, except Five Civilized Tribes.
152.11  Issuance of orders removing restrictions, except Five Civilized Tribes.
152.12  Removal of restrictions, Five Civilized Tribes, after application under authority other than section 2(a) of the Act of August 11, 1955.
152.13  Removal of restrictions, Five Civilized Tribes, after application under section 2(a) of the Act of August 11, 1955.
152.14  Removal of restrictions, Five Civilized Tribes, without application.
152.15  Judicial review of removal of restrictions, Five Civilized Tribes, without application.
152.16  Effect of order removing restrictions, Five Civilized Tribes.

AR00315

Department of the Interior

DEPARTMENTAL MANUAL

Part 516  National Environmental
Policy Act of 1969

Environmental Quality

---

Chapter 6  Managing the NEPA Process                516 DM 6.1

6.1  <u>Purpose</u>.  This Chapter provides supplementary instructions for implementing those provisions of the CEQ regulations pertaining to procedures for implementing and managing the NEPA process.

6.2  <u>Organization for Environmental Quality</u>.

A.  <u>Office of Environmental Project Review</u>.  The Director, Office of Environmental Project Review, reporting to the Assistant Secretary--Policy, Budget and Administration (PBA), is responsible for providing advice and assistance to the Department on matters pertaining to environmental quality and for overseeing and coordinating the Department's compliance with NEPA, E.O. 11514, the CEQ regulations, and this Part.  (See also 110 DM 22.)

B.  <u>Bureaus and Offices</u>.  Heads of bureaus and offices will designate organizational elements or individuals, as appropriate, at headquarters and regional levels to be responsible for overseeing matters pertaining to the environmental effects of the bureau's plans and programs. The individuals assigned these responsibilities should have management experience or potential, understand the bureau's planning and decisionmaking processes, and be well trained in environmental matters, including the Department's policies and procedures so that their advice has significance in the bureau's planning and decisions.  These organizational elements will be identified in the Bureau Appendix to this Chapter.

6.3  <u>Approval of EISs</u>.

A.  A program Assistant Secretary is authorized to approve an EIS in those cases where the responsibility for the decision for which the EIS has been prepared rests with the Assistant Secretary or below.  The Assistant Secretary may further assign the authority to approve the EIS if he or she chooses.  The Assistant Secretary--PBA will make certain that each program Assistant Secretary has adequate safeguards to assure that the EISs comply with NEPA, the CEQ regulations, and the Departmental Manual.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

AR00316

Department of the Interior

DEPARTMENTAL MANUAL

Environmental Quality

Part 516   National Environmental
Policy Act of 1969

Chapter 6   Managing the NEPA Process                516 DM 6.3B

B.  The Assistant Secretary--PBA is authorized to approve an EIS in those cases where the decision for which the EIS has been prepared will occur at a level in the Department above an individual program Assistant Secretary.

6.4   List of Specific Compliance Responsibilities.

A.  Bureaus and offices shall:

(1)  Prepare NEPA handbooks providing guidance on how to implement NEPA in principal program areas.

(2)  Prepare program regulations or directives for applicants.

(3)  Propose categorical exclusions.

(4)  Prepare and approve EAs.

(5)  Decide whether to prepare an EIS.

(6)  Prepare and publish NOIs and FONSIs.

(7)  Prepare and, when assigned, approve EISs.

B.  Assistant Secretaries shall:

(1)  Approve bureau handbooks.

(2)  Approve regulations or directives for applicants.

(3)  Approve categorical exclusions.

(4)  Approve EISs pursuant to 516 DM 6.3.

C.  The Assistant Secretary--Policy, Budget and Administration shall:

(1)  Concur with regulations or directives for applicants.

(2)  Concur with categorical exclusions.

(3)  Approve EISs pursuant to 516 DM 6.3.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

AR00317

Department of the Interior

DEPARTMENTAL MANUAL

| Environmental Quality | Part 516  National Environmental Policy Act of 1969 |
|---|---|

Chapter 6  Managing the NEPA Process                516 DM 6.5

6.5  Bureau Requirements.

    A.  Requirements specific to bureaus appear as appendices to this Chapter and include the following:

        (1)  Identification of officials and organizational elements responsible for NEPA compliance (516 DM 6.2B).

        (2)  List of program regulations or directives which provide information to applicants (516 DM 2.2B).

        (3)  Identification of major decision points in principal programs (516 DM 5.3B) for which an EIS is normally prepared (516 DM 2.3E).

        (4)  List of categorical exclusions (516 DM 2.3A).

    B.  Appendices are attached for the following bureaus:

        (1)  Fish and Wildlife Service (Appendix 1).

        (2)  Geological Survey (Appendix 2).

        (3)  Heritage Conservation and Recreation Service (Appendix 3).

        (4)  Bureau of Indian Affairs (Appendix 4).

        (5)  Bureau of Land Management (Appendix 5).

        (6)  Bureau of Mines (Appendix 6).

        (7)  National Park Service (Appendix 7).

        (8)  Office of Surface Mining (Appendix 8).

        (9)  Water and Power Resources Service (Appendix 9).

    C.  The Office of the Secretary and other Departmental Offices do not have separate appendices, but must comply with this Part and will consult with the Office of Environmental Project Review about compliance activities.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

AR00318

Department of the Interior

DEPARTMENTAL MANUAL

| | Part 516   National Environmental |
| Environmental Quality | Policy Act of 1969 |

Chapter 6   Managing the NEPA Process .... 516 DM 6.6

6.6   Information About the NEPA Process.   The Office of
Environmental Project Review will publish periodically a
Departmental list of contacts where information about the
NEPA process and the status of EISs may be obtained.

3/18/80 #2244
Replaces 9/17/70 #1222 and 9/27/71 #1341

AR00319

# DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

516 DM 6
Appendix 4

Bureau of Indian Affairs

516 DM 6, Appendix 4

**4.1 NEPA Responsibility**

A. *Assistant Secretary—Indian Affairs* is responsible for the NEPA compliance of Bureau of Indian Affairs (BIA) activities and programs.

B. *Deputy to the Assistant Secretary—Indian Affairs (Trust and Economic Development)* is responsible for oversight of the BIA program for achieving compliance with NEPA. The Deputy determines the adequacy of all EIS's which come before the Assistant Secretary before making decisions for implementing proposed actions.

C. *The Environmental Services Staff* (Washington), in the Office of Trust and Economic Development is the focal point for overall NEPA guidance within BIA and is responsible for advising and assisting Area Offices, Agency Superintendents, and other field support personnel in their environmental activities, providing training and acting as the Central Office's liaison with Indian tribal governments on environmental and NEPA compliance matters. Information about BIA NEPA documents or the NEPA process can be obtained by contacting the Environmental Services Staff.

D. *Other Central Office Directors and Division Chiefs* are responsible for ensuring that the programs and activities within their jurisdiction comply with NEPA.

E. *Area Directors and Project Officers* are responsible for conducting all activities under their jurisdiction in compliance with NEPA and providing advice and assistance to Agency Superintendents and consulting with the Indian tribes on environmental matters related to NEPA; and assigning sufficient trained staff to ensure that these responsibilities are carried out. An Environmental Coordinator is located in the agriculture resources division or, in its absence, the realty division.

F. *Agency Superintendents and Field Unit Supervisors* are responsible, as directed and delegated by the Area Directors, for implementation and enforcement of the BIA environmental policy at the Agency or field unit level, including field inspection and preparation of environmental documents. These documents should be reviewed to the extent practicable for procedural adequacy by the

Environmental Coordinator of the Area Office before release to the public.

**4.2 Guidance to Applicants and Tribal Governments**

A. *Relationship with Applicants and Tribal Governments.*

1. *Guidance to Applicants.*

a. An "applicant" is any entity which proposes to undertake any activity which will at some point require BIA action. These may include tribal governments, private entities, state and local governments or other Federal agencies. BIA compliance with NEPA is a Federal responsibility. Compliance is triggered when there will be a BIA decision required to implement an action.

b. Applicants should contact the BIA official at the appropriate level for assistance. This will be the Agency Superintendent, Area Director or Deputy to the Assistant Secretary—Indian Affairs (Trust and Economic Development), in the Central Office.

c. If the applicant's proposed action will affect responsibilities of more than one tribal government, one government agency, one BIA Agency, or where the action may be of State-wide or regional significance, the applicant may contact the respective Area Director(s). The Area Director, in his sole discretion, may assign the environmental responsibilities to one Agency Superintendent to act as the lead office for the proposal. From that point, the Applicant will deal with the designated lead office.

d. Since much of the applicant's planning may take the place outside the BIA planning system, it is the applicant's responsibility to prepare a milestone chart for BIA use at the earliest possible stage in order to coordinate the efforts of both parties. Early communication with the BIA responsible office will expedite determination of such matters as the scope, depth and sources of data for an environmental document.

11/16/94 #3025
Replaces 1/19/81 #2316

AR00320

DEPARTMENT OF THE INTERIOR

# DEPARTMENTAL MANUAL

516 DM 6
Appendix 4

Bureau of Indian Affairs

2. *Guidance to Tribal Government.*

a. Tribal governments may be applicants, and/or be affected by a proposed action of BIA or another Federal agency. Tribal governments affected by a proposed action shall be consulted during the preparation of environmental documents and, at their option, may cooperate in the review or preparation of such documents. Notwithstanding the above, the BIA retains sole responsibility and discretion in all NEPA compliance matters.

b. Proposed Tribal actions that do not require BIA or other Federal approval or funding are *not* subject to the NEPA process.

B. *Prepared Program Guidance.*

BIA has implemented regulations for environmental guidance for surface mining in 25 CFR Part 216 (Surface Exploration, Mining and Reclamation of Lands.) Environmental guidance for Forestry activities is found in 25 CFR 163.27 and 53 BIAM Supplement 2 and Supplement 3.

C. *Other Guidance.*

Programs under 25 CFR for which BIA has *not* yet issued regulations or directives for environmental information for applicants are listed below. These programs may or may not require environmental documents and could involve submission of applicant information to determine NEPA applicability. Applicants for these types of programs should contact the nearest affected BIA office for information and assistance:

1. Loans to Indians from the Revolving Loan Fund (25 CFR Part 101).

2. Loan guaranty, insurance, and interest subsidy (25 CFR Part 103).

3. Leasing and permitting (Lands) (25 CFR Part 162).

4. Sale of lumber and other forest products produced by Indian enterprises from the forests on Indian reservation (25 CFR Part 164).

