<u>RETYPED</u>

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C.   20240


MEMORANDUM

To:            Assistant Secretary — Indian Affairs

From:          Associate Solicitor, Indian Affairs

Subject:       Trust land for the Natives of Venetie and Arctic
               Village

This is in response to the memorandum of the Deputy Assistant
Secretary for Administration, dated December 13, 1977, requesting
reconsideration of the position taken by former Under Secretary
Kent Frizzell that the Alaska Native Claims Settlement Act
(ANCSA) precludes the Secretary from restoring land held in fee
by Alaska Natives to trust status pursuant to Section 5 of the
Indian Reorganization Act (IRA).  Our research reaffirms the
conclusion of the former Under Secretary.  We further believe
that there is no basis for distinguishing, for purposes of
Section 5, former reservation land patented pursuant to Section
19(b) of ANCSA from any other land conveyed to Natives pursuant
to ANCSA.

The intent of Congress to permanently remove all Native lands in
Alaska from trust status is unmistakable.  The declaration of
policy states that "the settlement should be accomplished
. . . without creating a reservation system or lengthy wardship
or trusteeship, and without adding to the categories of property
and institutions enjoying special tax privileges . . . ." 43
U.S.C. § 1481(b).

In analyzing the declaration of policy, the Senate Report stated:
"A major purpose of this committee and the Congress is to avoid
perpetuating in Alaska the reservation and the trustee system."
S. Rep. No. 405, 92th Cong., 1st Sess. (1071) at 108.  This theme
was oft repeated in the floor debates.  <u>See</u> examples cited in
Appendix.

The Natives of Venetie and Arctic Village elected, pursuant to
Section 19(b), to take their former reservation in fee.  They
argue that they thereby disassociated themselves from the
settlement legislation and that interpretations based upon the
act as a whole should not apply to them.  This argument
misconstrues the nature of Section 19(b).  While a vote to take a

ATTACHMENT 2

PAGE 5 OF 8 PAGES.

COPY

former reservation in fee renders the Natives ineligible for the land and monetary benefits generally provided for elsewhere in ANCSA, it is incorrect to say that the vote disassociates them from the settlement. ANCSA was a settlement of all Native claims. It includes Natives on and off reservations. This point may be demonstrated by comparing the treatment of the Metlakatlans of the Annette Island Reserve with Natives of all other reservations. The Metlakatlans are the sole group of Natives not included within the settlement since they are of Canadian origin and thus have no aboriginal claims to settle. In contrast to other reservation Natives, the Metlakatlans have no village corporation under ANCSA, and their reservation was not revoked.

The option contained in Section 19(b) was not designed to allow "reservation Natives" to disassociate themselves from the settlement. Rather, it was designed to avoid the hardship which would result if these Natives were forced to select land elsewhere, or a lesser total acreage. S. Rep. No. 405, 92d Cong., 1st Sess. (1971) at 159.

The structure and legislative history of Section 19 itself precludes the restoration of former reservations to trust status. Section 19 revokes all reservations (except for Metlakatla) and directs that the land be conveyed to the ANCSA village corporation, not to the IRA entitles. It does not allow Natives to vote for continued trust status. It merely allows them to choose between two forms of compensation in settlement of their claims. It is clear from alternatives to Section 19 in earlier proposed settlement legislation that Congress did not exclude the alternative of continued trust status by oversight. Section 22, the counterpart in S. 35 to Section 10, would have allowed the Metlakatlans the choice between continued trust status and fee ownership. Even more telling is the fact that the Councils of Venetie and Arctic Village proposed an amendment to Section 15 of H.R. 10193 (an earlier version of Section 19) which would have permitted the retention of trust status. The proposal was never incorporated into ANCSA. Resolution No. 69-3, Combined Councils of the Native Village of Venetie and Arctic Village Native Council, June 11, 1969.

Also significant is the repeal in Section 704(a) of the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, of Section 2 of the Act of May 1, 1936, 49 Stat. 1250, 25 U.S.C. § 496, which extended the provisions of the Indian Reorganization Act to Alaska and gave the Secretary the authority to designate certain lands in Alaska as Indian reservations. In view of the clear legislative intent and policy expressed in ANCSA's extensive legislative history, it would, in my opinion, be an abuse of the Secretary's discretion to attempt to use Section 5 of the IRA (which, along with §§ 1, 7, 8, 15, and 17 of the IRA still apply to Alaska pursuant to the unrepealed portion of the Act of May 1, 1936) to restore the former Venetie Reserve to trust status.

COPY

ATTACHMENT 2

PAGE 6 OF 8 PAGES.

AR00393

We have reviewed the materials received by the Chief of the Branch of Tribal Government Relations in support of the petition for the restoration of trust status. These materials concern the advisability of a restoration of trust status and set out the provisions of the IRA. There is nothing in these materials which counters our analysis of ANCSA. There is only a vague suggestion in the latter from Donald Wright to former Commissioner of Indian Affairs Thompson, dated August 13, 1976, that the Natives believed that they could retain the reservation in trust when they voted pursuant to Section 19 to take the reservation in fee. Nothing else in the materials supports or belies this suggestion. At any rate, a finding that the Natives were uninformed in no way affects the inability of the Secretary as a matter of law to restore the reservation to trust status. Even assuming the Natives could establish that they were uninformed, or worse, actively misled, it does not follow that the remedy would be to return the land to reservation, trust status. At most, the Natives would be entitled to another vote, such as the opt-in, opt-out election ordered by the court following the establishment of the 13th Region, between fee status and normal ANCSA benefits. The Natives do not seem to be requesting a such second vote, and we are not sure that a second vote would be possible at this time absent a court order.

In conclusion, Congress intended permanently to remove from trust status all Native land in Alaska except allotments and the Annette Island Reserve. Section 19(b) allows the Natives of former reservations to choose between two forms of compensation, but does not allow them to disassociate themselves from the settlement. Finally, even if the Natives could disassociate themselves from the settlement, Section 19 itself and its legislative history preclude the restoration of trust status.

*Thomas W. Fredericks*
Thomas W. Fredericks

# COPY

## APPENDIX

Statements regarding reservations made during ANCSA Debates

Rep. Fyl:  I do not know of any member of the committee who
wanted anything to do with setting up a reservation system
in the State of Alaska similar to that which we have in the
lower 48 states.  Our experience with reservations has just
been so tragic and has resulted in such a futile
paternalistic system that we wanted to avoid that
completely.  117 Cong. Rec. 36856 (1971).

Rep. Needs:  Every one of the bills in our committee and the
bills in the other body, all of them, eschew the reservation
or trust concept.  For far too long we in America have been
making the Natives' mistakes for them.  117 Cong. Rec. 36865
(1971).

Sec. McGovern:  Those who are concerned about creating new Indian
reservations in Alaska can find a solution to this problem
by assuring an opportunity for the Natives to secure
productive and promising lands.  117 Cong. Rec. 38444
(1971).

Sen. Gravel:  Under the committee bill all reservations in Alaska
are revoked, unless the village corporations located within
the reservation elect to take fee title to the reservation.
If Natives do elect to take title to the reservation, they
will not participate in the land selection procedures of the
bill nor share in the monetary settlement.  117 Cong. Rec.
46967 (1971).

# COPY

ATTACHMENT 2

PAGE 8 OF 8 PAGES.

AR00395

The Department has, in its final Part 151 regulations being published today, decided in its sound discretion to continue in place the bar against taking Native land in Alaska into trust (other than Metlakatla). 25 C.F.R. § 151.3(c). The preamble to these regulations expresses the Department's determination to continue this prohibition in place for three years, "during which time the Department will consider the legal and policy issues involved in determining whether the Department ought to remove the prohibition," and to provide notice and an opportunity to comment on any decision to remove it. Because of my substantial doubt about the validity of the conclusion in the 1978 Opinion, and in order to clear the record so as not to encumber future discussions over whether the Secretary can, as a matter of law, and should, as a matter of policy, consider taking Native land in Alaska into trust, I am hereby rescinding the Associate Solicitor's 1978 Opinion.

**COPY**



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C.  20240

DEC 3 0 1976

BIA 107A BCCO 5306 Box 6241
BIA AD, Juneau
BIA 930N mailroom
BIA 202/JFGordon:jwg 12/13/76

BIA 202 surname
BIA 202 chron
BIA 202 hold
BIA 200

cc:
Secty's surname
Secty's RF (2)
Other distribution P. 2

Dear Senator Stevens:

This is in further reply to your letters of August 23 and December 6 concerning the Venetie Reserve.

