64

No. 2

San Francisco, CA 94118-4145

Tel: (415)221-6263

Fax: (415)221-9716

Email: Teikweidee@msn.com

November 12, 1999

Office of Trust Responsibilities

Bureau of Indian Affairs

1849 C Street NW MS-4513-MIB

Washington, DC 20240

Re: Attn: 1076-AD90 and 64 Federal Register 17574-17588

Please find attached the Tongass Tantakwaan Tlingit Tribe's Comments on Land to Trust Regulations. On Friday, November 12th, the Department of Interior will close the comment period on its proposed changes to 25 CFR 151. These proposed regulations, published April 12, 1999 (64 Federal Register 17574-17588) govern the taking of land into trust for Indian Tribes and individual Indians. In general, the Tongass Tantakwaan Tlingit Tribe tribal government leadership has deep differences with Interior on both the substance of the proposed regulations and the lack of consultation in proposing the regulations.

The Tongass Tantakwaan Tlingit Tribe is an historic tribe of southeast Alaska that was left out of the Alaska Native Claims Settlement Act of 1971 and is not currently recognized by the United States of America. We are currently preparing a federal recognition petition for the Bureau of Indian Affairs Bureau of Acknowledgement and Recognition.

The Tongass Tantakwaan Tlingit Tribe, in consultation with the NCAI Tribal Leaders Task Force on Land Recovery, has developed a redraft proposal for amending the proposed regulations that is attached to this letter. A discussion of our major concerns with the Department's proposed rule changes follow.

1. Introduction - On April 12, 1999, the Department of Interior issued a proposed revision of the regulations for taking land into trust for Indian tribes and individual Indians. (64 Federal Register 17574-17588). Interior's primary authority for taking land into trust is found in Section 5 of the Indian Reorganization Act and is one of the most important powers that the agency possesses to aid the long-term recovery and survival of Indian Nations.

In general, tribal government leadership has deep differences with Interior on both the substance of the proposed regulations and the lack of consultation in proposing the regulations. The National Congress of American Indians hosted a large meeting on the regulations during the Midyear

17 

Session in July in Vancouver, BC, which featured a dialogue between tribal leaders and Assistant Secretary for Indian Affairs Kevin Gover. As a result of this meeting, the tribal leadership of NCAI passed a resolution opposing the regulations and established a Tribal Leaders' Task Force on Land Recovery to address concerns with the regulations. The Land Recovery Task Force has been open to all tribes and the Tongass Tantakwaan Tlingit Tribe's comments and proposed redraft of the proposed rule changes are the result of the considerable efforts that the Tongass Tantakwaan Tlingit Tribe and members of the Task Force have made.

We have attached to our comments a statement of the history of land loss that has been experienced by the Tongass Tantakwaan Tlingit Tribe. The Tongass Tantakwaan Tlingit Tribe wishes to express its deep appreciation to the NCAI Land Recovery Task Force and all who have contributed to the effort.

The Tongass Tantakwaan Tlingit Tribe believes that Interior must adhere to three fundamental principles in revising its proposal and promulgating the final regulation:

First, the regulations must carry out the intent of Congress in Section 5 of the Indian Reorganization Act to recover land in trust status as a critical component in revitalizing tribal economic, governmental and cultural life.

Second, the regulations must include clear standards regarding when lands will be taken into trust. This is an issue to which all parties - including the tribes, the state and Interior - share a fundamental interest.

Third, the regulations must create accountability in the Department of Interior for consideration of appropriate factors and timely decisions on trust land applications.

While the preamble to the proposed regulations indicates that Interior agrees with these principles, the Tongass Tantakwaan Tlingit Tribe believes that the language of the proposed regulations does not adequately implement these principles. In our view, the proposed regulations erect significant new and unnecessary barriers to the recovery of land for Indian tribes that, for many tribes, may ensure that they are never able to recover land sufficient to ensure economic and cultural survival. In addition, the proposed regulations do not provide clear standards for the consideration of trust land applications, nor do they address what for many tribes has the most critical issue, the lack of time frames for Interior's decisions.

As we have reviewed these regulations and the great variety of tribal land acquisition needs and circumstances, we have been struck by the variety of unintended consequences that can arise from apparently well-intended regulatory language. We understand Interior's rationale to create a process that will accommodate state and local government procedural interests, but we do not believe that the intention was to create barriers that are unrelated to state and local government's legitimate concerns. In addition, we sense that the proposed regulations were drafted with a deep awareness of a handful of controversial trust land applications, but without a sufficient context for the great variety of tribal land acquisition needs and circumstances, the vast majority of which are not controversial at all. As a result, the proposed regulations assume that conflict is the norm and create extensive mandatory procedures when a more flexible system



AR00430

6 4

might better serve the needs of all parties.

Finally, the proposed regulations were published without meaningful consultation or engagement with Indian tribes. While we are appreciative of the efforts that Interior has made to meet with the Tongass Tantakwaan Tlingit Tribe and with Indian tribes in general since the draft was published, we do not believe that appropriate government-to-government consultation has taken place because tribes were left out of the initial phases when the basic concepts of the proposal were under consideration. Since Interior has determined to go forward, we strongly request that Interior devote sufficient resources to reviewing the comments of all tribal governments and to the overall consideration of these vitally important and technically demanding regulations. The comments of so many tribal governments show a repeated history of land loss, the continuing economic and social disruptions caused by that land loss, and the adverse impacts that the proposed regulations would have on efforts to recover tribal land and restore tribal cultures. It is these comments that provide the most compelling argument for the continued need for recovering land into trust in fulfillment of the original purposes of the IRA.

The following comments include a listing of the our priority issues in the proposed regulations, a brief discussion of the purposes of Section 5 of the IRA, as well as the rationale for a number of our specific proposals for modifying the regulations. Attached to these comments is a complete set of specific suggestions for amending to the proposed regulations with comparison markings, as well as a copy without markings. This attachment contains many more detailed suggestions and we would urge Interior to review it carefully. Finally, these comments supercede all other drafts that may have been previously received by Interior.

2. Priority Issues - Based on the three principles described above, the Tongass Tantakwaan Tlingit Tribe would urge the Department to revise a number of provisions in the proposed regulations - most significantly:

Standards. The regulations should include standards that a) are consistent with the purposes of the IRA, require consideration of relevant factors including the history and consequences of a tribe's land loss, b) create a presumption in favor of taking land into trust and c) establish an evidentiary standard to permit the presumption to be rebutted in appropriate situations. We propose separate standards for on-reservation (section 151.10) and off-reservation (section 151.14) acquisitions. The regulations should recognize that for many tribes the only meaningful opportunity for achieving the purposes of the IRA involve the acquisition of lands off of the reservation.

Contiguous lands. The regulations should recognize that acquisition of lands contiguous to a reservation or to other trust parcels is a primary vehicle for many tribes in rebuilding a viable tribal homeland. To the maximum extent possible, contiguous lands should be treated as reservation lands under the regulations.

Former reservation and treaty rights lands. There are certain off-reservation lands as to which a tribe today has a strong historical, cultural or other connection. A tribe's former reservation or lands where a tribe retains treaty rights are examples of lands where a tribe has a special ongoing interest. The regulations should reflect these interests by treating the location of such lands as a positive factor in the Department's consideration of a trust land application.

17

64

Burden of providing information for off-reservation acquisitions. The proposed regulations would create an undue burden on tribes with respect to the information required in connection with off-reservation acquisitions. Among other things, the proposed regulations would require tribes to provide information even if it is clearly not pertinent to a particular application, as well as information in the custody of other governments. The regulations should be modified to clearly separate the information required of a tribe from information that may, in appropriate circumstances, be provided by any interested party.

The timing of Departmental decisions. The proposed regulations should include appropriate, mandatory time frames for agency action on trust land applications. To accommodate the Department's concerns, we would support a provision authorizing the waiver of time frames in extraordinary cases - provided that the Department met with the affected tribe and developed an alternative time frame for such a case. The uniform experience of tribes around the country has been that, without time requirements, trust land applications simply languish for extended periods in the Department. The regulations must address this concern.

Tribal Land Acquisition Areas. The proposed regulations would authorize landless tribes to apply for approval of a Tribal Land Acquisition Area - within which lands would be evaluated under the on-reservation criteria. This useful approach should be available not just to a completely landless tribe, but also to a tribe with a clearly inadequate land base - including a tribe with an extremely small reservation, or one with only widely scattered trust parcels and no overall reservation boundary.

3. Purposes of Interior's Land-into-Trust Authority - The principal goal of the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. §465 was to halt and reverse the abrupt decline in the economic, cultural, governmental and social well-being of Indian tribes caused by the disastrous federal policy of "allotment" and sale of reservation lands. Between the years of 1887 and 1934, the U.S. Government took more than 90 million acres from the tribes without compensation, nearly 2/3 of all reservation lands, and sold it to settlers. The IRA is comprehensive legislation for the benefit of tribes that stops the allotment of tribal lands, continues the federal trust ownership of tribal lands in perpetuity, encourages economic development, and provides a framework for the reestablishment of tribal government institutions on their own lands.

Section 5 of the IRA, 25 U.S.C. §465, provides for the recovery of the tribal land base and must be viewed in light of the IRA's overall goals of recovering from the loss of land and reestablishing tribal economic, governmental and cultural life:

The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

Section 5 is broad legislation designed to implement the fundamental principle that all tribes in all circumstances need a tribal homeland that is adequate to support economic activity and

17

le4

self-determination. As noted by one of the IRA's principal authors, Congressman Howard of Nebraska, "the land was theirs under titles guaranteed by treaties and law; and when the government of the United States set up a land policy which, in effect, became a forum of legalized misappropriation of the Indian estate, the government became morally responsible for the damage that has resulted to the Indians from its faithless guardianship," and said the purpose of the IRA was "to build up Indian land holdings until there is sufficient land for all Indians who will beneficially use it."(78 Cong. Rec. 11727-11728, 1934.)

As Congressman Howard described these land reform measures:

Section 5 sets up a land acquisition program to provide land for Indians who have no land or insufficient land, and who can use land beneficially. . .

I have already said that there are more than 100,000 landless Indians in America today, and in addition many of the reservations are so riddled by alienation that their economic use for Indian grazing is impossible. This program would permit the purchase of land for many bands and groups of landless Indians and would permit progress toward the consolidation of badly checkerboarded Indian reservation, as well as provide additional agricultural land to supplement stock grazing or forestry operations. Considering the magnitude of the losses of Indian land brought about by the past 50 years of incompetent Federal guardianship, the purchase program here proposed is indeed a very modest restitution; and it is moreover an investment that will many times repay itself by taking Indians off the relief and ration rolls.

78 Cong. Rec. 11730 (1934).

This Congress, by adopting this bill, can make a partial restitution to the Indians for a whole century of wrongs and of broken faith, and even more important - for this bill looks not to the past but to the future - can release the creative energies of the Indians in order that they may learn to take a normal and natural place in the American community.

78 Cong. Rec. 11731.

Of the 90 million acres of tribal land lost through the allotment process, only about 8 percent have been reacquired in trust status since the IRA was passed sixty-five years ago. Still today, many tribes have no land base and many tribes have insufficient lands to support housing and self-government. Most tribal lands will not readily support economic development. And the legacy of the allotment policy, which has deeply fractionated heirship of trust lands, means that for most tribes, far more Indian land passes out of trust than into trust each year. Section 5 clearly imposes a continuing active duty on the Secretary of Interior, as the trustee for Indian tribes, to take land into trust for the benefit of tribes until their needs for self-support and self-determination are met.

In broad terms, the proposed regulations published by Interior do not fulfill the intent of Section 5 of the IRA because they tend to favor non-Indian interests over Indians and also create an application process that will be very difficult and expensive to fulfill. The statute was enacted for the benefit of tribes, and their interests should be paramount in its interpretation and

**17**

AR00433

implementation. Creating unnecessarily burdensome financial and legal barriers to land reacquisition cannot fulfill the purposes of a statute intended to aid the economic, governmental and cultural recovery of Indian tribes.

The IRA reflected a fundamental shift in federal Indian policy - away from the devastating policy of allotment, in favor of a new policy of promoting the governmental, cultural and economic advancement of tribes. The regulations implementing the trust land acquisition sections of the IRA, and Interior's decisions on trust land applications, must recognize both that taking land into trust is a means to address a massive historical wrong, and that Congress has established a policy favoring the return of lands to trust status. To the extent that the rules proposed by the Department do not comport with those objectives they need to be changed, as described below.


4. Standards for Evaluation - One of the central issues in the proposed regulations is the standards for evaluation of trust land applications. The issue of standards has been the subject of considerable controversy, with certain states and others arguing that the current standards are not adequate. The Secretary has stated publicly that one of his objectives in developing proposed regulations was to address the concerns arising from the issue of standards. We feel very strongly that decisions on trust land applications must be made based on clear and appropriate standards. Basic fairness demands no less. In short, we believe that all parties share an interest in assuring that the regulations provide clearly defined standards for when lands will be taken into trust. Such standards will do much to reduce any controversy surrounding the land to trust process.

The proposed regulations do not provide clear standards under which the Secretary would exercise his discretion and balance competing interests on trust land decisions. Instead, the proposed regulations list factors for the Secretary to consider, but do not tell him what to do with such factors and retain ultimate discretion for the Secretary. We believe that tribes are entitled to have decisions that are based on clear and appropriate standards.

We also believe that the proposed criteria should incorporate the historical and policy context in which trust land decisions are made. Trust land decisions that are made today do not occur on a blank slate. The devastating loss of land that most tribes have suffered - and the long term adverse consequences of that land loss - creates an important historical backdrop to those decisions. Moreover, the fact that Congress has spoken to the problem, and through section 5 of the IRA has provided a mechanism to remedy the tribal loss of lands and rebuild tribal economic life, should provide a guiding policy principle to inform trust land decisions. Accordingly, we have suggested language to provide that these matters are considered, along with other pertinent factors, in the Secretary's consideration of trust land applications.

In addition, many tribes are attempting to recover and preserve land for protection of cultural or natural resources. Tribal concerns for protecting cultural resources should be considered paramount. In addition, tribal governments are increasingly taking an active role in protecting land for its natural resource and bio-diversity values. These are goals that are shared by the federal government and should be actively encouraged in the regulations. We have included protection of cultural and natural resources as factors weighing in favor of land acquisition.

