64

(iii)Trash pickup service or another method of trash disposal is available for the land;

(iv) The city or another facility supplies services to the land;

(v) There is an adequate water supply for the proposed use and any future anticipated uses; and

(vi) Whether the tribe has water rights to the available water supply.

(6) Utilities, including:

(i) What utilities currently serve the property;

(ii) Whether any changes in utility services are anticipated in connection with the applicant's proposed use of the land, and what plans have been made to address those needs.

(i) Whether a city or a rural electric company supplies electricity to the land; and

(ii) The source of heating for the land, such as: natural gas, propane, oil, coal, wood, electric, or solar.

(7) Whether there are any cooperative agreements or voluntary actions intended to address jurisdictional and land use issues. conflicts.

(8) Whether the tribe has made any provisions to compensate the State or local governments for revenue lost because of the removal of the land from the tax rolls. (Include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

Sec. 151.19 How is a tribal request for Secretarial approval processed?

When we receive a request for Secretarial approval of a Tribal Land Acquisition Area, we will review the supporting documentation to determine if the request meets the requirements of this part. If the request is complete, we will:

(a) Provide notice of the request for Secretarial approval to the Governor's Office, to appropriate local government officials, and to appropriate officials of tribes located within a 50-mile radius of the boundaries of the proposed Tribal Land Acquisition Area. Recipients of the notice will be provided 60 days from the date of receipt in which to comment on the proposed Tribal Land Acquisition Area and the request supporting it. Other interested parties may also submit comments during the 60-day consultation period.

(b) Within 90 days aAfter the close of the consultation period, based on the criteria described in Sec. 151.21, we will decide whether to approve the Tribal Land Acquisition Area. Our decision on whether to approve the Tribal Land Acquisition Area will be communicated in the form of a certified letter to the applicant. We also will provide notice of our decision to interested parties by sending a copy of the decision letter to everyone (including State and local governments) who sent us written comments on the request for approval.

(c) If we decide not to approve the Tribal Land Acquisition Area, we will take no further action.

(d) If we decide to approve the Tribal Land Acquisition Area, we will:



(1) Publish in the Federal Register, or in a newspaper of general circulation serving the affected area, a notice of the decision to approve the Tribal Land Acquisition Area; and

(2) Thereafter review requests to accept trust title land located within the Tribal Land Acquisition Area as "on-reservation" acquisitions under the applicable on-reservation provisions in this part.

Sec. 151.20 What criteria will we use to decide whether to approve a proposed Tribal Land Acquisition Area?

In general, because tribes without reservations and tribes with inadequate reservations are significantly disadvantaged, both in terms of cultural preservation and in terms of being ineligible eligibility for federal land-based programmatic funding and technical assistance, there is a presumption in favor of the tribe's need for at least some trust land. However, in determining whether to approve establishment of a Tribal Land Acquisition Area, we will consider the individual circumstances of each applicant tribe, surrounding community, and affected land base. There are some standard criteria which will help direct our decision-making process. These standard criteria include:

(a) The request must be complete and contain all supporting documents;

(b) The statutory basis upon which the tribe proposes to acquire lands. creation of the Tribal Land Acquisition Area: if the tribe is the subject of a statute directing the Secretary to take some unspecified land into trust for the tribe's benefit the tribe will enjoy a greater presumption in favor of approval of its proposed Tribal Land Acquisition Area. (For example, there is statutory language such as "the Secretary shall take land into trust within the tribe's service area," or "the Secretary shall take land into trust within X and Y counties.")

(c) The size of the proposed Tribal Land Acquisition Area in relation to the size of the tribe's membership: we will look for a reasonable connection between the amount of land the tribe wishes to take into trust, and the basic trust needs (housing, health, employment opportunities) of the tribe's membership.

(d) The relationship of the tribe to the lands located within the Tribal Land Acquisition Area: we will give greater weight to a request for approval of a Tribal Land Acquisition Area that encompasses lands to which the tribe has established a strong cultural, historical, and/or legal connection.

(e) The ability of the tribe and the local non-Indian community to adjust to the jurisdictional changes that will occur if the lands within the Tribal Land Consolidation Area are taken into trust, including:

(1) That there are adequate arrangements for provision of police and fire protecion and other emergency response for persons living within the Tribal Land Consolidation Area (whether living on trust or non-trust property);

(2) That there are adequate arrangements for provision of other municipal-type services, such as garbage removal, water, sewage;



(3) That adverse impacts on local governments and communities are reasonable compared to the benefits flowing to the applicant.

(c) A tribe is eligible to request that a Tribal Land Acquisition Area be established for it, if the tribe has no reservation or has a reservation (or other tribal land base) that is disproportionately small compared with its tribal population or does not meet the need of the tribe for land to provide a homeland for its people. In determining whether to grant such an application, we will consider, 1) whether the proposed Area is part of a former reservation, aboriginal homeland or was otherwise formerly held or used by the tribe or its members, 2) whether the proposed Area has special historical, cultural, religious or other value to the tribe, 3) whether the tribe's planned use of land in the proposed Area would further tribal economic development, self-determination, Indian housing land consolidation or natural resource protection, and 4) whether there are adequate arrangements for police and fire protection and other municipal-type services such as garbage removal, water and sewage (for persons living in the proposed Area on trust lands or non-trust lands). The Secretary shall approve a proposed Tribal Land Acquisition Area, unless, upon consideration of these factors, as well as the tribe's proposal and any comments, the benefits to the tribe of approving the proposed Tribal Land Acquisition area are clearly outweighed by the reasonably anticipated harm to the state and political subdivisions and local communities.

Sec. 151.21 Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?

A tribe may include land inside the reservation boundaries or within an approved Tribal Land Acquisition Area of another tribe, if:

(a) The host tribe's governing body consents in writing;

(b) The tribe already owns undivided fractional trust or restricted interests in the tracts of land identified in its Tribal Land Acquisition Area; or

(c) The tracts of land to be included in the plan are inside a reservation or an approved Tribal Land Acquisition area that is shared by two or more tribes, and the plan is for one of these tribes.

Sec. 151.22 If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?

No. However, the tribe will have to apply to have individual parcels taken into trust under the off-reservation provisions of this part.

Sec. 151.23 If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?

(a) No. Lands taken into trust, including lands within a Tribal Land Acquisition Area, will enjoy "Indian country" status as that term has been defined in relevant federal statutes and caselaw. However, those lands do not attain "reservation" status by virtue of the trust land conveyance or the Tribal Land Acquisition Area having been approved by the Secretary. Reservation status can only be attained if:

(1)(a) The tribe has applied to the Secretary under 12 25 U.S.C. 467; or

(2)(b) There is a specific federal statute designating the land as a reservation.

(b) Upon approval of the Tribe's Tribal Land Acquisition Area by the Secretary, and upon all approvals by the Secretary of trust land conveyances pursuant to 25 U.S.C. § 151, the Department shall immediately initiate the process to proclaim the trust land to have attained "reservation" status pursuant to 25 U.S.C. § 467 using the information previously provided pursuant to 25 U.S.C. § 151, unless the Tribe requests reservation status not be proclaimed.

Sec. 151.24 Can a Tribal Land Acquisition Area be modified after approval?

Yes. However, the changes must be submitted with a request for approval in compliance with the criteria in this part and must be approved by the Secretary.

Subpart F--False Statements, Recordkeeping, Information Collection

Sec. 151.25 What is the penalty for making false statements in connection with a request that we place land into trust?

Anyone who knowingly and willfully makes a false statement in connection with a trust title acquisition request may be subject to criminal prosecution under the False Statements Accountability Act of 1996, 18 U.S.C. 1001.

Sec. 151.26 What recordkeeping and reporting requirements apply to acquisitions of trust title under this part?

(a) Each document that we hold or that is created in the development of a request asking for land to be placed in trust is a permanent federal case file record. The Bureau of Indian Affairs file will maintain each of the documents in accordance with National Archives and Records Administration requirements.

(b) The Secretary will negotiate with Indian tribes and tribal organizations compacting and contracting under Title I or Title IV of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. 250 et seq., to ensure that such tribes and tribal organizations also maintain each document in a case file in accordance with National Archives and Records Administration rules and requirements, and to ensure that they follow all Bureau reporting requirements concerning this part.

Sec. 151.27 Do information collections under this part have Office of Management and Budget approval?

(a) The information collection requirements contained in Secs. 151.4; 151.9; 151.12; 151.15, 151.18, and 151.26 have been approved by the Office of Management and Budget under 44 U.S.C. 33501 et seq. and assigned clearance number 1076-xxxx. It is a requirement of the Paperwork Reduction Act that each respondent to any information collection be notified that an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a current valid OMB control number pursuant to 35 U.S.C. 3506(c)(B)(V); 44 CFR 1320 8(b)(3)(vii). Indian tribes and individuals must submit the information required under these sections to acquire



le 4

land into trust. We will use the information in making a determination on an application to take land into trust. The applicant must respond to this request to obtain a benefit.

