```
   .: ROBERT ANDERSON at ~DOI/SOL_HQ 9/14/95 2:11PM (2503 bytes: 40 ln)
     LESHY, SCOTT KEEP, SANDRA ASHTON, LAURI ADAMS at ~DOI/SOL_AK,
    . HUDSON at ~DOI/SOL_AK
    .DWARD COHEN, MARI THOMAS, TROY WOODWARD
  ject: Re[2]: Alaska Gaming Lawsuit
```
------------------------------ Message Contents ------------------------------

Bert Hirsch represents the Akiachak Native Community and the Kenaitze Indian Tribe in their attempts to conduct Indian gaming in Alaska (now likely limited to class II operations). In May or June we (DIA) drafted letters to the NIGC opining that the lands at issue were likely not Indian lands as defined by IGRA. Unlike the situation in the Venetie case, the lands were not affected by ANCSA. Kenaitze proposes to game on a Native allotment (statutory Indian country), while Akiachak is located on Native townsite land held in fee by the tribe. I feel that our position is extremely week in each case. The suits will be brought in the District of Columbia.

I asked Bert to hold off pending a discussion of the issue. We have a request for participation as amicus in the Venetie case pending and John has indicated that the issue will need to be raised with the Secretary. I'm concerned that a suit against the Department will result in Justice's involvement and limit our flexibility in dealing with the Indian country issue.

The Secretary indicated a desire to await a decision in Venetie and the specter of class III gaming on thousnads of allotments also played into that decision. The Legislature's action removes class III gaming from the debate. I think this issue is worth revisiting and await direction from John.

hat has the legislature done to take class III out - does it clearly have that effect?

ohn, I'll get copies of the legislation. It was adopted in response to Klawock's proposed compact that would have provided for class III gaming. It apparently outlawed the "casino nights" that were permissible for charities. All that remain are some lotteries based on amounts of snowfall, or when the ice goes out on the Nenana River (I'm not kidding). Roger is more on top of the details than I am. Bob

xt item 2:

> John, Have you had time to consider this, or to discuss it with the Secretary. I know that we have the Venetie request under consideration (from which I am recused) and I hate to see us get sued over a related matter before we conduct our review. At the same time I don't want to lead Akiachak & Kenaitze on unless there is some reason for them to hope we may change our view. Remember that the lands at issue are different in character than those at issue in Venetie. Here they are a Native allotment and Native townsite lands.
>
> You asked about the changes in the Alaska gaming statute and I provided you with a copy. The gaming attorneys tell me that they concede that class III gaming is no longer an option in Alaska.

No, I've (and he's) been so consumed with budget/approps/reconciiation that I've not had time. Soon I hope.

[871] From: LAURI ADAMS 1/29/96 9:04AM (1735 bytes: 25 ln)
To: ROGER HUDSON
Subject: Re[2]: Trust Land Acqusitions
------------------------------- Message Contents -------------------------------
ROGER, I HOPE I ALREADY FORWARDED THE ORIGINAL MESSAGE ON THIS TO YOU.
       HERE IS MORE ON THE SAME TOPIC.  (AND LET ME KNOW
    IF I DID NOT FORWARD EARLIER; I MEANT TO).  LAURI

