IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AKIACHAK NATIVE COMMUNITY, et al,  )
                                           )
          Plaintiffs,  )
                                             )
v.  )
                                             )
                                             )
UNITED STATES DEPARTMENT OF  )    CASE NO. 1:06 CV 00969-RWR
    THE INTERIOR et al.,  )
                                             )    MEMORANDUM IN SUPPORT
          Defendants.  )    OF PLAINTIFFS' MOTION
                                             )    FOR SUMMARY JUDGMENT

**INTRODUCTION** ................................................................ 3

**ARGUMENT** ....................................................................... 3

    SUMMARY OF ARGUMENT ............................................. 3

  I.    THE REGULATORY PROHIBITION VIOLATES
        25 USC §476(F) AND (G) ............................................ 3

  II.    THE REGULATORY PROHIBITION VIOLATES THE EQUAL
        PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE
        OF THE FIFTH AMENDMENT ................................... 10

      A.  Standard of review ................................................ 10

      B.  Application to this regulation ................................. 11

  III.    THE REGULATORY PROHIBITION VIOLATES THE
        PROSCRIPTION AGAINST ARBITRARY AND CAPRICIOUS
        REGULATIONS CONTAINED IN THE ADMINISTRATIVE
        PROCEDURE ACT ....................................................... 15

      A.  Standard of review ................................................ 15

      B.  Application to this regulation ................................. 17

          1. Without regard to the IRA ................................. 17

          2. Considered in light of the IRA .......................... 21

**CONCLUSION** ................................................................ 27

INTRODUCTION

Plaintiffs, four tribes and one tribal member, are seeking judicial review of 25 C.F.R. Part 151 insofar as it bars the acquisition of land in trust for federally recognized tribes in Alaska while allowing this privilege to federally recognized tribes in all other States. As detailed in the Statement of Material Facts, this Alaska exclusion was included in the original "land-into-trust" regulations promulgated in 1980, based upon the 1978 "Fredericks opinion." That 1978 opinion has long been rescinded, yet the Secretary has decided to retain the Alaska prohibition in his regulations, a result plaintiffs contend is impermissible under applicable law.

SUMMARY OF ARGUMENT

The Secretarial prohibition is violative of the law in three respects to which plaintiffs wish to draw this Court's attention.

First, and most straightforward, the regulatory prohibition violates 25 USC §476 (f) and (g), which forbid Secretarial classifications of this sort among federally recognized tribes.

Second, the regulatory prohibition violates the Due Process clause of the Fifth Amendment of the United States Constitution (which this Court need not reach if the regulation is found invalid under the first argument).

Third, independently of 25 U.S.C. §476(f) and (g), the regulation violates the Administrative Procedure Act (which, again, the Court may not need to reach).

## I.    The regulatory prohibition violates 25 USC §476(f) and (g).

These statutory subsections read:

> (f) Privileges and immunities of Indian tribes; prohibition on new regulations
> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

> (g) Privileges and immunities of Indian tribes; existing regulations
> Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

There is not actually all that much more to be said about this argument. The Secretary's regulation clearly diminishes for federally recognized tribes in Alaska a privilege (that of making land-into-trust requests) available to other federally-recognized tribes. As such, it is contrary to the statute.

This is reinforced by a parallel statutory provision, also enacted in 1994, as part of the "Tlingit-Haida Tribal Status Clarification Act,"[1] reinforcing (and explicating the application to Alaska tribes of) the principle that "[T]he Secretary may not

---

[1] Public Law 103-454, Title II, 02(4), 108 Stat. 4791, 4793 (Nov. 2, 1994).

administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress," 25 U.S.C. §1212(4). [2]

This argument has one other cogent credential: it has been endorsed by, indeed invoked by, the Secretary himself, to fend off a challenge by the State of Rhode Island to the Secretary's decision to take land into trust for the Narragansett Tribe. Rhode Island's suit argued *inter alia* that the IRA did not authorize the Secretary to take land into trust for any tribe, including the Narragansetts, which first received federal recognition after June 18, 1934, the effective date of the IRA.[3] The Department took the position that the result advocated by Rhode Island, *i.e.*, a Secretarial determination that certain tribes could not make land-into-trust requests, would violate these statutes. From the Secretary's brief:

> 1. Congress has recently clarified that the Indian Reorganization Act applies to all federally recognized tribes, regardless of their acknowledgment status on the date of its enactment.

---

[2] The Secretary had published a list of federally recognized tribes on October 21, 1993, including for the first time a definitive listing of federally recognized tribes in Alaska. The list had excluded the Central Council of Tlingit and Haida Indian Tribes of Alaska. Congress passed the "Federally Recognized Indian Tribe List Act of 1994" as Title I of this enactment, to endorse the Secretary's practice of publishing the list and to call for it to be updated annually (codified at 25 USC §§479a et seq.); the "Tlingit and Haida Status Clarification Act" was Title II, reminding the Secretary that he did not have the authority to terminate the federally recognized status of a tribe or to administratively diminish the privileges and immunities of federally recognized tribes without the consent of Congress, and confirming that the Central Council of Tlingit and Haida Indians continued to be a federally recognized tribe. This was codified at 25 U.S.C. §§1212 *et seq*.

