UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AKIACHAK NATIVE COMMUNITY <u>et al.</u>,<br><br>          Plaintiffs<br>          v.<br>DEPARTMENT OF THE INTERIOR, <u>et al.</u>.,<br><br>          Defendants | No. 1:06-cv-00969 (RWR) |

**STATE OF ALASKA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY
JUDGMENT**

**INTRODUCTION**

The Alaska Native Claims Settlement Act[1] (ANCSA) was enacted in

1971 and provided a comprehensive, statewide resolution to Native land claims in

Alaska.  It extinguished aboriginal title statewide.[2]  It extinguished statewide all

claims based on aboriginal right, title, use or occupancy of land.[3]  It extinguished

statewide all claims against the United States and the State of Alaska ("State" or

"Alaska") based on any statute relating to Native use and occupancy.[4]  It revoked

---

[1]     43 U.S.C. § 1601 et seq.

[2]     *Id.* § 1603(b).

[3]     *Id.* § 1603(c).

[4]     *Id.*

EXHIBIT A TO STATE OF ALASKA'S MOTION FOR LEAVE TO FILE
CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT          PAGE 1 OF 41

all Indian reservations in the state,[5] and effectively discontinued the authority for

most, if not all, trust land in the state.[6]  Yet Plaintiffs wholly fail to acknowledge

ANCSA's implications for this lawsuit.  Instead, Plaintiffs assert that when the

Solicitor of the Department of the Interior ("Solicitor") withdrew an opinion

interpreting ANCSA, the legal justification for prohibiting trust land acquisitions

in Alaska evaporated.  According to Plaintiffs, a twenty-year course of action by

the Department of Interior instantly came to violate the equal protection provisions

of the Constitution, three provisions of the Indian Reorganization Act (IRA),[7] and

the Administrative Procedures Act[8] (APA).  Plaintiffs' entire case is predicated on

the withdrawal of a 1978 Opinion by then-Associate Solicitor for Indian Affairs,

Thomas W. Fredericks[9] (Fredericks opinion).  Plaintiffs' position elevates the

---

[5]        ANCSA revoked all existing reservations except for the Annette
Island Reserve, which is the reservation for the Metlakatla Indian Community
(MIC).  The bar does not apply to MIC of the Annette Island Reserve or its
members.  25 C.F.R. § 151.1.  Members of MIC are of Canadian origin and have
no aboriginal land claims in Alaska.  Because of this, the Metlakatlans are not
covered by the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§
1601 *et seq*., and their reservation, the Annette Island Reserve, was not revoked.
This footnote is intended to incorporate the Metlakatla exception to ANCSA and
the land into trust regulations throughout the State's memorandum.

[6]        43 U.S.C. §§ 1617(a), 1618.

[7]        25 U.S.C. §§ 465, 476(f) & (g).

[8]        5 U.S.C. § 706(A)(2).

[9]        AR 001-04.

legal import of an Executive Branch legal opinion over the will of Congress. Their case is legally untenable.

ANCSA prohibits the creation of trust land in Alaska. Therefore, the prohibition against taking land into trust in Alaska does not violate the equal protection provisions of the Indian Reorganization Act[10] as Plaintiffs claim, because it does not discriminate between tribes by virtue of their status as tribes. The prohibition in 25 C.F.R. Part 151.1 on taking land into trust in Alaska distinguishes tribes that are subject to ANCSA from tribes that are not. The prohibition against taking land into trust in Alaska implements the will of Congress in exercising its plenary power over Tribes; it therefore does not violate the equal protection provisions of the Fifth Amendment. The IRA prohibits discriminatory action by the Executive branch, leaving intact and undisturbed the plenary authority of Congress to manage Indian affairs. The Secretary is without discretionary authority to take land into trust in Alaska when Congress has prohibited it by enacting ANCSA.

## STANDARD OF REVIEW

The traditional rule of statutory interpretation pertaining to Indian law requires liberal construction in favor of the Indians.[11] In recognition of the

---

[10]     25 U.S.C. §§ 476 (f) & (g).

[11]     *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Indian Educators Fed'n v. Kempthorne*, 541 F. Supp.2d 257, 262, 264 (D.D.C. 2008). *See also Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 58-59 (D.C.

gravity and permanence of the settlement codified in ANCSA, however, the

Native community was aided by some of the top legal minds of the era.  As a

result, the rule of statutory construction that favors resolution in favor of Indians

should apply with less force in interpreting ANCSA:

> The rule of construction of ambiguous statutes in favor of Indians is
> based on a concern that the powerful not take advantage of the
> helpless and uneducated. A similar concern guides modern law on
> the construction of contracts of adhesion. Where, as here, the
> Inupiats were represented before Congress by such illustrious
> counsel as former Supreme Court Justice Arthur Goldberg and
> former Attorney General Ramsey Clark, we think the rule of
> construction operates with less force.[12]

Explicit Congressional consideration of Indian sovereignty issues also indicates

that the Indian canon of construction may not apply.  In *Doe v. Mann* the Ninth

Circuit found that due to "the lack of ambiguity in ICWA and explicit

congressional recognition of Indian sovereignty in ICWA . . . the Indian canon of

construction does not come into play."[13]

Furthermore, ANCSA is a statute of specific application:  it applies

to Tribes and land in Alaska.  Its provisions therefore control over sections 5 and

---

Cir. 1991) (discussing Department of Interior's application of the Indian rule of
statutory construction to future rulemaking efforts).

[12]     *United States v.* Atlantic *Richfield Co.*, 612 F.2d 1132, 1139 (9th Cir.
1980), *cert. denied*, 449 U.S. 888 (1980).

[13]     415 F.3d 1038, 1066 (9th Cir. 2005).

16 the Indian Reorganization Act,[14] which is a statute of general application.[15]

ANCSA's enactment many years after section 5 of the IRA[16] also must be

considered:

> At the time a statute is enacted, it may have a range of plausible
> meanings. Over time, however, subsequent acts can shape or focus
> those meanings. The classic judicial task of reconciling many laws
> enacted over time, and getting them to make sense in combination,
> necessarily assumes that the implications of a statute may be altered
> by the implications of a later statute.  This is particularly so where
> the scope of the earlier statute is broad but the subsequent statutes
> more specifically address the topic at hand. As we recognized
> recently in *United States v. Estate of Romani*,[17] "a specific policy
> embodied in a later federal statute should control our construction of
> the [earlier] statute, even though it ha[s] not been expressly
> amended."[18]

Therefore, in determining the applicability of section 5 of the IRA to Alaska,

Congress' intent, as manifest in ANCSA, must be given priority.  Furthermore, the

Court must consider the comprehensive approach to resolving Native land claims

in Alaska manifest in ANCSA:

> In determining whether Congress has specifically addressed the

---

[14]    25 U.S.C. §§ 465, 476(f) & (g).

[15]    *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is
no clear intention otherwise, a specific statute will not be controlled or nullified by
a general one, regardless of the priority of enactment.").

[16]    Act of June 18, 1934, c. 576, § 5, 48 Stat. 985.

[17]    523 U.S. 517, 530-531(1998).

[18]    *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529
U.S. 120, 143 (2000) (internal citation omitted).

question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning-or-ambiguity-of certain words or phrases may only become evident when placed in context.[19]

With respect to judicial review of agency action, the legal standard is a familiar one:

> First, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[20]

The question of how to reconcile the apparent conflict between the principle that the judiciary is "uniquely responsible for the final determination of the meaning of statutes" with the principle that a court should accord substantial deference to the agency charged with administration of the statute has been characterized as "more apparent than real:"[21]

---

[19]    *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbit*, 116 F.Supp.2d 155, 159 (D.D.C. 2000) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. at 120).

[20]    *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984).

[21]    *Montana v. Clark*, 749 F.2d 740, 744-45 (D.C. Cir. 1985), *cert. denied*, *Montana v. Hodel*, 474 U.S. 919 (1985).

