UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AKIACHAK NATIVE COMMUNITY, <u>et al</u>., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:06-cv-0969 (RWR) |
| DEPARTMENT OF THE INTERIOR, <u>et al</u>., | ) ) ) ) | PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | ) ) | |

Introduction ............................................................................................................................1

I. The Opposition Memorandum's "Statutory and Legal Background" is incomplete
in some respects ....................................................................................................................2

II. The Administrative Record does not support Interior's Administrative Actions,
nor does it articulate fully informed reasons for its final determination..........................3

III. The Secretary's discretion is not unfettered and does not allow him to make arbitrary
distinctions among federally recognized tribes..................................................................6

IV. A "property interest" is not a necessary element of a showing of an equal protection
violation ...............................................................................................................................13

CONCLUSION........................................................................................................................15

Introduction

      The most significant point in the federal defendants' memorandum is the agreement that "the Secretary has both the authority and discretion to take lands within the State of Alaska into trust," (Doc. 55-2, page 17), making the case more straightforward.

    I.   <u>The Memorandum's "Statutory and Legal Background" is incomplete in some respects</u>

There are two points in the federal defendants' "Statutory and Legal Background" section of their opposition (Doc. 55-2, Fed. Opp. at pages 3-10)[1] with which Plaintiffs take issue.  First:

> Five years after ANCSA, Congress expressly repealed some statutes that applied to Alaska lands. Section 704(a) of the FLPMA of 1976, 90 Stat. 2792, expressly repealed Section 2 of the May 1, 1936 Act (formerly 25 U.S.C. § 496) and the May 31, 1938 Act (formerly 25 U.S.C. § 497). These statutes had authorized the Secretary to designate tracts of land in Alaska as Indian reservations (Section 2 of the 1936 Act) and to reserve tracts of land in Alaska for schools, hospitals, and other uses for Indians, Eskimos, and Aleuts (1938 Act). In contrast to the repeal of these laws specifically applicable in Alaska, Congress did not repeal 25 U.S.C. §465, an omission which was understandable because its reach was nationwide.

(Fed. Opp. at 8).  This is true as far as it goes, but omits mention of section *1* of the May 1, 1936 Act (a law "specifically applicable in Alaska"), codified at 25 U.S.C. §473a, that in fact made 25 U.S.C. §465 applicable in Alaska.  Thus, if Congress had wanted to make 25 U.S.C. §465 inapplicable in Alaska, repeal of 25 U.S.C. §465 itself would have been unnecessary and unlikely; repeal of 25 U.S.C. §473a would have been the necessary and likely step, and that is a step Congress has not taken at any point – not before ANCSA, not in ANCSA, not five years after ANCSA, not ever.

Second:

> It is noted that the Preamble does not refer to the 1978 Opinion, nor does it flatly say that ANCSA forbids acquisition of land in Alaska in trust.

(Fed. Opp. at 9 fn. 3).  The record contains no justification for the exclusion of Alaska other than the 1978 opinion, and in 1999 the Department explicitly noted that the 1980 regulatory Alaska ban had been included based on the Fredericks opinion.  AR 358-359, 64 Fed. Reg. 17577-17578 (Apr. 12, 1999) ("The regulatory bar to acquisition of title in trust for Alaska in the original version of these regulations was predicated on an opinion of the Associate Solicitor, Indian

---

[1] Plaintiffs will refer to Doc. 55-2 as "Fed. Opp."  Page numbers given in this memo will correspond to page numbers in the footer of the document, not the "blue" header page numbers.

Affairs ('Trust Land for the Natives of Venetie and Arctic Village,' September 15, 1978) …"

Thus, to the extent the memorandum implies that there may have been other legal rationales for the Alaska bar beyond the Fredericks opinion, that is unsupported by the record.

> II. The Administrative Record does not support Interior's Administrative Actions, nor does it articulate fully informed reasons for its final determination.

