## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**AKIACHAK NATIVE COMMUNITY,**
**et al.,**

                    **Plaintiffs,**

         **v.**

**KENNETH SALAZAR,**
**Secretary of the Interior, et al.,**

                 **Defendants,**

         **and**

**THE STATE OF ALASKA,**

                **Intervenor.**

</td><td>

Civil Action 06-969  (RC)

</td></tr>
</table>

## MEMORANDUM OPINION

Four tribes of Alaska Natives and one individual Native brought this suit to challenge the Secretary of the Interior's decision to leave in place a regulation that treats Alaska Natives differently from other native peoples.  The challenged regulation governs the taking of land into trust under Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465; it provides that, with one exception, the regulatory procedures "do not cover the acquisition of land in trust status in the State of Alaska."  25 C.F.R. § 151.1.  The plaintiffs argue that this exclusion of Alaska Natives—and only Alaska Natives—from the land-into-trust application process is void under 25 U.S.C. § 476(g), which nullifies regulations that discriminate among Indian tribes.  The State of Alaska has intervened to argue that the differential treatment is required by the Alaska Native Claims Settlement Act ("ANCSA" or the "Claims Settlement Act"), which (on the State's account) deprived the Secretary of the statutory authority to take most Alaska land into trust.

The Secretary disagrees, but nonetheless seeks to justify the regulation by reference to ANCSA. For the reasons explained below, the court concludes that the Secretary retains his statutory authority to take land into trust on behalf of all Alaska Natives, and that his decision to maintain the exclusion of most Natives from the land-into-trust regulation violates 25 U.S.C. § 476(g), which provides that contrary regulations "shall have no force or effect." The court therefore grants summary judgment to the plaintiffs, and orders additional briefing on the question of the proper remedy.

## I. BACKGROUND

The land claims of Alaska Natives remained unresolved for the first century of our history in Alaska. The Treaty of Cession, by which Russia conveyed Alaska to the United States, provided that "[t]he uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country." Treaty of Cession, U.S.-Russia, art. 3, Mar. 30, 1867, 15 Stat. 542. When the Organic Act of 1884 established a civil government in Alaska, it also declared "[t]hat the Indians or other persons in said district [that is, the Territory of Alaska] shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them." Organic Act of 1884, § 8, 23 Stat. 24, 26. However, the establishment of "the terms under which such persons may acquire title to such lands" was "reserved for future legislation by Congress." *Id.* The Supreme Court has explained that both the Organic Act of 1884 and the Act of June 6, 1900, 31 Stat. 321, were "intended . . . to retain the *status quo*" regarding the land claims of Alaska Natives "until further congressional or judicial action was taken." *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 278 (1955).

2

Congress enacted a series of laws providing land for Alaska Natives without resolving their claims of aboriginal right.  A reservation was established by Congress in 1891 for the Metlakatla Indians, who had recently moved to Alaska from British Columbia.  *See Metlakatla Indians v. Egan*, 369 U.S. 45, 48 (1962).  In the years that followed, other reserves were established by executive order.  *See* Cohen's Handbook of Federal Indian Law § 4.07[3][b][iii], at 337–38 (Nell Jessup Newton ed., 2012); David S. Case & David A. Voluck, Alaska Natives and American Laws 81–110 (3d ed. 2012) (both discussing the history of reservation policy in Alaska).  While those reserves were being established, Congress enacted Alaska Native Allotment Act, Pub. L. No. 59-171, 34 Stat. 197 (1906), and the Alaska Native Townsite Act, Pub. L. No. 69-280, 44 Stat. 629 (1926).  The Allotment Act allowed Alaska Natives to acquire title to as much as one hundred and sixty acres of land that they used and occupied, while the Townsite Act "provid[ed] for the patenting of lots within Native townsites ."  *United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1015 (D. Alaska 1977), *aff'd* 612 F.2d 1132 (9th Cir. 1980).  "Both acts placed restrictions on the title conveyed so that lands could not be alienated or taxed until . . . certain federally prescribed conditions were met."  Case & Voluck at 113; *see also Atlantic Richfield*, 435 F. Supp. at 1015 ("Native townsite residents received a restricted deed, inalienable except by permission of the townsite trustee.").

In 1934, Congress enacted the Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984.  Section 5 of the IRA provided that:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . within or without existing reservations, including trust or otherwise restricted allotments . . . for the purpose of providing land for Indians.

48 Stat. 985 (codified at 25 U.S.C. § 465).  At the time of its enactment, Section 5 was inapplicable "to any of the Territories, colonies, or insular possessions of the United States," 48 Stat. 986 (codified at 25 U.S.C. § 473), but it was extended to the Territory of Alaska two years later, Act of May 1, 1936, Pub. L. No. 74-538, § 1, 49 Stat. 1250 (codified at 25 U.S.C. § 473a). That enactment also authorized the Secretary to designate reservations on certain Alaska lands. *Id.* § 2, 49 Stat. 1250–51.  Seven reservations were established under that authority, *see* COHEN'S HANDBOOK § 4.07[3][b][iii], at 338, and three properties containing canneries were also taken into trust on behalf of Alaska Natives, AR 246 (Memorandum from Thomas L. Sansonetti, Solicitor, Department of the Interior ("Sansonetti Memo.") at 112 n.277 (Jan. 11, 1993)).