5. Sale of forest products, Red Lake Indian Reservation, Minn. (25 CFR Part 185).

6. General grazing regulations (25 CFR Part 166).

7. Navajo grazing regulations (25 CFR Part 167).

8. Grazing regulations for the Hopi partitioned lands area (25 CFR Part 168).

9. Rights-of-way over Indian lands (25 CFR Part 169).

10. Roads of the Bureau of Indian Affairs (25 CFR Part 170).

11. Concessions, permits and leases on lands withdrawn or acquired in connection with Indian irrigation projects (25 CFR Part 173).

12. Colorado River Irrigation Project, Arizona (25 CFR Part 175).

13. Flathead Indian Irrigation Project, Montana (25 CFR Part 176).

14. Leasing of tribal lands for mining (25 CFR Part 211).

15. Leasing of allotted lands for mining (25 CFR Part 212).

16. Leasing of restricted lands of members of Five Civilized Tribes, Oklahoma, for mining (25 CFR Part 213).

17. Leasing of Osage Reservation lands, Oklahoma, for mining, except oil and gas (25 CFR Part 214).

18. Lead and zinc mining operations and leases, Quapaw Agency (25 CFR Part 215).

19. Leasing of Osage Reservation lands for oil and gas mining (25 CFR Part 226).

20. Leasing of certain lands in Wind River Indian reservation, Wyoming, for oil and gas mining (25 CFR Part 227).

21. Off-reservation treaty fishing (25 CFR Part 249).

22. Preservation of antiquities (25 CFR Part 261).

23. Contracts under Indian Self-Determination Act (25 CFR Part 272).

24. Grants under Indian Self-Determination Act (25 CFR Part 272).

25. School construction or services for tribally operated perviously private schools (25 CFR Part 274).

26. School construction contracts for public schools (25 CFR Part 277).

27. Indian Business Development Program (25 CFR Part 286).

4.3 *Major Actions Normally Requiring an EIS*

A. The following BIA actions normally require the preparation of an Environmental Impact Statement (EIS).

1. Proposed mining contracts (for other than oil and gas), or the combination of a number of smaller contracts comprising a mining unit for:

a. New mines of 640 acres or more, other than surface coal mines.

b. New surface coal mines of 1,280 acres or more, or having an annual full production level of 5 million tons or more.

AR00321

## DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

Bureau of Indian Affairs

2. Proposed water development project which would, for example, inundate more than 1,000 acres, or store more than 30,000 acre-feet, or irrigate more than 5,000 acres of undeveloped land.

B. If, for any of these actions, it is proposed not to prepare an EIS, an Environmental Assessment (EA) will be prepared and handled in accordance with § 1501.4(e)(2).

4.4 Categorical Exclusions

In addition to the actions listed in the Department's categorical exclusions in Appendix 1 of 516 DM 2, many of which the BIA also performs, the following BIA actions are hereby designated as categorical exclusions unless the action qualifies as an exception under Appendix 2 of 516 DM 2:

A. Operation, maintenance, and replacement of existing facilities. Examples are normal renovation of buildings, road repairs and limited rehabilitation of irrigation structures.

B. Transfer for Existing Federal Facilities to Other Entities. Transfer of existing operation and maintenance activities of Federal facilities to tribal groups, water user organizations, or other entities where the anticipated operation and maintenance activities are agreed to in a contract, follow BIA policy, and no change in operations or maintenance is anticipated.

C. Human resources programs having primarily socio-economic effects. Examples are social services, education services, employment assistance, tribal operations, law enforcement and credit and financing activities.

D. Administrative actions and other activities relating to trust resources. Examples are: Management of trust funds, issuance of such documents as certificates of competency, allotments and fee patents; renewal of agricultural and other leases when environmental impacts are addressed in an earlier environmental document.

E. Self-Determination Act Grants and Contracts.
1. Self-Determination Act Grants.
2. Self-Determination Act contracts for BIA programs which are listed as categorical exclusions, or for programs in which environmental impacts are adequately addressed in an earlier environmental document.

F. Rights-of-Way.
1. Rights-of-way inside another right-of-way, or amendments to rights-of-way where minor deviations from or additions to the original right-or-way are involved and where there is an existing environmental document covering the same or similar impacts in the right-of-way area.

2. Service line agreements to an individual residence, building or well from an existing facility where installation will involve no clearance of vegetation from the right-of-way other than for placement of poles or lines.

3. Renewals, assignments and conversions of existing rights-of-way where would be essentially no change in use and continuation would not lead to environmental degradation.

C. Minerals.
1. Approval of permits for geologic mapping, inventory, reconnaissance and surface collecting.

2. Approval of unitization agreements, pooling or communitization agreements.

3. Approval of mineral lease adjustments and transfers, including assignments and subleases.

H. Forestry.
1. Approval of free-use cutting, without permit, to Indian owners for on-reservation personal use of forest products, not to exceed 2,500 feet board measure.

2. Approval and issuance of free-use cutting permits for forest products not to exceed $2,500 in value.

3. Approval and issuance of paid timber cutting permits for products valued at less than $10,000 when in compliance with policies and guidelines established by a current management plan covered by an environmental document.

4. Approval of annual logging plans when in compliance with policies and guidlines established by a current management plan covered by an environmental document.

5. Approval of Normal Fire Year Plans and/or Mobilization Plans detailing emergency fire suppression activities.

6. Approval of emergency forest and range rehabilitation plans when limited to environmental stabilization on less than 10,000 acres.

AR00322

# DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

516 DM 6
Appendix 4

## Bureau of Indian Affairs

7. Approval of timber stand improvement projects of less than 200 acres when in compliance with policies and guidlines established by a current management plan covered by an environmental document.

8. Approval of timber management access skid trail and logging road construction when consistent with policies and guidelines established by a current management plan covered by an environmental document.

9. Approval of prescribed burning plans of less than 200 acres when in compliance with policies and guidlines established by a current management plan covered by an environmental document.

10. Approval of tree planting projects and associated protection and site preparation activities on less than 200 acres when consistent with policies and guidelines established by a current management plan covered by an environmental document.

I. *Land Conveyance.*

1. Land transfers from Federal or State Agencies or other DOI Bureaus to the BIA as land to be held in trust for the Indian tribe(s) involving no development, physical alteration, or change in land use.

2. Purchase, sale, abandonment or exchange of tracts of land, mineral rights or other interests in land in which no change in land use or operation is planned.

3. Lands acquired pursuant to 25 U.S.C. 465, 35 U.S.C. 501, and 25 U.S.C. 2202 where no development, physical alteration, or change of land use after acquisition is known or planned.

J. *Other.*

1. Data gathering activities such as inventories, soil and range surveys, timber cruising, geological, archeological, paleontological and cadastral surveys.

2. Establishment of non-disturbance environmental quality monitoring programs and field monitoring stations including testing services.

3. Actions where BIA has concurrence or co-approval with another Bureau and the action is categorically excluded for that Bureau.

4. Approval of an Application for Permit to Drill for a new water source or observation well.

5. Approval of conversion of an abandoned oil well to a water well if water facilities are established only near the well site.

[FR Doc. 86-6963 Filed 3-30-86; 8:45 am]

11/16/94 #3025
Replaces 1/19/81 #2316

AR00323

DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

Part 602 Land Acquisition,
Public Lands                                    Exchange and Disposal
            Real Property Pre-Acquisition
Chapter 2 Environmental Site Assessments                    602 DM 2.1

2.1  **Purpose.**  This chapter prescribes Departmental policy,
responsibilities, and functions regarding required determinations
of the risk of exposing the Department to liability for hazardous
substances or other environmental cleanup costs and damages
associated with the acquisition of any real property by the
Department for the United States.  The responsibilities and
functions prescribed in this chapter are intended to ensure that,
prior to real property acquisition, each bureau determines the
likelihood of the presence and extent of hazardous substance-
related or other environmental liability associated with real
property.  Such determinations must be a consideration in any
decision to acquire real property and to establish the total cost
of the acquisition.

2.2  **Scope.**  The responsibilities and requirements of this
chapter shall apply to any Departmental or bureau proposed
acquisition of real property to which liability can attach.   In
addition, this policy shall apply to withdrawn public domain
lands returning to Departmental jurisdiction.  All acquisitions
of real property, whether discretionary or non-discretionary,
will require a pre-acquisition environmental site assessment to
be performed.  This includes real property acquisitions between
Departmental bureaus as well as other departments and agencies of
the United States.  The requirements of this chapter shall not
apply to real property to which liability will not attach, as
determined in consultation with the Office of the Solicitor.

2.3  **Authority.**  The primary authorities for carrying out pre-
acquisition environmental site assessments for the Department are
as follows:  Comprehensive Environmental Response, Compensation
and Liability Act (CERCLA), as amended, 42 U.S.C. § 9601 et seq.;
Community Environmental Response Facilitation Act, 42 U.S.C. §
9621; the Solid Waste Disposal Act, as amended, 42 U.S.C. 6901 et
seq.; Clean Water Act, as amended, 33 U.S.C. § 1251 et seq.;
Clean Air Act, as amended, 42 U.S.C. § 7401 et seq; Oil Pollution
Act, as amended, 33 U.S.C. § 2701 et seq.; Toxic Substances
Control Act, 42 U.S.C. § 2601 et seq.; the Emergency Planning and
Community Right-To-Know Act, "Comprehensive Waste Management",
518 DM 1; "Compliance with Waste Management Requirements," 518 DM
2; any other applicable Federal, State, and local requirements;
and the American Society for Testing Materials (ASTM) - Standards
on Environmental Site Assessments for Commercial Real Estate.

2.4  **Policy.**  It is Departmental policy to minimize the potential
liability of the Department and its bureaus by acquiring real
property that is not contaminated unless directed by the

AR00324

DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

Public Lands
Part 602 Land Acquisition
Exchange and Disposal

Real Property Pre-Acquisition
Chapter 2 Environmental Site Assessments                    602 DM 2.4

Congress, court mandate, or as determined by the Secretary.
Before any real property is acquired, the acquiring bureau shall:

A. Ascertain the nature and extent of any potential
liability resulting from hazardous substances or other
environmental problems associated with such property.