You have asked the status of the inhabitants of Christian Village and Robert's Fish Camp. Neither village was certified as a Native village pursuant to section 11(5)(3) of the Alaska Native Claims Settlement Act (ANCSA) [43 U.S.C. sec. 1610(b)(3)]. But while the residents of those villages originally voted to retain the Venetie Reserve, they are now given an option by section 1(b) of the Omnibus Act of January 2, 1976 (89 Stat. 1145) either to enroll into Venetie or Arctic Village or to remain enrolled in the Doyon Region on an at-large basis. There are no Alaska Native enrollees to Christian Village and only six enrolled to Robert's Fish Camp.

You have also inquired with regard to the delivery of services to the residents of Venetie under the Bureau of Indian Affairs contract with the Tanana Chiefs Conference. The formula for the provision of those services is not population-based, and services are being provided on essentially the same basis as if they were being provided directly by BIA. Of course, the remoteness of a village may necessarily impair the provision of services during certain times of the year. But local BIA officials feel that Venetie is receiving an equitable share of the contracted services.

Finally, you have asked that this Department look into the effect of the selection of a Native reserve on the trust responsibilities to the Native residents of such a reserve. This is, of course, a complex question rendered no less problematic by the fact that the scope of the Government's trust responsibility to Indian people remains a subject of much debate. See, for example, R. Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stanford Law Review 1213 (1975). The effect of the Settlement Act is, therefore, far from clear. In the case of Venetie and similar reserves, one can point to the fact that as a result of the Act, such reserves are no longer owned by the United States in trust for the benefit of the Natives. This necessarily has had some effect on

ATTACHMENT 4

PAGE 1 OF 2 PAGES.

COPY

2

trust responsibilities to provide realty-related services. To the
extent that the BIA's responsibilities to provide such services are
limited to trust land such obligations have been lifted. BIA services
for individual Indian allotments, however, would not appear to be
affected by the passage of ANCSA. Our responsibilities with respect
to former trust land could only be restored through legislation. Absent
more specific guidance from Congress, we will continue to evaluate our
remaining trust responsibilities in Alaska on a case-by-case basis.
If you have any questions regarding the nature or existence of the trust
relationship in a specific context, we will attempt to respond to it in
more detail.

If we can be of further assistance in this matter, please do not hesitate
to call on us.

                        Sincerely yours,


                        /S/ KENT FRIZZELL

              Under
                        Secretary of the Interior


Honorable Ted Stevens
United States Senate
Washington, D. C.   20510


COPY

ATTACHMENT ___4___

PAGE __2__ OF __2__ PAGES.

AR00398



UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C. 20240

John E. Rougeot, President                  **DEC 2 3 1980**
Rougeot Oil and Gas Corporation
7030 South Yale, Suite 401
Tulsa, Oklahoma  74136

Mr. Paul S. Williams
First Chief, Native Village of Venetie
Venetie, Alaska  98781

Gentlemen:

This is in partial response to an inquiry of September 11, 1980, by counsel
for the Native Village of Venetie and Rougeot Oil and Gas Corporation addressed
to the Superintendent of the Bureau of Indian Affairs, Fairbanks, relating to
Secretarial approval of certain oil and gas leases. Your inquiries were for-
warded by the Bureau of Indian Affairs to us for response.

You have posed several complex questions which give rise to a variety of
issues, some of which are relatively easy and some of which are extremely
difficult and ones of first impression for this Department.  Since we are
aware that the existing agreements contain an option provision which must
be exercised by December 31, 1980, we are anxious to provide you with at least
our initial response to those questions or parts of questions for which there
is a fairly clear answer.  We will endeavor to provide you with a complete
answer as soon as possible.  We believe, however, that even these partial
answers should be of help to you.

Our understanding of the facts is that on July 12, 1973, representatives of
the Village of Venetie tribal government incorporated the Village as an
Alaska corporation pursuant to Alaska Native Claims Settlement Act of 1971
(ANCSA).  Arctic Village followed the same procedures in forming the Neets'ai
Corporation.  The corporations elected to take the former Venetie Indian
Reservation lands, including the mineral estate, in fee pursuant to Section
19(b) of ANCSA.

On September 1, 1979, both Neets'ai Corporation and Venetie Indian Corporation
(the ANCSA entities) executed warranty deeds granting all their interests in
the reservation lands to the Venetie entities organized under the Indian
Reorganization Act (IRA).

On December 17, 1979, the Federal Government issued a patent to the Neets'ai
and Venetie Indian Corporations, as tenants in common, for the entire estate
comprising the former Venetie Indian Reservation.  The patent was issued
pursuant to Section 19(b) of ANCSA and was made subject only to valid existing
rights.

# COPY

ATTACHMENT  5

PAGE  1  OF  5  PAGES.

-2-

On September 4, 1980, the Venetie IRA entities leased oil and gas rights on all their lands to Rougeot for a primary term extending through December 31, 1982. The initial lease bonus was set at $1,800,000, of which $200,000 was a previously paid option fee.

Finally, and also on September 4, 1980, the IRA entities, the ANCSA entities and Rougeot entered an "Agreement and Conveyance" which purports to draw the IRA and ANCSA entities together as responsible parties under the oil and gas lease. The document provides that if any of the transactions with Rougeot or between the Native entities are held invalid, the IRA entities would be deemed to have conveyed their interest in the land and minerals back to the ANCSA entities as tenants in common. The Agreement and Conveyance further provides that Rougeot may enforce its rights under the oil and gas lease against any of the Native entities -- ANCSA or IRA.

As already indicated, these facts give rise to several complex issues. The membership in ANCSA corporations and the membership in the Venetie IRA entities are not the same. Accordingly, conveyance by the ANCSA corporations to the IRA entities could constitute the conveyance of all or substantially all of the ANCSA corporations' assets. While there is no evidence in the file on this point, we have no reason to suspect that the ANCSA corporations did not comply fully with the special requirements of Alaska state corporate law relating to shareholder approval of such conveyances. See Alaska Statutes § 10.05.435 and 438. We mention this requirement because there is an unresolved problem as to the relationship between the Venetie IRA and members of the traditional community of Arctic Village.

The members of both of these communities have acted in recent years as though they were all members of the Venetie IRA entities. However, the record does not justify such action. The Venetie IRA organization was ratified January 25, 1940. It was not until March 1, 1944, that people from the traditional community of Arctic Village and the Venetie IRA, as well as two other traditional communities (Christian and Robert's Fish Camp (Rachick)), voted to accept the reservation in trust. This later vote did not constitute an amendment of the Venetie IRA constitution or corporation charter but we are fearful it has been construed as such.

The situation in Alaska relating to the Indian Reorganization Act is substantially different than in the lower 48. In the lower 48, the existence of a reservation was a prerequisite to organization under the IRA. In Alaska, communities could organize without first having a reservation and many did so. The result seems to have been substantial confusion.

Our preliminary opinion that the members of the traditional community of Arctic Village are not necessarily the same as the members of the Venetie IRA aggravates the problem of shareholder approval under Alaska state corporate law. However, in light of the agreement and conveyance executed by the Natives on

**COPY**

-3-

September 4, the same date the oil and gas lease was executed, it may not be necessary to address this more complex issue. Pursuant to this agreement and conveyance the ANCSA corporations and the Venetie IRA entity agree that Rougeot Oil and Gas Corporation can enforce any of the lease and conveyance agreements against the two ANCSA corporations even if the lease or conveyance is determined invalid or unenforceable against the Venetie IRA by any person in any adminis- trative procedure for any reason. Thus, we believe that the most important question involved is the relatively simple one of whether there is any requirement for Secretarial approval of an oil and gas lease executed or adopted by the ANCSA corporations. Our answer is that the Secretary clearly does not need to approve any such actions by the ANCSA corporations.

The land transferred to the Venetie/Arctic Village ANCSA entities was the land comprising the Venetie Reservation which was set aside for the inhabitants of the Native Villages of Venetie, Arctic Village, Christian Village, and Robert's Fish Camps (Kachick) and vicinity by a proclamation of the Assistant Secretary on May 20, 1943, pursuant to the Act of May 1, 1936 (49 Stat. 1253). Section 19(a) of ANCSA provides in part:

> Notwithstanding any other provision of law, and except where inconsistent with the provisions of this chapter, the various reserves set aside by legislation or by Executive Order or Secretarial Order for Native use or for administration of Native affairs . . . are hereby revoked. See 43 U.S.C. § 1618(a).