We have suggested standards under which the Secretary, after consideration of the specified

factors, would balance competing interests with respect to trust land decisions. Separate standards would apply to on-reservation and off-reservation acquisitions.

Off-Reservation Standards - For off-reservation acquisitions (as for on-reservation acquisitions) there must be a clear standard, and that standard must be firmly grounded in the Indian Reorganization Act. Our proposed off-reservation standard meets that test - while at the same time fairly accommodating the Department's concerns about the potential impacts of off-reservation trust land acquisitions on non-tribal governments. Under our proposed standard for off-reservation acquisitions both the benefits to the tribe as defined by the IRA and the potential collateral consequences to non-Indian governments would be weighed by the Secretary. Upon consideration of all designated factors, land would be taken into trust "unless the adverse impact of doing so would outweigh the benefits to the tribe."

As noted above, section 5 of the IRA was intended by Congress to provide a mechanism for restoring land to tribes - in partial restitution for the terrible losses caused by the allotment policy. Congress correctly recognized that the impact of allotment meant that, as a practical matter, the restoration of a viable tribal land base and the effective rehabilitation of the tribes would often require land acquisitions off-reservation. This is clear on the fact of Section 5 itself, which provides the Secretary with broad authority to take land into trust "within or without existing reservations." This language underscores that Congress intended lands to be taken into trust to advance the broad policies of promoting tribal self-determination and self-sufficiency, and that to accomplish those goals Section 5 established a policy favoring taking land into trust, both on and off reservation. The legislative history also shows that the acquisition of land outside reservation boundaries was deemed necessary to meet the goals of providing adequate land for tribes:

Furthermore, that part of the allotted lands which has been lost is the most valuable part. Of the residual lands, taking all Indian-owned lands into account, nearly one half, or nearly 20,000,000 acres, are desert or semidesert lands.... Through the allotment system, more than 80 percent of the land value belonging to all of the Indians in 1887 has been taken away from them: more than 85 percent of the land value of all the allotted Indians has been taken away.

Readjustment of Indian Affairs, Hearings before the House Committee on Indian Affairs on H.R. 7902, 73rd Cong. 2nd. Session. at 17, 1934.

Recognizing that much of the land remaining to tribes within reservation boundaries was economically useless, the drafters explicitly intended to promote land acquisition off-reservation to meet the economic development goals of the legislation. Efforts to create new barriers to off-reservation land acquisitions are directly contrary to the statute's purpose.

Our suggested standard would expressly incorporate factors arising from the purposes of the IRA itself. For example, our standard would require consideration of "the history and circumstances of land loss by the tribe," and "the economic, social and cultural consequences of that land loss." These are the basic considerations that led Congress to enact Section 5 - the fact that so much land was lost, and that the land loss had devastating consequences to every aspect of tribal life. Our standard would also require consideration of the "intent of Congress to foster tribal economic

development, self-determination, Indian housing, land consolidation and natural resources protection." This is essentially a shorthand statement of the purposes of Section 5. And, our standard would require the consideration of the expected benefits of taking the particular parcel into trust. We think it is crucial to have these factors expressly stated in the regulations, in an effort to assure that at every stage in the decisionmaking process, these baseline Congressional purposes are kept clearly in mind.

We have also included in our standard for off-reservation acquisitions other factors that the Department views as relevant. For example, our standard would require consideration of all of the tax, zoning, law enforcement, traffic, utility or similar issues raised by a state or local government (or other party) in connection with a trust land application. Our proposed standard would provide that any adverse impact identified and properly documented by a state or county government would be required to be considered with respect to an off-reservation trust land application.

Our standard would thus include consideration of positive factors (based on the purposes of the IRA and the benefits documented by the tribe) and potential negative factors (based on adverse impacts documented by state and local governments or others). In addition, our standard would include consideration of one factor - the location of the land - that will in some instances be a positive factor, while in others may be a negative factor. In this regard, our standard provides that where a tribe has a particular nexus with a parcel of land that it seeks to have placed into trust, the location of that parcel is a factor supporting taking the land into trust. So, if a parcel is contiguous to a reservation (but does not meet the definition for on-reservation treatment), that parcel would receive favored treatment under the off-reservation standards. Similar treatment would be afforded to other lands as to which the tribe has a special connection - such as a former reservation, lands as to which a tribe has treaty rights, or some other place where an Indian community exists. In such cases, under our proposed standard the location of the land would be a factor supporting taking the land into trust - in recognition of the fact that the tribe has a heightened interest in the ownership and use of such lands.

The Department's proposed regulations include language indicating that the greater the distance from the reservation, the greater the scrutiny the Department would afford to the benefits articulated by the tribe, and the greater weight that the Department would give to concerns of state and local governments. We have retained language to the same effect in our proposal. In this regard, consistent with the Department's proposed regulations, location would in certain instances be a negative factor under our proposed standard, such as where a parcel is a great distance from the reservation and the tribe has no nexus, historical or current, with the parcel.

Overall, our standard provides a fair and balanced approach to off-reservation acquisitions. It articulates the appropriate factors for consideration, requires a careful weighing of those factors, and provides for land to be taken into trust unless the adverse impact outweighs the benefits. This is consistent with the IRA, which supports both on and off reservation acquisitions. It is good policy - since it supports tribal efforts at self-determination, while at the same time requiring due consideration of other interests. And, it provides clear standards for the Secretary, which will strengthen the Secretary's position with respect to any challenge to his authority to take land into trust.

We are aware that certain commenters and others have suggested that the regulations should establish a presumption against taking land into trust off-reservation. NCAI opposes any such formulation, in the strongest possible terms.

First, there is no legal basis for creating a presumption against taking land into trust. To the contrary, Section 5 clearly favors taking land into trust - as the Department itself elsewhere recognizes, including in the preamble to its proposed regulations. To suggest that Section 5 creates a presumption against taking land into trust is to simply turn that provision on its head. Such a presumption would be legally indefensible, and would undoubtedly be the subject of extensive litigation.

Second, a presumption against taking land into trust off-reservation would do serious harm to many tribes. Many tribes are faced with two choices - continue to live with all the adverse effects of the allotment policy that took their lands, or seek to rebuild their tribal economies and institutions through off-reservation trust land acquisitions. For many tribes off-reservation acquisitions are vital, since on-reservation is not an option. Creating a heavy presumption against taking land into trust off-reservation would have a devastating impact on such tribes, relegating them to more generations of poverty. This is clearly not what Congress intended in the IRA.

Third, there is no valid policy reason to create a presumption against off-reservation acquisitions. As noted above, the standard we propose requires balancing of all the interests and considerations of all interested parties. The state and local governments are certainly well situated to advance and document their own interests with regard to trust land requests. There is simply no need to create, without any statutory basis, a presumption that would tip the balance in favor of state and local governments and against the tribes. Indeed, to do so would be contrary to both the IRA and the Department's trust responsibility to the tribes.

Fourth, a presumption against taking land into trust would be inconsistent with the Department's own position in other regards. For example, as noted above the proposed regulations contain a provision indicating that the greater the distance from a reservation, the stronger the showing that a tribe must make for a trust land request to be granted. The corollary to this is that for land near a reservation, the required showing would be correspondingly less. But an overall presumption against taking land into trust off-reservation would effectively eliminate the ability of the Department to make such gradations based on distance. Under such an approach, there would apparently be a presumption against taking land into trust, even for a parcel located very near the center of tribal life. In this and other ways, a presumption against taking land into trust would unduly limit the Secretary's ability to weigh appropriate factors and determine whether the balance favors taking land into trust off-reservation.

In sum, in the view of the Tongass Tantakwaan Tlingit Tribe, no issue is more important in these regulations than the promulgation of appropriate standards, properly grounded in the IRA. We urge the Department to adopt our proposed standards, which provide a fundamentally fair, clearly defined and legally strong balancing test for off-reservation acquisitions.

Suggestion - We would separate out the threshold filing requirements, i.e. complete application,



AR00437

environmental review, etc., into a subsection (a) and would propose clear substantive standards as follows:

For on-reservation requests under the proposed Section 151.10, create a new standard for review:

(b) Based upon consideration of:

(1) the history and circumstances of land loss by the relevant tribe,

(2) the economic, governmental, social and cultural consequences of that land loss,

(3) the intent of Congress to foster tribal economic development, self-determination, self-government, Indian housing, land consolidation, and natural resources protection and

(4) the expected benefits of taking the specific land in question into trust,

a request to have land taken into trust that meets the requirements of section 151.10(a) shall be granted and the subject land shall be taken into trust, unless there is clear and compelling evidence that the adverse impacts of taking the land into trust would significantly outweigh the benefits.

For off-reservation, modify the standard to:

unless the adverse impact of doing so would outweigh the benefits to the tribe.

and append the following:

For purposes of this subsection, in evaluating the potential benefits and harms that would flow from the granting of a request to take land into trust, we will consider, in addition to the factors described above:

(1) Whether the acquisition will create extraordinary additional responsibilities for the Bureau of Indian Affairs, and

(i)neither the Bureau nor the tribe can reasonably meet those responsibilities, and

(ii)the burden of such responsibilities clearly outweighs the benefits of taking the lands into trust.

(2) Whether the location of the land supports taking the land into trust. For purposes of this section:

i) If the land is contiguous to the Tribe's reservation or is contiguous to a parcel of land held in trust or restricted fee for the tribe or a member of the tribe and is not within the definition of "reservation" under this part, the location of the land shall be deemed to be a factor strongly supporting taking the land into trust;

ii) If the land is within the tribe's former reservation, aboriginal homeland, treaty ceded area, land where the tribe retains treaty rights, or was otherwise formerly held or used by the tribe or its members, the location of the land shall be deemed to be a factor supporting taking the land into



AR00438

trust;

iii) If the land is not covered by subsections (b)(2)(i) or (b)(2)(ii) of this section, the greater the distance between the land and the tribe's reservation, the greater the scrutiny that will be afforded to the justification of anticipated benefits to the tribe, and the greater the weight that will be given to the legitimate concerns of state and local governments.

Contiguous Lands - A fundamental purpose of the IRA in promoting land acquisition was to diminish the harmful economic effects of former federal policies - including allotment - which left tribes with scattered and fractionated parcels and often rendered the tribal land base essentially unusable from a practical standpoint. In this sense, it was not just the loss of land, but also the manner in which the remaining land was separated and divided, which created such ongoing hardship for the tribes:

The opening of the reservation in this fashion [under the allotment policy] had many ramifications other than the sheer loss of land. Much of the remaining Indian land estate was crippled. As any large rancher, miner, or timber executive can attest, effective resource management can best be achieved on a large, contiguous block of land in single ownership. The allotment program deprived most tribes of that opportunity. The tribal land ownership pattern became checkerboarded, with individual Indian, non-Indian, and corporate ownership interspersed.

C. Wilkinson, American Indians, Time and the Law, at 20.

We feel very strongly that applications to take lands contiguous to a reservation into trust should be evaluated under the on-reservation standards. The proposed regulations make a drastic change from existing regulations by treating applications for trust acquisitions of land contiguous to a reservation as off-reservation applications. Contiguous land acquisition should be given a strong preference because it is an antidote to the primary problem cause by allotment of tribal lands - the fragmentation of land into small parcels that are exceedingly difficult to manage for purposes of jurisdiction, land use, environmental protection and economic development. Trust acquisitions of contiguous lands remedy the problem of small reservations and off-reservation checkerboarding while reducing the impact on the surrounding non-Indian community.


Contiguous acquisitions should be favored under the regulations. The legislative history for Section 5 of the Indian Reorganization Act emphasizes that it was intended to remedy the problems of discontinuous lands caused by allotment checkerboarding. See, e.g., Readjustment of Indian Affairs, supra, at 16-18, 61; 78 Cong. Rec. 11728, 11732 (Comments of Rep. Howard). The existing regulations are consistent with the Indian self-determination and Education Assistance Act "two-sides adjoining" language, which provides statutory justification for treating acquisitions of contiguous lands as on-reservation acquisitions. See 25 U.S.C. §450h(3). The language of the Indian Gaming Regulatory Act of 1988, which gives a "contiguity exception" to the Section 20 requirements, gives additional Congressional support to preferential treatment of contiguous lands. See 25 U.S.C. §2719(a)(1).

Preferred Option - include all contiguous lands in on-reservation section:



AR00439

Sec. 151.9 What information must be provided in a request involving land inside or contiguous to a reservation or inside an approved Tribal Land Acquisition Area?

Second Option - Although it is our strong belief that all contiguous lands should be eligible for on-reservation consideration, Interior has stated resistance to this because of difficulties in certain contexts. Rather than have these exceptions drive the rule, we have suggested a second option that would include most contiguous lands in the on-reservation section except those in urbanized areas and across state boundaries. We come to this second option only as a last resort, for the fundamental goal of rebuilding contiguous land blocks for the benefit of Indian people is equally strong for all tribes regardless of their location. If this option is implemented, it is absolutely vital that contiguousness also be considered a priority under the off-reservation section:

In 151.2 definition of "reservation":

(3) for the purposes of this section, the consideration of requests under the on-reservation criteria includes land contiguous to a reservation unless the land is:

i) within an urbanized area as determined by the U.S. Census Bureau, or

ii) in a State in which there is no reservation or trust lands of the relevant tribe.

In 151.14 criteria for review of off-reservation requests, create a preference as noted above, for review of off-reservation requests:

i) If the land is contiguous to the Tribe's reservation or is contiguous to a parcel of land held in trust or restricted fee for the tribe or a member of the tribe and is not within the definition of "reservation" under this part, the location of the land shall be deemed to be a factor strongly supporting taking the land into trust;

Former Reservation Lands and Treaty Right Lands - The on-reservation provisions of the regulation are intended to accord additional weight to a tribe's need for land "in recognition of the tribe's reasonable expectation that it will benefit from the lands originally promised to it by treaty or Executive Order." 64 FR 15577. Yet many tribes are struggling to repurchase lands that were once within their reservation boundaries or held in trust for their benefit, but were removed through acts of aggression and termination. This removal often occurred with the participation of the federal government and through the failure of the federal government to fulfill its obligation to protect tribal lands. Recovery of these lands into trust status should be a priority under the regulations.