(b) Public reporting for on-reservation information collection is estimated to average 4 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the information collected. Public reporting for off-reservation information collection is estimated to average 8 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the information collected. Comments regarding the burden estimate or any other aspect of this information collection should be sent to the Bureau of Indian Affairs, Information Collection Clearance Officer, 1849 C Street, NW, Washington, DC 20240; and Attention: Desk Officer, for the Department of the Interior, Office of Information and Regulatory Affairs [OMB Control Number 1076-xxxx], Office of Management and Budget, Docket Library, Room 10102, 725 17th Street, NW, Washington, DC 20502.

D:\SFCC\TAAN\TONGASS 151.REG FINAL 11-12-99.DOC

1

12 Nov 99 11:11 AM

Comments of Tongass Tantakwaan Tlingit Tribe Page 7

D:\SFCC\TAAN\TONGASS 151.REG FINAL 11-12-99.DOC

1

12 Nov 99 11:11 AM



AR00483

64

mime001 t



B-340

CENTRAL COUNCIL
Tlingit and Haida Indian Tribes of Alaska
ANDREW P. HOPE BUILDING
320 West Willoughby Avenue • Suite 300
Juneau, Alaska  99801-9983

November 12, 1999

Terry Virden
Director
Office of Trust Responsibilities
Bureau of Indian Affairs MS-4513 MIB
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

RECEIVED

MAY 1 8 2000

CAET

Dear Mr. Virden:

I am writing, as the President of the Central Council of Tlingit and Haida Indian Tribes of Alaska (the "Tribe"), to convey the Tribe's comments on the proposed regulations published on April 12, 1999, in the *Federal Register* at pages 17574-588.

The Tribe has been working closely with the Indian Land Recovery Task Force of the National Congress of American Indians ("Task Force"). The suggestions drafted by the Task Force would vastly improve the Secretary's proposed procedures. We urge you to give them careful consideration during the Department's review of the comments.  In particular, we are appreciative of the stance the Task Force has taken against the proposed perpetuation of the ban on taking land into trust in Alaska.  We do have specific comments, however, which we offer that distinguish our comments from those of the Task Force.

As published, the proposed regulations would make some rather dramatic changes to the procedures by which the Secretary of the Interior takes land into trust for Indian tribes under the Indian Reorganization Act (25 U.S.C. 465) and other federal statutes. However, the proposed regulations contain a very serious flaw – they propose at Section 151.3(c) to perpetuate the Department's self-imposed ban against taking any land into trust for the benefit of Indian tribes located within the State of Alaska.  We believe the Department's self-imposed ban is unlawful, unfair, and a root cause of our present great hardship.  We strongly object to the ban being continued in any revision to the existing regulations.

19 1.

NOV 1 2 1999

TEL 907/586-1432                                    FAX 907/586-8270

AR00485

*340*

Terry Virden
November 12, 1999
Page 2

### *The Fredericks Opinion and Ban Both Lack Any Basis in Present-Day Law or Policy*

The Department's self-imposed ban emanates from an indefensible opinion fraught with legal infirmities that was issued in the late 1970s by Tom Fredericks, then Associate Solicitor for Indian Affairs. To put it charitably, the memorandum was mis-guided and fundamentally mis-read both the law and political realities. Both have long since changed.

The Congress has, during this past decade, expanded upon and then ratified the clarification by then Assistant Secretary – Indian Affairs Ada Deer that village and regional tribes exist in the State of Alaska. Cf. 25 U.S.C. 1212 et seq. (the "Tlingit and Haida Status Clarification Act of 1994", Title II of Pub. L. 103-454); 25 U.S.C. 479a et seq. (the "Federally Recognized Indian Tribe List Act of 1994", Title I of Pub. L. 103-454, and particularly, the findings of Congress in Section 103 thereof).

More recently, in remarks he personally delivered to the national forum on subsistence convened by the Alaska Federation of Natives at the Smithsonian in Washington, D.C. in September, 1999, U.S. Senator Ted Stevens (R-AK) repeatedly referred to the practical reality that tribes do exist in Alaska and do have a role to play as governments in addressing the many challenges confronting American Indians and Alaska Natives in Alaska. His remarks indicate to me that the battle for acceptance of our existence as tribal governments has been largely concluded. The Interior Department, as our trustee, should be the first, not the last, to treat tribes in Alaska as governments and facilitate the reacquisition and protection of some of the land we have lost.

Even the highest court of the State of Alaska, which has traditionally been antagonistic toward any expression of tribal government in Alaska, recently held that as a matter of Alaska State law tribal courts have concurrent jurisdiction over domestic affairs. Cf. *Anita John v. John Baker*, No. S.-8099 (Alaska Sept. 8, 1999).

We note, as have others, that the April 12, 1999 notice of proposed rulemaking seeks guidance from the Alaska Governor's "Rural Governance Commission" on the question of whether the Secretary should remove the self-imposed regulatory ban on taking land into trust for tribes in Alaska. The June, 1999 final report of the State of Alaska's Rural Governance Commission could not be more clear in its strong recommendation to remove the regulatory ban against taking lands into trust in Alaska. The Commission bases its recommendation on persuasive evidence that the lack of a land base serves to further impoverish tribal communities in Alaska and deny them access to an array of land-based federal economic development assistance and associated authorities.

*340*

Terry Virden
November 12, 1999
Page 3

The Commission's rationale is echoed in the Department's preamble comments published in the Notice of Proposed Rulemaking with regard to all Indian tribes who lack a reservation.

> Federal policy for many decades has viewed the existence of a
> tribal land base as integral to the cultural, political, and economic
> well-being of a tribe. For example, most federal programs for
> Indians are in one way or another tied to the tribal land base.
> Because of the overwhelming importance of the tribal land base,
> and because the new regulations make it less burdensome for tribes
> to take land into trust on (as opposed to off-) reservation, we are
> proposing in these regulations an alternative mechanism by which
> reservation-less tribes may benefit from the on-reservation
> acquisition provisions to create a homeland.

*Federal Register*, at p. 17578. With one exception, all tribes in Alaska lack reservations. We ask that the Secretary apply his own argument, set out above, and remove the Secretary's self-imposed ban against taking land into trust in Alaska.

For the foregoing reasons, combined with the 1998 *Venetie* decision by the United States Supreme Court, we believe that much of the debate of the past two decades regarding the existence and role of tribal governments in Alaska essentially has been resolved. The reality is that there is growing, albeit grudging, recognition by all interests that tribes do exist in Alaska and do exercise governmental responsibilities over land and people. The Department should not subvert this evolving policy by reviving the legally flawed ban against taking land into trust in Alaska.

### A Tribal Trust Land Base is Essential to Our Survival

There is another factual reality that is not reflected in the proposed regulations and which argues against continuing the ban on taking land into trust in Alaska. There are already a few tracts of tribal trust land in Alaska outside of the island of Metlakatla. And there are a fair number of parcels in Alaska now held on behalf of individual Indians and Natives by the United States in a restricted status. These tracts exist, making it all the more unfair for the United States to propose to tribes in Alaska that they be barred from adding any more land to their meager trust land base while proposing to tribes outside Alaska that they may add land to their holdings.

AR00487

*340*

Terry Virden
November 12, 1999
Page 4

Without a modest land base, the tribal governments of our people are consigned to impoverishment and dependency. It is essential that we have our trustee, our advocate, stand with us on this issue and declare that there is no reason to treat Indian tribes in Alaska any different than Indian tribes in the Lower 48 States are treated for purposes of consideration of fee to trust land applications.

The regulations as proposed will do absolutely nothing to further our efforts toward self-determination and self-sufficiency. We need to recover our tribal lands in limited but targeted ways in order to take advantage of various Federal programs, resources, and advantages that accrue to the unique Federal-Tribal relationship.

Land is central to our Native way of life. Our tribal people cannot subsist without land. Our tribal governments cannot properly govern without land. Kept landless, our tribal economies are forever crippled and our tribal services are forever dependent upon grants funds that are fickle and undermine self-sufficiency. Unless the Secretary removes the ban against accepting tribal land into trust in Alaska, we will be forever damned to the hell of welfarism.

The current regulations, and the proposed regulations, completely and inequitably bar the tribal governments of American Indians and Alaska Natives in Alaska from participating in one of the single most basic aspects of tribal government – owning, managing, and exercising jurisdiction over land held in trust for the Tribe by the United States. This discriminatory approach is an outrage.

### *The Tribal Land Acquisition Area Language Should Be Revised to Fit Southeast Alaska*

We have additional concern regarding the proposed language on "Tribal Land Acquisition Areas" or "TLAAs". The Tribe's goal is to have the revised regulations permit an acknowledgement by the Department that the Tribe's TLAA is the "territorial area" of Southeast Alaska, the region in which the Tribe has traditionally provided primary services to its members. As you may know, the Tribe has provided governmental and program service activities to its members in this region and beyond since time immemorial. The Tribe has utilized funds from the Bureau of Indian Affairs (the "BIA") to provide services throughout this region since the 1960s when it first received funds from the BIA under contracts pursuant to the Buy Indian Act. Since 1975, the Tribe has received additional funds from BIA to serve this entire region under Titles I, III, and IV of P.L. 93-638. In 1993, the Tribe negotiated for the complete assumption of all BIA services for the entire region of Southeast Alaska. This assumption included closure of the BIA's Southeast Agency Office entire operations. As a practical matter, tribal governments now stand in the shoes of the BIA throughout Southeast Alaska. The Department has treated the

AR00488

*340*

Terry Virden
November 12, 1999
Page 5

entire region of Southeast Alaska as the service delivery area. As described in detail below, the
entire region of Southeast Alaska is the former "reservation" of our Tribe and of other village-
based tribes within our region.