    Portland has one
    comment in response to the memo.  We hope further
    consideration will be given to the exact method for giving
    notice under option B.  As currently drafted, it suggests
    using Federal Register notice.  That could pose a number of
    practical problems.  As I understand the current delegations
    within BIA, except for a few matters, all Fed Reg notices
    must be issued by Central Office.  In contrast, the vast
    majority of acquisitions are now handled completely by the
    Superintendents.  Thus, requiring that paperwork travel to
    DC could significantly complicate and extend the acquisition
    process.  It also is in direct conflict with current BIA
    (and tribal) efforts to decentralize BIA decisionmaking.  It
    would also add to the cost of acqustions. We suggest that
    the type of notice be tiered to type of acquisition.  For
    example, on reservation acquisitions when the Superintendent
    receives no adverse comments from the local govts, would
    require only local notice.  Also, providing Fed Reg notice
    for all acquisitions might be taken as a belief that every
    acquisition impacts and affects national interests which we
    assume is not our position.

```
[800] From: LAURI ADAMS 1/16/96 9:26AM (11733 bytes: 170 ln)
To: ROGER HUDSON
Subject: Re[2]: South Dakota v. DOI
------------------------------- Forwarded with Changes ---------------------------
From: TIM VOLLMANN at ~DOI/SOL_SW 1/16/96 8:47AM (11459 bytes: 167 ln)
To: ROBERT ANDERSON at ~DOI/SOL_HQ, COLLEEN KELLEY at ~DOI/SOL_PN, LYNN PETERSON
   at ~DOI/SOL_PN, VERNON PETERSON at ~DOI/SOL_PN, PRISCILLA WILFAHRT at
   ~DOI/SOL_TC, DAVID NAWI at ~DOI/SOL_PS, RICH ALDRICH at ~DOI/SOL_BL,
   SHARON BLACKWELL at ~DOI/SOL_TU, WILLIAM SWAN at ~DOI/SOL_PX, LAURI ADAMS at
   ~DOI/SOL_AK, DENNIS HOPEWELL at ~DOI/SOL_AK, DAVE ETHERIDGE at ~DOI/SOL_HQ,
   SCOTT KEEP at ~DOI/SOL_HQ
cc: JOHN LESHY at ~DOI/SOL_HQ
Subject: Re[2]: South Dakota v. DOI
------------------------------- Message Contents ---------------------------------
  Roger, the debate continues.  Just to keep you apprised.  Lauri
```

On behalf of Portland, we agree with Tim's response on modifying our position.
   I think it is important to understand how the acquisition process works if the regs are followed.  The first step is a decision by BIA to acquire the property (151.11). After that decision is made, title clearance and deed execution takes place, and then the actual acquisition occurs (151.13).  Since intervening events-like title issues-could prevent acquisition, the land is not in trust after the decision is made, but only when the official approves/accepts the deed.

I don't know the situation in which we have argued that a "public announcement" to acquire land is not agency action subject to review, but we have consistently been advising BIA that the BIA official's decision to acquire the land (generally a Supt or AD decision) is one subject to review under 25 CFR Part 2, and that appeal rights (as required by regs) must be given to any local govt that filed negative comments to the BIA.  Also under the regs, when an appeal is filed, the challenged decision to acquire the property is not effective (absent special action).  Thus, if regs are followed, an objecting local government has a full opportunity to challenge the BIA decision to acquire the land in trust--before it becomes trust land.  In fact IBIA has ruled a number of times in such cases.  See Town of Charlestown RI v. Eastern AD, 18 IBIA 67; Day County v. Aberdeen AD, 17 IBIA 204; City of Eagle Butte v. Aberdeen AD, 17 IBIA 192; see also Coos Tribe v. Portland AD, 27 IBIA 48.

Thus, in our view there is no need to change our position that once land is in trust--when the deed has been accepted--the QTA imposes a sovereign immunity barrier to challenges to its title as trust land.  A change in our position should only be to clarify that if the local govt exhausted its administrative remedies it presumably has the right to continue that challenge under the APA, and has the full opportunity to seek judicial relief--i.e. TRO or PI--to prevent administrative action pending the outcome of that review.

AR00785

Colleen, Thanks for the comments.

As to the time lag between an AD decision to take land in trust and the actual acquisition, Hilda Manuel informs me that most Areas (not including Portland) often do the title work before announcing a decision to take land in trust. In such cases there would be little opportunity for APA actions if we adhere to our QTA defense. One solution would be to make sure that all Areas and the Central office carefully follow the process as set out in the regs, i.e, announce the decision to take land in trust and then begin the title work. The normal APA review could then go forward in the interim. Those who went to court after the deeds were signed, or failed to obtain a PI prior to action taking the land in trust, would be out of luck as far as judicial review is concerned due to our QTA defense.

Hilda and the Secretary's office, however, express a preference for having the title work done simultaneously so that the land may be taken in trust promptly in some circumstances. (I see that this may require a change in the regs as to the Area offices.) That is especially true of the controversial acquisitions that are often removed from the Area Offices for action by the Central office. If we assert the QTA defense, we end up with the claim that judicial review is not available and the South Dakota delegation problem is upon us.