[3] Rhode Island also argued that the Secretary's authority was limited by the terms of the 1978 Rhode Island Indian Claims Settlement Act, 25 USC §§1701 *et seq*., and that Congress could not constitutionally delegate land-into-trust authority to the Secretary, also unsuccessfully.

In 1994, Congress enacted the Federally Recognized Indian Tribe List Act, Pub. L, 103-454, 108 Stat. 4791, which requires the Secretary of the Interior to keep a list of all federally recognized tribes, which "should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  That statute, codified as 25 U.S.C. 479a, defines "tribe" as "any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe." 25 U.S.C. 479a(2). The House Report accompanying the List Act explains that federal recognition "establishes tribal status for all federal purposes." H.R. REP. NO. 103-781, at 3 (1994). Earlier the same year, Congress amended the IRA (Pub.L. 103-263, 108 Stat 707) to clarify that:

> [d]epartments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 * * * with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. 476(f), and that any such determination by a federal agency that would have the effect of discriminating among recognized tribes, "shall have no force or effect." 25 U.S.C. 276(g). In enacting these amendments, Congress's purpose was "to clarify that section 16 of the Indian Reorganization Act [which permits tribes to organize under the IRA] was not intended to authorize the Secretary of the Department of the Interior to create categories of federally recognized Indian tribes."  140 Cong. Rec. S6144-03, S6146 (daily ed. May 19, 1994) (Statement of Sen. McCain).

…

As these statutory and regulatory provisions make clear, the Secretary's IRA authority extends to the Narragansett Indian Tribe regardless of the status of its acknowledgment in 1934. *Indeed, the Secretary is precluded by these provisions from making the determination sought by the State here, that the Tribe is ineligible for the benefits of Section 5 of the IRA because its acknowledgment occurred after the enactment of the IRA. Such a determination would diminish the Tribe's privileges in relation to other federally recognized tribes, contrary to the IRA's plain language.*[4]

---

[4] Brief for the Federal Appellees in Case No. 03-2647, *Carcieri v. Norton*, in the United States Court of Appeals for the First Circuit, at pp. 15-17 (emphasis added).

The First Circuit's panel opinion relied on this argument, repeating it almost verbatim from the Secretary's brief. *Carcieri v. Norton*, 398 F.3d 22, 31-32 (1st Cir. 2005), *(on reconsideration)*, 423 F.3d 45, 55-56 (1st Circuit 2005). After rehearing *en banc* was granted, the Secretary reiterated the argument: "As the panel correctly explained, 398 F.3d at 32, Congress has prohibited the Secretary from distinguishing among recognized tribes with regard to the privileges and immunities afforded such tribes. See 25 U.S.C. 476 (f) & (g)."[5] The *en banc* opinion, while upholding the Secretary's position, did not rely on 25 USC 476(f) and (g) in doing so.[6]

To bring *Carcieri* up-to-date for this Court, Rhode Island sought certiorari in *Carcieri* on three questions: (1) whether the 1934 Act empowers the Secretary to take land into trust for Indian tribes that were not recognized and under federal jurisdiction in 1934; (2) whether an act of Congress that extinguishes aboriginal title and all claims based on Indian rights and interests in land precludes the Secretary from creating Indian country there; (3) whether providing land "for Indians" in the 1934 Act establishes a sufficiently intelligible principle upon which to delegate the power to take land into trust. Certiorari was granted only on the first two.[7]

---

[5] Federal Appellees' Response to Petition for Rehearing En Banc in *Carcieri v. Norton,* Case No. 03-2647, in the United States Court of Appeals for the First Circuit, at p. 10.

[6] "[W]e do not take later enactments such as the 1994 amendments to section 476 to establish that Congress intended to make no distinctions among tribes in 1934." *Carcieri v. Kempthorne* (en banc opinion), 497 F.3d 15, 30 fn. 7 (1st Cir. 2007).

[7] *Carcieri v. Kempthorne*, __ U.S. __, 128 S.Ct. 1443, 170 L.Ed.2d 274 (Feb. 25, 2008). See http://www.supremecourtus.gov/qp/07-00526qp.pdf.

Even if the Supreme Court disagrees with the Secretary's position in *Carcieri* on either of the two certiorari issues, that will not have significant implications for this Alaska case. First, regardless of whether the 1934 Act encompassed tribes in Rhode Island not yet recognized as of 1934, the 1936 IRA Amendments clarified that, at least in Alaska, prior recognition as a tribe was not a prerequisite to application of the IRA, 25 U.S.C. 473a ("groups of Indians in Alaska not heretofore recognized as bands or tribes, but having a common bond of occupation or association or residence within a well-defined neighborhood, community or rural district").