Beyond question, it is the unique province of the judiciary to say what the law is. But the exercise of this function does not preclude affording deference to an agency's construction of its enabling statute. For, properly understood, deference to an agency's interpretation constitutes a *judicial* determination that Congress has delegated the norm-elaboration function to the agency and that the interpretation falls within the scope of that delegation. Thus the court exercises its constitutionally prescribed function as the final arbiter of questions of law when it evaluates the breadth of congressional delegation and, in so doing, determines the degree of deference warranted in the particular controversy before it.[22]

The Circuit Court for the District of Columbia recognizes that the relationship between the traditional canon of statutory construction to interpret ambiguities to benefit the Indians and review of agency action is nuanced,[23] and holds that the agency must apply the traditional canon to its own interpretations.[24] However, Ninth Circuit review of the Secretary's administration of ANCSA has rejected this approach, and has consistently afforded the Department of Interior's interpretation great deference.[25] An agency's longstanding interpretation carries more weight

----

[22]    *Montana v. Clark*, 749 F.2d at 745.

[23]    *See Confederated Tribes of Coos,* 116 F.Supp.2d at 159.

[24]    *Albequerque Indian Rights v. Lujan*, 930 F.2d 49, 58-59 (D.C. Cir. 1991).

[25]    *See, e.g., Doyon v. Bristol Bay Native Corp.*, 569 F.2d 491, 496 (9th Cir. 1978) ("[t]he principal responsibility for administering [ANCSA] lies with the Secretary and his interpretations of the statutes are entitled to 'great weight' upon judicial review"), *cert. denied*, 439 U.S. 954 (1978) ; *Haynes v. United States*, 891 F.2d 235, 238 (9th Cir. 1989); *City of Angoon v. Hodel*, 803 F.2d 1016, (1986), cert. denied, 484 U.S. 870 (1987). *See also Atlantic Richfield*, 612 F.2d at 1139 (holding that the Indian law "rule of construction operates with less force" with respect to ANCSA). The D.C. Circuit apparently has not yet directly addressed

than an interpretation at odds with an earlier position, which is entitled to

considerably less deference.[26]

## ARGUMENT

### I.     The Alaska Native Claims Settlement Act Prohibits the Secretary from Taking Land into Trust in Alaska

Unlike most other native land claims settlement statutes,[27] ANCSA

provides a comprehensive, statewide settlement of all Native land claims in the

state that explicitly revoked all reservations;[28] discontinued individual allotments;

extinguished *all* aboriginal titles that may have existed on the date of its

---

the appropriate judicial standard for review of action by the Department of Interior in interpreting ANCSA.

[26]     *INS v. Cardoza-Fonseca¸* 480 U.S. 431, 446 n.30 (1987); *City of Angoon*, 803 F.2d at 1026. *See also Connecticut v. U.S. Dept. of Interior*, 228 F.2d 82, 93-94 (2nd Cir. 2000) (applying this standard to the Secretary's interpretation of Connecticut Indian Land Claims Settlement Act).

[27]     A survey of other Indian land claims settlement statutes reveals none as comprehensive in scope as ANCSA (e.g., statewide revocation of all reservations, discontinuation of individual allotments, and extinguishment of existing and future claims based on both aboriginal title and statutory property rights). *See e.g.*, Rhode Island Indian Claims Settlement, 25 U.S.C. §§ 1701-12; Maine Indian Claims Settlement, 25 U.S.C. §§ 1721-35; Florida Indian (Miccosukee) Land Claims Settlement, 25 U.S.C. §§ 1741-50e; Connecticut Indian Land Claims Settlement, 25 U.S.C. §§ 1751-60; Massachusetts Indian Land Claims Settlement, 25 U.S.C. §§ 1771-71i; Washington Indian (Puyallup) Land Claims Settlement, 25 U.S.C. §§ 1773-73j; Seneca Nation (New York) Land Claims Settlement, 25 U.S.C. §§ 1774-74h; Mohegan Nation (Connecticut) Land Claims Settlement, 25 U.S.C. §§ 1775-75h; Crow Boundary Settlement, 25 U.S.C. §§ 1776-76k.

[28]     With the exception of the Annette Island Reserve. *See supra*, n.5.

enactment; extinguished all *future* claims based on aboriginal right, title, use or

occupancy; and extinguished all claims based on any statute relating to Native use

and occupancy.[29]

> In return, Congress authorized the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations that were to be formed pursuant to the statute; all of the shareholders of these corporations were required to be Alaska Natives. §§ 1605, 1607, 1613. The ANCSA corporations received title to the transferred land in fee simple, and no federal restrictions applied to subsequent land transfers by them.[30]

ANCSA established a statewide regime for resolving Native land claims that

extinguished aboriginal title, including all claims by Alaska Natives to any

sovereign authority over land.

ANCSA's settlement language is broad, extinguishing Native claims

to land that are based not only on aboriginal title, but also extinguishing Native

claims to land that are based on any statute of the United States relating to Native

use and occupancy.  ANCSA provides:

> (b) All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished.

---

[29]    43 U.S.C. § 1603(b) & (c), § 1617, §1618(a), § 1619.

[30]    *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 524 (1998) ("*Venetie*").

(c) All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.[31]

These sections extinguish three kinds of claims: (1) existing claims of aboriginal title, use or occupancy; (2) future claims based upon aboriginal title, use or occupancy; and (3) claims based upon any statute relating to Native use and occupancy.[32]

The comprehensive settlement framework of ANCSA envisions permanent abolition of trust land in Alaska. The regulatory jurisdiction that accrues to tribes with respect to land held in trust is an element of aboriginal title, which ANCSA specifically extinguished statewide. The Secretary is without authority to restore what Congress has extinguished. Furthermore, the right to have land taken into trust is based on section 5 of the Indian Reorganization Act (IRA), which is a statute of the United States "relating to Native use and occupancy" of land. ANCSA extinguished all claims based on statutes relating to native use and occupancy.

---

[31]    43 U.S.C. § 1603(b) & (c).

[32]    *See, e.g., Atlantic Richfield*, 612 F.2d at 1134-36.

A.    **ANCSA Discontinued Most Forms of Trust or Restricted Title Land and Prohibits the Secretary from Making New Trust Acquisitions**

ANCSA embodies a permanent, comprehensive land claims settlement that does not envision creation of any new trust land[33] or other special status land in the state.  ANCSA revoked all reservations in Alaska except the Annette Island Reserve and repealed the Native Allotment Act.[34]  ANCSA did not convey any land to Native tribes.  Instead, it conveyed 44 million acres and nearly 1 billion dollars to Native corporations formed pursuant to state law.[35]  The state provided consideration in the form of money and land selection priorities in

---

[33]    There are three properties in Southeast Alaska that remain in trust status for the benefit of native villages.  As described in the January 11, 1993 Solicitor's Opinion, M-36975:

> During the 1940's and 1950's, the Government acquired by purchase, and took title in trust to, cannery properties in three Southeast Alaska communities.  The BIA has not viewed trust title to these parcels as having been revoked by ANCSA § 19, 43 U.S.C. § 1618, and these lands have not been conveyed to the local Village Corporations under ANCSA § 16, 43 U.S.C. § 1615.  BIA views these as valid existing rights under ANCSA § 14(g), 43 U.S.C. § 1613(g). . . . Beneficial title to these trust lands is still held by the IRA community and/or association as follows:  Angoon (13.24 acres); Kake (15.9 acres); Klawock (1.91 acres).

AR 246.

[34]    *See* 43 U.S.C. § 1617(a); 43 U.S.C. § 1618.

[35]    *Venetie*, 520 U.S. at 524.

exchange for a release from future land claims by Alaska Natives.[36]  Congress'

stated intent in codifying the settlement was to avoid "a reservation system or

lengthy wardship or trusteeship, and without adding to the categories of property  .

. . enjoying special tax privileges."[37]  Taking land into trust in Alaska would, by

definition, create a trusteeship in direct violation of Congress' intent.  Trust land

also is exempt from taxation,[38] which would add to the categories of property

enjoying special tax privileges, again, in direct violation of Congress' intent.

ANCSA clearly prohibits the creation of trust land in Alaska.