Defendant argues that "Interior's Administrative Actions are Fully Supported by the Administrative Record," Fed. Opp. at 13, and that the Secretary "considered the Chilkoot, et al. Petition and articulated fully informed reasons for Interior's final determination," Fed. Opp. at 14. The administrative record does not support this.[2] The Secretary's January 2001 decisions, although final as to the validity of the Fredericks opinion, did not constitute a final determination as to the regulatory bar, keeping it in place for a temporary period. And the Secretary's November 2001 determination, also of questionable finality since it promised an (as-yet-unrevealed) new regulation,[3] did not mention the regulatory bar at all, let alone articulating fully informed reasons for its continuation. The Secretary acknowledges that he was required to "identify and comment" on "major issues raised during the proceeding," Fed. Opp. at 15, but the Alaska ban, although clearly a "major issue raised during the proceeding," was neither identified nor commented upon in the November 2001 "final" determination. No "fully informed" reasons were articulated.

---

[2] It is not "the fact that Plaintiffs disagree with the conclusions drawn by the Assistant Secretary," Fed. Opp. at 13, but rather the fact that the conclusion drawn by the Department in the regulation itself is not in agreement with the conclusion drawn by the Department in rescinding the Fredericks opinion, that make the final determination arbitrary, capricious, an abuse of discretion, and contrary to law.

[3] No new rule has been published for comment in the Federal Register in the seven-plus years since then, and the record contains no indication that a new proposal is imminent.

Akiachak et al. v. Dept of Interior et al., 1:06-cv-969
Plaintiffs' Reply Memo re Summary Judgment, page 3

The Opposition is a bit misleading when it posits that "The Publication stated Interior's view that it was 'impracticable and inefficient' to only withdraw part of the Rule 'as the Bureau of Indian affairs needs clear direction and standards to process land into trust applications [in Alaska]'" (Fed. Opp. at 15). As the brackets indicate, the words "in Alaska" did not in fact appear in the Publication. And, in fact, the Interior Department listed those subjects on which it indicated it would need further deliberation, and the Alaska bar was not among them.[4]

The memorandum argues that the Court would be compelling the Secretary to institute rulemaking proceedings, which should be done only in "extremely rare" instances, because APA review of an agency decision to deny a rulemaking petition is "very narrow." Fed. Opp. at 14-15.[5] The record here reflects that the Secretary has already initiated rulemaking proceedings, putting a possible revision to the Alaska ban out for public comments in 1995, AR 299, and affirmatively opening up the regulation in its entirety for revision in 1999, AR 355. The rulemaking is still, based on the Secretary's public pronouncements, ongoing; in November 2001, when the Secretary decided to scrap the final regulation, he did not terminate the rulemaking, instead undertaking to come up with a new version following consideration of several additional concerns. A comparison of this to the opinions in the two cases cited by the Secretary clarifies that the Court should grant Plaintiffs the relief they seek here.

---

[4] These included:
- [A]pplications for housing or home site purposes to meet individual housing needs;
- the requirement of land use plans;
- the standards of review used in reaching a determination of whether to accept land into trust;
- the availability of applications for review; and
- the use of computer technology

[5] Citing *Williams Natural Gas Co. v. Federal Energy Reg. Comm'n*, 872 F.2d 438, 443, 450. (D.C. 1989) and *Ark. Power & Light Co. v. ICC*, 725 F.2d 716,723 (D.D.C. 1984).

In *Arkansas Power & Light Co. v. ICC*, 725 F.2d 716 (D.C. Cir. 1989), the ICC had denied plaintiffs' petition for a rulemaking to implement a specific statute Congress had enacted listing the factors the ICC was to consider in setting railroad shipping rates. The ICC announced that it would instead implement the statute by considering the Congressionally-mandated factors in its case-by-case adjudications of individual rate requests. The Court upheld the ICC decision. Importantly, (1) the ICC denied that a rulemaking was necessary, whereas here, the Secretary has consistently, since proposing new changes in 1999, taken the position that a rulemaking is indeed necessary; (2) the method approved by the Court in AP&L was implementation of Congressional intent, with no regulations, through case-by-case administrative adjudications to develop the law, whereas here the Secretary 's decision is to bar case-by-case adjudications of individual applications, through use of a categorical ban based on a Secretarially-imposed classification among federally recognized tribes, in contravention of Congressional intent.