In 1971, Congress enacted the Alaska Native Claims Settlement Act, Pub. L. No. 92-203, § 2(b), 85 Stat. 688, "a comprehensive statute designed to settle all land claims by Alaska Natives," *Alaska v. Native Village of Venetie*, 522 U.S. 520, 523 (1998).  Congress declared its intention that,

> the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska[.]

ANCSA, § 2(b), 85 Stat. 688 (codified at 43 U.S.C. § 1601(b)).  To that end, the Claims Settlement Act "revoked 'the various reserves set aside . . . for Native use' by legislative or

4

Executive action, except for the Annette Island Reserve inhabited by the Metlakatla Indians, and

completely extinguished all aboriginal claims to Alaska land." *Venetie*, 522 U.S. at 524 (citing

ANCSA, § 4 and quoting *id.*, § 19(a) (codified at 43 U.S.C. §§ 1603, 1618(a))).  The terms of the

extinguishment were as follows:

> All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and
> occupancy . . . are hereby extinguished. . . .

> All claims against the United States, the State [of Alaska], and all other persons that
> are based on claims of aboriginal right, title, use, or occupancy of land or water areas
> in Alaska, or that are based on any statute or treaty of the United States relating to
> Native use and occupancy . . . are hereby extinguished.

ANCSA, § 4(b)–(c) (codified at 43 U.S.C. § 1603(b)–(c)).  "In return, Congress authorized the

transfer of $962.5 million in state and federal funds and approximately 44 million acres of

Alaska land to state-chartered private business corporations that were to be formed pursuant to

the statute; all of the shareholders of these corporations were required to be Alaska Natives."

*Venetie*, 522 U.S. at 524 (citing ANCSA, §§ 6, 8, 14 (codified at 43 U.S.C. §§ 1605, 1607,

1613)).  "The ANCSA corporations received title to the transferred land in fee simple, and no

federal restrictions applied to subsequent land transfers by them."  *Id.*  The Alaska Native tribes

did not receive either land or money in the settlement; rather, their members received stock in

the Native-owned corporations that received settlement land and funds.  In that way, ANCSA

"attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land;

it attempted to leave them as sovereign entities for some purposes, but as sovereigns without

territorial reach."  *Venetie*, 522 U.S. at 526 (quoting *Venetie*, 101 F.3d 1286, 1303 (9th Cir.

1996) (Fernandez, J., concurring)).

ANCSA repealed the Allotment Act, although the Secretary retained the power to

process pending applications.  ANCSA, § 18(a) (codified at 43 U.S.C. § 1617(a)).  Five years

later, Congress and the President enacted the Federal Land Policy and Management Act of 1976

("FLPMA"), Pub. L. No. 94-579, 90 Stat. 2743, which repealed both the Townsite Act and

Section 2 of the Act of May 1, 1936, 49 Stat. 1250–51, which authorized the Secretary to

establish reservations in Alaska.  *See* FLPMA § 704(a), 90 Stat. 2792.  FLPMA did not repeal

Section 1 of the 1936 Act, 49 Stat. 1250 (codified at 25 U.S.C. § 473a), which (among other

provisions) authorized the Secretary to take Alaska land into trust on behalf of Alaska Natives.

In the years after the Claims Settlement Act, the question arose whether the Secretary's

land-into-trust authority had survived ANCSA and FLPMA, or whether one or both of those

statutes had withdrawn a portion of that power.  In 1978, the Secretary proposed a regulation to

govern the taking of land into trust; the proposed rule made no special mention of Alaska.  *See*

Land Acquisitions, 43 Fed. Reg. 32,311 (July 19, 1978).  Several months after that proposed rule

was published, the Associate Solicitor for Indian Affairs signed an opinion letter addressing the

question of whether the Secretary could take former reservation land into trust.  The Associate

Solicitor concluded that, in light of the Claims Settlement Act, "it would . . . be an abuse of the

Secretary's discretion to attempt to use Section 5 of the IRA (which, along with §§ 1, 7, 8, 15,

and 17 of the IRA still apply to Alaska pursuant to the unrepealed portion of the Act of May 1,

1936) to restore the former Venetie Reserve to trust status."  AR 3 (Memorandum from Thomas

W. Fredericks, Associate Solicitor, Indian Affairs, Department of the Interior ("Fredericks

Memo.") at 3 (Sept. 15, 1978)).  The Associate Solicitor explained that:

> The intent of Congress [in ANCSA] to permanently remove all Native lands in
> Alaska from trust status is unmistakable.  The declaration of policy states that "the
> settlement should be accomplished . . . without creating a reservation system or
> lengthy wardship or trusteeship, and without adding to the categories of property and

institutions enjoying special tax privileges . . . ."  43 U.S.C. § 1601(b).

In analyzing the declaration of policy, the Senate Report stated: "A major purpose of this Committee and the Congress is to avoid perpetuating in Alaska the reservation and the trustee system."  S. Rep. No. 405, 92[nd] Cong., 1st Sess. (1971) at 108. This theme was oft repeated in the floor debates. . . .

The structure and legislative history of Section 19 itself precludes the restoration of former reservations to trust status.  Section 19 revokes all reservations (except for Metlakatla) and directs that the land be conveyed to the ANSCA village corporation, not to the IRA entities.  It does not allow Natives to vote for continued trust status. . . .

Also significant is the repeal, in Section 704(a) of the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, of Section 2 of the Act of May 1, 1936, 49 Stat. 1250, 25 U.S.C. § 496, which . . . gave the Secretary the authority to designate certain lands in Alaska as Indian reservations. . . .