B. Weigh the benefits of the acquisition relative to the
total cost, including: (1) fair market value, (2) remediation
costs, and (3) any known or reasonably estimated monetary damages
that could be associated with the acquisition.

C. Inform the appropriate Congressional committees of the
total cost, as specified in 2.4B, for any Congressionally
mandated acquisition of contaminated property.

2.5 Definitions. For purposes of this Chapter, the following
definitions shall apply:

A. Real Property. Means any land or an interest
therein, and all buildings, structures, and improvements affixed
to the land acquired by the Department of the Interior or its
bureaus, unless the affected bureau determines with concurrence
of the Office of the Solicitor that no environmental liability
will attach to such an interest.

B. Real Property Acquisition. Means real property obtained
either through discretionary acts or when acquired by law,
whether by way of condemnation, donation, escheat, right-of-
entry, escrow, exchange, lapses, purchase, or transfer and that
will be under the jurisdiction or control of the United States
for any period of time, however short.

C. Hazardous Substance and Release. Means all CERCLA listed
substances, petroleum products, nuclear source materials, and
unexploded ordnance. A release shall mean any unauthorized
discharge of a hazardous substance into the environment.

D. Pre-Acquisition Environmental Site Assessment. Means an
environmental site assessment, prior to acquisition, to determine
the potential of, and extent of liability for hazardous
substances or other environmental remediation or injury. This
includes but is not limited to a determination of the absence or
presence of hazardous substances or conditions that indicate an
existing or past release, or a material threat of a release on
the real property, into the air, soil, sediment, groundwater,
surface water, or any structures located on the real property.

AR00325

DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

| | Part 602 Land Acquisition, |
| Public Lands | Exchange and Disposal |
| Real Property Pre-Acquisition | |
| Chapter 2 Environmental Site Assessments | 602 DM 2.5E |

E. Remediation. Means meeting the requirements and standards of applicable laws in a cleanup.

2.6 Requirements, Functions, and Procedures.

A. Minimum Standards for Pre-Acquisition Environmental Site Assessments. Bureaus may establish their own pre-acquisition environmental site assessment procedures to meet their individual needs. However, all bureau pre-acquisition environmental site assessment procedures shall adapt ASTM - Standards on Environmental Site Assessments for Commercial Real Estate in effect at that time. Bureaus are to ensure that the pre-acquisition environmental site assessment is complete in terms of technical accuracy and comprehensiveness.

B. Qualifications of Personnel and Time Limit. The pre-acquisition environmental site assessment must be conducted or supervised by a qualified individual, as determined by the bureau. Pre-acquisition environmental site assessments will be considered adequate for a period not to exceed 12 months prior to the date of the acquisition of real property. Exceptions to this time limit will be considered for real property located in adverse climatic or geographical areas. All exceptions must be supported by documentation and approved by the Bureau Director.

C. Acquisition. Following the preparation of the pre-acquisition environmental site assessment, real property may be acquired, provided: (1) no evidence of hazardous substance or other environmental liability is found; (2) if there is such evidence, the acquisition will result in insignificant or no increased cost to the United States; (3) the pre-acquisition proposal, including any liability risk associated with the acquisition is determined to benefit the bureau and is approved in accordance with paragraph 2.6D; or (4) the acquisition is mandated by the Congress, courts, or by the Secretary. Whenever possible, the identification of the contributions to the management of the liability by potentially responsible parties or other liable entities should be included in the contract or other legally enforceable instrument.

D. Approvals. Approval is required for all real property acquisitions that: (1) may require hazardous substance or other environmental cleanup; or (2) that may result in liability risk, including remediation and other known and reasonably estimated costs associated with the acquisition. Where applicable, a formal estimate of the cost of alternatives should be included as part of the request for approval.

DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

     E. Levels of Approvals.  The level of approval authority
for remediation costs is as follows:

     Assistant Secretary -
     Policy, Management and Budget      greater than $500,000

     Bureau Director                    $500,000 or less

     Bureau Directors may further assign their approval
     authority to a level not to exceed $250,000.

     F. Approval of Real Property Acquisition Proposals by the
Assistant Secretary - Policy, Management and Budget (PMB).  All
requests for approval by the Assistant Secretary - PMB, involving
hazardous substances requiring remediation or other cleanup in
excess of the limits specified in 2.6E, require concurrence by
the Bureau Director and the respective programmatic Assistant
Secretary.  Such requests must provide detailed information on
costs of acquisition and potential liability risks.  The Office
of the Solicitor or the Assistant Secretary - PMB may impose
additional limitations on or requirements for acquisitions which
are determined to be necessary for the protection of the
Department from liability risks.

     G. Funding.  Performance of pre-acquisition environmental
assessments will be accomplished through normal program
appropriations.  The acquiring bureau must ensure that adequate
funds will be available for completion of cleanup or remediation
of all acquired contaminated real property.  Funding of pre-
acquisition environmental site assessments and associated
remediations will not be obtained from the Departmental Central
HazMat Fund.

     H. Reprogramming.  Any reprogramming proposal should be
submitted according to established Departmental reprogramming
procedures.

     I. Statutory Acquisitions.  To the maximum extent possible,
Bureau Directors shall ensure that reports to Congress, comments
on proposed legislation, and Congressional testimony on the
acquisition of real property contain pre-acquisition
environmental site assessment information and estimates of
remediation and associated costs or liability risks.

     J. Record Retention.  Each bureau that acquires real
property must maintain complete documentation of the process and
findings of the pre-acquisition environmental site assessment.

AR00327

DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

|                                      | Part 602 Land Acquisition, |
| Public Lands                         | Exchange and Disposal       |
|        Real Property Pre-Acquisition |                             |
| Chapter 2 Environmental Site Assessments |        602 DM 2.6J       |

These records should be maintained as part of the acquisition
case file and therefore retained for the same length of time.

2.7 Responsibilities.

A.  Office of the Solicitor.  The Office of the Solicitor is
responsible for providing legal review and guidance for any
bureau proposed real property acquisition.

B.  Assistant Secretaries.  All Assistant Secretaries are to
oversee bureaus and offices under their jurisdiction to ensure
compliance with this chapter.  The respective Assistant Secretary
must approve pre-acquisition environmental site assessments and
related information sent to the Assistant Secretary - PMB for
approval.  All Assistant Secretaries are responsible for approval
of remediation fund expenditures under their jurisdiction.

C.  Assistant Secretary - PMB.  The Assistant Secretary -
PMB, through the Office of Environmental Policy and Compliance,
is responsible for oversight of Departmental compliance with 602
DM 2.

D.  Office of Environmental Policy and Compliance.  The
Office of Environmental Policy and Compliance is responsible for
reviewing all pre-acquisition environmental site assessments and
reports requiring approval by the Assistant Secretary - PMB.

E.  Bureau Directors.  Bureau Directors having
responsibility for real property acquisition under their
jurisdiction will develop guidance and instructions, and maintain
records to implement 602 DM 2.  Bureau Directors are to ensure
that pre-acquisition environmental site assessments are performed
and are to exercise due diligence in limiting any potential
liability risks to the bureau or the Department.  Bureau
Directors are responsible for approval of remediation fund
expenditures under their jurisdiction.  In addition, within their
scope of authority, Bureau Directors are to ensure adequate
program support is provided in terms of resources and budget for
fulfilling the requirements of this Chapter.

AR00328

THE SECRETARY OF THE INTERIOR

WASHINGTON

RECEIVED
FOR OF IND AFFAIRS
IMMEDIATE SECRETARIAT

'90 JUL 19 P4:11

July 19, 1990

Memorandum

To:        Assistant Secretary – Indian Affairs

From:       The Secretary

Subject:     Policy for Placing Lands in Trust Status for
American Indians

I have completed review of the report of the Department's Ad
Hoc Task Force on Indian Trust Lands and your recommendation,
and I am directing the following actions be taken.

It shall be the policy of the Department of the Interior in
acquiring lands in trust status for American Indians, located
either within or contiguous to the tribal reservation's
exterior boundaries, to review such acquisition requests in
light of the presently existing Bureau regulations found in 25
CFR 151.10. The Secretarial review of these acquisition
requests shall be delegated to the respective Area Directors.

For off-reservation acquisition requests (other than lands
contiguous to the reservation), the policy shall be to consider
each request on its own merits. These requests shall meet the
following criteria:

1.   All existing land acquisition regulations found in
    25 CFR 151.10; i.e.:

      a)   The existence of statutory authority for the
          acquisition and any limitations contained in
          such authority;

      b)   The need of the tribe for additional land;

      c)   The purpose for which the land will be used;

      d)   If the land to be acquired is in unrestricted
          **fee status, the impact on the State and its
          political subdivisions** resulting from the
          removal of the land from tax rolls;

      e)   Jurisdictional problems and potential
          conflicts of land use which may arise;

AR00329

2

    f) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

2. The property is free of all hazardous and toxic material (as required in 602 DM 2).

3. Trust land to be acquired is located within the states in which a tribe or band presently owns trust land. In general, as the distance from the trust or reservation land base increases, the tribe will be required to justify greater economic benefit from the acquisition.

4. In consultation with local, city, county, and state governments, an effort must be made by the tribe to resolve possible conflicts over taxation, zoning and jurisdiction. If the acquisition is opposed or raises unresolved concerns from the governments, the proposal will automatically be referred to the Assistant Secretary for Indian Affairs for review and approval/disapproval.

5. The tribe shall provide an economic development plan specifying the proposed uses for the trust land with a cost/benefit analysis of the proposal.

6. Applications for trust land located within an urbanized, and primarily non-Indian, community must demonstrate that trust status is essential for the planned use of the property and the economic benefits to be realized from said property.

7. Acknowledgment that, after consideration of all local ordinances including (but not limited to) fire safety, building codes, health codes, and zoning requirements, the tribe will adopt standards that provide at least comparable safeguards;

In addition to the requirements listed above, all requests to acquire land in trust for gaming purposes will:

1. Be in compliance with the Indian Gaming Regulatory Act (P.L. 100-497);

2. When appropriate, be reviewed by the National Indian Gaming Commission;

3. Approval/disapproval by BIA's Central Office after discussion with the Secretary of the Interior;

AR00330

3

4.  Inclusion of an analysis by the tribe or band
    showing that it explored all reasonable alternatives
    (other than gaming) which would provide equivalent
    economic benefits from said property;

5.  Inclusion of provisions that the appropriate portion
    of individual winnings from gaming activities will
    be withheld for taxes by the IRS.