The Government's conveyance of former Venetie Reserve lands to the ANCSA entities in fee was a conveyance to Village Corporations, not to tribes. The Settlement Act section under which the patent was issued provides that:

> Notwithstanding any other provision of law or of this chapter, any Village Corporation or Corporations may elect . . . to acquire title to the surface and sub- surface estates in any reserve set aside for the use or benefit of its stockholders or members prior to December 18, 1971 . . . . In such event, the Secretary shall convey the land to the Village Corporation or Corporations . . . . 43 U.S.C. § 1618(b).

Not only is this statutory language revoking the reservation status of the land clear, but also ANCSA's declaration of policy and legislative history demonstrates that Congress intended to remove Alaska Native lands from a tribal or racially defined status and therefore free of any restraints on alienation. Congress' declaration of policy in the Settlement Act provides that:

> The settlement should be accomplished . . . without establishing any permanent racially defined insti- tutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges . . . . 43 U.S.C. § 1601(b).

COPY

ATTACHMENT __5__

PAGE __3__ OF __5__ PAGES.

AR00401

-4-

The House report on the Settlement Act declared that:

> [t]he bill does not establish any trust relationship
> between the Federal Government and the Natives. The
> regional corporations and the village corporations
> will be organized under State law, and will not be
> subject to Federal supervision except to the limited
> extent specifically provided in the bill. All con-
> veyances of land will be in fee — not in trust.
> H.R. Rep. No. 92-523, 92d Cong., 1st Sess. 9 (1971).

The Senate Report is also instructive:

> The assets granted to Alaska Natives under the terms
> of this settlement will be managed and disposed of by
> them either as individuals or through statewide,
> regional and local corporations controlled by them.

>          *          *          *

> The settlement of Alaska Native land claims is to be
> final and complete and the present legislation intends
> to avoid prolonged legal or property distinctions or
> implications of wardship based upon race. Accordingly,
> the assets granted in settlement of the claims will be,
> or will rapidly become, ordinary and unrestricted
> forms of property. Organizations established to
> implement the settlement will have a strictly limited
> life or will become ordinary public and private corpo-
> rations operating without any special privileges or
> restrictions. [Emphasis added.] S. Rep. No. 92-405,
> 92d Cong., 1st Sess. 80 (1971).

Although there is very little case law on the issue, what there is agrees with
the committee's interpretation of the Settlement Act. See Cape Fox Corp. v.
United States, 456 F. Supp. 784 (D. Ak. 1978). Furthermore, other sections
of the Settlement Act reflect Congress' consent to unrestricted Native alienation
of land and natural resources patented pursuant to the Settlement Act. For
example, in the definition of "Village Corporation" in section 3(j) of the
Settlement Act, 43 U.S.C. § 1602(j), the consent to alienation is clear:

> "Village Corporation" means an Alaska Native Village
> Corporation organized under the laws of the State of
> Alaska as a business for profit or nonprofit Corpor-
> ation to hold, invest, manage and/or distribute lands,
> property, funds, and other rights and assets for and
> on behalf of the Native Village in accordance with
> the terms of this chapter. [Emphasis added.]

# COPY

ATTACHMENT __5__

PAGE __4__ OF __5__ PAGES.

-5-

The laws of Alaska obviously allow corporations to alienate property freely. Similarly, Section 14(g) of the Settlement Act provides that:

> [u]pon issuance of the patent, the patentee shall succeed and become entitled to any and all interests of the State or the United States as lessor, contractor, permitter, or grantor, in any such leases, contracts, permit, rights-of-way, or easements covering the estate patented . . ..

This section substitutes the Village Corporation for the United States or the State, as the case may be, as grantor or lessor of pre-existing interests in the patented land. S. Rep. No. 92-405, 92d Cong., 1st Sess. 145 (1971). It follows that subsequent conveyances of interests in the patented land would be executed by the Native Corporations, not by the Federal or State Governments. Again, the conclusion is that Congress has consented in the Settlement Act to unrestricted Native alienation of ANCSA patented lands.

For all of the foregoing reasons, I am convinced that Secretarial approval is not required for any actions taken by the ANCSA corporate entities. Our preliminary view is that Secretarial approval is also not required of actions taken by the Venetie tribal government under these unique circumstances. The issues surrounding the actions by the Venetie tribal government are, however, considerably more complex. We will provide you with our views on those issues just as soon as we have finalized them. In the meantime, if you have any other questions, please don't hesitate to call on us.

Sincerely yours,

Scott Keep
Acting Associate Solicitor
Division of Indian Affairs

cc:    Regional Solicitor, Anchorage
         Attn:  David Case
       Mr. James Savok, Superintendent
       Frederic Dorwart, Esq.
       Clifford Groh, Esq.

COPY

ATTACHMENT 5

PAGE 5 OF 5 PAGES.

AR00403



DHL WORLDWIDE EXPRESS

Shipment Airwaybill (Non-negotiable)
1-800-CALL-DHL (in USA only)

**1 From (Shipper)**
Account no. 912344124
Company name SO AK LAW
Address Bruce Botelho
ATTORNEY GENERAL OFFICE FL 5
123 4TH ST
JUNEAU AK

Shipper's reference

**2 To (Recipient)**
Company name Ofc of Trust Responsibilities
Attention Terry Virden
Delivery address 1849 C Street NW
Washington DC 20240
Zip code (required) 998011141
Phone/Fax/Telex (907)465-3600

**3 Shipment details**
Services
☐ U.S. DOMESTIC
☐ INTERNATIONAL DOCUMENT
☐ INTERNATIONAL NON DOCUMENT
☐ WORLDMAIL 1st/APN/2nd
Special Services area charges may apply
☐ SATURDAY DELIVERY
☐ OTHER
Full description of contents

Payment Options not all options available to all countries
☐ Shipper's account
☐ Recipient
☐ Third party
Acct. No.

**4 Pcs/Weight/Size**
ORIGIN JNU
DESTINATION DCA
Weight if DHL Express Document packaging is used, enter Wt or X
No. of pieces
Dimensions in inches
length width height
DIMENSIONAL/CHARGED WEIGHT
CODES
CHARGES
Special services
Insurance
TOTAL

TRANSPORT COLLECT STICKER No.

**5 Shipper's authorization and signature**
Signature Timothy Henderson
Date 06/14/01

PICKED UP BY
Date 6/14/01 Time 11:00

DHL AIRWAYS, INC. • 333 TWIN DOLPHIN DRIVE, REDWOOD CITY, CA 94065

814 5075890

Recipient's Copy

544516 12/22/95

COPY

AR00404

*B − I*

# COMMENTS ON THE SECRETARY'S PROPOSED RULE
## FOR 25 C.F.R. Part 151, "ACQUISITION OF TITLE TO LAND IN TRUST"
### at 69 FED. REG. 17574 (April 12, 1999)

*X*

On Behalf Of:

ALASKA INTER-TRIBAL COUNCIL
CHILKOOT INDIAN ASSOCIATION
NATIVE VILLAGE OF LARSEN BAY
KENAITZE INDIAN TRIBE
NATIVE VILLAGE OF TULUKSAK
RurAL CAP
ALASKA VILLAGE COUNCIL PRESIDENTS
TANANA CHIEFS CONFERENCE
MASHPEE WAMPANOAG TRIBAL COUNCIL
SHINNECOCK INDIAN NATION
UNITED HOUMA NATION
PAMUNKEY INDIAN TRIBE

Submitted to: OFFICE OF TRUST RESPONSIBILITIES
Bureau of Indian Affairs
1849 C Street, NW, MS-4513-MIB
Washington, D.C. 20240

RECEIVED
MAY 1 8 2000
OAET

Dated: *11/10/99*

▶ **20** ◀

AR00405

## I.    INTRODUCTION

It is with great consternation that we find ourselves reviewing proposed regulations contemplating revisions to 25 C.F.R. 151 that will make it utterly impossible for Alaska tribes, unrecognized tribes, and California tribes to successfully petition to place lands into trust pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465.  Should such regulations become final, over fifty percent of the federally recognized tribes in the United States will lack the land protections guaranteed by trust status — an outcome directly at odds with the congressional policy of tribal self-determination.  For the reasons stated herein, we strongly urge the Secretary to withdraw the proposed regulations and initiate a process of negotiated rule-making with the tribes to develop regulations that more fairly represent the purposes of the IRA.