Suggestion - Create a preference in the 151.14 criteria, as noted above, for review of off-reservation requests:

ii) If the land is within the tribe's former reservation, aboriginal homeland, treaty ceded area, land where the tribe retains treaty rights, or was otherwise formerly held or used by the tribe or its members, the location of the land shall be deemed to be a factor supporting taking the land into



trust;

In addition, some tribes hold treaty rights for hunting, fishing and gathering in traditional places off-reservation and are seeking to purchase and protect these places from the development and encroachment that threaten to deny tribes the benefit of their treaty rights. These lands should also have a high-priority for trust acquisition under the regulations as this acquisition will prevent the inevitable conflicts that occur when treaty rights are threatened by environmental degradation.

Suggestion: Within the definition of reservation in 151.2, treat hunting and fishing treaty right areas within on-reservation criteria:

(4) for the purposes of this section, the consideration of requests under the on-reservation criteria includes land outside of a reservation that is acquired for purposes of exercising and protecting hunting, fishing and gathering rights pursuant to a treaty, Executive Order, or statute.

In addition, as noted above allotment era policies such as diminishment and disestablishment of Indian reservations were clearly intended to be offset by the IRA and the land reform purposes of Section 5. In addition, tribes with diminished or disestablished reservation boundaries will be unable to take advantage of the benefits of "on-reservation" treatment of their land acquisitions unless some provision is made to include them. For this reason, we strongly suggest that diminished and disestablished reservations be included within the scope of on-reservation acquisitions.

Suggestion: Within the definition of reservation in 151.2, treat diminished and disestablished reservations as on-reservation:

Reservation means that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in the final treaty, agreement, Executive or Secretarial Order, Presidential or Secretarial Proclamation, United States patent, federal statute or judicial or administrative determination, without regard to any taking, allotment, or cession of lands therein or diminishment or disestablishment by any means.

7. Burden of Providing Information for Off-Reservation Acquisitions - Section 5 of the IRA explicitly grants Interior equal authority to acquire land for the benefit of tribes "within or without existing reservations." The legislative history clearly shows that the acquisition of land outside reservation boundaries was considered necessary to meet the goal of providing adequate land for tribes. In addition, Interior is well aware of the many tribes who have lost their land base through acts of aggression and termination and are forced to rely on off-reservation land acquisitions to attempt to rebuild their homelands.

The requirements for off-reservation acquisition requests, as set forth in Section 151.12, are extremely burdensome. Applicants would be required to submit information that is under the control of other entities who may be opposed to the application. In addition, the cost of providing much of the requested information is prohibitive given the resources of most tribal applicants. While we understand Interior's goal of creating a process that will appropriately include the

concerns of states and local governments, we feel strongly that erecting such extreme barriers to off-reservation land acquisitions is directly contrary to the statute's purpose.

With regard to 151.12 (e), since state and local governments are in a better position to know the specific effects the trust acquisition will have on them, and are granted the right to comment extensively on these effects, it is redundant and unfairly burdensome to require the applicant to provide this information. The proposed regulations would substantially increase the ability of local non-Indian communities to frustrate or stifle tribal development. Similarly, with regard to 151.12 (f), state and local governments who have concerns about jurisdictional and land use issues should raise these concerns.

Finally, the proposed regulations seem to be drafted with a great awareness of controversial trust land applications, but without a context for the vast majority of trust land applications which have no controversy at all. As a result, the proposed regulations assume that conflict is the norm and require information that would be relevant only to large economic development projects, creating extensive mandatory procedures when a more flexible system might better serve the needs of all parties. A great majority of trust land acquisitions are not for development, but for cultural protection, sacred site protection, land consolidation or environmental and natural resource protection. A better method is to allow, but not require, all parties to submit information on the relevant issues, and then weigh the merits. This method will protect the procedural interests of states and local governments without placing an undue burden on tribal governments.

Suggestion - We would revise section 151.12 so that it is limited to the information that a tribe must submit in connection with an off-reservation land application. We have listed, in a separate section immediately following section 151.12, the additional information regarding the potential impact of the acquisition on state and local governments which the Secretary will consider, and which a tribe may choose to address in the application. We have further revised these provisions so they do not assume jurisdictional conflicts or adverse impacts on the state and local governments, but instead solicit information on these matters using a neutral tone. The language we suggest to precede subsections 151.12 (e) and (f) is as follows:


Sec. 151.__ What additional information will be considered with respect to a request involving land outside a reservation or outside a Tribal Land Acquisition Area?

In addition to the information required under Section 151.12, in determining whether to take land into trust that is outside a reservation we will consider the information submitted by any interested party on the matters contained in this section. While tribes and individual Indians are not required to submit this information, it may in some cases be in their interest to do so. We will consider:

Need for Timely Action in Interior Decision-Making - The draft regulations fail to address what has been the chief concern of many tribes with the existing land-into-trust process. The BIA, who processes the applications, is not held to any time line. Applications have been known to sit for years and even decades at Agency and Area offices. By not mandating a time line for application review and processing, tribes risk losing project funding and more. Interior has an obligation to ensure that the agency takes a reasonable amount of time to process applications for



AR00442

land-into-trust. We have attached a letter dated November 7, 1999, where we more specifically discussed this important issue.

Suggestion - We would add a series of time deadlines by which the steps are to be completed to the rule's description of the procedures for processing trust land requests. We are greatly interested in discussing the timing issues to determine an appropriate amount of time for each step of the process. We would also include a procedure by which Interior can waive the time lines in an unusual case:

Section 151.7a Under what circumstances may we waive the normal time requirements for processing requests?

Notwithstanding any other provision of these regulations, with respect to a particular request, if we determine that there are special circumstances which make the time requirements of this part impracticable, we will

(a) provide the applicant with a written notice, stating that we have so determined, and the reasons for that determination,

(b) offer to meet with the applicant within 30 days of the applicant's receipt of that written notice,

(c) if the applicant wishes, meet with the applicant to discuss our views, and to solicit the applicant's views, regarding the timing for the processing of the application, and

(d) within 14 days of the meeting (or within 14 days of the applicant declining our offer to meet), consistent with our obligation to process applications in a timely manner, we will provide the applicant with a written schedule under which we will process the application.

1. Tribal Land Acquisition Areas - The proposed regulations acknowledge the "overwhelming importance of the tribal land base" and the unfair footing that currently landless tribes face under the proposed rule. Accordingly, they establish an alternative process for reservation-less tribes. Once an area is designated as a tribal land acquisition area, a tribe's request to have land within the area placed into trust would be evaluated as if it were an on-reservation acquisition. While this is a positive development, the proposed regulations would not afford this opportunity to the tribes with extremely small or diminished reservations, or tribes with widely scattered trust parcels that are clearly insufficient as a viable land base for its people. The Tribal Land Acquisition Area (TLAA) is a useful concept that should be expanded to include any tribe that has an inadequate land base for their needs. The TLAA serves the federal interest in promoting continuous blocks of tribal lands, decreasing conflicts caused by checkerboard jurisdiction patterns. The TLAA would also allow state, local and tribal governments to engage in long-term land use planning.

We have also revised the criteria that the Secretary is to consider in evaluating a tribe's application for designation of a Tribal Land Acquisition Area (section 151.20) so that it requires consideration of four factors: 1) whether the proposed Area is part of an aboriginal homeland or was otherwise formerly held or used by the tribe or its members, 2) whether the proposed Area

AR00443

64

has special historical, cultural, religious or other value to the tribe, 3) whether the tribe's planned use of land in the proposed Area would further tribal economic development, self-determination, Indian housing or land consolidation, and 4) whether there are adequate arrangements for police and fire protection and other municipal-type services. We have further provided that the Secretary must approve a Tribal Land Acquisition Area "unless the benefits to the tribe are clearly outweighed by the reasonably anticipated harm to the state and political subdivisions and local communities." Section 151.20. Again, our approach here is designed to ensure that the proper factors are considered by the Secretary, and that those factors are evaluated in accordance with a clear standard that provides a presumption in favor of approving Tribal Land Acquisition Areas.

For these reasons, we would propose that these provisions be available to any tribe with a small, inadequate land base. We would also revised the criteria that the Secretary is to consider, in concert with our suggestions for the clear standards throughout the regulations. We would expand the application of Subpart E - Tribal Land Acquisition Areas - to include more than just "reservation-less" tribes:

Sec. 151.17 What is a Tribal Land Acquisition Area?

Tribal Land Acquisition Area is means a geographic boundary designated by a reservation-less tribe and approved by the Secretary that does not have a reservation, that is the tribe's historical and aboriginal territory of lands whereupon the tribe lived and/or which the tribe used for subsistence purposes during pre-contact and post-contact periods, and tribal ceded lands, within which the tribe plans to acquire land a ten-year period. If the Secretary approves the Tribal Land Acquisition Area under this part, the reservation-less tribe can acquire parcels of land within the Tribal Land Acquisition Area during that 10-year period under the on-reservation provisions of this part.

In addition, we would change the criteria for review of a TLAA in a manner similar to the on- and off-reservation criteria, and limit the eligibility for a TLAA to those who can show a need to establish or expand tribal homelands:

(c) A tribe is eligible to request that a Tribal Land Acquisition Area be established for it, if the tribe has no reservation or has a reservation (or other tribal land base) that is disproportionately small compared with its tribal population or does not meet the need of the tribe for land to provide a homeland for its people. In determining whether to grant such an application, we will consider, 1) whether the proposed Area is part of a former reservation, aboriginal homeland or was otherwise formerly held or used by the tribe or its members, 2) whether the proposed Area has special historical, cultural, religious or other value to the tribe, 3) whether the tribe's planned use of land in the proposed Area would further tribal economic development, self-determination, Indian housing or land consolidation, and 4) whether there are adequate arrangements for police and fire protection and other municipal-type services such as garbage removal, water and sewage (for persons living in the proposed Area (on trust lands or non-trust lands). The Secretary shall approve a proposed Tribal Land Acquisition Area, unless, upon consideration of these factors, as well as the tribe's proposal and any comments, the benefits to the tribe of approving the proposed Tribal Land Acquisition area are clearly outweighed by the reasonably anticipated harm to the state and political subdivisions and local communities.



AR00444

Retroactive Effect of Regulations - We strongly believe that the regulation should not be applied to pending requests to take land into trust. Indian Tribes and others are entitled to know the rules that govern when they engage in activity that is covered by a set of rules. Thus, for example, when a Tribe seeks to have land taken into trust, the Tribe understands the requirements it must meet to have the transaction approved pursuant to the Part 151 regulations. Interior's proposed regulations would unlawfully alter this system where they state that they "would apply to pending applications." 64 Fed. Reg. at 17,581.

Of course, at this time no one knows if Interior will amend its regulations, when the amendments will occur, or what the amended regulations will state. How then can a Tribe that has already submitted an application, or does so after today, know what the amended regulations will require when, and if, Interior gets around to amending them? In other words, a Tribe could submit an application under the current Part 151 regulations (as it is required to do), with the information required in those regulations. But, if, through no fault of the Tribe, that application is still pending when Interior amends its regulations, the application would be deficient if the Tribe has not submitted information that will be required under the new regulations, but is not required under the current regulations. This situation is especially unjust given that many tribes currently have applications that have been pending for years.

In any case, the Department has cited no authority empowering it to issue retroactive rules, and has ignored the Supreme Court's prohibition on the promulgation of retroactive rules by agencies that have not been given the express authority to do so by Congress. Bowen v. Georgetown University Hosp., 488 U.S. 204, 208 (1988). Because Interior has no such authority, the application of new regulations, once finalized, to pending applications would be illegal.

---

The application of a new regulation to pending matters is retroactive rulemaking. Yakima Valley Cablevision, Inc. v. FCC, 794 F.2d 737 (D.C. Cir. 1986). Many Tribes have premised land purchasing decisions and planning for economic, social, and cultural development, on the trust rules in existence at the time of the decision to have land taken into trust. "When parties rely on an admittedly lawful regulation and plan their activities accordingly, retroactive modification or rescission of the regulation can cause great mischief." Yakima Valley Cablevision, 794 F.2d at 746. The application process can be a long one. If every pending application had to be revised each time Interior changed its regulations, "the process would become much more lengthy. . . if the rules of the game changed each time the application neared the finish line." Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1323 (D.C. Cir. 1998).

Suggestion - We have developed language at 151.2 that would clarify that the regulation would apply to pending applications only when tribes have specifically requested so in writing.

Timing and Exhaustion of Agency and Federal Court Appeals - Under Interior's current regulations and policies, State and local governments and others can challenge a final decision to take land into trust. Once the agency makes a final decision to take the land into trust, it provides notice to interested parties. The land will not be taken into trust for the next thirty days. 25 C.F.R. § 151.12. During that period, an interested party can file suit in federal court, seeking to block the transaction. However, once that thirty-day period has expired, Interior is legally free to take the

land into trust, even if a lawsuit has been filed challenging the transaction, unless a court has prohibited the acquisition.

The current regulations do not require, or even suggest, that Interior will postpone taking land into trust simply because a lawsuit is filed. This practice of taking land into trust, even after a lawsuit is filed challenging the agency's action, continued after the agency issued amended regulations in 1996, and allows persons to challenge proposed land acquisitions in federal court. The system is fair and equitable to all interested persons, including tribes whose land is implicated in a transaction. The burden is squarely placed on the challenger to file a lawsuit and convince the court to enjoin the transaction. Unless the party suing has a strong case, it is unlikely to get relief from the court.

The proposed amended regulations would turn this system on its head. No land will attain trust status until the agency has published a notice of intent to take land into trust, the time period for appeal within the agency has run, and all litigation, including appeals rights, have been exhausted. Section 151.6, 151.7. As drafted, these provisions provide a strong incentive for opponents of a given application to bring suit against the agency, prolong the litigation as long as possible, and appeal all the way to the Supreme Court, simply to delay the effective date of a decision to take land into trust. This incentive to sue exists even for opponents with weak arguments. In 1996, President Clinton issued Executive Order 12988 entitled "Civil Justice Reform." The Order requires agencies to write a proposed regulation to "minimize litigation." The proposed regulations will not only not minimize litigation, but would invite unnecessary litigation. Much of the costs of defending these cases will be borne by tribes which intervene in the case and by the Justice Department, which represents Interior in court.