We ask that the Department revise its draft regulations to conform them to the reality that
Southeast Alaska is the "territorial area" of our Tribe and the other village-based tribes within
our region. Denoting Southeast Alaska as our "former reservation" or "territorial area" for the
purposes of these regulations is an essential step in our effort to regain land that we have lost and
to restore it to a protected status that will prevent it from being lost again. Likewise, declaring
Southeast Alaska as our "former reservation" or "territorial area" for the purposes of these
regulations is the only way that our Tribes can effectively self-govern in key areas, such as
domestic relations, a responsibility that the State of Alaska's highest state court recently
confirmed is within the jurisdiction of tribal courts in Alaska. Cf. *Anita John v. John Baker*,
No. S-8099 (Alaska Sept. 8, 1999).

The Department's revisions to the regulations should acknowledge that the Tribe exercises
concurrent jurisdiction over lands held in trust for the Tribe by the United States, over lands it
owns in fee and, of course, over members of our Tribe. Within the defined "territorial area" of
Southeast Alaska, the Department should clarify in revisions to the draft regulations that the
Tribe may seek trust status for lands the Tribe acquires without off-reservation concerns and
without concerns about whether the consent of another Tribe is needed.

The opportunity to seek trust status for land within the "territorial area" of Southeast Alaska
should be conditioned on the special considerations applicable to Southeast Alaska under the
Tribe's constitution and under the 1994 re-acknowledgement statute that protect against
duplication of services and require concurrent jurisdiction with other tribes within the same
territorial area. Central Council Tlingit and Haida Indian Tribes is, by definition, a regional tribe.
Within its region are other, village-based, Indian tribes. A virtually identical situation exists in
at least one other region within Alaska (i.e., Arctic Slope). Comparable situations exist in
Oklahoma (e.g., Cherokee Nation and the Delaware Tribe of Indians), Minnesota (e.g.,
Minnesota Chippewa Tribe and the Mille Lacs Band of Ojibwe), and in other parts of Indian
Country (e.g., California, Washington), where regional or federated Indian tribes are recognized
by the United States and co-exist in a territorial service delivery with other Indian tribes whose
members sometimes are dually-enrolled in both. In Southeast Alaska, we have resolved the
issues of duplicate services and concurrent jurisdiction that arise from dual-enrollment and
overlapping jurisdiction. In each instance, Central Council Tlingit and Haida has agreed as a
matter of constitutional and statutory obligation to give precedent to a village-based tribe and act
only where and when the village-based tribe has chosen not to.

340

Terry Virden
November 12, 1999
Page 6

Some other adjustments should be made to the TLAA provision as proposed in the April 12, 1999 notice of proposed rulemaking. We urge the Department to remove what we consider as curious the proposed ten-year limitation on acquisition of land in an approved TLAA that is set forth in the proposed Section 151.17. We would chafe at such a time restriction, especially when it is not applied to other Indian tribes on reservations. We request that once a TLAA is established, that it be considered, once and for all, the TLAA for the affected tribe. Indian tribes are no longer migrating. Our Tribe never did. Southeast Alaska has been our homeland from time immemorial. Try as we might, we cannot imagine what is the policy reason behind this proposal and ask that it be removed.

Similarly, we question the practical workability of the requirements set out in the proposed Section 151.18 which seem geared more to the consideration of a specific parcel of land than an entire TLAA. We believe the information requested in Section 151.18 should be reserved for the time when a specific parcel is applied for, rather than when the TLAA is applied for. Otherwise, to require land selections to be made at the time a TLAA is applied for is to skew the private sector market and cause to inflate the value of parcels subject to future acquisition interests of the Tribe.

We are also concerned about the proposed consent requirement provisions set forth in Section 151.18. As proposed, these requirements would allow the "host" tribe to veto any trust acquisitions for the tribe for whom the TLAA is established in the first place. Such a scheme would be simply unworkable in our region. We have in place a very effective mechanism which requires our Tribe to defer to any other village-based tribe in our region, but permits our sovereign Tribe the freedom to act, without first having the approval of any other sovereign tribe in our region, when and where those other sovereign tribes are not acting. We adopted this practice many years ago because the proposed approach of obtaining consent before acting caused a paralysis, given the number of tribes in our region and their relative small size and remoteness. Our region is quite large. There is plenty of room for each of the tribes in our region to do what they need to do without stumbling upon each other. But it has proven to be wholly impracticable to obtain the consent of each tribe in our region before acting. We have found that our policy of deferring to, but being able to act in default where there is no competing proposal from any of our neighboring tribes, is an effective way of exercising our sovereign powers while respecting the sovereign powers of our neighboring tribes. We urge you to amend the proposed regulations dealing with the evaluation of applications to place land in trust by a tribe within a multi-tribal TLAA to not apply the consent requirement upon a regional tribe like Central Council Tlingit and Haida where its land application is not in competition with the land application of another village-based tribe.

AR00490

340

Terry Virden
November 12, 1999
Page 7

*Withdraw the Fredericks Opinion and Remove the Discriminatory Ban Against Alaska Tribes*

In the preamble to the April 12, 1999 proposed rule, the Department invites comment on the continuing validity of a 1978 legal opinion issued by a former Associate Solicitor for Indian Affairs, Tom Fredericks ("Trust Land for the Natives of Venetie and Arctic Village," September 15, 1978) (the "Fredericks opinion"). The Department's invitation notes that the Fredericks opinion is under review because it conflicts in part with a more recent and more authoritative interpretation of the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. § 1601 *et seq.* ("ANCSA") by the United States Supreme Court (*Alaska v. Venetie,* 522 U.S. 520 (1998)).

We have reviewed the Fredericks opinion closely. Its conclusions have been over-run by the passage of time, decades of legislative and administrative policy, and the case law. We believe the Fredericks opinion is now thoroughly discredited. Accordingly, the Fredericks opinion should be either withdrawn or ignored and the regulatory ban against the taking of land into trust in Alaska abandoned.

The Fredericks opinion rests upon an erroneous conclusion, not supported by the law or legislative history, that ANCSA repealed the Secretary's authority to take land into trust in Alaska. The Secretary's authority arises from the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465. This authority is not affected in any way by the provisions of ANCSA. To conclude otherwise is to conclude that the Secretary's authority under the IRA to take land into trust likewise does not extend to the many other Indian tribes who lack present-day reservations in Oklahoma, California and other Indian communities outside of Alaska. Such an interpretation as to reservation-less tribes outside of Alaska would and should be dismissed as preposterous. It is just as preposterous that the Fredericks opinion interpretation is not dismissed out-of-hand with respect to reservation-less tribes within Alaska in 1999.

In enacting the 1971 ANCSA and the 1976 Federal Land Policy and Management Act, the Congress certainly could have amended 25 U.S.C. 473a to repeal the application of the Secretary's authority to take land into trust in Alaska under 25 U.S.C. 465. But the Congress did not. In 1988, the Congress even went so far as to further amend 25 U.S.C. 465, without addressing or altering its application to Alaska pursuant to 25 U.S.C. 473a. We cannot see how any credit can be given to the conclusion reached in the 1978 Fredericks opinion that because the Congress in 1976 repealed the authority of the Secretary to establish reservations in Alaska pursuant to 25 U.S.C. 496, that somehow that action, by implication, repealed the authority of the Secretary to take land into trust in Alaska pursuant to 25 U.S.C. 473a. The courts have long-held that repeals, by implication, are strongly disfavored. Section 473a stands untouched by the 1971

AR00491

*340*

Terry Virden
November 12, 1999
Page 8

and 1976 Acts of Congress. The Department's regulations should reflect that authority and remove the self-imposed ban against taking land into trust in Alaska.

The 1978 Fredericks opinion also appears to presume that the act of taking land into trust pursuant to 25 U.S.C. 465 and 25 U.S.C. 473a would also automatically result in the establishment of a reservation under 25 U.S.C. 496. They are distinct processes with separate statutory authorities. Quite simply, the acceptance of land in trust status does not establish a reservation upon such land. In fact, it is not widely known that the Department now holds land in trust or restricted status for both tribes and individuals in Alaska in addition to what it holds on the Annette Island Reserve for the Metlakatla Indian Community. Throughout the rest of Southeast Alaska the Department holds trust lands for several tribes, lands that formerly were cannery sites and maintained their trust land status untouched by the enactment of ANCSA. There are also numerous other parcels of land held in trust or restrictive status under the Native Allotment Act and Native Townsite Acts. Each of these tribal and individual parcels are trust or restricted land without being considered a reservation. The Secretary's lawful exercise of authority to take additional Alaska lands into trust pursuant to 25 U.S.C. 465 and 25 U.S.C. 473a would not result in the creation of reservation lands within a state where no such reservations currently exist.