We could avoid the foregoing problem by announcing our intent to take the land in trust and providing a thirty day window for others to seek judicial relief. If a PI were granted tribes would be forced to wait a long time before the land goes in trust and taxes or other encumbrances might pile up. Moreover, courts would seem likely to routinely grant PI motions since to deny such relief would effectively preclude further judicial review. These policy and practical concerns lead me to believe that it may be best to change our position on use fo the QTA defense.

Why should we even be relying on the QTA defense where the opposing party does not claim title, but instead objects only to the conversion to trust status? The dissenting judge in South Dakota makes a good case for non-application of the QTA. Under that rule a court could find our action unsupported by the record and remand for a better justification under the APA. That seems to be how the IBIA conducts its deferential review of appeals from Area Directors. We would also have to give up our argument that the action is committed by law to agency discretion and thus not reviewable. We would not, however, give up the claim that the Secretary's discretion is very broad. The IBIA requires that the Secretary show that he considered the factors in 25 CFR 151.10 and any objections by third parties when a decision to take land in trust is made. The IBIA also holds that "[a] decision to disapprove a trust acquisition may be based on a more limited analysis of only some of the factors, if BIA's analysis shows that those factors weigh heavily against the trust acquisition." City

of Eagle Butte .. Aberdeen Area Director, 17 IBIA 192 (July 25, 1989) [96 I.D. 328].

If we ultimately couldn't support a particular acquisition (an unlikely event in my view), could a court declare the acquisition void and order the fee title vested in the benficial owner, i.e., the tribe? I think the answer should be yes if the tribe was the original owner. What if the property was purchased or acquired by donation by the U.S. from a third party to be held in trust for a tribe? I'm sure there are other complications we need to consider before making a decision. Any thoughts?

Thanks for your help. Bob A.

Bob-- The Solicitor's Office has control over the timing of the closing on the real estate transaction because it must prepare a title opinion (although the BIA-- and other agencies-- have been known to acquire land without a title opinion in rare occasions.) Long ago I advised the four Area Directors in the SW Region that we would not prepare title opinions until a decision was made to take the land in trust. I did this for a variety of reasons: (1) workload, (2) SOL was getting blamed for holding up an acquisition when BIA hadn't even made a decision, and (3) some in BIA were justifying controversial trust acquisitions because "the Solicitor said it was okay", when in fact all we did was a title opinion. Hilda is correct that there are occasions when the title work needs to be done promptly because it is just part of a larger tribal economic initiative; but if we invite PIs, what good is that? The biggest cause of delay on title opinions is lousy realty work on the part of the BIA, the tribe, or other entity. Capable realty officers anticipate title problems, and work with the SOL attorney to cure them ahead of time, and insure that the tribe gets title insurance with few exceptions to the scope of the coverage. Thus, if the BIA realty officer works simultaneously on obtaining a thorough abstract and title insurance, there should be no lengthy delay. Then, SOL can have 30 days to do the title opinion while opponents of the transaction have the opportunity to appeal.

I am concerned that abandonment of the QTA defense will open up six years of trust acquisitions to litigation; the Tribes whose titles are challenged will be furious. Besides, even if DOJ repudiates the defense, there is no guarantee that the courts will go along, since there has been a significant, if not overwhelming, body of precedent that has developed since the 11th Circuit decision in the early 80s. I think the 30-day waiting period will suffice. It puts tribes on notice that they need to secure the alliance of the county, or other taxing entity, if their acquisition plans are dependent on the timing of the closing.

If the BIA does not provide written, actual notice of the acquisition decision to the local non-Indian government (and this could be several, including special purpose taxing districts), then the opportunity for administrative appeal and subsequent litigation is

AR00787

open-ended (at least for six years), and the Tribe's development plans could go down the drain after considerable investment. Thus, I advocate opening up the process to public scrutiny and challenge, but only for 30 days-- then rely on the QTA.

                                                    Tim V.