Second, regardless of whether the Rhode Island Indian Claims Settlement Act did extinguish "all claims based on Indian rights and interests in land," the Alaska Native Claims Settlement Act did not, rather extinguishing "All claims … that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation." 43 U.S.C. 1603(c). A claim to a tribe's ability to request that land be taken into trust under the IRA, regardless of whether or not it may be a claim "based on Indian rights and interests in land" extinguished under the Rhode Island Indian Claims Settlement Act, is not "based on [a] statute relating to Native use and occupancy" under the Alaska Native Claims Settlement Act.[8] This was recognized by Congress while working on ANCSA ("Another source of

---

[8] There was a distinctive line of statutes relating to Native use and occupancy in Alaska. The two most often cited were the "Organic Act" of May 17, 1884, §8 (23 Stat. 24) ("the Indians or other persons in said district shall not be disturbed in the possession of any

lands held by Alaska Natives *by some means other than the right to possession of aboriginal occupancy* is the Wheeler-Howard Act [IRA] of 1934, the terms of which were extended to Alaska in 1936," Senate Report No. 92-405, 92nd Cong., 1st Sess., at 91 (Oct. 21, 1971) (emphasis added)) and by the Department ("Rights acquired by virtue of compliance with statutory provisions are neither claims of aboriginal title nor claims based on use and occupancy, but property rights created by Congress," *United States v. Jones*, 95 I.D. 314, 106 IBLA 230, 274 (1988)).

Ultimately, the Supreme Court may endorse the Secretary's interpretation of 25 USC §476(f) and (g) (which would bolster plaintiffs' case here), or may reverse the Secretary based upon statutes inapplicable in Alaska (*i.e.*, the 1934 IRA without the 1936 Alaska IRA Amendments, and/or the Rhode Island Indian Claims Settlement Act), or

---

lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress") and the "Act Making Further Provision for a Civil Government for Alaska" of June 6, 1900, ch. 786, 31 Stat. 321 ("The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands now actually in their use or occupation"). These became the legal framework for pursuing Alaska Native land claims pre-ANCSA, see *Tee-Hit-Ton Indians*, 348 U.S. 272, 278-79 (1955).

  The progression of bills that eventually became ANCSA at first extinguished claims premised only on these two laws (Section 3 of H.R. 10193, 91st Cong., 1st Sess., and section 3 of the identical S. 1830, 91st Cong., 1st Sess., both introduced in April 1969, extinguished "any and all claims against the United States based upon aboriginal right, title, use or occupancy of lands in Alaska by any native or native group or claims arising under the Act of May 17, 1884 (23 Stat. 24), or the Act of June 6, 1900 (31 Stat. 321) …"), then these two laws and parallel statutes (Section 4 of Committee Substitute for S. 1830, as set out in S. Rep. No. 91-925, 91st Cong., 2d Sess., page 5 (June 11, 1970) extinguished "claims arising under the Act of May 17, 1884 (23 Stat. 24), or the Act of June 6, 1900 (31 Stat. 321) or any other statute or treaty of the United States relating to Native use or occupancy of land …"), eventually shortened to "based on any statute or treaty of the United States relating to Native use and occupancy," 43 USC 1603(c).

may uphold the Secretary without relying on 476(f) and (g) (as did the First Circuit en banc). The central point remains that the Secretary is insisting that these statutes render him powerless to bar Rhode Island tribes from making land-into-trust requests, while simultaneously he bars Alaska tribes from doing the same.

And the more fundamental point is that, even if the Secretary had not explicitly taken this position in *Carcieri*, the plain language of 476(f) and (g) is sufficient to invalidate the Alaska ban.

## II. The regulatory prohibition violates the equal protection component of the Due Process Clause of the Fifth Amendment.[9]

### A. Standard of review

Federal equal protection analysis uses three "tiers" in its equal protection analytical framework. Under "strict scrutiny," classifications based on race or national origin are upheld only if they are narrowly tailored to serve a compelling governmental objective. Under intermediate or "heightened" scrutiny, classifications based on gender or illegitimacy must be substantially related to an important governmental objective.

---

[9] Although the Fourteenth Amendment provides an explicit equal protection directive to the states, the Fifth Amendment's Due Process Clause contains an equal protection component applicable to the federal government. *See Bolling v. Sharpe,* 347 U.S. 497 (1954); *Tucker v. Branker,* 142 F.3d 1294 (D.C. Cir. 1998). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo,* 424 U.S. 1, 93 (1976).

Under the lowest or "rational basis" tier, the court's inquiry is limited to whether there is a rational or reasonable relationship to a legitimate governmental objective.[10]

Statutes classifying Native Americans (and Alaska Natives) in a different category from the population at large are, in general, subject to "rational basis" review, because they are regarded as "political" classifications, arising from the Indian Commerce Clause in the Constitution[11] as well as the long history of our country's relationships with and duties towards the tribes originally inhabiting our territory.[12]

As to classifications among Indian tribes: Despite indications in some Supreme Court rulings[13] and some D.C. Circuit rulings[14] that the "rational basis" standard applied to such classifications is worded with a slight change of emphasis, *i.e.*, that the law must be rationally related to the fulfillment of Congress's unique obligation towards the Indians, the D.C. Circuit has indicated that ordinary rational basis scrutiny should apply.[15]

---

[10] See *American Federation of Gov't Employees v. United States,* 195 F.Supp.2d 4, 10-13 (D.D.C. 2002), affirmed, 330 F.3d 513 (D.C.Cir. 2003) (hereafter *AFGE v. U.S.*)

[11] Constitution Article I, §8, cl. 3.

[12] *AFGE v. U.S.*, 195 F.Supp.2d at 19-20.

[13] *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 85 (1977) where the Supreme Court held that "the standard of review ... is that the legislative judgment should not be disturbed 'as long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation towards the Indians.'" (quoting *Morton v. Mancari,* 417 U.S. 535, 555 (1974)).