Furthermore, Congress specified that the provisions of ANCSA were

to be "broadly construed:"[39]

> The settlement should be accomplished rapidly, with
> certainty, in conformity with the real economic and
> social needs of Natives, without litigation, with
> maximum participation by Natives in decisions

---

[36]    *Venetie*, 522 U.S. at 531-33, establishes that ANCSA conveyed lands are not Indian country as defined by 18 US.C. § 1151(b) because lands conveyed to ANCSA corporations meet neither the federal set-aside nor the federal superintendence requirement for finding a "dependent Indian community." To find that the Secretary has authority to take non-ANCSA land into trust in Alaska would have the nonsensical result of protecting the State's jurisdiction over *only* ANCSA settlement land.  It would mean that the benefit of the State of Alaska's bargain in providing money and land selection priorities was to protect its jurisdiction over only the land that was conveyed by ANCSA.

[37]    43 U.S.C. § 1601(b).  *See also* 43 U.S.C. §§ 1605, 1608, 1610.

[38]    25 U.S.C. § 465.

[39]    *S. Conf. Rep. No. 581*, 92nd Cong., 1st Sess., 40 (1971); *Atlantic Richfield*, 612 F.2d at 1136-37.

> affecting their rights and property, without establishing
> any permanent racially defined institutions, rights,
> privileges, or obligations, *without creating a*
> *reservation system or lengthy wardship or trusteeship,*
> *and without adding to the categories of property and*
> *institutions enjoying special tax privileges* or to the
> legislation establishing special relationships between
> the United States Government and the State of
> Alaska.[40]

Application of 25 C.F.R. Part 151 to Alaska tribes would directly contravene

Congress' declaration of policy in enacting ANCSA by producing the sort of

reservation system or trusteeship that Congress extinguished and explicitly

intended to avoid in enacting ANCSA. ANCSA gave tribes that had reservations a

choice: either select land pursuant to ANCSA § 12[41] and receive distribution of

regional corporation funds pursuant to ANCSA § 7,[42] or take reservation land in

fee.[43] Reservation status would not be preserved; the land would be conveyed to

the village corporation. The statutory provision revoking reservation status

manifests Congressional intent that there be no more trust land in Alaska.

ANCSA also dealt with land held in trust and restricted status land

for individual Indians. Section 18[44] revoked Indian allotment authority for Alaska

---

[40]    43 U.S.C. § 1601(b) (emphasis added).

[41]    43 U.S.C. § 1611.

[42]    43 U.S.C. § 1606.

[43]    43 U.S.C. § 1618.

[44]    43 U.S.C. § 1617.

Natives under the Act of February 8, 1887 (24 Stat. 389) and the Act of June 25,

1910 (36 Stat. 363).  ANCSA also repealed the Alaska Native Allotment Act, Act

of May 17, 1906 (34 Stat. 197).  ANCSA provided that allotment applications

pending on the date of enactment under the revoked and repealed authorities

could, at the applicant's option, be approved under ANCSA § 18, in which case,

the applicant would not be eligible for a patent under ANCSA § 14(h)(5).

ANCSA § 14(h) set aside 2 million acres of unreserved and unappropriated land to

be made available for, inter alia, individual, 160-acre home sites for land occupied

by the applicant as a primary place of residence on August 31, 1971.[45]  The

applicant would hold fee title to the property; the subsurface estate would be

conveyed to the appropriate Regional Corporation.  Therefore, ANCSA effectively

discontinued authority for creation of new restricted status or trust land for the

benefit of individual Alaska Natives in the state.[46]  ANCSA resolved Alaska

Native land claims statewide, and instituted a comprehensive, statewide regime

that does not contemplate land in the state being taken into trust.

In *United States v. Atlantic Richfield Co.*, the Ninth Circuit

considered trespass claims by the Inupiat people that predated enactment of

ANCSA, and determined:

---

[45]     43 U.S.C. § 1613(h).

[46]     The exception being allotment applications that were pending at the
time ANCSA was enacted.  43 U.S.C. § 1617(a).

> We hold that [ANCSA] extinguished not only the aboriginal titles of all Alaska Natives, but also every claim "based on" aboriginal title in the sense that the past or present existence of aboriginal title is an element of the claim.[47]

In a footnote, the court elaborated:

> But claims not based on aboriginal title for example, personal injury claims, claims for damage to personal property, and claims for trespass to land held in fee were not extinguished.[48]

This distinction demonstrates ANCSA's comprehensive approach to settling all aboriginal land claims in Alaska. All claims and entitlements based upon Native sovereignty over land were extinguished. Personal or property rights claims not based on aboriginal title survive, to the extent they are not based on "any statute . . . relating to Native use and occupancy."[49] After evaluating the legislative history of ANCSA's extinguishment provisions, the Ninth Circuit concluded:

> Indeed, in view of the repeated statements in the legislative history that the statute should be "broadly" applied to extinguish "all claims," and in view of Congress' knowledge of the Natives' trespass claims, it would be incomprehensible to us if Congress did not intend to extinguish the trespass claims, along with all other claims based on aboriginal title, when it gave the Natives over 60,000 square miles of fee simple land and almost a billion dollars.[50]

---

[47]    *Atlantic Richfield*, 612 F.2d at 1134.

[48]    *Id.* at 1134 n.5; *See also id.* at 1137 (reviewing legislative history cited by the Inupiats).

[49]    43 U.S.C. § 1603(c).

[50]    *Atlantic Richfield*, 612 F.2d at 1137.

*Alaska v. Native Village of Venetie Tribal Gov't* determined that former

reservation land that the Tribe selected to take in fee under ANCSA § 19[51] did not

meet the "federal set-aside" requirement for Indian country.[52]  In evaluating the

comprehensive scope of the ANCSA settlement, the Supreme Court noted that:

> ANCSA, far from designating Alaskan lands for Indian use, revoked
> the existing Venetie Reservation, and indeed revoked all existing
> reservations in Alaska "*set aside* by legislation or by Executive or
> Secretarial Order *for Native use*," save one.  43 U.S.C. § 1618(a)
> (emphasis added).  In no clearer fashion could Congress have
> departed from its traditional practice of setting aside Indian lands.[53]

The Court also noted that ANCSA "transferred reservation lands to private, state-

chartered Native corporations, without any restraints on alienation or significant

use restrictions, and with the goal of avoiding "any permanent racially defined

institutions, rights, privileges, or obligations."[54]  The idea that Congress intended

to permit creation of new trust land in Alaska lies in diametric opposition to

ANCSA's wholesale repudiation of Congress' "traditional practice of setting aside

Indian lands."[55]

---

[51]     43 U.S.C. § 1618.

[52]     *Venetie*, 522 U.S. at 532.

[53]     *Id.*

[54]     *Id.* at 532-33 (citing 43 U.S.C. §§ 1601(b), 1607, 1613).

[55]     *Id.* at 532.

The extinguishment of the right to have land taken into trust in Alaska is consistent with the views advanced by Native proponents and others during congressional deliberations. The remarks of Byron I. Mallot, then second vice-president of the Alaska Federation of Natives (AFN), to Congress confirm that the concept of Indian country was fundamentally incompatible with the new direction sought by Native leaders and undertaken by Congress in enacting ANCSA:

> Freed of their own volition and by their accomplishments, from dependency upon the Government, the native of Alaska will be able to take his rightful place in this Nation and the Government will be freed from this haunting responsibility in a nation of plenty.[56]

Similarly, AFN President Emil Notti testified to Congress that the traditional wardship status of Indians in the lower forty-eight states was unacceptable to Alaska Natives:

> We have been treated as "wards" for many years. We have not profited by the "wardship"; we are humiliated by the very concept which assumes that we are something less than other citizens—and I assure you that we are not.[57]

---

[56]    *Hearings on S.2906 before Sen. Comm. on Interior and Insular Affairs*, 90th Cong. 2nd Sess., 55-56 (1968).

[57]    *Hearings on S.1830 before Sen. Comm. on Interior and Insular Affairs*, pt. 1, 91st Cong. 1st Sess. 115 (1969).

Contrasting the goals of ANCSA with the Indian country pueblos of New Mexico,

Barry Jackson, an attorney representing AFN, confirmed that Indian country status

of lands in Alaska was inconsistent with the desires of Alaska Natives themselves:

> [T]he natives in Alaska are very vehemently anti reservation
> and they have never been in favor of reservations and are not
> today. . . .
>
> Now, we also are trying to get away from the BIA, frankly,
> and from the Secretary of the Interior . . . We are trying to
> build in provisions which will prevent us from having, if you
> will pardon the expression, our villages frozen in history. It is
> my personal feeling that the Pueblos of New Mexico are
> frozen in history because of their rules that they have, and this
> is something that we want to avoid. [58]

Thus, not only is the concept of trust land status, including the creation of Indian

country, fundamentally incompatible with express provisions of ANCSA, it is also

inconsistent with the views of Alaska Native leaders who sought passage of the

Act.