In *Williams Natural Gas*, the court's ruling was in fact more helpful to plaintiffs' position than to that of defendants. The court noted that there is a "clear distinction between an agency's refusal to undertake a rulemaking (reviewable, if at all, under an exceedingly narrow standard), and its decision to terminate a docket after a substantial record has been compiled." Here, the Court is clearly faced with the latter situation.[6] The court further noted: "We do not believe that it is necessary to articulate a distinct intermediate standard for reviewing an agency's termination of an ongoing docket. We simply note that our application of the 'arbitrary and capricious' standard must be informed by our recognition that an agency's decision to retain the status quo

---

[6] In this instance, the Secretary's actions were in part a shift in policy (to rescind the Fredericks opinion) and in part a retention of the status quo (the maintenance of the "Alaska ban" in the regulations). The court in *Williams Gas* did not opine as to how a court's application of the "arbitrary and capricious" standard should be informed by recognition that the agency has purported to both change and retain the status quo on the same point, with no apparent harmonization of the inconsistency.

may be more easily defensible than a shift in policy would be." Notwithstanding the "more easily defensible" observation, the Court went on to reverse the administrative determination, finding that the explanations offered by the agency for its decision (explanations which, at least on the surface, sounded more compelling than those proffered by the Secretary here) did not provide an satisfactory explanation for termination of the docket. The Court reviewed one proffered reason which did parallel that offered by the Secretary here, i.e., that a new rulemaking could address the issue, but found it inadequate:

> Nor can we sustain the termination of this docket on the basis of the agency's statement that this problem may be dealt with in a future proceeding. [10] If the Commission's action is not otherwise sustainable, it cannot be upheld on the basis of a suggestion that the issue *might* be addressed at some indeterminate point in the future.

Thus, these two rulings, properly understood and applied here, cut against rather than in favor of upholding the Secretary's actions in this case.

### III. The Secretary's discretion is not unfettered and does not allow him to make arbitrary distinctions among federally recognized tribes.

From section II of the Opposition Memorandum (Fed. Opp. at 16):

> 25 C.F.R. § 151.1 cannot be read as an absolute prohibition on the Secretary's discretionary authority to take lands into trust in the State of Alaska. The regulation only excludes using those Part 151 regulations to take Alaska land in trust, and does not flatly prohibit the Secretary from taking Alaska land in trust outside of those regulations.

Were the Secretary to promulgate that position as policy, rather than positing it solely as a legal argument for upholding the regulations, then that could indeed make a major difference to the litigation. However, the difficulty with that passage is that it is not consistent with what is in the record. A similar point was made by one Interior official who noted:

> … as a Devil's advocate, I would point out that the existing 25 CFR §151.1 does not explicitly prohibit taking land in Alaska in trust; it just says that the Part 151 regulations don't apply. Arguably, the Secretary could take land in trust on the

Akiachak et al. v. Dept of Interior et al., 1:06-cv-969
Plaintiffs' Reply Memo re Summary Judgment, page 6

strength of the statute along, without amending the regs. He would just not have his own regs to guide him.

AR 808. But the author himself immediately disavowed this approach:

However, I see no advantage to such an interpretation. We want both the public process of an amendment to the regulations, and the useful substantive guidance that the regs afford, as we step off this cliff.

AR 808-809. And it does not appear that anyone else within the Department took a position endorsing this approach, at least from what appears in the record. Indeed, the record subsequent to this "Devil's Advocate" passage reinforces the notion that the regulations do constitute a "bar" to taking land into trust in Alaska.[7] Most recently, the opposition memo itself states that "the final rules promulgated on January 16, 2001 that provided for Secretarial review of land-into-trust petitions in Alaska were withdrawn in November 2001 (66 Fed. Reg. 56608 (Nov. 9, 2001)), *the effect of which was to leave in place the original regulations, 25 C.F.R. § 151.1, and the ban on acquiring land in trust in Alaska*" (Fed. Opp. at 14) (emphasis added). Either there is a ban, or there isn't.

As far as Plaintiffs are concerned, the Secretary can proceed either by amending 25 CFR 151 to remove the Alaskan ban, or by conceding that he must consider Alaska petitions outside the ambit of 25 CFR 151. What he cannot do is continue the present self-contradictory situation, keeping in place a regulatory "limitation" premised on reasoning he has now rejected.[8]

---

[7] AR 822 ("The preamble continues on to invite public comment on …, apparently, whether the current Alaska bar should continue"); AR 888 ("In the meantime, of course, we have published proposed revised regs, including the cited discussion indicating a conscious decision not to change the policy of not taking land in trust for Alaska Native tribes or individuals"); AR 891 ("The final regs kept in place the ban on taking lands into trust in Alaska for a period of three years during which time the Dept. will consider whether the ban on Alaska trust lands should stay in effect … Since the effective date was extended the current regs are in place and those regs preclude acquisition of trust lands in AK");