In conclusion, Congress intended permanently to remove from trust status all Native land in Alaska except allotments and the Annette Island Reserve.

*Id.* at 1–3; *see also* Sansonetti Memo. at 112 n.276, AR 246 ("In 1978, the Acting Solicitor accepted the conclusion of the Associate Solicitor, Division of Indian Affairs, that although § 5 of the IRA, 25 U.S.C. § 465 (authority to acquire lands in trust for Indians), was not repealed with respect to Alaska, in light of the clear expression of congressional intent in ANCSA not to create trusteeship or a reservation system, it would be an abuse of discretion for the Secretary to acquire lands in trust in Alaska for the Natives of Venetie and Arctic Village.")).

When the final land-into-trust regulation was published in 1980, its preamble noted that, during the notice-and-comment period "[i]t was . . . pointed out that the Alaska Native Claims Settlement Act does not contemplate the further acquisition of land in trust status, or the holding of land in such status, in the State of Alaska, with the exception of acquisitions for the Metlakatla Indian Community."  Land Acquisitions, 45 Fed. Reg. 62,034, 62,034 (Sept. 18, 1980).  "[C]onsequently a sentence [was] added . . . to specify that the regulations do not apply,

except for Metlakatla, in the State of Alaska." *Id.*  That sentence, which is the subject of this litigation, reads as follows: "These regulations do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or it[s] members." *Id.* at 62,036 (presently codified at 25 C.F.R. § 151.1).  The court will refer to this provision as the "Alaska exception," as its effect is disputed here.

In 1994, three tribes of Alaska Natives petitioned the Secretary to revise the land-into-trust regulations to "include within [their] scope all federally recognized Alaska Native tribes." AR 275 (Petition for Rulemaking at 1 (Oct. 11, 1994)).  The Secretary put that petition out for notice and comment, describing it as a request that the Secretary "remove the portion of the existing regulation that prohibits the acquisition of land in trust status in the State of Alaska for Alaska Native villages other than Metlakatla."  Land Acquisitions, 60 Fed. Reg. 1,956, 1,956 (Jan. 5, 1995).

Although the Secretary proposed a revision to the land-into-trust regulation in 1999, he noted that "[t]he proposed regulations would . . . continue the bar against taking Native land in Alaska in trust."  Acquisition of Title to Land in Trust, 64 Fed. Reg. 17,574, 17,578 (Apr. 12, 1999).  The Secretary explained that, "[t]he regulatory bar to acquisition of title in trust in Alaska in the original version of these regulations was predicated on an opinion of the Associate Solicitor, Indian Affairs . . . which concluded that the Alaska Native Claims Settlement Act (ANCSA) precluded the Secretary from taking land into trust for Natives in Alaska (again, except for Metlakatla).  Although that opinion has not been withdrawn or overruled, we recognize that there is a credible legal argument that ANCSA did not supersede the Secretary's authority to take land into trust in Alaska under the IRA."  *Id.* at 17,577–78 (citations omitted).

The Secretary noted that "if land were taken in trust by the Secretary, such trust land then would qualify as Indian country and an Alaskan tribe would have all the powers that pertain within Indian country" and invited "comment on the continued validity of the Associate Solicitor's opinion and issues raised by the petition noticed at 60 FR 1956 (1995)."  *Id.* at 17,578.

In 2001, the Secretary published a final rule and his Solicitor withdrew the Associate Solicitor's opinion.  The Solicitor announced that although "the Associate Solicitor for Indian Affairs concluded that the Alaska Native Claims Settlement Act (ANCSA) precludes the Secretary from taking land in trust for Alaska Natives except for members of the Metlakatla Indian Community. . . .  I have concluded that there is substantial doubt about the validity of the conclusion reached in the 1978 Opinion."  AR 619 (Memorandum from John Leshy, Solicitor, Department of the Interior ("Leshy Memo.") at 1 (Jan. 16, 2001)).  The Solicitor explained his conclusion as follows:

> Among other things, the Associate Solicitor found "significant" that in 1976 Congress repealed section 2 of the Indian Reorganization Act (IRA).  That section had extended certain provisions of the IRA to Alaska, and had given the Secretary the authority to designate certain lands in Alaska as Indian reservations.  *See* U.S.C. § 704(a), 90 Stat. 2743, repealing 49 Stat. 1250, 25 U.S.C. 496.  The 1978 Opinion gave little weight to the fact that Congress had not repealed section 5 of the IRA, which is the generic authority by which the Secretary takes Indian land into trust, and which Congress expressly extended to Alaska in 1936.  *See* 25 U.S.C. § 473a.  The failure of Congress to repeal that section, when it was repealing others affecting Indian status in Alaska, five years after Congress enacted the Alaska Native Claims Settlement Act in 1971, raises a serious question as to whether the authority to take land in trust in Alaska still exists. . . .

> Because of my substantial doubt about the validity of the conclusion in the 1978 Opinion, and in order to clear the record so as not to encumber future discussions over whether the Secretary can, as a matter of law, and should, as a matter of policy, consider taking Native land in Alaska into trust, I am hereby rescinding the Associate Solicitor's 1978 Opinion.