This policy shall be effective upon appropriate public
notification and comment.


cc:  Solicitor
     Assistant Secretary – Policy, Management and Budget

AR00331



THE SECRETARY OF THE INTERIOR

WASHINGTON

RECEIVED
BUR OF IND AFFAIRS
BY DEPUTY SECRETARIAT

'90 JUL 19 P4:11

July 19, 1990

**Memorandum**

To:          Assistant Secretary – Indian Affairs

From:        The Secretary

Subject:     Policy for Placing Lands in Trust Status for
             American Indians

I have completed review of the report of the Department's Ad
Hoc Task Force on Indian Trust Lands and  your recommendation,
and I am directing the following actions be taken.

It shall be the policy of the Department of the Interior in
acquiring lands in trust status for American Indians, located
either within or contiguous to the tribal reservation's
exterior boundaries, to review such acquisition requests in
light of the presently existing Bureau regulations found in 25
CFR 151.10.  The Secretarial review of these acquisition
requests shall be delegated to the respective Area Directors.

For off-reservation acquisition requests (other than lands
contiguous to the reservation), the policy shall be to consider
each request on its own merits.  These requests shall meet the
following criteria:

1.  All existing land acquisition regulations found in
    25 CFR 151.10; i.e.:

    a)  The existence of statutory authority for the
        acquisition and any limitations contained in
        such authority;

    b)  The need of the tribe for additional land;

    c)  The purpose for which the land will be used;

    d)  If the land to be acquired is in unrestricted
        fee status, the impact on the State and its
        political subdivisions resulting from the
        removal of the land from tax rolls;

    e)  Jurisdictional problems and potential
        conflicts of land use which may arise;

2

   f) If the land to be acquired is in fee status,
    whether the Bureau of Indian Affairs is
    equipped to discharge the additional
    responsibilities resulting from the
    acquisition of the land in trust status.

2. The property is free of all hazardous and toxic
  material (as required in 602 DM 2).

3. Trust land to be acquired is located within the
  states in which a tribe or band presently owns trust
  land.  In general, as the distance from the trust or
  reservation land base increases, the tribe will be
  required to justify greater economic benefit from
  the acquisition.

4. In consultation with local, city, county, and state
  governments, an effort must be made by the tribe to
  resolve possible conflicts over taxation, zoning and
  jurisdiction.  If the acquisition is opposed or
  raises unresolved concerns from the governments, the
  proposal will automatically be referred to the
  Assistant Secretary for Indian Affairs for review
  and approval/disapproval.

5. The tribe shall provide an economic development plan
  specifying the proposed uses for the trust land with
  a cost/benefit analysis of the proposal.

6. Applications for trust land located within an
  urbanized, and primarily non-Indian, community must
  demonstrate that trust status is essential for the
  planned use of the property and the economic
  benefits to be realized from said property.

7. Acknowledgment that, after consideration of all
  local ordinances including (but not limited to) fire
  safety, building codes, health codes, and zoning
  requirements, the tribe will adopt standards that
  provide at least comparable safeguards;

In addition to the requirements listed above, all requests to
acquire land in trust for gaming purposes will:

1. Be in compliance with the Indian Gaming Regulatory
  Act (P.L. 100-497);

2. When appropriate, be reviewed by the National Indian
  Gaming Commission;

3. Approval/disapproval by BIA's Central Office after
  discussion with the Secretary of the Interior;

AR00333

3

4.  Inclusion of an analysis by the tribe or band showing that it explored all reasonable alternatives (other than gaming) which would provide equivalent economic benefits from said property;

5.  Inclusion of provisions that the appropriate portion of individual winnings from gaming activities will be withheld for taxes by the IRS.

This policy shall be effective upon appropriate public notification and comment.


cc:  Solicitor
     Assistant Secretary - Policy, Management and Budget

AR00334

# DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

516 DM 6
Appendix 4

Bureau of Indian Affairs

**516 DM 6, Appendix 4**

### 4.1 NEPA Responsibility

A. *Assistant Secretary—Indian Affairs* is responsible for the NEPA compliance of Bureau of Indian Affairs (BIA) activities and programs.

B. *Deputy to the Assistant Secretary—Indian Affairs (Trust and Economic Development)* is responsible for oversight of the BIA program for achieving compliance with NEPA. The Deputy determines the adequacy of all EIS's which come before the Assistant Secretary before making decisions for implementing proposed actions.

C. *The Environmental Services Staff,* (Washington), in the Office of Trust and Economic Development is the focal point for overall NEPA guidance within BIA and is responsible for advising and assisting Area Offices, Agency Superintendents, and other field support personnel in their environmental activities, providing training and acting as the Central Office's liaison with Indian tribal governments on environmental and NEPA compliance matters. Information about BIA NEPA documents or the NEPA process can be obtained by contacting the Environmental Services Staff.

D. *Other Central Office Directors and Division Chiefs are responsible for* ensuring that the programs and activities within their jurisdiction comply with NEPA.

E. *Area Directors and Project Officers* are responsible for conducting all activities under their jurisdiction in compliance with NEPA and providing advice and assistance to Agency Superintendents and consulting with the Indian tribes on environmental matters related to NEPA; and assigning sufficient trained staff to ensure that these responsibilities are carried out. An Environmental Coordinator is located in the agriculture resources division or, in its absence, the realty division.

F. *Agency Superintendents and Field Unit Supervisors* are responsible, as directed and delegated by the Area Directors, for implementation and enforcement of the BIA environmental policy at the Agency or field unit level, including field inspection and preparation of environmental documents. These documents should be reviewed to the extent practicable for procedural adequacy by the Environmental Coordinator of the Area Office before release to the public.

### 4.2 Guidance to Applicants and Tribal Governments

A. *Relationship with Applicants and Tribal Governments.*

1. *Guidance to Applicants.*

a. An "applicant" is any entity which proposes to undertake any activity which will at some point require BIA action. These may include tribal governments, private entities, state and local governments or other Federal agencies. BIA compliance with NEPA is a Federal responsibility. Compliance is triggered when there will be a BIA decision required to implement an action.

b. Applicants should contact the BIA official at the appropriate level for assistance. This will be the Agency Superintendent, Area Director or Deputy to the Assistant Secretary—Indian Affairs (Trust and Economic Development), in the Central Office.

c. If the applicant's proposed action will affect responsibilities of more than one tribal government, one government agency, one BIA Agency, or where the action may be of State-wide or regional significance, the applicant may contact the respective Area Director(s). The Area Director, in his sole discretion, may assign the environmental responsibilities to one Agency Superintendent to act as the lead office for the proposal. From that point, the Applicant will deal with the designated lead office.

d. Since much of the applicant's planning may take place outside the BIA planning system, it is the applicant's responsibility to prepare a milestone chart for BIA use at the earliest possible stage in order to coordinate the efforts of both parties. Early communication with the BIA responsible office will expedite determination of such matters as the scope, depth and sources of data for an environmental document.

11/16/94 #3025
Replaces 1/19/81 #2316

# DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

516 DM 6
Appendix 4

## Bureau of Indian Affairs

2. *Guidance to Tribal Government.*

a. Tribal governments may be applicants, and/or be affected by a proposed action of BIA or another Federal agency. Tribal governments affected by a proposed action shall be consulted during the preparation of environmental documents and, at their option, may cooperate in the review or preparation of such documents. Notwithstanding the above, the BIA retains sole responsibility and discretion in all NEPA compliance matters.

b. Proposed Tribal actions that do not require BIA or other Federal approval or funding are *not* subject to the NEPA process.

B. *Prepared Program Guidance.*

BIA has implemented regulations for environmental guidance for surface mining in 25 CFR Part 216 (Surface Exploration, Mining and Reclamation of Lands.) Environmental guidance for Forestry activities is found in 25 CFR 163.27, and 53 BIAM Supplement 2 and Supplement 3.

C. *Other Guidance.*

Programs under 25 CFR for which BIA has not yet issued regulations or directives for environmental information for applicants are listed below. These programs may or may not require environmental documents and could involve submission of applicant information to determine NEPA applicability. Applicants for these types of programs should contact the nearest affected BIA office for information and assistance:

1. Loans to Indians from the Revolving Loan Fund (25 CFR Part 101).

2. Loan guaranty, insurance, and interest subsidy (25 CFR Part 103).

3. Leasing and permitting (Lands) (25 CFR Part 162).

4. Sale of lumber and other forest products produced by Indian enterprises from the forests on Indian reservation (25 CFR Part 164).

5. Sale of forest products, Red Lake Indian Reservation, Minn. (25 CFR Part 165).

6. General grazing regulations (25 CFR Part 166).

7. Navajo grazing regulations (25 CFR Part 167).

8. Grazing regulations for the Hopi partitioned lands area (25 CFR Part 168).

9. Rights-of-way over Indian lands (25 CFR Part 169).

10. Roads of the Bureau of Indian Affairs (25 CFR Part 170).

11. Concessions, permits and leases on lands withdrawn or acquired in connection with Indian irrigation projects (25 CFR Part 173).

12. Colorado River Irrigation Project, Arizona (25 CFR Part 175).

13. Flathead Indian Irrigation Project, Montana (25 CFR Part 176).

14. Leasing of tribal lands for mining (25 CFR Part 211).

15. Leasing of allotted lands for mining (25 CFR Part 212).

16. Leasing of restricted lands of members of Five Civilized Tribes, Oklahoma, for mining (25 CFR Part 213).

17. Leasing of Osage Reservation lands, Oklahoma, for mining, except oil and gas (25 CFR Part 214).

18. Lead and zinc mining operations and leases, Quapaw Agency (25 CFR Part 215).

19. Leasing of Osage Reservation lands for oil and gas mining (25 CFR Part 226).

20. Leasing of certain lands in Wind River Indian reservation, Wyoming, for oil and gas mining (25 CFR Part 227).

21. Off-reservation treaty fishing (25 CFR Part 249).

22. Preservation of antiquities (25 CFR Part 261).

23. Contracts under Indian Self-Determination Act (25 CFR Part 272).

24. Grants under Indian Self-Determination Act (25 CFR Part 272).

25. School construction or services for tribally operated perviously private schools (25 CFR Part 274).

26. School construction contracts for public schools (25 CFR Part 277).

27. Indian Business Development Program (25 CFR Part 286).

*4.3   Major Actions Normally Requiring an EIS*

A. The following BIA actions normally require the preparation of an Environmental Impact Statement (EIS).

1. Proposed mining contracts (for other than oil and gas), or the combination of a number of smaller contracts comprising a mining unit for:

a. New mines of 640 acres or more, other than surface coal mines.

b. New surface coal mines of 1,280 acres or more, or having an annual full production level of 5 million tons or more.