These comments are not meant to be exclusive but reflect our primary areas of concern.  We have been working with the Tribal Leaders' Task Force on Land Recovery and support their efforts to promote specific amendments to the proposed regulations.  To emphasize the import of the issues addressed, we have incorporated many of the Tribal Leaders' suggested changes to the proposed regulations in our comments.  We also join with NCAI and all other tribes in reiterating the grave concern that the proposed regulations grant far too much deference to state and local governments by prioritizing their concerns over the land needs of Indian tribes.  Such deference to state and local governments violates the federal government's trust responsibility to Indian tribes.

## II.    DISCRETIONARY ACQUISITIONS IN ALASKA

In 1995, the Chilkoot Indian Association, Native Village of Larsen Bay and Kenaitze Indian Tribe filed a petition setting forth the legal arguments supporting the Secretary's statutory authority to take lands into trust post-ANCSA and requesting that the Secretary revise 25 C.F.R. § 151.1 to comply with the IRA.  (60 Fed. Reg. 1956 (1995).  The Secretary has taken no final action on the petition to date but proposes to continue the regulatory bar to acquisition of title in trust in Alaska "subject to review pending the report of the Rural Governance Commission, or Congressional action clarifying that ANCSA lands are Indian country."  60 Fed. Reg. at 17578.

Comment:    The Secretary has offered no explanation for failing to take action on the Chilkoot *et al.* petition and has not responded to the legal arguments contained therein except to note that "we recognize that there is a credible legal argument

Comments on Acquisition of Title to Land in Trust
Page 2

that ANCSA did not supersede the Secretary's authority to take land into trust in Alaska under the IRA." Despite this acknowledgment of legal authority, the proposed rule maintains the regulatory bar to acquisition of title in trust in Alaska and solicits comment on the continued validity of the Associate Solicitor's opinion ("Trust Land for the Natives of Venetie and Arctic Village," September 15, 1978) ("Fredericks opinion"), in light of the United States Supreme Court's ruling in *Alaska v. Venetie*, 522 U.S. 520 (1998).

The legal basis for Secretarial authority to take lands into trust in Alaska as set forth in the Chilkoot *et al.* petition remains valid today. As we explained there, the Fredericks opinion incorrectly concluded that it would be an abuse of Secretarial discretion to take tribal land into trust following the passage of the Alaska Native Land Claims Settlement Act of 1971, 43 U.S.C. § 1601 *et seq.* (ANCSA). That opinion is not well founded since ANCSA did not repeal the Secretary's authority to take land into trust under the IRA, 25 U.S.C. § 465.

The IRA amendments of May 1, 1936 c. 254, 49 Stat. 1250 expanded the application of the IRA's various provisions to the Territory of Alaska. Although Section 2 of the IRA, which gave the Secretary authority to designate certain lands in Alaska as Indian reservations was repealed by Congress in 1976, section 465, which gave the Secretary authority to take tribal lands into trust pursuant to section 473a of the IRA, was not repealed. The Fredericks opinion makes no distinction between "reservation" lands and "trust" lands[1], but simply assumes that Congress impliedly repealed the Secretary's authority with respect to both types of land tenure with the passage of ANCSA.

To the contrary, Congress has passed no legislation that has repealed or in any way affected the right conferred to Alaska Native tribes by Section 473a of the IRA. Congress has only strengthened the protections afforded tribes by amending the IRA to prohibit promulgation of any "regulation" or "decision or determination" "that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." 25 U.S.C. § 476 (f) & (g). The current and proposed rule violates this statutory prohibition in numerous ways, but most particularly by denying Alaska's federally recognized tribes an equal status with federally recognized tribes in the continental United States. This

---

[1]  The Secretary appears to recognize this distinction as he specifically notes at section 151.23 of the proposed rule that lands taken into trust enjoy "Indian country" status but do not attain "reservation" status. This view is clearly at odds with the Fredericks opinion and justifies its withdrawal.

Comments on Acquisition of Title to Land in Trust
Page 3

AR00407

differing treatment is inconsistent with the Secretary's prior pronouncement that Alaska tribes are entitled to the "same protection, immunities, [and] privileges [shared by] other acknowledged tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

The legal underpinnings for Secretarial authority to acquire lands in trust for Alaska tribes has not been changed, altered or undermined by the Supreme Court's decision in *Alaska v. Venetie*, 522 U.S. 520 (1998). In *Venetie*, the Court addressed the question of whether Venetie's former ANCSA lands met the test for Indian country under 15 U.S.C. 1151(b). The Court held that ANCSA lands do not satisfy requirements for "Indian country" status because such lands were not set aside for Indians as such (since they were conveyed to corporations), and because ANCSA lands lack any restriction on alienability, the requisite federal superintendence over the land was missing. The Court rejected the proposition advanced by the State that no Indian country existed in Alaska, and instead held that "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of 1151(b) or if it constitutes 'allotments' under § 1151(c)." 522 U.S. at n.2. The Court did not address the question of whether the Secretary retains authority under the IRA to place lands into trust in Alaska. Since the statutory basis for the Secretary's authority remains in tact, neither the Fredericks opinion nor the *Venetie* opinion can validly be relied upon as bases for precluding Alaska tribes from enjoying the "same protection, immunities, [and] privileges [shared by] other acknowledged tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

Rather than take final action on the petition's specific request to revise 25 C.F.R. § 151.1 consistent with federal law, the proposed regulation solicits the views of the State of Alaska's Commission on Rural Governance and Empowerment on this topic.[2] In its June 1999 report, the Commission makes a recommendation in *favor* of Indian country and tribal territorial jurisdiction in Alaska:

> The State of Alaska should recognize the potential benefits to the state to further enhance local control and economic opportunities, and not foreclose the option of allowing tribes to transfer their land into federal trust status. Further, the State of Alaska should maintain an objective view of Indian Country issues and not continue its historical view that Indian

---

[2] Again, we note our consternation that the Secretary solicits views from a state created Commission (even if favorable) rather than consult directly with the tribes.

Comments on Acquisition of Title to Land in Trust
Page 4

AR00408

Country in Alaska is inherently threatening to State
sovereignty. The State should also continue to acknowledge
that Alaska Natives hold land in federal trust or restricted
status in the form of Native townsite lots, Native allotment, a
few parcels of trust land and the Annette Island Reserve.

Alaska Commission on Rural Governance and Empowerment, *Final Report to the
Governor* 17 (June 1999). The Rural Governance Commission's recommendation echos
previous recommendations made by blue-ribbon commissions and working groups. *See,
e.g.* Vol. 1, Alaska Native Commission Report at 75-76. This guidance, solicited by the
Secretary, further supports lifting the regulatory bar against taking lands into trust in
Alaska.

The proposed regulation is illegally restrictive both with respect to its
arbitrary bar against trust lands in Alaska, and with respect to the burden that it imposes
upon tribes that lack reservation status. There are no reservations in Alaska (with the
exception of Metlakatla). Thus, even if the Secretary were to lift the regulatory bar as it
pertains to Alaska tribes, such tribes would be subject to the *"Tribal Land Acquisition
Area"* category which would result in a *de facto* regulatory bar to the acquisition of title
in trust in Alaska.

The "*Tribal Land Acquisition Areas for Tribes Without Reservations*" is
prohibitively cumbersome for tribes that are either reservation-less or without an adequate
reservation. The following provisions in the proposed rule are amongst the most
egregious:

Section 151.18(g)(1)-(3) requires a tribal applicant to provide a "description
of the reasonably anticipated overall effect on the State and its political subdivisions of
removing lands located within the Tribal Land Acquisition Area from tax rolls. . . ."
including, "the amount of annual taxes currently assessed," "the amount of annual revenue
which would be lost," and "the amount of revenue lost from mineral receipts to local
governments." This requirement should be removed as it shifts the onus from state and
local governments to tribes to provide information that may not be available or readily
accessible to tribes. It should not fall upon the tribes to provide information on behalf of
a state or local government when those entities have the ability to provide comment on
trust acquisition petitions.

Section 151.18(h)(1)-(7) requires information on jurisdictional issues,

Comments on Acquisition of Title to Land in Trust
Page 5

AR00409

zoning issues, law enforcement, safety factors and fire protection, road and access issues, sanitation and water issues, and utilities issues. Alaska villages will be hard pressed to provide the breadth of information required without technical assistance. Moreover, tribes cannot be presumed to know what jurisdictional areas of dispute may arise before a state or local government provides comment. Law enforcement is a *non sequitur* in Alaska because it is a Pub.Law 280 state (it is a relevant criteria only to the extent that the State has failed to provide adequate law enforcement to Alaska Native communities).