Suggestion - We have modified the requirements for exhaustion of agency and judicial appeals. Sections 151.5, 151.6, 151.7.

Mandatory Acceptance of Title

Suggestion - We have proposed to modify the language of Subpart D to require the Secretary to determine within 30 days whether a land transfer is mandatory and allow for a direct appeal to federal court. We have also modified the definition of mandatory acceptance on title. Section 151.2. In order to address concerns about tribal and Congressional reliance on vaguely worded statutes, we have attached suggested language for the preamble to the regulations.

Protection of Confidentiality of Religious and Cultural Sites - Pursuant to Section 151.5 of the proposed land acquisition regulations once an application has been received state, county and municipal authorities will be provided site locale information. Further, this section allows for general public review of information pertaining to the site at the BIA area or agency offices. After a decision is made on the request for land acquisitions, Section 151.6 provides for Federal Register publication or publication in a newspaper of general circulation serving the affected area regarding the land acquisition.

Several federal statutes provide that Native American sacred sites, ceremonial sites and archaeological sites should be afforded confidentiality. The American Indian Religious Freedom

AR00446

Act of 1978 Public Law 95-341 sets forth a federal policy mandate to protect and preserve for American Indians their right to the expression and exercise of their traditional religions. Confidentiality of sacred site locations is afforded under the Executive Order 13007 of May 24, 1996. The National Historic Preservation Act of 1966, as amended. 1992 (P.L. 95-515) (P.L. 102-575, (16 U.S.C. 470 et seq.) (NHPA) specifically provides that the head of a Federal Agency shall withhold the disclosure of the location of sensitive historic resources such as Native American sacred or ceremonial sites if the agency determines that the disclosure may: 1) cause a significant invasion of privacy 2) risk harm to the historic resource or 3) impede the use of a traditional religious site by practitioners. (16 U.S.C. 470w-3)

Moreover, the Native American Graves Protection and Repatriation Act of 1990 (NAGPRA) addresses the need to have Native American human remains returned home to tribes for proper reburial and provides criminal penalties for trafficking in Native American human remains and funerary items. It would be a sacrilege and a violation of federal law to not provide for the confidentiality of land acquired for NAGPRA reburials or for Native American burial grounds.

Suggestion - We have included a special rule on confidentiality for information submitted by tribes in connection with land acquisitions involving sacred and ceremonial sites, or containing archeological resources. Section 151.5(d).

Clarify Land-into-Trust for Gaming Purposes - In our view, the issue of gaming has been a great source of confusion in trust land transactions. Many routine trust land transactions that have nothing to do with Indian gaming, but are for routine purposes such as cultural protection, sacred site protection, land consolidation or environmental and natural resource protection, have been adamantly opposed because of an unfounded fear that the land will be used for Indian gaming.

The Indian Gaming Regulatory Act of 1988 is very clear that land acquired into trust after 1988 may not be used for gaming purposes unless very specific exceptions are met, including the state governor's concurrence. We would propose language revising section 151.5 to clarify that there are additional procedures specified by the Indian Gaming Regulatory Act when acquiring certain land for gaming purposes:

2. Federal to Federal Transfers - Various treaties, federal statutes, and regulations provide for the authority of federal agencies to transfer real property to Indian tribes. For example, Congress authorized the General Services Administration (GSA) to transfer excess federal land within an Indian reservation's exterior boundaries to the Department of Interior (DOI) to be held in trust for that tribe. 40 U.S.C. § 483(a)(1) (1997). Congress has also given Indian tribes the unique right to step into the shoes of a federal agency and acquire excess property through the Indian Self-Determination and Education Assistance Act ("ISDEAA"). Under the ISDEAA, tribes have the right to acquire excess and surplus real and personal property from the Bureau of Indian Affairs ("BIA"), the Indian Health Service ("IHS") and other federal agencies through the General Services Administration ("GSA"). 25 U.S.C. § 450j(f) (1997).

Transfer of trust title through the proposed regulations will be illogical, impractical and far more expensive and is not justified by any impacts on state and local governments. In Mescalero Apache Tribe V. Jones, 411 U.S. 145, 154 n.11 (1973), the United States Supreme Court concluded that the United States need not technically "acquire" land that it already owns - a meaningless exercise - in

order for such land to fall within the tax exempt status of the Indian Reorganization Act (IRA), 25 U.S.C. § 465. Moreover, when federal land is transferred to an Indian tribe, there is likely to be little or no impact on the state and local governments. Federal land that was not subject to state and local regulatory jurisdiction, including taxation jurisdiction, remains outside state and local jurisdiction after transfer to a tribe. In many instances, prior to transfer, the transferring agency is required to analyze the subject property for potential environmental or land use problems stemming from the transfer. In short, the policy considerations contained within 25 C.F.R. Part 151 requiring a tribe to extensively document potential impacts of a land transfer simply do not apply to federal-to-federal transfers. See e.g. 4 U.S.C. § 107; United States v. State Tax Com'n. of Mississippi, 421 U.S. 599 (1975).

By way of example, several tribes in the United States are currently seeking or have successfully completed transfers of real property at downsized military bases through the Base Realignment and Closure Act (BRAC) process. In the BRAC process, the military must complete exhaustive environmental analysis of the property prior to transfer. See Base Reuse Implementation Manual (BRIM) at Chapter 2. When the requesting federal agency, usually the BIA on behalf of a tribe, seeks property at the excess level, that agency must fully document the tribe's need for the property, the use of the property, the impacts on state and local government, how the use of the property will be consistent with the zoning, physical properties, and environmental/cultural characteristics of the property, and whether any significant changes will be made to the use of the property, and if so, whether funding exists to make those changes. See BIA, "Procedures for Obtaining Department of Defense Properties Including Base Closure and Realignment Properties" (1998). BIA, "Justification Required for Requesting a Transfer Without Reimbursement" (1998). By the time the BIA has completed this documentation, all of the criteria in 25 C.F.R. Part 151 have been met.

However, the BIA has required some tribes under the current regulations to still provide a fee to trust application and move through Part 151 process even after the BIA has justified the acquisition of the parcel for the tribe at the federal excess level. Making this a BIA-wide policy will further the policy behind the IRA without undue burdens on tribes or state and local governments.

The proposed regulations have three major flaws with respect to federal land transfers to tribes. First, the proposed regulations do not specifically exempt federal-to-federal transactions. See, Proposed Rule § 151.3. Second, the proposed regulations create an extremely limited set of transactions that will be considered "mandatory transfers of title," excluding federal-to-federal transfers. See Proposed Rule, Subpart D. This section implies that statutes that do not mandate acquisition of a "specific tract of land" create only discretionary tribal rights to transfers, thereby requiring tribes to submit a fee-to-trust application for transfer of title. Third, because of the onerous documentation burdens within the proposed regulations, trust land acquisition of federal lands will be expensive, time-consuming, and give state and local governments potential veto power (through comments and judicial challenges) over a purely federal transfer of land.

Suggestion - We have proposed to amend Section 151.3(b) to denote a federal-to-federal transfer as a transaction that falls outside the proposed regulations.

Alaska Trust Lands - The proposed rule continues the regulatory bar to acquisition of title in trust



AR00448

in Alaska and seeks comment on the continued validity of the Associate Solicitor's opinion ("Trust Land for the Natives of Venetie and Arctic Village," September 15, 1978) ("Fredericks opinion"), in light of the Supreme Court's ruling in Alaska v. Venetie, 522 U.S. 520 (1998). The Fredericks opinion incorrectly concluded that it would be an abuse of Secretarial discretion to take tribal land into trust following the passage of the Alaska Native Land Claims Settlement Act of 1971, 43 U.S.C. § 1601 et seq. (ANCSA). That opinion is not well founded since ANCSA did not repeal the Secretary's authority to take land into trust under the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465. In 1995, the Chilkoot Indian Association, Native Village of Larsen Bay and Kenaitze Indian Tribe filed a petition setting forth the legal arguments supporting the Secretary's statutory authority to take lands into trust post-ANCSA and requesting that the Secretary revise 25 C.F.R. § 151.1 to comply with the IRA. (60 FR 1956 (1995). The legal basis for Secretarial authority to take lands into trust in Alaska as set forth in the Chilkoot et. al petition remains valid today.

The IRA amendments of May 1, 1936 c. 254, 49 Stat. 1250 facilitated the application of the IRA's various provisions to the Territory of Alaska notwithstanding the absence of existing reservations. Section 2 of the IRA gave the Secretary authority to designate certain lands in Alaska as Indian reservations and was repealed by Congress in 1976. But section 465 of the IRA, which gave the Secretary authority to take tribal lands into trust pursuant to section 473a, was not repealed. Congress has passed no legislation that has repealed or in any way affected the right conferred upon Alaska Native tribes by Section 473a, nor has the United States Supreme Court found to the contrary. In Venetie, the Court addressed the question of whether Venetie's former ANCSA lands met the test for Indian country under 15 U.S.C. 1151(b). The Court held that ANCSA lands do not satisfy requirements for "Indian country" status because such lands were not set aside for ~~Indians as such (since they were conveyed to corporations), and the requisite federal~~ superintendence over the land was missing since ANCSA lands lack any restriction on alienability. The Court rejected the proposition advanced by the State that no Indian country at all existed in Alaska, and instead held that "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of 1151(b) or if it constitutes 'allotments' under §1151(c)." 522 U.S. at n.2. The Court did not address the question of whether the Secretary retains authority under the IRA to place lands into trust in Alaska. Since the legal underpinning for the Secretary's authority remains intact, neither the Fredericks opinion nor the Venetie opinion can validly be relied upon as bases for precluding Alaska tribes from enjoying the "same protection, immunities, [and] privileges [shared by] other acknowledged tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

The proposed regulation also solicits the views of the State of Alaska's Rural Governance Commission on this topic. In its June 1999 report, the Commission makes a recommendation in favor of Indian country and tribal territorial jurisdiction in Alaska. The Rural Governance Commission's recommendation echos previous recommendations made by blue-ribbon commissions and working groups. See, e.g. Vol. 1, Alaska Native Commission Report at 75-76. This guidance, solicited by the Secretary, further supports lifting the regulatory bar against taking lands into trust in Alaska.

The proposed regulation is illegally restrictive both with respect to its arbitrary bar against trust

lands in Alaska, and with respect to the burden that it imposes upon tribes that lack reservation status. There are no reservations in Alaska (with the exception of Metlakatla). Thus, the "off-reservation lands" category would apply to Alaska resulting in a de facto regulatory bar to the acquisition of title in trust in Alaska. Alaska tribes therefore join NCAI's member tribes in opposition to the proposed regulation for all the other reasons as stated herein.

Suggestion - The Secretary should withdraw the Fredericks Associate Solicitor's opinion (Trust Lands for the Natives of Venetie and Arctic Village, Sept. 15, 1978.) and lift the regulatory bar to acquisition of trust lands in Alaska. Alaska tribes should be allowed to petition under the on-reservation standard or for tribal land acquisition area. In the alternative, if the Secretary chooses to maintain the regulatory bar against acquisition of trust lands in Alaska, the Secretary should make his decision final and set forth his reasons for doing so.


Payments in Lieu of Taxes - Section 151.12(f)(8) of the proposed regulations requires a tribal government, when applying to acquire land into trust off-reservation, to include "Whether the tribe has made any provisions to compensate the State or local governments for revenue lost because of the removal of the land from the tax rolls." This subsection's suggestion that tribes compensate state and local governments for lost tax revenues is very disconcerting given the negative impact such a requirement would have on tribal sovereignty.

Section 5 of the IRA directs the Secretary of Interior to acquire land for tribes and explicitly states that "such land or rights shall be exempt from State and local taxation." It would be a direct violation of the statute to deny a tribe's application based on a failure to pay state taxes or, euphemistically, failure to "compensate...for revenue lost."

State taxes on tribal government lands are fundamentally unfair. Most often state governments provide few services on Indian reservations. By and large, tribal government funding comes from federal and tribal government sources. When tribal governments are forced to collect and pay state taxes within their territory, tribal governments are left without a tax base for funding tribal infrastructure such as roads, schools and hospitals. As the editor-in-chief of State Tax Notes observed, "Indian tribes are entitled to the protections they were once afforded before the tide shifted so unfairly in favor of the states." Oswald Graham, "Do the States Have Too Much Taxing Power Over American Indians?" State Tax Notes, September 28, 1998.

The goal of the IRA and the official policy of the United States government since at least 1969 has been to support Indian sovereignty and self-determination. Numerous federal statutes, regulations, Executive Orders, and policy statements spanning six presidencies embody this policy and recognize the unique political and cultural aspects of Indian self-government. Self-determination, as explicitly stated in Section 5 of the IRA, means allowing the tribes to set their own tax policies free from state interference.

Suggestion - NCAI believes that section 151.12(f)(8) is an improper criteria for Interior to consider in reviewing land-to-trust applications and should be deleted. In the alternative, we have suggested more neutral language for this subsection where Interior would also consider the amount of any funds or other financial benefits (direct or indirect) that the State or local governments may realize as a result of the applicant's proposed use of the land.

*Notice to Tribe When Land Goes Out of Trust* - Although the IRA has been in effect for more than 60 years, to this date only a small fraction of the lands lost due to allotment have been returned to tribal ownership. 64 Fed Reg. at 17577 (citing Felix S. Cohen's, Handbook of Federal Indian Law at 138 (1982 ed.), BIA's Annual Report for Indian Land, 1996). Indian land losses have continued since passage of the IRA. For example, a very substantial amount of Indian trust lands passed out of Indian ownership in the early 1950s, during the Termination Era, when Commissioner of Indian Affairs Dillon Meyer advocated for, and administratively implemented of policy tantamount to illegal "forced fee patents." See Felix Cohen, "Erosion of Indian Rights 1950-1953: A Case Study in Bureaucracy," 62 Yale L.J. 348 (1953). And the legacy of the allotment policy, which has deeply fractionated heirship of trust lands, means that for most tribes, far more Indian land passes out of trust than into trust each year (BIA's Annual Report for Indian Land, 1996.) In most instances, the BIA readily transfers the land of individual Indians out of trust status so that it can be sold or that a mortgage can be obtained. These transfers contribute to the continuing downward spiral of Indian land holdings.