The *Venetie* opinion focused on the question of whether the Village of Venetie's former reservation lands, now held in fee not trust or other restricted status, met the test for Indian country under 15 U.S.C. 1151(b). Obviously, the Supreme Court held that such lands do not meet the test for Indian country. The Court did not address, however, the question of whether the Secretary has authority under the IRA to place lands into trust in Alaska. Thus, the legal foundation for the Secretary's authority to take land into trust in Alaska remains intact.

Moreover, in 1994 the Congress expressly added the following subsection to 25 U.S.C. 476, which plainly prohibits the Department from promulgating any regulation or making any determination that would treat different tribes differently in the way proposed in the April 12, 1999 draft regulations:

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the

AR00492

340

Terry Virden
November 12, 1999
Page 9

privileges and immunities available to the Indian tribe relative to
other federally recognized tribes by virtue of their status as Indian
tribes.

25 U.S.C. 476(f). This 1994 statute, on its face, should be sufficient authority for the Department
to rescind the 1978 Fredericks opinion as having been overturned as a matter of express statutory
law. This 1994 statute, on its face, plainly would prohibit the Department from maintaining the
regulatory ban against taking land into trust in Alaska. To maintain the ban is to flout the
statutory authority and render the regulations patently vulnerable to challenge for being in
violation of the law.

The proposed regulation is illegally restrictive both with respect to its arbitrary bar against taking
lands into trust in Alaska, and with respect to the burden that it imposes upon tribes that lack
reservation status. We most strenuously urge the Department to remove the ban against taking
land into trust in Alaska and instead treat tribes in Alaska as all other tribes without reservations
are treated for purposes of the acceptance and consideration of applications to place land into
trust pursuant to 25 U.S.C. 465. We also urge the Department to remove the extra burdens it
proposes to impose upon tribes without reservations.

The Tribe appreciates having this opportunity to comment on the proposed regulations. We are
likewise grateful that the Department has extended the time period to enable tribal governments
to more fully analyze the proposed rules.

Sincerely,

*Edward K. Thomas* /ck

Edward K. Thomas
President

cc: Philip Baker-Shenk, Esq.

AR00493

# Alaska State Legislature

B-502



**Senator Drue Pearce**
**President of the Senate**

**Representative Brian Porter**
**Speaker of the House**



during interim:
716 West 4th Avenue, Ste. 500
Anchorage, AK 99501-2133
voice: (907) 269-0200
fax: (907) 269-0204

during session:
State Capitol
Juneau, AK 99801-1182
voice (907) 465-4993
fax: (907) 465-3872

during session:
State Capitol
Juneau, AK 99801-1182
voice: (907) 465-4930
fax: (907) 465-3834

during interim:
716 West 4th Avenue, Ste. 300
Anchorage, AK 99501-2133
voice: (907) 269-0155
fax: (907) 269-0154

November 12, 1999

Office of Trust Responsibilities
Bureau of Indian Affairs
1849 C Street, N.W.
MS-4513-MIB
Washington, D.C. 20240

Re:    "Acquisition of Title to Land in Trust" Proposed Rule
       Published in 25 CFR Part 151 (April 12, 1999)

**RECEIVED**
**MAY 1 8 2000**
**CAET**

Dear Sirs:

On behalf of the Alaska State Legislature, the following are comments on the above-referenced proposed rule.  The Alaska Legislature supports two aspects of the rule: first, its rightful exclusion of Alaska Native Corporation lands which, under longstanding Congressional policy, may not be placed in federal trust, and second, its recognition of and provision for the fact that placing Indian lands into federal trust often creates serious federalism and states' rights concerns.

The Alaska Legislature strongly supports the formulation of section 151.3(c), which states: "We will not accept title to land in trust in the state of Alaska, except for the Metlakatla Indian Community of the Annette Island Reserve of Alaska or its members." On the other hand, we strongly disagree with the statement on page 17578 that " there is a credible legal argument that ANCSA did not supersede the Secretary's authority to take land into trust in Alaska under the IRA..."  On the contrary, Congress, in enacting the Alaska Native Claims Settlement Act in 1971, revoked all existing reservations in Alaska (with the exception of the Metlakatla Indian Community's reservation).  Also in ANCSA, Congress transferred certain lands to private, state-chartered native corporations without use restrictions or being subject to Interior Department management oversight.

Dating back to the Carter Administration, the Department of Interior has rejected efforts to convert ANCSA land to federal trust land.  Moreover, only recently the

✓

2 3    **RECEIVED**
        **NOV 1 9 1999**

AR00494

*502*

Supreme Court ruled that "ANCSA ended federal supervision over [tribal] lands" and "avoid[ed] a lengthy wardship or trusteeship." Alaska Native Village of Venetie Tribal Government, 522 U.S. 520, 533 (1998). In sum, Congressional policy is clear that new trust lands cannot be created in Alaska.

Turning next to federalism concerns, the Alaska Legislature appreciates the recognition throughout the proposed rule that state and local interests may suffer as a result of the transferral of Indian lands into Federal trust. We support the requirements of Sections 151.5, 151.6, 151.12, 151.14, 151.18, 151.19, and 151.20, which require that state and local governments be given notice and an opportunity to comment on applications to transfer lands into federal trust or to create Tribal Land Acquisition Areas; give state and local governments the right to appeal a decision transferring land to federal trust; and require that an applicant provide information (which the agency must consider in its decision) about the effect of the transfer or designation of a Tribal Land Acquisition Area on state and local governments.

We hope that these comments have been of assistance to you and anticipate continued recognition by the Department of the Interior of (1) the inapplicability of the proposed rule to Alaska Indian lands, and (2) the need to mitigate the rule's effects on state and local governments.

Sincerely,

Drue Pearce
SENATE PRESIDENT

Brian Porter
SPEAKER OF THE HOUSE

AR00495



"Kathleen Dickinson"                To: <landcomments@bia.gov>
<asna@polarnet.com>

12/29/99 02:54 PM                   cc:
Please respond to asna            Subject: Land in trust

my comments are as follows in the body of this message and as an attachment.

Attn: 1076-AD90

December 28, 1999

The Arctic Slope Native Association, Ltd. appreciates this opportunity to comment on the proposed regulations which will govern the taking of land into trust for Indian Tribes and individual Indians. The Arctic Slope Native Association, Ltd. is a non-profit organization dedicated to the cause of Native Self-determination representing eight federally recognized Tribal Councils on the North Slope of Alaska.

It is our opinion that the proposed regulations contain a very serious flaw in that they propose at section 151.3(c) to perpetuate the Department's self-imposed ban of taking any land into trust for the benefit of Indian tribes located within the State of Alaska.

The Department's ban is based on a misguided opinion issued in 1978 by Tom Fredericks, the Associate Solicitor for Indian Affairs. The Fredericks opinion rests upon an erroneous conclusion that the 1971 Alaska Native Claims Settlement Act (ANCSA) repealed the Secretary's authority to take land into trust in Alaska. This conclusion is not supported by the law or legislative history. The Secretary's authority to take land into trust arises from the Indian Reorganization Act (IRA) 25 U.S.C. 465. This authority is not affected in any way by the provisions of ANCSA. In enacting ANCSA and the Federal Land Policy and Management Act (FLPMA), Congress certainly could have amended 25 U.S.C. 473a to repeal the application of the Secretary' authority to take land into trust in Alaska, but Congress did not do that.

We cannot see how any credit can be given to the conclusion reached in the Frederick opinion that because Congress, in 1976 under FLPMA, repealed the authority for the Secretary to establish reservations in Alaska that somehow that action, by implication, repealed the authority of the Secretary to take land into trust in Alaska. Section 473a stands untouched by the 1971 and 1976 Acts of Congress. The Department's regulations should reflect the authority of section 473a and remove the self-imposed ban against taking land into trust in Alaska.

The acceptance of land in trust status does not establish reservations upon such land. The Departments holds land in trust and restricted status for both tribes and individuals in Alaska in addition to what it holds on the Annette Island Reserve. The Department holds trust lands for several tribes, lands that were formerly cannery sites and they maintain their trust land status untouched by the enactment of ANCSA. There are thousands of parcels of land held in restricted status under the Alaska Native Allotment Act and Native Townsite Acts. Each of these tribal and individual parcels are trust or restricted land without being considered a reservation. The Secretary's lawful exercise of authority to take additional Alaska lands into trust pursuant to 25 U.S.C. 465 and 473a would not result in the creation of reservation lands within a state where no such reservations currently exist.

RECEIVED

MAY 1 8 2000

OGC

 17

AR00496

74

The June, 1999 final report of the State of Alaska's Rural Governance Commission makes a strong recommendation to remove the regulatory ban against taking lands into trust in Alaska. The Commission bases its recommendation on persuasive evidence that the lack of a land base serves to further impoverish tribal communities in Alaska and deny them access to an array of land based federal economic development assistance and associated authorities.