AR00788



United States Department of the Interior

OFFICE OF THE SOLICITOR
Pacific Northwest Region
500 N.E. Multnomah Street, Suite 607
Portland, Oregon 97232

RECEIVED
Regional Solicitor's Office

MAY 13 1996

Anchorage, Alaska

MAY 09 1996

Robert Bundy
United States Attorney
U.S. Department of Justice
Room 253
222 West 7th Avenue
Anchorage, AK 99513-7567

Re: Acquisition of Trust Land on Behalf of Indians

Dear Mr. Bundy:

This is to alert you to the possibility of new litigation being filed against officials of the Bureau of Indian Affairs (BIA) or the Department of the Interior, and our office's special need to be informed promptly of the filing of any such litigation.

On April 24, 1996, the Assistant Secretary, Indian Affairs, amended the regulations, 25 C.F.R. Part 151, governing the acquisition of land in trust for Indians and Indian tribes. See 61 Fed. Reg. 18082 (April 24, 1996) (copy attached). The rulemaking added a requirement for a public notice of the BIA's intent to acquire land at least 30 days prior to the actual transfer of title to the United States. 25 C.F.R. § 151.12(b). The purpose of the new waiting period is to allow interested parties to seek judicial review of the BIA's decisions. We do not have any idea of how many suits will be filed, but expect that at least some of the BIA's decisions will be challenged.

The new requirement is in response to the recent Eighth Circuit decision, South Dakota v. U.S. Department of the Interior, 69 F.3d 878 (8th Cir. 1995), which held that the BIA's primary statutory authority to acquire land in trust, 25 U.S.C. § 465, was unconstitutional. Among the circumstances considered by the Eighth Circuit's opinion was an apparent lack of opportunity for judicial review of BIA's actions. This new requirement will afford the interested public an opportunity to challenge BIA decisions to acquire land in trust before title is transferred. The Quiet Title Act, 28 U.S.C. § 2409a, precludes judicial review after the United States acquires title.

AR00789

Authority: Secs. 512, 701 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360b, 371).

§ 558.58  [Amended]

2. Section 558.58 *Amprolium and ethopabate* is amended in the table in paragraph (d)(1), in the entry for (iii), under the "Limitations" and the "Sponsor" columns by removing "010042" wherever it appears and adding in its place "000004".

§ 558.78  [Amended]

3. Section 558.78 *Bacitracin zinc* is amended in paragraph (a)(2), and in the table in paragraph (d)(1) in the entries for (i), (ii), (v), and (vi) under the "Sponsor" column, and in paragraph (d)(2)(ii) by removing "010042" and adding in its place "000004".

§ 558.95  [Amended]

4. Section 558.95 *Bambermycins* is amended in paragraph (b)(1)(xiii)(b) by removing "(e)(1)(vii)(b)" and adding in its place "(b)(1)(vii)(b)".

§ 558.120  [Amended]

5. Section 558.120 *Carbarsone (not U.S.P.)* is amended in paragraph (c)(1)(iii)(b) by removing "010042" and adding in its place "000004".

§ 558.128  [Amended]

6. Section 558.128 *Chlortetracycline* is amended in paragraph (a) by removing "010042" and adding in its place "000004".

§ 558.145  [Amended]

7. Section 558.145 *Chlortetracycline, procaine penicillin, and sulfamethazine* is amended in paragraphs (a)(1) and (a)(2) by removing "010042" and adding in its place "000004".

§ 558.340  [Amended]

8. Section 558.340 *Maduramicin ammonium* is amended in paragraph (a) by removing "010042" and adding in its place "000004".

§ 558.355  [Amended]

9. Section 558.355 is amended in paragraphs (b)(8), (b)(9), (f)(1)(iv)(b), (f)(1)(v)(b), (f)(1)(xiv)(b), (f)(1)(xv)(b), and (f)(1)(xvi)(b) by removing "010042" and adding in its place "000004", in paragraph (b)(9) by removing ", (xvi), and (xvii)" and adding in its place "and (xvi)", and by adding paragraph (b)(10) to read as follows:

§ 558.355  Monensin.

(b) * * *

(10) To 012799: 45 and 60 grains per pound, as monensin sodium, paragraph (f)(1)(xvii) of this section.