[14] *Littlewolf v. Lujan,* 877 F.2d 1058 (D.C. Cir. 1989), in which the opinion adopts the *Weeks*'s "unique obligation" formulation.

[15] *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335, 1340-41 (D.C. Cir. 1998).

B.  Application to this regulation

Invocation of rational basis scrutiny is not a rubber stamp:

> Even though the subject classification is usually upheld under the rational basis standard of scrutiny, on occasion this test will result in the invalidation of a law or statute. *See* Romer *v. Evans, 517 U.S. 620, 134 L. Ed. 2d 855, 116 S. Ct. 1620 (1996)*; *City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985)*. As such, the rational basis test has some teeth because it leads to the abrogation of a law "whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *See  Cleburne, 473 U.S. at 446*; *Romer, 517 U.S. 620, 134 L. Ed. 2d 855, 116 S. Ct. 1620 (1996)* (striking down a State's constitutional amendment as unconstitutional, though employing rational basis review, because it was enacted based on animus against individuals that practice alternative lifestyles).[16]

This case presents a situation where this classification should be struck down even under the relatively lenient "rational basis" standard.

Preliminarily, it must be noted that what is being attacked here is a regulation and not a statute.  It is Congress that has the "plenary and exclusive power" over Indian tribes,[17] and the Executive Branch must look to Congressional enactments as the sources for its authority.[18]  It is Congress that can select a certain tribe or tribes for termination of the government-to-government relationship,[19] not the Executive Branch.[20]  Congress can

---

[16] *AFGE v. U.S.*, at 12.

[17] *United States v. Lara,* 541 U.S. 193, 200 (2004).

[18] See *Village of Kake v. Egan*, 369 U.S. 60, 62-63 (1962).

[19] See Cohen's Handbook of Federal Indian Law (2005 ed.) at §§3.02[8], 5.02[3].  But even Congressional power to define tribal status may not reach to the level of allowing arbitrary action, *United States v. Sandoval*, 231 U.S. 28, 46 (1913).

diminish the privileges and immunities of particular federally recognized tribes; the Executive Branch lacks inherent authority to do so in the absence of Congressional authorization.[21]

Thus, in applying equal protection principles to a regulation (as distinguished from a statute),[22] although the "rational basis" test formally still applies, it must be applied in a way consistent with the broader power of Congress, and the lesser power of the Secretary, to create distinctions among tribes.[23]

Turning to whether the regulation does represent a rational or reasonable relationship to a legitimate governmental objective, the actual analysis is relatively straightforward.  The regulatory bar was premised entirely on the 1978 Fredericks

---

[20] "[T]he Secretary does not have the authority to terminate the federally recognized status of an Indian tribe as determined by Congress," 25 U.S.C. §1212(3).

[21] "[T]he Secretary may not administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress," 25 U.S.C. §1212(4).

[22] *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335, 1340-41 (D.C. Cir. 1998), cited above in footnote 15, dealt with a statute (the "Chafee Amendment," singling out the Narragansett Tribal lands obtained under the Rhode Island Indian Claims Settlement Act to be excluded from the definition of "Indian lands" under the Indian Gaming Regulatory Act).

[23] Of course, in plaintiffs' view, Congress has explicitly *prohibited* Secretarial distinctions, in enacting 25 U.S.C. §476(f) and (g), as argued above.  This section of the memorandum focuses on the point that, even if those particular statutes did not exist, the Secretary still should not be able to arrogate to himself the authority to create the anti-Alaska classification in the regulation; as a matter of Constitutional structure, only Congress can do so.

opinion.[24]  That opinion has been withdrawn.[25]  It would be a legitimate governmental objective to word the regulation, or to maintain wording in the regulation, so that it conforms to a valid Solicitor's opinion – but with that Solicitor's opinion no longer extant, the legitimate governmental objective underlying the bar evaporates.[26]

There are other valid governmental objectives, of course – the Secretary's regulation lists the factors that should legitimately be taken into account in making decisions about whether or not to take property back into trust status.[27]  But does the absolute bar on any and all lands in Alaska bear a rational and reasonable relationship to those objectives?  Plainly not – if anything, the Alaska bar *prevents* the Secretary from considering the applicability of those factors in the case of a particular Alaskan tribe.

---

[24]  "The regulatory bar to acquisition of title in trust in Alaska in the original version of these regulations was predicated on an opinion of the Associate Solicitor, Indian Affairs ('Trust Land for the Natives of Venetie and Arctic Village,' September 15, 1978), which concluded that the Alaska Native Claims Settlement Act (ANCSA) precluded the Secretary from taking land into trust for Natives in Alaska (again, except for Metlakatla)."  64 Federal Register 17577-78 (April 12, 1999).

[25]  "[T]he Solicitor has signed a brief memorandum rescinding the 1978 Opinion."  66 Federal Register 3454 (Jan. 16, 2001).

[26]  The lack of a legitimate state purpose makes a classification violative of the equal protection clause under the rational basis test; see *Zobel v. Williams*, 457 U.S. 55, 60-61, 63 (1982).

[27]  "Before approving an acquisition, the Secretary must consider, among other things, the tribe's need for additional land; '[t]he purposes for which the land will be used'; 'the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls'; and '[j]urisdictional problems and potential conflicts of land use which may arise.'  25 CFR 151.10(f) (2004)."  *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197, 221 (2005).