### B.     ANCSA Extinguished Existing Claims of Aboriginal Title and Future Claims Based upon Aboriginal Title[59]

---

[58]     *Hearings on S.2906 before Sen. Comm. on Interior and Insular Affairs*, 90th Cong. 2nd Sess., 89-90 (1968).

[59]     The Supreme Court has granted certiorari in the case of *Carcieri v. Kempthorne* on two questions:  1) whether the IRA of 1934 empowers the Secretary to take land into trust for Indian tribes that were not recognized and under federal jurisdiction in 1934; and 2) whether an act of Congress that extinguishes aboriginal title and all claims based on Indian rights and interests in land precludes the Secretary from creating Indian country there.  *Carcieri v. Kempthorne*, 497 F.3d 15 (1st Cir. 2007), *cert. granted*, 128 S.Ct. 1443 (Feb. 28, 2008).  Alaska has joined with other states as amici in the case, which will be heard next term.  While the settlement, extinguishment, and release language of the Rhode Island settlement act at issue in *Carcieri* differs from that in ANCSA,

Tribal regulatory power over land, which is the exact relief sought by at least some of the plaintiffs,[60] is an essential aspect of aboriginal title and sovereignty over land. ANCSA extinguished aboriginal title in Alaska, as well as all claims based on aboriginal title. By taking land into trust in Alaska, the Secretary would be impermissibly resurrecting key elements of aboriginal title, which Congress completely extinguished in Alaska. Key elements of the State's sovereignty are challenged when land is placed into trust status, including the state's ability to tax,[61] and, potentially, the state's ability to manage its fish and game resources, protect the environment, provide public services, and ensure public safety.[62]

The understanding that tribal regulatory authority over land is one component of aboriginal title has been imbedded in the Supreme Court's decisions

_____

the Supreme Court's disposition of the case may provide direction or dispose of the question here as to whether taking land into trust would restore an extinguished element of aboriginal title.

[60]    Plaintiff tribes Chalkyitsik and Akiachak seek regulatory jurisdiction to enforce the village alcohol ban. Consol. Compl. paras. 27-36.

[61]    Section 5 mandates that land held in trust "shall be exempt from State and local taxation." 25 U.S.C. § 465. Such a special tax status would violate ANCSA's clear intent to not add to the categories of property enjoying special tax privileges. 43 U.S.C. § 1601(c).

[62]    There is dispute as to whether merely taking land that is outside of a reservation into trust under 25 U.S.C. 465 transforms it into Indian country. Compare *U.S. v. Roberts,* 185 F.3d 1125 (10th Cir. 1999) with *U.S. v. Stands*, 105 F.3d 1565 (8th Cir. 1997). However, Indian country status is clearly the result sought by some, if not all, of the plaintiffs.

since the earliest days of the nation's history. The Supreme Court held that, until

extinguished by the federal government, aboriginal title includes the right of tribes

"to use [the soil] according to their own discretion."[63]   Tribes were understood to

be "Indian nations," – "distinct political communities, having territorial

boundaries, *within which their authority [was] exclusive*, and having a right to all

the lands within those boundaries."[64]   Aboriginal title "is the treaty right of

occupancy with all its beneficial incidents."[65]  Within those lands, tribes

"possessed rights with which no state could interfere,"[66] including the authority to

exclude non-Indians.[67]  When they possessed unfettered aboriginal title, "[t]he

Indians had *command* of the lands and the waters, — *command* of all their

beneficial use…"[68]  The "command" of land – one of the "beneficial incidents" of

aboriginal title[69] – of necessity includes the right of tribes to regulate lands in

which aboriginal title has not been extinguished.

---

[63]     *Johnson v. McIntosh*, 21 U.S. (8 Wheat) 543, 574 (1823).

[64]     *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557 (1832) (emphasis added).

[65]     *Shoshone Tribe of Indians v. U.S.*, 299 U.S. 476, 496 (1937).

[66]     *Worcester*, 31 U.S. at 560.

[67]     *Id.* at 561.

[68]     *Winters v. U.S.,* 207 U.S. 564, 576 (1908) (emphasis added).

[69]     *Shoshone Tribe of Indians*, 299 U.S. at 496.

The broad scope of aboriginal title means that treaties between tribes and the United States are "not a grant of rights to the Indians, but a grant of right from them, — [and] a reservation of those not granted."[70]  Thus, continuing into the modern era, the Supreme Court has recognized that "Indian tribes within 'Indian country' . . . possess[] attributes of sovereignty over both their members *and their territory,*"[71] a sovereignty that includes "an inherent power necessary to tribal . . . territorial management."[72]

While "[t]he conceptual clarity"[73] of aboriginal tribal authority over Indian lands and those who enter upon them has been clouded since the earliest United States' court cases,[74] it is beyond dispute that the "geographic component to tribal sovereignty"[75] is derived from an aboriginal title that includes the exercise of tribal governmental authority over tribal land.  This governmental authority continues until aboriginal title is extinguished.

---

[70]    *United States v. Winans*, 198 US. 371, 381 (1905); *see also United States v. Skokomish Indian Tribe*, 764 F.2d 670, 671 (9th Cir. 1985) (recognizing that treaties reserved "pre-treaty" tribal rights).

[71]    *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (emphasis added)

[72]    *Merrion, id.* at 141.

[73]    *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973).

[74]    *See e.g., Nevada v. Hicks*, 533 U.S. 353, 358 (2001); *Montana v. United States*, 450 U.S. 544, 565 (1981).

[75]    *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 151 (1980)

For example, while the allotment and alienation of tribal lands have divested tribes of their inherent authority to regulate the activities of non-Indians on non-Indian fee-owned lands within a reservation, tribes retain inherent authority—derived from their aboriginal title—to engage in fish and game regulation of both Indians and non-Indians on reservation tribal lands and trust lands.[76] *Montana v. United States* is the "pathmarking case"[77] describing the general loss of tribal regulatory authority over the activities of non-Indians on non-Indian fee-owned lands within a reservation. *Montana* nevertheless confirms that a tribe's retained inherent power to regulate land use, a reserved aboriginal right, continues undisturbed on the portions of its reservation remaining in tribal ownership or in trust.[78] ANCSA, however, did not involve incremental reduction of rights based on aboriginal title: ANCSA comprehensively extinguished aboriginal title, and it extinguished all claims based on aboriginal title.[79]

*Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*[80] mandates a similar conclusion. While tribal authority to impose its own zoning regulation on land within the reservation that is owned in fee by non-

---

[76]    *Montana*, 450 U.S. at 557.

[77]    *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997).

[78]    *Montana*, 450 U.S. at 557.

[79]    43 U.S.C. § 1604(b)&(c).

[80]    492 U.S. 408 (1989).

members is limited, the tribe does retain, as an element of its inherent sovereignty, an enforceable right to prevent (through the entity vested with zoning power) development on the land that poses a threat to its political integrity, economic security, and health and welfare.[81]  In Alaska, however, all aboriginal title has been explicitly extinguished.  This includes the geographic component to Tribal sovereignty, the right to govern or regulate land.  It is this aspect of extinguished aboriginal title – tribal regulatory power over land – that Plaintiffs seek to revive by having land taken into trust.  The terms of ANCSA are explicit.   Section 465 cannot be read to delegate to the Secretary the power to resurrect an element of aboriginal title, that Congress has extinguished.

C.    **ANCSA Extinguished All Claims Based On Any Statute Relating to Native Use and Occupancy, Including Claims Based on Section 5 of the Indian Reorganization Act (IRA)**

Plaintiffs' claim of entitlement to have land taken into trust rests on section 5 of the Indian Reorganization Act ("section 5"), which provides:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, *for the purpose of providing land for Indians*.
>
> . . . .
>
> Title to any lands or rights acquired pursuant to this Act . . . *shall be taken in the name of the United States in trust for the Indian tribe or*

---

[81]    *Id.* at 430-31.

*individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.*[82]

The plain language of this statute conflicts with the settlement language of ANCSA declaring that the settlement should not result in the creation of a "reservation system" or "trusteeship" or add to the categories of property "enjoying special tax privileges."[83]  Moreover, the whole point of section 5 is to create trust land for the benefit of Indians.  This stated purpose to provide land for Indians puts it squarely within the scope of ANCSA's language extinguishing all claims that are based on any statute relating to Native use and occupancy.[84]  It is impossible to argue that section 5 is not a "statute relating to Native use and occupancy" when its stated purpose is "providing land for Indians."  Because section 5 was enacted "for the purpose of providing land for Indians," the statute relates to Native use and occupancy of the land.

In drafting ANCSA, Congress recognized that, in addition to occupying land based on claims of aboriginal title, Alaska Natives also possessed land in Alaska pursuant to statutory property rights, including those granted by the IRA:

*Another source of lands held by Alaska Natives by some means other than the right to possession of aboriginal occupancy* is the

---

[82]     25 U.S.C. § 465 (emphasis added).

[83]     43 U.S.C. § 1601(b).

[84]     43 U.S.C. § 1603(c).

Wheeler-Howard Act of 1934 [the IRA], the terms of which were extended to Alaska in 1936.[85]

Not only did Congress recognize that Alaska Natives could assert land claims under the IRA, but Congress included specific language in ANCSA § 4(c)[86] to discontinue land acquisition by Alaska Natives under the IRA.[87]

Plaintiffs explain in a footnote that the settlement language in ANCSA § 4(c) should be construed to limit the scope of the settlement to specific statutes addressing Native use and occupancy.[88]  However, Plaintiffs' own recitation of the legislative history of 43 U.S.C. § 1603(c) demonstrates that

---

[85]    Senate Rep. No. 92-405, 92nd Cong., 1st Sess., at 91 (Oct. 21, 1971) (emphasis added).

[86]    43 U.S.C. § 1603(c).

[87]    Senate Report No. 92-405, *supra* n.85, also states:
Some of the factors which the Committee considered in arriving at the present land grant provisions of S. 1830 are as follows: . . . (3) the desire to avoid the granting of huge land enclaves which could result in remote, land locked reservations rather than viable open communities.
Sen. Rep. 92-405, 92nd Cong. 1st Sess. , at 77 (Oct. 21, 1971).

[88]    *See* Pls.' Summ. J. Mem. at 7 n.8.  Plaintiffs' discussion regarding the relationship between *Carcieri* and the language of ANCSA § 4(c) is generally confusing.  *See* Pls.' Summ. J. Mem. at 4-8.  The Supreme Court may provide guidance for this case if it rules in *Carcieri* on the scope of the settlement language in the Rhode Island Indian Claims Settlement Act.  *See infra*, n.59.  The Supreme Court also may resolve *Carcieri* with an interpretation of the "now recognized" language in section 5, and not address the scope of the Rhode Island Indian Claims Settlement Act language at all.  This resolution to *Carcieri* would have little impact on this case.  *See infra*, n.96.  Regardless, the fact pertinent to this case is that ANCSA extinguished *all* land claims based on aboriginal title as well as claims to land based on a statute.

Congress progressed from referencing just two acts[89] in ANCSA's release language to the much broader final language involving "all claims . . . based on any statute or treaty of the United States relating to Native use and occupancy."[90] It is clear that Congress intended to extinguish *all* claims by Alaska Natives, as Alaska Natives, to land in Alaska, whether the claim originated from aboriginal title based on historic use and occupancy, or was based on a statutory property right.

## II.  The Prohibition Against Taking Land into Trust in Alaska does not Violate the Equal Protection Provisions of the Indian Reorganization Act

Plaintiffs argue that the plain language of 25 U.S.C. § 476(f) & (g) invalidates the bar to taking land into trust in Alaska.[91]  Section 476(f) prohibits "[d]epartments or agencies of the United States" from promulgating regulations or making any other determinations pursuant to any Act of Congress that "classifies, enhances, or diminishes the privileges and immunities available to" any Indian tribe "relative to other federally recognized tribes by virtue of their status as Indian tribes."  Similarly, section 476(g) nullifies any "regulation or administrative decision or determination of a department or agency" existing in 1994 (e.g., when

---

[89]    The Act of May 17, 1884 (23 Stat. 24) ("The Alaska Organic Act") and the Act of June 6, 1900 (31 Stat. 321).

[90]    43 U.S.C. § 1603(c).  *See* Pls.' Summ. J. Mem. at 7 n.8.

[91]    Pls. Summ. J. Mem. at 3.

§ 476(f) & (g) were enacted) that discriminates between tribes by virtue of their

status as tribes.  The land into trust regulation does not discriminate against Alaska

tribes "by virtue of their status as Indian tribes."  The land into trust regulation

distinguishes Alaska tribes as participants in a land claims settlement that prohibits

creation of trust lands in Alaska.  Second, 25 U.S.C. § 476(f) & (g) prohibit

*regulatory or administrative* action that discriminates between tribes because of

their status as tribes.[92]  The regulatory prohibition against taking land into trust in

Alaska simply restates a prohibition arising from statute, the Alaska Native Claims

Settlement Act.[93]  Sections 476(f) and (g) do not, and could not, limit Congress'

authority to discriminate among tribes through separate statutory settlements, like

ANCSA.  Nothing in sections 476(f) and (g) suggests that the Secretary may

restore rights to Alaska tribes that have been extinguished by Congress.

> Plaintiffs' arguments regarding section 476(f) and (g) are largely red
herrings that distract from the central legal issue in this case, which is whether

ANCSA precludes the Secretary from taking land into trust in Alaska.  Plaintiffs

argue at length that sections 476(f) & (g) apply to Alaska Natives because the

1936 IRA Amendments specifically extended section 476 of the IRA to Alaska

tribes, thereby empowering the Secretary to take land into trust for Alaska tribes

---

[92]    *See* discussion *infra*, pp. 34-40 identifying uncertainty as to the
specific regulatory or agency action giving rise to Plaintiffs' claims.

[93]    43 U.S.C. § 1601 *et seq.*

whether or not Alaska tribes were recognized and under federal jurisdiction in 1934.[94]  The applicability of the land into trust regulations to tribes not federally recognized in 1934 is a central issue in *Carcieri v. Kempthorne*,[95] currently pending before the Supreme Court.  In the context of this case, it is not ripe for determination.[96]

Sections 476(f) and (g) prohibit regulatory or administrative determinations by the Secretary that classify or diminish the privileges and immunities of any federally recognized tribe relative to other federally recognized tribes by virtue of their status as tribes.  Plaintiffs' arguments ignore the plain

---

[94]    *See* 25 U.S.C. 473a.

[95]    ___ U.S. ___, 128 S.Ct. 1443, 170 L.Ed.2d 274 (Feb. 25, 2008).

[96]    The issue of whether section 465 applies to tribes recognized after 1934 is not ripe for determination in this case.  "Indian," as it is used in section 465, means:

> all persons of Indian descent who are members of any recognized Indian tribe *now* under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any reservation, and shall further include all other persons of one-half or more Indian blood.  For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians.

25 U.S.C. § 479.  The issue in *Carcieri* is whether the use of the word "now" in the section 479 definition of "Indian" limits applicability of the statute to tribes that were recognized when the statute was enacted in 1934.  The Narragansett Indian Tribe, which is the tribe involved in *Carcieri*, was not federally recognized until 1983.  48 Fed. Reg., 6, 177 (Feb. 10, 1983).  At issue in this case is whether ANCSA prohibits the Secretary from taking land into trust behalf of *any* Alaska tribe, regardless of the date the tribe received federal recognition.

language of the statute.  Sections 476(f) and (g) prohibit the Secretary from

discriminating between federally recognized tribes "by virtue of their status as

Indian tribes."  The ANCSA ban does not discriminate between Alaska tribes and

other tribes "by virtue of their status as tribes."  The ban distinguishes Alaska

tribes from other tribes by virtue of their status as tribes subject to the ANCSA

land claims settlement.