[8] The brief takes a side trip to note that Ms. Kavairlook's petition will require a determination of "how such regulations apply," given that there are no reservations in Alaska save Metlakatla, and

Akiachak et al. v. Dept of Interior et al., 1:06-cv-969
Plaintiffs' Reply Memo re Summary Judgment, page 7

    IV.    <u>The Secretary's discretion is not unfettered and does not allow him to make arbitrary distinctions among federally recognized tribes.</u>

In section III, responding to the prohibitions in 25 USC 476(f) and (g). the Department's memo makes two arguments: first, that the legislative history indicates that Congress intended in 1994 to amend section 16 and not section 5 of the IRA, and second, that the Secretary must determine whether Alaska tribes are "similarly situated" to other federally recognized tribes.

It is correct that Congress amended section 16, but that was because section 16 was the section within which the Department had, erroneously in the view of Congress, found that it had the authority to make classifications among tribes. Congress amended section 16 to make it clear that the Department could not do so. Congress did not need to amend section 5. The amendments to section 16 accomplished this; it was unnecessary to amend section 5 as well, or any other IRA sections. Nothing in the text of the amendment or in the legislative history indicates that Congress intended for the Secretary to remain free to create classifications of tribes for some purposes while prohibiting it for others.

For its second argument, the memorandum starts by acknowledging that the 1994 amendments do constitute "an indication of congressional intent that unless authorized or directed by statute, Interior may not, though administrative action, classify, enhance or diminish

---

that individual land-into-trust petitions generally require that the land be either located within the boundaries of or adjacent to a reservation, or be already in trust or restricted status. Without taking this Court into areas that are not pertinent to the narrow issue before it, Ms. Kavairlook points out that the regulations contemplate that, where there has been a final judicial determination that a reservation has been disestablished or diminished, "reservation" means that land within the former reservation, 25 CFR 151.2(f). The Secretary did in fact set aside land for a reservation for Barrow from 1946 (11 Fed. Register 1459 (Aug. 14, 1946)) to 1959 (24 Fed. Register 6872 (Aug. 25, 1959).

  The Opposition Memo also makes a "good faith efforts" argument, Fed. Opp. at 16, although acknowledging that the case upon which they rely did still entitle the plaintiffs in that case to a timetable for agency action, which is more than plaintiffs have in this case. Setting field sanitation health and safety standards for the agricultural industry could indeed be a complex and time-consuming task; removing the invidiously discriminatory "Alaska ban" need not be.

Akiachak et al. v. Dept of Interior et al., 1:06-cv-969
Plaintiffs' Reply Memo re Summary Judgment, page 8

the privileges and immunities available to an Indian tribe under 25 U.S.C. § 476 relative to other similarly situated federally recognized tribes," going on to argue that the Secretary has in effect concluded that the Alaskan Natives are not "similarly situated" in relation to other federally recognized tribes for land-into-trust purposes.

First, it is important to note that the phrase "similarly situated" is the Department's own; it does not appear in the statute. Indeed, if the statute did allow the Secretary to determine which tribes were and were not "similarly situated," it would have missed its mark entirely; the Department could have continued to draw whatever distinctions it previously did, by finding that some tribes were not "similarly situated" to others. That is exactly what the Department had done, in deciding that "created" tribes were not similarly situated to "historic" tribes, leading Congress to enact the amendment. The sole issue is whether *Congress itself* has taken a particular prerogative away from a tribe.[9] The Secretary cannot.

The memorandum argues that ANCSA is a statute that does "classify, enhance or diminish the privileges or immunities available to an Indian tribe relative to other similarly situated Indian tribes." This is not correct. ANCSA required that corporations be formed, separate and apart from tribal governments. As one of its prime architects has noted:

> ANCSA was and is a land settlement. It did not terminate the special relationship between Alaska Natives from the Federal Government or resolve any questions concerning the governmental status, if any, of various Native groups.
>
> There's not one reference to sovereignty in ANCSA or in the 1971 Conference report. The Act's declaration of settlement is very clear. It extinguishes aboriginal claims of settlement and aboriginal hunting and fishing rights, and nothing more or less.