Leshy Memo. at 1–2, AR 619–20.  Although that opinion was withdrawn, the "Department . . . ,

in its final Part 151 regulations . . . decided in its sound discretion to continue in place the bar against taking Native land in Alaska into trust (other than Metlakatla)." AR 620. The preamble to the revised regulation announced that,

> the position of the Department has long been, as a matter of law and policy, that Alaska Native lands ought not to be taken in trust. Therefore, the Department has determined that the prohibition in the existing regulations on taking Alaska lands into trust (other than Metlakatla) ought to remain in place for a period of three years during which time the Department will consider the legal and policy issues involved in determining whether the Department ought to remove the prohibition on taking Alaska lands into trust. If the Department determines that the prohibition on taking lands into trust in Alaska should be lifted, notice and comment will be provided.

Acquisition of Title to Land in Trust, 66 Fed. Reg. 3,452, 3,454 (Jan. 16, 2001). The revised regulation amended the "prohibition on taking Alaska lands into trust," *id.*, to read, "We will not accept title to land in trust in the State of Alaska, except for the Metlakatla Indian Community of the Annette Island reserve of Alaska or its members," *id.* at 3,460 (to be codified at 25 C.F.R. § 151.3(c)). In proposing a nearly-identical amendment, the Secretary had explained that the revised language "would make no change in the current regulations and would continue the bar against taking Native land in Alaska in trust." Acquisition of Title to Land in Trust, 64 Fed. Reg. at 17,578.

After delaying its effectiveness several times, the Secretary withdrew the revised land-into-trust rule later that same year. *See* Acquisition of Title to Land in Trust, 66 Fed. Reg. 56,608, 56, 609 (Nov. 9, 2001). This suit followed.

## II.  LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and the "complaint, properly read . . . presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *accord Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  The district court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously," *Rempfer*, 583 F.3d at 865, "or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or another statutory standard.

## III.  ANALYSIS

### A.  Statutory Authority to Take Alaska Land Into Trust

Despite the length and complexity of the history recounted above, the legal questions in this case are relatively straightforward.  The first question is whether the Secretary still possesses the statutory authority to take land into trust for the benefit of Alaska Natives outside of Metlakatla.[1]  Alaska land-into-trust authority was conferred in 1936, Act of May 1, 1936, § 1,

---

[1]  The State of Alaska suggests, but does not squarely argue, that there is a prior question: whether the statute of limitations bars this action.  The Administrative Procedure Act authorizes review of "final agency action," 5 U.S.C. § 704, and "carries a six year statute of limitations," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1094 (D.C. Cir. 1996).  There is no dispute that the Secretary's publication and withdrawal of the revised land-into-trust regulations both constitute final agency action; this suit was filed within six years of those final actions. When an agency, "by some new promulgation creates the opportunity for renewed comment and

49 Stat. 1250 (codified at 25 U.S.C. § 473a), along with the authority to create Alaska

reservations, *id.* § 2, 49 Stat. 1250–51. The reservation authority was repealed by FLPMA in

1976, *see* FLPMA § 704(a), 90 Stat. 2792, but the land-into-trust authority has not been

explicitly repealed. And unlike some other claims settlement acts, ANCSA did not explicitly

revoke the Secretary's land-into-trust authority. *Cf.* Maine Indian Claims Settlement Act of

1980, Pub. L. No. 96-420, § 5(e), 94 Stat. 1785, 1791 (codified at 25 U.S.C. § 1724(e)) ("Except

for the provisions of this subchapter, the United States shall have no other authority to acquire

lands or natural resources in trust for the benefit of Indians or Indian nations, or tribes, or bands

of Indians in the State of Maine.").

     The plaintiffs argue that, absent the explicit repeal of the Secretary's Alaska land-into-

trust authority—either by an amendment to the 1936 Act or a provision of the sort found in the

Maine Claims Settlement Act—that authority should be understood to have survived ANCSA.

After many ambiguous pronouncements and years of internal debate, the Secretary now agrees.

*Compare* Fredericks Memo. at 3, AR 3 ("Congress intended permanently to remove from trust

status all Native land in Alaska except allotments and the Annette Island Reserve.") *and* Leshy

---

objection, affected parties may seek judicial review, even when the agency decides not to amend
the long-standing rule at issue." *P & V Enterps. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021,
1024 (D.C. Cir. 2008) (quoting *Gen. Motors Corp. v. EPA*, 363 F.3d 442, 449–50 (D.C. Cir.
2004) (internal quotation marks omitted)). The Secretary requested comment on a petition to
remove the Alaska exception and "determined that the prohibition in the existing regulations on
taking Alaska lands into trust (other than Metlakatla) ought to remain in place" pending further
consideration. Acquisition of Title to Land in Trust, 66 Fed. Reg. at 3,454. This determination
was unaffected by the withdrawal of the revised land-into-trust regulation, which similarly left
the Alaska exception in place. "[B]ecause 'the agency opened the issue up anew,' and then
'reexamined . . . and reaffirmed its [prior] decision,'" *P & V Enterps.*, 516 F.3d at 1023 (quoting
*Pub. Citizen v. Nuclear Reg. Comm'n*, 901 F.2d 147, 150–51 (D.C. Cir. 1990) (all but first
alteration in original)), a timely challenge to the Secretary's reaffirmation of the Alaska
exception is not barred by the statute of limitations.