AR00336

DEPARTMENT OF THE INTERIOR

# DEPARTMENTAL MANUAL

Bureau of Indian Affairs

2. Proposed water development project which would. for example, inundate more than 1,000 acres, or store more than 30,000 acre-feet, or irrigate more than 5,000 acres of undeveloped land.

B. If, for any of these actions, it is proposed not to prepare an EIS, an Environmental Assessment (EA) will be prepared and handled in accordance with § 1501.4(e)(2).

### 4.4 Categorical Exclusions

In addition to the actions listed in the Department's categorical exclusions in Appendix 1 of 516 DM 2, many of which the BIA also performs, the following BIA actions are hereby designated as categorical exclusions unless the action qualifies as an exception under Appendix 2 of 516 DM 2:

A. *Operation, maintenance, and replacement of existing facilities.* Examples are normal renovation of buildings, road repairs and limited rehabilitation of irrigation structures.

B. *Transfer for Existing Federal Facilities to Other Entities.* Transfer of existing operation and maintenance activities of Federal facilities to tribal groups, water user organizations, or other entities where the anticipated operation and maintenance activities are agreed to in a contract, follow BIA policy, and no change in operations or maintenance is anticipated.

C. *Human resources programs having primarily socio-economic effects.* Examples are social services, education services, employment assistance, tribal operations, law enforcement and credit and financing activities.

D. *Administrative actions and other activities relating to trust resources.* Examples are: Management of trust funds, issuance of such documents as certificates of competency, allotments and fee patents; renewal of agricultural and other leases when environmental impacts are addressed in an earlier environmental document.

E. *Self-Determination Act Grants and Contracts.*

1. Self-Determination Act Grants.

2. Self-Determination Act contracts for BIA programs which are listed as categorical exclusions, or for programs in which environmental impacts are adequately addressed in an earlier environmental document.

F. *Rights-of-Way.*

1. Rights-of-way inside another right-of-way, or amendments to rights-of-way where minor deviations from or additions to the original right-of-way are involved and where there is an existing environmental document covering the same or similar impacts in the right-of-way area.

2. Service line agreements to an individual residence, building or well from an existing facility where installation will involve no clearance of vegetation from the right-of-way other than for placement of poles or lines.

3. Renewals, assignments and conversions of existing rights-of-way where would be essentially no change in use and continuation would not lead to environmental degradation.

G. *Minerals.*

1. Approval of permits for geologic mapping, inventory, reconnaissance and surface collecting.

2. Approval of unitization agreements, pooling or communitization agreements.

3. Approval of mineral lease adjustments and transfers, including assignments and subleases.

H. *Forestry.*

1. Approval of free-use cutting, without permit, to Indian owners for on-reservation personal use of forest products, not to exceed 2,500 feet board measure.

2. Approval and issuance of free-use cutting permits for forest products not to exceed $2,500 in value.

3. Approval and issuance of paid timber cutting permits for products valued at less than $10,000 when in compliance with policies and guidelines established by a current management plan covered by an environmental document.

4. Approval of annual logging plans when in compliance with policies and guidlines established by a current management plan covered by an environmental document.

5. Approval of *Normal Fire Year Plans* and/or *Mobilization Plans* detailing emergency fire suppression activities.

6. Approval of emergency forest and range rehabilitation plans when limited to environmental stabilization on less than 10,000 acres.

11/16/94 #3025
Replaces 1/19/81 #2316

AR00337

DEPARTMENT OF THE INTERIOR
# DEPARTMENTAL MANUAL

516 DM 6
Appendix 4

Bureau of Indian Affairs

7. Approval of timber stand improvement projects of less than 200 acres when in compliance with policies and guidlines established by a current management plan covered by an environmental document.

8. Approval of timber management access skid trail and logging road construction when consistent with policies and guidelines established by a current management plan covered by an environmental document.

9. Approval of prescribed burning plans of less than 200 acres when in compliance with policies and guidlines established by a current management plan covered by an environmental document.

10. Approval of tree planting projects and associated protection and site preparation activities on less than 200 acres when consistent with policies and guidelines established by a current management plan covered by an environmental document.

I. *Land Conveyance.*

1. Land transfers from Federal or State Agencies or other DOI Bureaus to the BIA as land to be held in trust for the Indian tribe(s) involving no development, physical alteration, or change in land use.

2. Purchase, sale, abandonment or exchange of tracts of land, mineral rights or other interests in land in which no change in land use or operation is planned.

3. Lands acquired pursuant to 25 U.S.C. 485, 35 U.S.C. 501, and 25 U.S.C. 2202 where no development, physical alteration, or change of land use after acquisition is known or planned.

J. *Other.*

1. Data gathering activities such as inventories, soil and range surveys, timber cruising, geological, archeological, paleontological and cadastral surveys.

2. Establishment of non-disturbance environmental quality monitoring programs and field monitoring stations including testing services.

3. Actions where BIA has concurrence or co-approval with another Bureau and the action is categorically excluded for that Bureau.

4. Approval of an Application for Permit to Drill for a new water source or observation well.

5. Approval of conversion of an abandoned oil well to a water well if water facilities are established only near the well site.

[FR Doc. 88-6963 Filed 3-30-88; 8:45 am]

11/16/94 #3025
Replaces 1/19/81 #2316

AR00338

## INTERIOR BOARD OF INDIAN APPEALS

*(The Indian Law Reporter (ILR) receives copies of Interior Board of Indian Appeals (IBIA) decisions from the official subscription service of that Board. The ILR publishes the headnotes to the IBIA decisions and, where warranted, the text of an opinion, as well as synopses of IBIA orders. Subscribers desiring copies of the Board's complete decisions should contact the Interior Board of Indian Appeals, 4015 Wilson Blvd., Arlington, Virginia 22203, (703) 235-3799. Decisions are currently available at the rate of $.13 per page. Yearly subscriptions are available for $110.00. The number of pages in each decision and its beginning page number in the IBIA series follow the headnotes of each decision.)*

---

## VILLAGE OF RUIDOSO, NEW MEXICO v. ALBUQUERQUE AREA DIRECTOR, BUREAU OF INDIAN AFFAIRS

**IBIA 96-103-A**  **Decided September 12, 1997**

Appeal from a decision to take a tract of land into trust for the Mescalero Apache Tribe.

Referred to the Assistant Secretary - Indian Affairs.

1. Administrative Procedure: Administrative Procedure Act—Board of Indian Appeals: Jurisdiction—Bureau of Indian Affairs: Administrative Appeals: Discretionary Decisions

   Under 43 C.F.R. § 4.330(b)(2), the Assistant Secretary - Indian Affairs may, by special delegation or request, enlarge the normally limited jurisdiction of the Board of Indian appeals over discretionary Bureau of Indian Affairs decisions. Nothing in subsection 4.330(b)(2), however, authorizes the Board to apply a new substantive standard which has not been enacted as statutory law or issued in accordance with the Administrative Procedure Act, 5 U.S.C. § 553 (1994).

2. Administrative Procedure: Administrative Procedure Act—Indians: Lands: Trust Acquisitions

   The rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553 (1994), are not satisfied when a new standard for the review of trust acquisition requests is announced by the Assistant Secretary - Indian Affairs only in a brief before the Board of Indian Appeals.

APPEARANCES: John Underwood, Esq., and Charles Rennick, Esq., Ruidoso, New Mexico, for Appellant; Mary Jane Sheppard, Esq., Office of the Solicitor, U.S. Department of the Interior, Washington, D.C., and Ethel Abeita, Esq., Office of the Regional Solicitor, Albuquerque, New Mexico, for the Assistant Secretary - Indian Affairs and the Area Director.

### Opinion By Administrative Judge Vogt, 31 IBIA 143

### Full Text

Appellant Village of Ruidoso, New Mexico, seeks review of a June 18, 1996 decision of the Albuquerque Area Director, Bureau of Indian Affairs (Area Director; BIA), to take a 7.436-acre tract into trust for the Mescalero Apache Tribe (Tribe),

subject to receipt of a satisfactory title examination. For the reasons discussed below, the Board refers this appeal to the Assistant Secretary - Indian Affairs for further action.

### Background

The tract at issue is located within the boundaries of the Village of Ruidoso and contains a lodge, formerly known as the Carrizo Lodge and now known as the Mescalero Inn. It is contiguous to the Mescalero Apache Reservation. In 1995, the tract was given to the Tribe by Gaim Ko, Inc., a New Mexico corporation. By Tribal Resolution No. 95-61, dated August 15, 1995, the Tribe accepted the gift and requested the Area Director to take the property into trust.[1] The deed from Gaim Ko, Inc., to the Tribe was executed on November 21, 1995. By Tribal Resolution No. 96-03, dated January 5, 1996, the Tribe authorized its President to proceed with the trust acquisition request.

On March 22, 1996, the Acting Superintendent, Mescalero Agency, wrote to appellant, as well as the Governor of New Mexico and the Assessor of Lincoln County, New Mexico, informing them that the Tribe's trust acquisition request was being considered and inviting their comments. Appellant submitted extensive comments and requested that the Tribe's request be denied. Lincoln County also opposed trust acquisition. The Governor stated that the State opposed trust acquisition if the property was to be used for gaming purposes and asked that the Tribe's request be denied until appropriate information was provided.

On May 21, 1996, the Acting Superintendent submitted the Tribe's acquisition request to the Area Director, analyzing it under the criteria in 25 C.F.R. § 151.10 and recommending approval. On June 18, 1996, the Area Director issued the decision on appeal here. In a memorandum of that date addressed to the Superintendent, he included his analysis of the factors in section 151.10 and a discussion of the concerns expressed by the commenters. By letters of the same date, he notified appellant and others of his decision.