Section 151.18(8) requires a tribe to provide information regarding "[w]hether the tribe has made any provisions to compensate the State and local governments for revenue lost because of the removal of the lands from the tax rolls." This is not a proper criteria for assessing whether lands should be acquired in trust. One of the primary purposes for placing tribal lands into trust is to protect them from state and local taxation and foreclosure proceedings (as is the case with petitioner, Native Village of Larsen Bay). This requirement should be removed as it creates a presumption that a pay-off to a state or local government is a necessary prerequisite for tribal trust acquisitions.

If the Secretary elects to maintain the "*Tribal Land Acquisition Areas for Tribes Without Reservations*" distinction between tribes on and off-reservations, the rule should be modified to accommodate the unique circumstances in Indian land tenure in Alaska created by the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601 *et seq.*

All of the federally recognized tribes that are listed in ANCSA were found eligible to select lands pursuant to section 1610(b). The tribes were required to select the townships in and surrounding their villages precisely because such lands formed the basis of the tribes' respective aboriginal land claims. Pursuant to section 1607, however, all lands were conveyed in fee to village corporations that were organized "to hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf of a Native village. . . ." 43 U.S.C. § 1602(j). As a consequence, and for all practical purposes, the shareholders of a village corporation are also enrolled tribal members of a village tribe.

In recent years many village corporations, through action taken by their shareholders, have chosen to convey ANCSA corporate land to the tribal village council (as is the case with petitioner Native Village of Larsen Bay). Former ANCSA land that has been conveyed to a tribe should be entitled to an on-reservation presumption in favor

AR00410

of trust status because such lands have always been held in Indian title (i.e. first in aboriginal title, then by native-owned corporations, then tribal ownership). The State of Alaska has never possessed an ownership interest in such lands; therefore, the State's concerns should not be accorded preferential weight over the tribe's needs to protect its and base.

Suggestion - The Secretary should withdraw the Associate Solicitor Fredericks opinion ("Trust Land for the Natives of Venetie and Arctic Village," September 15, 1978), delete § 151.3(c), and lift the regulatory bar to acquisition of trust lands in Alaska. The regulations should not distinguish between on-reservation and the Tribal Land Acquisition Areas but employ the same criteria for evaluating both. Alaska tribes should be allowed to petition under the less burdensome standard. In the alternative, if the Secretary chooses to maintain the regulatory bar against acquisition of trust lands in Alaska, the Secretary should make his decision final and set forth his reasons for doing so.

## III.   THE RULE'S APPLICATION TO NON-FEDERALLY RECOGNIZED TRIBES

Unrecognized tribes (such as the Mashpee Wampanoag Tribal Council, the Shinnecock Indian Nation, the Pamunkey Indian Tribe and the United Houma Nation) will be disadvantaged by the proposed regulations in several ways.  First, as reservation-less tribes they will be subject to the Tribal Land Acquisition Area and as stated above, the criteria necessary to establish a Tribal Land Acquisition Area is prohibitively burdensome.  Subsequent to recognition, former non-recognized tribes are not likely to possess the financial resources necessary to cover the cost of compiling all the information required for purposes of establishing a Tribal Land Acquisition Area.

Second, the Tribal Land Acquisition Area designation is only available to tribes that are landless or lack reservations.  A non-recognized tribe may have some land holding in fee that the tribe, once recognized, may desire to have placed in trust.  The proposed rule should be modified to allow newly recognized tribes with fee holdings to qualify for trust status under the on-reservation acquisition criteria.

Third, if a newly recognized tribe is successful in getting land designated as a Tribal Land Acquisition Area, § 151.17 of the proposed rule sets forth a 10 year time period in which a reservation-less tribe can acquire land within a Tribal Land Acquisition Area under the on-reservation provisions. Presumably, after the ten year limit runs, a

Comments on Acquisition of Title to Land in Trust
Page 7

tribe will have to request that lands be taken into trust under the off-reservation standard. Tribes that occupy lands within a Tribal Land Acquisition Area should be treated similarly to on-reservation tribes and entitled to place lands in trust under the on-reservation provisions beyond the ten year time limit. The ten year time period should be deleted as it diminishes the privileges and immunities of newly recognized tribes in relation to existing federally recognized tribes. Such distinction is contrary to the Congressional mandate that the "Department or agencies of the United States shall not promulgate any regulation or make any decision or determination . . . with respect to a federally recognized tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." Technical Corrections Act of 1994, Pub. L. No. 103-263, §5(b), 108 Stat. 707, 709, codified at 25 U.S.C. § 476(f) (1996 Supp.); see also 25 C.F.R. § 83.

IV.    **WE ENCOURAGE THE SECRETARY TO ADOPT THE FOLLOWING SUGGESTED CHANGES TO THE PROPOSED LAND-TO-TRUST REGULATIONS AS SPECIFIED BY THE LAND TASK FORCE OF THE NATIONAL CONGRESS OF AMERICAN INDIANS**

A.    **Contiguous Lands**

We feel most strongly that applications to take lands contiguous to a reservation into trust should be evaluated under the on-reservation standards. The proposed regulations make a drastic change from existing regulations by treating applications for trust acquisitions of land contiguous to a reservation as off-reservation applications. Contiguous land acquisition should be given a strong preference because it is an antidote to the primary problem caused by allotment of tribal lands - the fragmentation of land into small parcels that are exceedingly difficult to manage for purposes of jurisdiction, land use, environmental protection and economic development. Trust acquisitions of contiguous lands remedy the problem of small reservations and off-reservation checkerboarding while reducing the impact on the surrounding non-Indian community.

Contiguous acquisitions should be favored under the regulations. The legislative history for Section 5 of the Indian Reorganization Act emphasizes that it was intended to remedy the problems of discontinuous lands caused by allotment checkerboarding. *See, e.g.*, Readjustment of Indian Affairs, supra, at 16-18, 61; 78 Cong. Rec. 11728, 11732 (Comments of Rep. Howard). The existing regulations are consistent

Comments on Acquisition of Title to Land in Trust
Page 8

AR00412

with the Indian Self-Determination and Education Assistance Act "two-sides adjoining" language, which provides statutory justification for treating acquisitions of contiguous lands as on-reservation acquisitions. *See* 25 U.S.C. §450h(3). The language of the Indian Gaming Regulatory Act of 1988, which provides for a "contiguity exception" to the Section 20 requirements, grants additional Congressional support to preferential treatment of contiguous lands. *See* 25 U.S.C. §2719(a)(1).

Preferred Option - include all contiguous lands in on-reservation section:

> ### Sec. 151.9  What information must be provided in a request involving land inside or contiguous to a reservation or inside an approved Tribal Land Acquisition Area?

Second Option - include most contiguous lands in the on-reservation section through definition of reservation except urbanized areas and across state boundaries and make contiguousness a priority under off-reservation section. This option is responsive to the primary concerns raised against a contiguity preference, yet retains the fundamental goal of rebuilding contiguous land blocks for the benefit of Indian people:

In 151.2 definition of "reservation":
> *(3) for the purposes of this section, the consideration of requests under the on-reservation criteria includes land contiguous to a reservation unless the land is:*
>> *i) within an urbanized area as determined by the U.S. Census Bureau\*, or*
>> *ii) in a State in which the relevant tribe does not possess an interest in a reservation or trust land.*

In 151.14 criteria for review of off-reservation requests:
> *(2) Whether the location of the land supports taking the land into trust. For purposes of this section:*
>> *i) If the land is contiguous to the Tribe's reservation or is contiguous to a parcel of land held in trust or restricted fee for the tribe or a member of the tribe and is not within the definition of "reservation" under this part, the location of the land shall be deemed to be a factor strongly supporting taking the land into trust;*

Comments on Acquisition of Title to Land in Trust
Page 9

AR00413

## B.    Former Reservation Lands and Treaty Right Lands

The on-reservation provisions of the regulation are intended to accord additional weight to a tribe's need for land "in recognition of the tribe's reasonable expectation that it will benefit from the lands originally promised to it by treaty or Executive Order." 64 Fed. Reg. 15577.    Yet many tribes are struggling to repurchase lands that were once within their reservation boundaries or held in trust for their benefit, but were removed through acts of aggression and termination by states and local governments.  This removal often occurred with the participation of the federal government and through the failure of the federal government to fulfill its obligation to protect tribal lands.  Recovery of these lands into trust status should be a priority under the regulations.