*Suggestion:* The regulation should be modified to require notice to the interested tribal government when the BIA has received a request to transfer land out of trust.

*Consultation* - We have put this issue last not in measure of its importance, but in order to allow for a discussion of the substance of the regulations. As you know, for many months tribal governments' primary issue with the proposed regulations was the failure of appropriate government-to-government consultation on this most critical issue. The tribes were adamant that the regulations must be withdrawn. Only after many heated discussions and Interior's continued insistence in going forward with a flawed process did the Tongass Tantakwaan Tlingit Tribe agree to put aside the consultation issue in order to focus on the content of the regulations. Nevertheless, in these final comments we must raise the issue once more.

As result of the federal government's long history of paternalistic and insensitive dealings with Indian tribes, the Clinton Administration and Congress have taken steps to require direct good faith consultation with Indian tribes as well as other procedures before federal actions are taken and before regulations are drafted and published. These procedures were not followed in this instance. The redraft of the land-to-trust regulations was a work in progress within Interior for several years. Only a few months prior to publication, Interior did inform tribal governments of its plans to publish new regulations. However, Interior did not allow tribes to have any input into the process, and the draft regulations were created without any consultation with tribes.

At publication, Interior sought to minimize the importance of the proposed regulations in order to avoid compliance with applicable procedures. Interior committed numerous procedural errors:

*Executive Order 13084.* In 1998, President Clinton issued Executive Order 13084 (Consultation and Coordination with Indian Tribal Governments) and directed each agency to provide an effective process to permit elected officials and other representatives of Indian Tribal governments to have meaningful and timely input in the development of regulatory policies on matters which significantly or uniquely affect their communities. The Order directs that on issues relating to Tribal self-government and trust resources, each agency "should explore and, where appropriate,

use consensual mechanisms for developing regulations, including negotiated rulemaking." Interior has not explored consensual mechanisms for revising its existing regulations on taking land into trust. Indeed, Interior summarily dismisses its obligations under this Executive Order by making the ludicrous assertion that the proposed amended regulations will not generate any "potential adverse effects" on Indian tribes. The Department has thus demonstrated a complete disregard for the Presidential directive to ensure that all agency action be informed by respect for tribal sovereignty and for the unique legal relationship between the Federal Government and Indian tribal governments.

Executive Order 12866. In 1993, President Clinton issued Executive Order 12866, entitled "Regulatory Planning and Review." Before issuing any proposed regulation, an agency is to "seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation," and perform a cost-benefit analysis. Here, the Department developed the proposed amended regulations without the participation of the very people who will most directly be burdened by the changes. Interior's failure to designate this proposed rule as a "significant regulatory action" has denied tribes a proper cost/benefit analysis and a list of potential alternatives.

The Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 et seq. The RFA compels Federal agencies to consider the impact of their regulations on small entities, which in this instance would include tribal government jurisdictions. The proposed amendments will pose major stumbling blocks for individual Indians and Tribes trying to improve their economic conditions through land acquisitions and should be subject to the analysis required by the RFA.

We would like to emphasize that appropriate government-to-government consultation in the development of regulations is not merely a pro forma exercise. We strongly believe that the regulatory process would have been vastly improved in this instance if Interior had consulted with tribal government leaders about their issues and concerns with land-to-trust in advance of drafting the regulations.

Suggestion - NCAI believes that the appropriate remedy is to require that the Executive Orders and federal statutes intended to protect tribes from unilateral federal action be followed. NCAI has sent a detailed letter to the Secretary of Interior, dated July 16, on these procedural issues, which is attached. We have strongly urged the Department to withdraw the proposed amended regulations for taking land into trust, and we continue to believe that was the appropriate remedy. Because Interior steadfastly refused to withdraw the proposed amendments, the Tongass Tantakwaan Tlingit Tribe, the NCAI and the Land Recovery Task Force have engaged in the commenting process. In the future, it is our strong belief that Interior should engage in appropriate consultation under relevant Executive Orders and federal statutes prior to engaging in any rulemaking that significantly affects tribal government interests.

Conclusion

On behalf of the Tongass Tantakwaan Tlingit Tribe, we urge the Department of Interior to consider all comments and adopt final regulations that are consistent with the suggestions and principles discussed herein.

*****

The **Tongass Tantakwaan Tlingit Tribe**'s proposed changes, "Redraft Proposal", is attached. If you have any questions, please contact Mr. William Micklin, by telephone at 415.221.6263, by fax at 415.221.9716, or by email at Teikweidee@msn.com. Thank you.

William M. Micklin, Spokesman

Xoots Hit, Teikweidee Clan

Tongass Tantakwaan Tlingit Tribe


Tongass Tantakwaan Tlingit Tribe

Redraft Proposal

November 12, 1999

Proposed revisions to 25 C.F.R. PART 151

*ACQUISITION OF TITLE TO LAND IN TRUST*

64 Fed. Reg. 17,574-17,588 (April 12, 1999)

=====================================

Subpart A--Purpose, Definitions, General

151.1 What is the purpose of this part?

151.2 How are key terms defined in this part?

151.3 To what types of transactions does this part apply?

151.4 How does an individual Indian or a tribe apply to have title to land conveyed to the United States in **trust**?

151.5 How do we process a request?

151.6 How do we proceed after making a decision on a request?

151.7 When does the land attain trust status?

151.8 Will we accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?

Subpart B--Discretionary Acquisitions of Title On-Reservation

151.9 What information must be provided in a request involving land inside or contiguous to a reservation or inside an approved Tribal Land Acquisition Area?



AR00453

151. 10 What criteria will we use to evaluate requests involving land inside or contiguous to a reservation or inside an approved Tribal Land Acquisition Area?

151.11 Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Tribal Land Acquisition Area of another tribe?

Subpart C--Discretionary Acquisitions of Title Off-Reservation

151.12 What information must be provided in a request involving land outside a reservation or outside a Tribal Land Acquisition Area?

151.__ What additional information will be considered with respect to a request involving land outside a reservation?

151.13 Can an individual Indian acquire land outside his or her own reservation?

151.14 What criteria will we use to evaluate a request involving land outside a reservation or outside an approved Tribal Land Acquisition Area?

Subpart D--Mandatory Acceptance of Title

151.15 What information must be provided in a request to process a mandatory transfer of title into trust status, and how will we process the request?

151.16 Can our determination that a transfer of title into trust status is mandatory be appealed?

Subpart E--Tribal Land Acquisition Areas

151.17 What is a Tribal Land Acquisition Area?

151.18 What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?

Sec. 151.__ What additional information will be considered with respect to a request for Secretarial approval of a Tribal Land Acquisition Area?

151.19 How is a tribal request for Secretarial approval processed?

151.20 What criteria will we use to decide whether to approve a proposed Tribal Land Acquisition Area?

151.21 Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?

151.22 If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?

151.23 If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?



151.24 Can a Tribal Land Acquisition Area be modified after approval?

Subpart F—False Statements, Recordkeeping, Information Collection

151.25 What is the penalty for making false statements in connection with a request that we place land in trust?

151.26 What recordkeeping and reporting requirements apply to acquisitions of trust title under this part?

151.27 Do information collections under this part have Office of Management and Budget approval?

Authority: R.S. 161: 5 U.S.C. 301. Interpret or apply 46 Stat. 1106, as amended; 46 Stat. 1471, as amended; 48 Stat. 985, as amended; 49 Stat. 1967, as amended, 53 Stat. 1129; 63 Stat. 605; 69 Stat. 392, as amended; 70 Stat. 290, as amended; 70 Stat. 626; 75 Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat. 747; 82 Stat. 174, as amended; 82 Stat. 884; 84 Stat. 120; 84 Stat. 1874; 86 Stat. 216;

86 Stat. 530; 86 Stat. 744; 88 Stat. 78; 88 Stat. 81; 88 Stat. 1716; 88 Stat. 2203; 88 Stat. 2207; 18 U.S.C. 1001; 25 U.S.C. 2, 9, 409a, 450h, 451, 464, 465, 467, 487, 488, 489, 501, 502, 573, 574, 576, 608, 608a, 610, 610a, 622, 624, 640d-10, 1466, 1495, and other authorizing acts.

Subpart A—Purpose, Definitions, General

Sec. 151.1 What is the purpose of this part?

The purpose of this part is to describe the authorities, policies, and procedures that we use to decide whether to accept title to land in the name of the United States to be held in trust for the benefit of an individual Indian or a tribe.

This part primarily implements section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. § 465, which expressly authorizes us to acquire in trust for Indians "any interest in lands, water rights, or surface rights to lands, within or without existing reservations." The policies codified in that statutory authority are to promote tribal economic development, self-determination, land consolidation, and the health and welfare of Indian tribes and their members, and to reverse the economic, social, and cultural effects of allotment and loss of Indian lands. This part advances those policies by providing guidelines for such acquisitions.

Discretionary Acquisitions in Alaska

The current regulations bar the acquisition of trust title in land in Alaska, unless an application for such acquisition is presented by the Metlakatla Indian Community or one of its members. (The lands of the Metlakatla Indian Community comprise the only Native land in Alaska currently designated as a ``reservation'' by the federal government.) The regulatory bar to acquisition of title in trust in Alaska in the original version of these regulations was predicated on an opinion of the Associate Solicitor, Indian Affairs (``Trust Land for the Natives of Venetie

and Arctic Village,'' September 15, 1978), which concluded that the Alaska Native Claims



Settlement Act (ANCSA) treated tax issues and did not precluded the Secretary from taking land into trust for Natives in Alaska.

We recognize that there is a credible legal argument that ANCSA did not supersede the Secretary's authority to take land into trust in Alaska under the IRA (see relevant IRA provision at 25 U.S.C. 473a). See also the Petition of Chilkoot Indian Association, Native Village of Larsen Bay, and Kenaitze Indian Tribe, requesting the Department to undertake a rulemaking to remove the prohibition on taking land in trust in Alaska (60 FR 1956 (1995). The Secretary retains authority to take land in trust in Alaska and will exercise that authority.

In recent years blue-ribbon commissions and working groups (such as the State of Alaska's Rural Governance Commission) have been formed to address various related issues concerning tribal governments and Native lands in Alaska and to address such issues in the wake of the decision in Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 118 S. Ct. 948 (1998). In that decision, the court held that former Native Corporation lands owned in fee simple by the Native Village of Venetie Tribal Government were not validly set apart for the use of Indians as such, nor were they under the superintendence of the federal government, and thus did not meet the definition of ``dependent Indian communities.'' Id. At 955. Since the lands did not qualify as dependent Indian communities, they did not meet the definition of Indian country and the Native Village of Venetie Tribal Government was not authorized to tax non-members. Of course, if land were taken in trust by the Secretary, such trust land then would qualify as Indian country and an Alaskan tribe would have all the powers that pertain within Indian country.

The proposed regulations would change the current regulations and would discontinue the bar against taking Native land in Alaska in trust. However, this change in the regulation would be severable from all other parts of the proposed regulations and would be subject to review pending the report of the Rural Governance Commission, or Congressional action clarifying that ANSCA lands are Indian country. If the provisions of the proposed regulation and the resultant final regulation that allows for the acquisition of trust title in land in Alaska or the application thereof to any Indian tribe or individual Indian or circumstances shall, to any extent be invalid or unenforceable, the remainder of this proposed regulation and the resultant final regulation, or the application of such term or provision to Indian tribes of individual Indians or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby. Each term and provision of this proposed regulation and the resultant final regulation shall be valid and enforced to the fullest extent permitted by law.

Tribal Land Acquisition Area

Few tribes have successfully recovered land outside of the current boundaries of their reservation and within the boundaries of the territory the tribes historically and/or aboriginally resided upon and/or used for subsistence purposes. Much of this land was taken from tribes through land deals contrary to and unauthorized by Federal regulation, through the cancellation of treaties negotiated with and approved by tribes but not ratified by Congress, through the breach of treaties negotiated with and approved by tribes and Congress, and through previous but now rescinded Federal termination policies.

There are tribes which do not benefit from the basic rights and opportunities inherent in having a

reservation. For the most part, these are tribes recently restored to federal recognition by a federal statute which does not specifically designate a reservation, or they are tribes that have obtained federal recognition through the administrative Federal Acknowledgment Process, which a matter of may not provide for the designation of a reservation, or tribes which will be restored to federal recognition in the future, or Alaskan tribes which may petition for reservation status for their land or for new trust title acquisitions in accordance with this proposed regulation.

Federal policy for many decades has viewed the existence of a tribal land base as integral to the cultural, political, and economic well-being of a tribe. For example, most federal programs for Indians are in one way or another tied to the tribal land base. Because of the overwhelming importance of the tribal land base, and because the new regulations make it less burdensome for tribes to take land into trust on (as opposed to off-) reservation, we are proposing in these regulations an alternative mechanism by which tribes may benefit from the on-reservation acquisition provisions to take land into trust with reservation status within the Tribal Land Acquisition Area.

A Tribal Land Acquisition Area is a geographic boundary designated by a tribe within which the tribe plans to acquire land within an unspecified period of time under the more lenient on-reservation provisions of the proposed rule. In other words, the Tribal Land Acquisition Area would create a geographic boundary within which individual parcels would be treated as on-reservation for the purposes of acquiring trust title under these regulations.

The establishment of a Tribal Land Acquisition Area will follow notification of state and local non-Indian governmental entities. Because the trust title acquisition within a tribe's Tribal Land Acquisition Area may affect local non-Indian governments, we will require that the concerns of local non-Indian governmental entities be solicited as comments and responded to by the tribe before the

Secretary approves the trust title acquisition. Because the trust title acquisition outside of a tribe's Tribal Land Acquisition Area may affect local non-Indian governments, we will require that the concerns of local non-Indian governmental entities be solicited as comments and addressed by the tribe before the Secretary will approve the trust title acquisition. For these reasons, an application for Secretarial approval of a trust title acquisition within the boundaries of a tribe's Tribal Land Acquisition Area requires submission of information similar to that required in applications for on-reservation acquisitions; and an application for Secretarial approval of a trust title acquisition outside of the boundaries of a tribe's Tribal Land Acquisition Area requires submission of information similar to that required in applications for off-reservation acquisitions. However, because we view the need for a homeland as fundamental, we will accord greater weight to the application of a reservation-less tribe whether inside or outside of the boundaries of the tribe's Tribal Land Acquisition Area, particularly in situations in which the tribe benefits from a federal statute directing the Secretary to acquire some land base for the tribe.