The proposed regulation is unduly restrictive both with respect to its arbitrary bar against taking lands into trust in Alaska and with respect to the burden that it imposes upon tribes that lack reservation status. We most strenuously urge the Department to remove the ban against taking land into trust in Alaska and instead treat tribes in Alaska as all other tribes without reservations are treated for purposes of the acceptance and consideration of applications to place land into trust pursuant to 25 U.S.C 465. We also urge the Department to remove the extra burdens it proposes to impose upon tribes without reservations.

Thank you for allowing us to comment on this important regulation.

Sincerely,

Kathleen Dickinson
Land Director
Arctic Slope Native Association, Ltd.
714 Fourth Ave., Suite 201
Fairbanks, AK  99701
907-457-2762

 - land to trust.txt

17

AR00497

74

Attn: 1076-AD90

December 28, 1999

The Arctic Slope Native Association, Ltd. appreciates this opportun ity to comment on the proposed regulations which will govern the ta king of land into trust for Indian Tribes and individual Indians. The Arctic Slope Native Association, Ltd. is a non-profit organizat ion dedicated to the cause of Native Self-determination representin g eight federally recognized Tribal Councils on the North Slope of Alaska.

It is our opinion that the proposed regulations contain a very seri ous flaw in that they propose at section 151.3(c) to perpetuate the Department's self-imposed ban of taking any land into trust for th e benefit of Indian tribes located within the State of Alaska.

The Department's ban is based on a misguided opinion issued in 1978 by Tom Fredericks, the Associate Solicitor for Indian Affairs. Th e Fredericks opinion rests upon an erroneous conclusion that the 19 71 Alaska Native Claims Settlement Act (ANCSA) repealed the Secreta ry's authority to take land into trust in Alaska. This conclusion is not supported by the law or legislative history. The Secretary 's authority to take land into trust arises from the Indian Reorgan ization Act (IRA) 25 U.S.C. 465. This authority is not affected i n any way by the provisions of ANCSA. In enacting ANCSA and the Fe deral Land Policy and Management Act (FLPMA), Congress certainly co uld have amended 25 U.S.C. 473a to repeal the application of the Se cretary' authority to take land into trust in Alaska, but Congress did not do that.

We cannot see how any credit can be given to the conclusion reached in the Frederick opinion that because Congress, in 1976 under FLP MA, repealed the authority for the Secretary to establish reservati ons in Alaska that somehow that action, by implication, repealed th e authority of the Secretary to take land into trust in Alaska. Se ction 473a stands untouched by the 1971 and 1976 Acts of Congress. The department's regulations should reflect the authority of secti on 473a and remove the self-imposed ban against taking land into tr ust in Alaska.

The acceptance of land in trust status does not establish reservati ons upon such land. The Departments holds land in trust and restri cted status for both tribes and individuals in Alaska in addition t o what it holds on the Annette Island Reserve. The Department hold s trust lands for several tribes, lands that were formerly cannery sites and they maintain their trust land status untouched by the en



Page 1

74

actment of ANCSA. There are thousands of parcels of land held in r
estricted status under the Alaska Native Allotment Act and Native T
ownsite Acts. Each of these tribal and individual parcels are trus
t or restricted land without being considered a reservation. The S
ecretary's lawful exercise of authority to take additional Alaska l
ands into trust pursuant to 25 U.S.C. 465 and 473a would not result
in the creation of reservation lands within a state where no such
reservations currently exist.

The June, 1999 final report of the State of Alaska's Rural Governan
ce Commission makes a strong recommendation to remove the regulator
y ban against taking lands into trust in Alaska. The Commission ba
ses its recommendation on persuasive evidence that the lack of a la
nd base serves to further impoverish tribal communities in Alaska a
nd deny them access to an array of land based federal economic deve
lopment assistance and associated authorities.

The proposed regulation is unduly restrictive both with respect to
its arbitrary bar against taking lands into trust in Alaska and wit
h respect to the burden that it imposes upon tribes that lack reser
vation status. We most strenuously urge the Department to remove t
he ban against taking land into trust in Alaska and instead treat t
ribes in Alaska as all other tribes without reservations are treate
d for purposes of the acceptance and consideration of applications
to place land into trust pursuant to 25 U.S.C 465. We also urge th
e Department to remove the extra burdens it proposes to impose upon
tribes without reservations.

Thank you for allowing us to comment on this important regulation.

Sincerely,


Kathleen Dickinson
Land Director
Arctic Slope Native Association, Ltd.
714 Fourth Ave., Suite 201
Fairbanks, AK 99701
907-457-2762



AR00499

COPY

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:
Transportation
MS-4058-MIB
BCCO 00837 Follow-up

AUG 2 2 2000



SURNAME

Honorable Alicia L. Reft
President, Karluk IRA Tribal Council
P.O. Box 22
Karluk, Alaska 99608

Dear President Reft:

This is the follow-up response to our June 2, 2000 letter to you regarding concerns expressed in your February 23 letter to President Clinton. We have gathered the following information from various sources and are providing it as follows:

The Alaska Region in Juneau could find no record of the Karluk IRA's past participation in either the road maintenance or the 2% planning programs.

The 1993 Juneau Area Transportation Plan (JATP) has three projects listed for Karluk, but the one that was ranked (a road connection to Larson Bay) received a score of 127. The Alaska Region is currently serving projects that ranked 75 and below.

The Alaska Region Office is updating the JATP but to date, a response from Karluk has not been received. A representative from your Village was not present at the recent planning meeting in Anchorage, Alaska and a new road application from Karluk has not been submitted.

Karluk is not on the current Transportation Improvement Plan ( TIP) or the third quarter change submitted to the Central Office on June 13, 2000, by the Alaska Region Road Engineer. There is no record of the Bureau of Indian Affairs doing any road construction for Karluk in the past. The BIA provides $300,000 per year for road maintenance to the Alaska Region. There are no set-aside funds for heavy equipment maintenance.

We recognize that the Karluk IRA did submit applications for the FY 2000 special funds for planning and bridge design, and you will be given consideration for your roads needs.

The Department of Housing and Urban Development (HUD), Office of Native American Programs (ONAP) has primary responsibility for the development of new housing in Indian country, as well as the responsibility and authority for the Federal appropriations provided for the Native American Housing Assistance and Self-Determination Act (NAHASDA) of 1996 from which the Kodiak Island Housing Authority is funded.

AR00500

COPY

151

In regard to the concerns you list as reasons for the lack of economic opportunity in your Village and other operations of tribal government, we suggest you contact the following sources for more information:

Road Maintenance:

Mr. Robert Martin, Jr.
Regional Road Engineer
Bureau of Indian Affairs
P.O. Box 25520
709 W. 9th St., Room 338A
Juneau, Alaska 99801
(907) 586-7386

Economic Development:

Mr. Richard See or Mr. Marvin Adams
Economic Development
Alaska Region Office
Bureau of Indian Affairs
P.O. Box 25520
709 W. 9th St., Rm 338A
Juneau, Alaska 99801
(907) 586-7101 or (907) 586-7183

Land Distribution:

Mr. Niles Cesar
Regional Director
Alaska Region Office
Bureau of Indian Affairs
P.O. Box 25520
709 W. 9th St., Rm 338A
Juneau, AK 99801
(907) 586-7177

Health Facilities:

Mr. Douglas Ott
Facilities Engineer
Alaska Area Indian Health Service
4141 Ambassador Drive
Anchorage, Alaska 99508
Anchorage, Alaska 99508
(907) 729-3610

Housing:

Department of Housing and
   Urban Development
Office of Native American Programs
451 7th Street, SW, Room 4126
Washington, DC 20410
(202) 401-7914

Ms. June Henkel
Chief, Division of Housing Assistance
Department of the Interior
Bureau of Indian Affairs
1849 C St., NW, MS-4603-MIB
(202) 208-3667

We hope the information provided is helpful to you.

Sincerely,      signed Terrance L. Virden

Director, Office of Trust
Responsibilities

bcc: 260Surname:260Chron:200:265:Hold:
      101A:BureauRF:ES:AAK(2):
      Psunwoo:pabh:208-4359:05/24/2000:BCCO00837:
      Psunwoo:pabh:208-4359:8/4/2000:BCCO00837:
      Rewrite per TVirden 8/15/2000:208-5831:
      Rewrite per Agoldtooth:8/21/2000:208-4877:

AR00502

WHReferral    COPY

00837  REFT Alicia L. (+1)
CONTROLLED CORRESPONDENCE
Hand Carry -- Do Not Include With Routine Mail
(Instructions on Reverse Side)

RECEIVED
BUR OF IND AFFAIRS
DIV OF TRANSPORTATION
'00 MAY 23 A7:03

FORM 5-1504    **U.S. DEPARTMENT OF THE INTERIOR**
REV. JUNE 1991    **Bureau of Indian Affairs Executive Secretariat**
Ext. 4877

**Originator:**  **REFT**   Alicia L.  (+1)

**Cosignors:**   Larry Sugak

**Secretary's Control #** _____220191_____

**BIA  Control No:**   00837    BIA Signature/Surname Due by:
_____05/22/00_____

**Action Office:**    Signature Information:
200    **Office Dir**

**Received BIA:**    Copies of Incoming Sent to:
05/08/00

---

### FOR ACTION OFFICE USE

*CHECK APPLICABLE ITEM(S):* **DUE IN DIR'S OFC ON:** _____
____No reply required   _____Acknowledge; copy to Area for direct reply