§ 558.515  [Amended]

10. Section 558.515 *Robenidine hydrochloride* is amended in paragraphs (a), (d)(1)(iii)(b), (d)(1)(iv)(b), and (d)(1)(v)(b) by removing "010042" and adding in its place "000004" and in paragraph (d)(1)(vi)(b) by removing "No. 011716" and adding in its place "Nos. 000004 and 011716".

§ 558.550  [Amended]

11. Section 558.550 *Salinomycin* is amended in paragraphs (b)(1)(vii)(c), (b)(1)(ix)(c), (b)(1)(xv)(c), and (b)(1)(xvi)(c) by removing "010042" and adding in its place "000004".

§ 558.582  [Amended]

12. Section 558.582 *Sulfamerazine* is amended in paragraph (a) by removing "010042" and adding in its place "000004".

Dated: April 4, 1996.

Robert C. Livingston,
*Director, Office of New Animal Drug Evaluation, Center for Veterinary Medicine.*

[FR Doc. 96–10019 Filed 4-23-96; 8:45 am]
BILLING CODE 4160-01-F

---

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs

25 CFR Part 151

[1076–AD65]

Land Acquisitions

AGENCY: Bureau of Indian Affairs, Interior.

ACTION: Final Rule.

SUMMARY: This rule establishes a 30-day waiting period after final administrative decisions to acquire land into trust under the Indian Reorganization Act and other federal statutes. The Department is establishing this waiting period so that parties seeking review of final decisions by the Interior Board of Indian Appeals or of decisions of the Assistant Secretary-Indian Affairs, will have notice of administrative decisions to take land into trust before title is actually transferred. This notice allows interested parties to seek judicial or other review under the Administrative Procedure Act and applicable regulations.

EFFECTIVE DATE: April 24, 1996.

FOR FURTHER INFORMATION CONTACT: Mary Jane Sheppard, Staff Attorney, Office of the Solicitor, Division of Indian Affairs, Room 6456, Main Interior Building, 1849 C Street, NW, Washington, DC 20240; Telephone (202) 208-5260.

SUPPLEMENTARY INFORMATION: On July 15, 1991, the proposed rule for off-reservation land acquisitions for Indian tribes was published in the Federal Register (56 FR 32278–32280). On June 23, 1995, the final rule was published at 60 FR 32878. That rulemaking supplemented the existing regulations in part 151. This procedural rule adds a subsection to existing 25 CFR 151.12, Action on requests.

Background

In response to a recent court decision, *State of South Dakota v. U.S. Department of the Interior*, 69 F.3d 878 (8th Cir. 1995), the Department of the Interior is establishing a procedure to ensure the opportunity for judicial review of administrative decisions to acquire title to lands in trust for Indian tribes and individual Indians under section 5 of the Indian Reorganization Act (IRA) (Pub. L. 73-383, 48 Stat. 984–988, 25 U.S.C. 465). Following consideration of the factors in the current regulations and completion of the title examination, the Department, through Federal Register notice, or other notice to affected members of the public, will announce any final administrative determination to take land in trust. The Secretary will not acquire title to the land in trust until at least 30 days after publication of the announcement. This procedure permits judicial review before transfer of title to the United States. The Quiet Title Act (QTA), 28 U.S.C. 2409a, precludes judicial review after the United States acquires title. See, e.g., *United States v. Mottaz*, 476 U.S. 834 (1986); *North Dakota v. Block*, 461 U.S. 273 (1983); *Florida v. Department of Interior*, 768 F.2d 1248 (11th Cir. 1985).

Section 5 of the IRA authorizes the Secretary to acquire land in trust for Indians and Indian tribes: (1) Within or adjacent to an Indian reservation; or (2) for purposes of facilitating tribal self-determination, economic development, or Indian housing. *State of South Dakota*, a case involving an off-reservation trust land acquisition, held Section 5 of the IRA unconstitutional on the ground that it violates the nondelegation doctrine. The court's decision was based in substantial part on the understanding that judicial review is not available to challenge the Secretary's action. The court noted that "judicial review is a factor weighing in favor of upholding a statute against a nondelegation challenge." This rule ensures that such review is available before formal conveyance of title to land to the United States, when the QTA's bar to judicial review becomes operative. Judicial review is available

AR00790