Would the regulation be valid if the Alaska bar were applicable everywhere, *i.e.*, the regulation reflected nothing more than an absolute Secretarial refusal to take land back into trust status anywhere in the United States? Arguably, the answer to this is "no" as well – if Congress intended the Secretary to exercise this authority in appropriate cases, an across-the-board ban would seem irrational. But here, the point is that the Secretary, having concluded that there can be appropriate cases arising from all the other states, should not be able to arbitrarily predict that there will never be such a thing as an appropriate case arising from within Alaska, and then to self-validate that prediction by barring all such requests at the outset.

### III.    The regulatory prohibition violates the proscription against arbitrary and capricious regulations contained in the Administrative Procedure Act.

A.    Standard of Review

Under the APA, a court must set aside an agency action if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).[28]    In making this review, the Court is deferential to the administrative agency,[29] presumes the agency action to be valid,[30] and must refrain from substituting its

---

[28] Obviously, plaintiffs' position is that the regulation is inconsistent with 25 U.S.C. §476(f) and (g) as argued in section I above. This section is intended to argue that, even independent of those provisions, the regulation is invalid under the APA.

[29] See *Environmental Defense Fund, Inc., v. Costle*, 657 F.2d 275, 282 (D.C. Cir. 1981); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc).

[30] *ITT World Communications Inc. v. Federal Communication Commission*, 725 F.2d 732, 741-42 (D.C.Cir. 1984).

own judgment for that of the agency.[31]    A court's inquiry, however, is not limited to determining whether the agency's action has a rational basis; a reviewing court must also determine whether the agency's decision was based on a consideration of all relevant factors.[32]    An agency's decision is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[33]

This differs to some extent than the "rational basis" test applied in equal protection analysis:

> An "administrative order cannot be upheld unless the grounds on which the agency acted in exercising its powers were those upon which its action can be sustained." Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 95, 87 L. Ed. 626, 63 S. Ct. 454 (1943).  See also Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 50, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983) ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). This rule rests on several bases. The most important of these is the conviction that "it is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress." Investment Company Institute v. Camp, 401 U.S. 617, 628, 28 L. Ed. 2d 367, 91 S. Ct. 1091 (1970). Where Congress or the Executive vouchsafes part of its authority to an administrative agency, it is for the agency and the agency alone to exercise that authority. Judicial review of the propriety of

---

[31] *Id.*

[32] *Id.*

[33] *Chiang v Kempthorne,* 503 F.Supp.2d 343, 352 (D.D.C. 2007), quoting *Motor Vehicle Mfrs Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

administrative action properly encompasses not a determination of the outer limit of an administrator's raw power, but an examination of the reasoning and rationale actually offered for the particular action being reviewed. Thus, "post hoc rationalizations by counsel for agency action are entitled to little deference." Securities Industry Association v. Board of Governors of the Federal Reserve System, 468 U.S. 137, 143, 82 L. Ed. 2d 107, 104 S. Ct. 2979 (1984).[34]

Additionally, when the action involves a change in a settled course of agency behavior, "the court should be satisfied both that the agency was aware it was changing its views and has articulated permissible reasons for that change, and also that the new position is consistent with the law."[35] Moreover, the court can "demand that the [agency] consider reasonably obvious alternative[s] . . . and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review."[36]

B.    Application to this regulation

1.    Without regard to the IRA

Here, the administrative record demonstrates that the Department signaled its uncertainty about the wisdom and/or validity of the Alaska ban by issuing a solicitation of comments on the subject in January 1995. In April 1999, in publishing its proposed revision, the Department publicly acknowledged that there was a "credible legal argument" that the 1978 Fredericks opinion was in error. And in January 2001, the Department officially rescinded the Fredericks opinion.

---

[34] *Population Institute v. McPherson*, 797 F.2d 1062, 1072 (D.C. Cir. 1986).

[35] *NAACP v. FCC*, 682 F.2d 993, 998 (D.C. Cir. 1982).

[36] *Natural Resources Defense Council v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979) (footnote omitted).

Simultaneously, however, the Department chose to retain the Alaska ban temporarily, or at least to proclaim a three-year moratorium on approving any requests from Alaska, while it examined the "legal and policy issues" on whether the Alaska ban ought to remain permanently (an issue it had been examining for the preceding six years).

The incoming administration, after a series of postponements,[37] ultimately announced "The Department finds that it is impracticable and inefficient to repeal only part of the final rule as the Bureau of Indian Affairs needs clear direction and standards to process land into trust applications. Considering the variety of comments received, the Department has decided to withdraw the final rule in whole to address these specific areas of concern in a new rule."[38]

This November 2001 announcement did not indicate that any further deliberation on the Alaska ban was necessary, or any further evidence or material or comment on that subject was being solicited. Indeed, the notice listed explicitly those topics that the Assistant Secretary for Indian Affairs found needed work:

> Consistent with Departmental policy to consult with federally-recognized Indian tribes on proposed Federal actions that impact Indian tribes, the Department will conduct consultation with Indian tribes on the following areas in its efforts to promulgate a new rule: applications for housing or

---

[37] "The Acquisition to Title to Land in Trust rule, amending 25 CFR part 151, published in the Federal Register on January 16, 2001 (66 FR 3452), delayed by a document published February 5, 2001 (66 FR 8899), corrected by documents published February 20, 2001 (66 FR 10815) and June 13, 2001 (66 FR 31976), delayed by documents published April 16, 2001 (66 FR 19403) and August 13, 2001 (66 FR 42415), is withdrawn as of November 9, 2001." 66 Fed. Reg. 56608 (Nov. 9, 2001).