These sections of the IRA were enacted in 1994—twenty-three years

after ANCSA—to clarify that the Secretary is not authorized to create categories

of federal recognition of tribes.  As stated by Senator John McCain, sponsor of

Senate Bill 1654, which added sections 476(f) and (g):

> In the past year, the Pascua Yagui Tribe of Arizona has brought to
> our attention the fact that the Department of the Interior has
> interpreted [section 476] to authorize the Secretary to categorize or
> classify Indian tribes as being either created or historic.  According
> to the Department, created tries are only authorized to exercise such
> powers of self-governance as the Secretary may confer on them.
>
> . . . .
>
> Over the years, the Federal Government has extended recognition to
> Indian tribes through treaties, executive orders, a course of dealing,
> decisions of the Federal courts, acts of Congress and administrative
> action.  Regardless of the method by which recognition was
> extended, all Indian tribes enjoy the same relationship with the
> United States and exercise the same inherent authority.[97]

---

[97]    140 Cong. Rec. S6144-03, S6146 (1994) (statement of Sen.
McCain), 1994 WL 196882 (Cong. Rec.).

Thus, sections 476(f) and (g) state that a tribe is either a federally recognized tribe or it is not; there are no categories of federal recognition. This issue of federal recognition of Alaska tribes is not at issue in this case. Nor is the issue of whether Alaska tribes are "historic" or "created" in the eyes of the Secretary. The issue is whether sections 476(f) and (g) overrule the Secretary's duty to respect and enforce legislative settlements of Native land claims. As shown above, they do not.

Plaintiffs also assert that the Tlingit-Haida Tribal Status Clarification Act[98] bolsters the equal protection provisions of the IRA.[99] While it is true that 25 U.S.C. § 1212(3) and (4) codify the principle of Congressional supremacy in determining the privileges and immunities of federally recognized Indian tribes, this point actually supports the State's argument that the Secretary is without discretion to take land into trust in Alaska because Congress enacted ANCSA, which prohibits it. Section 1212(4) of the Tlingit-Haida Tribal Status Clarification Act states: "the Secretary may not administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress."[100] Congress acted unequivocally in revoking reservations in Alaska, discontinuing individual trust acquisition authorities, and extinguishing all rights

---

[98]    25 U.S.C. § 1212.

[99]    Pls.' Summ. J. Mem. at 3-4.

[100]    25 U.S.C. § 1212(4).

and claims based on aboriginal title or based on any statute relating to Native use and occupancy. The Secretary therefore lacks administrative authority to create new trust land in Alaska.

The Alaska ban in the land into trust regulation is statutory in origin and is not prohibited regulatory or administrative action within the meaning of § 476(f) and (g). Under the Indian Commerce Clause of the Constitution,[101] Congress has plenary power to legislate on the subject of Indian tribes.[102] Congress has exercised this power in enacting ANCSA. Section 476(f), however, prohibits "*[d]epartments or agencies* of the United States" from promulgating any regulation or making any decision pursuant to the IRA that "classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes."[103] Section 476(g) nullifies "[a]ny *regulation or administrative decision or determination of a department or agency of the United States*" . . . that "classifies, enhances, or diminishes the privileges and immunities available to a federal recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes."[104] Congress

---

[101]    U.S. Const. art. I, § 8, cl. 3.

[102]    *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192 (1989).

[103]    25 U.S.C. § 476(f) (emphasis added).

[104]    25 U.S.C. § 476(g) (emphasis added).

legislated a distinction between Tribes in Alaska, which are subject to ANCSA, and Tribes elsewhere, which are not. The Secretary must recognize this distinction. Plaintiffs assume throughout their summary judgment memorandum that the ban on taking land into trust in Alaska is entirely a matter of the Secretary's discretion. As argued, *supra*, however, the ban implements congressional intent that trust land not exist in Alaska after enactment of ANCSA. The ban is statutory in origin. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[105]

## III. The Regulatory Prohibition Against Taking Land Into Trust in Alaska Does not Violate the Equal Protection Component of the Fifth Amendment Due Process Clause

Plaintiffs' constitutional equal protection argument, like Plaintiffs' section 476(f) & (g) arguments, is largely a decoy designed to distract attention from the fact that the prohibition against taking land into trust in Alaska carries out the will of Congress as expressed in ANCSA. As stated by Plaintiffs:

> Preliminarily, it must be noted that what is being attacked here is a regulation and not a statute. It is Congress that has the plenary and exclusive power over Indian tribes, and the Executive Branch must look to Congressional enactments as the sources for its authority. It is Congress that can select a certain tribe or tribes for termination of the government-to-government relationship, not the Executive Branch. Congress can diminish the privileges and immunities of

---

[105] *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984).

particular federally recognized tribes; the Executive Branch lacks inherent authority to do so in the absence of Congressional authorization.[106]

This is exactly the State's point: Congress exercised its plenary authority over Indian tribes when it enacted ANCSA and extinguished aboriginal title, including Tribal rights to jurisdiction over land, in Alaska. Congress authority includes the ability to "enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive."[107] The Secretary, as part of the Executive Branch, is without authority to contradict Congressional intent.

Plaintiffs argue that "[t]he regulatory bar was premised entirely on the 1978 Fredericks opinion," which has been withdrawn.[108] Plaintiffs continue to argue that "[i]t would be a legitimate governmental objective to word the regulation, or to maintain wording in the regulation, so that it conforms to a valid Solicitor's opinion—but with that Solicitor's opinion no longer extant, the legitimate governmental objective underlying the bar evaporates."[109] This argument impermissibly elevates the legal significance of a Solicitor's opinion over the will of Congress. ANCSA has not evaporated. ANCSA remains in force.

---

[106]    Pls.' Summ. J. Mem. at 11-12 (internal quotations and citations omitted).

[107]    *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500-01 (1979).

[108]    Pls.' Summ. J. Mem. at 12-13.

[109]    *Id.* at 13.

The prohibition against taking land into trust in Alaska bears a rational relationship to the provisions in ANCSA that extinguish aboriginal title, claims based upon aboriginal title, and claims based on any statute relating to native use and occupancy.[110]

## IV.    The Prohibition on Taking Land into Trust in Alaska is Not Arbitrary and Capricious Agency Action

It is unclear precisely which agency action by the Secretary might provide a legal basis for Plaintiffs' Administrative Procedure Act (APA)[111] claim. Plaintiffs argue that the prohibition on taking land into trust in Alaska represents arbitrary and capricious agency action in violation of APA section 706(2)(A),[112] yet this prohibition has been in place since the original (and current) land into trust regulation was promulgated in 1980.[113]  The original land into trust rule remains the current rule:  it has been in continuous effect since its promulgation.  The limitations period for any claim based on the existing rule expired long ago, in 1986.[114]  To avoid the limitations bar, claims pled by the Tribal Plaintiffs must have accrued on or after May 24, 2000; claims pled by Plaintiff Kavairlook must

---

[110]    43 U.S.C. § 1603(b) & (c).  *See Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335,1340 (D.C. Cir. 1998).

[111]    25 U.S.C. § 706(2)(A).

[112]    Pls.' Summ. J. Mem. at 14-26

[113]    AR 018-21.

[114]    28 U.S.C. § 2401(a).

have accrued on or after August 8, 2000.[115]  Withdrawal of the final rule (the

"withdrawn rule") on November 9, 2001[116] is the only "final" agency action that

falls within the limitations period.  What's puzzling about Plaintiffs' claims is that

the withdrawn rule contained the exact same prohibition as the current rule,

promulgated in 1980, against taking land into trust in Alaska.[117]  It's inconsistent

for Plaintiffs to complain about a withdrawn rule that, in pertinent part, was the

same as the rule it would have replaced.  The withdrawn rule did include a

statement that:

> [T]he position of the Department has long been, as a matter of law
> and policy, that Alaska Native lands ought not to be taken into trust.
> Therefore, the Department has determined that the prohibition in the
> existing regulations on taking Alaska lands into trust (other than
> Metlakatla) ought to remain in place for a period of three years
> during which time the Department will consider the legal and policy
> issues involved in determining whether the Department ought to
> remove the prohibition on taking Alaska lands into trust.  If the
> Department determines that the prohibition on taking lands into trust
> in Alaska should be lifted, notice and comment will be provided."[118]

Since publishing the withdrawn rule, the Secretary has provided no notice of any

determination that the prohibition on taking lands into trust in Alaska should be

---

[115]    Plaintiff Tribes filed their complaint on May 24, 2006 and Plaintiff
Kavairlook filed her complaint on August 8, 2006. *See* Complaint, Case No. 1:06-
CV-969 (RWR); Complaint, Case No. 1:06-CV-1405 (RWR).