---

[9] The opposition memo cites several instances where Congress has extended state civil and criminal jurisdiction to particular states over the territories of particular tribes, Fed. Opp. at 20, none of which are relevant here. The one Congressional enactment that would be relevant here is P.L. 280, in which Congress mandated certain states to exercise state criminal and civil jurisdiction within the Indian country inside those states. Alaska is a mandatory P.L. 280 state.

Hearings on S. 2065 before the Subcommittee on Public Lands of the Senate Committee on Energy and Natural Resources, 99th Cong., 2d Sess. 329 (1986) (statement of Sen. Stevens).

Next, it is important to note that the Secretary has affirmatively stated, well after ANCSA was passed, that federally recognized tribes in Alaska are in fact entitled to the same privileges as their counterparts in the contiguous 48 states:

> The purpose of the current publication is to publish an Alaska list of entities conforming to the intent of 25 C.F.R. §83.6(b) and to eliminate any doubt as to the Department's intention by expressly and unequivocally acknowledging that the Department has determined that the villages and regional tribes listed below are distinctly Native communities and have the same status as tribes in the contiguous 48 states. Such acknowledgement of tribal existence by the Department is a prerequisite to the protection, services, and benefits from the Federal Government available to Indian tribes. This list is published to clarify that the villages and regional tribes listed below are not simply eligible for services, or recognized as tribes for certain narrow purposes. Rather, they have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; *are entitled to the same protection, immunities, privileges as other acknowledged tribes;* have the right, subject to principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes.

58 Fed. Reg. 54364, 54369 (October 21, 1993).

After discussing ANCSA itself, the memo then turns to post-ANCSA amendments, asserting that "it may be argued"[10] that taking land in trust under the IRA is "inconsistent with the purpose underlying federal legislation providing special protection of property interests of Alaska Native Corporations," Fed. Opp. at 21.

But the property interests of Alaska Native Corporations are not the subject here, so there is no inconsistency in giving effect both to the IRA and to the federal legislation cited by the Memo. It is not Alaska Native Corporations that are seeking to have land taken into trust under the IRA, and indeed, no Alaska Native Corporation would be eligible to do so. ANCSA

---

[10] The use of the passive voice – "it may be argued" - leaves it ambiguous as to whether the Department is arguing this or not.

Corporations are neither federally recognized tribes nor individual Natives, and as such, without a Congressional amendment treating ANCSA Corporations as Tribes for purposes of the IRA,[11] the land-into-trust provisions are not available to ANCSA Corporations. Thus, the ANCSA amendments relied upon by the Memorandum,[12] counteracting ANCSA's original premises of fee simple ownership and alienability of ANCSA lands by ANCSA Corporations, may reveal a good deal about ANCSA, but nothing about the IRA. Congress has decided that ANCSA as originally enacted contained insufficient protection for the corporations' land and stock, and has increased those protections over the years, through a series of amendments to ANCSA, each of which constituted an adjustment to ANCSA's original vision. The vision that ANCSA stock would become freely alienable after 20 years gave way to a permanent restriction on the alienability of stock unless the corporation's shareholders voted otherwise. The vision that ANCSA Corporations would own their lands in fee simple gave way to a "land bank" under which undeveloped lands were permanently protected from property taxes, adverse possession, and court judgments. ANCSA Corporations were given special exemptions from the federal securities laws, and a special exemption from the Tax Reform Act of 1986 enabling them, uniquely, to sell their net operating losses to highly profitable companies. Congress recognized in each such amendment that there was a necessity for such measures, even though they might have been considered too paternalistic or otherwise inappropriate at the time ANCSA was originally enacted.[13]

---

[11] When Congress does so, it does so explicitly. See, e.g., 25 U.S.C. §450b(e), the definitions section of the Indian Self-Determination Act, which explicitly includes ANCSA village and regional corporations within the definition of "Indian tribe" for purposes of that statute.

[12] Fed. Opp. at 22.

[13] See generally D. Case and D. Voluck, Alaska Natives and American Laws (2d ed. 2002), p. 168-185.