Memo. at 1, AR 619 (concluding that there is "a serious question as to whether the authority to take land in trust in Alaska still exists") *with* Defs.' Reply [Dkt. #67] at 1–2 (arguing that "the Secretary . . . has discretionary authority to take Indian lands into trust status in the State of Alaska" and that ANCSA and FLPMA "have not removed the Secretary's discretionary authority to take Indian lands into trust status in the State of Alaska").  Although "[t]he Secretary is not estopped from changing a view she believes to have been grounded upon a mistaken legal interpretation," the Supreme Court has held that "the consistency of an agency's position is a factor in assessing the weight that position is due." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993); *see also United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the . . . agency's . . . consistency . . . .") (footnote omitted).  "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).  For that reason, the court will accord the Secretary's views on the question of his statutory authority only "the weight derived from their 'power to persuade.'" *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001) (quoting, among other things, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The State of Alaska takes the position that the Claims Settlement Act implicitly repealed the Secretary's statutory authority to take Alaska land into trust outside of Metlakatla.  "While a later enacted statute . . . can sometimes operate to amend or even repeal an earlier statutory provision . . . 'repeals by implication are not favored' and will not be presumed unless the

'intention of the legislature to repeal [is] clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)) (brackets in original).  Because of this "cardinal rule" of statutory construction, *Morton v. Mancari*, 417 U.S. 535, 549 (1974) (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)), a court "will not infer a statutory repeal 'unless the later statute "expressly contradict[s] the original act"' or unless such a construction 'is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all,'" *Nat'l Ass'n of Home Builders*, 551 U.S. at 662 (quoting *Traynor v. Turnage*, 485 U.S. 535, 548 (1988), which quotes *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976), which in turn quotes THEODORE SEDGWICK, THE INTERPRETATION AND CONSTRUCTION OF STATUTORY AND CONSTITUTIONAL LAW 98 (2d ed. 1874)) (alterations in original); *see also Hunter v. FERC*, 2013 WL 1003666, at *5 (D.C. Cir. Mar. 15, 2013) (noting the "strong presumption against implied repeals"); *Fogg v. Gonzales*, 492 F.3d 447, 453 (D.C. Cir. 2007) (applying the "interpretive norm against implied repeals").

The State points first to ANCSA's extinguishment of "[a]ll claims against the United States, the State [of Alaska], and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land . . .  or that are based on any statute or treaty of the United States relating to Native use and occupancy."  ANCSA, § 4(c) (codified at 43 U.S.C. § 1603(c)).  If a petition to have Alaska land taken into trust is indeed such a "claim," then ANCSA forecloses the Secretary's authority to grant it.  But, as the plaintiffs argue,[2] petitions to have land taken into

---

[2]  Because the Secretary filed the reply brief on his motion for summary judgment before the State was granted intervention, his arguments are often not directly responsive to those made by the State.  For that reason, the court will make more frequent reference to the plaintiffs' views on the question of the Secretary's statutory authority, taking care of course to note the Secretary's views where appropriate, and to accord those views the weight that they are due.

trust are not "claims," because to grant or deny those petitions is within the discretion of the

Secretary, *see* 25 U.S.C. § 465, and a "claim" is necessarily an assertion of right, *see Orenberg v.*

*Thecker*, 143 F.2d 375, 377 n.6 (D.C. Cir. 1944) ("'Claim,' in its primary meaning, is used to

indicate the assertion of an *existing right*.  In its secondary meaning, it may be used to indicate

the right itself.") (internal quotation marks omitted); BLACK'S LAW DICTIONARY 281–82 (9th ed.

2009) (defining "claim" as "[t]he assertion of an existing right").  Evidence from the legislative

history of ANCSA indicates that Congress understood the word in this way.[3]  And that the

Claims Settlement Act speaks of "claims *against* the United States, the State [of Alaska], and all

other persons," ANCSA, § 4(c) (codified at 43 U.S.C. § 1603(c)) (emphasis added), strengthens

the conclusion by emphasizing that a claim is necessarily adverse to the interests of another

party.  Moreover, the fact that ANCSA included a separate, explicit provision repealing the

Allotment Act, *see id.* § 18(a) (codified at 43 U.S.C. § 1617(a)), which would have been

unnecessary if Congress understood ANCSA § 4(c) to "extinguish *all* claims by Alaska Natives,

as Alaska Natives, to land in Alaska, whether the claim originated from aboriginal title . . . or

was based on a statutory property right," as the State has argued, Defs.' Mot. [Dkt. # 76] at 26,

suggests that Congress did not understand ANCSA's extinguishment of claims to sweep as

broadly as the State would have it.  (The subsequent, explicit repeal of the Townsite Act and

section 2 of the 1936 Act, *see* FLMPA, § 704(a), 90 Stat. 2792, would have been similarly

---

[3]  *See, e.g.*, H.R. Rep. No. 92-523, at 5 (1971) ("The $925,000,000 figure is . . . not intended to be related to the value of the lands claimed by the Natives under the doctrine of aboriginal title. . . .  The lands claimed by the Natives are claimed in separate parcels by these many different groups.  The validity of the Native claims has not been determined, and it is not practical to determine them.  The Committee recognizes, however, that the Natives do have valid claims to some lands, undetermined in quantity and in value.")

redundant under the State's interpretation.)  And, finally, the State's position would require the court to conclude that ANCSA eliminated the Secretary's authority to take land in trust for the benefit of Metlakatla Indians, whose land claims were extinguished along with all other claims by Alaska Natives.  If a petition to have land taken into trust is, as the State argues, a "claim[ ] against the United States . . . based on [a] statute or treaty of the United States relating to Native use and occupancy,"  ANCSA, § 4(c) (codified at 43 U.S.C. § 1603(c)), then Metlakatlans are barred from submitting such petitions.  But not even the State believes that that is true.

The State does not argue with any particular force that petitions to have land taken into trust are "claims" within the usual meaning of that word, and the court concludes that, because they are not, the Secretary's authority to consider them is unaffected by ANCSA § 4(c).