Appellant appealed the Area Director's decision to the Board. In the notice of docketing for this appeal, issued on August 16, 1996, the Board stated:

The Board has some concern about its review role in this matter. Prior Board decisions have made it clear that the Board considers BIA's decisions to grant or deny trust acquisition requests to be discretionary decisions and therefore, in light of 43 C.F.R. 4.330(b)(2), subject to limited review by the Board. *See, e.g., Ross v. Acting Muskogee Area Director*, 21 IBIA 251 (1992); *Baker v. Muskogee Area Director*, 19 IBIA 164, 98 I.D. 5 (1991), and cases cited therein. Following the decision of the United States Court of Appeals for the Eighth Circuit in *South Dakota v. U.S. Department of the Interior*, 69 F.3d 878 (8th Cir. 1996), *petition for cert. filed* 64 U.S.L.W. 3823 (U.S. June 3, 1996) (No. 95-1956),[2] the Assistant Secretary - Indian Affairs published an amendment to 25

---

[1] This resolution was deemed by BIA to satisfy the requirement of 25 C.F.R. § 151.9 for a "written request for approval" of a trust acquisition. *See* Area Director's September 26, 1995 Memorandum to Superintendent, Mescalero Agency.

[2] On October 15, 1996, the Supreme Court granted certiorari, vacated the judgment of the court of appeals, and remanded the case to that court for eventual remand to the Secretary of the Interior for reconsideration of his administrative decision. *Department of the Interior v. South Dakota*, 117 S. Ct. 286 [23 Indian L. Rep. 1059] (1996).

*See also* 106 F.3d 247 (8th Cir. 1996) (recalling mandate and vacating judgment); 62 Fed. Reg. 26,551 (May 14, 1997) (Assistant Secretary's notice that, as of December 24, 1996, when jurisdiction returned to the Department of the Interior, the land at issue in *South Dakota* was no longer held in trust).

### Discussion and Conclusions

The Board exercises review authority delegated to it by the Secretary of the Interior. The scope of that authority is set out in 43 C.F.R. § 4.1(b)(2), which provides: "*Board of Indian Appeals*. The Board decides finally for the Department appeals to the head of the Department pertaining to: (i) Administrative *actions of officials of the Bureau of Indian Affairs*, except as limited in 25 C.F.R. chapter I or § 4.330 of this part." The limitations stated in 43 C.F.R. § 4.330 include the following: "(b) Except as otherwise permitted by the Secretary or the Assistant Secretary - Indian Affairs by special delegation or request, the Board shall not adjudicate: ... (2) Matters decided by the Bureau of Indian Affairs through exercise of its discretionary authority."

It is this limitation in the Board's review authority which, as discussed further below, has been the basis for the Board's narrow scrutiny of BIA trust acquisition decisions. As indicated in 43 C.F.R. § 4.330(b), however, the Assistant Secretary may, by special delegation or request, remove the limitation on the Board's review authority. This has been done on occasion by former Assistant Secretaries. E.g., *Robinson v. Acting Billings Area Director*, 20 IBIA 168, 170-71 [18 Indian L. Rep. 7142] (1991). When the limitation is removed, the Board may fully review a BIA discretionary decision, even to the extent of substituting its judgment for BIA's. It may, therefore, as it did in *Robinson*, reverse a discretionary BIA decision and issue a final departmental decision on the merits. By contrast, under its normal limited review authority over discretionary decisions, the Board, upon concluding that BIA has exercised its discretion improperly, can do no more than remand the case to BIA for another decision. *See, e.g.*, *Jackson County, Oregon v. Phoenix Area Director*, 31 IBIA 126 (1997).

In this case, although initially suggesting an intent to grant the Board full review authority over the Area Director's decision, the Assistant Secretary ultimately stops short of such a grant, stating instead that the Board, if it finds problems with the Area Director's decision, is to remand the matter for further deliberations. In other respects as well, the Assistant Secretary's statement makes it clear that she expects the Board's review to continue to be a legal review, rather than a full review of the exercise of discretion. What the Assistant Secretary actually does here, rather than grant the Board additional review authority, is to articulate a new standard for trust acquisitions, which she asks the Board to apply in this case. In other words, the Assistant Secretary is requesting the Board to continue to review BIA trust acquisition decisions "on the law" but is seeking to add some new law for the Board to apply.

At the same time, the Assistant Secretary appears to be asking the Board to conduct the initial evaluation of the Tribe's trust acquisition request under the new balancing standard she articulates in her brief. That is, even though the Area Director has had *no opportunity* to evaluate the Tribe's request under the new standard, the Assistant Secretary does not seek remand of this case to him but, rather, urges the Board to affirm the Area Director's decision.

Were the Board to find the new standard applicable to this case, it would not undertake to conduct the initial evaluation under the standard. Instead, in accord with prior practice, it would vacate the Area Director's decision and remand the matter to him in order to give him the initial opportunity to render a decision on the issue. *See, e.g.*, *Walter Torske & Sons v. Acting Billings Area Director*, 30 IBIA 157, 161 [24 Indian L. Rep. 7086] (1997).

However, even if, as the Board assumes for the moment, the new standard can be applied to this case, a remand to the Area Director with directions to follow that standard would cause more problems than it would solve. The Assistant Secretary's

brief offers little guidance to the Area Director as to how the new standard is to be interpreted. The Board has a number of questions about its meaning and would expect that a BIA Area Director attempting to apply it might also have questions.

How, for instance, does the new standard relate to the existing criteria in 25 C.F.R. § 151.10? If the standard is an economic one, as some of the Assistant Secretary's statements indicate,[5] what weight is to be given to the criteria in section 151.10 which are not economic, or not primarily economic, in nature?[6]

What are the "purposes of the IRA," contributions to which are to be weighed under the new standard? It appears likely that the purposes the Assistant Secretary has in mind are related to what she describes in her brief as limitations on trust acquisition authority.[7] However, this is not entirely clear.

How does the term "local jurisdiction," as used in the new standard, relate to the term "State and its political subdivisions" in 25 C.F.R. § 151.10(e) and the term "state and local governments" in section 151.10 and subsection 151.11(d)? Specifically, does the term "jurisdiction" mean a governmental entity? Or, by using a term different than those used for governmental entities in the regulations, does the Assistant Secretary intend something different? Does she, for instance, intend the term "jurisdiction" to be understood in a territorial sense? If so, are the economic interests of individuals or businesses located within the local jurisdiction to be taken into consideration in the equation?[8]

Further, appellant argues, and the Board tends to agree, that there are arguable inconsistencies in the Assistant Secretary's various phrasings of the standard. *See* Appellant's Amended Reply Brief at 3-4.

These questions of interpretation, however, need not be addressed at this point. The Board must first deal with a threshold question—What is the source of the Board's authority to apply the new standard or to ask the Area Director to apply it?

---

[5] *See, e.g.*, Assistant Secretary's Brief at 6: "[T]he Assistant Secretary wishes the Board to apply the economic standard that arises out of application of the factors listed in Part 151 and remand to the BIA any decisions that fail to meet that standard."

[6] One example of such a criterion is 25 C.F.R. § 151.10(f), which concerns "[j]urisdictional problems and potential conflicts of land use which may arise."

[7] At page 4 of her brief, the Assistant Secretary states:

[T]he Secretary must not only consider the factors as had been done previously, but, in addition, weigh any negative impacts against positive impacts and the extent of the contribution to the purposes behind the IRA. Those purposes were identified in the preamble to the rule making. In that preamble, the Assistant Secretary stated that the legislative history of the IRA demonstrates intent to limit the authority so delegated to acquiring lands either:

(1) "within or adjacent to an Indian reservation," or (2) "for purposes of facilitating tribal self-determination, economic development or Indian housing."

The Board finds no explicit discussion of the purposes of the IRA in the cited preamble, which does, however, state: "Section 5 of the IRA authorizes the Secretary to acquire land in trust for Indians and Indian tribes: (1) Within or adjacent to an Indian reservation; or (2) for purposes of facilitating tribal self-determination, economic development or Indian housing." 61 Fed. Reg. 18,082.

[8] This is not an academic question. There are several appeals presently pending before the Board in which individuals and businesses contend that their economic interests will be affected by certain trust acquisitions. *E.g.*, *Chapman v. Muskogee Area Director*, Docket No. IBIA 96-115-A; *Dudley v. Muskogee Area Director*, Docket No. IBIA 96-119-A; *Quik Trip v. Muskogee Area Director*, Docket No. IBIA 97-12-A. The standing of these individuals and businesses to challenge trust acquisition decisions before the Board has not yet been determined.

AR00340

consideration of the relevant factors," [*Citizens to Preserve Overton Park [v. Volpe]*, 401 U.S. [402,] 416 [1971], we conclude the regulatory factors contained in § 151.10 do provide a meaningful and objective standard by which the court can judge the Secretary's exercise of discretion in this case. [Footnote omitted.]

112 F.3d at 1434. The court then concluded that its task was "to assess whether the agency considered all of the relevant factors contained at 25 C.F.R. § 151.10 in evaluating Mr. McAlpine's 1990 request to extend trust status to his property." *Id.* at 1436.

*McAlpine* involved a challenge to BIA's denial of a trust acquisition request and the Board's affirmance of the denial. *See McAlpine v. Muskogee Area Director*, 19 IBIA 2 [17 Indian L. Rep. 7100] (1990). Upon reviewing these departmental decisions, the Tenth Circuit concluded:

The administrative record in this case demonstrates that the agency properly considered the relevant regulatory factors then in effect in denying Mr. McAlpine's request.... On the basis of [certain BIA findings concerning the factors in section 151.10], which are well documented in the administrative record, we hold that the Secretary's denial of Mr. McAlpine's decision [sic] was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

112 F.3d at 1436-37.

As the Board reads *McAlpine*, the Tenth Circuit has taken an approach similar to that taken by the Board since 1989. More importantly, with respect to the concerns expressed by the Assistant Secretary in this appeal, the court has found that there is, in the present regulations, law which may be applied by a reviewing court.

The Board finds itself in somewhat of a quandary. Especially in view of the decision in *McAlpine*, the Board might undertake at this point to review this trust acquisition decision under its previously articulated standard of review. The Assistant Secretary, however, has made it plain that she believes this trust acquisition request, and presumably all others to follow, should be evaluated under a new standard. Although, for the reasons discussed above, the Board has found that it cannot apply the Assistant Secretary's new standard to this appeal at this time, it also respects the Assistant Secretary's authority to set policy for trust acquisitions. Therefore, the Board concludes that it should not follow its past practice because to do so would be to ignore the Assistant Secretary's authority, as well as her intent, in this regard.