In addition, some tribes hold treaty rights for hunting, fishing and gathering in traditional places off-reservation and are seeking to purchase and protect these places from the development and encroachment that threaten to deny tribes the benefit of their treaty rights.  These lands should also have a high-priority for trust acquisition under the regulations as this acquisition will prevent the inevitable conflicts that occur when treaty rights are threatened and eroded by environmental degradation.

Option - Create a preference in 151.14 criteria for review of off-reservation requests:

> *ii) If the land is within the tribe's former reservation, aboriginal homeland, treaty ceded area, land where the tribe retains treaty rights, or was otherwise formerly held or used by the tribe or its members, the location of the land shall be deemed to be a factor supporting taking the land into trust;*

## C.    Criteria for Evaluation

The proposed regulations contain criteria for evaluating trust land applications for on-reservation lands, Section 151.10, as well as criteria for lands off-reservation, Section 151.14.  These criteria are at the heart of the proposed regulations.  But while these provisions are intended to establish the basis by which trust land decisions will be made, they fail to provide clear standards to guide the Secretary, to protect the interests of the tribes, or inform the expectations of other interested parties.

Comments on Acquisition of Title to Land in Trust
Page 10

AR00414

We believe that the proposed criteria should incorporate the historical and policy context in which trust land decisions are made. Trust land decisions that are made today do not occur on a blank slate. The devastating loss of land that most tribes have suffered – and the long term adverse consequences of that land loss – creates an important historical backdrop to those decisions.

Most importantly, the proposed regulations do not provide clear standards under which the Secretary would exercise his discretion and balance competing interests with respect to trust land decisions. Instead, the proposed regulations list factors for the Secretary to consider, but fail to provide clear standards for his/her consideration of such factors. Tribes are entitled to have tribal trust land decisions based on clear and appropriate standards. In addition, clear standards will make the regulations less vulnerable to attack by states and others who have long argued that the current regulations are invalid precisely because they lack clearly defined standards.

Option - We separated out the threshold filing requirements and would propose clear substantive standards as follows:

For on-reservation, create a new standard for review:

(b) Based upon consideration of:
    (1) the history and circumstances of land loss by the relevant tribe,
    (2) the economic, governmental, social and cultural consequences of that land loss,
    (3) the intent of Congress to foster tribal economic development, self-determination, self-government, Indian housing and land consolidation, and
    (4) the expected benefits of taking the specific land in question into trust,
a request to have land taken into trust that meets the requirements of section 151.10(a) shall be granted and the subject land shall be taken into trust, unless there is clear and compelling evidence that the adverse impacts of taking the land into trust would significantly outweigh the benefits.

For off-reservation, modify the standard to:

Comments on Acquisition of Title to Land in Trust
Page 11

AR00415

*unless the adverse impact of doing so would outweigh the benefits to the tribe.*

and append the following:

> *For purposes of this subsection, in evaluating the potential benefits and harms that would flow from the granting of a request to take land into trust, we will consider, in addition to the factors described above:*
>
> > *(1) Whether the acquisition will create extraordinary additional responsibilities for the Bureau of Indian Affairs, and*
> > > *(i)neither the Bureau nor the tribe can reasonably meet those responsibilities, and*
> > > *(ii)the burden of such responsibilities clearly outweighs the benefits of taking the lands into trust.*
> > *(2) Whether the location of the land supports taking the land into trust. For purposes of this section:*
> > > *{see i and ii above}*
> > > *iii) If the land is not covered by subsections (b)(2)(i) or (b)(2)(ii) of this section, the greater the distance between the land and the tribe's reservation, the greater the scrutiny that will be afforded to the justification of anticipated benefits to the tribe, and the greater the weight that will be given to the legitimate concerns of state and local governments.*

## D.    Burden of Providing Information for Off-Reservation Acquisitions

The requirements for off-reservation acquisition requests, as set forth in Section 151.12, are extremely burdensome. Applicants would be required to submit information that is under the control of other entities who may be opposed to the application. In addition, the cost of providing much of the requested information is prohibitive given the resources of most tribal applicants. The proposed regulations would require that tribes investigate, anticipate, and mitigate to a considerable extent, any potential impacts or added burdens on local non-Indian communities that may be

Comments on Acquisition of Title to Land in Trust
Page 12

AR00416

attributable to the transfer of land from fee to trust. While we understand Interior's goal of creating a process that will appropriately include the concerns of states and local governments, we feel strongly that erecting such extreme barriers to off-reservation land acquisitions is directly contrary to the statute's purpose.

Section 5 of the IRA explicitly grants Interior equal authority to acquire land for the benefit of tribes *"within or without existing reservations."* The legislative history clearly shows that the acquisition of land outside reservation boundaries was considered necessary to meet the goal of providing adequate land for tribes.

In addition, Interior is well aware of the many tribes who have lost their land base through acts of aggression and termination or other circumstances and are forced to rely on off-reservation land acquisitions to attempt to rebuild their homelands.

With regard to 151.12 (e), since state and local governments are in a better position to know the specific effects the trust acquisition will have on them, and are granted the right to comment extensively on these effects, it is redundant and unfairly burdensome to require the applicant to provide this information. The proposed regulations would substantially increase the ability of local non-Indian communities to frustrate or stifle tribal development. Similarly, with regard to 151.12 (f), state and local governments who have concerns about jurisdictional and land use issues should raise these concerns.

Finally, the proposed regulations seem to be drafted with a great awareness of controversial trust land applications, but without a context for the vast majority of trust land applications which have no controversy at all. As a result, the proposed regulations assume that conflict is the norm and require information that would be relevant only to large economic development projects, creating extensive mandatory procedures when a more flexible system might better serve the needs of all parties. A great majority of trust land acquisitions are not for development, but for cultural protection, sacred site protection, land consolidation or environmental and natural resource protection. A better method is to allow, but not require, all parties to submit information on the relevant issues, and then weigh the merits.

> Option - We have revised section 151.12 so that it is limited to the information that a tribe <u>must</u> submit in connection with an off-reservation land application. We have listed, in a separate section immediately following section 151.12, the additional information regarding the potential impact of the acquisition on state

Comments on Acquisition of Title to Land in Trust
Page 13

AR00417

and local governments which the Secretary will consider, and which a tribe may choose to address in the application. We have further revised these provisions so they do not assume jurisdictional conflicts or adverse impacts on the state and local governments, but instead solicit information on these matters using a neutral tone. The language we suggest to precede subsections (e) and (f) is as follows:

> ### Sec. 151.___ What additional information will be considered with respect to a request involving land outside a reservation or outside a Tribal Land Acquisition Area?
>
> *In addition to the information required under Section 151.12, in determining whether to take land into trust that is outside a reservation we will consider the information submitted by any interested party on the matters contained in this section. While tribes and individual Indians are not required to submit this information, it may in some cases be in their interest to do so. We will consider:*

**E.    Need for Timely Action in Interior Decision-Making**

The draft regulations fail to address what has been the chief concern of many tribes with the existing land-into-trust process. The BIA, who processes the applications, is not held to any time line. Applications have been known to sit for years and even decades at Agency and Area offices. By not mandating a time line for application review and processing, tribes risk losing project funding and more. Interior has an obligation to ensure that the agency takes a reasonable amount of time to process applications for land-into-trust.

Suggestion - We have added a series of deadlines by which the steps are to be completed to the rule's description of the procedures for processing trust land requests. We are greatly interested in discussing the timing issues with Interior.

We have suggested time lines for agency decisions throughout the process in Sections 151.5, 151.6, 151.7. In response to Interior's concerns, we have also included a procedure by which Interior can waive the time lines in an unusual case:

> ### Section 151.7a Under what circumstances may we waive the normal time requirements for processing requests?