However, while off-reservation land located within a Tribal Land Acquisition Area may be treated as on-reservation land for acquisition purposes, such lands legally cannot be treated as on-reservation for the purposes of IGRA. In other words, title to land which is inside a Tribal Land Acquisition Area cannot be taken into trust for the purpose of gaming unless and until the requirements of section 20 of IGRA have been satisfied.

AR00457

Consultation and Coordination with Indian Tribal Governments (E.O. 13084)

The President's memorandum of May 14, 1998, ``Consultation and Coordination with Indian Tribal Governments'' (FR Vol. 63, No. 96, Pages 27655-27657) and 512 DM 2, and Executive Order 13084 established the United States has a unique legal relationship with Indian tribal governments as set forth in the Constitution of the United States, treaties, statutes, Executive orders, and court decisions. Since the formation of the Union, the United States has recognized Indian tribes as domestic dependent nations under its protection. In treaties, our Nation has guaranteed the right of Indian tribes to self-government. As domestic dependent nations, Indian tribes exercise inherent sovereign powers over their members and territory. The United States continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, trust resources, and Indian tribal treaty and other rights.

The Bureau of Indian Affairs and the Department of the Interior conform to Executive Order 13084 in order to establish regular and meaningful consultation and collaboration with Indian tribal governments in the development of regulatory practices on Federal matters that significantly or uniquely affect their communities; to reduce the imposition of unfunded mandates upon Indian tribal governments; and to streamline the application process for and increase the availability of waivers to Indian tribal governments.

In order to provide an effective process to permit elected officials and other representatives of Indian tribal governments to provide meaningful and timely input in the development of the proposed rule that significantly and uniquely affect their communities, the end date for the comment period for the proposed rule was extended from July 12, 1999 to September 12, 1999. In addition, a description of the extent of the prior consultation with representatives of affected Indian tribal governments, a summary of the nature of their concerns, and the position supporting the need to issue the regulation shall be provided to the Director of the Office of Management and Budget and made a preamble to the final rule and regulation.

Prior to formal promulgation of the regulation, the Bureau of Indian Affairs shall identify the funds necessary to pay the direct costs incurred by Indian tribal governments in complying with the regulation.

Finally, upon review of the processes under which Indian tribal governments apply for waivers of statutory and regulatory requirements and in order to take appropriate steps to streamline those processes, with a general view toward increasing opportunities for utilizing flexible policy approaches at the Indian tribal level in cases in which the proposed waiver is consistent with the applicable Federal policy objectives and is otherwise appropriate, the Bureau of Indian Affairs and the Secretary of the Department of the Interior shall waive the statutory and regulatory requirements in connection with Indian tribes acquisition of Federal agency land and real property at the surplus and excess level upon completion of the redevelopment plan and final environmental impact analysis by the agency and upon the Indian tribe's solicitation of interest.

Sec. 151.2 How are key terms defined in this part?

Alienation means a conveyance or transfer of title to property.



AR00458

*Bureau* means the Bureau of Indian Affairs within the Department of the Interior.

*Discretionary acquisitions of title* means those acquisitions of trust title which we are authorized, but are not required, to accept administratively.

*Encumbrance* means a limitation on the title of property, such as a claim, lien, easement, charge, or restriction of any kind.

*Fee simple land* means title to land is absolute and clear of any condition or restriction, and with unconditional power of disposition.

*Former reservation* means:

(1) within the State of Oklahoma, lands that are within the jurisdictional area of an Oklahoma Indian tribe and that are within the boundaries of the last reservation established for that tribe by treaty, Executive or Secretarial Order, or Presidential or Secretarial Proclamation;

(2) outside the State of Oklahoma, lands that are within the boundaries of an Indian reservation established for a tribe by treaty, agreement, Executive or Secretarial Order, Presidential or Secretarial Proclamation, United States patent, federal statute or judicial or administrative determination, before allotment or cession of lands therein or diminishment or disestablishment by any means;

(3) provided that in California, the term also includes those reservations described in unratified treaties negotiated between the United States and the California tribes during the period 1851-1852, and those lands known as rancherias, acquired by purchase under various appropriations acts which authorized the acquisition of lands for homeless California Indians whose trust status was terminated pursuant to the California Rancheria Act of 1958, Pub.L. 85-671, 72 Stat. 619 (1958), and other federal statutes.

*Host tribe* means the tribe having jurisdiction over the land being acquired.

*Individual Indian* means a person who:

(1) Is a member of a federally recognized tribe; or

(2) Was physically residing on a federally recognized Indian reservation as of June 1, 1934, and is a descendant of an enrolled member of a federally recognized tribe; or

(3) Possesses a total of one-half degree or more Indian blood of a federally recognized tribe.

*Land* means real property or any title interest therein, as defined by the statute that authorizes the land acquisition.

*Legislative transfer of title* means the direct transfer of title to land into trust status for the benefit of an individual Indian or Indian tribe by Congress through legislation. The regulations in this part do not apply to legislative transfers of title.

*Mandatory acceptance of title* means a conveyance of trust title which Congress or a court has



required the Secretary to accept if certain specified conditions over which the Secretary has no control are met.

Reservation means that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in the final treaty, agreement, Executive or Secretarial Order, Presidential or Secretarial Proclamation, United States patent, federal statute or judicial or administrative determination, without regard to any taking, allotment, or cession of lands therein or diminishment or disestablishment by any means,

except provided that:

(1) in the State of Oklahoma, "reservation" means that area of land constituting the former reservation of the tribe. "Former reservation" means lands that are within the jurisdictional area of an Oklahoma Indian tribe and are within the boundaries of the last reservation established by treaty, Executive Orders, or Secretarial Orders.; and

(2) for Pueblo Indian tribes in the State of New Mexico, "reservation" means lands within the exterior boundaries of lands granted or confirmed to or acquired by the Pueblo as reported by the Pueblo Lands Board under section 2 of the Act of June 7, 1924, ch. 331, 43 Stat. 636, notwithstanding any finding of extinguishment of title, plus any other lands reserved, set aside, or held in trust by the United States for the use of the Pueblo or its members; and

(3) for the purposes of this section, the consideration of requests under the on-reservation criteria includes land outside of a reservation that is acquired for purposes of exercising and protecting hunting, fishing and gathering rights pursuant to a treaty, Executive Order, or statute.

Restricted fee land means land for which an individual Indian or a tribe holds fee simple title subject to limitations or restrictions against alienation or encumbrance as set forth in the title and/or by operation of law.

Secretary means the Secretary of the Interior or an authorized representative.

Tribal Land Acquisition Area is means a geographic boundary designated by a reservation-less tribe and approved by the Secretary that does not have a reservation, that is the tribe's historical and aboriginal territory of lands whereupon the tribe lived and/or which the tribe used for subsistence purposes during pre-contact and post-contact periods, and tribal ceded lands, within which the tribe plans to acquire land a ten-year period. If the Secretary approves the Tribal Land Acquisition Area under this part, the reservation-less tribe can acquire parcels of land within the Tribal Land Acquisition Area during that 10-year period under the on-reservation provisions of this part.

Tribe means any Indian tribe, nation, band, pueblo, town, community, rancheria, colony, or other group of Indians, which is recognized by the Secretary as eligible for the special programs and services provided by the Bureau of Indian Affairs, and listed in the Federal Register under Pub. L. 103-454, Act of Nov. 2, 1994 (108 Stat. 4791; 25 U.S.C. 479a (1994)).

Trust land means land, or an interest therein, for which the United States holds fee title in trust for the benefit of an individual Indian or a tribe.

AR00460

Undivided fractional interest means that the interest of co-owners is in the entire property and that such interest is indistinguishable not partitioned. The interest has not been divided out from the whole parcel. (Example: If you own \1/4\ interest in 160 acres, you do not own 40 acres. You own \1/4\ of the whole 160 acres because your \1/4\ interest has not been divided out from the whole 160 acres.)

We or us means the Secretary of the Interior or an authorized representative.

Sec. 151.3 To what types of transactions requests does this part apply?

(a) Except as provided in paragraphs (b) and (c) of this section, this part applies to all fee simple land-to-trust, restricted fee land-to-trust, trust-to-trust, and land exchange transactions requests that are:

(1) initially filed with us on or after the effective date of this regulation; or

(2) pending with us on the effective date of this regulation if the applicant has requested in writing that the request be considered under these regulations.

(b) This part does not apply to the following transactions requests:

(1) Fee to restricted fee or restricted fee to restricted fee;

(2) The transfer of title of trust land through inheritance or escheat; or

(3) The Legislative transfer of title into trust status;

(4) Substantially complete requests pending with us on the effective date of these regulations unless there is a written request filed with us under paragraph (a)(2) of this section.

(5) Transfers of federally owned land either directly to a tribe or to the Department for the benefit of a tribe. Federal interagency transfers and the acquisition of excess or surplus Federal land and real property through the Base Realignment and Closure Act (BRAC) and the Indian Self-Determination and Education Assistance Act ("ISDEAA") under two statutory schemes in this Act: Self-Determination contracting under Title I and/or Self-Governance compacting under Titles III or IV. The Bureau of Indian Affairs and the Secretary shall waive the statutory and regulatory requirements in connection with Indian tribes acquisition of Federal agency land and real property at the surplus and excess level upon completion of the redevelopment plan and final environmental impact analysis by the agency and upon the Indian tribe's solicitation of interest.

(c) We will not accept title to land in trust in the State of Alaska, except for the Metlakatla Indian Community of the Annette Island Reserve of Alaska or its members.

(c) Except for sections 151.2, 151.15 and 151.16, this part does not apply to the mandatory acceptance of title into trust status.

Sec. 151.4 How does an individual Indian or a tribe apply to have title to land conveyed to the United States in trust?



Individual Indians and tribes must send us a written request asking that we accept title and place the land into trust.

(a) The request must:

(1) Identify the applicant (including the applicant's tribal affiliation);

(2) Include the legal description of the land to be acquired; and

(3) Include all information which shows that the proposed acquisition meets the applicable requirements in this section, for the particular type of acquisition involved (e.g., on- or off-reservation, discretionary or mandatory).

(b) The request does not need to be in any special form. However, we strongly urge the applicant to address each section of this part that is relevant to the type of acquisition (e.g., on- or off-reservation, discretionary or mandatory), in the order it appears here.

Constructing the request in this way will enable us to review the request more efficiently.

(c) We may also ask for additional information to aid us in reaching a decision.

Sec. 151.5 How do we process the request?

(a) After we receive Within 10 days of receiving the request, we will notify the State, county, and municipal governments having regulatory jurisdiction over the land where the land is located, as well as interested tribal governments. We will send all notices under this section by certified mail, return receipt requested. The notice will contain the information described in paragraph (a)(1) or (a)(2) of this section, as appropriate.

(1) If the request is for on-reservation lands or lands inside an approved Tribal Land Acquisition Area, an acquisition under subpart B of this Part, the notice we send under this section will:

(i) Include the name of the applicant;

(ii) Describe the lands proposed to be taken in trust;

(iii) State the proposed use of the land; and

(iv) Invite the State and local governments from the State in which the land is located to comment in writing within 30 days on the proposed acquisition.

(2) If the request is for land outside a reservation and outside a Tribal Land Acquisition Area, an acquisition under Subpart C of this Part, the notice we send under this section will:

(i) Include the name of the applicant;

(ii) Describe the lands proposed to be taken in trust;

(iii) Describe the proposed use of the land; and



AR00462

(iv) Invite the State and local governments from the State in which the land is located to comment in writing within 60 30 days on the acquisition's potential effects on the State and local governments, including on their regulatory jurisdiction, real property taxes, and special assessments.

(b) After the comment period has ended, we will send to the applicant copies of any comments made by State or local governments on the applicant's request. We will give the applicant a reasonable time in which to reply to the comments.

(c) Subject to restrictions on disclosure required by the Freedom of Information Act (5 U.S.C. §552), the Privacy Act (5 U.S.C. §552a), the National Historic Preservation Act (16 USC §470w-3), the Native American Graves Protection and Repatriation Act (25 U.S.C. §3001, the Archaeological Resources Protection Act (16 U.S.C. §470aa), and the Trade Secrets Act (18 U.S.C. §1905), and other laws, the request will be available for review at the local BIA agency or area office having administrative jurisdiction over the land.

(d) Information regarding sacred, historic and cultural resource sites, or other information of a sensitive and confidential nature, may be set out in a separate portion of a request along with the reasons that confidentiality is necessary. Such information shall be deemed confidential and withheld from disclosure and may be relied on in making decisions to the extent that confidentiality is supported by law.

(d) (e) We will consider all the documentation that the applicant submits as well as all comments submitted. For on-reservation lands or lands inside a Tribal Land Acquisition Area, we will make a decision whether to accept or deny the request within 30 days of the close of all comment and reply periods. For land outside of a reservation and outside a Tribal Land Acquisition Area, we will make a decision within 30 days of the close of all comment and reply periods.

(f) If the request is for an acquisition under the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §2719, which governs the use of land acquired in trust when the intended use of the land is for gaming, there are additional procedures and requirements specified in the Act.

Sec. 151.6 How do we proceed after making a decision on the request?

(a) Within 5 days after we make a decision, Wwe will send the applicant a certified letter describing our decision to accept approve or deny a request. We will also send a copy of the decision letter to everyone (including State and local governments) who sent us written comments on the request. The notice decision letter to the applicant and interested parties will explain that they have a right to appeal our decision under part 2 of this title, provided that appeals of decisions on requests to place land into trust shall not be subject to appeal to the Interior Board of Indian Appeals and an appeal bond shall be posted unless the applicant waives the posting of the bond.