____Acknowledge only   ____Acknowledge; copy to Area with request for report
*(Area copies to be transmitted with Form 5-1524)*
Staff member to whom assigned:___260___ Extension_____

---

### ROUTING

| Mail Stop | Bldg | Route to Code | Released Initial | Date | Comments |
|---|---|---|---|---|---|
| 4058 | MIB | 260 | | | bcc: (2) ES:AAK |
| 4513 | | 200 | | | Signature |
| 4140 | | 101A | | | |
| 4513 | | 200 | | | |
| 4058 | | 260 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*I just picked this up this morning. We definitely need an extension to properly respond.*

5/23/00

**RETURN THIS FORM A**
**BIA EXECUTIVE SECRETAR**

AR00503

COPY

# DEPARTMENT OF THE INTERIOR

## TASKING PROFILE

ACCN #:    220191                    Status:    O                    Fiscal Year:    2000

| Document Date | Received Date | Due Date | Action Office | Signature Level | Mail Source |
|---|---|---|---|---|---|
| 04/20/00 | 04/25/00 | 05/30/00 | BIA | DR | WHR |

Addressee:        BRUCE BABBITT

From:             REFT, ALICIA L.; SUGAK, LARRY
                  PRESIDENT/VICE PRESIDENT
                  KARLUK IRA COUNCIL
                  KARLUK
                  AK    99608

Subject Text:     SEEKING HELP FOR SURVIVAL OF VILLAGE

                  WHR 7187507 - PLEASE PROVIDE ORIGINAL OF RESPONSE ALONG WITH 2 COPIES OF
                  ENTIRE PACKAGE (INCOMING AND OUTGOING) TO ES FOR COORDINATION WITH THE
                  WHITE HOUSE

Recommended Surnames:

Mail Carrier:     CM                    Mail Track #:    P676186988

Cross_Reference:

Copies To:        ES:PMC, SIO-HEIMAN

Status_Tracking:


                  SCO                   SCO Phone              CO
                  AKEARY                208-3572               AKEARY

AR00504

COPY

# THE WHITE HOUSE

### WASHINGTON

ID _7187507_

_4/20/00_
DATE

AGENCY LIAISON'S TRACKED REFERRAL

TO: _DOI/BIA_

INCOMING INQUIRY FROM: _ALICIA L. REFT_

TO: ✓ PRESIDENT CLINTON ___ MRS. CLINTON

ACTION REQUESTED: ✓ DIRECT RESPONSE TO WRITER/CALLER

___ ANY APPROPRIATE ACTION

---

Please return the original inquiry, this referral form and a copy of your written response or your telephone report to the following address:

Mrs. Helen S. Castleman _HSC._
Director, Agency Liaison
Room 6, OEOB
The White House
Washington, D.C.  20502

Thank you for your help and cooperation in getting this tracked inquiry returned to the White House.  Prompt action is requested.

If you have any questions, call my office at 202/456-7486.

Helen S. Castleman
Director, Agency Liaison

AR00505



P.01

COPY

DOI/BIA

MC

## KARLUK IRA TRIBAL COUNCIL
### P.O. BOX 22
### KARLUK, ALASKA 99608
### PH#(907)241-2218   FAX#(907)241-2208

**February 23, 2000**



Honorable William Clinton
President of the United States
White House
1600 Pennsylvania Avenue
Washington, D. C. 20500

*416189*

Dear President Clinton,

We, the governing body of the Karluk IRA Council, are writing you on behalf of our Tribal members of the Native Village of Karluk and request your assistance in helping our Tribe and our village survive.

Our village is said to be one of the oldest villages in Alaska based on recent archeological findings. At the time of the enrollment process under the Alaska Native Claims Settlement Act of 1971, we had 190 Native people of Koniag/Alutiiq descent enrolled in our village. In 1980, Koniag, Inc., our Regional Native Corporation, developed and put to a vote of all Native shareholders a *merger proposal* between itself and most of the villages on Kodiak Island. An Alaska Superior Court judge later ruled the shareholder-approved merger plan "legally flawed", because Koniag failed to disclose to the shareholders of the merged villages of two things:

1) the value of the assets (timber) being merged; and,
2) that the $2100 paid to each and every shareholder for voting for the merger proposal, were paid from the assets of each of the villages being merged.

Although the Court deemed the merger plan legally flawed, the ruling required shareholder(s) from each village that wanted to de-merge to file a lawsuit against its village corporation and Koniag in order to de-merged from Koniag. This, we did not do in a timely manner because we did not know, nor did we have advice of counsel, and therefore, we along with the

AR00506

P.02

COPY

Native people of Larsen Bay are now stuck with Koniag. What was once our lands and assets are now merged with Koniag, Inc. We are without our village corporation. And, except for some 1900 acres, we are landless. Although we got 10 acres per shareholder and 100 additional shares of stock in Koniag, this does not replace or compensate our Native people for the 115,000 acres we owned of the Karluk and Sturgeon Rivers near our village(s) and 5% in the Afognak Joint Venture or approximately 10,000 acres of lands on Afognak Island that we didn't realize we owned until recently.

The sad and regrettable part of this whole mess is that Koniag has already sold to the Exxon Trustee Council about 56,000 acres of what were once our lands and which should still be our lands based on the Court ruling. Koniag is now negotiating the sale, or what they're calling a "conservation easement" of the remaining 59,000 acres of lands which includes the Karluk River and the Sturgeon Rivers, which are near our villages. What is more regrettable, Mr. President, is the fact that we, as Alaska Native people, once owned the entire lands of Alaska under Aboriginal Title, which date back to the Russian occupation of Alaska. Of that 375,000,000 acres that Alaska is, we collectively only got 44 million acres under the Alaska Native Claims Settlement Act of 1971. In other words, we lost 331,000,000 acres under the so-called Alaska Native Claims Settlement Act of 1971!

This situation has caused other very negative incidences in our village. In the last two years, we have been pleading for help to keep our village and our Native way of life from dying off. Our pleas have been falling on deaf ears. The following are examples of what we believe to be the cause and negative effects of the legally flawed 1980 merger with Koniag:

1. Our local Borough government has stopped our revenue sharing, without notice. We relied on this funding for equipment purchases and maintenance and parts and the operations of our Tribal government.

2. Our local Borough government applied for and received a grant of $200,000 in behalf of the Native Village of Karluk for the construction of a much needed health clinic for our village, but held on to the grant funds for about two years, which was eventually retracted by the federal funding agency due to the lack of activity. Had we known about the grant funds, we could have

AR00507

P.03
COPY

administered the grant ourselves, but were not informed of any of the options.

3. Our area housing authority, the Kodiak Island Housing Authority, which administers HUD funds for Alaska Natives, has and is denying housing for our members who are in need of housing. Due to the lack of economic opportunity and now the absence of any schools here in our village, many of our people have left, seeking opportunities elsewhere, leaving many houses vacant and unoccupied, which Tribal families should be able to move into. It is our understanding that with the new NAHASDA rules and regulations in effect, that our Tribe and Tribal members are to have more meaningful input into the housing program in our village. This definitely is not the case. We now believe that there are secret combinations between the Housing Authority and Koniag, since Koniag is designated as the sponsoring Tribal entity by the federal government for Native housing, to force our Tribal members to move out of the Native Village of Karluk. What better way to reduce or eliminate any resistance to the effort to sell our lands to the Exxon Trustee Council, than by forcing our Tribal members to move out of our village due to lack of economic opportunities here.



4. We have dilapidated heavy equipment for the maintenance of Our local airport and road. Our grader and backhoe have been out of commission for days, if not months. The equipment is needed to keep our airstrip and road open and usable. Since we don't have any road systems to connect us with places like Kodiak, nor do we have any sea ports adequate for regular boat traffic to our village, we rely on our airstrip for the transportation of goods and service for our Tribal members.

Mr. President, we are desperate and in need of your help. All the opposition against our village by groups such as Koniag, the Kodiak Island Borough and the Kodiak Island Housing Authority, to us, resembles what the federal government did to the Native Americans during the "termination era"—all because they would like our remaining 59,000 acres of lands sold out from under us. The policies of callous exclusion and termination by these groups toward our Tribe and village community must be stopped.

We look forward to your response.

AR00508



COPY

Sincerely yours,

KARLUK IRA COUNCIL of
THE NATIVE VILLAGE OF KARLUK

Alicia L. Reft, President          Larry Sugak, Vice President

AR00509

COPY



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:
Transportation
BCCO 00837

JUN  2

Honorable Alicia L. Reft
President, Karluk IRA Tribal Council
P.O. Box 22
Karluk, Alaska 99608

Dear President Reft:

We have been asked by President Clinton to respond to your letter of February 23, 2000, in which you asked about assistance in regards to acres of land, revenue sharing, health clinic, housing, and road maintenance.  Our staff is preparing the answers, with information provided from our field offices.  We anticipate that a complete response will be forwarded to you within the next three weeks.