[38] 66 Fed. Reg. 56609 (Nov. 9, 2001).

home site purposes to meet individual housing needs; the requirement of land use plans; the standards of review used in reaching a determination of whether to accept land into trust; the availability of applications for review; and the use of computer technology prior to the proposal of a new Acquisition of Title to Land in Trust rule.[39]

Based on this, the inference is that the Department has all the information it needs to determine the continued viability of the Alaska ban.

Thus, on the undisputed facts, the November 2001 publication in the Federal Register was an announcement that the agency was changing its views, triggering the requirement that "the court should be satisfied both that the agency was aware it was changing its views and has articulated permissible reasons for that change, *and also that the new position is consistent with the law*."[40]  Plaintiffs will stipulate that the agency was aware it was changing its views by rescinding the Fredericks opinion, and that the agency articulated permissible reasons therefor.[41]  But it is obvious from this record that the new position is not consistent with the law.  The Fredericks opinion has been rescinded, and that constituted the sole basis for the imposition of the Alaska bar in the first place.

---

[39] 66 Fed. Reg. 56609-56610 (Nov. 9, 2001).

[40] *NAACP v. FCC*, 682 F.2d 993, 998 (D.C. Cir. 1982) (emphasis added).  Again, it is plaintiffs' position that the regulation is clearly inconsistent with 25 U.S.C. §476(f) and (g).  But this section is written on the premise that, even independent of those statutes, the regulation is inconsistent with the case law cited below and is arbitrary and capricious.

[41] Plaintiffs do not agree that the agency articulated a permissible reason for the three-year temporary continuation of the bar – much less the decision to extend that three years to seven or indefinitely.

Various APA rulings illustrate the point that the Department of the Interior has an obligation to recognize the implication of, and act in accordance with, its rescission of the Fredericks opinion, and to follow through on the rulemaking necessitated by this change.

In *Geller v. FCC*, 610 F.2d 973 (D.C.Cir. 1979), the Court succinctly stated the situation presented in that case:

> The relevant circumstances were rather clear to all. In 1972, the Commission had stated what from its viewpoint the public interest demanded in several aspects of cable television policy. Some of the regulations that were to effectuate this public-interest determination were sacrificed to modifications proposed by the consensus agreement in a bid to facilitate the passage of copyright legislation. From late 1976 onward, however, once that objective was achieved, this rationale could no longer support the rules derived from the agreement. Yet the Commission, despite previous assurances to the contrary, continues to adhere to the rules adopted on the basis of the consensus agreement--rules that it has never found to serve the public interest in any other way.
>
> What we have, then, are cable television rules that may or may not presently square with the public interest. Even assuming that the rules in question initially were justified by the aid the Commission expected them to afford to enactment of the copyright legislation--a question we do not decide --it is plain that that justification has long since evaporated.
>
> … Even a statute depending for its validity upon a premise extant at the time of enactment may become invalid if subsequently that predicate disappears. It can hardly be supposed that the vitality of conditions forging the vital link between Commission regulations and the public interest is any less essential to their continuing operation. We hold that the Commission is statutorily bound to determine whether that linkage now exists. [42]

Here, as in *Geller*, the original regulations were promulgated based on a particular premise (here, that the Fredericks opinion correctly stated the law); here, as there, that rationale could no longer support the rule after a particular date (here, 2001 when the

---

[42] *Geller v. FCC*, 610 F.2d 973, 979-980 (D.C.Cir. 1979).

Fredericks opinion was rescinded); here, as there, the agency has publicly stated that it will revisit the rules (here, in both January 2001 and in November 2001); here, as there, the agency continues to adhere to the former rule; and here, as there, the justification has long since evaporated.

See also *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1273 (D.C.Cir. 1980) ("[W]here time does demonstrate the infeasibility of a standard once approved as feasible, so that the very predicate for the original rule and its statutory basis have disappeared, a court may well be able to deny the agency any discretion to refuse a new rulemaking").[43]

Here, the agency in fact undertook a new rulemaking, starting as far back as 1995, but has not completed that task. "[H]aving initiated a rulemaking premised on the conclusion that the rules may not be in the public interest and then rejected its own proposal to abrogate the rules, the [agency] bears a burden of explanation."[44]

    2.   Considered in light of the IRA

The invalidity of the Alaska Bar under the APA becomes even more apparent when the import of the IRA is considered.

---

[43] See also *American Ass'n of Paging Carriers v. FCC*, 442 F.3d 751, 757-58 (D.C.Cir. 2006) ("If in fact the use of the low-power frequencies exposes AAPC's members to increased interference, the denial of a petition for rulemaking based thereon could be subject to review notwithstanding the generous measure of discretion usually afforded an agency in its rulemaking process").

[44] *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 881 (D.C.Cir. 1999).