[116]    AR 748, 750-51.

[117]    66 Fed. Reg. 3452, 3460; AR 00558.

[118]    AR 535.

lifted.  However, Plaintiffs do not sue to compel the Secretary to complete acting

on the 1994 petition for rulemaking.[119]  Nor do Plaintiffs sue to compel

reinstatement of the withdrawn rule.  Plaintiffs instead seek to invalidate the

original rule, promulgated twenty-eight years ago in 1980.

      Apparently to avoid this statute of limitations problem, Plaintiffs'

APA argument relies entirely on the premise that the Fredericks Opinion[120] was

the sole legal justification for the prohibition on taking land into trust in Alaska,[121]

and that any action by the Secretary in accordance with the withdrawn opinion is

therefore arbitrary, capricious, or otherwise not in accordance with law.[122]  As

discussed, *supra*, however, this argument confers too much legal authority on the

opinions of the Solicitor and too little legal authority on a federal statute, ANCSA.

The prohibition against taking land into trust is rationally related to implementing

the will of Congress, as expressed in ANCSA, that trust land not be created in

Alaska.

      Plaintiffs' own arguments reveal the precariousness of their claim:

    Plaintiffs will stipulate that the agency was aware it was changing its
    views by rescinding the Fredericks opinion, and that the agency

---

[119]    AR 272-96. 5 U.S.C. § 706(1) (providing a cause of action for agency action unlawfully withheld or unreasonably delayed).

[120]    AR 001-004.

[121]    Pls.' Summ. J. Mem. at 18.

[122]    *Id*. at 16-17, 18.

articulated permissible reasons therefore. *But it is obvious from this record that the new position is not consistent with the law.* The Fredericks opinion has been rescinded, and that constituted the sole basis for the imposition of the Alaska bar in the first place.[123]

First, rescission of a legal opinion does not constitute an agency "changing [of] views" that is actionable under the APA.[124] Second, the "new position" of the withdrawn rule is no different than the "old position" of the 1980 original rule. Since its enactment, ANCSA has not been amended in any way that implicates the Secretary's authority to take land into trust in Alaska.

Not only is the foundation of Plaintiffs' claims tenuous, at best, but so is their argument that rescission of the Fredericks opinion and internal agency discussion regarding the implications of the rescission indicates that the Secretary is acting contrary to law.[125] At less than one and a half pages, the Solicitor's memorandum rescinding the Fredericks opinion is decidedly brief. It expresses concern regarding the validity of the Fredericks opinion but performs no legal analysis regarding authority to take land into trust in Alaska and reaches no

---

[123]    *Id.* at 18 (emphasis added).

[124]    Plaintiffs assertion that the Fredericks opinion provides the only justification for the prohibition against taking land into trust in Alaska highlights the potential incompleteness of the agency record in this case. The record contains fewer than 20 pages of material regarding development of the 1980 rule. The State submits this memorandum as a would-be intervenor in this case, and therefore did not have the opportunity to participate as a party in discovery or file jurisdictional motions prior to seeking to address the case on the merits.

[125]    Pls.' Summ. J. Mem. at 26; Pls.' Stmt. Mat'l Facts at 11-14.

conclusions, other than the Fredericks opinion should be rescinded "so as not to encumber future discussions over whether the Secretary can, as a matter of law, and should, as a matter of policy, consider taking Native land in Alaska into trust."[126]  Far from demonstrating that the legal justification for the Alaska prohibition was untenable or in error, the rescission memorandum demonstrates that the Secretary had no justification for departing from the well-settled course of agency behavior[127] over nearly twenty years of interpreting ANCSA to prohibit trust acquisitions in Alaska.[128]  Furthermore, the January 19, 1993 Opinion of the Solicitor regarding Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers ("Sansonetti Opinion"), remains in force.[129]  It reaches the same conclusion that ANCSA extinguished the right of Alaska Tribes to exercise jurisdiction over land:

> Without a co-existing reservation system of tribal trust lands creating federal jurisdictional enclaves for tribes in Alaska, we are not convinced that the mere acquisition of lands in fee by a Native village confers upon such lands the status of Indian country.  Indian country depends primarily upon congressional, not tribal, intent.

---

[126]    AR 620.

[127]    An agency's longstanding interpretation carries more weight than an interpretation at odds with an earlier position, which is entitled to considerably less deference. *INS v. Cardoza-Fonseca*¸ 480 U.S. 446 n.30; *City of Angoon*, 803 F.2d at 1026 *Connecticut v. U.S.*, 228 F.2d at 93-94.

[128]    The land into trust regulations were initially promulgated in 1980. AR 18-21.

[129]    AR 130-269.

The ANCSA statutory scheme simply does not permit tribes to create Indian country in Alaska by unilateral action, nor by virtue of such tribal ownership to impose federal restrictions on the land that congress in ANCSA sought to avoid.  The declaration against a reservation system implemented by the 1971 Act and undiluted by any subsequent amendments, is simply too strong to square with the proposition that tribes in Alaska can create unilaterally what Congress sought so clearly to avoid.[130]

The footnote supporting this paragraph reads:

Our conclusion is consistent with the 1978 Acting Solicitor's conclusion discussed *supra* n. 276, that in light of Congress' clearly expressed intent in ANCSA, it would be an abuse of discretion for the Secretary to take lands in trust for Venetie and Arctic Village. To now conclude that the villages, by acquiring lands in fee, could essentially accomplish on their own what the Secretary cannot, is a proposition we cannot accept.[131]

The Sansonetti opinion consists of approximately 130 pages of documentation, legal research and analysis.[132]  It independently arrives at the same conclusion as the Fredericks opinion and this memorandum:  in enacting ANCSA, Congress intended to discontinue Native trust land in Alaska.[133]  It would be an abuse of the Secretary's discretion to act otherwise.

The cases cited by Plaintiffs are inapposite.  *Geller v. FCC* concerned the staleness of regulations developed to protect intellectual property

---

[130]    AR 122-23.

[131]    AR 123 n.296.

[132]    AR 130-267.

[133]    AR 122-23; AR 001-04.

rights of television programmers during development of new cable copyright legislation.[134] Once the new legislation was enacted, the justification for the rules no longer existed.[135] This case actually demonstrates the strength of the State's position here. In this case, there has been no change in the law that would render the Secretary's actions arbitrary, capricious, or in abuse of his discretion. ANCSA still is valid, and Plaintiffs do not challenge its validity in this action. Similarly, the quote Plaintiffs attribute to *United Steelworkers of America v. Marshall* addresses technical feasibility of attaining OSHA protection standards pertaining to toxic substances in mining.[136] There has been no change in the technical feasibility of implementing the land into trust regulations, nor has the technical feasibility of implementing the prohibition against taking land into trust in Alaska been diminished.

The regulatory prohibition against taking land into trust in Alaska implements the will of Congress and is not arbitrary, capricious, or otherwise in violation of law.

## CONCLUSION

As demonstrated in this memorandum, the regulatory prohibition against taking land into trust in Alaska manifests the will of Congress in enacting

---

[134]    610 F.2d 973, 974-75(D.C. Cir. 1979).

[135]    *Id.* at 980-81.

[136]    647 F.2d 1189, 1263-73 (D.C. Cir. 1980).

ANCSA. To hold otherwise would contravene Congressional intent and abrogate

the terms of ANCSA's settlement.  Plaintiffs' motion for summary judgment

should be denied.

DATED this 13th day of June, 2008.