But none of these changes to ANCSA are in any way inconsistent with a request that land be taken into trust for any of the plaintiffs, none of whom are Alaska Native Corporations.[14] Four plaintiffs are Alaska tribal governments, separate and distinct entities from Alaska Village Corporations created under ANCSA,[15] and one is an individual Alaska Native.[16] The ANCSA amendments to enact special protections for ANCSA Corporations neither compel nor refute Secretarial authority to consider petitions for land-into-trust status by the federally recognized tribes and individual tribal members who are eligible to submit them. Plaintiffs would posit that Congress's recognition that the trust-like traits are beneficial and necessary and should be applied to ANCSA lands, if anything, bolsters the case that the Secretary can consider petitions for land-into-trust status by Alaska tribal governments and tribal members; but it is not necessary to go that far. All that need be said is this: whoever it is who "may be arguing" that Congress, by amending ANCSA to protect ANCSA lands held by ANCSA Corporations, somehow signaled an intent to eliminate the possibility that (non-ANCSA) tribal governments and tribal members could seek protection for their own lands, is wrong.

---

[14] And, as the State has previously pointed out, Doc. 18-2, page 5 (State's Memorandum of Points and Authorities in Support of Motion to Intervene), none of the lands which plaintiffs have specified in this complaint are ANCSA lands: "Plaintiffs' claims, however, involve lands that were not ANCSA conveyances."

[15] The Department has since 1993 acknowledged the clear distinction between ANCSA Corporations and federally recognized tribes in Alaska. In the preamble to the listing of federally recognized tribes in 1993, the Department noted the confusion it had caused by including ANCSA Corporations in its 1988 listing. It noted that ANCSA Corporations, although included as "tribes" for purposes of some specific federal laws, nonetheless "are not governments" and "lack tribal status in a political sense," and thus were not included on the 1993 (and subsequent) listings. 58 Fed. Reg. 54364, 54365 (Oct. 21, 1993).

[16] And the record contains no information about what if any Alaska Native Corporation stock, Village or Regional, she may have.

One last point: even if this reasoning had any validity to it, the Federal Defendants' memorandum gives no citations to the record to support this view. As such, it is at most a post-hoc rationalization for the continuation of the discriminatory regulatory bar.[17]

Congress in enacting ANCSA knew how to repeal other statutes. ANCSA did repeal the Alaska Native Allotment Act, through explicit language.[18] It did not repeal section 1 of the 1936 Alaska IRA. Congress in post-ANCSA enactments also knew how to repeal other statutes, as it demonstrated in 1976 by repealing section 2 of the 1936 Alaska IRA, again without repealing section 1 of the Alaska IRA. Neither ANCSA nor any post-ANCSA amendment justifies a conclusion to the contrary. The Secretary's discretion to accept land-into-trust under the IRA does not authorize him to make arbitrary distinctions, particularly when those distinctions are in violation of the terms of the IRA itself.

IV.  A "property interest" is not a necessary element of a showing of an equal protection violation.

The federal defendants' memorandum makes two arguments in section IV on the constitutional argument: (A) that the procedures used in withdrawing the January 2001 regulation were procedurally proper, and (B) that the plaintiffs have failed to show any "property interest" meriting due process protection.

These arguments miss the point that the Plaintiffs are arguing that their *equal protection* rights are being violated, not their *procedural due process* rights. None of the cases counsel has found in which a Fifth Amendment equal protection argument has been considered has indicated

---

[17] Post hoc rationalizations advanced to remedy inadequacies in the agency's record or its explanation are bootless. *City of Brookings Mun. Tel.Co. v. FCC*, 822 F.2d 1153, 1165 (D.C.Cir. 1987).

[18] 43 U.S.C. §1617 (repealing Alaska Native Allotment Act, and revoking Secretarial authority under the General Allotment Act within Alaska, with a savings clause for pending applications).

that a "property interest" is a necessary part of the equal protection claim, by the United States Supreme Court[19] or the Circuit Court for the District of Columbia.[20]

The opposition memorandum argues that "Plaintiffs' claims are akin to an applicant for benefits, 'as distinct from [one] already receiving' benefits and possessing a 'legitimate claim of entitlement protected by the Due Process Clause' … Moreover none of the cases Plaintiffs cite in support of their due process argument stand for the proposition that a party has a due process/equal protection right to a property interest which has not been received." (Fed. Opp. at 24). The case of *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) supplies what defendants apparently feel is a critical gap. In that case, the Supreme Court struck down a Civil Service Commission regulation barring noncitizens, including lawfully admitted resident aliens, from employment in the federal competitive civil service, as depriving such residents of liberty without due process of law in violation of the Fifth Amendment. Since the plaintiffs were would-be applicants barred from applying by their lawful resident alien status, the argument raised by defendants here would clearly have resulted in dismissal for lack of a property interest to be protected by due process. But the fact that the plaintiffs had no cognizable property interest in potential employment was not a barrier to the Court's holding. See also *Jiminez v. Weinberger*, 417 U.S. 628 (1974) (illegitimate children able to apply for dependents' benefits under Social Security).