The State turns to ANCSA's declaration of congressional purpose, which indicates that "the settlement should be accomplished . . . without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges."  *Id.* § 2(b) (codified at 43 U.S.C. § 1601(b)).  To that end, ANCSA lands were conveyed to village and to regional corporations in fee simple.  *See Venetie*, 522 U.S. at 524.  Alaska Native tribes received neither land nor money in the settlement, which disestablished all reservations except for Metlakatla.  *See* ANCSA, § 19(a) (codified at 43 U.S.C. § 1618(a)).  For the Secretary to now take trust title on behalf of Alaska Natives would, the State argues, create precisely the "lengthy . . . trusteeship" that ANCSA was designed to avoid.  The State argues from both the structure of ANCSA, which converted large tracts of trust land into fee simple ownership while creating no new trust land,  and the intention of its drafters and

proponents,[4] many of whom associated trust land with paternalism and dependency,[5] to the

conclusion that the Claims Settlement Act necessarily prevents the Secretary from taking

additional Alaska land into trust.[6]

This statement of purpose could only effect an implicit repeal if it was in "irreconcilable

conflict" with the Secretary's land-into-trust authority, *Branch v. Smith*, 538 U.S. 254, 273

(2003) (quoting *Posadas*, 296 U.S. at 503), or to infer a repeal of that authority was "absolutely

necessary in order that the words of the later statute shall have any meaning at all," *Nat'l Ass'n*

*of Home Builders*, 551 U.S. at 662 (brackets, ellipses, and internal quotation marks omitted).

Although the Claims Settlement Act "sought to end the sort of federal supervision over Indian

affairs that had previously marked federal Indian policy," *Venetie*, 522 U.S. at 523–24, the terms

of the settlement are "capable of co-existence" with the power to take Alaska land into trust, *see*

---

[4] *See, e.g.*, S. Rep. No. 92-405, at 108 (1971) ("A major purpose of this Committee and the Congress is to avoid perpetuating in Alaska the reservation and the trustee system. . . .").

[5] *See, e.g.*, *A Bill to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes*: *Hearing Before the S. Comm. on Interior and Insular Affairs*, 91st Cong. 115 (1969) (statement of Emil Notti, President, Alaska Federation of Natives) ("We have been treated as 'wards' for many years.  We have not profited by the 'wardship'; we are humiliated by the very concept which assumes that we are something less than other citizens . . . ."); *A Bill to Authorize the Secretary of the Interior to Grant Certain Lands to Alaska Natives, Settle Alaska Native Land Claims, and for Other Purposes: Hearings Before the S. Comm. on Interior and Insular Affairs*, 90th Cong. 33 (1968) (statement of Emil Notti, President, Alaska Federation of Natives) ("Controls by federal agencies over the resources and lives of native people in Alaska ha[ve] not met with any success . . . . [T]here is a strong feeling among the native people in Alaska, that they want to have control of their own destiny."); *id.* at 89–90 (statement of Barry Jackson) ("[T]he natives in Alaska are very vehemently antireservation and they have never been in favor of reservations and are not today. . . .  Now, we also are trying to get away from the B[ureau of ]I[ndian ]A[ffairs], frankly, and from the Secretary of the Interior . . . .").

[6] The State posits that Congress emphasized the purpose of ANCSA when it subsequently revoked the Secretary's authority to create reservations and approve new allotment applications.  *See* FLMPA, § 704(a), 90 Stat. 2792.

*Traynor*, 485 U.S. at 548 ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).   There may be a tension between ANCSA's elimination of most trust property in Alaska[7] and the Secretary's authority to create new trust land, but a tension is not an "irreconcilable conflict."[8]   It is perfectly possible for land claims to be settled by transferring land and money to tribal corporations, while the Secretary retains the discretion—but not the obligation—to take additional lands (or, perhaps, those same transferred lands) into trust.   Although ANCSA instructed that "the settlement should be accomplished . . . without creating a . . . lengthy . . . trusteeship," ANCSA, § 2(b) (codified at 43 U.S.C. § 1601(b)), the fact that the settlement would not create a trusteeship does not necessarily mean that it prohibits the creation of any trusteeship outside of the settlement.   Because it is possible to give effect to both ANCSA and the statute giving the Secretary land-into-trust authority in Alaska, it is the court's obligation to do so.[9]

---

[7]   But not all trust land.   The Annette Island Reserve and three cannery properties remain in trust, and title to allotments and townsite properties is still restricted.

[8]   Moreover, the Secretary could negotiate some of this tension by considering any "acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments," as his regulations require him to do when state or local governments raise those concerns.   25 C.F.R. § 151.11(d).