Under the unusual circumstances here, the Board concludes that the only reasonable disposition of this appeal is to refer it to the Assistant Secretary. If the Assistant Secretary continues to believe that her new standard should be applied to this trust acquisition request, she will have the opportunity to promulgate the standard through formal rulemaking, or other method permitted under the APA, and then to return the trust acquisition request to the Area Director for evaluation under the new standard. If, however, she now believes, in light of the discussion above, that the Area Director's decision should be reviewed under the Board's present standard of review, she may return the case to the Board for such review.

The Assistant Secretary also has two other options. One of these is to grant the Board full authority to review the Area Director's exercise of discretion under 43 C.F.R. § 4.330(b). As discussed above, if she were to do this, the Board would have authority to second-guess the judgment calls made by the Area Director. Acting under such a grant of authority, the Board, if it were to disagree with the Area Director's judgment, would not remand the case to him for further work but would simply reverse his decision.

The Assistant Secretary's fourth option is to review the Area Director's decision herself under 25 C.F.R. § 2.20(f), in which

case she may, of course, exercise her full authority to review the Area Director's exercise of discretion. For purposes of this option, the Board construes this referral as a referral under 43 C.F.R. § 4.337(b).

The Board currently has several pending appeals which challenge trust acquisition decisions. It therefore requests that the Assistant Secretary decide upon a course of action in this case in such a way as to provide guidance for these other appeals. The Board further requests that she notify it of her decision as to a course of action as soon as possible. The Board will issue stays in its current trust acquisition appeals pending such notice from the Assistant Secretary.

Pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, this matter is referred to the Assistant Secretary - Indian Affairs.

---

# ORDERS

## Leasing

**Order Affirming Decision as Modified**—In appeals from a February 27, 1995 decision of the Acting Billings Area Director, Bureau of Indian Affairs, concerning the award of an agricultural lease on an allotment on the Blackfeet Reservation, the Interior Board of Indian Appeals modifies and affirms the Area Director's decision and returns the matter to the superintendent. As to appellant Johnson, the Board: 1) rejects her contention that Montana state law gives her rights to the use of Indian trust land, stating that federal law, and in some instances tribal law, governs the use of Indian land and the manner in which interests in Indian land may be acquired; and 2) concludes that appellant's apparent reliance on 25 C.F.R. 162.2(a)(4) is misplaced because § 162.2(a)(4) applies only to heirs and devisees, which appellant is not, and therefore she does not have a right to continue her use, and 25 C.F.R. 162.5(e), precludes appellant from claiming any right to a new lease by virtue of having previously leased the trust interests in the property. The Board rejects appellant Fenner's contention that he had a right to the lease even though he made the high bid because BIA retained the discretion to award the lease to another party matching the high bid, as long as BIA is able to support its decision. However, the Board agrees with the Area Director that the Superintendent did not provide adequate reasons for his decision and therefore the cause should be returned to the Superintendent but deletes the requirement that the lease be *readvertised*. **Bill E. Fenner v. Acting Billings Area Director, Bureau of Indian Affairs, and Liane Johnson v. Acting Billings Area Director, Bureau of Indian Affairs,** Nos. IBIA 95-89-A & IBIA 95-95-A (29 IBIA 116, Mar. 11, 1996).

---

## Federal Authority over Indian Affairs: Loans

**Order Dismissing Appeal**— Following appellant's notification to the Board that it was dropping its appeal, the Interior Board of Indian Appeals dismisses with prejudice an appeal from an October 31, 1995 decision of the Acting Aberdeen Area Director, in which appellant's claim for loss on a loan was

AR00341



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

APR 1 6 1998

IN REPLY REFER TO:
Real Estate Services

RECEIVED
Regional Solicitor's Office

NOV 2 3 1998

Anchorage, Alaska

Memorandum

To:        All Area Directors
           All Area Realty Officers

From: ACTING Deputy Commissioner of Indian Affairs    Nancy Jemison

Subject:   Policy Statement Concerning Qualifying as an Indian under the IRA

We have had inquiries about whether individuals of Indian descent qualify to acquire lands in trust status under the Indian Reorganization Act (IRA) of June 18, 1934 (48 Stat. 988, 25 U.S.C. 479; 48 U.S.C. 465). For example, an individual inherited lands in trust status within the boundaries of a reservation. This individual did not meet tribal qualifications as an enrolled member but would like to purchase other trust interests in the allotment in which he inherited. Our policy is as follows:

The land acquisition regulation is based on various statutes, in particular, the IRA. Section 19 of the IRA ( 25 U.S.C. § 479, 48 Stat. 988) defines an Indian for the purposes of acquiring lands in trust status as:

> ". . . all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians."

Although the individual is of Indian descent, but he/she does not qualify as an Indian as described above, the individual cannot acquire lands in trust status under the IRA.

AR00342

U.S. Department of the Interior

Proposed Amendments to

# REGULATIONS GOVERNING TAKING

# LAND INTO TRUST FOR INDIANS

## (25 C.F.R. Part 151)

## INFORMATION PACKET

AR00343

U.S. Department of the Interior

Bureau of Indian Affairs

April, 1999

Proposed Amendments to Land-into-Trust Regulations

Information Package Contents

Narrative Summary ........................................................................... 1

Summary of Proposed Application Process ......................................... 3

Summary of Proposed Information Requirements ............................... 4

Some Specific Issues Addressed in the Proposed Regulations ............ 6

Brief Description of Some Current and Proposed Regulations ............ 8

Contacts for More Information .......................................................... 10

## Narrative Summary

The Secretary of the Interior is authorized under various statutory authorities to accept title to land on behalf of individual Indians and Indian tribes, thereby placing the land "in trust." The primary statutory authority used for the acquisition of trust title is Section 5 of the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The main goal of Section 5 is to reverse the precipitous decline in the economic, cultural, governmental and social well-being of Indians caused by the disastrous late nineteenth century federal policy which facilitated the breakup of reservations through "allotment" and eventual disposal (sale) of reservation lands.

Of the approximately 90 million acres of tribal land lost through the allotment process, only about 8 percent have been reacquired in trust status since the IRA was passed sixty-five years ago. Even today, Indians continue to contend with the loss of trust lands. In 1996 and 1997, approximately 178,000 acres of land lost trust status, while only a portion of that number of acres acquired trust status. The overwhelming majority of trust applications encompass on-reservation land, and involve an average of only about 30 acres.

Regulations governing the process by which the Secretary exercises his discretionary authority to take land into trust under the IRA were first published in 1980, and can be found at 25 C.F.R. Part 151. The Department of the Interior now proposes to amend the Part 151 regulations to provide tribes and their non-Indian neighbors with a clearer understanding of how we review requests to take land into trust. By restructuring the regulations, we believe our decision-making process will better reflect the modern-day needs and concerns of Indian tribes *and* of surrounding non-Indian communities.

Our proposed revisions underscore the inherent policy differences underlying the need for trust land on-reservation versus trust land off-reservation:

*On-reservation* : The policy of the Department is to assist tribes in the reacquisition of land within reservation boundaries. To accomplish this, we have streamlined the process by which land within reservations may be returned to trust status, and we establish a strong presumption in favor of the applicant.

*Off-reservation* : The Department is committed to responding to the impacts that non-Indian communities have on off-reservation trust acquisitions by ensuring that jurisdictional, economic, zoning, and other related concerns are adequately addressed before the Department will consider acting favorably on an application to take land into trust.

In addition, the proposed regulations clarify how the Department will address a number of more specialized issues related to taking land into trust. For example, the proposed regulations delineate the procedure by which the Department will process "mandatory acceptances of title." Mandatory acceptances of title are trust acquisitions which Congress, by explicit statutory direction, requires the Secretary to accept through the administrative process.

The proposed regulations also address the unique difficulties encountered by tribes which do not have reservations by including new provisions which set out a process (using "Tribal Land Acquisition Areas") by which those tribes may benefit from the on-reservation provisions of this regulation.

AR00345

## Summary of Proposed Application Process

- Tribe submits application containing information as required for on- or off-reservation parcels of land (see next page).
- BIA notifies State, county and municipal governments of the application, and provides an opportunity for comment on the application:

    A. If ON-RESERVATION, local community and others have <u>30 days</u> to comment

    B. If OFF-RESERVATION, local community and others have 60 days to comment

3. At the end of comment period, the applicant is provided with copies of all state/local comments, and is provided with an opportunity to respond.

4. The Department makes a decision on whether to take the land in trust, and communicates that decision in a certified letter to the applicant, with copies to all parties who commented.

5. Applicants and interested parties concurrently are notified of their right to an administrative appeal of the Department's decision.

6. *If the Department's decision is to deny the application* , we will take no further action

- OR-

7. If the Department's decision is to take the land into trust, after any administrative remedies have been exhausted, we will complete a title examination and require the applicant to cure any title defects.

8. After all title issues are clear, the Department will publish (in a local newspaper or in the Federal Register), a notice of our decision to take the land in trust. This gives parties an opportunity to challenge the decision in federal court.

9. Assuming the successful exhaustion of judicial remedies, we then accept title to the property and it attains trust status. From then on, the land's trust status cannot be removed except by act of Congress.

## Summary of Proposed Information Requirements

*<u>On-reservation Applications</u>*

- statutory authority
- need for trust status

AR00346

- title insurance information
- environmental compliance information
- description of intended use

*Off-reservation Applications*

- statutory authority
- need for trust status
- title insurance information
- environmental compliance information
- description of use, including:

- past uses/present/future uses

- cultural/historical uses

- goals to be achieved with such use

- if for housing, number of units

  - location of the land:

- relative to state boundaries

- relative to the tribe's reservation

- relative to other trust land

- relative to the nearest BIA office

- relative to infrastructure (roads,etc)

  - impact on local tax structure:

- projected lost revenue

- effect on local government's ability

to provide services

  - identification of jurisdictional issues:

- zoning conflicts

- provision of law enforcement,

fire protection, emergency medical

- traffic impacts/road maintenance

- sanitation/sewage/trash

AR00347

- utilities

- water supply/water rights

  • identification of cooperative agreements re: juris. conflicts
  • identification of any payment in lieu

of tax agreements

## Summary of Proposed Review Criteria

### On-reservation Criteria

  • conveyance is necessary to facilitate self-determination, economic development, housing, or land consolidation
  • there is adequate legal authority for the acquisition
  • the request is complete, including all supporting documentation
  • the request will benefit the economic or social conditions of the applicant

  • title evidence meets applicable standards
  • there is adequate environmental compliance (NEPA, etc.)
  • we determine that after mitigation of effects on the environment, etc. that the conveyance is consistent with applicable environmental, cultural, historic, or natural resources law

### Off-reservation Criteria

  • conveyance is necessary to facilitate self-determination, economic development, housing, or land consolidation
  • there is adequate legal authority for the acquisition
  • the request is complete, including all supporting documentation
  • the request will benefit the economic or social conditions of the applicant
  • title evidence meets applicable standards
  • there is adequate environmental compliance (NEPA, etc.)