Comments on Acquisition of Title to Land in Trust
Page 14

AR00418

*Notwithstanding any other provision of these*
*regulations, with respect to a particular request, if we*
*determine that there are special circumstances which*
*make the time requirements of this part impracticable,*
*we will*

    *(a) provide the applicant with a written notice,*
*stating that we have so determined, and the reasons*
*for that determination,*
    *(b) offer to meet with the applicant withing 30 days*
*of the applicant's receipt of that written notice,*
    *(c) if the applicant wishes, meet with the applicant*
*to discuss our views, and to solicit the applicant's*
*views, regarding the timing for the processing of*
*the application, and*
    *(d) within 14 days of the meeting (or within 14 days*
*of the applicant declining our offer to meet),*
*consistent with our obligation to process*
*applications in a timely manner, we will provide*
*the applicant with a written schedule under which*
*we will process the application.*

**A.     Tribal Land Acquisition Areas -**

    The proposed regulations acknowledge the "overwhelming importance of the tribal land base" and the unfair footing that currently landless tribes face under the proposed rule. Accordingly, they establish an alternative process for reservation-less tribes. Once an area is designated as a tribal land acquisition area, a tribe's request to have land within the area placed into trust would be evaluated as if it were an on-reservation acquisition. While this is a positive development, the proposed regulations would not afford this opportunity to the tribes with extremely small or diminished reservations, or tribes with widely scattered trust parcels that are clearly insufficient as a viable land base for its people. The Tribal Land Acquisition Area (TLAA) concept that should be expanded to include any tribe that has an inadequate land base for their needs. The TLAA serves the federal interest in promoting continuous blocks of tribal lands and decreasing conflicts caused by checkerboard jurisdiction patterns. The TLAA would also allow state, local and tribal governments to engage in long-term land use planning.

    In addition, the Department's proposed procedures for Tribal Land

Comments on Acquisition of Title to Land in Trust
Page 15

Acquisition Areas mirror the information requirements and criteria found in Subpart C that were noted above to be unduly burdensome and inflexible and do not accomplish their stated objective of facilitating land acquisitions.

Option - For these reasons, we have proposed that these provisions be available to any tribe with a small or inadequate land base. We have also revised the criteria that the Secretary is to consider, in concert with our suggestion for the clear standards throughout the regulations. We would expand the application of Subpart E - Tribal Land Acquisition Areas - to include more than just "reservation-less" tribes:

### *Sec. 151.17  What is a Tribal Land Acquisition Area?*

*A Tribal Land Acquisition Area is a geographic boundary designated by a ~~reservation-less~~ tribe within which the tribe plans to acquire land ~~within a 10-year period.~~ If the Secretary approves the Tribal Land Acquisition Area under this part, the ~~reservation-less~~ tribe can acquire parcels of land within the Tribal Land Acquisition Area ~~during that 10-year period~~ under the on-reservation provisions of this part.*

In addition, we would change the criteria for review of TLAA in a manner similar to the on- and off-reservation criteria, and limit the eligibility for a TLAA to those who can show a need to establish or expand tribal homelands:

*(c) A tribe  is eligible to request that a Tribal Land Acquisition Area be established for it, if the tribe has no reservation or  has a  reservation (or other tribal land base) that is disproportionately small compared with its tribal population or does not meet the need of the tribe for land to provide a homeland for its people. In determining whether to grant such an application, we will consider, 1) whether the proposed Area is part of a former reservation, aboriginal homeland or was otherwise formerly held or used by the tribe or its members, 2) whether the proposed Area  has special historical, cultural, religious or other value to the tribe, 3) whether the tribe's planned use of land in the proposed Area*

Comments on Acquisition of Title to Land in Trust
Page 16

AR00420

*would further tribal economic development, self-determination, Indian housing or land consolidation, and 4) whether there are adequate arrangements for police and fire protection and other municipal-type services such as garbage removal, water and sewage (for persons living in the proposed Area (on trust lands or non-trust lands). The Secretary shall approve a proposed Tribal Land Acquisition Area, unless, upon consideration of these factors, as well as the tribe's proposal and any comments, the benefits to the tribe of approving the proposed Tribal Land Acquisition area are clearly outweighed by the reasonably anticipated harm to the state and political subdivisions and local communities.*

**G.     Federal to Federal Transfers**

        Various treaties, federal statutes, and regulations provide for the authority of federal agencies to transfer real property to Indian tribes. For example, Congress authorized the General Services Administration (GSA) to transfer excess federal land within an Indian reservation's exterior boundaries to the Department of Interior (DOI) to be held in trust for that tribe. 40 U.S.C. § 483(a)(1) (1997). Congress has also given Indian tribes the unique right to step into the shoes of a federal agency and acquire excess property through the Indian Self-Determination and Education Assistance Act ("ISDEAA"). Under the ISDEAA, tribes have the right to acquire excess and surplus real and personal property from the Bureau of Indian Affairs ("BIA"), the Indian Health Service ("IHS") and other federal agencies through the General Services Administration ("GSA"). 25 U.S.C. § 450j(f) (1997).

        Transfer of trust title through the proposed regulations will be illogical, impractical and far more expensive and is not justified by any impacts on state and local governments. In *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 154 n.11 (1973), the United States Supreme Court concluded that the United States need not technically "acquire" land that it already owns - a meaningless exercise - in order for such land to fall within the tax exempt status of the Indian Reorganization Act (IRA), 25 U.S.C. § 465. Moreover, when federal land is transferred to an Indian tribe, there is likely to be little or no impact on the state and local governments. Federal land that was not subject to state and local regulatory jurisdiction, including taxation jurisdiction, remains outside state and local jurisdiction after transfer to a tribe. In many instances, prior to transfer, the transferring agency is required to analyze the subject property for potential environmental

Comments on Acquisition of Title to Land in Trust
Page 17

AR00421

or land use problems stemming from the transfer. In short, the policy considerations contained within 25 C.F.R. Part 151 requiring a tribe to extensively document potential impacts of a land transfer simply do not apply to federal-to-federal transfers. *See e.g.* 4 U.S.C. § 107; *United States v. State Tax Com'n. of Mississippi*, 421 U.S. 599 (1975).

By way of example, several tribes in the United States are currently seeking or have successfully completed transfers of real property at downsized military bases through the Base Realignment and Closure Act (BRAC) process. In the BRAC process, the military must complete exhaustive environmental analysis of the property prior to transfer. *See* Base Reuse Implementation Manual (BRIM) at Chapter 2. When the requesting federal agency, usually the BIA on behalf of a tribe, seeks property at the excess level, that agency must fully document the tribe's need for the property, the use of the property, the impacts on state and local government, how the use of the property will be consistent with the zoning, physical properties, and environmental/cultural characteristics of the property, and whether any significant changes will be made to the use of the property, and if so, whether funding exists to make those changes. *See* BIA, "Procedures for Obtaining Department of Defense Properties Including Base Closure and Realignment Properties" (1998). BIA, "Justification Required for Requesting a Transfer Without Reimbursement" (1998). By the time the BIA has completed this documentation, all of the criteria in 25 C.F.R. Part 151 have been met.

However, the BIA has required some tribes under the current regulations to still provide a fee to trust application and move through Part 151 process even after the BIA has justified the acquisition of the parcel for the tribe at the federal excess level. Making this a BIA-wide policy will further the policy behind the IRA without undue burdens on tribes or state and local governments.

The proposed regulations have three major flaws with respect to federal land transfers to tribes. First, the proposed regulations do not specifically exempt federal-to-federal transactions. *See,* Proposed Rule § 151.3. Second, the proposed regulations create an extremely limited set of transactions that will be considered "mandatory transfers of title," excluding federal-to-federal transfers. *See* Proposed Rule, Subpart D. This section implies that statutes that do not mandate acquisition of a "specific tract of land" create only discretionary tribal rights to transfers, thereby requiring tribes to submit a fee-to-trust application for transfer of title. Third, because of the onerous documentation burdens within the proposed regulations, trust land acquisition of federal lands will be expensive, time-consuming, and give state and local governments potential veto power (through comments and judicial challenges) over a purely federal transfer of

Comments on Acquisition of Title to Land in Trust
Page 18

AR00422

land.

   <u>Suggestion</u> - We have proposed to amend Section 151.3(b) to denote a federal-to-federal transfer as a transaction that falls outside the proposed regulations.

## H. Protection of Confidentiality of Religious and Cultural Sites

   Pursuant to Section 151.5 of the proposed land acquisition regulations once an application has been received, state county and municipal authorities will be provided site locale information. Further, this section allows for general public review of information pertaining to the site at the BIA area or agency offices. After a decision is made on the request for land acquisition, Section 151.6 provides for Federal Register publication or publication in a newspaper of general circulation serving the affected area regarding the land acquisition.