(b) If our decision is to deny the request, we will take no further action.

(c) If our decision is to approve the request, after the exhaustion of administrative remedies we will:



(1) Complete a preliminary title examination within 30 days of that decision. For both discretionary and mandatory acquisitions, a After we examine the title evidence, we will notify the applicant of any liens, encumbrances, or infirmities. If the liens, encumbrances, or infirmities make title to the land unmarketable, we will may require the applicant to eliminate the liens, encumbrances, or infirmities before we act on the application.

(2) No later than 10 days after the exhaustion of administrative remedies, Ppublish in the Federal Register, or in a newspaper of general circulation serving the affected area, a notice of the decision to take land into trust under this part. The notice will state that we have made a final decision to take land in trust and that we will accept title in the name of the United States no sooner than 30 days after the notice is published; and

(3) Act on any judicial appeals that may be filed; and

(4) (3) After the exhaustion of judicial remedies, aAccept trust title to the land by issuing or approving an appropriate instrument of conveyance, provided that the Secretary shall accept trust title notwithstanding the filing of a lawsuit seeking to enjoin such acceptance unless plaintiff in the suit obtains a temporary restraining order or a preliminary injunction barring the Secretary from accepting trust title. In any such suit, the Secretary shall oppose any application for a temporary restraining order or a preliminary injunction, unless the tribe or individual making the trust application consents in writing.

Sec. 151.7 When does land attain trust status?

We will approve or issue the appropriate instrument of conveyance no later than 10 days after the 30-day time period specified in Sec. 151.6(c)(2) has run. After the Secretary has published notice of intent to take the land into trust pursuant to Sec. 151.6 (c)(2), the time period for appeal has run, all appeals rights have been exhausted, and all title objections have been cleared, we will approve or issue the appropriate instrument of conveyance. Only after these steps have been completed will the land attain trust status. The approved deed will then be recorded in the county where located, title evidence will be updated, a final title opinion will be issued and the deed will be recorded in the appropriate Bureau of Indian Affairs title plant under part 150 of this chapter.

Section 151.7a Under what circumstances may we waive the normal time requirements for processing requests?

Notwithstanding any other provision of these regulations, with respect to a particular request, if we determine that there are special circumstances which make the time requirements of this part impracticable, we will

(a) provide the applicant with a written notice, stating that we have so determined, and the reasons for that determination,

(b) offer to meet with the applicant withing 30 days of the applicant's receipt of that written notice,



(c) if the applicant wishes, meet with the applicant to discuss our views, and to solicit the applicant's views, regarding the timing for the processing of the application, and

(d) within 14 days of the meeting (or within 14 days of the applicant declining our offer to meet), consistent with our obligation to process applications in a timely manner, we will provide the applicant with a written schedule under which we will process the application.

Sec. 151.8 Will we accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?

We will not accept and hold in trust for an individual Indian or a tribe an undivided fractional interest in land, except under one of the following conditions:

(a) The individual Indian or tribe already owns an undivided fractional restricted or trust interest in the land, and is acquiring the additional interest(s) to consolidate ownership.

(b) The individual Indian or tribe acquires the undivided fractional interest as the result of a gift under Sec. 152.25(d) of this chapter and the conveyance does not result in further fractionation of interest in the land.

(c) The individual Indian or tribe is acquiring interest in fee and there are existing undivided fractional trust or restricted interests in the same land.

(d) The individual Indian or tribe offers and agrees to purchase the remaining undivided fractional trust or restricted interest in the land, at not less than fair market value.

(e) A specific statute grants the individual Indian or tribe the right to purchase an undivided fractional interest in trust or restricted land without offering to purchase all interests.

(f) A majority of the owners of the remaining undivided trust or restricted fractional interest agree in writing that the individual Indian or tribe may acquire the interest, or once an offer has been sent to all owners by certified mail, the owners of the remaining undivided trust or restricted fractional interest will have six months to meet the offer made by the individual Indian or tribe.

(g) Under the Indian Land Consolidation Act, 25 U.S.C. 2201 et seq., a tribe may acquire an undivided fractional interest in trust or restricted land under these conditions:

(1) The land is inside the tribe's reservation, or inside an approved Tribal Land Consolidation Area, or is otherwise subject to the tribe's jurisdiction, and

(2) The tribe acquires the land:

(i) At not less than the fair market value; and

(ii) With the written consent of a majority of the owners of the remaining undivided fractional trust or restricted interest of this land.

(h) The tribe acquires, at not less than the fair market value, part or all of the undivided fractional interests in a parcel of trust or restricted land within the tribe's reservation, or subject to the

AR00465

tribe's jurisdiction and:

(1) Over 50 percent of the owners of the undivided fractional interests consent in writing to the acquisition; or

(2) An individual Indian makes an offer under paragraph (e) of this section.

(i) An individual Indian:

(1) Already owns an undivided fractional interest in the land;

(2) Offers to match a tribal offer to purchase under paragraph (d) of this section; and

(3) Has used and possessed the land for at least 3 years preceding the tribe's offer to purchase.


Subpart Part B--Discretionary Acquisitions of Title On-Reservation

Sec. 151.9 What information must be provided in a request involving land inside or contiguous to a reservation or inside an approved Tribal Land Acquisition Area?

A request from an individual Indian or a tribe asking that the United States accept title to land inside or contiguous to a reservation boundary, former reservation, ceded tribal lands, lands where the tribe retains treaty rights, or to land inside an approved Tribal Land Acquisition Area must include:

(a) A citation, complete description, or a copy, of the federal statute that authorizes legal authority under which the United States to may accept the land in trust and any limitations contained in the authority.

(b) An explanation of why the individual Indian or tribe needs land to be in trust how taking the land into trust will promote the economic, governmental, social, cultural or other interests of the tribe or individual Indian and how the land will be used. This explanation is a crucial factor in determining if the request should be approved.

(c) If the applicant is a tribe, an explanation of whether the tribe:

(1) Already owns an undivided fractional trust or restricted interest in the land; and

(2) Maintains jurisdiction over the land.

(d) If the applicant is an individual Indian, an explanation of:

(1) Whether the applicant already owns an undivided fractional trust or restricted interest in the land;

(2) The amount of land that the applicant already owns and the status of the land (fee, restricted, or trust); and



(3) Whether the applicant needs assistance in handling real estate affairs. For example, tell us if the applicant is a minor or has been declared legally incompetent.

(e) Title insurance or an abstract of title that meets the Standards for the Preparation of Title Evidence in Land Acquisitions by the United States, issued by the U. S. Department of Justice.

(f) Documentation that we need to comply with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies of these directives, see the Department of Interior, Bureau of Indian Affairs website at: <http://www.doi.govbureau-indian-affairs.html>.) Include a record of consultation with appropriate authorities regarding if applicable environmental, endangered species, water quality, fish and wildlife, wetlands, transportation, air quality, cultural, historical value, hazardous waste, and toxic material issues.

Sec. 151. 10 What criteria will we use to evaluate requests involving land inside or contiguous to a reservation or inside an approved Tribal Land Acquisition Area?

We will review all information submitted under Sec. 151.9. We may decide to accept trust title to the land if the acquisition meets all of the following criteria:

(a) We determine that the conveyance is necessary to facilitate tribal self-determination, economic development, Indian housing, or land consolidation;

(b) There is legal authority that authorizes us to accept the land in trust;

(c) The request is complete (including all supporting documents);

(d) The request will benefit the economic and/or social condition of the applicant;

(e) There is title insurance or an abstract of title that meets the Standards for the Preparation of Title Evidence in Land Acquisitions by the United States, issued by the U. S. Department of Justice;

(f) There is information sufficient for compliance with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations, including, a record of coordination with agencies having jurisdiction over cultural, historic, or natural resources; and

(g) We determine after mitigation of effects on the environment, cultural resources, historic resources, and endangered or threatened species, that the conveyance is consistent with applicable environmental, cultural, historic, or natural resources law.

We will review all information submitted under Sec. 151.9. We will first determine if the application complies with Sec. 151.10 (a). If so, we will take the land into trust if it meets the standard in Sec. 151.10(b).

(a) An application to have land taken into trust must:

(1) Be complete (including all supporting documents);



AR00467

(2) Be supported by legal authority that authorizes us to accept the land in trust;

(3) Include title insurance or an abstract of title that meets the Standards for the preparation of Title Evidence in Land Acquisitions by the United States, issued by the U.S. Department of Justice;

(4) Include information sufficient for compliance with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations, including, a record of coordination with agencies having jurisdiction over cultural, historic, or natural resources.

(b) Based upon consideration of:

(1) the history and circumstances of land loss by the relevant tribe,

(2) the economic, governmental, social and cultural consequences of that land loss,

(3) the intent of Congress to foster tribal economic development, self-determination, self-government, Indian housing land consolidation and natural resource protection, and

(4) the expected benefits of taking the specific land in question into trust,

a request to have land taken into trust that meets the requirements of section 151.10(a) shall be granted and the subject land shall be taken into trust, unless there is clear and compelling evidence that the adverse impacts of taking the land into trust would significantly outweigh the benefits.

Sec. 151.11 Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Tribal Land Acquisition Area of another tribe?

An individual Indian or a tribe, including individual Indians and tribes in Oklahoma, may acquire land in trust on another tribe's reservation, or inside another tribe's approved Tribal Land Acquisition Area, if the host tribe's governing body consents in writing. No consent is required if:

(a) An individual Indian or tribe already owns an undivided fractional trust or restricted interest in the parcel of land to be acquired; or

(b) The proposed acquisition is inside a reservation or an approved Tribal Land Acquisition Area that is shared by two or more tribes, and the acquisition is for one of these tribes, or one of these tribes' members.

Subpart C--Discretionary Acquisitions Off-Reservation

Sec. 151.12 What information must be provided in a request involving land outside a reservation or outside a Tribal Land Acquisition Area?

A request from an individual Indian or a tribe asking that the United States accept title to land outside a reservation or outside an approved Tribal Land Acquisition Area, must include:

(a) A citation, complete description, or a copy of, the statutory authority that authorizes legal



authority under which the United States to may accept land in trust and any limitations contained in the authority;

(b) An explanation of the need of the individual Indian or tribe for land in trust how taking the land into trust will promote the economic, governmental, social, cultural or other interests of the tribe (or individual Indians) and how the land will be used. This explanation is a crucial factor in determining if the request should be approved. The request must explain:

(1) Why the present land base is not appropriate for the activity contemplated in the request;

(2) Why the applicant needs How taking the land in trust for will enhance or facilitate the proposed use; and

(3) How trust status will benefit the applicant's economic and/or governmental, social, cultural or other interests..

(c) A description of how the applicant will use the land. This description must include an explanation of:

(1) The past uses of the land;

(2) The present use of the land;

(3) The anticipated future uses of the land;

(4) The cultural or historical interest in the land;

(5) The objectives that the individual Indian or tribe hopes to attain; and

(6) If the acquisition is for housing:

(i) The projected number of units to be built; and

(ii) The number of members who will benefit.

(7) If the applicant is acquiring the land for business purposes, the tribe applicant must provide a business plan that specifies specify the anticipated economic benefits of the proposed use.

(d) A description of the following:

(1) The location of the land relative to State boundaries;

(2) The distance of the land from the boundaries of the tribe's reservation;

(3) The distance of the land from the Bureau's agency or area office;

(4) (3) The location of roads and rights-of-way that provide access to the land; and

(5) (4) The location of the land in relation to the tribe's other trust lands.

(g) (e) Whether there is title evidence that meets the Standards for the Preparation of Title



Evidence in Land Acquisitions by the United States, issued by the U. S. Department of Justice. The evidence will be examined to determine if the applicant has marketable title.

(h) (f) The documentation that we need to comply with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies of these directives, see the Bureau of Indian Affairs web site at: <http://www.doi.gov/bureau-indian-affairs.html>.) Include a record of consultation with appropriate authorities regarding if applicable environmental, endangered species, water quality, fish and wildlife, wetlands, transportation, air quality, cultural, historical value, hazardous waste, and toxic material issues.

(i) (g) If the request is for an individual Indian, documentation demonstrating that the applicant's request meets one of the criteria described in Sec. 151.13 (to be renumbered to 151.4).

Sec. 151.___ What additional information will be considered with respect to a request involving land outside a reservation or outside a Tribal Land Acquistion Area?

In addition to the information required under Section 151.12, in determining whether to take land into trust that is outside a reservation we will consider the information submitted by any interested party on the matters contained in this section. While tribes and individual Indians are not required to submit this information, it may in some cases be in their interest to do so. We will consider:

(e) (a) A description of The Secretary may consider, from submissions pursuant to § 15.5.(1)(iv), if any, the effect on the State and its political subdivisions of removing the land from tax rolls. Describe This may include a description of any measures the applicant will take to reduce these effects. The description of effects must may include an explanation of:

(1) The amount of real property taxes and special assessments currently imposed on the land including natural resources annual taxes currently assessed by the State and/or local governments;

(2) The amount of any funds or other financial benefits (direct or indirect) that the State or local governments may realize as a result of the applicant's proposed use of the land. (This may include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

(2) The amount of annual revenue lost from special assessments to the local governments, if any;

(3) The amount of annual revenue lost from mineral receipts to the local governments, if any; and

(4) The local governments' ability to provide public safety services for the land.

(f) (b) A description of the acquisition's potential impacts on any jurisdictional and land use. infrastructure issues that might arise. The description must may address each of the following issues.

(1) Zoning, including:

(i) The current zoning of the land and nearby property;



(ii) How the applicant's proposed use of the property fits within the current zoning of the land and of the nearby property; Any proposed use conflicts with current zoning; and

(iii) Whether the tribe has adopted any zoning or land use ordinance or plan, and the zoning or land use allowed for the property under tribal law if the land were placed into trust.Any tribal zoning ordinances.

(2) Law enforcement and cross-deputization, including:

(i) Who currently provides law enforcement services for the land;

(ii) Whether the tribe already has its own law enforcement;

(iii) (ii) Who will supply law enforcement if the land is approved for trust status; and

(iv) (iii) Any additional resources required to provide adequate law enforcement and how they will be funded.