Sincerely,

Terrance L. Virden

Director, Office of Trust
Responsibilities

AR00510

COPY



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:
Transportation
BCCO 00837

JUN 2

Mr. Larry Sugak
Vice President, Karluk IRA Tribal Council
P.O. Box 22
Karluk, Alaska 99608

Dear Mr. Sugak:

We have been asked by President Clinton to respond to your letter of February 23, 2000, in which you asked about assistance in regards to acres of land, revenue sharing, health clinic, housing, and road maintenance. Our staff is preparing the answers, with information provided from our field offices. We anticipate that a complete response will be forwarded to you within the next three weeks.

Sincerely,

Terrance L. Virden

Director, Office of Trust
Responsibilities

AR00511

# COPY

## United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

Transportation
MS-4058-MIB
BCCO 00837

MAY 30 2000



SURNAME

Honorable Alicia L. Reft
President, Karluk IRA Tribal Council
P.O. Box 22
Karluk, Alaska 99608

Dear President Reft:

We have been asked by President Clinton to respond to your letter of February 23, 2000, in which you asked about assistance in regards to acres of land, revenue sharing, health clinic, housing and road maintenance. Our staff is preparing the answers, with information provided from our field offices. We anticipate that a complete response will be forwarded to you within the next three weeks.

Sincerely,

signed Terry E. Schnur

**ACTING**

Director, Office of Trust
Responsibilities

bcc: 260Surname:260Chron:200:265:Hold:
101A:BureauRF:ES:AAK(2):
Psunwoo:pabh:208-4359:05/24/2000:BCCO00837:

AR00512

WHReferral 

**00837 REFT Alicia L. (+1) CONTROLLED CORRESPONDENCE**

Hand Carry -- Do Not Include With Routine Mail

(Instructions on Reverse Side)

RECEIVED
BUR OF IND AFFAIRS
DIV OF TRANSPORTATION
'00 MAY 23 A7:03

FORM 5-1504
REV. JUNE 1991

**U.S. DEPARTMENT OF THE INTERIOR**
**Bureau of Indian Affairs Executive Secretariat**
Ext. 4877

Originator: **REFT    Alicia L. (+1)**
Cosignors:    Larry Sugak

Secretary's Control #    220191

BIA Control No:    00837          BIA Signature/Surname Due by:
                                  05/22/00

Action Office:    200          Signature Information:
                               **Office Dir**

Received BIA:    05/08/00       Copies of Incoming Sent to:

---

### FOR ACTION OFFICE USE

*CHECK APPLICABLE ITEM(S):* **DUE IN DIR'S OFC ON:** _____

_____ No reply required    _____ Acknowledge; copy to Area for direct reply

_____ Acknowledge only    _____ Acknowledge; copy to Area with request for report

*(Area copies to be transmitted with Form 5-1524)*

Staff member to whom assigned: _260_ Extension _____

---

### ROUTING

| Mail Stop | Bldg | Route to Code | Released Initial | Date | Comments |
|-----------|------|---------------|------------------|------|----------|
| 4058 | MIB | 260 | | | bcc: (2) ES:AAK |
| 4513 | | 200 | | | Signature |
| 4140 | | 101A | | | |
| 4513 | | 200 | | | |
| 4058 | | 260 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*I just picked this up this morning. We definitely need an extension to properly respond.*

5/23/00

**RETURN THIS FORM A**
**BIA EXECUTIVE SECRETAR:**

AR00513

COPY

# DEPARTMENT OF THE INTERIOR

## TASKING PROFILE

ACCN #:     220191                    Status:     O                    Fiscal Year:     2000

| Document Date | Received Date | Due Date | Action Office | Signature Level | Mail Source |
|---|---|---|---|---|---|
| 04/20/00 | 04/25/00 | 05/30/00 | BIA | DR | WHR |

Addressee:      BRUCE BABBITT

From:           REFT, ALICIA L.; SUGAK, LARRY
                PRESIDENT/VICE PRESIDENT
                KARLUK IRA COUNCIL
                KARLUK
                AK     99608

Subject Text:   SEEKING HELP FOR SURVIVAL OF VILLAGE

                WHR 7187507 - PLEASE PROVIDE ORIGINAL OF RESPONSE ALONG WITH 2 COPIES OF
                ENTIRE PACKAGE (INCOMING AND OUTGOING) TO ES FOR COORDINATION WITH THE
                WHITE HOUSE

Recommended Surnames:

Mail Carrier:      CM              Mail Track #:      P676186988

Cross_Reference:

Copies To:         ES:PMC, SIO-HEIMAN

Status_Tracking:

           SCO                    SCO Phone                    CO
           AKEARY                 208-3572                     AKEARY

AR00514



COPY

## KARLUK IRA TRIBAL COUNCIL
### P.O. BOX 22
### KARLUK, ALASKA  99608
### PH#(907)241-2218   FAX#(907)241-2208

### February 23, 2000

*416189*

Honorable William Clinton
President of the United States
White House
1600 Pennsylvania Avenue
Washington, D. C.  20500

Dear President Clinton,

We, the governing body of the Karluk IRA Council, are writing you on
behalf of our Tribal members of the Native Village of Karluk and request
your assistance in helping our Tribe and our village survive.

Our village is said to be one of the oldest villages in Alaska based on recent
archeological findings.  At the time of the enrollment process under the
Alaska Native Claims Settlement Act of 1971, we had 190 Native people of
Koniag/Alutiiq descent enrolled in our village.  In 1980, Koniag, Inc., our
Regional Native Corporation, developed and put to a vote of all Native
shareholders a *merger proposal* between itself and most of the villages on
Kodiak Island.  An Alaska Superior Court judge later ruled the shareholder-
approved merger plan "legally flawed", because Koniag failed to disclose to
the shareholders of the merged villages of two things:

  1)  the value of the assets (timber) being merged; and,
  2)  that the $2100 paid to each and every shareholder for voting for the
     merger proposal, were paid from the assets of each of the villages
     being merged.

Although the Court deemed the merger plan legally flawed, the ruling
required shareholder(s) from each village that wanted to de-merge to file a
lawsuit against its village corporation and Koniag in order to de-merged
from Koniag.  This, we did not do in a timely manner because we did not
know, nor did we have advice of counsel, and therefore, we along with the


COPY

Native people of Larsen Bay are now stuck with Koniag. What was once our lands and assets are now merged with Koniag, Inc. We are without our village corporation. And, except for some 1900 acres, we are landless. Although we got 10 acres per shareholder and 100 additional shares of stock in Koniag, this does not replace or compensate our Native people for the 115,000 acres we owned of the Karluk and Sturgeon Rivers near our village(s) and 5% in the Afognak Joint Venture or approximately 10,000 acres of lands on Afognak Island that we didn't realize we owned until recently.

The sad and regrettable part of this whole mess is that Koniag has already sold to the Exxon Trustee Council about 56,000 acres of what were once our lands and which should still be our lands based on the Court ruling. Koniag is now negotiating the sale, or what they're calling a "conservation easement" of the remaining 59,000 acres of lands which includes the Karluk River and the Sturgeon Rivers, which are near our villages. What is more regrettable, Mr. President, is the fact that we, as Alaska Native people, once owned the entire lands of Alaska under Aboriginal Title, which date back to the Russian occupation of Alaska. Of that 375,000,000 acres that Alaska is, we collectively only got 44 million acres under the Alaska Native Claims Settlement Act of 1971. In other words, we lost 331,000,000 acres under the so-called Alaska Native Claims Settlement Act of 1971!

This situation has caused other very negative incidences in our village. In the last two years, we have been pleading for help to keep our village and our Native way of life from dying off. Our pleas have been falling on deaf ears. The following are examples of what we believe to be the cause and negative effects of the legally flawed 1980 merger with Koniag:

1. Our local Borough government has stopped our revenue sharing, without notice. We relied on this funding for equipment purchases and maintenance and parts and the operations of our Tribal government.

2. Our local Borough government applied for and received a grant of $200,000 in behalf of the Native Village of Karluk for the construction of a much needed health clinic for our village, but held on to the grant funds for about two years, which was eventually retracted by the federal funding agency due to the lack of activity. Had we known about the grant funds, we could have

AR00516

P. 03

COPY

administered the grant ourselves, but were not informed of any of the options.

3. Our area housing authority, the Kodiak Island Housing Authority, which administers HUD funds for Alaska Natives, has and is denying housing for our members who are in need of housing. Due to the lack of economic opportunity and now the absence of any schools here in our village, many of our people have left, seeking opportunities elsewhere, leaving many houses vacant and unoccupied, which Tribal families should be able to move into. It is our understanding that with the new NAHASDA rules and regulations in effect, that our Tribe and Tribal members are to have more meaningful input into the housing program in our village. This definitely is not the case. We now believe that there are secret combinations between the Housing Authority and Koniag, since Koniag is designated as the sponsoring Tribal entity by the federal government for Native housing, to force our Tribal members to move out of the Native Village of Karluk. What better way to reduce or eliminate any resistance to the effort to sell our lands to the Exxon Trustee Council, than by forcing our Tribal members to move out of our village due to lack of economic opportunities here.