Strengthening tribal governments and the concomitant goal of protecting tribal assets and resources has been the focal point of federal Indian policy for decades. Beginning with the *Meriam* Report[45] in the 1920's, and continuing to the present, congressional policy has emphasized strengthening tribal governments and protection of tribal lands as a means to tribal self-determination and economic self-sufficiency. This policy was formally implemented in the Indian Reorganization Act (IRA), 25 U.S.C. §§ 461-479.

In enacting the IRA, Congress clearly associated Indian ownership of land with Indian economic survival. Congress's foremost concerns were to improve the economic situation of Indians by stopping further land loss through allotments, to provide for additional acquisitions of tribal lands, and to revitalize tribal governments.[46] "The over-riding purpose of the [IRA] was to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1974).

The prime sponsor of the IRA, Representative Howard, recognized that loss of land through the Indian General Allotment Act produced widespread poverty among

---

[45] Institute for Government Research, THE PROBLEM OF INDIAN ADMINISTRATION (L. Meriam ed. 1928).

[46] Hearings on S. 2755 and S. 3645 before the Senate Comm. on Indian Affairs, 73d Cong., 2d Sess. (1934). It was in this context that Congress empowered Section 16 entities "to prevent the sale, disposition, lease or encumbrance of tribal lands, interests in lands, of other tribal assets without the consent of the tribe."

reservation Indians.[47]  Thus, in enacting the IRA, Congress preserved the remaining lands and provided a framework whereby tribes could acquire additional lands and thereby exercise a stronger role in governing their members and resources.

Strengthening tribal governance has been the emphasis of virtually every major piece of federal legislation since the IRA addressing the status of tribes (including Alaska tribes) and programs for their benefit.[48]  "These Acts reflect Congress' desire to promote the 'goal of Indian self-government, including its "overriding" goal of encouraging tribal self-sufficiency and economic development.'"  *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 510 (1991), *quoting California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987).

Section 465 of the IRA expressly authorizes the Secretary to acquire lands for Indian tribes and to take such lands into trust status for such tribes.  25 U.S.C. § 465.  The only tribe excluded from section 465 is the Navajo tribe.  Thus, Alaska tribes would

---

[47] 78 Cong. Rec. (Part II) 11727, S3645 (daily ed. July 15, 1934).

[48] *See e.g.*, the Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.*, including Alaska Native Villages at §1452(b); the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450 *et seq.*, including Alaska Native Villages at §450b(e); and the Indian Child Welfare Act, 25 U.S.S. §§ 1901 et seq., including Alaska Native Villages at §1903(8).

The single exception to this was the federal government's disastrous experiment during the 1950's with the now thoroughly repudiated policy of Termination.  President Richard Nixon renounced the Termination policy because it ignored the moral and legal obligations involved in the special relationship between tribes and the federal government.  Special Message to Congress on Indian Affairs, [1970], Pub. Papers 564, 565-66 (Richard M. Nixon).

appear to be covered by section 465.[49]   Section 473a, however, removes any doubt,

specifying that "Section . . . 465 . . . of this title shall hereafter [after May 1, 1936], apply

to … Alaska . . . ."  25 USC §473a.

The application of the trust land provision is consistent with the general treatment

of Alaska Natives in the IRA.  Congress explicitly included Alaska Natives in the

definition section of the original 1934 Act ("Eskimos and other aboriginal peoples of

Alaska shall be considered Indians")[50] and explicitly applied several sections of the

original Act to Alaska.[51]  More importantly, when the Interior Department concluded that,

due to inadvertent drafting ambiguities, those sections might not be given their full effect

in Alaska, Congress acted in 1936 to address those ambiguities.[52]  Congress intended this

---

[49] In pertinent part section 465 provides:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians . . . .
>
> Title to any lands or tights acquired pursuant to this Act … shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

Act of June 18, 1934, c. 576, § 5, 48 Stat. 985.

[50] Act of June 18, 1934, ch. 576, section 19, codified as amended at 25 U.S.C. 479.

[51] "The provisions of this Act shall not apply to any of the Territories, colonies, or insular possessions of the United States, except that sections 9, 10, 11, 12, and 16, shall apply to the Territory of Alaska …"  Act of June 18, 1934, c. 576, sec. 13, 48 Stat. 986.

[52] Act of May 1, 1936 c. 254, 49 Stat. 1250.  See generally Cohen's Handbook of Federal Indian Law (2005 ed.), §4.07[3][d][1] at 360-361.

amendment to allow Alaska Natives to secure the full promise of the original statute by allowing them to participate in the benefits of existing law "*to the same extent and manner as the Indians of the United States proper.*"[53]

A federal right granted by congress cannot be administratively revoked by agency action. Only congress can repeal such right and then only by an express and unequivocal statement of its intent. *United States ex rel. Hualpai Indians v. Santa Fe Pacific R.R.*, 314 U.S. 339, 353-54 (1941). Although Section 2 of the 1936 IRA amendments (placing certain limitations on the Secretary's authority to designate lands in Alaska as Indian reservations, formerly codified at 25 USC 496), was repealed by Congress in 1976, section 1 of the 1936 IRA Amendments (25 U.S.C.473(a)) was not repealed; thus it continues to extend to Alaska Natives (*inter alia*) section 5 of the original 1934 Act (25 USC 465), giving the Secretary authority to take tribal lands into trust. Congress has passed no legislation that has repealed or in any way affected the privileges conferred on Alaska Native tribes by sections 473a and 465 of Title 25 of the United States Code.[54]

Typically, when a statute contains an ambiguous term, standard principles of statutory interpretation dictate that the Court defer to an agency's permissible construction of the statute pursuant to the Supreme Court's holding in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.* 467 U.S. 837 (1984); *Phillips Petroleum Co. v.*

---

[53] H.R. Rep. No. 2244, 74th Cong., 2nd Sess. 3 (1936); S. Rep. No. 1748, 74th Cong., 2nd Sess. 3 (1936) (emphasis added).