TALIS J. COLBERG
ATTORNEY GENERAL


By:    /s/ J. Anne Nelson
       J. Anne Nelson
       Assistant Attorney General
       Alaska Bar No. 0705023

TALIS J. COLBERG
ATTORNEY GENERAL


By:    /s/ Elizabeth J. Barry
       Elizabeth J. Barry
       Assistant Attorney General
       Alaska Bar No. 9505023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AKIACHAK NATIVE COMMUNITY *et al.*, | ) ) ) |
| Plaintiffs | ) ) |
| v. | ) |
| DEPARTMENT OF THE INTERIOR, *et al.*., | ) ) ) |
| Defendants | ) ) ) |

No. 1:06-cv-00969 (RWR)

**STATE OF ALASKA'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY
JUDGMENT**

The State of Alaska ("State" or "Alaska") contends that the following facts

are undisputed and material to disposition of the State's cross-motion for summary

judgment:

1.    The Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §

1601 et seq., was enacted in 1971 and extinguishes: all aboriginal

titles and claims of aboriginal title, if any, in Alaska; all claims based

on claims of aboriginal right, title, use or occupancy of land in

Alaska; and all claims based on any statute or treaty relating to

Native use and occupancy.

2.    Plaintiffs are Alaska Natives and/or Alaska Tribes subject to

ANCSA.

3.    The Department of the Interior's ("Interior" or "Secretary") land into trust regulations were first proposed in July 1978.  43 Fed. Reg. 32311 (Jul. 19, 1978).

4.    Two months after the land into trust regulations were proposed, the Associate Solicitor for Indian Affairs issued an opinion on the effect of ANCSA on the Secretary's ability pursuant to section 5 of the Indian Reorganization Act to restore to trust status land held in fee by Alaska Natives.  The opinion concluded that "[t]he intent of Congress to permanently remove all Native lands in Alaska from trust status is unmistakable."  AR 001-004; Memorandum from Thomas W. Fredericks, Associate Solicitor for Indian Affairs, to Assistant Secretary for Indian Affairs (Sep. 15, 1978) ("Fredericks Opinion").

5.    The final rule was initially published on September 18, 1980, and included the following provision:

> These regulations do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its members.

The supplementary information accompanying the final rule explained that this provision was added because "the Alaska Native Claims Settlement Act does not contemplate the further acquisition of land in trust status in the State of Alaska" except for Metlakatla.

AR 018-21; 45 Fed. Reg. 62034, 62036 (Sep. 18, 1980).

6.    On January 19, 1993, then-Solicitor Thomas L. Sansonetti issued a 133-page legal Memorandum (the "Sansonetti opinion") to the Secretary on the subject "Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers." AR 130-269.

7.    The Sansonetti opinion has not been withdrawn.

8.    The Sansonetti opinion concludes that ANCSA prohibits the Secretary from taking land into trust in Alaska. AR 256-257.

9.    A petition for rule-making to the Secretary of Interior to Revise 25 C.F.R. § 151.1 to bring federally recognized Alaska Native Tribes within the scope of federal regulations authorizing the acquisition of land in trust status was submitted on October 11, 1994 by the Chilkoot Indian Association, the Native Village of Larsen Bay, and the Kenaitze Indian Tribe. AR 272-296.

10.    The Department of Interior proposed revisions to the land into trust rule in 1999. The proposed revisions maintained the prohibition against taking land into trust in Alaska. AR 355-70; 64 Fed. Reg. 17574, 17578 (Apr. 12, 1999).

11.    The Department of Interior published a final land into trust rule, which included significant revisions, on January 16, 2001. However, the final rule maintained the prohibition on taking land into trust in

Alaska and stated that "[t]he position of the Department has long been, as a matter of law and policy, that Alaska Native lands ought not to be taken into trust.  Therefore, the Department has determined that the prohibition in the existing regulations on taking Alaska lands into trust (other than Metlakatla) ought to remain in place for a period of three years during which time the Department will consider he legal and policy issues involved in determining whether the Department ought to remove the prohibition on taking Alaska lands into trust.  If the Department determines that the prohibition on taking lands into trust in Alaska should be lifted, notice and comment will be provided."  AR 585; 66 Fed. Reg. 3452, 3454 (Jan. 16, 2001).

12.   The Department never provided public notice and comment indicating that it had determined that the prohibition on taking lands into trust in Alaska should be lifted.

13.   The Solicitor also rescinded the Fredericks opinion on January 16, 2001.   AR 619-20; Memorandum from Solicitor John Leshy to Assistant Secretary, Indian Affairs (Jan. 16, 2001).

14.   The effective date of the revised final land into trust rule was delayed several times.  AR 627, 66 Fed. Reg. 8899 (Feb. 5, 2001);

66 Fed. Reg. 10815 (Feb. 20, 2001); AR 629, 66 Fed. Reg 19403 (Apr. 16, 2001); AR 744-46, 66 Fed. Reg. 42415 (Aug. 13, 2001).

15.    The revised final land into trust rule regulation was withdrawn on November 9, 2001 without ever having become effective.  AR 748-51; 66 Fed. Reg. 56608 (Nov. 9, 2001).

16.    The Federal Register notice withdrawing the revised final land into trust rule did not mention the prohibition on taking land into trust in Alaska, but cited concerns over several other aspects of the revised final rule.  AR 748, 750-51.

17.    The land into trust regulations published in 1980 are currently in effect and have been in effect continuously since they were promulgated.

18.    Since promulgation in 1980, the land into trust regulations have not applied to trust land acquisitions in the State of Alaska.

DATED this 13th day of June, 2008.

TALIS J. COLBERG
ATTORNEY GENERAL


By:    /s/ J. Anne Nelson
       J. Anne Nelson
       Assistant Attorney General
       Alaska Bar No. 0705023

TALIS J. COLBERG
ATTORNEY GENERAL


By:    /s/ Elizabeth J. Barry
       Elizabeth J. Barry
       Assistant Attorney General
       Alaska Bar No. 9505023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AKIACHAK NATIVE COMMUNITY <u>et al.</u>,<br><br>   Plaintiffs<br><br>   v.<br><br>DEPARTMENT OF THE INTERIOR, <u>et al.</u>.,<br><br>   Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

)    No. 1:06-cv-00969 (RWR)

**STATE OF ALASKA'S STATEMENT OF MATERIAL FACTS AS TO WHICH EXIST A GENUINE ISSUE NECESSARY TO BE LITIGATED**

The State of Alaska ("State" or "Alaska") submits in support of its opposition to Plaintiffs' motion for summary judgment the following statement of material facts as to which exist a genuine issue necessary to be litigated:

1. The State of Alaska does not dispute any of the material facts identified by Plaintiffs on page 1 of their Statement of Material Facts as to which Plaintiffs Contend There is no Genuine Issue ("Plaintiffs' Statement of Material Facts") [Dkt. No. 46-3]. The State makes this stipulation with reference to Plaintiffs' statement on page 2 of their Statement of Material Facts that "the foregoing are all the facts about the plaintiffs that this Court needs in order to undertake its legal analysis."

2. The State does not dispute the authenticity of any of the material in the Record that is cited by Plaintiffs in their Statement of Material Facts.

EXHIBIT A TO STATE OF ALASKA'S MOTION FOR LEAVE TO FILE
CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT     PAGE 1 OF 2

3.      The State incorporates by reference all admissions and denials to specific facts in its proposed answer, filed as an exhibit  [Dkt. No. 18-3] to the State's motion to intervene [Dkt. No. 18], to the extent Plaintiffs' Statement of Undisputed Facts repeats or relies on the factual allegations in the consolidated complaint [Dkt. No. 15].

4.      The State incorporates into this statement its statement of undisputed material fact in support of its cross-motion for summary judgment.

5.      For the purpose of not waiving its right to controvert statements that may be asserted in Plaintiffs' Statement of Undisputed Facts but do not appear to be factual, material or disputed at this time, the State disputes all statements of argument, opinion, or legal interpretation in Plaintiffs' Statement of Undisputed Facts.

DATED this 13th day of June, 2008.

TALIS J. COLBERG
ATTORNEY GENERAL

By:      /s/ J. Anne Nelson
         J. Anne Nelson
         Assistant Attorney General
         Alaska Bar No. 0705023

TALIS J. COLBERG
ATTORNEY GENERAL

By:      /s/ Elizabeth J. Barry
         Elizabeth J. Barry
         Assistant Attorney General
         Alaska Bar No. 9505023