---

[19] Some cases indicate that a violation of equal protection represents an invasion of a "liberty interest" protected by the Fifth Amendment's due process clause. See, *e.g., Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). Others straightforwardly apply equal protection analysis to federal governmental actions without discussing whether there is any liberty or property interest to be protected under the due process clause, *e.g., Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2 (1975);. *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

[20] *Tucker v. Branker*, 142 F.3d 1294 (D.C.Cir. 1998).

Akiachak et al. v. Dept of Interior et al., 1:06-cv-969
Plaintiffs' Reply Memo re Summary Judgment, page 14

An example of a case concretely showing that the lack of a property or liberty interest is no bar to an equal protection claim under the Fifth Amendment's due process clause is *Matthews v. Hesburgh*, 504 F.Supp. 108 (D.D.C. 1980). Matthews alleged that his termination from a federal position had been done without a hearing in violation of his procedural due process, and for racial reasons in violation of the equal protection component of the due process clause. The court, after an extensive discussion, dismissed his procedural due process claims on summary judgment, finding that he had not established either a property interest in continued employment or a liberty interest in seeking other employment. With respect to the equal protection claim, however, the court found that he had raised a genuine issue of material fact requiring a trial. If the federal defendants' argument here were valid, then Matthews's equal protection claim would have been dismissed as well for lack of a property or liberty interest. But it is not valid; a property interest is not a prerequisite to equal protection analysis.

CONCLUSION

Most crucially, the Federal Defendants' Memorandum acknowledges that the Secretary has the authority and discretion to take lands in Alaska into trust. The Memorandum also acknowledges that the 1994 IRA Amendments do constitute an indication of congressional intent that Interior may not, though administrative action, classify, enhance or diminish the privileges and immunities available to an Indian tribe under 25 U.S.C. § 476. There is not much more that the Court needs to resolve to rule in plaintiffs' favor on all three bases – the APA, the IRA anti-discrimination provisions, and equal protection.

As to the APA, the record demonstrates that the Interior Department had only one rationale for the "Alaska bar," i.e., the Fredericks opinion; any other rationales have been

supplied after the fact. No informed explanation was given for maintaining the discriminatory regulation once the Fredericks opinion was rescinded.

As to 25 USC §476(f) and (g), only Congress, not the Secretary, can eliminate a privilege accorded to a particular federally recognized tribe or set of tribes. With regard to the privilege of requesting that land be taken into trust, Congress did not remove that privilege in ANCSA or any post-ANCSA amendment, and the Secretary's rationale that he can extrapolate from ANCSA that federally recognized tribes are not "similarly situated" is an incorrect interpretation, not only of the IRA, but of ANCSA.

As to equal protection, the Secretary's sole argument is that plaintiffs have not shown a "property interest," which is not a requirement of a showing of an equal protection violation.

The Court should direct the Department of the Interior to discontinue its discriminatory and illegal policy of refusing to accept petitions to take land into trust in Alaska.

Respectfully submitted this 24th day of June, 2008.

>/s/ Heather Kendall Miller
>Alaska Bar No. 9211084
>NATIVE AMERICAN RIGHTS FUND
>420 L Str. Suite 505
>Anchorage, Alaska 99517
>Telephone: (907) 276-0680
>Facsimile: (907) 276-2466
>Email: kendall@narf.org

>/s/ Andrew Harrington
>Alaska Bar No. 9106026
>Denise Bakewell
>California Bar No. 208660
>ALASKA LEGAL SERVICES CORPORATION
>1648 South Cushman, Suite 300
>Fairbanks, Alaska 99701
>Telephone: (907) 452-5181
>Facsimile: (907) 456-6359
>Email: aharrington@alsc-law.org

/s/ Richard A. Guest
D.C. Bar No. 477572
NATIVE AMERICAN RIGHTS FUND
1712 N/ Street, N.W.
Washington, D.C. 20036
(202) 785-4166

Attorneys for Plaintiffs