[9]   The State also argues that ANCSA should be read to repeal the Alaska land-into-trust authority because it is both more recent and more specific than the land-into-trust statute.   But the canons that "recent enactments should be favored over older ones[,] and specific statutory provisions should prevail over general ones . . . . apply only in the face of 'irreconcilably conflicting statutes.'" *Detweiler v. Pena*, 38 F.3d 591, 594 (D.C. Cir. 1994) (quoting *Watt*, 451 U.S. at 266).   As discussed above, there is no irreconcilable conflict here.   For the same reason, ANCSA's savings clause—which provides that, in case of "a conflict between any provision of this Act and any other Federal laws applicable to Alaska, the provisions of this Act shall

The text of ANCSA and its structure, read alongside FLPMA, suggest that the Secretary retains the authority to take Alaska land into trust.  Congress explicitly—and, on the State's view, redundantly—repealed the Allotment Act, the Townsite Act, and, the Secretary's authority to establish reservations in Alaska.  Congress did not explicitly eliminate the grant of authority to take Alaska land into trust.  If the Secretary's authority to take land into trust had been implicitly repealed, it would follow that his authority to establish reservations was repealed by an even stronger implication.  But Congress felt the need to explicitly repeal the Secretary's reservation authority in FLPMA.  And the simple fact that the statute conferring land-into-trust authority in Alaska survives is a strong indication that the Secretary's authority to take Alaska land into trust also survives.[10]

From the weight of the textual and structural evidence, and the strength of the presumption against implicit repeals, the court concludes that ANCSA left intact the Secretary's authority to take land into trust throughout Alaska and turns to the effect and legality of his land-

---

govern," ANCSA, § 26, (codified at 43 U.S.C. § 1601 note)—does not help the State.

[10]   The leading treatise on Indian law agrees.  *See* COHEN'S HANDBOOK § 4.07[3][d][i], at 353 n.551 ("The Secretary of the Interior's authority to take land in trust for Alaska tribes under the IRA remains intact, 25 U.S.C. § 473a, although Secretarial authority to proclaim new reservations was repealed in the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 704(a) . . . .").  The Secretary endorses this argument here, and has previously made note of it.  *See* Acquisition of Title to Land in Trust, 66 Fed. Reg. at 3,454.  *See also Connecticut ex rel. Blumenthal v. United States*, 228 F.3d 82, 90 (2d Cir. 2000) ("We . . . find in the Maine Settlement Act an obvious demonstration that Congress knew how to prohibit the Secretary from taking into trust any lands outside of specifically designated settlement lands.  The absence of an analogous provision in the Settlement Act at issue in this case confirms that the Settlement Act was not meant to eliminate the Secretary's power under the IRA to take land purchased without settlement funds into trust for the benefit of the Tribe.").

into-trust regulations.[11]

## B.  Regulatory Authority

### i.  Effect of 25 C.F.R. § 151.1

The land-into-trust regulations state that they "do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or it[s] members." 25 C.F.R. § 151.1.  The Secretary argues[12] that this Alaska exception does not prohibit him from exercising his discretionary authority to take Alaska land into trust outside of Metlakatla, but only bars him from doing so by means of the regulations that he has promulgated.  On the Secretary's account, the Alaska exception means precisely what it says, and the court should not interpret "do not cover" to mean anything more than that.  Yet he also admits that "there are no procedures in place that would allow the Secretary to consider . . . a request" to take Alaska lands into trust, Defs.' Supplemental Br. [Dkt. #101] at 11, and suggests that he would only consider such a request if regulations were "amended or promulgated to provide a process and decisional criteria for the exercise of the discretion to acquire land in trust for Alaska Natives," *id.* at 10.

The court "owe[s] the Secretary 'substantial deference'" for his interpretation of his own regulation.  *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 311 (D.C. Cir. 2001)

---

[11]  The plaintiffs also argue that the court should construe the Claims Settlement Act "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).  But, after applying the presumption against implied repeals, the court has no need to invoke that additional canon.

[12]  The State's arguments regarding the land-into-trust regulations all presuppose that the Secretary's statutory authority to make such acquisitions was largely removed by ANCSA. Because the court has reached to opposite conclusion, it will make no further reference to the State's arguments.

(quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).  To adopt his reading, the court "need not find that the agency's construction is the only possible one, or even the one that the court would have adopted in the first instance." *Id.* (quoting *Wyo. Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999)); *see also Thomas Jefferson*, 512 U.S. at 512 ("Our task is not to decide which among several competing interpretations best serves the regulatory purpose.").  Instead, the court must "give the agency's interpretation 'controlling weight,'" *Tozzi*, 271 F.3d at 311 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)), "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation,'" *id.* (quoting *Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 136 F.3d 819, 822 (D.C. Cir. 1998)) (internal quotation marks and citation omitted in original); *accord Thomas Jefferson*, 512 U.S. at 512; *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988).

The mere fact that "the Secretary's interpretation" of a regulation is first announced "in the form of a legal brief . . . does not . . . make it unworthy of deference." *Auer v. Robbins*, 519 U.S. 452, 462 (1997); *see also Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 (D.C. Cir. 1997) ("The mere fact that an agency offers its interpretation in the course of litigation does not automatically preclude deference to the agency.").  As the D.C. Circuit has explained, "[t]here are at least three preconditions for applying this so-called *Auer* deference." *Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002).  One precondition is that "there must be 'no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" *Id.* (quoting *Auer*, 519 U.S. at 462); *see also Bigelow v. Dep't of Defense*, 217 F.3d

875, 878 (D.C. Cir. 2000).  "In conducting this inquiry," a court must "consider whether the

agency has 'ever adopted a different interpretation of the regulation or contradicted its [current]

position . . . .'" *Drake*, 291 F.3d at 69 (quoting *Nat'l Wildlife*, 127 F.3d at 1129).