  • we determine that after mitigation of effects on the environment, etc. that the conveyance is consistent with applicable environmental, cultural, historic, or natural resources law

  • we determine that any adverse impacts on local governments and communities are reasonable compared to the benefits flowing to the applicant from taking the land in trust

  • The BIA is equipped to handle the additional responsibilities of the acquisition, including sufficient staff
  • the location of the land relative to State boundaries, and the distance

### On-reservation criteria, cont.

### Off-reservation criteria, cont.

from the boundaries of the tribe's reservation, are reasonable:

AR00348

- if in a different state, tribe's

justification, of anticipated

benefits from the acquisition will be subject to greater scrutiny

- as distance between reservation

and land increases, the tribe's

justification of anticipated

benefits will be subject to

greater scrutiny

- as distance between reservation

and land increases, concerns raised

by state and local governments will

be given greater weight.


## Some Specific Issues Addressed in the Proposed Regulations


1. *Congressional Directives to the Secretary to Take Land into Trust* :

Occasionally Congress directs the Secretary to take land in to trust for a tribe. In some of those instances, Congress explicitly removes *all* Secretarial discretion as to what land must be accepted into trust. For these "mandatory acceptances of title," the proposed regulation sets forth the streamlined process by which the Department will review and implement the Congressional directive to take the land in trust.

2. *Addressing the Needs of Tribes Which Do Not Have Reservations:*

There are a few tribes which do not benefit from the basic rights and opportunities inherent in having a reservation. For the most part, these are tribes recently restored to federal recognition by a federal statute which does not specifically designate a reservation, or they are tribes that have obtained federal recognition through the administrative Federal Acknowledgment Process, which as a matter of course does not provide for the designation of a reservation.

Because of the overwhelming importance of the tribal land base, and because the new regulations make it less burdensome for tribes to take land into trust on- (as opposed to off-) reservation, we are proposing in these regulations an alternative mechanism by which reservation-less tribes may benefit from the on-reservation acquisition provisions to create a homeland.

The alternative mechanism is the use of a "Tribal Land Acquisition Area." A Tribal Land Acquisition

AR00349

Area is a geographic boundary designated by a reservation-less tribe within which the tribe plans to acquire land within a specified period of time under to the more lenient on-reservation provisions of the proposed rule. In other words, the Tribal Land Acquisition Area would create a geographic boundary within which individual parcels would be treated as on-reservation for the purposes of acquiring trust title under these regulations.

Because establishment of a Tribal Land Acquisition Area will affect local non-Indian governments, we will require that the concerns of local non-Indian governmental entities be addressed before the Secretary will approve the creation of the Tribal Land Acquisition Area boundaries. For that reason, an application for Secretarial approval of a Tribal Land Acquisition Area requires submission of information similar to that required in applications for off-reservation acquisitions. However, because we view the need for a homeland as fundamental, we will accord greater weight to the application of a reservation-less tribe, particularly in situations in which the tribe benefits from a federal statute directing the Secretary to acquire some land base for the tribe.

Note: While off-reservation land located within a Tribal Land Acquisition Area may be treated as on-reservation land for acquisition purposes, such lands legally cannot be treated as on-reservation for the purposes of Section 20 of the Indian Gaming Regulatory Act, 25 U.S.C. § 2719 (IGRA). In other words, title to land which is inside a Tribal Land Acquisition Area cannot be taken into trust for the purpose of gaming unless and until the requirements of Section 20 of IGRA have been satisfied.

*3. Reservations in Oklahoma:*

The definition of "reservation" includes "former reservations" in Oklahoma. In the proposed amendments, the definition of "former reservation" has been clarified to include lands within the jurisdictional area of an Oklahoma Indian tribe and within the boundaries of the last reservation established by treaty, Executive Orders, or Secretarial Orders. This definition is identical to the definition provided in IRS Notice 98-45, issued in August 1998, that defines "former reservation in Oklahoma" for purposes of Section 188 (j) (6) of the Internal Revenue Code. We believe that by defining the term as the IRS has, we will provide greater certainty in establishing these former boundaries, and congruity in coordinating the Department's land acquisition program with other federal programs.

**Brief Description of Some of the Differences**

**Between the Current and Proposed Regulations**

*Proposed Regulations*

- much clearer distinction made between on and off-reservation applications to take land into trust, including on on-reservation:

- fewer information requirements

- fewer review criteria

- presumption in favor of tribes

AR00350

and for off-reservation:

- more information requirements

- more stringent review criteria

- unresolved concerns of local

community accorded greater

weight

- directly addresses "mandatory acceptance of title" (i.e., acquisitions for which Congress has removed all discretion as to which land must be taken into trust

- reservation-less tribes may still benefit from the more streamlined on-reservation provisions through the designation of a Secretarily-approved "Tribal Land Acquisition Area"

- conforms definition of "former reservation in Oklahoma" to that used in recent IRS Notice 98-45, thereby providing more certainty as to how the term will be interpreted

- contiguous parcels of land contiguous to reservation treated as off-reservation

### *Current Regulations*

- distinctions between on- and off-reservation exist, but are less clearly differentiated

- do not contemplate "mandatory acceptance of title" situations
- no special provision for reservation-less tribes
- definition of "former reservation in Oklahoma" left somewhat open-ended ("former reservations of the tribes as defined by the Secretary")

contiguous parcels of land contiguous to the reservation treated as on-reservation

http://www.doi.gov/news/infopac.html                                          11/26/99

AR00351

## Contact for More Information

Kevin Gover, Assistant Secretary for Indian Affairs 202/208-7163

Heather Sibbison, Office of the Secretary 202/208-5617

Terry Virden, BIA Office of Trust Responsibility 202/208-5831

Laura Daniel-Davis, Office of Congressional Affairs 202/208-4549

Stephanie Hanna, Office of Communications 202/208-3171

Jay Spector, Intergovernmental Affairs Office 202/208-5336

H:\PR9999~1.HTMVHSIBBISON08Apr992:58 PM

_____ to the Department of the Interior from here

## You can also view the index of press releases

## U.S. Department of the Interior, Washington, DC, USA

AR00352

*Roger*

## U.S. Department of the Interior

## OFFICE OF THE SECRETARY

FOR IMMEDIATE RELEASE: April 8, 1999

Stephanie Hanna (O) 202/208-6416
(BIA) Nedra Darling (O) 202/219-4150

### INTERIOR DEPARTMENT TO STREAMLINE POLICIES FOR TAKING LAND INTO TRUST FOR INDIANS

The Department of the Interior is proposing to amend the federal regulations used in determining whether to take land into trust on behalf of Indians. The proposed amendments will be published in the *Federal Register* on Monday, April 12. Their publication will open up a 90-day period of public comment.

Historically, tribal ownership of lands set aside as Indian reservations was seriously eroded by the federal government's allotment policies in the late 19th Century. Recognizing that loss of tribal lands had resulted in serious degradation of the social welfare and economic opportunity for Indian people, Congress in 1934 authorized the Secretary of the Interior to take land in trust for the benefit of Indians. Since that time, however, only approximately eight percent of the lands lost through allotment have been re-acquired. The overwhelming majority of applications to take land in trust are for lands located within the boundaries of Indian reservations and involve small parcels of land, on average about 30 acres.

Federal regulations governing the process by which the Secretary of the Interior decides whether to take land into trust for Indians were first published in 1980 (25 C.F.R. Part 151). The Department now proposes to amend the Part 151 regulations to provide tribes and their non-Indian neighbors with a clearer understanding of how the Department reviews requests to take land into trust.

"In restructuring the regulations, we believe that the decision-making process will better reflect the present-day needs and concerns of Indian tribes and surrounding non-Indian communities," Secretary of the Interior Bruce Babbitt said.

The proposed revisions underscore clear differences in policy regarding the need to re-acquire land in trust on reservations versus trust land off reservation.

- *On reservation:* The policy of the Department is to assist tribes in the re-acquisition of land within reservation boundaries. To accomplish this, the process by which land may be returned to trust status has been streamlined and there is a strong presumption established in favor of the applicant.

- *Off reservation:* The Department is committed to addressing the impact on non-Indian communities affected by proposed acquisitions of off-reservations lands. Jurisdictional, economic, zoning and other related concerns must be adequately resolved within an application to take off reservation land into trust under the new proposed regulations before the

http://www.doi.gov/news/990408.html                                    11/26/99

AR00353

Department considered acting favorably on the request.

In addition, the proposed regulations clarify how the Department will address a number of more specialized issues related to taking land into trust. For example, the proposed amendments to Part 151 delineate the procedure by which the Department will process "mandatory acceptances of title." Mandatory acceptances of title are trust acquisitions where Congress, by explicit direction in statute, requires the Secretary to take lands into trust for Indians through the administrative process.

Finally, the proposed regulations address the unique difficulties encountered by tribes that do not have a reservation. New provisions are included that set out a process using Tribal Land Acquisition Areas approved by the Secretary to give tribes without reservations access to same policy benefits within the new regulations for on reservation trust acquisitions.

After the regulations are published, Assistant Secretary for Indian Affairs Kevin Gover plans a series of regional meetings with tribes and other outreach opportunities during the public comment period. Information on his activities can be obtained through Nedra Darling in the Bureau of Indian Affairs at 202/219-4150.

Informational materials on the proposed regulations are available on the Department of the Interior's and the Bureau of Indian Affairs' web sites.

Attachment
(Information Packet) Proposed Amendments to Regulations Governing Taking Land Into Trust for Indians

### -DOI-

you can get to the Department of the Interior from here

### You can also view the index of press releases

### U.S. Department of the Interior, Washington, DC, USA

AR00354