   Several federal statutes provide that Native American sacred sites, ceremonial sites and archaeological sites should be afforded confidentiality. The American Indian Religious Freedom Act of 1978 Public Law 95-341 sets forth a federal policy mandate to protect and preserve for American Indians their right to the expression and exercise of their traditional religions. Confidentiality of sacred site locations is afforded under the Executive Order 13007 of May 24, 1996. The National Historic Preservation Act of 1966, as amended. 1992 (P.L. 95-515) (P.L. 102-575, (16 U.S.C. 470 et seq.) (NHPA) specifically provides that the head of a Federal Agency shall withhold the disclosure of the location of sensitive historic resources such as Native American sacred or ceremonial sites if the agency determines that the disclosure may: 1) cause a significant invasion of privacy 2) risk harm to the historic resource or 3) impede the use of a traditional religious site by practitioners. (16 U.S.C. 470w-3)

   Moreover, The Native American Graves Protection and Repatriation Act of 1990 (P.L. 101-601) (NAGPRA) addresses the need to have Native American human remains returned home to tribes for proper reburial and provides criminal penalties for trafficking in Native American human remains and funerary items. It would be a sacrilege and a violation of federal law to not provide for the confidentiality of land acquired for NAGPRA reburials or for Native American burial grounds.

   <u>Suggestion</u> - We have included a special rule on confidentiality for information submitted by tribes in connection with land acquisitions involving sacred and ceremonial sites, or containing archeological resources. Section 151.5(d).

Comments on Acquisition of Title to Land in Trust
Page 19

AR00423

_Heather Kendall Miller_

Heather Kendall Miller
Native American Rights Fund
420 L Str., Suite 505
Anchorage, Ak 99501
Attorney for Alaska Inter-Tribal Council
Chilkoot Indian Association
Native Village of Larsen Bay
Kenaitze Indian Tribe
Native Village of Tuluksak

_Heather Kendall Miller_

Carol Daniel
(joins in comments relevant to Alaska)
731 E 8th Ave.
Anchorage, Ak 99501
Attorney for RurAL CAP

_Heather Kendall Miller_

Harold Brown
(joins in comments relevant to Alaska)
122 First Avenue, Suite 600
Fairbanks, Sk 99701-4897
Attorney for Tanana Chiefs Conference

_Heather Kendall Miller_

Mark Tilden
Native American Rights Fund
1506 Broadway
Boulder, Co 80302-6296
Attorney for
Mashpee Wampanoag Tribal Council
Shinnecock Indian Nation
United Houma Nation
Pamunkey Indian Tribe

_Heather Kendall Miller_

John Sky Starkey
(joins in comments relevant to Alaska)
36170 Sunshine Str.
Homer, Ak 99603
Attorney for AVCP

Comments on Acquisition of Title to Land in Trust
Page 20

AR00424

13-16

# AKIACHAK NATIVE COMMUNITY
## Akiachak Indian Reorganization Act Council
Post Office Box 70
Akiachak, Alaska 99551
(907)825-4626
Facsimile No. (907)825-4029

X

RECEIVED
1 8
CAET

## Comments on Land to Trust Regulations
November 11, 1999

Akiachak Native Community is a federally recognized Tribe and organized as an Indian Reorganization Act Council with an approved Constitution and Bylaws on August 6, 1948.

The traditional homelands of the Akiachak Native Community was legislated away by the Alaska Native Claims Settlement Act of December 18, 1971, which established Akiachak Limited, an ANCSA for-profit corporation, and selected 115,000 acres of land surrounding the tribal territory of the Akiachak Native Community. The 115,000 acres of lands selected by the ANCSA corporation does not include the vast territory of lands the tribal members of Akiachak Native Community conducts subsistence activity at.

Currently, the immediate lands under tribal jurisdiction is the federal townsite where majority of the tribal members chosed to built homes at. A few of the tribal members also own Native Allotments throughout the territory where the Tribe administers from the Bureau of Indian Affairs under the Real Estate program contract.

The recent decision of the United States Supreme Court under the *Venetie* decision ruled that ANCSA lands are not Indian Country. The ruling did not address the federal townsite and Native Allotment lands. The ruling also left an avenue for Alaska Natives to seek legislative remedy for the Indian Country issue for Alaska tribes.

The Akiachak Native Community is also aware of a Solicitor's Opinion after the passage of ANCSA where it states that the United States Department of Interior cannot and will not accept lands into trust in Alaska on behalf of Alaska Natives and tribes.

The Alaska tribes having the same attributes of tribal governments in the continental United States was reaffirmed in the publication of federally recognized tribes in the Federal Register in the early 1990s. Why than are the Alaska Tribes treated differently by the Department of the Interior despite Executive Orders and federal legislations by Congress than our sister tribes in the United States?

Akiachak Native Community, along with several tribes across the State of Alaska, involved ourselfs in attempts to tribalize corporate lands when ANCSA was being amended to secure more protections for ANCSA shareholders. We were not

**20**

√

AR00425

16

successful, but tribal peoples across the State of Alaska became aware of the injustices created by ANCSA and the unwillingness by the United States Department of the Interior to protect our rights as a Trustee.

This attitude can be changed today by this process. It is critical for the health of the Alaska tribes to become self-sufficient by economic, social and political means. The process of accepting lands into trust for the Alaska tribes will have a far reaching effect.

We understand that initially the Alaska tribes concern of taking land into trust was not included in the development of this regulation. We would urge you to include taking land into trust for the Alaska tribes. After all it is your trust responsibility to treat all tribes equally based on federal laws.

We thank you for your assistance and WE TRUST YOU!!

On behalf of the Akiachak Native Community
Phillip K. Peter, Sr., Chairman

Jackson A. Lomack
President & CEO

B-45

# *Akiak Native Community*

### *Akiak IRA Council*

*P.O. Box 52127*     *Akiak, Ak 99552*

PH.(907) 765-7112     FAX (907) 765-7512

*RESOLUTION 99-06-04*

## A RESOLUTION OF THE AKIAK NATIVE COMMUNITY FOR INCLUSION OF ALASKA TRIBES INTO 25CFR part 151.

**Whereas,** the Akiak Native Community herinafter referred to as ANC, is a federally recognized tribe of Eskimos acting under a constitution and bylaws approved by the Secretary of the Interior on May 11, 1949, and

**Whereas,** the recognized Tribe of the ANC is operating its governmental authority under the Indian Reorganization Act (the I.R.A.) of June 18, 1934 (48 Stat.984), and desire to submit its "Fee Lands to be held in Trust by the United States for the benefit of its Eskimo Tribe and Individual Eskimos" under Section five(5) of the Indian Reorganiztion Act of 1934 ( the I.R.A), and

**Whereas,** the Congress has given the Secretary of the Interior *discretionary authority to acquire title to land to be held in trust by the United States for the benefit of Indian tribes and Individual Indians.* Acquiring such title is commonly referred to as "taking land into trust.", and

**Whereas,** under 25 U.S.C. 465 and Section 5 (Five) of the Indian Reorganization Act of 1934 states that; "The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to land, *within or without existing reservations,* including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land to Indians.", and

**Whereas,** the proposed revisions to 25 CFR part 151, excludes the Alaska's 226 Recognized Tribes operating under the Constitution and the By-laws of the IRA of 1934 for the Secretary of the Interior to acquire "Fee Lands into Trust" under Section 5 of the Act, and

**Whereas,** the Alaska's 226 Recognized Tribes have the same rights as the Continental Lower 48 State Tribes, and excluding Alaska Tribes from taking "Fee Simple Lands into trust lands under Section 5(five) of I.R.A. of 1934 is discrimnatory and detrimental to the Tribes Jurisdiction over its Tribal; Language, Education, Health, Social, Economic, Cultural and Traditional Subsistance use of its lands & Resources, and

RECEIVED

MAY 1 8 2000

CAET

**Now Therefore Be It Resolved,** that the Congress and the Secretary of the Interior recognize the NEED for CLEAR and EXPEDITIOUS PROVISION for the

4



AR00427

Alaska's 226 Recognized Tribal Fee Lands into Trust Lands by the Secretary of the Interior, and

**Therefore Be It Resolved,** that **Alaska's 226 Recognized Tribes be included in the 25 CFR part 151** for the Tribes operating their governmental authority under Indian Reorganization Act of 1934 and 25 U.S.C. 465 to have their "Fee Lands be Held In Trust" through the Secretary of the Interior by the United States of America for the benefit of the Alaska Tribe(s) and Individual Alaskan Tribal Members".

Approved this 25th day of June, 1999 by:

Owen A. Ivan, Chief                    Jackson Williams, Secretary/Treasurer