(3) Safety factors, including:

(i) Who supplies fire protection service for the land;

(ii) Who supplies emergency medical service for the land; and

(iii) If the land is in a flood area or flood control area.

(4) Traffic, roads, and streets, including:

(i) Access to the land;

(ii) Whether any change in traffic pattern is anticipated as a result of the proposed use of the land, and if so what changes are expected and what plans have been made to address them;A description and quantification of anticipated increased traffic in the area from proposed use; and

(iii) A description of whether existing roads and streets are adequate to handle any anticipated increase in traffic caused by the proposed use.

(5) Sanitation, including whether:

(i) What is currently done with regard to water supply for, and sewage and trash disposal from the property;

(ii) Whether any changes in water supply, sewage and trash disposal, are anticipated in connection with the applicant's proposed use of the land, and, if changes are needed, what plans have been made to fill those needs.

(i) The land is on a city sewage system;

(ii) The land is served by an adequate sewage system that meets applicable standards;



AR00471

(iii)Trash pickup service or another method of trash disposal is available for the land;

(iv) The city or another facility supplies services to the land;

(v) There is an adequate water supply for the proposed use and any future anticipated uses; and

(vi) Whether the tribe has water rights to the available water supply.

(6) Utilities, including:

(i) What utilities currently serve the property;

(ii) Whether any changes in utility services are anticipated in connection with the applicant's proposed use of the land, and what plans have been made to address those needs.

(i) Whether a city or a rural electric company supplies electricity to the land; and

(ii) The source of heating for the land, such as: natural gas, propane, oil, coal, wood, electric, or solar.

(7) Whether there are any cooperative agreements or voluntary actions intended to address jurisdictional and land use issues. conflicts.

(8) Whether the tribe has made any provisions to compensate the State or local governments for revenue lost because of the removal of the land from the tax rolls. (Include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

Sec. 151.13 Can an individual Indian acquire land outside his or her own reservation?

Except as provided in paragraphs (a) and (b) of this section, we will not accept title to land in trust outside an individual Indian's reservation or approved Tribal Land Acquisition Area. We may approve acquisitions of land outside an individual Indian's reservation or Tribal Land Acquisition Area if:

(a) The individual Indian already owns an undivided fractional trust or restricted interest in the property being acquired; or

(b) The individual Indian has sold trust or restricted interest in land and the money received from the sale is reinvested in other land selected and purchased with these funds, or the individual Indian is purchasing land with funds obtained as a result of a sale of trust or

restricted land under 25 U.S.C. § 409a.

(c) The land was formerly an allotment or is contiguous to trust property.

Sec. 151.14 What criteria will we use to evaluate a request involving land outside a reservation or outside an approved Tribal Land Acquisition Area?

We will review all information submitted under section Sec. 151.12. We may decide to place the land in trust if we determine that the application meets all of the following criteria:

(a) We determine that the conveyance is necessary to facilitate tribal self-determination, economic development, Indian housing, or land consolidation;

(b) There is legal authority that authorizes us to accept land in trust;

(c) The request is complete (including all supporting documents);

(d) The acquisition will benefit the tribe's economic and/or social conditions;

(e) There is title evidence that meets the Standards for the Preparation of Title Evidence in Land Acquisitions by the United States, issued by the U. S. Department of Justice;

(f) There is information sufficient for compliance with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations: a record of coordination with agencies having jurisdiction over cultural, historic, and natural resources;

(g) We determine after mitigation of impacts on the environment, cultural resources, historic resources, and endangered or threatened species, that the conveyance is consistent with applicable environmental, cultural and historic resources law, and the Endangered Species Act;

(h) We determine that any adverse impacts on local governments and communities are reasonable compared to the benefits flowing to the applicant from taking the land in trust;

In determining whether to take land into trust that is outside a reservation and that is outside a Tribal Land Acquisition Area, we will review all information submitted under sections 151.12 (and 151.13). We will first determine if the application complies with (a). If so, we will take the land into trust if it meets the standard in (b).

(a) The application to have land taken into trust must:

(1) Be complete (including all supporting documents);

(2) Be supported by legal authority that authorizes us to accept the land in trust;

(3) Include title evidence that meets the Standards for the Preparation of Title Evidence in Land Acquisitions by the United States, issued by the U.S. Department of Justice.

(4) Include information sufficient for compliance with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations: a record of coordination with agencies having jurisdiction over cultural, historic and natural resources.

(b) Based upon consideration of

1) the history and circumstances of land loss by the tribe,

2) the economic, social and cultural consequences of that land loss,



3) the intent of Congress to foster tribal economic development, self-determination, Indian housing, land consolidation and natural resources protection, and

4) the expected benefits of taking the specific land in question into trust,

a request to have land taken into trust that otherwise meets the requirements of section 151.14(a) shall be granted and the subject land shall be taken into trust, unless the adverse impact of doing so would outweigh the benefits to the tribe.

For purposes of this subsection, in evaluating the potential benefits and harms that would flow from the granting of a request to take land into trust, we will consider, in addition to the factors described above:

(i) The Bureau of Indian Affairs is equipped to handle the additional responsibilities of this acquisition and has sufficient staff to perform inspections for rights-of-way, leasing, soil conservation, and oil and gas exploration, or any other responsibilities resulting from the acquisition of the land in trust status; and

(1) Whether the acquisition will create extraordinary additional responsibilities for the Bureau of Indian Affairs, and

(i)neither the Bureau nor the tribe can reasonably meet those responsibilities, and

(ii)the burden of such responsibilities clearly outweighs the benefits of taking the lands into trust.

(2) Whether the location of the land supports taking the land into trust. For purposes of this section:

i) If the land is contiguous to the Tribe's reservation or is contiguous to a parcel of land held in trust or restricted fee for the tribe or a member of the tribe and is not within the definition of "reservation" under this part, the location of the land shall be deemed to be a factor strongly supporting taking the land into trust;

ii) If the land is within the tribe's former reservation, aboriginal homeland, treaty ceded area, land where the tribe retains treaty rights, or was otherwise formerly held or used by the tribe or its members, the location of the land shall be deemed to be a factor supporting taking the land into trust;

iii) If the land is not covered by subsections (b)(2)(i) or (b)(2)(ii) of this section, the greater the distance between the land and the tribe's reservation, the greater the scrutiny that will be afforded to the justification of anticipated benefits to the tribe, and the greater the weight that will be given to the legitimate concerns of state and local governments.

(j) The location of the land relative to State boundaries, and its distance from the boundaries of the tribe's reservation, is reasonable based in part on the following:

(1) If the land is in a different state than the tribe's reservation, the tribe's justification of anticipated benefits from the acquisition will be subject to greater scrutiny.



(2) As the distance between the tribe's reservation or approved Tribal Land Acquisition area and the land to be acquired increases, the tribe's justification of anticipated benefits from the acquisition will be subject to greater scrutiny.

(3) As the distance between the tribe's reservation or approved Tribal Land Acquisition Area and the land to be acquired increases, the concerns raised by the state and local governments will be given greater weight.

Subpart D--Mandatory Acceptance of Title

Sec. 151.15 What information must be provided in a request to process a mandatory transfer acceptance of title into trust status, and how will we process the request?

(a) To help us determine whether we are mandated by legislation to accept trust title to a specific tract of land In a request to process a mandatory acceptance of title, we require submission of the following documentation:

(1) A complete description, citation to, or a copy of, the statutory authority that directs the United States to place the land in trust, and any limitations contained in that authority;

(2) Title insurance or an abstract of title that meets the Standards for the Preparation of Title Evidence in Land Acquisitions by the United States, issued by the U.S. Department of Justice; and

(3) Any additional information that we may request.

(b) We will determine within 30 days of receipt of the trust application if the transfer is mandatory. If we determine that the transfer of title into trust status is mandatory, within 10 days of that determination we will publish that determination and a notice of intent to take the land in trust in the Federal Register. The notice will state that we will accept title in the name of the United States 30 days after the notice is published. If we determine that the transfer of title into trust status is not mandatory, within 10 days of that determination we will notify the applicant of the reasons we believe the requested transfer is not mandatory.

(c) After the 30-day period has expired, we will approve or issue the appropriate instrument of conveyance.

Sec. 151.16 Can our determination that a transfer of title into trust status is or is not mandatory be appealed?

The Department's determination that a transfer of title into trust status is or is not "mandatory" may be appealed directly to a federal court of competent jurisdiction. The administrative appeals processes set forth according to requirements set forth in part 2 of this title do not apply to the Secretary's determination under this section.

Subpart E--Tribal Land Acquisition Areas

Sec. 151.17 What is a Tribal Land Acquisition Area?

A Tribal Land Acquisition Area is a geographic boundary designated by a reservation-less tribe



6 4

within which the tribe plans to acquire land within a 10-year period. If the Secretary approves the Tribal Land Acquisition Area under this part, the reservation-less tribe can acquire parcels of land within the Tribal Land Acquisition Area during that 10-year period under the on-reservation provisions of this part.

Sec. 151.18 What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?

A request for Secretarial approval of a Tribal Land Acquisition Area must be made in writing, although we do not require that it take any special form. However, we strongly urge the applicant to address each applicable section of this part in the order it appears here. Constructing the application in this way will help us review the request more efficiently. To be complete, a request for Secretarial approval of a Tribal Land Acquisition Area must identify the applicant tribe, and must include:

(a) A citation, complete description, or a copy, of the federal statute(s) that authorize legal authority under which the United States to may accept land in trust on behalf of the tribe, and any limitations contained in that authority.

(b) Copies of tribal documents relating to the establishment of the Tribal Land Acquisition Area and the acquisition of land within it, including:

(1) A copy of the tribe's constitution and by-laws, corporate charter, resolution, or excerpts from those documents that identify and grant tribal officials the authority of the tribe to acquire tribal lands on behalf of the tribe;

(2) A copy of a tribal resolution designating the Tribal Land Acquisition Area, including a legal description of the lands located within it area boundaries; and

(3) A copy of a tribal resolution requesting that the Secretary approve the proposed Tribal Land Acquisition Area.

(c) A narrative summary that describes the purposes and goals for acquiring lands in trust within the Tribal Land Acquisition Area, including general information about whether the lands are to be used for residential, governmental, educational, economic development, social, cultural or other purposes.

(d) A narrative of the tribe's history that explains:

(1) When and how the tribe was federally recognized or restored to federal recognition, and whether it was through legislation, treaty, or the Bureau of Indian Affairs' Federal Acknowledgment Process; and

(2) If applicable, how the tribe became dispossessed of its aboriginal homelands, former reservation lands or other lands formerly held or used by the tribe or its members.

(e) A description of the Tribal Land Acquisition Area, including:

(1) A legal description of the lands within boundaries of the Tribal Land Acquisition Area;



64

(2) Information about whether the lands are within the tribe's former reservation or aboriginal homelands, or other lands formerly held or used by the tribe or its members;

(3) Information about whether the lands are Federal lands, State lands, Tribal lands, or private lands;

(4) Information about whether the lands overlap with another tribe's jurisdictional area;

(5) Information about the significance of the land to the tribe, including whether the land has any particular historical, cultural, religious, or other value to the tribe; and

(6) Information about the distance of the Tribal Land Acquisition Area from the Bureau's nearest agency or area office.

Sec. 151.__ What additional information will be considered with respect to a request for Secretarial approval of a Tribal Land Acquisition Area?

In addition to the information required under Section 151.18, in determining whether to approve a Tribal Land Acquisition Area, we will consider the information submitted by any interested party on the matters contained in this Section. While Tribes and individual Indians are not required to submit this information, it may in some cases be in their interest to do so. We will consider:

(f) A description of the location of roads and rights-of-way, or of additional rights-of-way that may be needed to provide access to lands located within the Tribal Land Acquisition Area.

(g) (a) A description of the effect on the State and its political subdivisions of removing the land from tax rolls. Describe This may include a description of any measures the applicant will take to reduce these effects. The description of effects must may include an explanation of:

(1) The amount of real property taxes and special assessments currently imposed on the land including natural resources annual taxes currently assessed by the State and/or local governments;

(2) The amount of any funds or other financial benefits (direct or indirect) that the State or local governments may realize as a result of the applicant's proposed use of the land. (This may include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

(2) The amount of annual revenue lost from special assessments to the local governments, if any;

(3) The amount of annual revenue lost from mineral receipts to the local governments, if any; and

(4) The local governments' ability to provide public safety services for the land.

(h) (b) A description of the acquisition's potential impacts on any jurisdictional and land use infrastructure issues that might arise. The description must may address each of the following issues.

(1) Zoning, including:

(i) The current zoning of the land and nearby property;



64

(ii) How the applicant's proposed use of the property fits within the current zoning of the land and of the nearby property; Any proposed use conflicts with current zoning; and

(iii) Whether the tribe has adopted any zoning or land use ordinance or plan, and the zoning or land use allowed for the property under tribal law if the land were placed into trust. Any tribal zoning ordinances.

(2) Law enforcement and cross-deputization, including:

(i) Who currently provides law enforcement services for the land;

(ii) Whether the tribe already has its own law enforcement;

(iii) (ii) Who will supply law enforcement if the land is approved for trust status; and

(iv) (iii) Any additional resources required to provide adequate law enforcement and how they will be funded.

(3) Safety factors, including:

(i) Who supplies fire protection service for the land;

(ii) Who supplies emergency medical service for the land; and

(iii) If the land is in a flood area or flood control area.

(4) Traffic, roads, and streets, including:

(i) Access to the land;

(ii) Whether any change in traffic pattern is anticipated as a result of the proposed use of the land, and if so what changes are expected and what plans have been made to address them; A description and quantification of anticipated increased traffic in the area from proposed use; and

(iii) A description of whether existing roads and streets are adequate to handle any anticipated increase in traffic caused by the proposed use.

(5) Sanitation, including whether:

(i) What is currently done with regard to water supply for, and sewage and trash disposal from the property;

(ii) Whether any changes in water supply, sewage and trash disposal, are anticipated in connection with the applicant's proposed use of the land, and, if changes are needed, what plans have been made to fill those needs.

(i) The land is on a city sewage system;

(ii) The land is served by an adequate sewage system that meets applicable standards;



AR00478