4. We have dilapidated heavy equipment for the maintenance of Our local airport and road. Our grader and backhoe have been out of commission for days, if not months. The equipment is needed to keep our airstrip and road open and usable. Since we don't have any road systems to connect us with places like Kodiak, nor do we have any sea ports adequate for regular boat traffic to our village, we rely on our airstrip for the transportation of goods and service for our Tribal members.

Mr. President, we are desperate and in need of your help. All the opposition against our village by groups such as Koniag, the Kodiak Island Borough and the Kodiak Island Housing Authority, to us, resembles what the federal government did to the Native Americans during the "termination era"—all because they would like our remaining 59,000 acres of lands sold out from under us. The policies of callous exclusion and termination by these groups toward our Tribe and village community must be stopped.

We look forward to your response.

AR00517



Sincerely yours,

KARLUK IRA COUNCIL of
THE NATIVE VILLAGE OF KARLUK

Alicia L. Reft, President    Larry Sugak, Vice President

COPY

 **Martha Smith**
06/19/00 03:28 PM

To: Paul Sunwoo/DC/BIA/DOI@BIA, Leroy Gishi/DC/BIA/DOI@BIA, Paula Holcomb/DC/BIA/DOI@BIA, Lakisha J Collier/DC/BIA/DOI@BIA

cc:
Subject: Input from 460 on BCCO 00837 +1

Please include paragraph with your response...thank you

Martha Smith Ghodoumipour
Office of Trust Responsibilities
Bureau of Indian Affairs
Telephone: 202-208-5831
Fax: 202-219-1522

----- Forwarded by Martha Smith/DC/BIA/DOI on 06/19/2000 03:22 PM -----

 **June Henkel**
06/19/2000 02:31 PM
vb

To: Martha Smith/DC/BIA/DOI@BIA

cc: Marlene Virden/DC/BIA/DOI@BIA

Subject: Input from 460 on BCCO 00837 +1

Martha,
The following information is provided for partial response to the subject BCCO. Please advise should further information be required.
June


Bcc00837.wp

COPY

*See & ma...*

Housing Assistance
BCCO 00837+1

The Department of Housing and Urban Development (HUD), Office of Native American Programs (ONAP) has primary responsibility for the development of new housing in Indian country. HUD, ONAP also has responsibility and authority for the federal appropriations provided for the Native American Housing Assistance and Self-Determination Act (NAHASDA) of 1996, from which the Kodiak Island Housing Authority is funded. By copy of this letter, we are forwarding your correspondence to the Department of Housing and Urban Development, Office of Native American Programs, 451 7th Street S.W., Washington, D.C. 20410, for appropriate action as necessary and direct reply concerning the Kodiak Island housing entity.

J.Henkel
June 19, 2000

*MS-4603-MIB*
*(202) 208-3667*
*Tribal Servs*

*Chief, Div of Housing Assist*

AR00520

COPY

Housing Assistance
BCCO 00837+1

The Department of Housing and Urban Development (HUD), Office of Native American Programs (ONAP) has primary responsibility for the development of new housing in Indian country. HUD, ONAP also has responsibility and authority for the federal appropriations provided for the Native American Housing Assistance and Self-Determination Act (NAHASDA) of 1996, from which the Kodiak Island Housing Authority is funded. By copy of this letter, we are forwarding your correspondence to the Department of Housing and Urban Development, Office of Native American Programs, 451 7th Street S.W., Washington, D.C. 20410, for appropriate action as necessary and direct reply concerning the Kodiak Island housing entity.

J.Henkel
June 19, 2000

COPY

 **Martha Smith**
06/19/00 03:28 PM

To: Paul Sunwoo/DC/BIA/DOI@BIA, Leroy Gishi/DC/BIA/DOI@BIA, Paula Holcomb/DC/BIA/DOI@BIA, Lakisha J Collier/DC/BIA/DOI@BIA

cc:
Subject: Input from 460 on BCCO 00837 +1

Please include paragraph with your response...thank you

Martha Smith Ghodoumipour
Office of Trust Responsibilities
Bureau of Indian Affairs
Telephone: 202-208-5831
Fax: 202-219-1522

----- Forwarded by Martha Smith/DC/BIA/DOI on 06/19/2000 03:22 PM -----

 **June Henkel**
06/19/2000 02:31 PM
vb

To: Martha Smith/DC/BIA/DOI@BIA

cc: Marlene Virden/DC/BIA/DOI@BIA

Subject: Input from 460 on BCCO 00837 +1

Martha,
The following information is provided for partial response to the subject BCCO. Please advise should further information be required.
June


Bcc00837.wp

COPY

**Woody Sneed**                   To: Paula Holcomb/DC/BIA/DOI@BIA
08/04/00 09:12 AM
                                  cc:
                         Subject: Alaska


Richard See and Marvin Adams know all about economic development.  Call (907) 586-7101 and 7183.

AR00523



# DIVISION OF TRANSPORTATION

May 23, 2000

**Minute Memo**

**To:**        Bob Martin, Alaska Regional Road Engineer

**Subject:**   Response to Letter from Alicia Reft of Karluk Tribal Council

Bob, attached is a copy of a 2/23/2000 letter from Alicia Reft of Karluk Tribal Council
addressed to the President Clinton requesting assistance on transportation issues (See Item #4 of
the letter).

Please provide your input regarding how we should respond to this letter.  These input may
include:
1) Your assessment (pros and cons) regarding the issues as addressed.
2) Any short range plans to accommodate improvements to their transportation needs.
3) Status of airstrip (FAA-approved, Tribally-owned, or private?), needs for equipment and road.
4) TIP status including schedule and $.

Send you input to me, and I will finalize the response.

Your prompt attention would be appreciated.  We have just received this letter, today.

Attachment

From the desk of ...

**Paul Sunwoo**
Assistant Division Chief
Division of Transportation
Bureau of Indian Affairs
1849 C Street, NW
Washington, D.C. 20240
Tel. (202) 208-5790
Fax. (202) 208-4696

AR00524

COPY



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:
Transportation
BCCO 00837

JUN 2 2000

Honorable Alicia L. Reft
President, Karluk IRA Tribal Council
P.O. Box 22
Karluk, Alaska 99608

Dear President Reft:

We have been asked by President Clinton to respond to your letter of February 23, 2000, in which you asked about assistance in regards to acres of land, revenue sharing, health clinic, housing, and road maintenance. Our staff is preparing the answers, with information provided from our field offices. We anticipate that a complete response will be forwarded to you within the next three weeks.

Sincerely,

Terrance L Virden

Director, Office of Trust
Responsibilities

AR00525

Petersburg Indian Association
P.O. Box 1418
Petersburg, AK 99833


June 15, 2001


The Honorable Gale A. Norton, Secretary of Interior
**Attn: Terry Virden**
MS 4513-MIB
1849 C Street, NW
Washington, D.C. 20240

**RE:  Comments on Final Regulations on Acquisition of Title to Land in Trust**

Dear Secretary Norton:

I write on behalf of Petersburg Indian Association to urge you to make effective the final regulations regarding Indian trust land acquisitions, as published in the Federal Register on January 16, 2001.

The regulations should be made effective because they advance three fundamental principles. First, the regulations carry out the pp8rposes of the Indian reorganization Act and recognize the critical role that land restoration must play in the fostering tribal self-sufficiency. Second, the final regulations implement clear standards for taking lands into trust which provide guidance to the Department in the exercise of its authority, and ensure basic fairness to all parties in connection with the trust application process. Third, the final regulations facilitate fair consideration of appropriate factors and a timely decision on trust land applications.

The issue of land into trust has been given full and fair consideration by the Department and further delay would be unfair and unwarranted. The process of revisiting the trust land acquisition regulations has been ongoing for years. The Department, as well as the tribes, needs to be certain regarding the procedures and standards for taking land into trust. The final rule provides a fair process that will facilitate informed and timely decision making under meaningful standards. It is time for the Department to move forward and make the final rule effective.

As Secretary of Interior, you have a trust responsibility to Indian tribes, and we believe that the Department of Interior has an obligation to further that relationship by removing obstacles to tribal self-government and self-determination. Moving forward with the final regulations will further that objective.

We urge you to make the final regulations on trust land acquisitions effective as soon as possible. Thank you for your consideration of this matter of great importance to us, and to Indian tribes nationwide.

Sincerely,

*Barbara K. Erickson*

Barbara K. Erickson

**COPY**

**RECEIVED**

JUN 1 5 2001

TRUST RESPONSIBILITIES

6/18/1

*Logged 6/20/01*

AR00526

Petersburg Indian Association
P/O/Box 1418
Petersburg, Alaska 99833
Phone: 907-772-3636
Fax: 907-772-3637

# facsimile transmittal

| | | | |
|---|---|---|---|
| **To:** | Terry Virden | **Fax:** | 202-219-1255 |
| **From:** | Barbara Erickson | **Date:** | 06/15/01 |
| **Re:** | Final Regualtions | **Pages:** | 2-inc.cover |
| **CC:** | | | |

☐ Urgent    ☐ For Review    ☐ Please Comment    x Please Reply    ☐ Please Recycle

# COPY

AR00527