[54] Indeed, in 1948 Congress rejected a proposal which would have repealed portions of the IRA for Alaska. S.J. Res. 162, 80th Conf., 1st Sess. (Dec. 4, 1947); see 94 Cong. Record 9348 (June 19, 1948).

*F.E.R.C.*, 792 F.2d 1165, 1169 (D.C. Cir. 1986).   In this case, the statute is <u>not</u> ambiguous, yet the Secretary has maintained the arbitrary regulatory bar that was premised on Associate Solicitor Frederick's eschewed and now withdrawn legal opinion.[55]

When construing statutes that address Indian law, the courts in the D.C. Circuit recognize that the *Chevron* principle of deference to administrative interpretations is subjugated by the "long-standing canon that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 58 (D.C. Cir. 1991) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also, Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1441 (D.C. Cir. 1988);[56] *Cobell v. Kempthorne*, 455 F.3d

_____

[55] Since the 1978 issuance of the Fredericks opinion, Congress has enacted other state-specific acts settling Native claims, and it has become clear that Congress knows how to deprive the Secretary of land-into-trust authority when that is the desired result.  The Maine Indian Claims Settlement Act, Pub. L. 96-420, 94 Stat. 1785, codified at 25 U.S.C. §1721 et seq.: "Except for the provisions of this [Act], the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians or Indian nations, or tribes, or bands of Indians in the State of Maine."  In the absence of such language, courts should not imply that result.  *Connecticut v. Blumenthal*, 228 F.3d 82, 90 (2nd Cir. 2000) ("We have compared both statutes and find in the Maine Settlement Act an obvious demonstration that Congress knew how to prohibit the Secretary from taking into trust any lands outside of specifically designated settlement lands. The absence of an analogous provision in the [Connecticut] Settlement Act at issue in this case confirms that the [Connecticut] Settlement Act was not meant to eliminate the Secretary's power under the IRA to take land purchased without settlement funds into trust for the benefit of the Tribe.").

[56] Cert. denied, 488 U.S. 1010 (1989).  "If the [legislation] can reasonably construed as the Tribe would have it construed, it must be construed that way.  It is for this reason that,

301, 304 (D.C.Cir. 2006) ("the normally-applicable [*Chevron*] deference was trumped by the requirement that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'")  The D.C. Circuit has noted that this canon has "special strength."  *Albuquerque Indian Rights*, 930 F.2d at 59.  This canon owes its strength in part to the "distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942).

With these principles in mind, this Court must find that the record is devoid of any valid explanation of the justification on which the Secretary relied in maintaining the Alaska ban.  The original pronouncement in January 2001 was that the Secretary could justify no more than a three-year extension of the ban, and the November 2001 pronouncement contained no discussion of the ban whatsoever.  The grounds of his action are therefore not disclosed and there is no way of knowing the basis on which his conclusion to maintain the ban rested.  Since the record is as complete on this score as the Secretary can make it, this Court should hold that the Secretary's decision cannot be shown to be anything other than arbitrary.   See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971);[57] *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 596 (D.C. Cir. 1971).

---

while we have given careful consideration to Interior's interpretation of the [legislation], we do not defer to it."  851 F.2d at 1445 & fn. 8.

[57] Overruled on other grounds, *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

CONCLUSION

If the Court agrees with the analysis of 25 U.S.C. §476(f) and (g) in Section I, then it is unnecessary to reach the constitutional argument in Section II and perhaps the APA argument in Section III as well.    Regardless of which basis is most appropriate, the regulatory Alaska ban should be struck down and the Secretary prohibited from refusing to consider petitions for land into trust status from Alaska Native Villages and tribal members on the same basis as petitions from tribes in other states.

Respectfully submitted this 21 day of April, 2008.

/s/ Heather Kendall Miller
Alaska Bar No. 9211084
NATIVE AMERICAN RIGHTS FUND
420 L Str. Suite 505
Anchorage, Alaska 99517
Telephone: (907) 276-0680
Facsimile: (907) 276-2466
Email: kendall@narf.org

/s/ Andrew Harrington
Alaska Bar No. 9106026
Denise Bakewell, California Bar No. 208660
ALASKA LEGAL SERVICES CORPORATION
1648 South Cushman, Suite 300
Fairbanks, Alaska 99701
Telephone 907-452-5181
Fax 907-456-6359
Email aharrington@alsc-law.org

/s/ Richard A. Guest
D.C. Bar No. 477572
NATIVE AMERICAN RIGHTS FUND
1712 N/ Street, N.W.
Washington, D.C. 20036
(202) 785-4166

Attorneys for Plaintiffs