When the Secretary promulgated 25 C.F.R. § 151.1, he explained that the Alaska

exception had been added to the regulation after it was "pointed out that the Alaska Native

Claims Settlement Act does not contemplate the further acquisition of land in trust status, or the

holding of land in such status, in the State of Alaska, with the exception of acquisitions for the

Metlakatla Indian Community."  Land Acquisitions, 45 Fed. Reg. at 62,034.  Since that time, he

has said that "the current . . . regulations bar the acquisition of trust title in land in Alaska, unless

an application for such acquisition is presented by the Metlakatla Indian Community or one of its

members."  Acquisition of Title to Land in Trust, 64 Fed. Reg. at 17,577; *see also* Acquisition of

Title to Land in Trust, 66 Fed. Reg. at 3,454 (discussing "the bar in the existing regulations to

the acquisition of trust title in land in Alaska (other than for the Metlakatla Indian Community or

its members)").  He has also referred to this bar as a "prohibition."  Acquisition of Title to Land

in Trust, 66 Fed. Reg. at 3,454 (discussing "the prohibition in the existing regulations on taking

Alaska lands into trust (other than Metlakatla)"); *see also* Land Acquisitions, 60 Fed. Reg. at

1,956 (referring to 25 C.F.R. § 151.1 as "the portion of the existing regulation that prohibits the

acquisition of land in trust status in the State of Alaska for Alaska Native villages other than

Metlakatla").  Finally, when the Secretary promulgated the revised (and since withdrawn) land-

into-trust regulations, he amended the Alaska exception to read, "We will not accept title to land

in trust in the state of Alaska, except for the Metlakatla Indian Community of the Annette Island

reserve of Alaska or its members."  Acquisition of Title to Land in Trust, 66 Fed. Reg. at 3,460

(to be codified at 25 C.F.R. § 151.3(c)).  In proposing the revision, he explained that this new language "would make no change in the current regulations."  Acquisition of Title to Land in Trust, 64 Fed. Reg. at 17,578.

The position that the Secretary has taken here—that the Alaska exception does not prohibit him from taking Alaska land into trust outside of Metlakatla—is contradicted both by evidence of his understanding at the time that the exception was promulgated, and by his own repeated descriptions of the exception as a "bar" or a "prohibition."  In these circumstances, the court cannot defer to the Secretary's interpretation.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

The Alaska exception represents the Secretary's considered judgment that he will not take Alaska land into trust outside of Metlakatla, as his repeated characterizations and the withdrawn regulation make clear. Whether this judgment can be accurately described as a "bar" is, finally, beside the point.  The question is whether it is legally valid.

### ii.  Legality of 25 C.F.R. § 151.1

The plaintiffs argue that the Alaska exception is "not in accordance with law," 5 U.S.C. § 706(2)(A), because it violates 25 U.S.C. § 476(g), which provides:

> Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

25 U.S.C. § 476(g).  The plaintiffs' argument is straightforward: the Alaska exception is a regulation that diminishes the privileges of non-Metlakatlan Alaska Natives relative to all other

Indian tribes, by providing that the Secretary will not consider their petitions to have land taken into trust.  It is therefore void by the plain text of 25 U.S.C. § 476(g).

The Secretary makes two attempts to counter this argument.  First, he notes that 25 U.S.C. § 476(g) was enacted in response to congressional disapproval of the Secretary's interpretation of Section 16 of the Indian Reorganization Act, which concerns tribal elections, and not in response to any concerns over Section 5, which provides the general grant of land-into-trust authority.  *See* 140 Cong. Rec. 11,234 (1994) (statement of Sen. John McCain) ("The purpose of the amendment is to clarify that section 16 of the Indian Reorganization Act was not intended to authorize the Secretary of the Department of the Interior to create categories of federally recognized Indian tribes.").  That is true enough, but 25 U.S.C. § 476(g) plainly applies to "[a]ny regulation" that violates its prohibition.  Congress commonly enacts statutes that address more than the precise concern that gave rise to them, and courts should "not resort to legislative history to cloud a statutory text that is clear."  *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994); *accord Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.").  Nothing in the text of 25 U.S.C. § 476(g) suggests that it is limited in the way that the Secretary suggests, and the court will not read such a limitation into the statute.

The Secretary's second argument is that 25 U.S.C. § 476(g) only prohibits discrimination between "similarly situated" tribes, and, Alaska Natives are not "similarly situated" to any other tribes because of the Claims Settlement Act.  But "similarly situated" appears nowhere in the statutory text, and the Secretary cannot invent a limitation on the statute any more than he could import one from the public statements of individual legislators.  "[W]here, as here, the statute's

language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enterps., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *Hercules Inc. v. EPA*, 938 F.2d 276, 281 (D.C. Cir. 1991) (same).

The Secretary does not deny that his regulation diminishes the privileges available to tribes of Alaska Natives (except for the Metlakatlans) relative to the "privileges . . . available to all other federally recognized tribes by virtue of their status as Indian tribes." 25 U.S.C. § 476(g). Instead he asks the court to adopt limiting constructions that have no basis in the statutory text. But a law "is not susceptible to a limiting construction" when "its language is plain and its meaning unambiguous." *City of Houston v. Hill*, 482 U.S. 451, 468 (1987). The Secretary offers no other arguments, and the challenged regulation shall therefore "have no force or effect." 25 U.S.C. § 476(g).

The court will order briefing as to the scope of the remedy in this case: whether it is only the Alaska exception that is deprived of "force or effect," or whether some larger portion of the land-into-trust regulation must fall.

## IV. CONCLUSION

For the reasons set out above, the plaintiffs' motions for summary judgment will be granted, and the State's and the Secretary's motions will be denied. An order for additional briefing on the question of the appropriate remedy will follow.

Rudolph Contreras
United States District Judge

Date: March 31, 2013

25